EXHIBIT A

# Yorkville Advisors Management, LLC

*101 Hudson Street*
*Suite 3700*
*Jersey City, NJ 07302*
*Tel: (201) 985-8300*
*Fax: (201) 985-8266*

November 1, 2004

Mr. Adam Gottbetter
HH Advisors, LLC
488 Madison Avenue, 12th Floor
New York, NY 10022

Dear Mr. Gottbetter:

This letter agreement ("Agreement") will confirm our understanding of the engagement of HH Advisors, LLC, and its permitted successors and assigns as co-Portfolio Manager (the "Co-Manager") by Yorkville Advisors Management, LLC, and its successors and assigns (the "Company"). All investment decisions of the Co-Manager shall be made exclusively by Mr. Gottbetter. This Agreement supersedes any description or statement contained in any agreement or offering document used in connection with the Funds entered into or dated prior to the date hereof.

1. **Scope.** This engagement shall commence on November 1, 2004. Your primary duties will consist of co-managing Highgate House Funds, Ltd. (the "US Feeder Fund"), Highgate House Global, Ltd. (the "Offshore Feeder Fund") and Highgate House US, LP (the "Master Fund"; which together with the US Feeder Fund and the Offshore Feeder Fund are referred to as the "Funds") on behalf of the Company, subject to the direction and authority of the Company, which will make investments in the form of purchases by the Funds, including, but not limited to, PIPE's, convertible and preferred securities and stock swaps (each an "Investment") into entities in which any of the Funds invests (an "Issuer"). In performing the duties hereunder, the Co-Manager and Mr. Gottbetter shall jointly and severely owe a fiduciary duty to the Funds and the Company and, in that regard, shall owe a duty of trust, utmost loyalty and good faith to the Funds and the Company. Your duties with respect to the Funds, shall also include, without limitation, maintaining open communication with the Company, the investment research staff, and the marketing, sales and client servicing staff of the Company. The Company shall have sole, exclusive and absolute authority over all aspects of the Funds, including, without limitation, the right to approve or disapprove all investment decisions by the Co-Manager, to accept or reject new capital coming into any of the Funds, to open or close

the Funds with respect to new capital, return capital to any or all limited partners or equity holders in the Funds or to allocate new capital among any funds managed by the Company (even to the exclusion of the Funds), and the right to retain all professionals, such as legal counsel, accountants and others. The Co-Manager agrees that the Company and its legal department shall direct all legal work on behalf of the Funds. Any expenses or fees due to the Company's legal department shall be direct costs of the Funds and shall be in the amounts consistent with the Company's policies, as may be amended from time to time at its discretion.

## 2. Compensation.

(a) During your engagement, as compensation for all services to be performed by you under this Agreement, you shall be paid the "Payout Percentage" as defined in Section 2(a)(VII)) of the following fees and consideration (collectively, the "Compensation"). All fees and compensation payable in connection with an Investment or related to the Funds shall be paid exclusively to the Company.

(I)     In connection with each Investment, the Company shall pay to the Co-Manager an amount equal to the Payout Percentage of "Net Profits". "Net Profits" shall mean the difference between all revenue earned by the Company and its affiliate, Yorkville Advisors, LLC, in connection with an Investment made by the Funds, including, without limitation, cash, common stock, debentures, warrants, and/or any other security, from the Funds as defined and limited below, reduced by any and all expenses incurred by the Company or Yorkville Advisors, LLC with respect to the Funds. Revenue shall also include, without limitation, all management and other fees, including the 2% fixed management fee, the 20% incentive fee charged to the Funds and received by the Company or Yorkville Advisors, LLC with respect to the Funds. Expenses shall include, without limitation, all expenses and direct costs of the Funds and an allocation of overhead based on the relative size of the Funds compared to the other funds managed by the Company. The Company shall calculate Net Profits on a monthly basis and the Company shall pay the Co-Manager the Payout Percentage of the Net Profits periodically at the reasonable discretion of the Company at its reasonable discretion.

(II)    For the purposes of determining "Net Profits", revenue shall include all fees received by the Company for each Standby Equity Distribution Agreement ("SEDA") financing, arranged for each Issuer provided that such Issuer was originated by the Co-Manager and the Fund made an initial Investment in the Issuer.

(III)   In the event that another fund managed by the Company invests in an Issuer originated by the Co-Manager and in which any of the Funds make an Investment, then the fees that the Co-Manager is entitled to under Section 2(a)(II) above shall not be affected and no other co-manager of any fund

2

managed by the Company shall be entitled to share in the fees that the Co-Manager is entitled to receive under Section 2(a)(II).

(IV) For the purposes of determining "Net Profits," revenue shall include 50% of all Compensation received by the Company for each financing completed by Highgate House, LLC, and/or any other fund managed by the Company implementing the same investment structure (the "Minnesota Fund") originated by Bob Press (an "M&A Financing") regardless of which fund of the Company makes any additional investment. Each M&A Financing generated by the Co-Manager and not by Press will be subject to Section 2(a) (I), (II) and (III), as applicable, and Press will not have any participation in such Compensation.

*— 100% if AG originates*
*— 50% if Press originates*
*pre-expenses*

(V) *Profits in fund* Notwithstanding the foregoing, any fee due to a "Banker" which shall mean a person acting as a finder who introduces to either the Company or to any manager of any fund managed by the Company any entity that ultimately pays fees to the Company or to any fund managed by the Company incurred in connection with any investment by any of the Funds shall be paid by the Company from the gross fees generated by the Company and payable by the Issuer (before application of the Payout Percentage).

*Allocate overhead based on fund size*

(VI) *After expenses* The Co-Manager shall be entitled to a fee as a Banker equal to twenty percent (20%) of all fees earned by the Company on any business that the Co-Manager originates and which another fund managed by the Company invests but in which none of the Funds invests.

*Organizations*
*— Seward & Kissel*
*— Walker*
*— Matt*

(VII) For purposes of this Section 2, the "Payout Percentage" shall be forty percent (40%) through October 31, 2005. The Payout Percentage shall increase by one percent (1%) on each of November 1, 2005, 2006 and 2007 and by one and four tenths percent (1.4%) on November 1, 2008 so that on November 1, 2008, the Payout Percentage shall be forty-four and 4/10 percent (44.4%).

For the purposes of determining "Net Profits," revenue shall include an amount equal to forty-four and 4/10 percent (44.4%) of the Net Profit earned and collected by the Company for each and every exchange traded fund in the United Kingdom managed by Pearl Investment Management and its affiliates, successors or assigns.

*N/A*

(b) The Company shall provide the Co-Manager, or its accountants or agents (which costs shall be the sole responsibility of the Co-Manager and shall not be costs of the Funds or the Company), with reasonable opportunities to inspect the Company's books and records with respect to all Compensation subject to the Payout Percentage and the calculation of Net Profits. All payments in this section are subject to any required federal, state and local withholdings and such deductions as you may instruct the Company to make.

**3. Sale.** In the event of the sale of all or substantially all of the assets of the Company and/or the sale of all or substantially all of the equity interests of the Company (collectively, a "Sale Event") to a bona fide third party, then the Company shall pay an "Acquisition Payout" to the Co-Manager. The Acquisition Payout shall be equal to the product of the Vesting Percentage, multiplied by the Contribution Factor, multiplied by the Purchase Price for the Company, multiplied by a fraction, the numerator of which is the Net Profits for the previous twelve (12) month period and the denominator is the sum of the "net profits" for the previous twelve (12) month period for all the funds of the Company (with net profits calculated in the manner specified in Section 2(a)(I) except that such calculation shall include all funds managed or co-managed by the Company, including, without limitation, the Funds). The "Vesting Percentage" shall be equal to five percent (5%) from the date of this Agreement and shall increase to twenty percent (20%) effective as of November 1, 2006, then to forty percent (40%) effective as of November 1, 2008, and then to forty-four and 4/10 (44.4%) effective from and after November 1, 2010. The "Contribution Factor" shall be equal to eighty percent (80%) from the date of this Agreement, then increase to ninety percent (90%) effective as of November 1, 2006 and then to ninety-five percent (95%) from and after November 1, 2008. The Acquisition Payout shall be paid to the Co-Manager directly from the proceeds of such Sale Event.

**4. Termination.**

(a) This engagement shall automatically terminate if:

(i)     there is a sale of substantially all of the assets of the Funds as defined in Section 3 above; or

(ii)    if Mr. Gottbetter is unable to render the services and perform his duties hereunder because of illness, physical or mental disability, or other incapacity, for a period of twelve (12) consecutive weeks, or if Mr. Gottbetter contracts an illness or injury which permanently prevents him from performing the services provided for in this Agreement, or if Mr. Gottbetter dies during the term of this Agreement; or

(iii)   if Mr. Gottbetter resigns or the Co-Manager terminates the Agreement for any reason, excluding death or disability, or if there is a change in control of the equity ownership of the Co-Manager or if Mr. Gottbetter is no longer exclusively making the investment decisions on behalf of the Co-Manager or serving in capacity of the highest ranking executive officer of the Co-Manager or performing the duties commensurate with those of such office; or

(iv)    the Company terminates this Agreement at any time "without cause" or "for cause". As used herein, the term "for cause" shall mean: (A) Co-Manager's or Mr. Gottbetter's conviction of any crime (whether or not involving the Co-Manager) which constitutes a crime of moral turpitude or is punishable by imprisonment of one year or more; (B) any act or omission by Co-Manager or Mr. Gottbetter involving willful malfeasance

4

or gross negligence in the performance of its or his duties or responsibilities to the Company, or constituting a material breach of this Agreement; (C) Co-Manager or Mr. Gottbetter's omission or act constituting fraud or misrepresentation by the Co-Manager in connection with its or his duties hereunder, including, without limitation, civil or criminal violations of any state or federal securities laws; or (D) Co-Manager's or Gottbetter's willful failure or refusal to comply with the provisions of this Agreement or to perform its or his duties and obligations under this Agreement, in any material respect; or

(v)    the Company elects to terminate and dissolve the Funds for any reason other than a Sale Event.

(each, an event of "Termination"). Notice of Termination will be made upon ten (10) days prior written notice by either party to the other party prior to the effective date of such Termination, except upon the death of Mr. Gottbetter in which the date of death shall be the effective date ("Effective Date"). You acknowledge that in the event that you no longer serve as the Co-Manager of the Funds for any reason specified herein, except pursuant to Section 4(a)(i), that any Net Profits that you may be owed, and which have not previously been paid to you, shall be paid to the Co-Manager, or his estate as applicable, according to the Company's then existing policy regarding distributions.

(b)    In the event of Termination, the Company, in addition to the payment described in Section 4(a) above, shall pay the Co-Manager as applicable the following:

(i)    if pursuant to Section 4(a)(i), the Company shall pay the Co-Manager in accordance with the terms and conditions of Section 3 above; or

(ii)   if pursuant to Section 4(a)(ii), (iii), (iv) without cause and/or (v), the Co-Manager shall be entitled to the Payout Percentage of the Tail Profits (as defined herein) for a period of eighteen (18) months after the Effective Date of such termination. For the purposes of this Section, "Tail Profits" shall be equal to Net Profits but only with respect to any and all Investments made by (A) the Funds prior to the Effective Date of such termination, (B) the Funds after the Effective Date with Issuers in which the Funds had invested in prior to the Effective Date, and (C) any Standby Equity Distribution Agreements entered into after the Effective Date with Issuers in which the Funds had invested, or in which the Co-Manager had originated, prior to the Effective Date, provided, however, that Tail Profits shall exclude the 2% fixed management fee. Tail Profits shall exclude any Net Profits pursuant to Section 4(a) to which the Co-Manager is entitled before the Effective Date but has not yet received; or

(iii)  if pursuant to Section 4(a)(iv) for cause, the Co-Manager shall not be entitled to any Compensation or other amounts received by the Company on or after the date of termination (even if such fees relate to Investments

5

made by the Funds, or are originated by the Co-Manager or Mr. Gottbetter, prior to the Effective Date of such termination).

5. **Non-Compete.** During this engagement, except as set forth on Schedule 5 hereto,

(a) the Co-Manager, Mr. Gottbetter and their affiliates (as defined in Rule 144 promulgated under the Securities Act of 1933, as amended) (collectively, the "Restricted Persons") jointly and severely agree that they will not engage in any other business activity, without the prior written approval of the Company, except for the passive investment by a Restricted Person of family assets, and that the Restricted Persons will devote sufficient business time, attention, energy and best efforts to fulfilling the duties and responsibilities to the Company. The Restricted Persons agree that they shall not, directly or indirectly, (i) originate, facilitate, direct or otherwise assist anyone in obtaining financing (in whatever form, regardless of debt or equity) from any source other than a fund managed by the Company or its affiliates or (ii) discourage anyone from doing business with a fund managed by the Company or its affiliates or (iii) accept any compensation whatsoever in any form in connection with any financing transaction that is consummated by a fund managed by anyone other than the Company or its affiliates. The Restricted Persons shall not engage in any activity that unduly interferes with the performance of the duties hereunder or that is reasonably deemed by the Company to be harmful to the business, reputation or goodwill of the Company. Unless otherwise excluded herein or approved in writing by the Company, all earnings or revenues derived from any other activities will be turned over to the Company to be distributed in accordance with the Compensation terms of Section 2 of this Agreement, other than income derived from Restricted Persons' passive investments. The Co-Manager and Mr. Gottbetter shall acknowledge compliance with this paragraph on January 1 and July 1 of each year during the engagement, as well as any other time as may be requested by the Company.

(b) As part of the consideration for the benefits and consideration paid to you under this Agreement, you and Mr. Gottbetter agree that during the period of your engagement, and for a period of eighteen (18) months thereafter, you and Mr. Gottbetter will not, without the prior written consent of the Company, directly or indirectly (a) solicit or accept funds from any actual or prospective client of the Company or any limited partner, shareholder or investor of or in any of the Funds; or (b) encourage any such client, limited partner, shareholder or investor to terminate or reduce its business relationship with the Company or a Fund or withdraw any monies from a Fund or any other account managed for it by the Company

(c) As part of the consideration for the benefits and consideration paid to you under his Agreement, you and Mr. Gottbetter agree that during the engagement and for a period of eighteen (18) months thereafter, you and Mr. Gottbetter will not, without the prior written consent of the Company, or any reason, solicit, entice, induce, recruit, employ or associate with or engage in any business relationship with (whether as a partner, co-venture, employee, investor or otherwise) any person or entity (i) then currently engaged by the Company as an employee, advisor, analyst, consultant, or

6

representative, or (ii) who was engaged by the Company within the final twelve (12) months of the termination of the engagement, or (iii) who is or was engaged by any entity affiliated with the Company.

6. **Remedies.** You and Mr. Gottbetter agree that the provisions of Section 5 are reasonable and appropriate and will not cause substantial economic harm. You and Mr. Gottbetter further agree that if there is a breach or attempt to breach or violate those paragraphs as well as paragraphs 7(a) and 7(b), the Company (or any affiliate or related entity which is or may be harmed by such misconduct) will be irreparably harmed and monetary damages will not provide an adequate remedy. Accordingly, it is agreed that the Company (or any affiliate or related entity which is or may be harmed by such misconduct) may apply for and shall be entitled to temporary, preliminary and permanent injunctive relief in order to prevent the breach of these paragraphs or to specifically enforce the provisions of such paragraphs, and you and Mr. Gottbetter consent to the granting of such relief without the Company having to prove the inadequacy of the available remedies at law or actual damages and without the Company having to post any bond or other security; however, Mr. Gottbetter may assert any defense they may have regarding a lack of breach of these paragraphs. It is understood that any such injunctive remedy shall not be the exclusive remedy or waive any rights to seek other remedies at law or in equity. If at any time, a court or panel of arbitrators having jurisdiction over this Agreement shall determine that any of the subject matter or duration is unreasonable in any respect, it shall be reduced, and not terminated, as such court or panel of arbitrators determines may be reasonable. If, except with respect to the foregoing sentence, any provision or term of this Agreement is held to be invalid, prohibited or unenforceable for any reason, such provision or term shall be ineffective to the extent of such invalidity, prohibition or unenforceability, without invalidating the remaining provisions of this Agreement.

7. **Confidentiality.**

(a) During the course of this engagement the Restricted Persons will have access to information that is confidential and proprietary to the Company and its related entities and affiliates. Except in the performance of your obligations under this Agreement or with the prior written consent of the Company, the Restricted Persons agree that they will not at any time, during or after your engagement, disclose to any person or use for their benefit or the benefit of others, any such information obtained by a Restricted Person in the course of your engagement, including, without limitation, sensitive information regarding existing and potential limited partners, shareholders and investors in any fund or account established or managed by the Company (or any affiliate or related entity), the identity of portfolio companies of the Funds, performance information (or any component thereof) of the Company, work product developed and research conducted by the Company (or any affiliate or related entity) about investment opportunities and confidential information of or about the Company (or any affiliate or related entity) or the Funds. Notwithstanding the foregoing, the Co-Manager may during the term hereof discuss the performance of the Funds in connection with any discussions with a potential or actual Issuer. Following a Termination of this Agreement, the Co-Manager and any

7

Restricted Person may discuss the performance of the Funds during the time the Funds were managed by the Co-Manager.

(b) Each party hereto agrees that it will not at any time, during or after your engagement, disparage, criticize or ridicule the other party or make any negative public comments either by way of news interviews or the expression of your personal views, opinions or judgments to the media, to current or former officers, directors or employees of the other party or to any individuals or entities with whom the other party has or may have a business relationship.

(c) You and Mr. Gottbetter represent and warrant that they are not in breach of any agreement, obligation or duty requiring you to preserve the confidentiality of any information, client lists, trade secrets or other confidential information or any agreement not to compete or interfere with any prior or other employer, and that neither the execution of this letter nor the performance by of the obligations hereunder will conflict with, result in a breach of, or constitute a default under, any agreement to which you are a party or to which you may be subject.

8. **Limitation Of Liability; Conflicts Of Interest.**    The Co-Manager acknowledges that the Company manages other funds and intends to form and manage additional funds in the future. The management of such funds is likely to create actual and potential conflicts of interest between the Company and the Co-Manager, including, without limitation, the allocation of Investments in Issuers among such funds and raising capital for, or allocating capital among, all such funds (even to the exclusion of the Funds). The Company shall have no liability to the Co-Manager or Gottbetter or any of their affiliates whatsoever for exercising its absolute authority over the Funds as specified in Section 1 hereof or for any apparent or actual conflict of interest. Neither party shall be liable to the other for any incidental, indirect, special, consequential or punitive damages.

9. **Jurisdiction.**    This Agreement shall be governed by and construed in accordance with the laws of the State of New Jersey, without regard to principles of conflicts of laws.

10. **Arbitration.**    Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, or otherwise relating in any way to the terms and conditions of your engagement, including any statutory claim of discrimination, shall be settled by arbitration in New Jersey, administered by the American Arbitration Association under its commercial arbitration rules, and judgment on the award rendered by the arbitrators may be entered in any court having jurisdiction thereof. For injunctive relief, it is agreed that any court of competent jurisdiction may also entertain an application by either party. The parties further agree that no demand for punitive damages shall be made in any arbitration proceeding. Any award of the arbitrators shall be final and binding, subject only to such right of review that may lie under applicable law.

8

11. <u>Miscellaneous</u>.  This Agreement contains the entire understanding between the parties and supersedes all prior agreements, arrangements and understandings, whether written or oral.  You and Mr. Gottbetter acknowledge that you have not relied on any representations not contained in this Agreement.  This Agreement may not be changed orally, but only in writing signed by all parties.

We look forward to you joining forces with Yorkville Advisors Management and are confident it will be a mutually rewarding relationship.  Please indicate your understanding and acceptance of the foregoing by signing below and returning a copy of this Agreement of ten (10) pages to my attention.

*(Signature Page Immediately Follows)*

9

Very truly yours,

**YORKVILLE ADVISORS MANAGEMENT, LLC**

By:

Name:  Mark Angelo

Title:  Portfolio Manager

Accepted and agreed:

HH Advisors, LLC

By:

Name:  Adam Gottbetter, *PRESIDENT, SPENCER INVESTMENT GROUP, INC.*

Title:  Managing Member

Adam Gottbetter, as individual

Date:  11/4/04

10

## SCHEDULE "5"

The following activities and all fees, revenues and earnings derived by The Co-Manager and other Restricted Persons are specifically excluded from the scope of Section 3:

1. All legal fees of past, current and future clients of Gottbetter & Partners, LLP and/or Kaplan Gottbetter & Levenson, LLP. Adam S. Gottbetter may expressly continue to practice law as a partner of Gottbetter & Partners, LLP and its successor entities and assigns.

2. All non-legal fees of past, current and future clients of Jackson Steinem, Inc. and/or KGL Investments Ltd.

3. Consulting Agreement between Spencer Investment Group, Inc. and Swiss Overseas Finance Company Ltd. and its assigns, successors and/or affiliates, as amended and/or renewed.

4. Fee sharing agreements between Jackson Steinem, Inc. and Maximum Ventures, Inc. relating to all deals generated prior to November 1, 2004, including, but not limited to, NS8 Corporation, Vertical Buyer, Inc., AB Watley, Inc., Langley Investment Trust, Seaside Investment Trust, Roanoke Technology Corp., AuGRID Corp., Assure Energy, Inc., Jill Kelly Productions Holding, Inc., Maximum Media Ventures, Inc., Go West, Inc. and Scores Holdings Company, Inc.

5. Finder's Fee agreement between Jackson Steinem, Inc. and All American Plazas, Inc.

6. Fee sharing agreement between Jackson Steinem, Inc. and Fleming Capital Group, LLC and its assigns, successors and/or affiliates.

11

**EXHIBIT B**

## SECURITIES PURCHASE AGREEMENT

**THIS SECURITIES PURCHASE AGREEMENT** (this "Agreement"), dated as of November 16, 2005, by and among **CHARYS HOLDING COMPANY INC.**, a Delaware corporation (the "Company"), and Highgate House Funds, Ltd. (the "Buyer").

## WITNESSETH:

**WHEREAS**, the Company and the Buyer are executing and delivering this Agreement in reliance upon an exemption from securities registration pursuant to Section 4(2) and/or Rule 506 of Regulation D ("Regulation D") as promulgated by the U.S. Securities and Exchange Commission (the "SEC") under the Securities Act of 1933, as amended (the "Securities Act");

**WHEREAS**, the parties desire that, upon the terms and subject to the conditions contained herein, the Company shall issue and sell to the Buyer, as provided herein, and the Buyer shall purchase at the Closing (as defined below) (i) a Three Million Dollar ($3,000,000) secured convertible debenture (the "First Convertible Debenture"), which shall be convertible, unless redeemed by the Company before the expiration of one hundred twenty days from the Closing Date (as defined below) (the "Exclusive Redemption Date"), into shares of the Company's common stock, par value $0.001 (the "Common Stock") (as converted, the "Conversion Shares"), and (ii) warrants (the "First Warrants") to purchase an aggregate of 750,000 shares of Common Stock (the "First Warrant Shares"). The total purchase price for the First Convertible Debenture and the First Warrants shall be Three Million Dollars ($3,000,000), (the "First Purchase Price"); and

**WHEREAS**, at the Closing, the parties hereto shall execute and deliver a Registration Rights Agreement substantially in the form attached hereto as Exhibit A (the "Investor Registration Rights Agreement") pursuant to which the Company has agreed to provide certain registration rights under the Securities Act and the rules and regulations promulgated there under, and applicable state securities laws; and

**WHEREAS**, the aggregate proceeds of the sale of the First Convertible Debenture and the First Warrants contemplated hereby shall be held in escrow pursuant to the terms of an escrow agreement substantially in the form of the Escrow Agreement among the Company, the Buyer and the Escrow Agent (as defined below) attached hereto as Exhibit B (the "Escrow Agreement") and executed by the parties concurrently herewith;

**WHEREAS**, at the Closing, the parties hereto shall execute and deliver a Security Agreement substantially in the form attached hereto as Exhibit C (the "Security Agreement") pursuant to which the Company has agreed to provide the Buyer a security interest in Pledged Collateral (as this term is defined in the Security Agreement) to secure the Company's obligations as reflected therein;

**WHEREAS**, at the Closing, the parties hereto shall execute and deliver an Escrow Shares Escrow Agreement substantially in the form attached hereto as Exhibit D (the "Escrow Shares Escrow Agreement") pursuant to which the Company shall issue and deliver to the

{00077240.8 / 0860-001}

LEGAL_US_E # 70173508.6

Escrow Agent Twenty Million (20,000,000) shares of Common Stock or "security stock" (the "Escrow Shares") and the Escrow Agent shall distribute some or all of the Escrow Shares to the Buyer upon conversion, if applicable, of the First Convertible Debenture and Second Convertible Debenture (as defined herein), as the case may, pursuant to a Conversion Notice (as defined herein) and/or exercise of the First Warrants and Second Warrants (as defined herein), as the case may be; *provided, however*, that the Escrow Agent shall distribute all of such Escrow Shares (less 1,000,000 of such shares which shall be retained by the Escrow Agent for purposes of distributing First Warrant Shares and Second Warrant Shares (as defined herein) upon exercise by the Buyer of the First Warrants and Second Warrants, as the case may be) to the Company upon receipt of a Redemption Notice (as defined in the Escrow Shares Agreement);

WHEREAS, at the Closing, the parties hereto shall execute and deliver Irrevocable Transfer Agent Instructions substantially in the form attached hereto as Exhibit E (the "Irrevocable Transfer Agent Instructions");

WHEREAS, the Registration Rights Agreement, the Security Agreement, the Escrow Shares Agreement and the Irrevocable Transfer Agent Instructions are sometimes referred to herein as the "Other Transaction Documents";

WHEREAS, the Company shall also have the option (the "First Option"), exercisable at any time upon notice duly given to Buyer, to issue and sell to the Buyer, whereupon the Buyer shall purchase, at the Second Closing (as defined below) (i) a One Million Dollar ($1,000,000) secured convertible debenture (the "Second Convertible Debenture"), which shall be convertible, unless earlier redeemed by the Company, into Conversion Shares, and (ii) warrants (the "Second Warrants") to purchase an aggregate of 250,000 shares of Common Stock (the "Second Warrant Shares"). The total purchase price for the Second Convertible Debenture and the Second Warrants shall be One Million Dollars ($1,000,000), (the "Second Closing Purchase Price"); and

WHEREAS, in the event the Company exercises the First Option, the parties shall execute and deliver at the Second Closing appropriate amendments to the Other Transaction Documents to reflect the issuance of the Second Convertible Debenture, the additional Conversion Shares into which such debenture is convertible, the Second Warrants and the Second Warrant Shares;

WHEREAS, for purposes of the representations and warranties set forth in Sections 2 and 3 below, the terms "Convertible Debenture," "Warrants," "Conversion Shares" and "Warrant Shares" shall mean: (i) with respect to the First Closing, the First Convertible Debenture, the First Warrants, the Conversion Shares into which the First Convertible Debenture is convertible and the First Warrant Shares, respectively; and (ii) with respect to the Second Closing, the Second Convertible Debenture, the Second Warrants, the Conversion Shares into which the Second Convertible Debenture is convertible and the Second Warrant Shares, respectively;

WHEREAS, for purposes of the covenants and other provisions set forth in Sections 4, 5, 6 and 9 below, the terms "Convertible Debenture," "Warrants," "Conversion Shares" and "Warrant Shares" shall mean: (i) if the Company has not exercised the First Option, the First Convertible Debenture, the First Warrants, the Conversion Shares into which the First Convertible Debenture is convertible and the First Warrant Shares, respectively; (ii) if the

2

LEGAL_US_E # 70173508.6 {00077240.8 / 0860-001}

Company has exercised the First Option, the First Convertible Debenture and Second Convertible Debenture, as the case may be, and the Conversion Shares into which the same may be convertible, the First Warrants and Second Warrants, as the case may be, and the First Warrant Shares and Second Warrant Shares, as the case may be.

**NOW, THEREFORE**, in consideration of the mutual covenants and other agreements contained in this Agreement the Company and the Buyer hereby agree as follows:

1. <u>PURCHASE AND SALE OF CONVERTIBLE DEBENTURES; CLOSINGS</u>.

(a) <u>Purchase of First Convertible Debenture</u>. Subject to the satisfaction (or waiver) of the terms and conditions of this Agreement, the Buyer agrees to purchase at the Closing (as defined herein below) and the Company agrees to sell and issue to the Buyer at the Closing, the First Convertible Debenture and the First Warrants. Upon execution hereof by the Buyer, the Buyer shall wire transfer the First Purchase Price in same-day funds or a check payable to "Gottbetter & Partners, LLP, as Escrow Agent for Charys Holding Company Inc.", which Purchase Price shall be held in escrow pursuant to the terms of the Escrow Agreement (as hereinafter defined) and disbursed in accordance therewith.

(b) <u>Closing</u>. The closing (the "<u>Closing</u>") of the purchase and sale of the First Convertible Debenture and First Warrants shall take place at 10:00 a.m. Eastern Standard Time within five (5) business days following the date hereof, subject to notification of satisfaction of the conditions to the Closing set forth herein and in Sections 7 and 8 below (or such later date as is mutually agreed to by the Company and the Buyer) (the "<u>Closing Date</u>"). The Closing shall occur on the Closing Date at the offices of Gottbetter & Partners, LLP, 488 Madison Avenue, New York, New York 10022 (or such other place as is mutually agreed to by the Company and the Buyer).

(c) <u>Escrow Arrangements; Form of Payment</u>. Upon execution hereof by Buyer and pending the Closing, the First Purchase Price shall be deposited in a non-interest bearing escrow account with Gottbetter & Partners, LLP as escrow agent (the "<u>Escrow Agent</u>"), pursuant to the terms of the Escrow Agreement. Subject to the satisfaction of the terms and conditions of this Agreement, on the Closing Date, (i) the Escrow Agent shall deliver to the Company in accordance with the terms of the Escrow Agreement the First Purchase Price for the First Convertible Debenture and First Warrants to be issued and sold to the Buyer, and (ii) the Company shall deliver to the Buyer, the First Convertible Debenture and the First Warrants, duly executed on behalf of the Company.

(d) <u>Purchase of Second Convertible Debenture</u>. In the event the Company exercises the First Option upon notice given to Buyer, and subject to the satisfaction (or waiver) of the terms and conditions set forth in Sections 7 and 8 of this Agreement with respect to the Second Closing, the Buyer agrees to purchase at the Second Closing (as defined herein below) and the Company agrees to sell and issue to the Buyer at the Second Closing, the Second Convertible Debenture and the Second Warrants. Notwithstanding the foregoing, in the event the Company shall have exercised the First Option prior to the First Closing, the parties may

3

agree that the purchase and sale of the Second Convertible Debenture and Second Warrants shall take place at the First Closing.

(e) Second Closing.   Subject to the last sentence of the preceding paragraph, the closing (the "Second Closing") of the purchase and sale of the Second Convertible Debenture and Second Warrants shall take place at 10:00 a.m. Eastern Standard Time two (2) business days prior to the date a registration statement is filed by the Company with the Securities and Exchange Commission ("SEC") pursuant to the Investor Registration Rights Agreement providing for the registration of: (i) the Escrow Shares for conversion of the First Convertible Debenture; (ii) the First Warrant Shares; and (iii) if the Company has exercised the First Option, the Escrow Shares for conversion of the Second Convertible Debenture and Second Warrant Shares; (the "Registration Statement"), subject to notification of satisfaction of the conditions to the Second Closing set forth herein and in Sections 7 and 8 below (or such later date as is mutually agreed to by the Company and the Buyer) (the "Second Closing Date"). The Second Closing shall occur on the Second Closing Date at the offices of Gottbetter & Partners, LLP, 488 Madison Avenue, New York, New York 10022 (or such other place as is mutually agreed to by the Company and the Buyer).

## 2.  BUYER'S REPRESENTATIONS AND WARRANTIES.

The Buyer represents and warrants to the Company that:

(a) Investment Purpose.   The Buyer is acquiring the Convertible Debenture and the Warrants, and, upon conversion of the Convertible Debenture, if applicable and/or the exercise of the Warrants, the Buyer will acquire the Conversion Shares and/or Warrant Shares, as defined below, then issuable, for its own account for investment only and not with a view towards, or for resale in connection with, the public sale or distribution thereof, except pursuant to sales registered or exempted under the Securities Act; *provided, however*, that by making the representations herein, the Buyer reserves the right to dispose of the Conversion Shares, if applicable, and the Warrants and Warrant Shares at any time in accordance with or pursuant to an effective registration statement covering such Conversion Shares, Warrants and Warrant Shares or an available exemption under the Securities Act.

(b) Accredited Investor Status.   The Buyer is an "Accredited Investor" as that term is defined in Rule 501(a)(3) of Regulation D.

(c) Reliance on Exemptions.   The Buyer understands that the Convertible Debenture and the Warrants are being offered and sold to it in reliance on specific exemptions from the registration requirements of United States federal and state securities laws and that the Company is relying in part upon the truth and accuracy of, and the Buyer's compliance with, the representations, warranties, agreements, acknowledgments and understandings of the Buyer set forth herein in order to determine the availability of such exemptions and the eligibility of the Buyer to acquire such securities.

(d) Information.   The Buyer and its advisors (and his or, its counsel), if any, have been furnished with all materials relating to the business, finances and operations of the Company and information he deemed material to making an informed investment decision

4

regarding its purchase of the Convertible Debenture and the Warrants, and the Warrant Shares and the Conversion Shares into which the Convertible Debenture and Warrants are convertible or exercisable, as the case may be, which have been requested by the Buyer. The Buyer and its advisors, if any, have been afforded the opportunity to ask questions of the Company and its management. Neither such inquiries nor any other due diligence investigations conducted by the Buyer or its advisors, if any, or its representatives shall modify, amend or affect the Buyer's right to rely on the Company's representations and warranties contained in Section 3 below. The Buyer understands that its investment in the Convertible Debenture and the Warrants, and the Warrant Shares and Conversion Shares into which the Convertible Debenture and Warrants are convertible or exercisable, as the case may be, involves a high degree of risk. The Buyer is in a position regarding the Company, which, based upon employment, family relationship or economic bargaining power, enabled and enables the Buyer to obtain information from the Company in order to evaluate the merits and risks of this investment. The Buyer has sought such accounting, legal and tax advice, as it has considered necessary to make an informed investment decision with respect to its acquisition of the Convertible Debenture and the Warrants, and the Warrant Shares and Conversion Shares into which the Convertible Debenture and Warrants are convertible or exercisable, as the case may be.

(e) No Governmental Review. The Buyer understands that no United States federal or state agency or any other government or governmental agency has passed on or made any recommendation or endorsement of the Convertible Debenture, the Warrants, the Warrant Shares or the Conversion Shares, or the fairness or suitability of the investment in the Convertible Debenture and the Warrants, and the Warrant Shares and Conversion Shares into which the Convertible Debenture and Warrants are convertible or exercisable, as the case may be, nor have such authorities passed upon or endorsed the merits of the offering of the Convertible Debenture and the Warrants, and the Warrant Shares and Conversion Shares into which the Convertible Debenture and Warrants are convertible or exercisable, as the case may be.

(f) Transfer or Resale. The Buyer understands that, except as provided in the Investor Registration Rights Agreement: (i) the Convertible Debenture, the Conversion Shares, the Warrants and the Warrant Shares have not been and are not being registered under the Securities Act or any state securities laws, and may not be offered for sale, sold, assigned or transferred unless (A) subsequently registered thereunder, or (B) the Buyer shall have delivered to the Company an opinion of counsel, in a generally acceptable form, to the effect that such securities to be sold, assigned or transferred may be sold, assigned or transferred pursuant to an exemption from such registration requirements; (ii) any sale of such securities made in reliance on Rule 144 under the Securities Act (or a successor rule thereto) ("Rule 144") may be made only in accordance with the terms of Rule 144 and further, if Rule 144 is not applicable, any resale of such securities under circumstances in which the seller (or the person through whom the sale is made) may be deemed to be an underwriter (as that term is defined in the Securities Act) may require compliance with some other exemption under the Securities Act or the rules and regulations of the Securities and Exchange Commission ("SEC") thereunder; and (iii) neither the Company nor any other person is under any obligation to register such securities under the Securities Act or any state securities laws or to comply with the terms and conditions of any exemption thereunder.

5

LEGAL_US_E # 70173508.6 {00077240.8 / 0860-001}

(g) <u>Legends</u>.    The Buyer understands that the certificates or other instruments representing the Convertible Debenture, the Warrants, the Warrant Shares, the Escrow Shares and/or the Conversion Shares shall bear a restrictive legend in substantially the following form (and a stop transfer order may be placed against transfer of such stock certificates):

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS.    THE SECURITIES HAVE BEEN ACQUIRED SOLELY FOR INVESTMENT PURPOSES AND NOT WITH A VIEW TOWARD RESALE AND MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED IN THE ABSENCE OF (i) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS, OR (ii) AN OPINION OF COUNSEL, IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR APPLICABLE STATE SECURITIES LAWS.

The legend set forth above shall be removed and the Company within five (5) business days shall cause its transfer agent to issue a certificate without such legend to the holder of the Convertible Debenture, Warrants, the Warrant Shares and/or Conversion Shares upon which it is stamped, if, unless otherwise required by state securities laws, (i) in connection with a public sale transaction, provided the applicable securities subject to such public sale transaction are registered under the Securities Act or (ii) in connection with a private sale transaction, after such holder provides the Company with an opinion of counsel, which opinion shall be in form, substance and scope customary for opinions of counsel in comparable transactions, to the effect that a sale, assignment or transfer of the securities subject to such private sale transaction may be made without registration under the Securities Act.

(h) <u>Authorization, Enforcement</u>.    This Agreement has been duly and validly authorized, executed and delivered on behalf of the Buyer and is a valid and binding agreement of the Buyer enforceable in accordance with its terms, except as such enforceability may be limited by general principles of equity or applicable bankruptcy, insolvency, reorganization, moratorium, liquidation and other similar laws relating to, or affecting generally, the enforcement of applicable creditors' rights and remedies.

6

(i) <u>Receipt of Documents</u>. The Buyer and its counsel has received and read in their entirety: (i) this Agreement and each representation, warranty and covenant set forth herein, the Security Agreement, the Investor Registration Rights Agreement, the Escrow Agreement, the Irrevocable Transfer Agent Agreement, and the Escrow Shares Escrow Agreement; (ii) all due diligence and other information necessary to verify the accuracy and completeness of such representations, warranties and covenants; (iii) the Company's Form 10-KSB for the fiscal year ended April 30, 2005; (iv) the Company's Form 10-QSB for the fiscal quarter ended July 31, 2005; (v) the Company's Form 8-K related to the restatement of the Company's Financial Statements and (vi) it has received answers to all questions the Buyer submitted to the Company regarding an investment in the Company; and the Buyer has relied on the information contained therein and has not been furnished any other documents, literature, memorandum or prospectus.

(j) <u>Due Formation of Corporate and Other Buyers</u>. The Buyer is a corporation duly incorporated and validly existing under the laws of the Cayman Islands and has not been organized for the specific purpose of purchasing the Convertible Debenture and Warrants and is not prohibited from doing so.

(k) <u>No Legal Advice From the Company</u>. The Buyer acknowledges, that it had the opportunity to review this Agreement and the transactions contemplated by this Agreement with its own legal counsel and investment and tax advisors. The Buyer is relying solely on such counsel and advisors and not on any statements or representations of the Company or any of its representatives or agents for legal, tax or investment advice with respect to this investment, the transactions contemplated by this Agreement or the securities laws of any jurisdiction.

(l) <u>No Group Participation</u>. The Buyer and its affiliates is not a member of any group, nor is the Buyer acting in concert with any other person with respect to its acquisition of the Convertible Debenture and the Warrants, and the Warrant Shares and Conversion Shares into which the Convertible Debenture and Warrants are convertible or exercisable, as the case may be.

(m)<u>Company Registration Statement</u>. The Buyer makes no representation or warranty regarding the Company's ability to have any registration statement filed pursuant to the Investor Registration Rights Agreement or otherwise declared effective by the SEC. The Company has the sole obligation to make any and all such filings as may be necessary and to have any registration statement declared effective by the SEC to the extent required by the Investor Registration Rights Agreement.

3. <u>REPRESENTATIONS AND WARRANTIES OF THE COMPANY</u>.

The Company represents and warrants to the Buyer that, except as set forth in the SEC Documents (as defined herein) or otherwise on the schedule of exceptions delivered to the Buyer in connection with the execution of this Agreement (the "<u>Schedules</u>"):

(a) <u>Organization and Qualification</u>. The Company and its subsidiaries are corporations duly organized and validly existing in good standing under the laws of the

7

jurisdiction in which they are incorporated, and have the requisite corporate power to own their properties and to carry on their business as now being conducted. Each of the Company and its subsidiaries is duly qualified as a foreign corporation to do business and is in good standing in every jurisdiction in which the nature of the business conducted by it makes such qualification necessary, except to the extent that the failure to be so qualified or be in good standing would not have a material adverse effect on the Company and its subsidiaries taken as a whole.

(b) <u>Authorization, Enforcement, Compliance with Other Instruments.</u> (i) The Company has the requisite corporate power and authority to enter into and perform this Agreement, the Security Agreement, the Investor Registration Rights Agreement, the Irrevocable Transfer Agent Instructions, the Escrow Agreement and the Escrow Shares Escrow Agreement (collectively the "<u>Transaction Documents</u>") and to issue the Convertible Debenture and the Warrants, and the Warrant Shares and Conversion Shares into which the Convertible Debenture and Warrants are convertible or exercisable, as the case may be (including those comprising the Escrow Shares), in accordance with the terms hereof and thereof, (ii) the execution and delivery of the Transaction Documents by the Company and the consummation by it of the transactions contemplated hereby and thereby, including, without limitation, the issuance of the Convertible Debenture and the Warrants, and the reservation for issuance and the issuance of the Conversion Shares and Warrant Shares issuable upon conversion or exercise thereof, as the case may be (including those comprising the Escrow Shares), have been duly authorized by the Company's Board of Directors and no further consent or authorization is required by the Company, its Board of Directors or its stockholders, (iii) the Transaction Documents have been duly executed and delivered by the Company, (iv) the Transaction Documents constitute the valid and binding obligations of the Company enforceable against the Company in accordance with their terms, except as such enforceability may be limited by general principles of equity or applicable bankruptcy, insolvency, reorganization, moratorium, liquidation or similar laws relating to, or affecting generally, the enforcement of creditors' rights and remedies. The authorized officer of the Company executing the Transaction Documents knows of no reason why the Company cannot file the registration statement as required under the Investor Registration Rights Agreement or perform any of the Company's other obligations under such documents.

(c) <u>Capitalization.</u> The Company's authorized capital stock is comprised of: (i) 300,000,000 shares of Common Stock, $0.001 par value per share, of which 8,930,951 shares are issued and outstanding, 11,361,682 shares are reserved for issuance pursuant to outstanding options and 862,069 shares are reserved for issuance pursuant to outstanding warrants; and (ii) 5,000,000 shares of Preferred Stock, $0.001 par value per share. There are currently three series of Preferred Stock designated as follows: (i) 1,000,000 shares have been designated as Series A Preferred Stock, $0.001 par value per share, all of which have been issued and are outstanding; (ii) 400,000 shares have been designated as Series B Preferred Stock, $0.001 par value per share, all of which have been issued and are outstanding; and (iii) 500,000 shares of Series C Preferred Stock, $0.001 par value per share, all of which have been issued and are outstanding. All of such outstanding shares have been validly issued and are fully paid and nonassessable. Except as disclosed in the SEC Documents (as defined in Section 3(f)) or in the Schedules, no shares of Common Stock are subject to preemptive rights or any other similar rights or any liens or encumbrances suffered or permitted by the Company. Except as disclosed in the SEC Documents or in the Schedules, as of the date of this Agreement, (i) there are no outstanding options, warrants, scrip, rights to subscribe to, calls or commitments of any character

8

whatsoever relating to, or securities or rights convertible into, any shares of capital stock of the Company or any of its subsidiaries, or contracts, commitments, understandings or arrangements by which the Company or any of its subsidiaries is or may become bound to issue additional shares of capital stock of the Company or any of its subsidiaries or options, warrants, scrip, rights to subscribe to, calls or commitments of any character whatsoever relating to, or securities or rights convertible into, any shares of capital stock of the Company or any of its subsidiaries, (ii) there are no outstanding debt securities and (iii) there are no agreements or arrangements under which the Company or any of its subsidiaries is obligated to register the sale of any of their securities under the Securities Act (except pursuant to the Investor Registration Rights Agreement) and (iv) there are no outstanding registration statements and there are no outstanding comment letters from the SEC or any other regulatory agency. There are no securities or instruments containing anti-dilution or similar provisions that will be triggered by the issuance of the Convertible Debenture and Warrants as described in this Agreement. The Convertible Debenture, Warrants, Warrant Shares and Conversion Shares when issued, if applicable, will be free and clear of all pledges, liens, encumbrances and other restrictions (other than those arising under federal or state securities laws as a result of the private placement of the Convertible Debenture and Warrants). No co-sale right, right of first refusal or other similar right exists with respect to the Convertible Debenture, Warrants, Warrant Shares, and/or the Conversion Shares or the issuance and sale thereof. The issue and sale of the Convertible Debenture and the Warrants, and the Warrant Shares and Conversion Shares into which the Convertible Debenture and Warrants are convertible or exercisable, as the case may be, will not result in a right of any holder of Company securities to adjust the exercise, conversion, exchange or reset price under such securities. The Company has furnished to the Buyer true and correct copies of the Company's Certificate of Incorporation, as amended and as in effect on the date hereof (the "Certificate of Incorporation"), and the Company's By-laws, as in effect on the date hereof (the "By-laws"), and the terms of all securities convertible into or exercisable for Common Stock and the material rights of the holders thereof in respect thereto other than stock options issued to employees and consultants.

(d) Issuance of Securities. The Convertible Debenture and Warrants are duly authorized and, upon issuance in accordance with the terms hereof, shall be duly issued, fully paid and nonassessable, are and free from all taxes, liens and charges with respect to the issue thereof. The Conversion Shares and the Warrant Shares issuable upon conversion of the Convertible Debenture and Warrants, as the case may be (including those comprising the Escrow Shares), have been duly authorized and reserved for issuance. Upon conversion or exercise in accordance with the Transaction Documents, the Conversion Shares and the Warrant Shares, as the case may be (including those comprising the Escrow Shares), will be duly issued, fully paid and nonassessable.

(e) No Conflicts. Except as disclosed in the SEC Documents or in the Schedules, the execution, delivery and performance of the Transaction Documents by the Company and the consummation by the Company of the transactions contemplated thereby will not (i) result in a violation of the Certificate of Incorporation, any certificate of designations of any outstanding series of preferred stock of the Company or the By-laws or (ii) conflict with or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture or instrument to which the Company or any of its

9

subsidiaries is a party, or result in a violation of any law, rule, regulation, order, judgment or decree (including federal and state securities laws and regulations and the rules and regulations of The National Association of Securities Dealers Inc.'s OTC Bulletin Board on which the Common Stock is quoted) applicable to the Company or any of its subsidiaries or by which any property or asset of the Company or any of its subsidiaries is bound or affected. Except as disclosed in the SEC Documents or in the Schedules, neither the Company nor its subsidiaries is in violation of any term of or in default under its Certificate of Incorporation or By-laws or their organizational charter or by-laws, respectively, or any material contract, agreement, mortgage, indebtedness, indenture, instrument, judgment, decree or order or any statute, rule or regulation applicable to the Company or its subsidiaries. The business of the Company and its subsidiaries is not being conducted, and shall not be conducted in violation of any material law, ordinance, or regulation of any governmental entity. Except as specifically contemplated by this Agreement and as required under the Securities Act and any applicable state securities laws, the Company is not required to obtain any consent, authorization or order of, or make any filing or registration with, any court or governmental agency in order for it to execute, deliver or perform any of its obligations under or contemplated by this Agreement or the Investor Registration Rights Agreement in accordance with the terms hereof or thereof. Except as disclosed in the SEC Documents or in the Schedules, all consents, authorizations, orders, filings and registrations which the Company is required to obtain pursuant to the preceding sentence have been obtained or effected on or prior to the date hereof. The Company and its subsidiaries are unaware of any facts or circumstance, which might give rise to any of the foregoing.

(f) SEC Documents: Financial Statements. Since February 4, 2004, the Company has filed all reports, schedules, forms, statements and other documents required to be filed by it with the SEC under the Securities Exchange Act of 1934, as amended (the "Exchange Act") (all of the foregoing filed prior to the date hereof or amended after the date hereof and all exhibits included therein and financial statements and schedules thereto and documents incorporated by reference therein, being hereinafter referred to as the "SEC Documents"). The Company has delivered to the Buyer or its representatives, or made available through the SEC's website at http://www.sec.gov., true and complete copies of the SEC Documents. Except as otherwise set forth in the Schedules, as of their respective dates, the financial statements of the Company disclosed in the SEC Documents (the "Financial Statements") complied as to form in all material respects with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto. Such financial statements have been prepared in accordance with generally accepted accounting principles, consistently applied, during the periods involved (except (i) as may be otherwise indicated in such Financial Statements or the notes thereto, or (ii) in the case of unaudited interim statements, to the extent they may exclude footnotes or may be condensed or summary statements) and, fairly present in all material respects the financial position of the Company as of the dates thereof and the results of its operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal year-end audit adjustments). No other information provided by or on behalf of the Company to the Buyer which is not included in the SEC Documents, including, without limitation, information referred to in this Agreement, contains any untrue statement of a material fact or omits to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

10

(g) 10(b)-5. Except as otherwise set forth in the Schedules, the SEC Documents do not include any untrue statements of material fact, nor do they omit to state any material fact required to be stated therein necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

(h) Absence of Litigation. Except as disclosed in the SEC Documents or in the Schedules, there is no action, suit, proceeding, inquiry or investigation before or by any court, public board, government agency, self-regulatory organization or body pending against or affecting the Company, the Common Stock or any of the Company's subsidiaries, wherein an unfavorable decision, ruling or finding would (i) have a material adverse effect on the transactions contemplated hereby, (ii) adversely affect the validity or enforceability of, or the authority or ability of the Company to perform its obligations under, this Agreement or any of the documents contemplated herein, or (iii) except as expressly disclosed in the SEC Documents or in the Schedules, have a material adverse effect on the business, operations, properties, financial condition or results of operations of the Company and its subsidiaries taken as a whole.

(i) Acknowledgment Regarding Buyer's Purchase of the Convertible Debenture. The Company acknowledges and agrees that the Buyer is acting solely in the capacity of an arm's length purchaser with respect to this Agreement and the transactions contemplated hereby. The Company further acknowledges that the Buyer is not acting as a financial advisor or fiduciary of the Company (or in any similar capacity) with respect to this Agreement and the transactions contemplated hereby and any advice given by the Buyer or any of their respective representatives or agents in connection with this Agreement and the transactions contemplated hereby is merely incidental to such Buyer's purchase of the Convertible Debenture and the Warrants, and the Warrant Shares and Conversion Shares into which the Convertible Debenture and Warrants are convertible or exercisable, as the case may be. The Company further represents to the Buyer that the Company's decision to enter into this Agreement has been based solely on the independent evaluation by the Company and its representatives.

(j) No General Solicitation. Neither the Company, nor any of its affiliates, nor any person acting on its or their behalf, has engaged in any form of general solicitation or general advertising (within the meaning of Regulation D under the Securities Act) in connection with the offer or sale of the Convertible Debenture and the Warrants, and the Warrant Shares and Conversion Shares into which the Convertible Debenture and Warrants are convertible or exercisable, as the case may be.

(k) No Integrated Offering. Neither the Company, nor any of its affiliates, nor any person acting on its or their behalf has, directly or indirectly, made any offers or sales of any security or solicited any offers to buy any security, under circumstances that would require registration of the Convertible Debenture and the Warrants, and the Warrant Shares and Conversion Shares into which the Convertible Debenture and Warrants are convertible or exercisable, as the case may be, under the Securities Act or cause this offering of the Convertible Debenture and the Warrants, and the Warrant Shares and Conversion Shares into which the Convertible Debenture and Warrants are convertible or exercisable, as the case may be, to be integrated with prior offerings by the Company for purposes of the Securities Act.

LEGAL_US_E # 70173508.6 (00077240.8 / 0860-001)

(l) <u>Employee Relations</u>.  Neither the Company nor any of its subsidiaries is involved in any labor dispute nor, to the knowledge of the Company or any of its subsidiaries, is any such dispute threatened.  None of the Company's or its subsidiaries' employees is a member of a union and the Company and its subsidiaries believe that their relations with their employees are good.

(m)<u>Intellectual Property Rights</u>.  The Company and its subsidiaries own or possess adequate rights or licenses to use all trademarks, trade names, service marks, service mark registrations, service names, patents, patent rights, copyrights, inventions, licenses, approvals, governmental authorizations, trade secrets and rights necessary to conduct their respective businesses as now conducted.  The Company and its subsidiaries do not have any knowledge of any infringement by the Company or its subsidiaries of trademark, trade name rights, patents, patent rights, copyrights, inventions, licenses, service names, service marks, service mark registrations, trade secret or other similar rights of others, and, to the knowledge of the Company there is no claim, action or proceeding being made or brought against, or to the Company's knowledge, being threatened against, the Company or its subsidiaries regarding trademark, trade name, patents, patent rights, invention, copyright, license, service names, service marks, service mark registrations, trade secret or other infringement; and the Company and its subsidiaries are unaware of any facts or circumstances which might give rise to any of the foregoing.

(n) <u>Environmental Laws</u>.

(i)    To the knowledge of the Company, each of the Company and its subsidiaries has complied with all applicable Environmental Laws (as defined below), except for violations of Environmental Laws that, individually or in the aggregate, have not had and would not reasonably be expected to have a material adverse effect on the assets, business, condition (financial or otherwise), results of operations or future prospects of the Company (a "<u>Material Adverse Effect</u>").  There is no pending or, to the knowledge of the Company, threatened civil or criminal litigation, written notice of violation, formal administrative proceeding, or investigation, inquiry or information request, relating to any Environmental Law involving the Company or any subsidiary, except for litigation, notices of violations, formal administrative proceedings or investigations, inquiries or information requests that, individually or in the aggregate, have not had and would not reasonably be expected to have a Material Adverse Effect.  For purposes of this Agreement, "Environmental Law" means any federal, state or local law, statute, rule or regulation or the common law relating to the environment or occupational health and safety, including without limitation any statute, regulation, administrative decision or order pertaining to (i) treatment, storage, disposal, generation and transportation of industrial, toxic or hazardous materials or substances or solid or hazardous waste; (ii) air, water and noise pollution; (iii) groundwater and soil contamination; (iv) the release or threatened release into the environment of industrial, toxic or hazardous materials or substances, or solid or hazardous waste, including without limitation emissions, discharges, injections, spills, escapes or dumping of pollutants, contaminants or chemicals; (v) the protection of wild life, marine life and wetlands, including without limitation all endangered and threatened species; (vi) storage tanks, vessels, containers, abandoned or discarded barrels, and other closed receptacles; (vii) health and safety of employees and other persons; and (viii) manufacturing, processing, using, distributing, treating, storing, disposing, transporting or handling of materials

12

LEGAL_US_E # 70173508.6 {00077240.8 / 0860-001}

regulated under any law as pollutants, contaminants, toxic or hazardous materials or substances or oil or petroleum products or solid or hazardous waste. As used above, the terms "release" and "environment" shall have the meaning set forth in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA").

(ii)     Set forth in the Schedules to this Agreement is a list of all documents (whether in hard copy or electronic form) that contain any environmental reports, investigations and audits relating to premises currently or previously owned or operated by the Company or a subsidiary (whether conducted by or on behalf of the Company or a subsidiary or a third party, and whether done at the initiative of the Company or a subsidiary or directed by a third party) which were issued or conducted during the past five years and which the Company has possession of or access to. A complete and accurate copy of each such document has been provided to the Buyer.

(iii)     To the knowledge of the Company there is no material environmental liability with respect to any solid or hazardous waste transporter or treatment, storage or disposal facility that has been used by the Company or any subsidiary.

(iv)     The Company and its subsidiaries (i) have received all permits, licenses or other approvals required of them under applicable Environmental Laws to conduct their respective businesses and (ii) are in compliance with all terms and conditions of any such permit, license or approval.

(o) Title.    Any real property and facilities held under lease by the Company and its subsidiaries are held by them under valid, subsisting and enforceable leases with such exceptions as are not material and do not interfere with the use made and proposed to be made of such property and buildings by the Company and its subsidiaries.

(p) Insurance.    The Company and each of its subsidiaries are insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as management of the Company believes to be prudent and customary in the businesses in which the Company and its subsidiaries are engaged. Neither the Company nor any such subsidiary has been refused any insurance coverage sought or applied for and neither the Company nor any such subsidiary has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business at a cost that would not materially and adversely affect the condition, financial or otherwise, or the earnings, business or operations of the Company and its subsidiaries, taken as a whole.

(q) Regulatory Permits.    The Company and its subsidiaries possess all material certificates, authorizations and permits issued by the appropriate federal, state or foreign regulatory authorities necessary to conduct their respective businesses, and neither the Company nor any such subsidiary has received any notice of proceedings relating to the revocation or modification of any such certificate, authorization or permit.

(r) Internal Accounting Controls.    Except as otherwise set forth in the Schedules, the Company and each of its subsidiaries maintain a system of internal accounting

13

controls sufficient to provide reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorizations, (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain asset accountability, and (iii) the recorded amounts for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

(s) <u>No Material Adverse Breaches, etc</u>. Except as set forth in the SEC Documents or in the Schedules, neither the Company nor any of its subsidiaries is subject to any charter, corporate or other legal restriction, or any judgment, decree, order, rule or regulation which in the judgment of the Company's officers has or is expected in the future to have a Material Adverse Effect. Except as set forth in the SEC Documents or in the Schedules, neither the Company nor any of its subsidiaries is in breach of any contract or agreement which breach, in the judgment of the Company's officers, has or is expected to have a Material Adverse Effect.

(t) <u>Tax Status</u>. Except as set forth in the SEC Documents or in the Schedules, the Company and each of its subsidiaries has made and filed all federal and state income and all other tax returns, reports and declarations required by any jurisdiction to which it is subject and (unless and only to the extent that the Company and each of its subsidiaries has set aside on its books provisions reasonably adequate for the payment of all unpaid and unreported taxes) has paid all taxes and other governmental assessments and charges that are material in amount, shown or determined to be due on such returns, reports and declarations, except those being contested in good faith and has set aside on its books provision reasonably adequate for the payment of all taxes for periods subsequent to the periods to which such returns, reports or declarations apply. There are no unpaid taxes in any material amount claimed to be due by the taxing authority of any jurisdiction, and the officers of the Company know of no basis for any such claim.

(u) <u>Certain Transactions</u>. Except as set forth in the SEC Documents or in the Schedules, and except for arm's length transactions pursuant to which the Company makes payments in the ordinary course of business upon terms no less favorable than the Company could obtain from third parties and other than the grant of stock options disclosed in the SEC Documents, none of the officers, directors, or employees of the Company is presently a party to any transaction with the Company (other than for services as employees, officers and directors), including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any officer, director or such employee or, to the knowledge of the Company, any corporation, partnership, trust or other entity in which any officer, director, or any such employee has a substantial interest or is an officer, director, trustee or partner.

(v) <u>Fees and Rights of First Refusal</u>. The Company is not obligated to offer the securities offered hereunder on a right of first refusal basis or otherwise to any third parties including, but not limited to, current or former stockholders of the Company, underwriters, brokers, agents or other third parties.

(w) <u>Reliance</u>. The Company acknowledges that the Buyer is relying on the representations and warranties made by the Company hereunder and that such representations

14

and warranties are a material inducement to the Buyer purchasing the Convertible Debenture and Warrants. The Company further acknowledges that without such representations and warranties of the Company made hereunder, the Buyer would not enter into this Agreement.

(x)     Sarbanes-Oxley.   The Company is in compliance with the applicable requirements of the Sarbanes-Oxley Act of 2002, as amended, and the rules and regulations thereunder, that are currently in effect and is actively taking steps to ensure that it will be in compliance with other applicable provisions of such Act not currently in effect at all times after the effectiveness of such provisions except where such noncompliance would not have or reasonably be expected to result in a Material Adverse Effect or which would be reasonably likely to have a material adverse effect on the transactions contemplated hereby or by the Investor Registration Rights Agreement.

(y)     Registration Form.  The Company meets the requirements for the use of Form SB-2 for the registration of the resale of the Conversion Shares, the Escrow Shares and Warrant Shares, as the case may be, by the Buyer to the extent required by the Investor Registration Rights Agreement.

(z)     Non-Public Information.  The Company confirms that neither it nor any person acting on its behalf has provided the Buyer or its agents or counsel with any information that the Company believes constitutes material, non-public information. The Company understands and confirms that the Buyer will rely on the foregoing representation in effecting transactions in securities of the Company.

(aa)     Anti-Takeover Provision.   The Company and its Board of Directors have taken all necessary action, if any, in order to render inapplicable any control share acquisition, business combination, poison pill (including any distribution under a rights agreement) or other similar anti-takeover provision under the Company's Certificate of Incorporation (or similar charter documents) or the laws of its jurisdiction of incorporation that is or could become applicable to the Buyer as a result of the Buyer and the Company fulfilling their obligations or exercising their rights under this Agreement, including without limitation the Company's issuance of the Convertible Debenture, Warrants, Warrant Shares and Conversion Shares, as the case may be, and the Buyer's ownership thereof.

4.   COVENANTS.

(a)     Reasonable Best Efforts.  Each party shall use its commercially reasonable best efforts timely to satisfy each of the conditions to be satisfied by it as provided in Sections 7 and 8 of this Agreement.

(b)     Form D.  The Company agrees to file a Form D with respect to the Convertible Debenture, Warrants, Warrant Shares and Conversion Shares as required under Regulation D and to provide a copy thereof to the Buyer promptly after such filing. The Company shall, on or before the Closing Date (or the Second Closing Date as the context so requires), take such action as the Company shall reasonably determine is necessary to qualify the Convertible Debenture, Warrants, the Warrant Shares and Conversion Shares, or obtain an exemption for the Convertible Debenture, Warrants, the Warrant Shares and Conversion Shares,

15

as the case may be, for sale to the Buyer at the Closing (or the Second Closing as the context so requires) pursuant to this Agreement under applicable securities or "Blue Sky" laws of the states of the United States, and shall provide evidence of any such action so taken to the Buyer on or prior to the Closing Date (or the Second Closing Date as the context so requires).

(c)     Reporting Status.  Until the earlier of (i) the date as of which the Buyer may sell all of the Warrants, the Warrant Shares, and Conversion Shares, as the case may be, without restriction pursuant to Rule 144(k) promulgated under the Securities Act (or successor thereto), or (ii) the date on which (A) the Buyer shall have sold all the Warrants, the Warrant Shares and Conversion Shares, as the case may be, and (B) no amount of the Convertible Debenture is outstanding (the "Registration Period"), the Company shall file in a timely manner all reports required to be filed with the SEC pursuant to the Exchange Act and the regulations of the SEC thereunder, and the Company shall not terminate its status as an issuer required to file reports under the Exchange Act even if the Exchange Act or the rules and regulations thereunder would otherwise permit such termination.

(d)     Use of Proceeds.  The Company shall use the proceeds from the sale of the Convertible Debenture and Warrants for general corporate and working capital purposes (including the funding of acquisitions), but in no event shall the Company use the proceeds to repay any indebtedness owed to any Company insiders.

(e)     Reservation of Shares.   The Company shall take all action reasonably necessary to at all times have authorized, and reserved for the purpose of issuance, that number of shares of Common Stock equal to a multiple of five (5) times the number of shares of Common Stock into which the Convertible Debenture is from time to time convertible at the Default Conversion Price (as defined in the Convertible Debenture) unless a change in such multiple is agreed to in writing by the Buyer and the Company.  If at any time the Company does not have available such number of authorized and unissued shares of Common Stock as shall from time to time be sufficient to effect the issuance of all of (i) the Conversion Shares, (including those comprising the Escrow Shares), upon the conversion of the entire principal amount of the Convertible Debenture and (ii) Warrant Shares upon exercise of the Warrants, the Company shall call and hold a special meeting of the stockholders within one hundred twenty (120) days of such occurrence, for the sole purpose of increasing the number of shares authorized.  The Company's management shall recommend to the stockholders to vote in favor of increasing the number of shares of Common Stock authorized.  Subject to any restrictions under the proxy rules under the Exchange Act, management shall also vote all of its shares in favor of increasing the number of authorized shares of Common Stock.  Notwithstanding the foregoing, the Company's obligations under this Section 4(e) (other than an obligation to keep reserved for issuance the Warrant Shares upon exercise of the Warrants) shall terminate and be of no further force and effect in the event the Convertible Debenture is redeemed by the Company.

(f)     Listings or Quotation.  The Company shall promptly after the Closing (and the Second Closing as the context so requires) secure the listing or quotation of the Conversion Shares and the Warrant Shares upon a national securities exchange, automated quotation system or The National Association of Securities Dealers Inc.'s Over-The-Counter Bulletin Board ("OTCBB") or other market, if any, upon which shares of Common Stock are

16

then listed or quoted (subject to official notice of issuance) and shall use its commercially reasonable best efforts to maintain, so long as any other shares of Common Stock shall be so listed, such listing of the Conversion Shares and Warrant Shares. The Company shall maintain the Common Stock's authorization for quotation on the OTCBB. It shall be an event of default hereunder if the Company fails to strictly comply with its obligation under this Section 4(f).

(g) <u>Fees and Expenses</u>. (i) Prior to the date hereof, the Company has paid an aggregate of Ten Thousand Dollars ($10,000) in legal fees to the Buyer in connection with this transaction and shall pay Fourteen Thousand Nine Hundred Seventy-Five Dollars ($14,975) at the First Closing. The Company shall bear all of its own legal and professional fees and expenses, including but not limited to those associated with the filing of any registration statement to the extent required under the Investor Registration Rights Agreement. Each of the Company and the Buyer shall pay all costs and expenses incurred by such party in connection with the negotiation, investigation, preparation, execution and delivery of the Transaction Documents. The Company shall also pay Yorkville Advisors Management, LLC a fee equal to seven percent (7%) of the Purchase Price which shall be deducted from the monies deposited in Escrow by the Buyer at the Closing (and the Second Closing as the context so requires).

(ii) The Company has paid a due diligence fee to Yorkville Advisors Management, LLC ("<u>YAM</u>") of $5,000 and shall pay a structure fee of $5,000 to YAM at the First Closing.

(h) <u>Warrants</u>. The Company shall issue the Warrants to the Buyer at the Closing (and at the Second Closing as the context so requires). The Warrant Shares shall have such registration rights as set forth in the Investor Registration Rights Agreement.

(i) <u>Registration Statement</u>. The Company shall be solely responsible for the contents of any registration statement, prospectus or other filing made with the SEC or otherwise used in the offering of the Company's securities (except as such disclosure relates solely to the Buyer and then only to the extent that such disclosure conforms with information furnished in writing by the Buyer to the Company), even if the Buyer or its agents as an accommodation to the Company participate or assist in the preparation of such registration statement, prospectus or other SEC filing. The Company shall retain its own legal counsel to review, edit, confirm and do all things such counsel deems necessary or desirable to such registration statement, prospectus or other SEC filing to ensure that it does not contain an untrue statement or alleged untrue statement of material fact or omit or alleged to omit a material fact necessary to make the statements made therein, in light of the circumstances under which the statements were made, not misleading.

(j) <u>Corporate Existence</u>. So long as any of the Convertible Debenture remains outstanding, the Company shall not directly or indirectly consummate any merger, reorganization, restructuring, reverse stock split consolidation, sale of all or substantially all of the Company's assets or any similar transaction or related transactions (each such transaction, an "<u>Organizational Change</u>") unless, prior to the consummation of an Organizational Change, the Company obtains the written consent of each Buyer. In any such case, the Company will make appropriate provision with respect to such holders' rights and interests to insure that the provisions of this Section 4(j) will thereafter be applicable to the Convertible Debenture.

17

(k) <u>Transactions With Affiliates</u>.    So long as any of the Convertible Debenture remains outstanding, the Company shall not, and shall cause each of its subsidiaries not to, enter into, amend, modify or supplement, or permit any subsidiary to enter into, amend, modify or supplement any agreement, transaction, commitment, or arrangement with any of its or any subsidiary's officers, directors, person who were officers or directors at any time during the previous two (2) years, stockholders who beneficially own five percent (5%) or more of the Common Stock, or Affiliates (as defined below) or with any individual related by blood, marriage, or adoption to any such individual or with any entity in which any such entity or individual owns a five percent (5%) or more beneficial interest (each a "<u>Related Party</u>"), *except for* (a) customary employment arrangements and benefit programs on reasonable terms, (b) any investment in an Affiliate of the Company, (c) any agreement, transaction, commitment, or arrangement on an arms-length basis on terms no less favorable than terms which would have been obtainable from a person other than such Related Party, (d) any agreement transaction, commitment, or arrangement which is approved by a majority of the disinterested directors of the Company and for purposes hereof, any director who is also an officer of the Company or any subsidiary of the Company shall not be a disinterested director with respect to any such agreement, transaction, commitment, or arrangement.  "<u>Affiliate</u>" for purposes hereof means, with respect to any person or entity, another person or entity that, directly or indirectly, (i) has a ten percent (10%) or more equity interest in that person or entity, (ii) has ten percent (10%) or more common ownership with that person or entity, (iii) controls that person or entity, or (iv) shares common control with that person or entity.  "<u>Control</u>" or "<u>controls</u>" for purposes hereof means that a person or entity has the power, direct or indirect, to conduct or govern the policies of another person or entity.

(l) <u>Transfer Agent</u>.  The Company covenants and agrees that, in the event that the Company's agency relationship with the transfer agent should be terminated for any reason prior to a date which is two (2) years after the Closing Date, the Company shall immediately appoint a new transfer agent and shall require that the new transfer agent execute and agree to be bound by the terms of the Irrevocable Transfer Agent Instructions (as defined herein).

(m)<u>Restriction on Issuance of the Capital Stock</u>. So long as any of the Convertible Debenture remains outstanding, the Company shall not, without the prior written consent of the Buyer, (i) except for proposed issuances disclosed in Schedule 3(c), issue or sell shares of Common Stock or Preferred Stock without consideration or for a consideration per share less than the Closing Bid Price of the Common Stock determined immediately prior to its issuance, (ii) except for proposed issuances disclosed in Schedule 3(c), issue any warrant, option, right, contract, call, or other security instrument granting the holder thereof, the right to acquire Common Stock without consideration or for a consideration less than such Common Stock's Bid Price value determined immediately prior to its issuance, (iii) except for the Security Agreement (relating to a $3,500,000 note), dated November 1, 2005, among the Company, Viasys Network Services Inc.("<u>VNS</u>"), Viasys Services Inc. ("<u>VSI</u>") and New Viasys Holdings, LLC ("<u>NVH</u>") and the additional Security Agreement (relating to a $6,572,103 note), dated November 1, 2005, among the Company, VNS, VSI and NVH, enter into any security instrument granting the holder a security interest in any and all assets of the Company or (iv) file any registration statement on Form S-8.  "Closing Bid Price" on any day shall be the closing bid price for a share of Common Stock on such date on the OTCBB (or such other exchange, market, or other system that the

18

LEGAL_US_E # 70173508.6 {00077240.8 / 0860-001}

Common Stock is then traded on), as reported on Bloomberg, L.P. (or similar organization or agency succeeding to its functions of reporting prices).

(n) <u>Resales Absent Effective Registration Statement</u>.  The Buyer understands and acknowledges that (i) this Agreement and the agreements contemplated hereby may require the Company to issue and deliver Conversion Shares (including those comprising the Escrow Shares) or Warrant Shares to the Buyer with legend restricting their transferability under the Securities Act, and (ii) it is aware that resales of such Conversion Shares (including those comprising the Escrow Shares) or Warrant Shares may not be made unless, at the time of resale, there is an effective registration statement under the Securities Act covering such Buyer's resale(s) or an applicable exemption from registration.

(o) <u>Legend</u>.  Certificates evidencing the Warrant Shares and Conversion Shares shall not contain any legend (including the legend set forth above), (A) while a registration statement covering the resale of such security is effective under the Securities Act (provided, however, that the Buyer's prospectus delivery requirements under the Securities Act will remain applicable), or (B) following any sale of such Warrant Shares and/or Conversion Shares pursuant to Rule 144, or (C) if such Warrant Shares and/or Conversion Shares are eligible for sale under Rule 144(k), or (D) if such legend is not required under applicable requirements of the Securities Act (including judicial interpretations and pronouncements issued by the Staff of the SEC).  Subject to the foregoing, upon written request of the Buyer to have such legend removed, the Company shall cause its counsel to issue a legal opinion to the Company's transfer agent promptly after the effective date of any registration statement (the "Effective Date") if required by the Company's transfer agent to effect the removal of the legend hereunder. The Company agrees that following the Effective Date or at such time as such legend is no longer required under this Section 4(o), it will, no later than three trading days following the delivery by the Buyer to the Company or the Company's transfer agent of a certificate representing Warrant Shares and/or Conversion Shares issued with a restrictive legend, deliver or cause to be delivered to such Buyer a certificate representing such Warrant Shares and/or Conversion Shares that is free from all restrictive and other legends. The Company may not make any notation on its records or give instructions to any transfer agent of the Company that enlarge(s) the restrictions on transfer set forth herein.

(p) <u>Pledge</u>.  The Company acknowledges and agrees that the Buyer may from time to time pledge pursuant to a bona fide margin agreement with a registered broker-dealer or grant a security interest in some or all of the Convertible Debenture, Warrants, Warrant Shares and/or Conversion Shares to a financial institution that is an "accredited investor" as defined in Rule 501(a) under the Securities Act and, if required under the terms of such arrangement, the Buyer may transfer pledged or secured Convertible Debenture, Warrants, Warrant Shares and/or Conversion Shares to the pledgees or secured parties.  Such a pledge or transfer would not be subject to approval of the Company provided that the Company may require a legal opinion of legal counsel to the Buyer in connection therewith. Further, no notice shall be required of such pledge. At the Buyer's expense, the Company will execute and deliver such reasonable documentation as a pledgee or secured party of Convertible Debenture, Warrants, Warrant Shares, Escrow Shares and/or Conversion Shares may reasonably request in connection with a pledge or transfer of the Convertible Debenture, Warrants, Warrant Shares and/or Conversion Shares, including the preparation and filing of any required prospectus

19

supplement under Rule 424(b)(3) of the Securities Act or other applicable provision of the Securities Act to appropriately amend the list of selling stockholders thereunder.

(q) <u>Removal of Legend</u>.  In addition to the Buyer's other available remedies and provided that the conditions permitting the removal of legend specified in Section 4(o) are met, the Company shall pay to the Buyer, in cash, as partial liquidated damages and not as a penalty, for each $1,000 of Warrant Shares and/or Conversion Shares (based on the closing price of the Common Stock on the date such Warrant Shares and/or Conversion Shares are submitted to the Company's transfer agent), $5 per trading day (increasing to $10 per trading day five (5) trading days after such damages have begun to accrue) for each trading day after the seventh (7th) trading day following delivery by the Buyer to the Company or the Company's transfer agent of a certificate representing Warrant Shares and/or Conversion Shares issued with a restrictive legend, until such certificate is delivered to the Buyer with such legend removed. Nothing herein shall limit the Buyer's right to pursue actual damages for the failure of the Company and its transfer agent to deliver certificates representing any securities as required hereby or by the Irrevocable Transfer Agent Instructions, and the Buyer shall have the right to pursue all remedies available to it at law or in equity, including, without limitation, a decree of specific performance and/or injunctive relief.

(r) <u>Press Release</u>.  In addition to any and all other public statements or disclosures made by the Company in its sole discretion (subject to the last sentence of this Section 4(r), the Company will issue a press release and file a Current Report on Form 8-K with the SEC regarding the Closing of the purchase and sale of the Convertible Debenture and Warrants on or before (4) business days after the date of the Closing (and Second Closing as the context so requires). Notwithstanding the foregoing, the Company shall not publicly disclose the names of the Buyer, or include the names of the Buyer in any filing with the SEC, without the prior written consent of the Buyer, except (i) as required by federal securities law and (ii) to the extent such disclosure is required by law or regulations, in which case the Company shall provide the Buyer with prior notice of such disclosure permitted under subclause (i) or (ii). Furthermore, the Company covenants and agrees that neither it nor any other person acting on its behalf will provide the Buyer or its agents or counsel with any information that the Company believes constitutes material non-public information, unless prior thereto the Buyer shall have executed a written agreement regarding the confidentiality and use of such information. The Company understands and confirms that the Buyer shall be relying on the foregoing representations in effecting transactions in securities of the Company.

(s) <u>Stock Splits, Etc.</u>  The provisions of this Agreement shall be appropriately adjusted to reflect any stock split, stock divided, reverse stock split, reorganization or other similar event effected after the date hereof.

(t) <u>No Short Position</u>.  Each of the Buyer and any of its Affiliates do not have an open short position in the Common Stock, and the Buyer agrees that it will not, and that it will cause its Affiliates not to, engage in any short sales of, or hedging transactions with respect to the Common Stock until the earlier to occur of (i) the fifth anniversary of the Closing Date and (ii) the Buyer no longer owns a principal balance of the Convertible Debenture.

20

LEGAL_US_E # 70173508.6  {00077240.8 / 0860-001}

### 5.  TRANSFER AGENT INSTRUCTIONS.

The Company shall issue the Irrevocable Transfer Agent Instructions to its transfer agent irrevocably appointing Gottbetter & Partners, LLP as its agent for purpose of having certificates issued, registered in the name of the Buyer or its respective nominee(s), for the Conversion Shares representing such amounts of Convertible Debenture as specified from time to time by the Buyer to the Company upon conversion of the Convertible Debenture, for interest owed pursuant to the Convertible Debenture, and for any and all Liquidated Damages (as this term is defined in the Investor Registration Rights Agreement). Gottbetter & Partners, LLP shall be paid a cash fee of One Hundred Fifty Dollars ($150) by the Buyer or their assigns for every occasion they act pursuant to the Irrevocable Transfer Agent Instructions. For so long as any of the Conversion Debenture remains outstanding, the Company shall not change its transfer agent without the express written consent of the Buyer, which may be withheld by the Buyer in its sole discretion, and any successor transfer agent shall be required to execute the Irrevocable Transfer Agent Instructions. Prior to registration of the Conversion Shares, if applicable, under the Securities Act, all such certificates shall bear the restrictive legend specified in Section 2(g) of this Agreement. The Company warrants that no instruction other than the Irrevocable Transfer Agent Instructions referred to in this Section 5, and stop transfer instructions to give effect to Section 2(g) hereof (in the case of the Conversion Shares prior to registration of such shares under the Securities Act) will be given by the Company to its transfer agent and that the Conversion Shares shall otherwise be freely transferable on the books and records of the Company as and to the extent provided in this Agreement and the Investor Registration Rights Agreement. Nothing in this Section 5 shall affect in any way the Buyer's obligations and agreement to comply with all applicable securities laws upon resale of Conversion Shares. If the Buyer provides the Company with an opinion of counsel, in form, scope and substance customary for opinions of counsel in comparable transactions to the effect that registration of a resale by the Buyer of any of the Conversion Shares is not required under the Securities Act, and absent manifest error in such opinion, the Company shall within five (5) business days instruct its transfer agent to issue one or more certificates in such name and in such denominations as specified by the Buyer. The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Buyer by vitiating the intent and purpose of the transaction contemplated hereby. Accordingly, the Company acknowledges that the remedy at law for a breach of its obligations under this Section 5 will be inadequate and agrees, in the event of a breach or threatened breach by the Company of the provisions of this Section 5, that the Buyer shall be entitled, in addition to all other available remedies, to an injunction restraining any breach and requiring immediate issuance and transfer, without the necessity of showing economic loss and without any bond or other security being required.

### 6.  THE ESCROW SHARES; LIMITATION ON CONVERSION.

(a)  <u>Share Denominations</u>. The Escrow Agent shall retain and hold the Escrow Shares which shall be held in accordance with the terms of this Agreement and the Escrow Shares Escrow Agreement. The Escrow Shares shall be in the share denominations specified in Schedule II hereto, registered in the name of the Buyer.

(b)  <u>Conversion Notice.</u> **Exhibit F** attached hereto and made a part hereof sets forth the procedures with respect to the conversion of the Convertible Debentures, including the

21

forms of Conversion Notice to be provided upon conversion, instructions as to the procedures for conversion and such other information and instructions as may be reasonably necessary to enable the Buyer or its permitted transferee(s) to exercise the right of conversion smoothly and expeditiously. Said Exhibit F also sets forth the procedures with respect to the exercise of the Warrants, the Company's redemption of the Convertible Debenture and the release of the Escrow Shares by the Escrow Agent to the Company in connection therewith.

(c)     From and after the Closing Date, the Company agrees that, at any time the conversion price of the Convertible Debenture is such that the number of Escrow Shares for the Convertible Debenture is less than five (5) times the number of shares of Common Stock that would be needed to satisfy full conversion of such Convertible Debenture then outstanding, given the then current conversion price (the "Full Conversion Shares"), upon five (5) business days written notice of such circumstance to the Company by the Buyer and the Escrow Agent, the Company shall issue additional share certificates in the name of the Buyer and/or its assigns in denominations specified by the Buyer, and deliver same to the Escrow Agent, such that the new number of Escrow Shares with respect to the Convertible Debentures is equal to five (5) times the Full Conversion Shares.

(d)     Buyer's Ownership of Common Stock. In addition to and not in lieu of the limitations on conversion set forth in the Convertible Debenture, the conversion rights of the Buyer set forth in the Convertible Debenture shall be limited, solely to the extent required, from time to time, such that, unless the Buyer gives written notice 65 days in advance to the Company of the Buyer's intention to exceed the Limitation on Conversion as defined herein, with respect to all or a specified amount of the Convertible Debenture and the corresponding number of the Conversion Shares in no instance shall the Buyer (singularly, together with any Persons who in the determination of the Buyer, together with the Buyer, constitute a group as defined in Rule 13d-5 of the Exchange Act) be entitled to convert the Convertible Debenture to the extent such conversion would result in the Buyer beneficially owning four point nine nine percent (4.99%) of the outstanding shares of Common Stock of the Company. For these purposes, beneficial ownership shall be defined and calculated in accordance with Rule 13d-3, promulgated under the Exchange Act (the foregoing being herein referred to as the "Limitation on Conversion"); provided, however, that the Limitation on Conversion shall not apply to any forced or automatic conversion pursuant to this Agreement or the Convertible Debenture; and provided, further that if the Company shall have breached any of the Transaction Documents, the provisions of this Section 6(d) shall be null and void from and after such date. The Company shall, promptly upon its receipt of a Conversion Notice tendered by the Buyer (or its sole designee) for the Convertible Debenture, as applicable, notify the Buyer by telephone and by facsimile (the "Limitation Notice") of the number of shares of Common Stock outstanding on such date and the number of Conversion Shares, which would be issuable to the Buyer (or its sole designee, as the case may be) if the conversion requested in such Conversion Notice were effected in full and the number of shares of Common Stock outstanding giving full effect to such conversion whereupon, in accordance with the Convertible Debenture, notwithstanding anything to the contrary set forth in the Convertible Debenture, the Buyer may, by notice to the Company within one (1) business day of its receipt of the Limitation Notice by facsimile, revoke such conversion to the extent (in whole or in part) that the Buyer determines that such conversion would result in the ownership by the Buyer of shares of Common Stock in excess of the Limitation on Conversion. The Limitation Notice shall begin the 65 day advance notice required in this Section 6(d).

22

(e)    Attorney's fees. The Company shall pay all reasonable attorney's fees of the Buyer and Escrow Agent related to the redemption of the Convertible Debenture but in no event shall such fees exceed $2,000.

## 7. CONDITIONS TO THE COMPANY'S OBLIGATION TO SELL

(a)    First Closing. The obligation of the Company hereunder to issue and sell the First Convertible Debenture and the First Warrants to the Buyer at the Closing is subject to the satisfaction, at or before the Closing Date, of each of the following conditions, provided that these conditions are for the Company's sole benefit and may be waived by the Company at any time in its sole discretion:

(i)    The Buyer shall have executed the Transaction Documents and delivered them to the Company.

(ii)    The Buyer shall have delivered to the Escrow Agent the First Purchase Price for the First Convertible Debenture and the First Warrants and the Escrow Agent shall have delivered the net proceeds to the Company by wire transfer of immediately available U.S. funds pursuant to the wire instructions provided by the Company.

(iii)    The representations and warranties of the Buyer shall be true and correct in all material respects as of the date when made and as of the Closing Date as though made at that time (except for representations and warranties that speak as of a specific date), and the Buyer shall have performed, satisfied and complied in all material respects with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by the Buyer at or prior to the Closing Date. If requested by the Company, the Company shall have received a certificate, executed by an executive officer of the Buyer, dated as of the Closing Date, to the foregoing effect and as to such other matters as may be reasonably requested by the Company.

(iv)    The Company shall have filed a form UCC –1 with regard to the Pledged Property and Pledged Collateral as detailed in the Security Agreement dated the date hereof and provided proof of such filing to the Buyer.

(v)    The Company shall have executed a definitive stock purchase agreement with Viasys, Inc.

(b)    Second Closing. Unless otherwise consummated at the First Closing (which, in that event, the following conditions precedent shall be satisfied in connection with the First Closing) the obligation of the Company hereunder to issue and sell the Second Convertible Debenture and the Second Warrants to the Buyer at the Second Closing is subject to the satisfaction, at or before the Second Closing Date, of each of the following conditions, provided that these conditions are for the Company's sole benefit and may be waived by the Company at any time in its sole discretion:

(i)    The Buyer shall have executed appropriate amendments to the Other Transaction Documents providing for the inclusion thereunder of the Second

23

Convertible Debenture, Second Warrants and Second Warrant Shares, as the case may be, and delivered them to the Company.

(ii)     The Buyer shall have delivered to the Escrow Agent the Second Purchase Price for the Second Convertible Debenture and the Second Warrants and the Escrow Agent shall have delivered the net proceeds to the Company by wire transfer of immediately available U.S. funds pursuant to the wire instructions provided by the Company.

(iii)     The representations and warranties of the Buyer shall be true and correct in all material respects as of the date when made and as of the Second Closing Date as though made at that time (except for representations and warranties that speak as of a specific date), and the Buyer shall have performed, satisfied and complied in all material respects with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by the Buyer at or prior to the Second Closing Date. If requested by the Company, the Company shall have received a certificate, executed by an executive officer of the Buyer, dated as of the Second Closing Date, to the foregoing effect and as to such other matters as may be reasonably requested by the Company.

## 8.   CONDITIONS TO THE BUYER'S OBLIGATION TO PURCHASE.

(a)     First Closing.  The obligation of the Buyer hereunder to purchase the First Convertible Debenture and the First Warrants at the Closing is subject to the satisfaction, at or before the Closing Date, of each of the following conditions, provided that these conditions are for the Buyer's sole benefit and may be waived by the Buyer at any time in its sole discretion:

(i)     The Company shall have executed the Transaction Documents and delivered the same to the Buyer.

(ii)     The Common Stock shall be authorized for quotation on the OTCBB, trading in the Common Stock shall not have been suspended for any reason, and all the Conversion Shares issuable upon the conversion of the First Convertible Debenture shall have been approved by the OTCBB.

(iii)     The representations and warranties of the Company shall be true and correct in all material respects (except to the extent that any of such representations and warranties is already qualified as to materiality in Section 3 above, in which case, such representations and warranties shall be true and correct without further qualification) as of the date when made and as of the Closing Date as though made at that time (except for representations and warranties that speak as of a specific date) and the Company shall have performed, satisfied and complied in all material respects with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by the Company at or prior to the Closing Date. If requested by the Buyer, the Buyer shall have received a certificate, executed by the President of the Company, dated as of the Closing Date, to the foregoing effect and as to such other matters as may be reasonably requested by the Buyer including, without limitation an update as of the Closing Date regarding the representation contained in Section 3(c) above.

24

(iv)    The Company shall have executed and delivered to the Buyer the First Convertible Debenture and the First Warrants.

(v)    The Buyer shall have received an opinion of counsel in a form satisfactory to the Buyer.

(vi)    The Company shall have provided to the Buyer a certificate of good standing from the Secretary of State from the state in which the Company is incorporated.

(vii)    The Company shall have delivered to the Escrow Agent the Escrow Shares.

(viii)    The Company shall have provided to the Buyer an acknowledgement, to the satisfaction of the Buyer, from the Company's certified public accountant as to its ability to provide all consents required in order to file a registration statement in connection with this transaction.

(ix)    The Company shall have reserved out of its authorized and unissued Common Stock, solely for the purpose of effecting the conversion of the First Convertible Debenture, shares of Common Stock sufficient to effect the conversion of all of such First Convertible Debenture.

(x)    The Irrevocable Transfer Agent Instructions shall have been delivered to and acknowledged in writing by the Company's transfer agent.

(b)    Second Closing.  Unless otherwise consummated at the First Closing (which, in that event, the following conditions precedent other than subsection (iv) below shall be satisfied in connection with the First Closing), the obligation of the Buyer hereunder to purchase the Second Convertible Debenture and the Second Warrants at the Second Closing is subject to the satisfaction, at or before the Second Closing Date, of each of the following conditions:

(i)    The Company shall have executed appropriate amendments to the Other Transaction Documents providing for the inclusion thereunder of the Second Convertible Debenture, Second Warrants and Second Warrant Shares, as the case may be, and delivered them to the Buyer.

(ii)    The representations and warranties of the Company shall be true and correct in all material respects (except to the extent that any of such representations and warranties is already qualified as to materiality in Section 3 above, in which case, such representations and warranties shall be true and correct without further qualification) as of the date when made and as of the Second Closing Date as though made at that time (except for representations and warranties that speak as of a specific date) and the Company shall have performed, satisfied and complied in all material respects with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by the Company at or prior to the Second Closing Date.  If requested by the Buyer, the Buyer shall have received a certificate, executed by two officers of the Company, dated as of the Second Closing

25

Date, to the foregoing effect and as to such other matters as may be reasonably requested by the Buyer including, without limitation an update as of the Second Closing Date regarding the representation contained in Section 3(c) above.

(iii)    The Company shall have executed and delivered to the Buyer the Second Convertible Debenture and the Second Warrants.

(iv)    The Company shall have certified that all conditions to the Second Closing have been satisfied and that the Company will file the Registration Statement with the SEC in compliance with the rules and regulations promulgated by the SEC for filing thereof two (2) business days after the Second Closing.  If requested by the Buyer, the Buyer shall have received a certificate, executed by the two officers of the Company, dated as of the Second Closing Date, to the foregoing effect.  The Buyers have no obligation to fund at the Second Closing if the Company has filed the Registration Statement.

(v)    The Company shall have provided to the Buyer a certificate of good standing from the secretary of the state in which the Company is incorporated.

(v)    The Company shall have delivered to the Escrow Agent the additional Escrow Shares pursuant to 6(c) hereof, if necessary.

(vi)    The Company shall have provided to the Buyer an acknowledgement, to the satisfaction of the Buyer, from the Company's certified public accountant as to its ability to provide all consents required in order to file a registration statement in connection with this transaction.

9.    INDEMNIFICATION.

(a) In consideration of the Buyer's execution and delivery of this Agreement and acquiring the Convertible Debenture and the Warrants hereunder, and the Conversion Shares and Warrants into which the Convertible Debenture and Warrants are convertible or exercisable, as the case, and in addition to all of the Company's other obligations under this Agreement, the Company shall defend, protect, indemnify and hold harmless the Buyer, and its officers, directors, employees and agents (including, without limitation, those retained in connection with the transactions contemplated by this Agreement) (collectively, the "Buyer Indemnitees") from and against any and all actions, causes of action, suits, claims, losses, costs, penalties, fees, liabilities and damages, and expenses in connection therewith (irrespective of whether any such Buyer Indemnitee is a party to the action for which indemnification hereunder is sought), and including reasonable attorneys' fees and disbursements (the "Indemnified Liabilities"), incurred by the Buyer Indemnitees or any of them as a result of, or arising out of, or relating to (a) any misrepresentation or breach of any representation or warranty made by the Company in this Agreement, or any other certificate, instrument or document contemplated hereby executed by the Company, (b) any breach of any covenant, agreement or obligation of the Company contained in this Agreement, the Convertible Debenture or the Investor Registration Rights Agreement or any other certificate, instrument or document contemplated hereby executed by the Company, or (c) any cause of action, suit or claim brought or made against such Buyer Indemnitee based on material misrepresentations or due to a material

26

LEGAL_US_E # 70173508.6 {00077240.8 / 0860-001}

breach by the Company and arising out of or resulting from the execution, delivery, performance or enforcement of this Agreement or any other instrument, document or agreement executed pursuant hereto by any of the Buyer Indemnities, any transaction financed or to be financed in whole or in part, directly or indirectly, with the proceeds of the issuance of the Convertible Debentures. To the extent that the foregoing undertaking by the Company may be unenforceable for any reason, the Company shall make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities, which is permissible under applicable law.

(b) In consideration of the Company's execution and delivery of this Agreement, and issuance of the Convertible Debenture and the Warrants hereunder, and the Conversion Shares and Warrants into which the Convertible Debenture and Warrants are convertible or exercisable, as the case, and in addition to all of the Buyer's other obligations under this Agreement, the Buyer shall defend, protect, indemnify and hold harmless the Company and all of its officers, directors, employees and agents (including, without limitation, those retained in connection with the transactions contemplated by this Agreement) (collectively, the "Company Indemnitees") from and against any and all Indemnified Liabilities incurred by the Company Indemnitees or any of them as a result of, or arising out of, or relating to (a) any misrepresentation or breach of any representation or warranty made by the Buyer in this Agreement, or any other certificate, instrument or document contemplated hereby executed by the Buyer, (b) any breach of any covenant, agreement or obligation of the Buyer contained in this Agreement, the Convertible Debenture or the Investor Registration Rights Agreement or any other certificate, instrument or document contemplated hereby executed by the Buyer, or (c) any cause of action, suit or claim brought or made against such Company Indemnitee based on material misrepresentations or due to a material breach by the Buyer and arising out of or resulting from the execution, delivery, performance or enforcement of this Agreement, the Convertible Debenture or the Investor Registration Rights Agreement or any other instrument, document or agreement executed pursuant hereto by any of the Company Indemnities. To the extent that the foregoing undertaking by the Buyer may be unenforceable for any reason, the Buyer shall make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities, which is permissible under applicable law.

## 10. GOVERNING LAW: MISCELLANEOUS.

(a) Governing Law. The parties hereto acknowledge that the transactions contemplated by this Agreement and the exhibits hereto bear a reasonable relation to the State of New York. The parties hereto agree that the internal laws of the State of New York shall govern this Agreement and the exhibits hereto, including, but not limited to, all issues related to usury. Any action to enforce the terms of this Agreement or any of its exhibits shall be brought exclusively in the state and/or federal courts situated in the County and State of New York. Service of process in any action by the Buyer to enforce the terms of this Agreement may be made by serving a copy of the summons and complaint, in addition to any other relevant documents, by commercial overnight courier to the Company at its principal address set forth in this Agreement.

(b) Counterparts. This Agreement may be executed in two or more identical counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other

27

LEGAL_US_E # 70173508.6 {00077240.8 / 0860-001}

party. In the event any signature page is delivered by facsimile transmission, the party using such means of delivery shall cause four (4) additional original executed signature pages to be physically delivered to the other party within five (5) days of the execution and delivery hereof.

(c) Headings. The headings of this Agreement are for convenience of reference and shall not form part of, or affect the interpretation of, this Agreement.

(d) Severability. If any provision of this Agreement shall be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect the validity or enforceability of the remainder of this Agreement in that jurisdiction or the validity or enforceability of any provision of this Agreement in any other jurisdiction.

(e) Entire Agreement, Amendments. This Agreement supersedes all other prior oral or written agreements between the Buyer, the Company, their affiliates and persons acting on their behalf with respect to the matters discussed herein, and this Agreement and the instruments referenced herein contain the entire understanding of the parties with respect to the matters covered herein and therein and, except as specifically set forth herein or therein, neither the Company nor any Buyer makes any representation, warranty, covenant or undertaking with respect to such matters. No provision of this Agreement may be waived or amended other than by an instrument in writing signed by the party to be charged with enforcement.

(f) Notices. Any notices, consents, waivers, or other communications required or permitted to be given under the terms of this Agreement must be in writing and will be deemed to have been delivered (i) upon receipt, when delivered personally; (ii) upon confirmation of receipt, when sent by facsimile; (iii) seven (7) days after being sent by U.S. certified mail, return receipt requested, or (iv) one (1) day after deposit with a nationally recognized overnight delivery service, in each case properly addressed to the party to receive the same. The addresses and facsimile numbers for such communications shall be:

If to the Company, to:

Charys Holding Company Inc.
1117 Perimeter Center West, Suite N415
Atlanta, GA 30338
Attention:    Billy Ray, Jr.
Telephone:    678-443-2300
Facsimile:    678-443-2320

With a copy to:

Paul, Hastings, Janofsky & Walker LLP
600 Peachtree Street, N.E., Suite 2400
Atlanta, GA 30308
Attention:    Karen K. Leach
Telephone:    404-815-2528
Facsimile:    404-685-5028

28

If to the Transfer Agent, to:          Fidelity Transfer Company
                                      1800 S. West Temple, Suite 301
                                      Salt Lake City, Utah 84115
                                      Attention:    Heidi Sadowski
                                        Telephone:   801-484-7222
                                        Facsimile:   801-466-4122

If to the Buyer, to its address and facsimile number on Schedule I, with copies to the Buyer's counsel as set forth on Schedule I. Each party shall provide five (5) days' prior written notice to the other party of any change in address or facsimile number.

(g) <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns. Neither the Company nor the Buyer shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the other party hereto.

(h) <u>No Third Party Beneficiaries</u>. This Agreement is intended for the benefit of the parties hereto and their respective permitted successors and assigns, and is not for the benefit of, nor may any provision hereof be enforced by, any other person.

(i) <u>Survival</u>. Unless this Agreement is terminated under Section 10(l), the representations and warranties of the Company and the Buyer contained in Sections 2 and 3, the agreements and covenants set forth in Sections 4, 5 and 10, and the indemnification provisions set forth in Section 9, shall survive the Closing for a period of two (2) years following the date on which the First Convertible Debenture and Second Convertible Debenture, as the case may be, is redeemed or converted in full.

(j) <u>Publicity</u>. The Company and the Buyer shall have the right to approve, before issuance any press release or any other public statement with respect to the transactions contemplated hereby made by any party; provided, however, that the Company shall be entitled, without the prior approval of the Buyer, to issue any press release or other public disclosure with respect to such transactions required under applicable securities or other laws or regulations provided, that the Company shall use its commercially reasonable best efforts to consult the Buyer in connection with any such press release or other public disclosure prior to its release and Buyer shall be provided with a copy thereof upon release thereof.

(k) <u>Further Assurances</u>. Each party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as the other party may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

(l) <u>Termination</u>. In the event that the Closing shall not have occurred with respect to the Buyer on or before five (5) business days from the date hereof due to the Company's or the Buyer's failure to satisfy the conditions set forth in Sections 7 and 8 above (and the non-breaching party's failure to waive such unsatisfied condition(s)), the non-breaching party shall have the option to terminate this Agreement with respect to such breaching party at

29

the close of business on such date without liability of any party to any other party; provided, however, that if this Agreement is terminated by the Company pursuant to this Section 10(l), the Company shall remain obligated to reimburse the Buyer for the $5,000 fee (to the extent not paid) to Yorkville Advisors Management, LLC and the fees and expenses of Gottbetter & Partners, LLP described in Section 4(g) above.

(m) No Strict Construction. The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rules of strict construction will be applied against any party.

(n) Remedies. In addition to being entitled to exercise all rights provided herein or granted by law, including recovery of damages, the Buyer and the Company will be entitled to specific performance under the Agreement. The parties agree that monetary damages may not be adequate compensation for any loss incurred by reason of any breach of obligations described in the foregoing sentence and hereby agree to waive in any action for specific performance of any such obligation the defense that a remedy at law would be adequate.

**[REMAINDER PAGE INTENTIONALLY LEFT BLANK]**

30

IN WITNESS WHEREOF, the Buyer and the Company have caused this Securities Purchase Agreement to be duly executed as of the date first written above.

BUYER:
HIGHGATE HOUSE FUNDS, LTC.

By:_____
Name:
Title:

COMPANY:
CHARYS HOLDING COMPANY INC.

By:_____
Name: Billy Ray, Jr.
Title:   Chief Executive Officer

31

**IN WITNESS WHEREOF**, the Buyer and the Company have caused this Securities Purchase Agreement to be duly executed as of the date first written above.

**BUYER:**
**HIGHGATE HOUSE FUNDS, LTC.**

By:_____

Name: Adam S. Gottbetter
Title:  Portfolio Manager

**COMPANY:**
**CHARYS HOLDING COMPANY INC.**

By:_____

Name: Billy Ray, Jr.
Title:  Chief Executive Officer

31

**EXHIBIT C**

**Void after 5:00 p.m., New York Time on November 17, 2008**
**Warrant to Purchase 200,000 Shares of Common Stock**

## WARRANT TO PURCHASE COMMON STOCK

### CHARYS HOLDING COMPANY INC.

THIS WARRANT, AND THE SECURITIES INTO WHICH IT IS EXERCISABLE (COLLECTIVELY, THE "SECURITIES"), HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR THE SECURITIES LAWS OF ANY STATE. THE SECURITIES MAY NOT BE OFFERED OR SOLD UNLESS THE SECURITIES ARE REGISTERED UNDER THE ACT OR PURSUANT TO AVAILABLE EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND THE COMPANY WILL BE PROVIDED WITH OPINION OF COUNSEL OR OTHER SUCH INFORMATION AS IT MAY REASONABLY REQUIRE TO CONFIRM THAT SUCH EXEMPTIONS ARE AVAILABLE.

FOR VALUE RECEIVED, Charys Holding Company Inc., a corporation organized under the laws of Delaware (the "Company"), grants the following rights to Highgate House Funds, Ltd, a Cayman Islands company and/or its assigns (the "Holder"):

### ARTICLE 1. DEFINITIONS

Capitalized terms used and not otherwise defined herein shall have the meanings given such terms in the Securities Purchase Agreement by and between the Company and the Holder and entered into on November 16, 2005 (the "Purchase Agreement"). As used in this Agreement, the following terms shall have the following meanings:

"Corporate Office" shall mean the office of the Company (or its successor) at which at any particular time its principal business shall be administered.

"Exercise Date" shall mean any date on which the Holder gives the Company a Notice of Exercise in the form attached hereto as Appendix I and in compliance with Exhibit F to the Purchase Agreement.

"Exercise Price" shall mean the Fixed Price per share of Common Stock, subject to adjustment as provided herein.

"Expiration Date" shall mean 5:00 p.m. (New York time) on November 16, 2008.

"Fair Market Value" shall have the meaning set forth in Section 2.2(b).

{00080237.3 / 0860-103}

"Fixed Price" shall mean US$1.00 or if the First Convertible Debenture (as defined in the Purchase Agreement) is not redeemed by the Exclusive Redemption Date (as defined in the Purchase Agreement) shall mean US$.01.

"Market Value" shall have the meaning set forth in Section 2.2(b).

"SEC" shall mean the United States Securities and Exchange Commission.

"Warrant Shares" shall mean the shares of the Common Stock issuable upon exercise of this Warrant.

## ARTICLE 2. EXERCISE AND AGREEMENTS

2.1   Exercise of Warrant; Sale of Warrant and Warrant Shares.   (a) This Warrant shall entitle the Holder to purchase, at the Exercise Price, 200,000 shares of Common Stock. This Warrant shall be exercisable at any time and from time to time from the date hereof and prior to the Expiration Date (the "Exercise Period"). This Warrant and the right to purchase Warrant Shares hereunder shall expire and become void on the Expiration Date.

2.2   Manner of Exercise.

(a)   The Holder may exercise this Warrant at any time and from time to time during the Exercise Period, in whole or in part (but not in denominations of fewer than 10,000 Warrant Shares, except upon an exercise of this Warrant with respect to the remaining balance of Warrant Shares purchasable hereunder at the time of exercise), by delivering to the Escrow Agent pursuant to the Escrow Shares Escrow Agreement of even date herewith incorporated herein by reference   (i) a duly executed Notice of Exercise in substantially the form attached as Appendix I hereto, (ii) the certificate representing the Warrants and (iii) a bank cashier's or certified check for the aggregate Exercise Price of the Warrant Shares being purchased.

(b)   The Holder may, at its option, in lieu of paying cash for the Warrant Shares, exercise this Warrant by an exchange, in whole or in part (a "Warrant Exchange"), by delivery to the Escrow Agent of (i) a duly executed Notice of Exercise electing a Warrant Exchange and (ii) the certificate representing this Warrant. In connection with any Warrant Exchange, the Holder shall be deemed to have paid for the Warrant Shares an amount equal to the Fair Market Value of each Warrant delivered, and the Warrants shall be deemed exercised for the amount so paid. For this purpose, the Fair Market Value of each Warrant is the difference between the Market Value of a share of Common Stock and the Exercise Price on the Exercise Date. Market Value shall mean the average Closing Bid Price of a share of Common Stock during the ten (10) Trading Days ending on the Exercise Date.

2.3   Termination. All rights of the Holder in this Warrant, to the extent they have not been exercised, shall terminate on the Expiration Date.

2.4   No Rights Prior to Exercise. This Warrant shall not entitle the Holder to any voting or other rights as a stockholder of the Company.

2.5   Fractional Shares. No fractional shares shall be issuable upon exercise of this Warrant, and the number of Warrant Shares to be issued shall be rounded up to the nearest whole number. If, upon exercise of this Warrant, the Holder hereof would be entitled to receive any fractional share, the Company shall issue to the Holder one additional share of Common Stock in lieu of such fractional share.

2.6   Escrow. The Company agrees to enter into the Escrow Shares Escrow Agreement and to deposit with the Escrow Agent thereunder stock certificates registered in the name of the Holder, each representing a number of shares of Common Stock (in denominations specified by the Purchaser) equal, in the aggregate, to the total number of Warrant Shares for which this Warrant is exercisable, assuming exercise of this Warrant in full on the date hereof. The Company shall deposit additional certificates for Warrant Shares upon request by the Escrow Agent pursuant to the Escrow Agreement and Exhibit F to the Purchase Agreement.

2.7   Adjustments to Exercise Price and Number of Securities.
    (a)   Computation of Adjusted Exercise Price. In case the Company shall at any time after the date hereof and until this Warrant is fully exercised issue or sell any shares of Common Stock (other than the issuances or sales referred to in Section 2.7 (f) hereof), including shares held in the Company's treasury and shares of Common Stock issued upon the exercise of any options, rights or warrants to subscribe for shares of Common Stock and shares of Common Stock issued upon the direct or indirect conversion or exchange of securities for shares of Common Stock (excluding shares of Common Stock issuable upon exercise of options, warrants or conversion rights granted as of the date hereof), for a consideration per share less than the Exercise Price on the date immediately prior to the issuance or sale of such shares, or without consideration, then forthwith upon such issuance or sale, the Exercise Price shall (until another such issuance or sale) be reduced to the price equal to the quotient derived by dividing (A) an amount equal to the sum of (X) the product of (a) the Exercise Price on the date immediately prior to the issuance or sale of such shares, multiplied by (b) the total number of shares of Common Stock outstanding immediately prior to such issuance or sale plus, (Y) the aggregate of the amount of all consideration, if any, received by the Company upon such issuance or sale, by (B) the total number of shares of Common Stock outstanding immediately after such issuance or sale; provided, however, that in no event shall the Exercise Price be adjusted pursuant to this computation to an amount in excess of the Exercise Price in effect immediately prior to such computation, except in the case of a combination of outstanding shares of Common Stock, as provided by Section 2.7 (c) hereof.

For the purposes of any computation to be made in accordance with this Section 2.7(a), the following provisions shall be applicable:

    (i)   In case of the issuance or sale of shares of Common Stock for a consideration part or all of which shall be cash, the amount of cash consideration therefor shall be deemed to be the amount of cash received by the Company for such shares (or, if shares of Common Stock are offered by the Company for

{00080237.3 / 0860-103}

subscription, the subscription price, or if either of such securities shall be sold to underwriters or dealers for public offering without a subscription offering, the initial public offering price) before deducting therefrom any compensation paid or discount allowed in the sale, underwriting or purchase thereof by underwriters or dealers or others performing similar services, or any expenses incurred in connection therewith.

(ii)     In case of the issuance or sale (otherwise than as a dividend or other distribution on any stock of the Company) of shares of Common Stock for a consideration part or all of which shall be other than cash, the amount of the consideration therefor other than cash shall be deemed to be the value of such consideration as determined in good faith by the Board of Directors of the Company.

(iii)    Shares of Common Stock issuable by way of dividend or other distribution on any stock of the Company shall be deemed to have been issued immediately after the opening of business on the day following the record date for the determination of stockholders entitled to receive such dividend or other distribution and shall be deemed to have been issued without consideration.

(iv)    The reclassification of securities of the Company other than shares of the Common Stock into securities including shares of Common Stock shall be deemed to involve the issuance of such shares of Common Stock for a consideration other than cash immediately prior to the close of business on the date fixed for the determination of security holders entitled to receive such shares, and the value of the consideration allocable to such shares of Common Stock shall be determined as provided in subsection (ii) of this Section 2.7(a).

(v)     The number of shares of Common Stock at any one time outstanding shall include the aggregate number of shares issued or issuable (subject to readjustment upon the actual issuance thereof) upon the exercise of options, rights, warrants and upon the conversion or exchange of convertible or exchangeable securities; provided, however, that shares issuable upon the exercise of the Warrants shall not be included in such calculation.

(b)     Options, Rights, Warrants and Convertible and Exchangeable Securities. In case the Company shall at any time after the date hereof and until this Warrant is fully exercised issue options, rights or warrants to subscribe for shares of Common Stock, or issue any securities convertible into or exchangeable for shares of Common Stock, for a consideration per share less than the Exercise Price immediately prior to the issuance of such options, rights or warrants (excluding shares of Common Stock issuable upon exercise of options, warrants or conversion rights granted as of the date hereof and shares of Common Stock issuable upon exercise of stock options at or above the closing market price per share of Common Stock under any stock option plan of the Company), or such convertible or exchangeable securities, or without consideration, the Exercise Price in effect immediately prior to the issuance of such options, rights or warrants, or such convertible or exchangeable securities, as the case may be, shall be reduced to a price

{00080237.3 / 0860-103}

determined by making a computation in accordance with the provision of Section 2.7(a) hereof, provided that:

(i)    The aggregate maximum number of shares of Common Stock, as the case may be, issuable under such options, rights or warrants shall be deemed to be issued and outstanding at the time such options, rights or warranties were issued, and for a consideration equal to the minimum purchase price per share provided for in such options, rights or warrants at the time of issuance, plus the consideration (determined in the same manner as consideration received on the issue or sale of shares in accordance with the terms of the Warrants), if any, received by the Company for such options, rights or warrants.

(ii)    The aggregate maximum number of shares of Common Stock issuable upon conversion or exchange of any convertible or exchangeable securities shall be deemed to be issued and outstanding at the time of issuance of such securities, and for a consideration equal to the consideration (determined in the same manner as consideration received on the issue or sale of shares of Common Stock in accordance with the terms of the Warrants) received by the Company for such securities, plus the minimum consideration, if any, receivable by the Company upon the conversion or exchange thereof.

(iii)    If any change shall occur in the price per share provided for in any of the options, rights or warrants referred to in subsection (a) of this Section 2.7, or in the price per share at which the securities referred to in subsection (b) of this Section 2.7 are convertible or exchangeable, such options, rights or warrants or conversion or exchange rights, as the case may be, shall be deemed to have expired or terminated on the date when such price change became effective in respect of shares not theretofore issued pursuant to the exercise or conversion or exchange thereof, and the Company shall be deemed to have issued upon such date new options, rights or warrants or convertible or exchangeable securities at the new price in respect of the number of shares issuable upon the exercise of such options, rights or warrants or the conversion or exchange of such convertible or exchangeable securities.

(iv)    If any options, rights or warrants referred to in subsection (a) of this Section 2.7, or any convertible or exchangeable securities referred to in subsection (b) of this Section 2.7, expire or terminate without exercise or conversion, as the case may be, then the Exercise Price of the remaining outstanding Warrant shall be readjusted as if such options, rights or warrants or convertible or exchangeable securities, as the case may be, had never been issued.

(c)    Subdivision and Combination.  In case the Company shall at any time subdivide or combine the outstanding shares of Common Stock, the Exercise Price shall forthwith be proportionately decreased in the case of subdivision or increased in the case of combination.

(d)    Adjustment in Number of Securities.  Upon each adjustment of the Exercise Price pursuant to the provisions of this Section 2.7, the number of Warrant

{00080237.3 / 0860-103}

Shares issuable upon the exercise of each Warrant shall be adjusted to the nearest whole number by multiplying a number equal to the Exercise Price in effect immediately prior to such adjustment by the number of Warrant Shares issuable upon exercise of the Warrants immediately prior to such adjustment and dividing the product so obtained by the adjusted Exercise Price.

(e) Merger or Consolidation. In case of any consolidation of the Company with, or merger of the Company with, or merger of the Company into, another corporation (other than a consolidation or merger which does not result in any reclassification or change of the outstanding Common Stock), the corporation formed by such consolidation or merger shall execute and deliver to the Holder a supplemental warrant agreement providing that the Holder of each Warrant then outstanding or to be outstanding shall have the right thereafter (until the expiration of such Warrant) to receive, upon exercise of such Warrant, the kind and amount of shares of stock and other securities and property (except in the event the property is cash, then the Holder shall have the right to exercise the Warrant and receive cash in the same manner as other stockholders) receivable upon such consolidation or merger, by a holder of the number of shares of Common Stock of the Company for which such warrant might have been exercised immediately prior to such consolidation, merger, sale or transfer. Such supplemental warrant agreement shall provide for adjustments which shall be identical to the adjustments provided in Section 2.7. The foregoing provisions of this paragraph (e) shall similarly apply to successive consolidations or mergers.

(f) No Adjustment of Exercise Price in Certain Cases. No adjustment of the Exercise Price shall be made upon the issuance of any securities (i) under an Approved Stock Plan (as such term is defined in the Convertible Debenture dated as of the date hereof), (ii) that constitute Excluded Securities (as such term is defined in the Convertible Debenture dated as of the date hereof) and/or (iii) that constitute Other Securities (as such term is defined in the Convertible Debenture dated as of the date hereof).

(g) Dividends and Other Distributions. In the event that the Company shall at any time prior to the exercise of all Warrants declare a dividend (other than a dividend consisting solely of shares of Common Stock) or otherwise distribute to its stockholders any assets, property, rights, evidences of indebtedness, securities (other than shares of Common Stock), whether issued by the Company or by another, or any other thing of value, the Holders of the unexercised Warrants shall thereafter be entitled, in addition to the shares of Common Stock or other securities and property receivable upon the exercise thereof, to receive, upon the exercise of such Warrants, the same property, assets, rights, evidences of indebtedness, securities or any other thing of value that they would have been entitled to receive at the time of such dividend or distribution as if the Warrants had been exercised immediately prior to such dividend or distribution. At the time of any such dividend or distribution, the Company shall make appropriate reserves to ensure the timely performance of the provisions of this subsection 2.7 (g). Nothing contained herein shall provide for the receipt or accrual by a Holder of cash dividends prior to the exercise by such Holder of the Warrants.

2.8 Registration Rights. The Holder shall have the registration rights set forth in the Investor Registration Rights Agreement.

## ARTICLE 3.  MISCELLANEOUS

3.1    Transfer.  This Warrant may not be offered, sold, transferred, pledged, assigned, hypothecated or otherwise disposed of, in whole or in part, at any time, except in compliance with applicable federal and state securities laws by the transferor and the transferee (including, without limitation, the delivery of an investment representation letter and a legal opinion reasonably satisfactory to the Company).

3.2    Transfer Procedure.  Subject to the provisions of Section 3.1, the Holder may transfer or assign this Warrant by giving the Company notice setting forth the name, address and taxpayer identification number of the transferee or assignee, if applicable (the "Transferee"), and surrendering this Warrant to the Company for reissuance to the Transferee and, in the event of a transfer or assignment of this Warrant in part, the Holder.  (Each of the persons or entities in whose name any such new Warrant shall be issued are herein referred to as a "Holder").

3.3    Loss, Theft, Destruction or Mutilation.  If this Warrant shall become mutilated or defaced or be destroyed, lost or stolen, the Company shall execute and deliver a new Warrant in exchange for and upon surrender and cancellation of such mutilated or defaced Warrant or, in lieu of and in substitution for such Warrant so destroyed, lost or stolen, upon the Holder filing with the Company an affidavit that such Warrant has been so mutilated, defaced, destroyed, lost or stolen.  However, the Company shall be entitled, as a condition to the execution and delivery of such new Warrant, to demand reasonably acceptable indemnity to it and payment of the expenses and charges incurred in connection with the delivery of such new Warrant.  Any Warrant so surrendered to the Company shall be canceled.

3.4    Notices.  All notices and other communications from the Company to the Holder or vice versa shall be deemed delivered and effective when given personally, by facsimile transmission with confirmation sheet at such address and/or facsimile number as may have been furnished to the Company or the Holder, as the case may be, in writing by the Company or the Holder from time to time.

3.5    Waiver.  This Warrant and any term hereof may be changed, waived, or terminated only by an instrument in writing signed by the party against which enforcement of such change, waiver, discharge or termination is sought.

3.6    Governing Law.  This Warrant shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to its principles regarding conflicts of law.  Any action to enforce the terms of this Warrant shall be exclusively heard in the county, state and federal Courts of New York and Country of the United States of America.

3.7    Signature.  In the event that any signature on this Warrant is delivered by facsimile transmission, such signature shall create a valid and binding obligation of the

party executing (or on whose behalf such signature is executed) the same, with the same force and effect as if such facsimile signature page were an original thereof.

     3.8    Legal Fees.  In the event any Person commences a legal action or proceeding to enforce its rights under this Warrant, the non-prevailing party to such action or proceeding shall pay all reasonable and necessary costs and expenses (including reasonable and necessary attorney's fees) incurred in enforcing such rights.

Dated:  November 17, 2005

CHARYS HOLDING COMPANY INC.

By: _____
    Name: Billy Ray, Jr.
    Title: Chief Executive Officer

Attest: _____

Name: H Alec melay
Title: Director

{00080237.3 / 0860-103}

## APPENDIX I

## NOTICE OF EXERCISE

1.    The undersigned hereby elects (please check the appropriate box and fill in the blank spaces):

☐ to purchase _____ shares of Common Stock, $.001 par value per share, of Charys Holding Company Inc. at [$1.00] [$.01] per share for a total of $_____ and pursuant to the terms of the attached Warrant, and tenders herewith payment of the aggregate Exercise Price of such Warrant Shares in full; or

☐ to purchase _____ shares of Common Stock, $.001 par value per share, of Charys Holding Company Inc. pursuant to the cashless exercise provision under Section 2.2 (b) of the attached Warrant, and tenders herewith the number of Warrant Shares to purchase such Warrant Shares based upon the formula set forth in Section 2.2 (b).

2.    Please issue a certificate or certificates representing said Warrant Shares in the name of the undersigned or in such other name as is specified below:


Dated: _____          By: _____

                                      Name: _____

Title: _____

{00080237.3 / 0860-103}

Void after 5:00 p.m., New York Time on November 17, 2008
Warrant to Purchase 200,000 Shares of Common Stock

## WARRANT TO PURCHASE COMMON STOCK

### OF

### CHARYS HOLDING COMPANY INC.

THIS WARRANT, AND THE SECURITIES INTO WHICH IT IS EXERCISABLE (COLLECTIVELY, THE "SECURITIES"), HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR THE SECURITIES LAWS OF ANY STATE. THE SECURITIES MAY NOT BE OFFERED OR SOLD UNLESS THE SECURITIES ARE REGISTERED UNDER THE ACT OR PURSUANT TO AVAILABLE EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND THE COMPANY WILL BE PROVIDED WITH OPINION OF COUNSEL OR OTHER SUCH INFORMATION AS IT MAY REASONABLY REQUIRE TO CONFIRM THAT SUCH EXEMPTIONS ARE AVAILABLE.

FOR VALUE RECEIVED, Charys Holding Company Inc., a corporation organized under the laws of Delaware (the "Company"), grants the following rights to Highgate House Funds, Ltd, a Cayman Islands company and/or its assigns (the "Holder"):

### ARTICLE 1. DEFINITIONS

Capitalized terms used and not otherwise defined herein shall have the meanings given such terms in the Securities Purchase Agreement by and between the Company and the Holder and entered into on November 16, 2005 (the "Purchase Agreement"). As used in this Agreement, the following terms shall have the following meanings:

"Corporate Office" shall mean the office of the Company (or its successor) at which at any particular time its principal business shall be administered.

"Exercise Date" shall mean any date on which the Holder gives the Company a Notice of Exercise in the form attached hereto as Appendix I and in compliance with Exhibit F to the Purchase Agreement.

"Exercise Price" shall mean the Fixed Price per share of Common Stock, subject to adjustment as provided herein.

"Expiration Date" shall mean 5:00 p.m. (New York time) on November 16, 2008.

"Fair Market Value" shall have the meaning set forth in Section 2.2(b).

{00080235.3 / 0860-103}

"Fixed Price" shall mean US$0.75 or if the First Convertible Debenture (as defined in the Purchase Agreement) is not redeemed by the Exclusive Redemption Date (as defined in the Purchase Agreement) shall mean US$.01.

"Market Value" shall have the meaning set forth in Section 2.2(b).

"SEC" shall mean the United States Securities and Exchange Commission.

"Warrant Shares" shall mean the shares of the Common Stock issuable upon exercise of this Warrant.

## ARTICLE 2. EXERCISE AND AGREEMENTS

2.1    Exercise of Warrant; Sale of Warrant and Warrant Shares.   (a) This Warrant shall entitle the Holder to purchase, at the Exercise Price, 200,000 shares of Common Stock.  This Warrant shall be exercisable at any time and from time to time from the date hereof and prior to the Expiration Date (the "Exercise Period").  This Warrant and the right to purchase Warrant Shares hereunder shall expire and become void on the Expiration Date.

2.2    Manner of Exercise.

(a)    The Holder may exercise this Warrant at any time and from time to time during the Exercise Period, in whole or in part (but not in denominations of fewer than 10,000 Warrant Shares, except upon an exercise of this Warrant with respect to the remaining balance of Warrant Shares purchasable hereunder at the time of exercise), by delivering to the Escrow Agent pursuant to the Escrow Shares Escrow Agreement of even date herewith incorporated herein by reference  (i) a duly executed Notice of Exercise in substantially the form attached as Appendix I hereto, (ii) the certificate representing the Warrants and (iii) a bank cashier's or certified check for the aggregate Exercise Price of the Warrant Shares being purchased.

(b)    The Holder may, at its option, in lieu of paying cash for the Warrant Shares, exercise this Warrant by an exchange, in whole or in part (a "Warrant Exchange"), by delivery to the Escrow Agent of (i) a duly executed Notice of Exercise electing a Warrant Exchange and (ii) the certificate representing this Warrant.  In connection with any Warrant Exchange, the Holder shall be deemed to have paid for the Warrant Shares an amount equal to the Fair Market Value of each Warrant delivered, and the Warrants shall be deemed exercised for the amount so paid. For this purpose, the Fair Market Value of each Warrant is the difference between the Market Value of a share of Common Stock and the Exercise Price on the Exercise Date. Market Value shall mean the average Closing Bid Price of a share of Common Stock during the ten (10) Trading Days ending on the Exercise Date.

2.3    Termination.  All rights of the Holder in this Warrant, to the extent they have not been exercised, shall terminate on the Expiration Date.

{00080235.3 / 0860-103}

2.4    No Rights Prior to Exercise. This Warrant shall not entitle the Holder to any voting or other rights as a stockholder of the Company.

2.5    Fractional Shares. No fractional shares shall be issuable upon exercise of this Warrant, and the number of Warrant Shares to be issued shall be rounded up to the nearest whole number. If, upon exercise of this Warrant, the Holder hereof would be entitled to receive any fractional share, the Company shall issue to the Holder one additional share of Common Stock in lieu of such fractional share.

2.6    Escrow. The Company agrees to enter into the Escrow Shares Escrow Agreement and to deposit with the Escrow Agent thereunder stock certificates registered in the name of the Holder, each representing a number of shares of Common Stock (in denominations specified by the Purchaser) equal, in the aggregate, to the total number of Warrant Shares for which this Warrant is exercisable, assuming exercise of this Warrant in full on the date hereof. The Company shall deposit additional certificates for Warrant Shares upon request by the Escrow Agent pursuant to the Escrow Agreement and Exhibit F to the Purchase Agreement.

2.7    Adjustments to Exercise Price and Number of Securities.
    (a)    Computation of Adjusted Exercise Price. In case the Company shall at any time after the date hereof and until this Warrant is fully exercised issue or sell any shares of Common Stock (other than the issuances or sales referred to in Section 2.7 (f) hereof), including shares held in the Company's treasury and shares of Common Stock issued upon the exercise of any options, rights or warrants to subscribe for shares of Common Stock and shares of Common Stock issued upon the direct or indirect conversion or exchange of securities for shares of Common Stock (excluding shares of Common Stock issuable upon exercise of options, warrants or conversion rights granted as of the date hereof), for a consideration per share less than the Exercise Price on the date immediately prior to the issuance or sale of such shares, or without consideration, then forthwith upon such issuance or sale, the Exercise Price shall (until another such issuance or sale) be reduced to the price equal to the quotient derived by dividing (A) an amount equal to the sum of (X) the product of (a) the Exercise Price on the date immediately prior to the issuance or sale of such shares, multiplied by (b) the total number of shares of Common Stock outstanding immediately prior to such issuance or sale plus, (Y) the aggregate of the amount of all consideration, if any, received by the Company upon such issuance or sale, by (B) the total number of shares of Common Stock outstanding immediately after such issuance or sale; provided, however, that in no event shall the Exercise Price be adjusted pursuant to this computation to an amount in excess of the Exercise Price in effect immediately prior to such computation, except in the case of a combination of outstanding shares of Common Stock, as provided by Section 2.7 (c) hereof.

For the purposes of any computation to be made in accordance with this Section 2.7(a), the following provisions shall be applicable:

    (i)    In case of the issuance or sale of shares of Common Stock for a consideration part or all of which shall be cash, the amount of cash consideration therefor shall be deemed to be the amount of cash received by the Company for such shares (or, if shares of Common Stock are offered by the Company for

subscription, the subscription price, or if either of such securities shall be sold to underwriters or dealers for public offering without a subscription offering, the initial public offering price) before deducting therefrom any compensation paid or discount allowed in the sale, underwriting or purchase thereof by underwriters or dealers or others performing similar services, or any expenses incurred in connection therewith.

(ii)    In case of the issuance or sale (otherwise than as a dividend or other distribution on any stock of the Company) of shares of Common Stock for a consideration part or all of which shall be other than cash, the amount of the consideration therefor other than cash shall be deemed to be the value of such consideration as determined in good faith by the Board of Directors of the Company.

(iii)    Shares of Common Stock issuable by way of dividend or other distribution on any stock of the Company shall be deemed to have been issued immediately after the opening of business on the day following the record date for the determination of stockholders entitled to receive such dividend or other distribution and shall be deemed to have been issued without consideration.

(iv)    The reclassification of securities of the Company other than shares of the Common Stock into securities including shares of Common Stock shall be deemed to involve the issuance of such shares of Common Stock for a consideration other than cash immediately prior to the close of business on the date fixed for the determination of security holders entitled to receive such shares, and the value of the consideration allocable to such shares of Common Stock shall be determined as provided in subsection (ii) of this Section 2.7(a).

(v)    The number of shares of Common Stock at any one time outstanding shall include the aggregate number of shares issued or issuable (subject to readjustment upon the actual issuance thereof) upon the exercise of options, rights, warrants and upon the conversion or exchange of convertible or exchangeable securities; provided, however, that shares issuable upon the exercise of the Warrants shall not be included in such calculation.

(b)    Options, Rights, Warrants and Convertible and Exchangeable Securities. In case the Company shall at any time after the date hereof and until this Warrant is fully exercised issue options, rights or warrants to subscribe for shares of Common Stock, or issue any securities convertible into or exchangeable for shares of Common Stock, for a consideration per share less than the Exercise Price immediately prior to the issuance of such options, rights or warrants (excluding shares of Common Stock issuable upon exercise of options, warrants or conversion rights granted as of the date hereof and shares of Common Stock issuable upon exercise of stock options at or above the closing market price per share of Common Stock under any stock option plan of the Company), or such convertible or exchangeable securities, or without consideration, the Exercise Price in effect immediately prior to the issuance of such options, rights or warrants, or such convertible or exchangeable securities, as the case may be, shall be reduced to a price

{00080235.3 / 0860-103}

determined by making a computation in accordance with the provision of Section 2.7(a) hereof, provided that:

(i)     The aggregate maximum number of shares of Common Stock, as the case may be, issuable under such options, rights or warrants shall be deemed to be issued and outstanding at the time such options, rights or warranties were issued, and for a consideration equal to the minimum purchase price per share provided for in such options, rights or warrants at the time of issuance, plus the consideration (determined in the same manner as consideration received on the issue or sale of shares in accordance with the terms of the Warrants), if any, received by the Company for such options, rights or warrants.

(ii)     The aggregate maximum number of shares of Common Stock issuable upon conversion or exchange of any convertible or exchangeable securities shall be deemed to be issued and outstanding at the time of issuance of such securities, and for a consideration equal to the consideration (determined in the same manner as consideration received on the issue or sale of shares of Common Stock in accordance with the terms of the Warrants) received by the Company for such securities, plus the minimum consideration, if any, receivable by the Company upon the conversion or exchange thereof.

(iii)     If any change shall occur in the price per share provided for in any of the options, rights or warrants referred to in subsection (a) of this Section 2.7, or in the price per share at which the securities referred to in subsection (b) of this Section 2.7 are convertible or exchangeable, such options, rights or warrants or conversion or exchange rights, as the case may be, shall be deemed to have expired or terminated on the date when such price change became effective in respect of shares not theretofore issued pursuant to the exercise or conversion or exchange thereof, and the Company shall be deemed to have issued upon such date new options, rights or warrants or convertible or exchangeable securities at the new price in respect of the number of shares issuable upon the exercise of such options, rights or warrants or the conversion or exchange of such convertible or exchangeable securities.

(iv)     If any options, rights or warrants referred to in subsection (a) of this Section 2.7, or any convertible or exchangeable securities referred to in subsection (b) of this Section 2.7, expire or terminate without exercise or conversion, as the case may be, then the Exercise Price of the remaining outstanding Warrant shall be readjusted as if such options, rights or warrants or convertible or exchangeable securities, as the case may be, had never been issued.

(c)     <u>Subdivision and Combination</u>.  In case the Company shall at any time subdivide or combine the outstanding shares of Common Stock, the Exercise Price shall forthwith be proportionately decreased in the case of subdivision or increased in the case of combination.

(d)     <u>Adjustment in Number of Securities</u>.  Upon each adjustment of the Exercise Price pursuant to the provisions of this Section 2.7, the number of Warrant

Shares issuable upon the exercise of each Warrant shall be adjusted to the nearest whole number by multiplying a number equal to the Exercise Price in effect immediately prior to such adjustment by the number of Warrant Shares issuable upon exercise of the Warrants immediately prior to such adjustment and dividing the product so obtained by the adjusted Exercise Price.

(e)    Merger or Consolidation.  In case of any consolidation of the Company with, or merger of the Company with, or merger of the Company into, another corporation (other than a consolidation or merger which does not result in any reclassification or change of the outstanding Common Stock), the corporation formed by such consolidation or merger shall execute and deliver to the Holder a supplemental warrant agreement providing that the Holder of each Warrant then outstanding or to be outstanding shall have the right thereafter (until the expiration of such Warrant) to receive, upon exercise of such Warrant, the kind and amount of shares of stock and other securities and property (except in the event the property is cash, then the Holder shall have the right to exercise the Warrant and receive cash in the same manner as other stockholders) receivable upon such consolidation or merger, by a holder of the number of shares of Common Stock of the Company for which such warrant might have been exercised immediately prior to such consolidation, merger, sale or transfer. Such supplemental warrant agreement shall provide for adjustments which shall be identical to the adjustments provided in Section 2.7. The foregoing provisions of this paragraph (e) shall similarly apply to successive consolidations or mergers.

(f)    No Adjustment of Exercise Price in Certain Cases.  No adjustment of the Exercise Price shall be made upon the issuance of any securities (i) under an Approved Stock Plan (as such term is defined in the Convertible Debenture dated as of the date hereof), (ii) that constitute Excluded Securities (as such term is defined in the Convertible Debenture dated as of the date hereof) and/or (iii) that constitute Other Securities (as such term is defined in the Convertible Debenture dated as of the date hereof).

(g)    Dividends and Other Distributions.  In the event that the Company shall at any time prior to the exercise of all Warrants declare a dividend (other than a dividend consisting solely of shares of Common Stock) or otherwise distribute to its stockholders any assets, property, rights, evidences of indebtedness, securities (other than shares of Common Stock), whether issued by the Company or by another, or any other thing of value, the Holders of the unexercised Warrants shall thereafter be entitled, in addition to the shares of Common Stock or other securities and property receivable upon the exercise thereof, to receive, upon the exercise of such Warrants, the same property, assets, rights, evidences of indebtedness, securities or any other thing of value that they would have been entitled to receive at the time of such dividend or distribution as if the Warrants had been exercised immediately prior to such dividend or distribution. At the time of any such dividend or distribution, the Company shall make appropriate reserves to ensure the timely performance of the provisions of this subsection 2.7 (g). Nothing contained herein shall provide for the receipt or accrual by a Holder of cash dividends prior to the exercise by such Holder of the Warrants.

2.8    Registration Rights.  The Holder shall have the registration rights set forth in the Investor Registration Rights Agreement.

## ARTICLE 3. MISCELLANEOUS

3.1    Transfer.  This Warrant may not be offered, sold, transferred, pledged, assigned, hypothecated or otherwise disposed of, in whole or in part, at any time, except in compliance with applicable federal and state securities laws by the transferor and the transferee (including, without limitation, the delivery of an investment representation letter and a legal opinion reasonably satisfactory to the Company).

3.2    Transfer Procedure.  Subject to the provisions of Section 3.1, the Holder may transfer or assign this Warrant by giving the Company notice setting forth the name, address and taxpayer identification number of the transferee or assignee, if applicable (the "Transferee"), and surrendering this Warrant to the Company for reissuance to the Transferee and, in the event of a transfer or assignment of this Warrant in part, the Holder. (Each of the persons or entities in whose name any such new Warrant shall be issued are herein referred to as a "Holder").

3.3    Loss, Theft, Destruction or Mutilation.  If this Warrant shall become mutilated or defaced or be destroyed, lost or stolen, the Company shall execute and deliver a new Warrant in exchange for and upon surrender and cancellation of such mutilated or defaced Warrant or, in lieu of and in substitution for such Warrant so destroyed, lost or stolen, upon the Holder filing with the Company an affidavit that such Warrant has been so mutilated, defaced, destroyed, lost or stolen.  However, the Company shall be entitled, as a condition to the execution and delivery of such new Warrant, to demand reasonably acceptable indemnity to it and payment of the expenses and charges incurred in connection with the delivery of such new Warrant.  Any Warrant so surrendered to the Company shall be canceled.

3.4    Notices.  All notices and other communications from the Company to the Holder or vice versa shall be deemed delivered and effective when given personally, by facsimile transmission with confirmation sheet at such address and/or facsimile number as may have been furnished to the Company or the Holder, as the case may be, in writing by the Company or the Holder from time to time.

3.5    Waiver.  This Warrant and any term hereof may be changed, waived, or terminated only by an instrument in writing signed by the party against which enforcement of such change, waiver, discharge or termination is sought.

3.6    Governing Law.  This Warrant shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to its principles regarding conflicts of law.  Any action to enforce the terms of this Warrant shall be exclusively heard in the county, state and federal Courts of New York and Country of the United States of America.

3.7    Signature.  In the event that any signature on this Warrant is delivered by facsimile transmission, such signature shall create a valid and binding obligation of the

{00080235.3 / 0860-103}

party executing (or on whose behalf such signature is executed) the same, with the same force and effect as if such facsimile signature page were an original thereof.

     3.8   <u>Legal Fees</u>.  In the event any Person commences a legal action or proceeding to enforce its rights under this Warrant, the non-prevailing party to such action or proceeding shall pay all reasonable and necessary costs and expenses (including reasonable and necessary attorney's fees) incurred in enforcing such rights.

Dated: November 17, 2005

**CHARYS HOLDING COMPANY INC.**

By: _____
    Name: Billy Ray
    Title: Chief Executive Officer

Attest:

_____
Name: H. Alec McLarty
Title: Director

## APPENDIX I

### <u>NOTICE OF EXERCISE</u>

1.    The undersigned hereby elects (please check the appropriate box and fill in the blank spaces):

☐ to purchase _____ shares of Common Stock, $.001 par value per share, of Charys Holding Company Inc. at [$.75] [$.01] per share for a total of $_____ and pursuant to the terms of the attached Warrant, and tenders herewith payment of the aggregate Exercise Price of such Warrant Shares in full; or

☐ to purchase _____ shares of Common Stock, $.001 par value per share, of Charys Holding Company Inc. pursuant to the cashless exercise provision under Section 2.2 (b) of the attached Warrant, and tenders herewith the number of Warrant Shares to purchase such Warrant Shares based upon the formula set forth in Section 2.2 (b).

2.    Please issue a certificate or certificates representing said Warrant Shares in the name of the undersigned or in such other name as is specified below:

Dated: _____       By: _____

                                     Name: _____

Title: _____

Void after 5:00 p.m., New York Time on November 17, 2008
Warrant to Purchase 200,000 Shares of Common Stock

## WARRANT TO PURCHASE COMMON STOCK

## CHARYS HOLDING COMPANY INC.

THIS WARRANT, AND THE SECURITIES INTO WHICH IT IS EXERCISABLE (COLLECTIVELY, THE "SECURITIES"), HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR THE SECURITIES LAWS OF ANY STATE. THE SECURITIES MAY NOT BE OFFERED OR SOLD UNLESS THE SECURITIES ARE REGISTERED UNDER THE ACT OR PURSUANT TO AVAILABLE EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND THE COMPANY WILL BE PROVIDED WITH OPINION OF COUNSEL OR OTHER SUCH INFORMATION AS IT MAY REASONABLY REQUIRE TO CONFIRM THAT SUCH EXEMPTIONS ARE AVAILABLE.

FOR VALUE RECEIVED, Charys Holding Company Inc., a corporation organized under the laws of Delaware (the "Company"), grants the following rights to Highgate House Funds, Ltd, a Cayman Islands company and/or its assigns (the "Holder"):

## ARTICLE 1. DEFINITIONS

Capitalized terms used and not otherwise defined herein shall have the meanings given such terms in the Securities Purchase Agreement by and between the Company and the Holder and entered into on November 16, 2005 (the "Purchase Agreement"). As used in this Agreement, the following terms shall have the following meanings:

"Corporate Office" shall mean the office of the Company (or its successor) at which at any particular time its principal business shall be administered.

"Exercise Date" shall mean any date on which the Holder gives the Company a Notice of Exercise in the form attached hereto as Appendix I and in compliance with Exhibit F to the Purchase Agreement.

"Exercise Price" shall mean the Fixed Price per share of Common Stock, subject to adjustment as provided herein.

"Expiration Date" shall mean 5:00 p.m. (New York time) on November 16, 2008.

"Fair Market Value" shall have the meaning set forth in Section 2.2(b).

{00080060.6 / 0860-103}

"Fixed Price" shall mean US$0.25 or if the First Convertible Debenture (as defined in the Purchase Agreement) is not redeemed by the Exclusive Redemption Date (as defined in the Purchase Agreement) shall mean US$.01.

"Market Value" shall have the meaning set forth in Section 2.2(b).

"SEC" shall mean the United States Securities and Exchange Commission.

"Warrant Shares" shall mean the shares of the Common Stock issuable upon exercise of this Warrant.

## ARTICLE 2. EXERCISE AND AGREEMENTS

2.1    Exercise of Warrant; Sale of Warrant and Warrant Shares.    (a) This Warrant shall entitle the Holder to purchase, at the Exercise Price, 200,000 shares of Common Stock.  This Warrant shall be exercisable at any time and from time to time from the date hereof and prior to the Expiration Date (the "Exercise Period").  This Warrant and the right to purchase Warrant Shares hereunder shall expire and become void on the Expiration Date.

2.2    Manner of Exercise.

(a)    The Holder may exercise this Warrant at any time and from time to time during the Exercise Period, in whole or in part (but not in denominations of fewer than 10,000 Warrant Shares, except upon an exercise of this Warrant with respect to the remaining balance of Warrant Shares purchasable hereunder at the time of exercise), by delivering to the Escrow Agent pursuant to the Escrow Shares Escrow Agreement of even date herewith incorporated herein by reference  (i) a duly executed Notice of Exercise in substantially the form attached as Appendix I hereto, (ii) the certificate representing the Warrants and (iii) a bank cashier's or certified check for the aggregate Exercise Price of the Warrant Shares being purchased.

(b)    The Holder may, at its option, in lieu of paying cash for the Warrant Shares, exercise this Warrant by an exchange, in whole or in part (a "Warrant Exchange"), by delivery to the Escrow Agent of (i) a duly executed Notice of Exercise electing a Warrant Exchange and (ii) the certificate representing this Warrant.  In connection with any Warrant Exchange, the Holder shall be deemed to have paid for the Warrant Shares an amount equal to the Fair Market Value of each Warrant delivered, and the Warrants shall be deemed exercised for the amount so paid. For this purpose, the Fair Market Value of each Warrant is the difference between the Market Value of a share of Common Stock and the Exercise Price on the Exercise Date. Market Value shall mean the average Closing Bid Price of a share of Common Stock during the ten (10) Trading Days ending on the Exercise Date.

2.3    Termination.  All rights of the Holder in this Warrant, to the extent they have not been exercised, shall terminate on the Expiration Date.

{00080060.6 / 0860-103}

2.4    No Rights Prior to Exercise. This Warrant shall not entitle the Holder to any voting or other rights as a stockholder of the Company.

2.5    Fractional Shares. No fractional shares shall be issuable upon exercise of this Warrant, and the number of Warrant Shares to be issued shall be rounded up to the nearest whole number. If, upon exercise of this Warrant, the Holder hereof would be entitled to receive any fractional share, the Company shall issue to the Holder one additional share of Common Stock in lieu of such fractional share.

2.6    Escrow. The Company agrees to enter into the Escrow Shares Escrow Agreement and to deposit with the Escrow Agent thereunder stock certificates registered in the name of the Holder, each representing a number of shares of Common Stock (in denominations specified by the Purchaser) equal, in the aggregate, to the total number of Warrant Shares for which this Warrant is exercisable, assuming exercise of this Warrant in full on the date hereof. The Company shall deposit additional certificates for Warrant Shares upon request by the Escrow Agent pursuant to the Escrow Agreement and Exhibit F to the Purchase Agreement.

2.7    Adjustments to Exercise Price and Number of Securities.
(a)    Computation of Adjusted Exercise Price. In case the Company shall at any time after the date hereof and until this Warrant is fully exercised issue or sell any shares of Common Stock (other than the issuances or sales referred to in Section 2.7 (f) hereof), including shares held in the Company's treasury and shares of Common Stock issued upon the exercise of any options, rights or warrants to subscribe for shares of Common Stock and shares of Common Stock issued upon the direct or indirect conversion or exchange of securities for shares of Common Stock (excluding shares of Common Stock issuable upon exercise of options, warrants or conversion rights granted as of the date hereof), for a consideration per share less than the Exercise Price on the date immediately prior to the issuance or sale of such shares, or without consideration, then forthwith upon such issuance or sale, the Exercise Price shall (until another such issuance or sale) be reduced to the price equal to the quotient derived by dividing (A) an amount equal to the sum of (X) the product of (a) the Exercise Price on the date immediately prior to the issuance or sale of such shares, multiplied by (b) the total number of shares of Common Stock outstanding immediately prior to such issuance or sale plus, (Y) the aggregate of the amount of all consideration, if any, received by the Company upon such issuance or sale, by (B) the total number of shares of Common Stock outstanding immediately after such issuance or sale; provided, however, that in no event shall the Exercise Price be adjusted pursuant to this computation to an amount in excess of the Exercise Price in effect immediately prior to such computation, except in the case of a combination of outstanding shares of Common Stock, as provided by Section 2.7 (c) hereof.

For the purposes of any computation to be made in accordance with this Section 2.7(a), the following provisions shall be applicable:

(i)    In case of the issuance or sale of shares of Common Stock for a consideration part or all of which shall be cash, the amount of cash consideration therefor shall be deemed to be the amount of cash received by the Company for such shares (or, if shares of Common Stock are offered by the Company for

{00080060.6 / 0860-103}

subscription, the subscription price, or if either of such securities shall be sold to underwriters or dealers for public offering without a subscription offering, the initial public offering price) before deducting therefrom any compensation paid or discount allowed in the sale, underwriting or purchase thereof by underwriters or dealers or others performing similar services, or any expenses incurred in connection therewith.

(ii)     In case of the issuance or sale (otherwise than as a dividend or other distribution on any stock of the Company) of shares of Common Stock for a consideration part or all of which shall be other than cash, the amount of the consideration therefor other than cash shall be deemed to be the value of such consideration as determined in good faith by the Board of Directors of the Company.

(iii)     Shares of Common Stock issuable by way of dividend or other distribution on any stock of the Company shall be deemed to have been issued immediately after the opening of business on the day following the record date for the determination of stockholders entitled to receive such dividend or other distribution and shall be deemed to have been issued without consideration.

(iv)     The reclassification of securities of the Company other than shares of the Common Stock into securities including shares of Common Stock shall be deemed to involve the issuance of such shares of Common Stock for a consideration other than cash immediately prior to the close of business on the date fixed for the determination of security holders entitled to receive such shares, and the value of the consideration allocable to such shares of Common Stock shall be determined as provided in subsection (ii) of this Section 2.7(a).

(v)     The number of shares of Common Stock at any one time outstanding shall include the aggregate number of shares issued or issuable (subject to readjustment upon the actual issuance thereof) upon the exercise of options, rights, warrants and upon the conversion or exchange of convertible or exchangeable securities; provided, however, that shares issuable upon the exercise of the Warrants shall not be included in such calculation.

(b)     Options, Rights, Warrants and Convertible and Exchangeable Securities. In case the Company shall at any time after the date hereof and until this Warrant is fully exercised issue options, rights or warrants to subscribe for shares of Common Stock, or issue any securities convertible into or exchangeable for shares of Common Stock, for a consideration per share less than the Exercise Price immediately prior to the issuance of such options, rights or warrants (excluding shares of Common Stock issuable upon exercise of options, warrants or conversion rights granted as of the date hereof and shares of Common Stock issuable upon exercise of stock options at or above the closing market price per share of Common Stock under any stock option plan of the Company), or such convertible or exchangeable securities, or without consideration, the Exercise Price in effect immediately prior to the issuance of such options, rights or warrants, or such convertible or exchangeable securities, as the case may be, shall be reduced to a price

determined by making a computation in accordance with the provision of Section 2.7(a) hereof, provided that:

(i)    The aggregate maximum number of shares of Common Stock, as the case may be, issuable under such options, rights or warrants shall be deemed to be issued and outstanding at the time such options, rights or warranties were issued, and for a consideration equal to the minimum purchase price per share provided for in such options, rights or warrants at the time of issuance, plus the consideration (determined in the same manner as consideration received on the issue or sale of shares in accordance with the terms of the Warrants), if any, received by the Company for such options, rights or warrants.

(ii)    The aggregate maximum number of shares of Common Stock issuable upon conversion or exchange of any convertible or exchangeable securities shall be deemed to be issued and outstanding at the time of issuance of such securities, and for a consideration equal to the consideration (determined in the same manner as consideration received on the issue or sale of shares of Common Stock in accordance with the terms of the Warrants) received by the Company for such securities, plus the minimum consideration, if any, receivable by the Company upon the conversion or exchange thereof.

(iii)    If any change shall occur in the price per share provided for in any of the options, rights or warrants referred to in subsection (a) of this Section 2.7, or in the price per share at which the securities referred to in subsection (b) of this Section 2.7 are convertible or exchangeable, such options, rights or warrants or conversion or exchange rights, as the case may be, shall be deemed to have expired or terminated on the date when such price change became effective in respect of shares not theretofore issued pursuant to the exercise or conversion or exchange thereof, and the Company shall be deemed to have issued upon such date new options, rights or warrants or convertible or exchangeable securities at the new price in respect of the number of shares issuable upon the exercise of such options, rights or warrants or the conversion or exchange of such convertible or exchangeable securities.

(iv)    If any options, rights or warrants referred to in subsection (a) of this Section 2.7, or any convertible or exchangeable securities referred to in subsection (b) of this Section 2.7, expire or terminate without exercise or conversion, as the case may be, then the Exercise Price of the remaining outstanding Warrant shall be readjusted as if such options, rights or warrants or convertible or exchangeable securities, as the case may be, had never been issued.

(c)    Subdivision and Combination.  In case the Company shall at any time subdivide or combine the outstanding shares of Common Stock, the Exercise Price shall forthwith be proportionately decreased in the case of subdivision or increased in the case of combination.

(d)    Adjustment in Number of Securities.  Upon each adjustment of the Exercise Price pursuant to the provisions of this Section 2.7, the number of Warrant

Shares issuable upon the exercise of each Warrant shall be adjusted to the nearest whole number by multiplying a number equal to the Exercise Price in effect immediately prior to such adjustment by the number of Warrant Shares issuable upon exercise of the Warrants immediately prior to such adjustment and dividing the product so obtained by the adjusted Exercise Price.

(e)     Merger or Consolidation.  In case of any consolidation of the Company with, or merger of the Company with, or merger of the Company into, another corporation (other than a consolidation or merger which does not result in any reclassification or change of the outstanding Common Stock), the corporation formed by such consolidation or merger shall execute and deliver to the Holder a supplemental warrant agreement providing that the Holder of each Warrant then outstanding or to be outstanding shall have the right thereafter (until the expiration of such Warrant) to receive, upon exercise of such Warrant, the kind and amount of shares of stock and other securities and property (except in the event the property is cash, then the Holder shall have the right to exercise the Warrant and receive cash in the same manner as other stockholders) receivable upon such consolidation or merger, by a holder of the number of shares of Common Stock of the Company for which such warrant might have been exercised immediately prior to such consolidation, merger, sale or transfer. Such supplemental warrant agreement shall provide for adjustments which shall be identical to the adjustments provided in Section 2.7. The foregoing provisions of this paragraph (e) shall similarly apply to successive consolidations or mergers.

(f)     No Adjustment of Exercise Price in Certain Cases.  No adjustment of the Exercise Price shall be made upon the issuance of any securities (i) under an Approved Stock Plan (as such term is defined in the Convertible Debenture dated as of the date hereof), (ii) that constitute Excluded Securities (as such term is defined in the Convertible Debenture dated as of the date hereof) and/or (iii) that constitute Other Securities (as such term is defined in the Convertible Debenture dated as of the date hereof).

(g)     Dividends and Other Distributions.  In the event that the Company shall at any time prior to the exercise of all Warrants declare a dividend (other than a dividend consisting solely of shares of Common Stock) or otherwise distribute to its stockholders any assets, property, rights, evidences of indebtedness, securities (other than shares of Common Stock), whether issued by the Company or by another, or any other thing of value, the Holders of the unexercised Warrants shall thereafter be entitled, in addition to the shares of Common Stock or other securities and property receivable upon the exercise thereof, to receive, upon the exercise of such Warrants, the same property, assets, rights, evidences of indebtedness, securities or any other thing of value that they would have been entitled to receive at the time of such dividend or distribution as if the Warrants had been exercised immediately prior to such dividend or distribution. At the time of any such dividend or distribution, the Company shall make appropriate reserves to ensure the timely performance of the provisions of this subsection 2.7 (g). Nothing contained herein shall provide for the receipt or accrual by a Holder of cash dividends prior to the exercise by such Holder of the Warrants.

2.8     Registration Rights.  The Holder shall have the registration rights set forth in the Investor Registration Rights Agreement.

{00080060.6 / 0860-103}

## ARTICLE 3. MISCELLANEOUS

3.1    Transfer. This Warrant may not be offered, sold, transferred, pledged, assigned, hypothecated or otherwise disposed of, in whole or in part, at any time, except in compliance with applicable federal and state securities laws by the transferor and the transferee (including, without limitation, the delivery of an investment representation letter and a legal opinion reasonably satisfactory to the Company).

3.2    Transfer Procedure. Subject to the provisions of Section 3.1, the Holder may transfer or assign this Warrant by giving the Company notice setting forth the name, address and taxpayer identification number of the transferee or assignee, if applicable (the "Transferee"), and surrendering this Warrant to the Company for reissuance to the Transferee and, in the event of a transfer or assignment of this Warrant in part, the Holder. (Each of the persons or entities in whose name any such new Warrant shall be issued are herein referred to as a "Holder").

3.3    Loss, Theft, Destruction or Mutilation. If this Warrant shall become mutilated or defaced or be destroyed, lost or stolen, the Company shall execute and deliver a new Warrant in exchange for and upon surrender and cancellation of such mutilated or defaced Warrant or, in lieu of and in substitution for such Warrant so destroyed, lost or stolen, upon the Holder filing with the Company an affidavit that such Warrant has been so mutilated, defaced, destroyed, lost or stolen. However, the Company shall be entitled, as a condition to the execution and delivery of such new Warrant, to demand reasonably acceptable indemnity to it and payment of the expenses and charges incurred in connection with the delivery of such new Warrant. Any Warrant so surrendered to the Company shall be canceled.

3.4    Notices. All notices and other communications from the Company to the Holder or vice versa shall be deemed delivered and effective when given personally, by facsimile transmission with confirmation sheet at such address and/or facsimile number as may have been furnished to the Company or the Holder, as the case may be, in writing by the Company or the Holder from time to time.

3.5    Waiver. This Warrant and any term hereof may be changed, waived, or terminated only by an instrument in writing signed by the party against which enforcement of such change, waiver, discharge or termination is sought.

3.6    Governing Law. This Warrant shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to its principles regarding conflicts of law. Any action to enforce the terms of this Warrant shall be exclusively heard in the county, state and federal Courts of New York and Country of the United States of America.

3.7    Signature. In the event that any signature on this Warrant is delivered by facsimile transmission, such signature shall create a valid and binding obligation of the

{00080060.6 / 0860-103}

party executing (or on whose behalf such signature is executed) the same, with the same force and effect as if such facsimile signature page were an original thereof.

     3.8    Legal Fees.  In the event any Person commences a legal action or proceeding to enforce its rights under this Warrant, the non-prevailing party to such action or proceeding shall pay all reasonable and necessary costs and expenses (including reasonable and necessary attorney's fees) incurred in enforcing such rights.

Dated:  November 17, 2005

CHARYS HOLDING COMPANY INC.

By: _____
    Name: Billy Ray, Jr.
    Title: Chief Executive Officer

Attest: _____

_____
Name: H. Alec McLofty
Title: Director

## APPENDIX I

### NOTICE OF EXERCISE

1.    The undersigned hereby elects (please check the appropriate box and fill in the blank spaces):

☐ to purchase _____ shares of Common Stock, $.001 par value per share, of Charys Holding Company Inc. at [$.25] [$.01] per share for a total of $_____ and pursuant to the terms of the attached Warrant, and tenders herewith payment of the aggregate Exercise Price of such Warrant Shares in full; or

☐ to purchase _____ shares of Common Stock, $.001 par value per share, of Charys Holding Company Inc. pursuant to the cashless exercise provision under Section 2.2 (b) of the attached Warrant, and tenders herewith the number of Warrant Shares to purchase such Warrant Shares based upon the formula set forth in Section 2.2 (b).

2.    Please issue a certificate or certificates representing said Warrant Shares in the name of the undersigned or in such other name as is specified below:

Dated: _____        By: _____

                                    Name: _____

Title: _____

{00080060.6 / 0860-103}

**Void after 5:00 p.m., New York Time on November 17, 2008**
**Warrant to Purchase 400,000 Shares of Common Stock**

## WARRANT TO PURCHASE COMMON STOCK

## CHARYS HOLDING COMPANY INC.

THIS WARRANT, AND THE SECURITIES INTO WHICH IT IS EXERCISABLE (COLLECTIVELY, THE "SECURITIES"), HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR THE SECURITIES LAWS OF ANY STATE.  THE SECURITIES MAY NOT BE OFFERED OR SOLD UNLESS THE SECURITIES ARE REGISTERED UNDER THE ACT OR PURSUANT TO AVAILABLE EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND THE COMPANY WILL BE PROVIDED WITH OPINION OF COUNSEL OR OTHER SUCH INFORMATION AS IT MAY REASONABLY REQUIRE TO CONFIRM THAT SUCH EXEMPTIONS ARE AVAILABLE.

**FOR VALUE RECEIVED,** Charys Holding Company Inc., a corporation organized under the laws of Delaware (the "Company"), grants the following rights to Highgate House Funds, Ltd, a Cayman Islands company and/or its assigns (the "Holder"):

### ARTICLE 1.  DEFINITIONS

Capitalized terms used and not otherwise defined herein shall have the meanings given such terms in the Securities Purchase Agreement by and between the Company and the Holder and entered into on November 16, 2005 (the "Purchase Agreement").  As used in this Agreement, the following terms shall have the following meanings:

"Corporate Office" shall mean the office of the Company (or its successor) at which at any particular time its principal business shall be administered.

"Exercise Date" shall mean any date on which the Holder gives the Company a Notice of Exercise in the form attached hereto as Appendix I and in compliance with Exhibit F to the Purchase Agreement.

"Exercise Price" shall mean the Fixed Price per share of Common Stock, subject to adjustment as provided herein.

"Expiration Date" shall mean 5:00 p.m. (New York time) on November 16, 2008.

"Fair Market Value" shall have the meaning set forth in Section 2.2(b).

"Fixed Price" shall mean US$0.50.

"Market Value" shall have the meaning set forth in Section 2.2(b).

"SEC" shall mean the United States Securities and Exchange Commission.

"Warrant Shares" shall mean the shares of the Common Stock issuable upon exercise of this Warrant.

## ARTICLE 2. EXERCISE AND AGREEMENTS

2.1    Exercise of Warrant; Sale of Warrant and Warrant Shares.    (a) This Warrant shall entitle the Holder to purchase, at the Exercise Price, 400,000 shares of Common Stock.  This Warrant shall be exercisable at any time and from time to time from the date hereof and prior to the Expiration Date (the "Exercise Period").  This Warrant and the right to purchase Warrant Shares hereunder shall expire and become void on the Expiration Date.

2.2    Manner of Exercise.

(a)    The Holder may exercise this Warrant at any time and from time to time during the Exercise Period, in whole or in part (but not in denominations of fewer than 10,000 Warrant Shares, except upon an exercise of this Warrant with respect to the remaining balance of Warrant Shares purchasable hereunder at the time of exercise), by delivering to the Escrow Agent pursuant to the Escrow Shares Escrow Agreement of even date herewith incorporated herein by reference   (i) a duly executed Notice of Exercise in substantially the form attached as Appendix I hereto, (ii) the certificate representing the Warrants and (iii) a bank cashier's or certified check for the aggregate Exercise Price of the Warrant Shares being purchased.

(b)    The Holder may, at its option, in lieu of paying cash for the Warrant Shares, exercise this Warrant by an exchange, in whole or in part (a "Warrant Exchange"), by delivery to the Escrow Agent of (i) a duly executed Notice of Exercise electing a Warrant Exchange and (ii) the certificate representing this Warrant.   In connection with any Warrant Exchange, the Holder shall be deemed to have paid for the Warrant Shares an amount equal to the Fair Market Value of each Warrant delivered, and the Warrants shall be deemed exercised for the amount so paid. For this purpose, the Fair Market Value of each Warrant is the difference between the Market Value of a share of Common Stock and the Exercise Price on the Exercise Date. Market Value shall mean the average Closing Bid Price of a share of Common Stock during the ten (10) Trading Days ending on the Exercise Date.

2.3    Termination.  All rights of the Holder in this Warrant, to the extent they have not been exercised, shall terminate on the Expiration Date.

2.4    No Rights Prior to Exercise.  This Warrant shall not entitle the Holder to any voting or other rights as a stockholder of the Company.

2.5     Fractional Shares.  No fractional shares shall be issuable upon exercise of this Warrant, and the number of Warrant Shares to be issued shall be rounded up to the nearest whole number.  If, upon exercise of this Warrant, the Holder hereof would be entitled to receive any fractional share, the Company shall issue to the Holder one additional share of Common Stock in lieu of such fractional share.

2.6     Escrow.  The Company agrees to enter into the Escrow Shares Escrow Agreement and to deposit with the Escrow Agent thereunder stock certificates registered in the name of the Holder, each representing a number of shares of Common Stock (in denominations specified by the Purchaser) equal, in the aggregate, to the total number of Warrant Shares for which this Warrant is exercisable, assuming exercise of this Warrant in full on the date hereof.  The Company shall deposit additional certificates for Warrant Shares upon request by the Escrow Agent pursuant to the Escrow Agreement and Exhibit F to the Purchase Agreement.

2.7     Adjustments to Exercise Price and Number of Securities.

(a)     Computation of Adjusted Exercise Price.  In case the Company shall at any time after the date hereof and until this Warrant is fully exercised issue or sell any shares of Common Stock (other than the issuances or sales referred to in Section 2.7 (f) hereof), including shares held in the Company's treasury and shares of Common Stock issued upon the exercise of any options, rights or warrants to subscribe for shares of Common Stock and shares of Common Stock issued upon the direct or indirect conversion or exchange of securities for shares of Common Stock (excluding shares of Common Stock issuable upon exercise of options, warrants or conversion rights granted as of the date hereof), for a consideration per share less than the Exercise Price on the date immediately prior to the issuance or sale of such shares, or without consideration, then forthwith upon such issuance or sale, the Exercise Price shall (until another such issuance or sale) be reduced to the price equal to the quotient derived by dividing (A) an amount equal to the sum of (X) the product of (a) the Exercise Price on the date immediately prior to the issuance or sale of such shares, multiplied by (b) the total number of shares of Common Stock outstanding immediately prior to such issuance or sale plus, (Y) the aggregate of the amount of all consideration, if any, received by the Company upon such issuance or sale, by (B) the total number of shares of Common Stock outstanding immediately after such issuance or sale; provided, however, that in no event shall the Exercise Price be adjusted pursuant to this computation to an amount in excess of the Exercise Price in effect immediately prior to such computation, except in the case of a combination of outstanding shares of Common Stock, as provided by Section 2.7 (c) hereof.

For the purposes of any computation to be made in accordance with this Section 2.7(a), the following provisions shall be applicable:

(i)     In case of the issuance or sale of shares of Common Stock for a consideration part or all of which shall be cash, the amount of cash consideration therefor shall be deemed to be the amount of cash received by the Company for such shares (or, if shares of Common Stock are offered by the Company for subscription, the subscription price, or if either of such securities shall be sold to underwriters or dealers for public offering without a subscription offering, the

initial public offering price) before deducting therefrom any compensation paid or discount allowed in the sale, underwriting or purchase thereof by underwriters or dealers or others performing similar services, or any expenses incurred in connection therewith.

(ii)    In case of the issuance or sale (otherwise than as a dividend or other distribution on any stock of the Company) of shares of Common Stock for a consideration part or all of which shall be other than cash, the amount of the consideration therefor other than cash shall be deemed to be the value of such consideration as determined in good faith by the Board of Directors of the Company.

(iii)    Shares of Common Stock issuable by way of dividend or other distribution on any stock of the Company shall be deemed to have been issued immediately after the opening of business on the day following the record date for the determination of stockholders entitled to receive such dividend or other distribution and shall be deemed to have been issued without consideration.

(iv)    The reclassification of securities of the Company other than shares of the Common Stock into securities including shares of Common Stock shall be deemed to involve the issuance of such shares of Common Stock for a consideration other than cash immediately prior to the close of business on the date fixed for the determination of security holders entitled to receive such shares, and the value of the consideration allocable to such shares of Common Stock shall be determined as provided in subsection (ii) of this Section 2.7(a).

(v)    The number of shares of Common Stock at any one time outstanding shall include the aggregate number of shares issued or issuable (subject to readjustment upon the actual issuance thereof) upon the exercise of options, rights, warrants and upon the conversion or exchange of convertible or exchangeable securities; provided, however, that shares issuable upon the exercise of the Warrants shall not be included in such calculation.

(b)    Options, Rights, Warrants and Convertible and Exchangeable Securities. In case the Company shall at any time after the date hereof and until this Warrant is fully exercised issue options, rights or warrants to subscribe for shares of Common Stock, or issue any securities convertible into or exchangeable for shares of Common Stock, for a consideration per share less than the Exercise Price immediately prior to the issuance of such options, rights or warrants (excluding shares of Common Stock issuable upon exercise of options, warrants or conversion rights granted as of the date hereof and shares of Common Stock issuable upon exercise of stock options at or above the closing market price per share of Common Stock under any stock option plan of the Company), or such convertible or exchangeable securities, or without consideration, the Exercise Price in effect immediately prior to the issuance of such options, rights or warrants, or such convertible or exchangeable securities, as the case may be, shall be reduced to a price determined by making a computation in accordance with the provision of Section 2.7(a) hereof, provided that:

(i)     The aggregate maximum number of shares of Common Stock, as the case may be, issuable under such options, rights or warrants shall be deemed to be issued and outstanding at the time such options, rights or warranties were issued, and for a consideration equal to the minimum purchase price per share provided for in such options, rights or warrants at the time of issuance, plus the consideration (determined in the same manner as consideration received on the issue or sale of shares in accordance with the terms of the Warrants), if any, received by the Company for such options, rights or warrants.

(ii)    The aggregate maximum number of shares of Common Stock issuable upon conversion or exchange of any convertible or exchangeable securities shall be deemed to be issued and outstanding at the time of issuance of such securities, and for a consideration equal to the consideration (determined in the same manner as consideration received on the issue or sale of shares of Common Stock in accordance with the terms of the Warrants) received by the Company for such securities, plus the minimum consideration, if any, receivable by the Company upon the conversion or exchange thereof.

(iii)   If any change shall occur in the price per share provided for in any of the options, rights or warrants referred to in subsection (a) of this Section 2.7, or in the price per share at which the securities referred to in subsection (b) of this Section 2.7 are convertible or exchangeable, such options, rights or warrants or conversion or exchange rights, as the case may be, shall be deemed to have expired or terminated on the date when such price change became effective in respect of shares not theretofore issued pursuant to the exercise or conversion or exchange thereof, and the Company shall be deemed to have issued upon such date new options, rights or warrants or convertible or exchangeable securities at the new price in respect of the number of shares issuable upon the exercise of such options, rights or warrants or the conversion or exchange of such convertible or exchangeable securities.

(iv)    If any options, rights or warrants referred to in subsection (a) of this Section 2.7, or any convertible or exchangeable securities referred to in subsection (b) of this Section 2.7, expire or terminate without exercise or conversion, as the case may be, then the Exercise Price of the remaining outstanding Warrant shall be readjusted as if such options, rights or warrants or convertible or exchangeable securities, as the case may be, had never been issued.

(c)     Subdivision and Combination. In case the Company shall at any time subdivide or combine the outstanding shares of Common Stock, the Exercise Price shall forthwith be proportionately decreased in the case of subdivision or increased in the case of combination.

(d)     Adjustment in Number of Securities. Upon each adjustment of the Exercise Price pursuant to the provisions of this Section 2.7, the number of Warrant Shares issuable upon the exercise of each Warrant shall be adjusted to the nearest whole number by multiplying a number equal to the Exercise Price in effect immediately prior to such adjustment by the number of Warrant Shares issuable upon exercise of the

Warrants immediately prior to such adjustment and dividing the product so obtained by the adjusted Exercise Price.

(e) <u>Merger or Consolidation</u>. In case of any consolidation of the Company with, or merger of the Company with, or merger of the Company into, another corporation (other than a consolidation or merger which does not result in any reclassification or change of the outstanding Common Stock), the corporation formed by such consolidation or merger shall execute and deliver to the Holder a supplemental warrant agreement providing that the Holder of each Warrant then outstanding or to be outstanding shall have the right thereafter (until the expiration of such Warrant) to receive, upon exercise of such Warrant, the kind and amount of shares of stock and other securities and property (except in the event the property is cash, then the Holder shall have the right to exercise the Warrant and receive cash in the same manner as other stockholders) receivable upon such consolidation or merger, by a holder of the number of shares of Common Stock of the Company for which such warrant might have been exercised immediately prior to such consolidation, merger, sale or transfer. Such supplemental warrant agreement shall provide for adjustments which shall be identical to the adjustments provided in Section 2.7. The foregoing provisions of this paragraph (e) shall similarly apply to successive consolidations or mergers.

(f) <u>No Adjustment of Exercise Price in Certain Cases</u>. No adjustment of the Exercise Price shall be made upon the issuance of any securities (i) under an Approved Stock Plan (as such term is defined in the Convertible Debenture dated as of the date hereof), (ii) that constitute Excluded Securities (as such term is defined in the Convertible Debenture dated as of the date hereof) and/or (iii) that constitute Other Securities (as such term is defined in the Convertible Debenture dated as of the date hereof).

(g) <u>Dividends and Other Distributions</u>. In the event that the Company shall at any time prior to the exercise of all Warrants declare a dividend (other than a dividend consisting solely of shares of Common Stock) or otherwise distribute to its stockholders any assets, property, rights, evidences of indebtedness, securities (other than shares of Common Stock), whether issued by the Company or by another, or any other thing of value, the Holders of the unexercised Warrants shall thereafter be entitled, in addition to the shares of Common Stock or other securities and property receivable upon the exercise thereof, to receive, upon the exercise of such Warrants, the same property, assets, rights, evidences of indebtedness, securities or any other thing of value that they would have been entitled to receive at the time of such dividend or distribution as if the Warrants had been exercised immediately prior to such dividend or distribution. At the time of any such dividend or distribution, the Company shall make appropriate reserves to ensure the timely performance of the provisions of this subsection 2.7 (g). Nothing contained herein shall provide for the receipt or accrual by a Holder of cash dividends prior to the exercise by such Holder of the Warrants.

2.8 <u>Registration Rights</u>. The Holder shall have the registration rights set forth in the Investor Registration Rights Agreement.

## ARTICLE 3.  MISCELLANEOUS

3.1     Transfer.  This Warrant may not be offered, sold, transferred, pledged, assigned, hypothecated or otherwise disposed of, in whole or in part, at any time, except in compliance with applicable federal and state securities laws by the transferor and the transferee (including, without limitation, the delivery of an investment representation letter and a legal opinion reasonably satisfactory to the Company).

3.2     Transfer Procedure.  Subject to the provisions of Section 3.1, the Holder may transfer or assign this Warrant by giving the Company notice setting forth the name, address and taxpayer identification number of the transferee or assignee, if applicable (the "Transferee"), and surrendering this Warrant to the Company for reissuance to the Transferee and, in the event of a transfer or assignment of this Warrant in part, the Holder.  (Each of the persons or entities in whose name any such new Warrant shall be issued are herein referred to as a "Holder").

3.3     Loss, Theft, Destruction or Mutilation.  If this Warrant shall become mutilated or defaced or be destroyed, lost or stolen, the Company shall execute and deliver a new Warrant in exchange for and upon surrender and cancellation of such mutilated or defaced Warrant or, in lieu of and in substitution for such Warrant so destroyed, lost or stolen, upon the Holder filing with the Company an affidavit that such Warrant has been so mutilated, defaced, destroyed, lost or stolen.  However, the Company shall be entitled, as a condition to the execution and delivery of such new Warrant, to demand reasonably acceptable indemnity to it and payment of the expenses and charges incurred in connection with the delivery of such new Warrant.  Any Warrant so surrendered to the Company shall be canceled.

3.4     Notices.  All notices and other communications from the Company to the Holder or vice versa shall be deemed delivered and effective when given personally, by facsimile transmission with confirmation sheet at such address and/or facsimile number as may have been furnished to the Company or the Holder, as the case may be, in writing by the Company or the Holder from time to time.

3.5     Waiver.  This Warrant and any term hereof may be changed, waived, or terminated only by an instrument in writing signed by the party against which enforcement of such change, waiver, discharge or termination is sought.

3.6     Governing Law.  This Warrant shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to its principles regarding conflicts of law.  Any action to enforce the terms of this Warrant shall be exclusively heard in the county, state and federal Courts of New York and Country of the United States of America.

3.7     Signature.  In the event that any signature on this Warrant is delivered by facsimile transmission, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) the same, with the same force and effect as if such facsimile signature page were an original thereof.

3.8    Legal Fees.    In the event any Person commences a legal action or proceeding to enforce its rights under this Warrant, the non-prevailing party to such action or proceeding shall pay all reasonable and necessary costs and expenses (including reasonable and necessary attorney's fees) incurred in enforcing such rights.

Dated:   November 17, 2005

CHARYS HOLDING COMPANY INC.

By: _____
    Name: Billy Ray, Jr.
    Title: Chief Executive Officer

Attest: _____

_____
Name: H Alec McCarty
Title: Director

## APPENDIX I

### NOTICE OF EXERCISE

1.  The undersigned hereby elects (please check the appropriate box and fill in the blank spaces):

    ☐ to purchase _____ shares of Common Stock, $.001 par value per share, of Charys Holding Company Inc. at $.50 per share for a total of $_____ and pursuant to the terms of the attached Warrant, and tenders herewith payment of the aggregate Exercise Price of such Warrant Shares in full; or

    ☐ to purchase _____ shares of Common Stock, $.001 par value per share, of Charys Holding Company Inc. pursuant to the cashless exercise provision under Section 2.2 (b) of the attached Warrant, and tenders herewith the number of Warrant Shares to purchase such Warrant Shares based upon the formula set forth in Section 2.2 (b).

2.  Please issue a certificate or certificates representing said Warrant Shares in the name of the undersigned or in such other name as is specified below:

Dated: _____        By: _____

                                     Name: _____

Title: _____