**EXHIBIT D**



## HIGHGATE HOUSE
### FUNDS, LTD.

101 Hudson Street, Suite 3700, Jersey City, NJ 07302
(201) 985 8300 · FAX (201) 985 8266
www.cornellcapital.com

**Via E-Mail and Facsimile (404) 365-9532**

Sonia H. Sun, Esquire
Morris, Manning & Martin, LLP
1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, Georgia 30326

      **Re:**    **Highgate House Funds, Ltd.**

Dear Ms. Sun:

I am a Director of Highgate House Funds, Ltd. and a Managing Director of Yorkville Advisors, LLC, the investment manager of Highgate House Funds, Ltd. This letter will confirm that Highgate House Funds, Ltd. is in existence and holds warrants to purchase 1,000,000 shares of Charys' common stock, of which 600,000 have an exercise price of $0.01 per share and 400,000 have an exercise price of $0.50 per share. As a reminder, Highgate House received the warrants in connection with its investment in Charys. The warrants are still held by Highgate House. No part of the warrants has been assigned or transferred to any other party, including HH Advisors, Jason Rimland or Michael Chorske. Further, Gottbetter & Partners, LLP does not represent Highgate or any of its affiliates and is not authorized to act on their behalf.

I have attached copies of the warrants evidencing Highgate House Funds, Ltd. ownership of the warrants.

                    Very truly yours,

                    Troy J. Rillo

**EXHIBIT E**

SB-2/A 1 a06-20484_1sb2a.htm REGISTRATION OF SECURITIES TO BE SOLD TO THE PUBLIC BY SMALL BUSINESS ISSUERS

**As Filed with Securities and Exchange Commission on October 17, 2006**

Registration No. 333-131928

# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM SB-2
Amendment No. 2

## REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933

# CHARYS HOLDING COMPANY, INC.
(Exact name of the registrant as specified in its charter)

| **Delaware** | **7200** | **54-2152284** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification No.) |

| | |
|---|---|
| **1117 Perimeter Center West, Suite N-415** | **1117 Perimeter Center West, Suite N-415** |
| **Atlanta, Georgia 30338** | **Atlanta, Georgia 30338** |
| **(678) 443-2300** | **(678) 443-2300** |
| (Address and telephone number of principal executive offices) | (Address of principal place of business or intended principal place of business) |
| **Mr. Billy V. Ray, Jr.** | **With a Copy to:** |
| **1117 Perimeter Center West, Suite N-415** | **Larry W. Shackelford, Esq.** |
| **Atlanta, Georgia 30338** | **Morris, Manning & Martin, LLP** |
| **(678) 443-2300 (Office)** | **1600 Atlanta Financial Center** |
| **(678) 443-2320 (Facsimile)** | **3343 Peachtree Road, N.E.** |
| (Name, address and telephone number of agent for service) | **Atlanta, Georgia 30326** |
| | **(404) 233-7000 (Office)** |
| | **(404) 365-9532 (Facsimile)** |

Approximate date of commencement of proposed sale to the public: From time to time after this registration statement becomes effective.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act, check the following box. ☒

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If delivery of the prospectus is expected to be made pursuant to Rule 434, check the following box. ☐

## CALCULATION OF REGISTRATION FEE

| Title of Each Class of Securities To Be Registered | Amount To Be Registered(1) | Proposed Maximum Offering Price Per Share(2) | Proposed Maximum Aggregate Offering Price | Amount of Registration Fee |
|---|---|---|---|---|
| Common stock | 42,800,370 | (2) | $75,221,451.45 | $ 8,048.70 |
| Common stock issuable upon conversion of notes | 8,628,129 | (2) | $ 26,229,512.16 | $ 2,806.56 |
| Common stock issuable upon conversion of preferred stock | 5,827,868 | (2) | $17,716,718.72 | $ 1,895.69 |
| Total Registration Fee | | | | $ 12,750.94 (2) |

(1) Represents shares of our common stock, par value $0.001 per share, held by the selling stockholders. In addition to the shares set forth in the table, the amount to be registered includes an indeterminate number of shares issuable upon the conversion of our Series C and Series D preferred stock, as such number may be adjusted as a result of stock splits, stock dividends and similar transactions in accordance with Rule 416 of the Securities Act of 1933, as amended. For purposes of estimating the number of shares of common stock to be included in this registration statement, we calculated a good faith estimate of the number of shares of our common stock that we believe will be issuable upon conversion or exercise of convertible notes, debentures, warrants, and preferred stock. In addition, should a decrease in the exercise price occur as a result of an issuance or sale of shares below the then current market price, which causes us to have insufficient shares, we will not rely upon Rule 416, but will file a new registration statement to cover the resale of such additional shares should that become necessary.

(2) With respect to 30,665,741 shares of common stock originally covered by this registration statement, a filing fee of $4,101.54 was paid upon the original filing of this registration statement on February 17, 2006, based on a proposed maximum offering price per share of $1.25, equal to the average of the high and low prices as reported on the Over the Counter Bulletin Board on February 16, 2006. With respect to the additional 26,590,627 shares of class A common stock covered by Amendment No.2 to this registration statement, an additional filing fee of $8,649.40 was paid based on a proposed maximum offering price per share of $3.04, equal to the average of the high and low prices as reported on the Over the Counter Bulletin Board on October 11, 2006.

The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933, or until this registration statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.

SUBJECT TO COMPLETION, DATED OCTOBER 17, 2006

Information contained herein is subject to completion or amendment. A registration statement relating to these securities has been filed with the Securities and Exchange Commission. These securities may not be sold nor may offers to buy be accepted prior to the time the registration statement becomes effective. This prospectus shall not constitute an offer to sell or the solicitation of an offer to buy nor shall there be any sale of these securities in any state in which such offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any such state.

PRELIMINARY PROSPECTUS

# CHARYS HOLDING COMPANY, INC.

## Resale of 57,256,368 Shares of Common Stock

We are registering 57,256,368 shares of our common stock, par value $0.001 per share, for resale by the selling stockholders identified in this prospectus. The shares covered by this prospectus are as follows:

- 8,628,129 shares to be issued upon conversion of our convertible notes;

- 6,227,868 shares, 400,000 shares of which are issued upon conversion of our Series B Preferred Stock, 500,000 shares of which are to be issued upon conversion of our Series C Preferred Stock and 5,327,868 shares of which are to be issued upon conversion of our Series D Preferred Stock;

- 15,978,598 shares as stock consideration in connection with our merger and acquisition transactions;

- 17,083,443 shares in connection with various financing transactions, including shares underlying the warrants issued in connection with such financings;

- 275,000 shares issued in private placements of our common stock;

- 8,558,330 shares issued to our consultants and financial advisors as part of their consulting or services fees; and

- 500,000 shares in settlement of a lawsuit involving our subsidiaries.

Please refer to "Selling Stockholders" beginning on page 93 of this prospectus.

We will not receive any proceeds from the sale of shares of our common stock by the selling stockholders pursuant to this prospectus. However, we will receive the exercise price of the shares we sell to the selling stockholders upon exercise of their warrants. We will bear all expenses in connection with the registration of the shares, other than underwriting discounts and selling commissions.

Our common stock currently trades on the Over the Counter Bulletin Board under the symbol "CHYS.OB." The last reported sales price of our common stock on October 16, 2006 was $4.20 per share.

**Investment In Our Common Stock Involves Risks Which Are Described Under "Risk Factors" Beginning On Page 8.**

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THESE SECURITIES OR DETERMINED IF THIS PROSPECTUS IS TRUTHFUL OR COMPLETE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

The date of this prospectus is          , 2006.

**TABLE OF CONTENTS**

PROSPECTUS SUMMARY ........................................................... 1
SUMMARY HISTORICAL FINANCIAL INFORMATION ....................... 7
RISK FACTORS ..................................................................... 8
SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS ....... 19
USE OF PROCEEDS ............................................................... 19
MARKET FOR COMMON EQUITY AND RELATED STOCKHOLDER MATTERS ... 19
DESCRIPTION OF BUSINESS ................................................... 21
MANAGEMENT'S DISCUSSION AND ANALYSIS OR PLAN OF OPERATION ... 58
MANAGEMENT ..................................................................... 74
PRINCIPAL STOCKHOLDERS ................................................... 84
DESCRIPTION OF SECURITIES ................................................. 86
CERTAIN PROVISIONS OF OUR CERTIFICATE OF INCORPORATION AND BYLAWS ... 90
SELLING STOCKHOLDERS ....................................................... 93
PLAN OF DISTRIBUTION ......................................................... 101
LEGAL MATTERS ................................................................. 103
EXPERTS ........................................................................... 103
CHANGE OF INDEPENDENT PUBLIC ACCOUNTING FIRM DURING FISCAL YEAR 2005 ... 104
WHERE YOU CAN FIND MORE INFORMATION ............................... 104
FINANCIAL STATEMENTS ....................................................... F-1

You should rely only on the information contained in this prospectus. We have not, and the selling stockholders have not, authorized anyone to provide you with different information. If anyone provides you with different information, you should not rely on it. We are not, and the selling stockholders are not, making an offer to sell these securities in any jurisdiction where the offer or sale is not permitted. You should assume that the information contained in this prospectus is accurate only as of the date on the front cover of this prospectus. Our business, financial condition, results of operations and prospects may have changed since that date.

i

equity ownership of Cotton Holdings 1, Inc. (the "Cotton Holdings") and its affiliated businesses. Pursuant to the purchase agreement, we agreed to issue to the sellers a stock consideration of 1,955,533 shares of our common stock. See "Management's Discussion and Analysis or Plan of Operation—Acquisition of Cotton Holdings 1, Inc."

*Private Placements.*   From August 2005 to January 2006, we closed a series of private placements of our common stock with 27 unrelated individuals, resulting in the issuance of a total of 275,000 shares. See "Description of Business—Private Placements."

*Other Financings.*   We issued shares and warrants in connection with the following transactions:

- *CAPCO Financing.*   On July 18, 2005, we arranged financing for CCI Telecom with CAPCO Financial Company, a division of Greater Bank N.A., to provide for an asset-based credit facility of up to $5,000,000. In consideration of the financing on August 1, 2005, we issued to Venture Banking Group, an affiliate of CAPCO, a warrant to purchase up to 862,069 shares of our common stock at $0.35 per share. The warrant expires on July 31, 2012. See "Description of Business—CAPCO Financing" in this prospectus.

- *Highgate House Funds, Ltd. ("Highgate") Financing.*   We issued a $4,000,000 secured debenture to Highgate to fund our acquisition of Viasys Services, Inc. and Viasys Network Services, Inc. Highgate may convert any or all of the face amount of the debenture plus redemption premium and accrued and unpaid interest, into shares of our common stock at a conversion price equal to the lower of $0.80 or 80% of the lowest closing bid price for the five days immediately preceding the date of conversion. On April 20, 2006 and May 19, 2006, Highgate converted a total of $773,096 of the debenture and outstanding interest into 966,370 shares of our common stock. The rest of the debenture totaling approximately $3.3 million was redeemed by the Company with the proceeds from the sale of our Series D Preferred Stock discussed above. In connection with the Highgate financing, we issued warrants to Highgate Funds to purchase an aggregate of 1,000,000 shares of our common stock. The warrants contained initial exercise prices of (i) $0.25 for 200,000 shares; (ii) $0.50 for 400,000 shares; (iii) $0.75 for 200,000 shares, and (iv) $1.00 for 200,000 shares. Each of the exercise prices was reduced to $0.01 per share except for the 400,000 shares exercisable at $0.50 per share since the secured debenture was not redeemed in full by March 16, 2006. The warrants expire on November 16, 2008. See "Description of Business—Highgate House Funds, Ltd. Financing" in this prospectus.

- *Mel Harris and Steven Posner Financing.*   In connection with our acquisition of Method IQ, Inc. ("Method IQ"), we issued a $1,000,000 secured debenture to Mel Harris and Steven Posner, who may, at their sole option, convert any or all of the face amount of the debenture plus a premium on that amount accruing at a rate of 12 percent per annum, into shares of our common stock. This debenture was subsequently converted into 1,565,000 shares of our common stock on May 26, 2006. In connection with the financing for the Method IQ acquisition, we issued to Mel Harris and Steven Posner warrants to purchase an aggregate of 250,000 shares of our common stock. The warrants provide for an exercise period of three years, expiring on December 22, 2008, with a maximum exercise price of $0.80 per share. See "Description of Business—Harris/Posner Financing with Respect to Method IQ" in this prospectus.

- *Renewal and Extension of Notes by Various Investors.*   On August 24, 2005 Charys sold a series of unsecured notes to six unrelated parties for an aggregate principal of $400,000. The notes bear an annual rate of interest at eight percent, and matured on January 3, 2006. At maturity, we issued 160,000 shares of our common stock in payment of the aggregate interests due under these notes. On March 20, 2006, each note holder executed an extension agreement extending the maturity of notes until April 15, 2006. On April 15, 2006, we issued a total of 20,000 shares as payment of an

4

*Highgate House Funds, Ltd. Financing*

In order to fund the purchase of Viasys, we arranged financing with Highgate House Funds, Ltd. On November 16, 2005, we executed a securities purchase agreement with Highgate providing for $4,000,000 in funds. In consideration of the funding, we issued to Highgate:

- A $4,000,000 secured debenture which was convertible into shares of our common stock, unless redeemed by us before March 17, 2006. The debenture had a maturity date of November 16, 2008, with interest at the rate of 8% per annum, compounded monthly. On April 20, 2006, Highgate converted $600,000 of the debenture into 750,000 shares of Charys common stock. A portion of the debenture totaling approximately $3.3 million was redeemed by Charys, and Highgate converted the remaining $173,096 of the debenture into 216,370 shares of our common stock on May 19, 2006, as a result of the sale of our Series D Preferred Stock discussed below. See "—Series D Preferred Stock Financing."

- Warrants to purchase an aggregate of 1,000,000 shares of our common stock. The warrants contained initially exercise prices of (i) $0.25 for 200,000 shares; (ii) $0.50 for 400,000 shares; (iii) $0.75 for 200,000 shares, and (iv) $1.00 for 200,000 shares. Each of the exercise prices was reduced to $0.01 per share except for the 400,000 shares exercisable at $0.50 per share since the secured debenture was not redeemed in full by March 16, 2006. The warrants expire on November 16, 2008, and may be exercised at any time until their expiration, in whole or in part.

*Security Agreement for the Highgate Financing.* As security for our obligations under the debenture and the warrants, Charys and our wholly-owned subsidiaries PRG and Viasys, executed a security agreement in favor of Highgate and granting Highgate a security interest in all of the assets of Charys, PRG and Viasys. The security agreement was subsequently terminated due to the partial redemption and conversion of the Highgate debentures.

*Escrow of Shares.* Pursuant to the securities purchase agreement with Highgate and to further ensure our obligation to issue shares of our common stock upon conversion of the debenture and exercise of the warrants, we also issued and escrowed 20,000,000 shares of our common stock with an escrow agent. The escrowed shares were reduced to 1,000,000 shares following the retirement of the Highgate debentures.

*Registration Rights.* We entered into an investor registration rights agreement with Highgate obligating us to register all of the shares issued or to be issued to Highgate. We were required to file the registration statement by February 13, 2006 and have the registration statement declared effective within 90 days thereafter. We are in default under both of these requirements. The agreement provided for monthly liquidated damages in the amount of 2% per month of the outstanding principal amount of the debentures for each month we are in default. There is currently no principal amount of debentures outstanding although we continue to be in default of our obligation to have the registration statement declared effective. As of the date of this prospectus, no claims have been made by Highgate based on our default under the registration rights agreement.

*Termination of the Highgate House Financing.* On April 20, 2006, Highgate converted $600,000 of the debenture into 750,000 shares of Charys common stock. A portion of the debenture totaling approximately $3.3 million was redeemed by the Company with the proceeds from the sale of our Series D Preferred Stock discussed below, and Highgate converted the remaining $173,096 of the debenture and outstanding interest into 216,370 shares of our common stock on May 19, 2006. Therefore, the principal and interest accrued under the Highgate convertible debenture were repaid in full and terminated accordingly.

*Series D Preferred Stock Financing*

On May 19, 2006, (the "Series D Closing Date") Charys and various investors executed a securities purchase agreement whereby the investors, for a total consideration of $12,200,000, purchased 1,300 shares

29

- The number and percentage of shares of common stock which will be owned after the offering by the selling stockholder, assuming that all of the shares offered are sold by the selling stockholder.

| Selling Shareholders | Shares Beneficially Owned Prior to the Offering | | | Number of Shares to be Offered | Shares Beneficially Owned After the Offering | |
|---|---|---|---|---|---|---|
| | Shares | Shares Underlying Warrants/ Convertible Securities | Total | | Shares | Percent |
| **CCI Acquisition** | | | | | | |
| Mike Novak(1)(2) | 275,087 | 0 | 275,087 | 275,087 | 0 | * |
| O'Donnell & Masur LP(1) | 275,087 | 0 | 275,087 | 275,087 | 0 | * |
| Jeffrey P. Blanchard(1) | 34,636 | 0 | 34,636 | 34,636 | 0 | * |
| TSG Equity Fund L.P.(1)(3) | 32,770 | 0 | 32,770 | 32,770 | 0 | * |
| Thomas R. Shepherd(1) | 4,656 | 0 | 4,656 | 4,656 | 0 | * |
| T. Nathanael Shepherd(1) | 1,669 | 0 | 1,669 | 1,669 | 0 | * |
| The Berkshires Capital Investors(1) | 38,090 | 0 | 38,090 | 38,090 | 0 | * |
| The Berkshires Capital Investors Fund II(1) | 34,526 | 0 | 34,526 | 34,526 | 0 | * |
| The Mass Ventures Equity Fund(1)(4) | 6,298 | 0 | 6,298 | 6,298 | 0 | * |
| Thomas Walsh(1) | 115 | 0 | 115 | 115 | 0 | * |
| Kieran Kelly(1) | 460 | 0 | 460 | 460 | 0 | * |
| David B. Morrison(1) | 2,947 | 0 | 2,947 | 2,947 | 0 | * |
| Dennis W. Teichert(1) | 3,033 | 0 | 3,033 | 3,033 | 0 | * |
| Kevin Kushi, Jr.(1) | 7,848 | 0 | 7,848 | 7,848 | 0 | * |
| Roger Benavides(1)(5) | 26,040 | 0 | 26,040 | 26,040 | 0 | * |
| Dale Ponder(1)(6) | 26,040 | 0 | 26,040 | 26,040 | 0 | * |
| Jimmy Taylor(1)(7) | 26,040 | 0 | 26,040 | 26,040 | 0 | * |
| CCI Associates Ltd.(8) | 250,000 | 0 | 250,000 | 250,000 | 0 | * |
| **Method IQ Acquisition** | | | | | | |
| J. Alan Shaw(9) | 65,000 | 0 | 65,000 | 65,000 | 0 | * |
| Rock Creek Equity Holdings, LLC(9)(10) | 1,250,000 | 0 | 1,250,000 | 1,250,000 | 0 | * |
| **Viasys Acquisition** | | | | | | |
| Mel Harris(11)(12) | 1,725,392 | 158,333 | 1,883,725 | 1,883,725 | 0 | * |
| Steven Posner(11)(13) | 1,256,274 | 158,333 | 1,414,607 | 1,414,607 | 0 | * |
| Crochet Partners Ltd.(14) | 8,008,000 | 0 | 8,008,000 | 8,008,000 | 0 | * |
| **Series D Preferred Stock Financing** | | | | | | |
| Gottbetter Capital Master, Ltd.(15)(16) | 0 | 3,715,846 | 3,715,846 | 3,715,846 | 0 | * |
| Enable Growth Partners LP(15)(17) | 0 | 1,932,241 | 1,932,241 | 1,932,241 | 0 | * |
| Enable Opportunity Partners LP(15)(18) | 0 | 297,267 | 297,267 | 297,267 | 0 | * |
| Pierce Diversified Strategy Master Fund LLC(15)(19) | 0 | 743,169 | 743,169 | 743,169 | 0 | * |
| Castlerigg Master Investments Ltd.(15)(20) | 0 | 2,229,508 | 2,229,508 | 2,229,508 | 0 | * |
| UBS O'Connor LLC F/B/O O'Connor PIPES Corporate Strategies Master Ltd. (15)(21) | 0 | 743,169 | 743,169 | 743,169 | 0 | * |

94

***Gottbetter Convertible Note Financing***

| | | | | | | |
|---|---|---|---|---|---|---|
| Gottbetter Capital Master, Ltd.(22)(23) | 0 | 685,491 | 685,491 | 685,491 | 0 | * |
| Fort Mason Master, LP(22)(24) | 0 | 4,828,076 | 4,828,076 | 4,828,076 | 0 | * |
| Fort Mason Partners, LP(22)(25) | 0 | 313,098 | 313,098 | 313,098 | 0 | * |
| UBS O'Connor LLC F/B/O O'Connor PIPES Corporate Strategies Master Ltd. (22)(26) | 0 | 342,745 | 342,745 | 342,745 | 0 | * |
| GCA Strategic Investment Fund Limited(22) (27) | 0 | 685,491 | 685,491 | 685,491 | 0 | * |
| PCM II, LLC(22)(28) | 0 | 6,854,899 | 6,854,899 | 6,854,899 | 0 | * |
| ***2004 Consultant Shares*** | | | | | | |
| Ash Mascarenhas(29) | 16,666 | 0 | 16,666 | 16,666 | 0 | * |
| Bruce Caldwell(29) | 33,333 | 0 | 33,333 | 33,333 | 0 | * |
| Francis Zubrowski(29) | 16,666 | 0 | 16,666 | 16,666 | 0 | * |
| Janet Risher(29)(30) | 633,333 | 0 | 633,333 | 633,333 | 0 | * |
| Jimmy Villalobos(29) | 33,333 | 0 | 33,333 | 33,333 | 0 | * |
| John Jordan(29)(31) | 33,333 | 0 | 33,333 | 33,333 | 0 | * |
| Paul Ferandell(29) | 33,333 | 0 | 33,333 | 33,333 | 0 | * |
| Richard Schmidt(29)(32) | 633,333 | 0 | 633,333 | 633,333 | 0 | * |
| ***Investment Banking Consultants and Financial Advisors*** | | | | | | |
| Newpoint Advisors, LLC(33)(34) | 0 | 500,000 | 500,000 | 500,000 | 0 | * |
| Gunn Allen Financial, Inc.(33)(35) | 800,000 | 350,000 | 1,150,000 | 1,150,000 | 0 | * |
| Aries Equity Corp.(33)(36) | 500,000 | 250,000 | 750,000 | 750,000 | 0 | * |
| CSH Advisors Inc.(33)(37) | 500,000 | 250,000 | 750,000 | 750,000 | 0 | * |
| Sam DelPresto(33)(38) | 125,000 | 400,000 | 525,000 | 525,000 | 0 | * |
| New Century Capital Consultants Inc.(33) (39) | 400,000 | 0 | 400,000 | 400,000 | 0 | * |
| Ronald Berkovitz(33) | 475,000 | 0 | 475,000 | 475,000 | 0 | * |
| Allen Levi(33) | 50,000 | 0 | 50,000 | 50,000 | 0 | * |
| Aubert Jordan(33) | 50,000 | 0 | 50,000 | 50,000 | 0 | * |
| ***Growth Management, LLC(33)*** | 400,000 | 0 | 400,000 | 400,000 | 0 | * |
| Katherine Chelsler(33) | 125,000 | 0 | 125,000 | 125,000 | 0 | * |
| Rebecca Tedder(33) | 125,000 | 0 | 125,000 | 125,000 | 0 | * |
| Russell Adler(33) | 200,000 | 0 | 200,000 | 200,000 | 0 | * |
| Salma Hassan(33) | 10,000 | 0 | 10,000 | 10,000 | 0 | * |
| Steven N. Posner(33) | 300,000 | 0 | 300,000 | 300,000 | 0 | * |
| Stuart Posner(33) | 200,000 | 0 | 200,000 | 200,000 | 0 | * |
| Teresa Pacin(33) | 140,000 | 0 | 140,000 | 140,000 | 0 | * |
| Robert McClane(33) | 75,000 | 0 | 75,000 | 75,000 | 0 | * |
| | | | | | | * |

95

| | | | | | | |
|---|---|---|---|---|---|---|
| Lumbermens Mutual Casualty Company(40) | 500,000 | 0 | 500,000 | 500,000 | 0 | * |
| Frost National Bank(41) | 400,000 | 500,000 | 900,000 | 900,000 | 0 | * |
| Highgate House Funds, Ltd.(42) | 966,370 | 1,000,000 | 1,966,370 | 1,966,370 | 0 | * |
| Venture Banking Group(43) | 0 | 862,069 | 862,069 | 862,069 | 0 | * |
| New Stream Commercial Finance, LLC(44) | 0 | 2,000,000 | 2,000,000 | 2,000,000 | 0 | * |
| *Holders of 2005 Unsecured Notes* | | | | | | |
| John Milano(45)(46) | 50,000 | 0 | 50,000 | 50,000 | 0 | * |
| Dennis Petriella(45)(46) | 27,500 | 0 | 27,500 | 27,500 | 0 | * |
| Frank Pellegrino(45)(46) | 50,000 | 0 | 50,000 | 50,000 | 0 | * |
| Peter Palumbo(45)(46) | 27,500 | 0 | 27,500 | 27,500 | 0 | * |
| Bruce Chips(45)(46) | 27,500 | 0 | 27,500 | 27,500 | 0 | * |
| RAE Ierardi IRA(45) | 8,000 | 0 | 8,000 | 8,000 | 0 | * |
| RAE Ierardi(45) | 14,500 | 0 | 14,500 | 14,500 | 0 | * |
| Anthony Pinto(46) | 5,000 | 0 | 5,000 | 5,000 | 0 | * |
| Christopher Longley(46) | 10,000 | 0 | 10,000 | 10,000 | 0 | * |
| Frank W. Stone Trust(46) | 5,000 | 0 | 5,000 | 5,000 | 0 | * |
| Gordon Pepper(46) | 10,000 | 0 | 10,000 | 10,000 | 0 | * |
| John Biondo(46) | 5,000 | 0 | 5,000 | 5,000 | 0 | * |
| Joseph Biondo(46) | 10,000 | 0 | 10,000 | 10,000 | 0 | * |
| Mark Cannavo(46) | 10,000 | 0 | 10,000 | 10,000 | 0 | * |
| Michael Peterson(46) | 5,000 | 0 | 5,000 | 5,000 | 0 | * |
| Richard Demaio(46) | 13,000 | 0 | 13,000 | 13,000 | 0 | * |
| Robert Landino(46) | 35,000 | 0 | 35,000 | 35,000 | 0 | * |
| Ronald Terebesi, Jr.(46) | 5,000 | 0 | 5,000 | 5,000 | 0 | * |
| Thomas Audley(46) | 22,000 | 0 | 22,000 | 22,000 | 0 | * |
| Glen Maleri(46) | 10,000 | 0 | 10,000 | 10,000 | 0 | * |
| Robert Trincellito(46) | 10,000 | 0 | 10,000 | 10,000 | 0 | * |
| Edward Ardito(46) | 5,000 | 0 | 5,000 | 5,000 | 0 | * |
| Louis Florio(46) | 10,000 | 0 | 10,000 | 10,000 | 0 | * |
| R. Dino Landino(46) | 10,000 | 0 | 10,000 | 10,000 | 0 | * |
| Richard Bicknell(46) | 20,000 | 0 | 20,000 | 20,000 | 0 | * |
| Fred Baldieri(46) | 10,000 | 0 | 10,000 | 10,000 | 0 | * |
| Elisa Novichi(46) | 20,000 | 0 | 20,000 | 20,000 | 0 | * |
| David Qerion(46) | 5,000 | 0 | 5,000 | 5,000 | 0 | * |
| Martin Steiglitz(46) | 10,000 | 0 | 10,000 | 10,000 | 0 | * |
| *Jade Specialty Strategy LLC*(47) | 0 | 250,000 | 250,000 | 250,000 | 0 | * |
| Milton Schwarz(48) | 0 | 250,000 | 250,000 | 250,000 | 0 | * |
| Douglus Topkis(49) | 0 | 250,000 | 250,000 | 250,000 | 0 | * |
| Scott Boruff(50) | 0 | 125,000 | 125,000 | 125,000 | 0 | * |
| L. Ford Clark(51) | 1,963,500 | 0 | 1,963,500 | 1,963,500 | 0 | * |

96

(32) Mr. Schmidt is the former director and chief financial officer of the Compay.

(33) These persons received shares of our common stock as part of their service fees in connection with our public relationship management, acquisition and financing transactions. See "Description of Business—Investment Banking Consultants and Other Financial Advisors."

(34) Includes a warrant to purchase 500,000 shares at an exercise price of 0.231. The natural person exercising dispositive and voting power over these shares of common stock owned by the Newpoint Advisors LLC is Stephen R. McDermott, the managing director.

(35) Includes a warrant to purchase 350,000 shares at an exercise price of $2.00. Gunn Allen Financial is a registered broker-dealer. It is controlled by Richard A. Frueh, who has the control and power to vote and/or sell the securities held by Gunn Allen Financial.

(36) Includes a warrant to purchase 250,000 shares at an exercise price of $1.50.

(37) Includes a warrant to purchase 250,000 shares at an exercise price of $1.50. The natural person exercising dispositive and voting power over these shares of common stock owned by CSH Advisors, Inc. is Stephen Schaeffer, the president.

(38) Includes a warrant to purchase 400,000 shares at an exercise price of $1.50.

(39) The natural person exercising dispositive and voting power over these shares of common stock owned by New Century Capital Consultants Inc. is Stephen Apolant.

(40) Lumbermens Mutual Casualty Company, a U.S. casualty insurance company, acquired the shares in connection with the settlement agreement involving Viasys. See "Description of Business—Lumbermens Settlement."

(41) Frost National Bank is a wholly owned subsidiary of Cullen/Frost Bankers, Inc., a publicly-held company subject to the periodic reporting requirements of the Exchange Act. Includes 400,000 shares of common stock issued upon the conversion of Series B Preferred Stock and 500,000 shares of common stock to be issued upon the conversion of Series C Preferred Stock. See "Description of Business—Frost Bank Refinancing."

(42) The natural person exercising dispositive and voting power over these shares of common stock owned by HighgateHouse Funds, Ltd. is Mark Angelo, the portfolio manager of the funds. Includes 966,370 shares issued upon the conversion of its convertible debenture and 1,000,000 shares issuable upon the exercise of warrants with per share exercise prices of $0.01 for 600,000 shares and $0.50 for 400,000 shares. See "Description of Business—Highgate House funds, Ltd. Financing."

(43) Venture Banking Group is a division of Greater Bay Bank NA., a bank subsidiary of Greater Bay Bancorp, a publicly-held company subject to the periodic reporting requirements of the Exchange Act. Includes 862,069 shares issuable upon the exercise of warrants with an exercises price of $0.35.

(44) Includes a warrant to purchase up to 2,000,000 shares of common stock at an exercise price of $4.80.

(45) These persons acquired shares of our common stock in connection with our unsecured note financing in August 2005. See "Description of Business—Renewal and Extension of Notes by Various Investors."

(46) These persons acquired shares of our common stock during the period from August 2005 to January 2006 in connection with a series of private placements of our common stock.

(47) Includes a warrant to purchase 250,000 shares with an exercise price of $1.10. This warrant was issued in connection with our $250,000 loan with Jade Specialty Strategy LLC that closed in February 2006. See "Description of Business—Jade Specialty Strategy LLC and Milton Schwarz Notes."

100

**EXHIBIT F**

# BUDD LARNER

### A PROFESSIONAL CORPORATION

### COUNSELLORS AT LAW

150 JOHN F. KENNEDY PARKWAY
SHORT HILLS, NJ 07078-2703
973.379.4800
FAX 973.379.7734
www.buddlarner.com
WRITER'S DIRECT DIAL: (973) 315-4410
WRITER'S DIRECT E-MAIL: CFINAZZO@BUDD-LARNER.COM

October 17, 2006

VIA FACSIMILE and REGULAR MAIL

August C. Venturini, Esq.
Venturini & Associates
230 Park Avenue, Suite 545
New York, New York 10169

Re:    **Charys Holding Company**

Dear Mr. Venturini:

As you know, this firm represents Cornell Capital Partners, L.P., Yorkville Advisors Management, LLC, and the various Highgate House funds. We are writing to inquire as to the current location of the original Warrants issued to the Highgate House Funds, Ltd by Charys Holding Company while your client, Adam S. Gottbetter, was Co-Portfolio Manager of the Fund and its attorney of record in the Charys' matter.

It is our understanding that while Mr. Gottbetter was acting on behalf of Highgate House Funds, Ltd, the Fund completed a transaction with Charys in which, *inter alia*, the Fund received one million Warrants (600,000 Warrants exercisable at $.01 and 400,000 Warrants exercisable at $.50). When Mr. Gottbetter terminated his engagement last January, he returned to our clients a Closing Binder for the Charys transaction that was to include all of the documents relating to the transaction including, but not limited to, the original Warrants. However, as a result of an inquiry to our clients last evening from an attorney representing Charys, our clients discovered that Mr. Gottbetter included only *copies*, rather than the *originals* of the Charys' Warrants in the Binder.

Yesterday, in his telephone call with the Charys' attorney, Sonia Sun, Troy Rillo of Highgate House Funds, Ltd. was informed that Charys was preparing to make an SEC filing and, as part of that process, Ms. Sun was inquiring as to the ownership of the Warrants. She stated that it was her understanding, from Tim Dockery of Gottbetter & Partners, that Highgate House Funds, Ltd had been disbanded and that ownership of the Warrants had been transferred to Mr. Gottbetter and/or his firm. Mr. Rillo was quite taken aback by this statement and assured Ms. Sun that

BUDD LARNER
A PROFESSIONAL CORPORATION

August C. Venturini
October 17, 2006
Page 2

Highgate House Fund, Ltd was still in existence and still the rightful owner of the Warrants. A copy of Mr. Rillo's letter to Ms. Sun is enclosed.

We are hoping that the statements made by Ms. Sun to Mr. Rillo and attributed to Mr. Dockery were simply an error born out of a miscommunication between Ms. Sun and Mr. Dockery. Charys' common stock is currently trading at approximately $3.65/share and, accordingly, the Warrants are currently worth approximately $3.5 million to our clients.

Please arrange to have Mr. Gottbetter confirm to us immediately that he or his law firm are currently in possession of the "original" Warrants and that he or his law firm will arrange for the Warrants to be delivered to Mr. Rillo at Cornell Capital's offices in Jersey City, New Jersey by the close of business tomorrow, October 18, 2006.

Please acknowledge your receipt of this letter by return fax.

Very truly yours,

CHRISTOPHER S. FINAZZO

#616561w
Cc: Troy Rillo, Esq.
    David Gonzalez, Esq.
    Richard M. DeAgazio, Esq.
    Adam Gottbetter, Esq. via fax, reg. mail, and cert. mail, RRR

**EXHIBIT G**

# HIGHGATE HOUSE FUNDS, LTD

May 19, 2006

**Via Facsimile and Federal Express**

Charys Holding Company, Inc.
1117 Perimeter Center West, Suite N415
Atlanta, Georgia 30338

Attention:    Mr. Billy V. Ray, Jr.
              Chief Executive Officer

Re:    **Charys Holding Company, Inc. / Highgate House Funds, Ltd.**
       **Exercise of Warrants**

Dear Mr. Ray:

Enclosed herewith please find Warrant Exercise Notices executed by Troy J. Rillo on behalf of Highgate House Funds, Ltd., for the full exercise of Warrants with exercise prices of $1.00 (reduced to $0.01), and $0.75 (reduced to $0.01) and partial exercise of Warrant with an exercise price of $0.25 (reduced to $0.01).

One wire in the amount of five thousand dollars ($5,000) in payment of the cash exercise fees for all Warrants ($2,000 + $2,000 + $1,000) shall be sent to the following instructions:

**Bank Name:** BB&T
**ABA Routing No.:** 061 113 415
**Account No.:** 5147412004
**Name on Account:** Charys Holding Company

Please confirm these are the correct instructions via e-mail to jmhalady@cornellcapital.com and/or trillo@cornellcapital.com.

Additionally, kindly arrange for issuance in the name of Highgate House Funds, Ltd., three certificates for the exercise of Warrants as follows:

1.  For exercise of Warrant with an initial exercise price of $1.00, a certificate for two hundred thousand (200,000) shares,

101 Hudson Street, Suite 3700
Jersey City, NJ 07302
Tel: (201) 985-8300 / Facsimile: (201) 985-8266

Charys Holding Company, Inc.
      Mr. Billy V. Ray, Jr., CEO      - page 2 -      October 18, 2006

2. For exercise of Warrant with an initial exercise price of $0.75, a certificate for two hundred thousand (200,000) shares, and
3. For partial exercise of Warrant with an initial exercise price of $0.25, a certificate for one hundred thousand (100,000) shares.

The certificates may be sent to this office via overnight delivery.

In the event you have any questions and/or concerns, please feel free to contact this office.

Sincerely,

**HIGHGATE HOUSE FUNDS, LTD.**

Troy J. Rillo
Co-Portfolio Manager

Via Facsimile to 678-443-2320

cc:    Sonia H. Sun, Esq.
      (Via Facsimile to 404-365-9532)

      Gottbetter & Partners
      (Via Facsimile to 212-400-6901)

      Kevin Kopaunik at Fidelity Stock Transfer
      (Via Facsimile to 801-466-4122)

## APPENDIX I

### NOTICE OF EXERCISE

1.  The undersigned hereby elects (please check the appropriate box and fill in the blank spaces):

    ☑ to purchase 200,000 shares of Common Stock, $.001 par value per share, of Charys Holding Company Inc. at [$1.00] ($.01) per share for a total of $2,000 and pursuant to the terms of the attached Warrant, and tenders herewith payment of the aggregate Exercise Price of such Warrant Shares in full; or

    ☐ to purchase _____ shares of Common Stock, $.001 par value per share, of Charys Holding Company Inc. pursuant to the cashless exercise provision under Section 2.2 (b) of the attached Warrant, and tenders herewith the number of Warrant Shares to purchase such Warrant Shares based upon the formula set forth in Section 2.2 (b).

2.  Please issue a certificate or certificates representing said Warrant Shares in the name of the undersigned or in such other name as is specified below:

HiGHGATe House Funds Ltd.

Dated: October 18, 2006        By: _____

Name: Troy J. Rillo

Title: Co-Portfolio Manager

{00080237.3 / 0860-103}

## APPENDIX I

### NOTICE OF EXERCISE

1.   The undersigned hereby elects (please check the appropriate box and fill in the blank spaces):

☑ to purchase 200,000 shares of Common Stock, $.001 par value per share, of Charys Holding Company Inc. at [$.45] ($.01) per share for a total of $2,000 and pursuant to the terms of the attached Warrant, and tenders herewith payment of the aggregate Exercise Price of such Warrant Shares in full; or

☐ to purchase _____ shares of Common Stock, $.001 par value per share, of Charys Holding Company Inc. pursuant to the cashless exercise provision under Section 2.2 (b) of the attached Warrant, and tenders herewith the number of Warrant Shares to purchase such Warrant Shares based upon the formula set forth in Section 2.2 (b).

2.   Please issue a certificate or certificates representing said Warrant Shares in the name of the undersigned or in such other name as is specified below:

Dated: _October 18, 2006_     By: _Highgate House Funds, Ltd._

Name: _Troy J. Rillo_

Title: _Co-Portfolio Manager_

(000R0235.3 / 0860-103)

## APPENDIX I

### NOTICE OF EXERCISE

1.    The undersigned hereby elects (please check the appropriate box and fill in the blank spaces):

☑ to purchase 100,000 shares of Common Stock, $.001 par value per share, of Charys Holding Company Inc. at [$.25] ($.01) per share for a total of $ 1,000 and pursuant to the terms of the attached Warrant, and tenders herewith payment of the aggregate Exercise Price of such Warrant Shares in full; or

☐ to purchase _____ shares of Common Stock, $.001 par value per share, of Charys Holding Company Inc. pursuant to the cashless exercise provision under Section 2.2 (b) of the attached Warrant, and tenders herewith the number of Warrant Shares to purchase such Warrant Shares based upon the formula set forth in Section 2.2 (b).

2.    Please issue a certificate or certificates representing said Warrant Shares in the name of the undersigned or in such other name as is specified below:

Dated: __October 18, 2006__    By: __Highgate House Funds, Ltd.__

Name: __Troy J. Rillo__

Title: __Co-Portfolio Manager__

{00080060.6 / 0860-103}

**EXHIBIT H**

# VENTURINI & ASSOCIATES

## Attorneys At Law

230 Park Avenue, Suite 545
New York, New York 10169

Telephone:  (212) 826-6800
Facsimile:   (212) 949-6162
acv@venturini-law.com

## FACSIMILE TRANSMITTAL COVER SHEET

**DATE:**          October 20, 2006

**TO:**            Christopher S. Finazzo, Esq.        (973) 379-7734
                   Gottbetter & Partners, LLP         (212) 400-6901

**FROM:**             August C. Venturini

**PAGES:**            2 (INCLUDING THIS COVER SHEET)

**COMMENTS:**
                   Please see attached letter.

CONFIDENTIALITY NOTICE:  This facsimile message is intended only for the addressee and may contain information that is privileged and confidential. If you are not the intended recipient, you are hereby notified that any dissemination or copying of this fax is strictly prohibited. If you have received this fax in error, please notify the sender directly by telephone and return the original fax by mail to the above address. Thank you.

# VENTURINI & ASSOCIATES

### ATTORNEYS AT LAW

230 PARK AVENUE, SUITE 545
NEW YORK, NY 10169

TEL: (212) 826-6800
FAX: (212) 949-6162

AUGUST C. VENTURINI

MEMBER OF
NY & NJ BARS

October 20, 2006

### VIA FACSIMILE & REGULAR MAIL

Christopher S. Finazzo, Esq.
Budd Larner, P.C.
150 John F. Kennedy Parkway, 3rd Floor
Short Hills, NJ 07078-2703

Re:    **Yorkville Advisors Management, LLC, HH Advisors, LLC, and Charys Holding Co.**

Dear Mr. Finazzo:

I write in response to your letter to me dated October 17, 2006 concerning warrants issued by Charys Holding Company (the "Warrants").

Gottbetter & Partners, LLP ("G&P") has received from Highgate House Funds, Ltd. ("HHF") various Notices of the exercise of the Warrants, dated October 18, 2006. Both the Notices and your letter incorrectly assume that all of the Warrants belong to HHF.

In accordance with the agreement between Yorkville and HH Advisors, my client is entitled to certain portions of the Warrants as is the Banker. Specifically, the Banker on the transaction, Michael Chorske, is entitled to a 20% Banker fee (200,000 warrants). HH Advisors is entitled to its Payout Percentage of 44.4% of the remaining 800,000 warrants (355,200) for a total of 555,200 warrants owed to parties other than HHF. HHF is entitled to receive the remaining 444,800 warrants. The issuer has reissued the Warrants to reflect the proper allocation.

Thus, please inform your client to amend its Notices of the exercise of warrants to reflect the exercise of 444,800 warrants. Upon receipt of the Notices, G&P will release shares of common stock it is holding in escrow to HHF to cover the exercise.

Sincerely yours,

August C. Venturini

cc: Gottbetter & Partners, LLP

**EXHIBIT I**

# BUDD LARNER

### A PROFESSIONAL CORPORATION

### COUNSELLORS AT LAW

150 JOHN F. KENNEDY PARKWAY
SHORT HILLS, NJ 07078-2703
973.379.4800
FAX 973.379.7734
www.buddlarner.com

DIRECT DIAL (973) 315-4403

October 24, 2006

<u>VIA TELECOPIER</u>

August C. Venturini, Esq.
Venturini & Associates
230 Park Avenue, Suite 545
New York, NY 10169

> Re:  Yorkville Advisors Management, LLC,
>      HH Advisors, LLC, and Charys Holding Co.

Dear Mr. Venturini:

As you know, we are counsel to Yorkville Advisors Management, LLC and Highgate House Funds, Ltd. This letter is in response to your letter of October 20, 2006. Your client acted contrary to his fiduciary obligations by converting the Warrants for his own use as acknowledged in your October 20, 2006 letter. Moreover, there is no banker's fee to which Mr. Chorske is entitled on account of the Charys transaction as the Warrants were not part of the banker's fee. Also, HH Advisors, LLC is not entitled to 44.4% of the Warrants. Therefore, any reissuance of the Warrants as set forth in your October 20, 2006 letter was inappropriate and in violation of your client's fiduciary obligation.

We hereby demand that to the extent new Warrants have been issued, that they be immediately returned to Highgate House Funds, Ltd. We must have your written assurance not later than 5:00 p.m. tomorrow that your client will take all action to have the Warrants reissued to Highgate House. Absent that written assurance, we will take all necessary action to protect our client's rights.

Very truly yours,

MICHAEL M. ROSENBAUM

MMR/ch

NEW YORK          CHERRY HILL          SHORT HILLS          PHILADELPHIA          ATLANTA

**EXHIBIT J**

# VENTURINI & ASSOCIATES

## Attorneys At Law

**230 Park Avenue, Suite 545**
**New York, New York 10169**

**Telephone: (212) 826-6800**
**Facsimile: (212) 949-6162**
**acv@venturini-law.com**

## FACSIMILE TRANSMITTAL COVER SHEET

**DATE:**              October 25, 2006

**TO:**                Michael M. Rosenbaum, Esq.

**COMPANY:**           Budd Larner, P.C.

**FACSIMILE NO:**      (973) 379-7734

**FROM:**              August C. Venturini

**PAGES:**             3 (INCLUDING THIS COVER SHEET)

**COMMENTS:**

                       Please see attached letter.

**CONFIDENTIALITY NOTICE:**  This facsimile message is intended only for the addressee and may contain information that is privileged and confidential. If you are not the intended recipient, you are hereby notified that any dissemination or copying of this fax is strictly prohibited. If you have received this fax in error, please notify the sender directly by telephone and return the original fax by mail to the above address. Thank you.

# VENTURINI & ASSOCIATES

ATTORNEYS AT LAW

230 PARK AVENUE, SUITE 545
NEW YORK, NY 10169

AUGUST C. VENTURINI

TEL: (212) 826-6800
FAX: (212) 949-6162

MEMBER OF
NY & NJ BARS

October 25, 2006

**VIA FACSIMILE & REGULAR MAIL**

Michael M. Rosenbaum, Esq.
Budd Larner, P.C.
150 John F. Kennedy Parkway, 3rd Floor
Short Hills, NJ 07078-2703

Re:    **Yorkville Advisors Management, LLC, HH Advisors, LLC, and Charys Holding Co.**

Dear Mr. Rosenbaum:

I write in response to your letter to me dated October 24, 2006 concerning warrants issued by
Charys Holding Company (the "Charys Warrants").

You have obviously been given only partial information by your client. If you are considering
legal action, I strongly urge you to conduct an investigation of the facts prior to making frivolous
allegations to a Court or an Arbitrator.

Specifically, you have no basis to assert that there is no banker's fee in connection with the
Charys Warrants or that my client is not entitled to its 44.4% fee. To the contrary, such fees are
mandated by the parties' express agreement.

Moreover, it has been the parties' practice to allocate warrants according to the fee split terms
directly to the party entitled to the fee. For example, in at least two other instances this year, your
client expressly agreed to the issuance of warrants directly to my client and to the banker to cover
their fees with the balance issued to your client. Your client agreed to those allocations and has
never complained about it.

The only difference with respect to the Charys Warrants is that they are worth significantly more
money than the warrants issued in the other transactions. Thus, simply motivated by blind greed,
your client now challenges the same allocation to which it had agreed.

The only breach of a duty that has occurred here is your client's communication of its intention to
breach its duties to pay my client the fees owed. We find this troubling. Equally disturbing is

Michael M. Rosenbaum, Esq.
October 25, 2006
Page 2

your client's refusal to meet to discuss all of the issues the parties have put on the table. Indeed, there has been no response to that offer made in my letter to your firm dated September 8, 2006.

Finally, the Charys Warrants that are issued to your client will be delivered forthwith so that your client will have ample time in advance of the upcoming sale eligibility date to convert and sell the underlying shares if it wishes to do so.

Very truly yours,

August C. Venturini

**EXHIBIT K**

# Gottbetter&Partners,LLP

488 Madison Ave, 12th Floor
New York, NY 10022-5718    **T** 212.400.6900
www.gottbetter.com    **F** 212.400.6901

October 26, 2006

***Via Federal Express***

Troy Rillo
Highgate House Funds, Ltd.
101 Hudson St., Suite 3700
Jersey City, NJ 07302

Re:    **Charys Holding Company, Inc. (the "Company")**

Dear Troy,

I enclose warrants issued to Highgate House Funds, Ltd. ("Highgate") to purchase 444,800 shares of the Company (the "Highgate Warrants").

Pursuant to a November 2005 financing of the Company by Highgate, the Company issued 1,000,000 warrants to Highgate, of which 200,000 were exercisable at $0.25 (reduced to $0.01), 400,00 were exercisable at $0.50, 200,000 were exercisable at $0.75 (reduced to $0.01) and 200,000 were exercisable at $1.00 (reduced to $0.01). In accordance with agreements between Yorkville Advisors Management, LLC and HH Advisors, LLC ("HH Advisors"), these warrants have been distributed with (i) 20% (200,000 warrants) being paid to a banker as a banker's fee, (ii) 44.4% of the remainder (800,000 warrants) being paid to HH Advisors (355,200 warrants) and (iii) the remainder staying with Highgate. The breakdown is as shown below:

|  | Upon 2005 Financing | Banker's Fee | Distribution to HH Advisors | Highgate |
|---|---|---|---|---|
| Warrants at $0.25 | 200,000 | 40,000 | 71,040 | 88,960 |
| Warrants at $0.50 | 400,000 | 80,000 | 142,080 | 177,920 |
| Warrants at $0.75 | 200,000 | 40,000 | 71,040 | 88,960 |
| Warrants at $1.00 | 200,000 | 40,000 | 71,040 | 88,960 |
| Total: | 1,000,000 | 200,000 | 355,200 | 444,800 |

The Notices of Exercise that Highgate sent the Company on October 18, 2006 seek to exercise a number of warrants that exceed the number of Highgate Warrants. We believe that, if Highgate wishes to exercise the Highgate Warrants, it will need to send the Company, and we will need to receive, copies of the Notice of Exercise setting forth how many warrants it wants to exercise.

{00087637.1 / 0992-201}

If you have any questions regarding the above, please do not hesitate to contact me on 212.400.6900.

Sincerely,

Adam S. Gottbetter

cc:     Michael M. Rosenbaum, Esq., Budd Larner, P.C.
        August C. Venturini, Esq., Venturini & Associates

{00087637.1 / 0992-201}

Void after 5:00 p.m., New York Time on November 17, 2008
Warrant to Purchase 88,960 Shares of Common Stock

## WARRANT TO PURCHASE COMMON STOCK  ORIGINAL

### OF

### CHARYS HOLDING COMPANY INC.

THIS WARRANT, AND THE SECURITIES INTO WHICH IT IS EXERCISABLE (COLLECTIVELY, THE "SECURITIES"), HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR THE SECURITIES LAWS OF ANY STATE. THE SECURITIES MAY NOT BE OFFERED OR SOLD UNLESS THE SECURITIES ARE REGISTERED UNDER THE ACT OR PURSUANT TO AVAILABLE EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND THE COMPANY WILL BE PROVIDED WITH OPINION OF COUNSEL OR OTHER SUCH INFORMATION AS IT MAY REASONABLY REQUIRE TO CONFIRM THAT SUCH EXEMPTIONS ARE AVAILABLE.

FOR VALUE RECEIVED, Charys Holding Company Inc., a corporation organized under the laws of Delaware (the "Company"), grants the following rights to Highgate House Funds, Ltd, a Cayman Islands company and/or its assigns (the "Holder"):

### ARTICLE 1. DEFINITIONS

Capitalized terms used and not otherwise defined herein shall have the meanings given such terms in the Securities Purchase Agreement by and between the Company and the Holder and entered into on November 16, 2005 (the "Purchase Agreement"). As used in this Agreement, the following terms shall have the following meanings:

"Corporate Office" shall mean the office of the Company (or its successor) at which at any particular time its principal business shall be administered.

"Exercise Date" shall mean any date on which the Holder gives the Company a Notice of Exercise in the form attached hereto as Appendix I and in compliance with Exhibit F to the Purchase Agreement.

"Exercise Price" shall mean the Fixed Price per share of Common Stock, subject to adjustment as provided herein.

"Expiration Date" shall mean 5:00 p.m. (New York time) on November 16, 2008.

"Fair Market Value" shall have the meaning set forth in Section 2.2(b).

"Fixed Price" shall mean US$0.75 or if the First Convertible Debenture (as defined in the Purchase Agreement) is not redeemed by the Exclusive Redemption Date (as defined in the Purchase Agreement) shall mean US$.01.

"Market Value" shall have the meaning set forth in Section 2.2(b).

"SEC" shall mean the United States Securities and Exchange Commission.

"Warrant Shares" shall mean the shares of the Common Stock issuable upon exercise of this Warrant.

## ARTICLE 2. EXERCISE AND AGREEMENTS

2.1     Exercise of Warrant; Sale of Warrant and Warrant Shares.  (a) This Warrant shall entitle the Holder to purchase, at the Exercise Price, 88,960 shares of Common Stock.  This Warrant shall be exercisable at any time and from time to time from the date hereof and prior to the Expiration Date (the "Exercise Period").  This Warrant and the right to purchase Warrant Shares hereunder shall expire and become void on the Expiration Date.

2.2     Manner of Exercise.

(a)     The Holder may exercise this Warrant at any time and from time to time during the Exercise Period, in whole or in part (but not in denominations of fewer than 10,000 Warrant Shares, except upon an exercise of this Warrant with respect to the remaining balance of Warrant Shares purchasable hereunder at the time of exercise), by delivering to the Escrow Agent pursuant to the Escrow Shares Escrow Agreement of even date herewith incorporated herein by reference  (i) a duly executed Notice of Exercise in substantially the form attached as Appendix I hereto, (ii) the certificate representing the Warrants and (iii) a bank cashier's or certified check for the aggregate Exercise Price of the Warrant Shares being purchased.

(b)     The Holder may, at its option, in lieu of paying cash for the Warrant Shares, exercise this Warrant by an exchange, in whole or in part (a "Warrant Exchange"), by delivery to the Escrow Agent of (i) a duly executed Notice of Exercise electing a Warrant Exchange and (ii) the certificate representing this Warrant.   In connection with any Warrant Exchange, the Holder shall be deemed to have paid for the Warrant Shares an amount equal to the Fair Market Value of each Warrant delivered, and the Warrants shall be deemed exercised for the amount so paid. For this purpose, the Fair Market Value of each Warrant is the difference between the Market Value of a share of Common Stock and the Exercise Price on the Exercise Date. Market Value shall mean the average Closing Bid Price of a share of Common Stock during the ten (10) Trading Days ending on the Exercise Date.

2.3     Termination.  All rights of the Holder in this Warrant, to the extent they have not been exercised, shall terminate on the Expiration Date.

2

2.4    No Rights Prior to Exercise. This Warrant shall not entitle the Holder to any voting or other rights as a stockholder of the Company.

2.5    Fractional Shares. No fractional shares shall be issuable upon exercise of this Warrant, and the number of Warrant Shares to be issued shall be rounded up to the nearest whole number. If, upon exercise of this Warrant, the Holder hereof would be entitled to receive any fractional share, the Company shall issue to the Holder one additional share of Common Stock in lieu of such fractional share.

2.6    Escrow. The Company agrees to enter into the Escrow Shares Escrow Agreement and to deposit with the Escrow Agent thereunder stock certificates registered in the name of the Holder, each representing a number of shares of Common Stock (in denominations specified by the Purchaser) equal, in the aggregate, to the total number of Warrant Shares for which this Warrant is exercisable, assuming exercise of this Warrant in full on the date hereof. The Company shall deposit additional certificates for Warrant Shares upon request by the Escrow Agent pursuant to the Escrow Agreement and Exhibit F to the Purchase Agreement.

2.7    Adjustments to Exercise Price and Number of Securities.
   (a)    Computation of Adjusted Exercise Price. In case the Company shall at any time after the date hereof and until this Warrant is fully exercised issue or sell any shares of Common Stock (other than the issuances or sales referred to in Section 2.7 (f) hereof), including shares held in the Company's treasury and shares of Common Stock issued upon the exercise of any options, rights or warrants to subscribe for shares of Common Stock and shares of Common Stock issued upon the direct or indirect conversion or exchange of securities for shares of Common Stock (excluding shares of Common Stock issuable upon exercise of options, warrants or conversion rights granted as of the date hereof), for a consideration per share less than the Exercise Price on the date immediately prior to the issuance or sale of such shares, or without consideration, then forthwith upon such issuance or sale, the Exercise Price shall (until another such issuance or sale) be reduced to the price equal to the quotient derived by dividing (A) an amount equal to the sum of (X) the product of (a) the Exercise Price on the date immediately prior to the issuance or sale of such shares, multiplied by (b) the total number of shares of Common Stock outstanding immediately prior to such issuance or sale plus, (Y) the aggregate of the amount of all consideration, if any, received by the Company upon such issuance or sale, by (B) the total number of shares of Common Stock outstanding immediately after such issuance or sale; provided, however, that in no event shall the Exercise Price be adjusted pursuant to this computation to an amount in excess of the Exercise Price in effect immediately prior to such computation, except in the case of a combination of outstanding shares of Common Stock, as provided by Section 2.7 (c) hereof.

   For the purposes of any computation to be made in accordance with this Section 2.7(a), the following provisions shall be applicable:

      (i)    In case of the issuance or sale of shares of Common Stock for a consideration part or all of which shall be cash, the amount of cash consideration therefor shall be deemed to be the amount of cash received by the Company for such shares (or, if shares of Common Stock are offered by the Company for

3

subscription, the subscription price, or if either of such securities shall be sold to underwriters or dealers for public offering without a subscription offering, the initial public offering price) before deducting therefrom any compensation paid or discount allowed in the sale, underwriting or purchase thereof by underwriters or dealers or others performing similar services, or any expenses incurred in connection therewith.

(ii)     In case of the issuance or sale (otherwise than as a dividend or other distribution on any stock of the Company) of shares of Common Stock for a consideration part or all of which shall be other than cash, the amount of the consideration therefor other than cash shall be deemed to be the value of such consideration as determined in good faith by the Board of Directors of the Company.

(iii)     Shares of Common Stock issuable by way of dividend or other distribution on any stock of the Company shall be deemed to have been issued immediately after the opening of business on the day following the record date for the determination of stockholders entitled to receive such dividend or other distribution and shall be deemed to have been issued without consideration.

(iv)     The reclassification of securities of the Company other than shares of the Common Stock into securities including shares of Common Stock shall be deemed to involve the issuance of such shares of Common Stock for a consideration other than cash immediately prior to the close of business on the date fixed for the determination of security holders entitled to receive such shares, and the value of the consideration allocable to such shares of Common Stock shall be determined as provided in subsection (ii) of this Section 2.7(a).

(v)     The number of shares of Common Stock at any one time outstanding shall include the aggregate number of shares issued or issuable (subject to readjustment upon the actual issuance thereof) upon the exercise of options, rights, warrants and upon the conversion or exchange of convertible or exchangeable securities; provided, however, that shares issuable upon the exercise of the Warrants shall not be included in such calculation.

(b)     Options, Rights, Warrants and Convertible and Exchangeable Securities. In case the Company shall at any time after the date hereof and until this Warrant is fully exercised issue options, rights or warrants to subscribe for shares of Common Stock, or issue any securities convertible into or exchangeable for shares of Common Stock, for a consideration per share less than the Exercise Price immediately prior to the issuance of such options, rights or warrants (excluding shares of Common Stock issuable upon exercise of options, warrants or conversion rights granted as of the date hereof and shares of Common Stock issuable upon exercise of stock options at or above the closing market price per share of Common Stock under any stock option plan of the Company), or such convertible or exchangeable securities, or without consideration, the Exercise Price in effect immediately prior to the issuance of such options, rights or warrants, or such convertible or exchangeable securities, as the case may be, shall be reduced to a price

4

determined by making a computation in accordance with the provision of Section 2.7(a) hereof, provided that:

(i)    The aggregate maximum number of shares of Common Stock, as the case may be, issuable under such options, rights or warrants shall be deemed to be issued and outstanding at the time such options, rights or warranties were issued, and for a consideration equal to the minimum purchase price per share provided for in such options, rights or warrants at the time of issuance, plus the consideration (determined in the same manner as consideration received on the issue or sale of shares in accordance with the terms of the Warrants), if any, received by the Company for such options, rights or warrants.

(ii)    The aggregate maximum number of shares of Common Stock issuable upon conversion or exchange of any convertible or exchangeable securities shall be deemed to be issued and outstanding at the time of issuance of such securities, and for a consideration equal to the consideration (determined in the same manner as consideration received on the issue or sale of shares of Common Stock in accordance with the terms of the Warrants) received by the Company for such securities, plus the minimum consideration, if any, receivable by the Company upon the conversion or exchange thereof.

(iii)    If any change shall occur in the price per share provided for in any of the options, rights or warrants referred to in subsection (a) of this Section 2.7, or in the price per share at which the securities referred to in subsection (b) of this Section 2.7 are convertible or exchangeable, such options, rights or warrants or conversion or exchange rights, as the case may be, shall be deemed to have expired or terminated on the date when such price change became effective in respect of shares not theretofore issued pursuant to the exercise or conversion or exchange thereof, and the Company shall be deemed to have issued upon such date new options, rights or warrants or convertible or exchangeable securities at the new price in respect of the number of shares issuable upon the exercise of such options, rights or warrants or the conversion or exchange of such convertible or exchangeable securities.

(iv)    If any options, rights or warrants referred to in subsection (a) of this Section 2.7, or any convertible or exchangeable securities referred to in subsection (b) of this Section 2.7, expire or terminate without exercise or conversion, as the case may be, then the Exercise Price of the remaining outstanding Warrant shall be readjusted as if such options, rights or warrants or convertible or exchangeable securities, as the case may be, had never been issued.

(c)    Subdivision and Combination.  In case the Company shall at any time subdivide or combine the outstanding shares of Common Stock, the Exercise Price shall forthwith be proportionately decreased in the case of subdivision or increased in the case of combination.

(d)    Adjustment in Number of Securities.  Upon each adjustment of the Exercise Price pursuant to the provisions of this Section 2.7, the number of Warrant

5

Shares issuable upon the exercise of each Warrant shall be adjusted to the nearest whole number by multiplying a number equal to the Exercise Price in effect immediately prior to such adjustment by the number of Warrant Shares issuable upon exercise of the Warrants immediately prior to such adjustment and dividing the product so obtained by the adjusted Exercise Price.

(e)     Merger or Consolidation.  In case of any consolidation of the Company with, or merger of the Company with, or merger of the Company into, another corporation (other than a consolidation or merger which does not result in any reclassification or change of the outstanding Common Stock), the corporation formed by such consolidation or merger shall execute and deliver to the Holder a supplemental warrant agreement providing that the Holder of each Warrant then outstanding or to be outstanding shall have the right thereafter (until the expiration of such Warrant) to receive, upon exercise of such Warrant, the kind and amount of shares of stock and other securities and property (except in the event the property is cash, then the Holder shall have the right to exercise the Warrant and receive cash in the same manner as other stockholders) receivable upon such consolidation or merger, by a holder of the number of shares of Common Stock of the Company for which such warrant might have been exercised immediately prior to such consolidation, merger, sale or transfer. Such supplemental warrant agreement shall provide for adjustments which shall be identical to the adjustments provided in Section 2.7. The foregoing provisions of this paragraph (e) shall similarly apply to successive consolidations or mergers.

(f)     No Adjustment of Exercise Price in Certain Cases.  No adjustment of the Exercise Price shall be made upon the issuance of any securities (i) under an Approved Stock Plan (as such term is defined in the Convertible Debenture dated as of the date hereof), (ii) that constitute Excluded Securities (as such term is defined in the Convertible Debenture dated as of the date hereof) and/or (iii) that constitute Other Securities (as such term is defined in the Convertible Debenture dated as of the date hereof).

(g)     Dividends and Other Distributions.  In the event that the Company shall at any time prior to the exercise of all Warrants declare a dividend (other than a dividend consisting solely of shares of Common Stock) or otherwise distribute to its stockholders any assets, property, rights, evidences of indebtedness, securities (other than shares of Common Stock), whether issued by the Company or by another, or any other thing of value, the Holders of the unexercised Warrants shall thereafter be entitled, in addition to the shares of Common Stock or other securities and property receivable upon the exercise thereof, to receive, upon the exercise of such Warrants, the same property, assets, rights, evidences of indebtedness, securities or any other thing of value that they would have been entitled to receive at the time of such dividend or distribution as if the Warrants had been exercised immediately prior to such dividend or distribution. At the time of any such dividend or distribution, the Company shall make appropriate reserves to ensure the timely performance of the provisions of this subsection 2.7 (g). Nothing contained herein shall provide for the receipt or accrual by a Holder of cash dividends prior to the exercise by such Holder of the Warrants.

2.8     Registration Rights.  The Holder shall have the registration rights set forth in the Investor Registration Rights Agreement.

6

## ARTICLE 3. MISCELLANEOUS

3.1    Transfer.  This Warrant may not be offered, sold, transferred, pledged, assigned, hypothecated or otherwise disposed of, in whole or in part, at any time, except in compliance with applicable federal and state securities laws by the transferor and the transferee (including, without limitation, the delivery of an investment representation letter and a legal opinion reasonably satisfactory to the Company).

3.2    Transfer Procedure.  Subject to the provisions of Section 3.1, the Holder may transfer or assign this Warrant by giving the Company notice setting forth the name, address and taxpayer identification number of the transferee or assignee, if applicable (the "Transferee"), and surrendering this Warrant to the Company for reissuance to the Transferee and, in the event of a transfer or assignment of this Warrant in part, the Holder.  (Each of the persons or entities in whose name any such new Warrant shall be issued are herein referred to as a "Holder").

3.3    Loss, Theft, Destruction or Mutilation.  If this Warrant shall become mutilated or defaced or be destroyed, lost or stolen, the Company shall execute and deliver a new Warrant in exchange for and upon surrender and cancellation of such mutilated or defaced Warrant or, in lieu of and in substitution for such Warrant so destroyed, lost or stolen, upon the Holder filing with the Company an affidavit that such Warrant has been so mutilated, defaced, destroyed, lost or stolen.  However, the Company shall be entitled, as a condition to the execution and delivery of such new Warrant, to demand reasonably acceptable indemnity to it and payment of the expenses and charges incurred in connection with the delivery of such new Warrant.  Any Warrant so surrendered to the Company shall be canceled.

3.4    Notices.  All notices and other communications from the Company to the Holder or vice versa shall be deemed delivered and effective when given personally, by facsimile transmission with confirmation sheet at such address and/or facsimile number as may have been furnished to the Company or the Holder, as the case may be, in writing by the Company or the Holder from time to time.

3.5    Waiver.  This Warrant and any term hereof may be changed, waived, or terminated only by an instrument in writing signed by the party against which enforcement of such change, waiver, discharge or termination is sought.

3.6    Governing Law.  This Warrant shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to its principles regarding conflicts of law.  Any action to enforce the terms of this Warrant shall be exclusively heard in the county, state and federal Courts of New York and Country of the United States of America.

3.7    Signature.  In the event that any signature on this Warrant is delivered by facsimile transmission, such signature shall create a valid and binding obligation of the

7

party executing (or on whose behalf such signature is executed) the same, with the same force and effect as if such facsimile signature page were an original thereof.

3.8 Legal Fees. In the event any Person commences a legal action or proceeding to enforce its rights under this Warrant, the non-prevailing party to such action or proceeding shall pay all reasonable and necessary costs and expenses (including reasonable and necessary attorney's fees) incurred in enforcing such rights.

Dated:  November 17, 2005

CHARYS HOLDING COMPANY INC.

By: _____
    Name: Billy Ray, Jr.
    Title: Chief Executive Officer

Attest:

_____
Name:
Title:

8

## APPENDIX I

### NOTICE OF EXERCISE

1.  The undersigned hereby elects (please check the appropriate box and fill in the blank spaces):

    ☐ to purchase _____ shares of Common Stock, $.001 par value per share, of Charys Holding Company Inc. at [$.75] [$.01] per share for a total of $_____ and pursuant to the terms of the attached Warrant, and tenders herewith payment of the aggregate Exercise Price of such Warrant Shares in full; or

    ☐ to purchase _____ shares of Common Stock, $.001 par value per share, of Charys Holding Company Inc. pursuant to the cashless exercise provision under Section 2.2 (b) of the attached Warrant, and tenders herewith the number of Warrant Shares to purchase such Warrant Shares based upon the formula set forth in Section 2.2 (b).

2.  Please issue a certificate or certificates representing said Warrant Shares in the name of the undersigned or in such other name as is specified below:

Dated: _____        By: _____

                                    Name: _____

Title: _____

Void after 5:00 p.m., New York Time on November 17, 2008
Warrant to Purchase 177,920 Shares of Common Stock

## WARRANT TO PURCHASE COMMON STOCK

### OF



### CHARYS HOLDING COMPANY INC.

THIS WARRANT, AND THE SECURITIES INTO WHICH IT IS EXERCISABLE (COLLECTIVELY, THE "SECURITIES"), HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR THE SECURITIES LAWS OF ANY STATE. THE SECURITIES MAY NOT BE OFFERED OR SOLD UNLESS THE SECURITIES ARE REGISTERED UNDER THE ACT OR PURSUANT TO AVAILABLE EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND THE COMPANY WILL BE PROVIDED WITH OPINION OF COUNSEL OR OTHER SUCH INFORMATION AS IT MAY REASONABLY REQUIRE TO CONFIRM THAT SUCH EXEMPTIONS ARE AVAILABLE.

FOR VALUE RECEIVED, Charys Holding Company Inc., a corporation organized under the laws of Delaware (the "Company"), grants the following rights to Highgate House Funds, Ltd, a Cayman Islands company and/or its assigns (the "Holder"):

### ARTICLE 1. DEFINITIONS

Capitalized terms used and not otherwise defined herein shall have the meanings given such terms in the Securities Purchase Agreement by and between the Company and the Holder and entered into on November 16, 2005 (the "Purchase Agreement"). As used in this Agreement, the following terms shall have the following meanings:

"Corporate Office" shall mean the office of the Company (or its successor) at which at any particular time its principal business shall be administered.

"Exercise Date" shall mean any date on which the Holder gives the Company a Notice of Exercise in the form attached hereto as Appendix I and in compliance with Exhibit F to the Purchase Agreement.

"Exercise Price" shall mean the Fixed Price per share of Common Stock, subject to adjustment as provided herein.

"Expiration Date" shall mean 5:00 p.m. (New York time) on November 16, 2008.

"Fair Market Value" shall have the meaning set forth in Section 2.2(b).

"Fixed Price" shall mean US$0.50.

"Market Value" shall have the meaning set forth in Section 2.2(b).

"SEC" shall mean the United States Securities and Exchange Commission.

"Warrant Shares" shall mean the shares of the Common Stock issuable upon exercise of this Warrant.

### ARTICLE 2.  EXERCISE AND AGREEMENTS

2.1    Exercise of Warrant; Sale of Warrant and Warrant Shares.    (a) This Warrant shall entitle the Holder to purchase, at the Exercise Price, 400,000 shares of Common Stock.  This Warrant shall be exercisable at any time and from time to time from the date hereof and prior to the Expiration Date (the "Exercise Period").  This Warrant and the right to purchase Warrant Shares hereunder shall expire and become void on the Expiration Date.

2.2    Manner of Exercise.

(a)    The Holder may exercise this Warrant at any time and from time to time during the Exercise Period, in whole or in part (but not in denominations of fewer than 10,000 Warrant Shares, except upon an exercise of this Warrant with respect to the remaining balance of Warrant Shares purchasable hereunder at the time of exercise), by delivering to the Escrow Agent pursuant to the Escrow Shares Escrow Agreement of even date herewith incorporated herein by reference  (i) a duly executed Notice of Exercise in substantially the form attached as Appendix I hereto, (ii) the certificate representing the Warrants and (iii) a bank cashier's or certified check for the aggregate Exercise Price of the Warrant Shares being purchased.

(b)    The Holder may, at its option, in lieu of paying cash for the Warrant Shares, exercise this Warrant by an exchange, in whole or in part (a "Warrant Exchange"), by delivery to the Escrow Agent of (i) a duly executed Notice of Exercise electing a Warrant Exchange and (ii) the certificate representing this Warrant.  In connection with any Warrant Exchange, the Holder shall be deemed to have paid for the Warrant Shares an amount equal to the Fair Market Value of each Warrant delivered, and the Warrants shall be deemed exercised for the amount so paid. For this purpose, the Fair Market Value of each Warrant is the difference between the Market Value of a share of Common Stock and the Exercise Price on the Exercise Date. Market Value shall mean the average Closing Bid Price of a share of Common Stock during the ten (10) Trading Days ending on the Exercise Date.

2.3    Termination.  All rights of the Holder in this Warrant, to the extent they have not been exercised, shall terminate on the Expiration Date.

2.4    No Rights Prior to Exercise.  This Warrant shall not entitle the Holder to any voting or other rights as a stockholder of the Company.

2.5     Fractional Shares. No fractional shares shall be issuable upon exercise of this Warrant, and the number of Warrant Shares to be issued shall be rounded up to the nearest whole number. If, upon exercise of this Warrant, the Holder hereof would be entitled to receive any fractional share, the Company shall issue to the Holder one additional share of Common Stock in lieu of such fractional share.

2.6     Escrow. The Company agrees to enter into the Escrow Shares Escrow Agreement and to deposit with the Escrow Agent thereunder stock certificates registered in the name of the Holder, each representing a number of shares of Common Stock (in denominations specified by the Purchaser) equal, in the aggregate, to the total number of Warrant Shares for which this Warrant is exercisable, assuming exercise of this Warrant in full on the date hereof. The Company shall deposit additional certificates for Warrant Shares upon request by the Escrow Agent pursuant to the Escrow Agreement and Exhibit F to the Purchase Agreement.

2.7     Adjustments to Exercise Price and Number of Securities.

(a)   Computation of Adjusted Exercise Price. In case the Company shall at any time after the date hereof and until this Warrant is fully exercised issue or sell any shares of Common Stock (other than the issuances or sales referred to in Section 2.7 (f) hereof), including shares held in the Company's treasury and shares of Common Stock issued upon the exercise of any options, rights or warrants to subscribe for shares of Common Stock and shares of Common Stock issued upon the direct or indirect conversion or exchange of securities for shares of Common Stock (excluding shares of Common Stock issuable upon exercise of options, warrants or conversion rights granted as of the date hereof), for a consideration per share less than the Exercise Price on the date immediately prior to the issuance or sale of such shares, or without consideration, then forthwith upon such issuance or sale, the Exercise Price shall (until another such issuance or sale) be reduced to the price equal to the quotient derived by dividing (A) an amount equal to the sum of (X) the product of (a) the Exercise Price on the date immediately prior to the issuance or sale of such shares, multiplied by (b) the total number of shares of Common Stock outstanding immediately prior to such issuance or sale plus, (Y) the aggregate of the amount of all consideration, if any, received by the Company upon such issuance or sale, by (B) the total number of shares of Common Stock outstanding immediately after such issuance or sale; provided, however, that in no event shall the Exercise Price be adjusted pursuant to this computation to an amount in excess of the Exercise Price in effect immediately prior to such computation, except in the case of a combination of outstanding shares of Common Stock, as provided by Section 2.7 (c) hereof.

For the purposes of any computation to be made in accordance with this Section 2.7(a), the following provisions shall be applicable:

(i)     In case of the issuance or sale of shares of Common Stock for a consideration part or all of which shall be cash, the amount of cash consideration therefor shall be deemed to be the amount of cash received by the Company for such shares (or, if shares of Common Stock are offered by the Company for subscription, the subscription price, or if either of such securities shall be sold to underwriters or dealers for public offering without a subscription offering, the

initial public offering price) before deducting therefrom any compensation paid or discount allowed in the sale, underwriting or purchase thereof by underwriters or dealers or others performing similar services, or any expenses incurred in connection therewith.

(ii)   In case of the issuance or sale (otherwise than as a dividend or other distribution on any stock of the Company) of shares of Common Stock for a consideration part or all of which shall be other than cash, the amount of the consideration therefor other than cash shall be deemed to be the value of such consideration as determined in good faith by the Board of Directors of the Company.

(iii)   Shares of Common Stock issuable by way of dividend or other distribution on any stock of the Company shall be deemed to have been issued immediately after the opening of business on the day following the record date for the determination of stockholders entitled to receive such dividend or other distribution and shall be deemed to have been issued without consideration.

(iv)   The reclassification of securities of the Company other than shares of the Common Stock into securities including shares of Common Stock shall be deemed to involve the issuance of such shares of Common Stock for a consideration other than cash immediately prior to the close of business on the date fixed for the determination of security holders entitled to receive such shares, and the value of the consideration allocable to such shares of Common Stock shall be determined as provided in subsection (ii) of this Section 2.7(a).

(v)   The number of shares of Common Stock at any one time outstanding shall include the aggregate number of shares issued or issuable (subject to readjustment upon the actual issuance thereof) upon the exercise of options, rights, warrants and upon the conversion or exchange of convertible or exchangeable securities; provided, however, that shares issuable upon the exercise of the Warrants shall not be included in such calculation.

(b)   Options, Rights, Warrants and Convertible and Exchangeable Securities. In case the Company shall at any time after the date hereof and until this Warrant is fully exercised issue options, rights or warrants to subscribe for shares of Common Stock, or issue any securities convertible into or exchangeable for shares of Common Stock, for a consideration per share less than the Exercise Price immediately prior to the issuance of such options, rights or warrants (excluding shares of Common Stock issuable upon exercise of options, warrants or conversion rights granted as of the date hereof and shares of Common Stock issuable upon exercise of stock options at or above the closing market price per share of Common Stock under any stock option plan of the Company), or such convertible or exchangeable securities, or without consideration, the Exercise Price in effect immediately prior to the issuance of such options, rights or warrants, or such convertible or exchangeable securities, as the case may be, shall be reduced to a price determined by making a computation in accordance with the provision of Section 2.7(a) hereof, provided that:

(i)    The aggregate maximum number of shares of Common Stock, as the case may be, issuable under such options, rights or warrants shall be deemed to be issued and outstanding at the time such options, rights or warranties were issued, and for a consideration equal to the minimum purchase price per share provided for in such options, rights or warrants at the time of issuance, plus the consideration (determined in the same manner as consideration received on the issue or sale of shares in accordance with the terms of the Warrants), if any, received by the Company for such options, rights or warrants.

(ii)    The aggregate maximum number of shares of Common Stock issuable upon conversion or exchange of any convertible or exchangeable securities shall be deemed to be issued and outstanding at the time of issuance of such securities, and for a consideration equal to the consideration (determined in the same manner as consideration received on the issue or sale of shares of Common Stock in accordance with the terms of the Warrants) received by the Company for such securities, plus the minimum consideration, if any, receivable by the Company upon the conversion or exchange thereof.

(iii)    If any change shall occur in the price per share provided for in any of the options, rights or warrants referred to in subsection (a) of this Section 2.7, or in the price per share at which the securities referred to in subsection (b) of this Section 2.7 are convertible or exchangeable, such options, rights or warrants or conversion or exchange rights, as the case may be, shall be deemed to have expired or terminated on the date when such price change became effective in respect of shares not theretofore issued pursuant to the exercise or conversion or exchange thereof, and the Company shall be deemed to have issued upon such date new options, rights or warrants or convertible or exchangeable securities at the new price in respect of the number of shares issuable upon the exercise of such options, rights or warrants or the conversion or exchange of such convertible or exchangeable securities.

(iv)    If any options, rights or warrants referred to in subsection (a) of this Section 2.7, or any convertible or exchangeable securities referred to in subsection (b) of this Section 2.7, expire or terminate without exercise or conversion, as the case may be, then the Exercise Price of the remaining outstanding Warrant shall be readjusted as if such options, rights or warrants or convertible or exchangeable securities, as the case may be, had never been issued.

(c)    Subdivision and Combination.  In case the Company shall at any time subdivide or combine the outstanding shares of Common Stock, the Exercise Price shall forthwith be proportionately decreased in the case of subdivision or increased in the case of combination.

(d)    Adjustment in Number of Securities.  Upon each adjustment of the Exercise Price pursuant to the provisions of this Section 2.7, the number of Warrant Shares issuable upon the exercise of each Warrant shall be adjusted to the nearest whole number by multiplying a number equal to the Exercise Price in effect immediately prior to such adjustment by the number of Warrant Shares issuable upon exercise of the

Warrants immediately prior to such adjustment and dividing the product so obtained by the adjusted Exercise Price.

(e)    Merger or Consolidation.  In case of any consolidation of the Company with, or merger of the Company with, or merger of the Company into, another corporation (other than a consolidation or merger which does not result in any reclassification or change of the outstanding Common Stock), the corporation formed by such consolidation or merger shall execute and deliver to the Holder a supplemental warrant agreement providing that the Holder of each Warrant then outstanding or to be outstanding shall have the right thereafter (until the expiration of such Warrant) to receive, upon exercise of such Warrant, the kind and amount of shares of stock and other securities and property (except in the event the property is cash, then the Holder shall have the right to exercise the Warrant and receive cash in the same manner as other stockholders) receivable upon such consolidation or merger, by a holder of the number of shares of Common Stock of the Company for which such warrant might have been exercised immediately prior to such consolidation, merger, sale or transfer. Such supplemental warrant agreement shall provide for adjustments which shall be identical to the adjustments provided in Section 2.7. The foregoing provisions of this paragraph (e) shall similarly apply to successive consolidations or mergers.

(f)    No Adjustment of Exercise Price in Certain Cases.  No adjustment of the Exercise Price shall be made upon the issuance of any securities (i) under an Approved Stock Plan (as such term is defined in the Convertible Debenture dated as of the date hereof), (ii) that constitute Excluded Securities (as such term is defined in the Convertible Debenture dated as of the date hereof) and/or (iii) that constitute Other Securities (as such term is defined in the Convertible Debenture dated as of the date hereof).

(g)    Dividends and Other Distributions.  In the event that the Company shall at any time prior to the exercise of all Warrants declare a dividend (other than a dividend consisting solely of shares of Common Stock) or otherwise distribute to its stockholders any assets, property, rights, evidences of indebtedness, securities (other than shares of Common Stock), whether issued by the Company or by another, or any other thing of value, the Holders of the unexercised Warrants shall thereafter be entitled, in addition to the shares of Common Stock or other securities and property receivable upon the exercise thereof, to receive, upon the exercise of such Warrants, the same property, assets, rights, evidences of indebtedness, securities or any other thing of value that they would have been entitled to receive at the time of such dividend or distribution as if the Warrants had been exercised immediately prior to such dividend or distribution. At the time of any such dividend or distribution, the Company shall make appropriate reserves to ensure the timely performance of the provisions of this subsection 2.7 (g). Nothing contained herein shall provide for the receipt or accrual by a Holder of cash dividends prior to the exercise by such Holder of the Warrants.

2.8    Registration Rights.  The Holder shall have the registration rights set forth in the Investor Registration Rights Agreement.

## ARTICLE 3. MISCELLANEOUS

3.1     Transfer.  This Warrant may not be offered, sold, transferred, pledged, assigned, hypothecated or otherwise disposed of, in whole or in part, at any time, except in compliance with applicable federal and state securities laws by the transferor and the transferee (including, without limitation, the delivery of an investment representation letter and a legal opinion reasonably satisfactory to the Company).

3.2     Transfer Procedure.  Subject to the provisions of Section 3.1, the Holder may transfer or assign this Warrant by giving the Company notice setting forth the name, address and taxpayer identification number of the transferee or assignee, if applicable (the "Transferee"), and surrendering this Warrant to the Company for reissuance to the Transferee and, in the event of a transfer or assignment of this Warrant in part, the Holder.  (Each of the persons or entities in whose name any such new Warrant shall be issued are herein referred to as a "Holder").

3.3     Loss, Theft, Destruction or Mutilation.  If this Warrant shall become mutilated or defaced or be destroyed, lost or stolen, the Company shall execute and deliver a new Warrant in exchange for and upon surrender and cancellation of such mutilated or defaced Warrant or, in lieu of and in substitution for such Warrant so destroyed, lost or stolen, upon the Holder filing with the Company an affidavit that such Warrant has been so mutilated, defaced, destroyed, lost or stolen.  However, the Company shall be entitled, as a condition to the execution and delivery of such new Warrant, to demand reasonably acceptable indemnity to it and payment of the expenses and charges incurred in connection with the delivery of such new Warrant.  Any Warrant so surrendered to the Company shall be canceled.

3.4     Notices.  All notices and other communications from the Company to the Holder or vice versa shall be deemed delivered and effective when given personally, by facsimile transmission with confirmation sheet at such address and/or facsimile number as may have been furnished to the Company or the Holder, as the case may be, in writing by the Company or the Holder from time to time.

3.5     Waiver.  This Warrant and any term hereof may be changed, waived, or terminated only by an instrument in writing signed by the party against which enforcement of such change, waiver, discharge or termination is sought.

3.6     Governing Law.  This Warrant shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to its principles regarding conflicts of law.  Any action to enforce the terms of this Warrant shall be exclusively heard in the county, state and federal Courts of New York and Country of the United States of America.

3.7     Signature.  In the event that any signature on this Warrant is delivered by facsimile transmission, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) the same, with the same force and effect as if such facsimile signature page were an original thereof.

3.8    Legal Fees.    In the event any Person commences a legal action or proceeding to enforce its rights under this Warrant, the non-prevailing party to such action or proceeding shall pay all reasonable and necessary costs and expenses (including reasonable and necessary attorney's fees) incurred in enforcing such rights.

Dated:   November 17, 2005

**CHARYS HOLDING COMPANY INC.**

By: _____
     Name:  Billy Ray, Jr.
     Title:   Chief Executive Officer

Attest:

_____
Name:
Title:

## APPENDIX I

## <u>NOTICE OF EXERCISE</u>

1.   The undersigned hereby elects (please check the appropriate box and fill in the blank spaces):

☐ to purchase _____ shares of Common Stock, $.001 par value per share, of Charys Holding Company Inc. at $.50 per share for a total of $_____ and pursuant to the terms of the attached Warrant, and tenders herewith payment of the aggregate Exercise Price of such Warrant Shares in full; or

☐ to purchase _____ shares of Common Stock, $.001 par value per share, of Charys Holding Company Inc. pursuant to the cashless exercise provision under Section 2.2 (b) of the attached Warrant, and tenders herewith the number of Warrant Shares to purchase such Warrant Shares based upon the formula set forth in Section 2.2 (b).

2.   Please issue a certificate or certificates representing said Warrant Shares in the name of the undersigned or in such other name as is specified below:


Dated: _____      By: _____

                                  Name: _____

Title: _____

Void after 5:00 p.m., New York Time on November 17, 2008
Warrant to Purchase 88,960 Shares of Common Stock

## WARRANT TO PURCHASE COMMON STOCK

 **ORIGINAL**

### OF

## CHARYS HOLDING COMPANY INC.

THIS WARRANT, AND THE SECURITIES INTO WHICH IT IS EXERCISABLE (COLLECTIVELY, THE "SECURITIES"), HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR THE SECURITIES LAWS OF ANY STATE. THE SECURITIES MAY NOT BE OFFERED OR SOLD UNLESS THE SECURITIES ARE REGISTERED UNDER THE ACT OR PURSUANT TO AVAILABLE EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND THE COMPANY WILL BE PROVIDED WITH OPINION OF COUNSEL OR OTHER SUCH INFORMATION AS IT MAY REASONABLY REQUIRE TO CONFIRM THAT SUCH EXEMPTIONS ARE AVAILABLE.

**FOR VALUE RECEIVED,** Charys Holding Company Inc., a corporation organized under the laws of Delaware (the "Company"), grants the following rights to Highgate House Funds, Ltd, a Cayman Islands company and/or its assigns (the "Holder"):

### ARTICLE 1. DEFINITIONS

Capitalized terms used and not otherwise defined herein shall have the meanings given such terms in the Securities Purchase Agreement by and between the Company and the Holder and entered into on November 16, 2005 (the "Purchase Agreement"). As used in this Agreement, the following terms shall have the following meanings:

"Corporate Office" shall mean the office of the Company (or its successor) at which at any particular time its principal business shall be administered.

"Exercise Date" shall mean any date on which the Holder gives the Company a Notice of Exercise in the form attached hereto as Appendix I and in compliance with Exhibit F to the Purchase Agreement.

"Exercise Price" shall mean the Fixed Price per share of Common Stock, subject to adjustment as provided herein.

"Expiration Date" shall mean 5:00 p.m. (New York time) on November 16, 2008.

"Fair Market Value" shall have the meaning set forth in Section 2.2(b).

"Fixed Price" shall mean US$1.00 or if the First Convertible Debenture (as defined in the Purchase Agreement) is not redeemed by the Exclusive Redemption Date (as defined in the Purchase Agreement) shall mean US$.01.

"Market Value" shall have the meaning set forth in Section 2.2(b).

"SEC" shall mean the United States Securities and Exchange Commission.

"Warrant Shares" shall mean the shares of the Common Stock issuable upon exercise of this Warrant.

## ARTICLE 2. EXERCISE AND AGREEMENTS

2.1    Exercise of Warrant; Sale of Warrant and Warrant Shares.    (a) This Warrant shall entitle the Holder to purchase, at the Exercise Price, 88,960 shares of Common Stock. This Warrant shall be exercisable at any time and from time to time from the date hereof and prior to the Expiration Date (the "Exercise Period"). This Warrant and the right to purchase Warrant Shares hereunder shall expire and become void on the Expiration Date.

2.2    Manner of Exercise.

(a)    The Holder may exercise this Warrant at any time and from time to time during the Exercise Period, in whole or in part (but not in denominations of fewer than 10,000 Warrant Shares, except upon an exercise of this Warrant with respect to the remaining balance of Warrant Shares purchasable hereunder at the time of exercise), by delivering to the Escrow Agent pursuant to the Escrow Shares Escrow Agreement of even date herewith incorporated herein by reference  (i) a duly executed Notice of Exercise in substantially the form attached as Appendix I hereto, (ii) the certificate representing the Warrants and (iii) a bank cashier's or certified check for the aggregate Exercise Price of the Warrant Shares being purchased.

(b)    The Holder may, at its option, in lieu of paying cash for the Warrant Shares, exercise this Warrant by an exchange, in whole or in part (a "Warrant Exchange"), by delivery to the Escrow Agent of (i) a duly executed Notice of Exercise electing a Warrant Exchange and (ii) the certificate representing this Warrant. In connection with any Warrant Exchange, the Holder shall be deemed to have paid for the Warrant Shares an amount equal to the Fair Market Value of each Warrant delivered, and the Warrants shall be deemed exercised for the amount so paid. For this purpose, the Fair Market Value of each Warrant is the difference between the Market Value of a share of Common Stock and the Exercise Price on the Exercise Date. Market Value shall mean the average Closing Bid Price of a share of Common Stock during the ten (10) Trading Days ending on the Exercise Date.

2.3    Termination. All rights of the Holder in this Warrant, to the extent they have not been exercised, shall terminate on the Expiration Date.

2

2.4  No Rights Prior to Exercise. This Warrant shall not entitle the Holder to any voting or other rights as a stockholder of the Company.

2.5  Fractional Shares. No fractional shares shall be issuable upon exercise of this Warrant, and the number of Warrant Shares to be issued shall be rounded up to the nearest whole number. If, upon exercise of this Warrant, the Holder hereof would be entitled to receive any fractional share, the Company shall issue to the Holder one additional share of Common Stock in lieu of such fractional share.

2.6  Escrow. The Company agrees to enter into the Escrow Shares Escrow Agreement and to deposit with the Escrow Agent thereunder stock certificates registered in the name of the Holder, each representing a number of shares of Common Stock (in denominations specified by the Purchaser) equal, in the aggregate, to the total number of Warrant Shares for which this Warrant is exercisable, assuming exercise of this Warrant in full on the date hereof. The Company shall deposit additional certificates for Warrant Shares upon request by the Escrow Agent pursuant to the Escrow Agreement and Exhibit F to the Purchase Agreement.

2.7  Adjustments to Exercise Price and Number of Securities.
(a)  Computation of Adjusted Exercise Price. In case the Company shall at any time after the date hereof and until this Warrant is fully exercised issue or sell any shares of Common Stock (other than the issuances or sales referred to in Section 2.7 (f) hereof), including shares held in the Company's treasury and shares of Common Stock issued upon the exercise of any options, rights or warrants to subscribe for shares of Common Stock and shares of Common Stock issued upon the direct or indirect conversion or exchange of securities for shares of Common Stock (excluding shares of Common Stock issuable upon exercise of options, warrants or conversion rights granted as of the date hereof), for a consideration per share less than the Exercise Price on the date immediately prior to the issuance or sale of such shares, or without consideration, then forthwith upon such issuance or sale, the Exercise Price shall (until another such issuance or sale) be reduced to the price equal to the quotient derived by dividing (A) an amount equal to the sum of (X) the product of (a) the Exercise Price on the date immediately prior to the issuance or sale of such shares, multiplied by (b) the total number of shares of Common Stock outstanding immediately prior to such issuance or sale plus, (Y) the aggregate of the amount of all consideration, if any, received by the Company upon such issuance or sale, by (B) the total number of shares of Common Stock outstanding immediately after such issuance or sale; provided, however, that in no event shall the Exercise Price be adjusted pursuant to this computation to an amount in excess of the Exercise Price in effect immediately prior to such computation, except in the case of a combination of outstanding shares of Common Stock, as provided by Section 2.7 (c) hereof.

For the purposes of any computation to be made in accordance with this Section 2.7(a), the following provisions shall be applicable:

(i)  In case of the issuance or sale of shares of Common Stock for a consideration part or all of which shall be cash, the amount of cash consideration therefor shall be deemed to be the amount of cash received by the Company for such shares (or, if shares of Common Stock are offered by the Company for

3

subscription, the subscription price, or if either of such securities shall be sold to underwriters or dealers for public offering without a subscription offering, the initial public offering price) before deducting therefrom any compensation paid or discount allowed in the sale, underwriting or purchase thereof by underwriters or dealers or others performing similar services, or any expenses incurred in connection therewith.

(ii)    In case of the issuance or sale (otherwise than as a dividend or other distribution on any stock of the Company) of shares of Common Stock for a consideration part or all of which shall be other than cash, the amount of the consideration therefor other than cash shall be deemed to be the value of such consideration as determined in good faith by the Board of Directors of the Company.

(iii)    Shares of Common Stock issuable by way of dividend or other distribution on any stock of the Company shall be deemed to have been issued immediately after the opening of business on the day following the record date for the determination of stockholders entitled to receive such dividend or other distribution and shall be deemed to have been issued without consideration.

(iv)    The reclassification of securities of the Company other than shares of the Common Stock into securities including shares of Common Stock shall be deemed to involve the issuance of such shares of Common Stock for a consideration other than cash immediately prior to the close of business on the date fixed for the determination of security holders entitled to receive such shares, and the value of the consideration allocable to such shares of Common Stock shall be determined as provided in subsection (ii) of this Section 2.7(a).

(v)    The number of shares of Common Stock at any one time outstanding shall include the aggregate number of shares issued or issuable (subject to readjustment upon the actual issuance thereof) upon the exercise of options, rights, warrants and upon the conversion or exchange of convertible or exchangeable securities; provided, however, that shares issuable upon the exercise of the Warrants shall not be included in such calculation.

(b)    <u>Options, Rights, Warrants and Convertible and Exchangeable Securities</u>. In case the Company shall at any time after the date hereof and until this Warrant is fully exercised issue options, rights or warrants to subscribe for shares of Common Stock, or issue any securities convertible into or exchangeable for shares of Common Stock, for a consideration per share less than the Exercise Price immediately prior to the issuance of such options, rights or warrants (excluding shares of Common Stock issuable upon exercise of options, warrants or conversion rights granted as of the date hereof and shares of Common Stock issuable upon exercise of stock options at or above the closing market price per share of Common Stock under any stock option plan of the Company), or such convertible or exchangeable securities, or without consideration, the Exercise Price in effect immediately prior to the issuance of such options, rights or warrants, or such convertible or exchangeable securities, as the case may be, shall be reduced to a price

4

determined by making a computation in accordance with the provision of Section 2.7(a) hereof, provided that:

(i)    The aggregate maximum number of shares of Common Stock, as the case may be, issuable under such options, rights or warrants shall be deemed to be issued and outstanding at the time such options, rights or warranties were issued, and for a consideration equal to the minimum purchase price per share provided for in such options, rights or warrants at the time of issuance, plus the consideration (determined in the same manner as consideration received on the issue or sale of shares in accordance with the terms of the Warrants), if any, received by the Company for such options, rights or warrants.

(ii)    The aggregate maximum number of shares of Common Stock issuable upon conversion or exchange of any convertible or exchangeable securities shall be deemed to be issued and outstanding at the time of issuance of such securities, and for a consideration equal to the consideration (determined in the same manner as consideration received on the issue or sale of shares of Common Stock in accordance with the terms of the Warrants) received by the Company for such securities, plus the minimum consideration, if any, receivable by the Company upon the conversion or exchange thereof.

(iii)    If any change shall occur in the price per share provided for in any of the options, rights or warrants referred to in subsection (a) of this Section 2.7, or in the price per share at which the securities referred to in subsection (b) of this Section 2.7 are convertible or exchangeable, such options, rights or warrants or conversion or exchange rights, as the case may be, shall be deemed to have expired or terminated on the date when such price change became effective in respect of shares not theretofore issued pursuant to the exercise or conversion or exchange thereof, and the Company shall be deemed to have issued upon such date new options, rights or warrants or convertible or exchangeable securities at the new price in respect of the number of shares issuable upon the exercise of such options, rights or warrants or the conversion or exchange of such convertible or exchangeable securities.

(iv)    If any options, rights or warrants referred to in subsection (a) of this Section 2.7, or any convertible or exchangeable securities referred to in subsection (b) of this Section 2.7, expire or terminate without exercise or conversion, as the case may be, then the Exercise Price of the remaining outstanding Warrant shall be readjusted as if such options, rights or warrants or convertible or exchangeable securities, as the case may be, had never been issued.

(c)    Subdivision and Combination.  In case the Company shall at any time subdivide or combine the outstanding shares of Common Stock, the Exercise Price shall forthwith be proportionately decreased in the case of subdivision or increased in the case of combination.

(d)    Adjustment in Number of Securities.  Upon each adjustment of the Exercise Price pursuant to the provisions of this Section 2.7, the number of Warrant

Shares issuable upon the exercise of each Warrant shall be adjusted to the nearest whole number by multiplying a number equal to the Exercise Price in effect immediately prior to such adjustment by the number of Warrant Shares issuable upon exercise of the Warrants immediately prior to such adjustment and dividing the product so obtained by the adjusted Exercise Price.

(e)   Merger or Consolidation.  In case of any consolidation of the Company with, or merger of the Company with, or merger of the Company into, another corporation (other than a consolidation or merger which does not result in any reclassification or change of the outstanding Common Stock), the corporation formed by such consolidation or merger shall execute and deliver to the Holder a supplemental warrant agreement providing that the Holder of each Warrant then outstanding or to be outstanding shall have the right thereafter (until the expiration of such Warrant) to receive, upon exercise of such Warrant, the kind and amount of shares of stock and other securities and property (except in the event the property is cash, then the Holder shall have the right to exercise the Warrant and receive cash in the same manner as other stockholders) receivable upon such consolidation or merger, by a holder of the number of shares of Common Stock of the Company for which such warrant might have been exercised immediately prior to such consolidation, merger, sale or transfer. Such supplemental warrant agreement shall provide for adjustments which shall be identical to the adjustments provided in Section 2.7. The foregoing provisions of this paragraph (e) shall similarly apply to successive consolidations or mergers.

(f)   No Adjustment of Exercise Price in Certain Cases.  No adjustment of the Exercise Price shall be made upon the issuance of any securities (i) under an Approved Stock Plan (as such term is defined in the Convertible Debenture dated as of the date hereof), (ii) that constitute Excluded Securities (as such term is defined in the Convertible Debenture dated as of the date hereof) and/or (iii) that constitute Other Securities (as such term is defined in the Convertible Debenture dated as of the date hereof).

(g)   Dividends and Other Distributions.  In the event that the Company shall at any time prior to the exercise of all Warrants declare a dividend (other than a dividend consisting solely of shares of Common Stock) or otherwise distribute to its stockholders any assets, property, rights, evidences of indebtedness, securities (other than shares of Common Stock), whether issued by the Company or by another, or any other thing of value, the Holders of the unexercised Warrants shall thereafter be entitled, in addition to the shares of Common Stock or other securities and property receivable upon the exercise thereof, to receive, upon the exercise of such Warrants, the same property, assets, rights, evidences of indebtedness, securities or any other thing of value that they would have been entitled to receive at the time of such dividend or distribution as if the Warrants had been exercised immediately prior to such dividend or distribution. At the time of any such dividend or distribution, the Company shall make appropriate reserves to ensure the timely performance of the provisions of this subsection 2.7 (g). Nothing contained herein shall provide for the receipt or accrual by a Holder of cash dividends prior to the exercise by such Holder of the Warrants.

2.8   Registration Rights.  The Holder shall have the registration rights set forth in the Investor Registration Rights Agreement.

6

## ARTICLE 3. MISCELLANEOUS

3.1     Transfer.  This Warrant may not be offered, sold, transferred, pledged, assigned, hypothecated or otherwise disposed of, in whole or in part, at any time, except in compliance with applicable federal and state securities laws by the transferor and the transferee (including, without limitation, the delivery of an investment representation letter and a legal opinion reasonably satisfactory to the Company).

3.2     Transfer Procedure.  Subject to the provisions of Section 3.1, the Holder may transfer or assign this Warrant by giving the Company notice setting forth the name, address and taxpayer identification number of the transferee or assignee, if applicable (the "Transferee"), and surrendering this Warrant to the Company for reissuance to the Transferee and, in the event of a transfer or assignment of this Warrant in part, the Holder.  (Each of the persons or entities in whose name any such new Warrant shall be issued are herein referred to as a "Holder").

3.3     Loss, Theft, Destruction or Mutilation.  If this Warrant shall become mutilated or defaced or be destroyed, lost or stolen, the Company shall execute and deliver a new Warrant in exchange for and upon surrender and cancellation of such mutilated or defaced Warrant or, in lieu of and in substitution for such Warrant so destroyed, lost or stolen, upon the Holder filing with the Company an affidavit that such Warrant has been so mutilated, defaced, destroyed, lost or stolen.  However, the Company shall be entitled, as a condition to the execution and delivery of such new Warrant, to demand reasonably acceptable indemnity to it and payment of the expenses and charges incurred in connection with the delivery of such new Warrant.  Any Warrant so surrendered to the Company shall be canceled.

3.4     Notices.  All notices and other communications from the Company to the Holder or vice versa shall be deemed delivered and effective when given personally, by facsimile transmission with confirmation sheet at such address and/or facsimile number as may have been furnished to the Company or the Holder, as the case may be, in writing by the Company or the Holder from time to time.

3.5     Waiver.  This Warrant and any term hereof may be changed, waived, or terminated only by an instrument in writing signed by the party against which enforcement of such change, waiver, discharge or termination is sought.

3.6     Governing Law.  This Warrant shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to its principles regarding conflicts of law.  Any action to enforce the terms of this Warrant shall be exclusively heard in the county, state and federal Courts of New York and Country of the United States of America.

3.7     Signature.  In the event that any signature on this Warrant is delivered by facsimile transmission, such signature shall create a valid and binding obligation of the

party executing (or on whose behalf such signature is executed) the same, with the same force and effect as if such facsimile signature page were an original thereof.

       3.8    <u>Legal Fees</u>.   In the event any Person commences a legal action or proceeding to enforce its rights under this Warrant, the non-prevailing party to such action or proceeding shall pay all reasonable and necessary costs and expenses (including reasonable and necessary attorney's fees) incurred in enforcing such rights.

Dated:  November 17, 2005

**CHARYS HOLDING COMPANY INC.**

By: _____
     Name: Billy Ray, Jr.
     Title:  Chief Executive Officer

Attest:

_____

Name:
Title:

8

## APPENDIX I

### <u>NOTICE OF EXERCISE</u>

1.    The undersigned hereby elects (please check the appropriate box and fill in the blank spaces):

☐ to purchase _____ shares of Common Stock, $.001 par value per share, of Charys Holding Company Inc. at [$1.00] [$.01] per share for a total of $_____ and pursuant to the terms of the attached Warrant, and tenders herewith payment of the aggregate Exercise Price of such Warrant Shares in full; or

☐ to purchase _____ shares of Common Stock, $.001 par value per share, of Charys Holding Company Inc. pursuant to the cashless exercise provision under Section 2.2 (b) of the attached Warrant, and tenders herewith the number of Warrant Shares to purchase such Warrant Shares based upon the formula set forth in Section 2.2 (b).

2.    Please issue a certificate or certificates representing said Warrant Shares in the name of the undersigned or in such other name as is specified below:


Dated: _____     By: _____

                                        Name: _____

Title: _____

Void after 5:00 p.m., New York Time on November 17, 2008
Warrant to Purchase 88,960 Shares of Common Stock

 ORIGINAL

## WARRANT TO PURCHASE COMMON STOCK

### OF

## CHARYS HOLDING COMPANY INC.

THIS WARRANT, AND THE SECURITIES INTO WHICH IT IS EXERCISABLE (COLLECTIVELY, THE "SECURITIES"), HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR THE SECURITIES LAWS OF ANY STATE. THE SECURITIES MAY NOT BE OFFERED OR SOLD UNLESS THE SECURITIES ARE REGISTERED UNDER THE ACT OR PURSUANT TO AVAILABLE EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND THE COMPANY WILL BE PROVIDED WITH OPINION OF COUNSEL OR OTHER SUCH INFORMATION AS IT MAY REASONABLY REQUIRE TO CONFIRM THAT SUCH EXEMPTIONS ARE AVAILABLE.

FOR VALUE RECEIVED, Charys Holding Company Inc., a corporation organized under the laws of Delaware (the "Company"), grants the following rights to Highgate House Funds, Ltd, a Cayman Islands company and/or its assigns (the "Holder"):

### ARTICLE 1. DEFINITIONS

Capitalized terms used and not otherwise defined herein shall have the meanings given such terms in the Securities Purchase Agreement by and between the Company and the Holder and entered into on November 16, 2005 (the "Purchase Agreement"). As used in this Agreement, the following terms shall have the following meanings:

"Corporate Office" shall mean the office of the Company (or its successor) at which at any particular time its principal business shall be administered.

"Exercise Date" shall mean any date on which the Holder gives the Company a Notice of Exercise in the form attached hereto as Appendix I and in compliance with Exhibit F to the Purchase Agreement.

"Exercise Price" shall mean the Fixed Price per share of Common Stock, subject to adjustment as provided herein.

"Expiration Date" shall mean 5:00 p.m. (New York time) on November 16, 2008.

"Fair Market Value" shall have the meaning set forth in Section 2.2(b).

"Fixed Price" shall mean US$0.25 or if the First Convertible Debenture (as defined in the Purchase Agreement) is not redeemed by the Exclusive Redemption Date (as defined in the Purchase Agreement) shall mean US$.01.

"Market Value" shall have the meaning set forth in Section 2.2(b).

"SEC" shall mean the United States Securities and Exchange Commission.

"Warrant Shares" shall mean the shares of the Common Stock issuable upon exercise of this Warrant.

## ARTICLE 2. EXERCISE AND AGREEMENTS

2.1    Exercise of Warrant; Sale of Warrant and Warrant Shares.    (a) This Warrant shall entitle the Holder to purchase, at the Exercise Price, 88,960 shares of Common Stock. This Warrant shall be exercisable at any time and from time to time from the date hereof and prior to the Expiration Date (the "Exercise Period"). This Warrant and the right to purchase Warrant Shares hereunder shall expire and become void on the Expiration Date.

2.2    Manner of Exercise.

(a)    The Holder may exercise this Warrant at any time and from time to time during the Exercise Period, in whole or in part (but not in denominations of fewer than 10,000 Warrant Shares, except upon an exercise of this Warrant with respect to the remaining balance of Warrant Shares purchasable hereunder at the time of exercise), by delivering to the Escrow Agent pursuant to the Escrow Shares Escrow Agreement of even date herewith incorporated herein by reference    (i) a duly executed Notice of Exercise in substantially the form attached as Appendix I hereto, (ii) the certificate representing the Warrants and (iii) a bank cashier's or certified check for the aggregate Exercise Price of the Warrant Shares being purchased.

(b)    The Holder may, at its option, in lieu of paying cash for the Warrant Shares, exercise this Warrant by an exchange, in whole or in part (a "Warrant Exchange"), by delivery to the Escrow Agent of (i) a duly executed Notice of Exercise electing a Warrant Exchange and (ii) the certificate representing this Warrant. In connection with any Warrant Exchange, the Holder shall be deemed to have paid for the Warrant Shares an amount equal to the Fair Market Value of each Warrant delivered, and the Warrants shall be deemed exercised for the amount so paid. For this purpose, the Fair Market Value of each Warrant is the difference between the Market Value of a share of Common Stock and the Exercise Price on the Exercise Date. Market Value shall mean the average Closing Bid Price of a share of Common Stock during the ten (10) Trading Days ending on the Exercise Date.

2.3    Termination.    All rights of the Holder in this Warrant, to the extent they have not been exercised, shall terminate on the Expiration Date.

2

2.4   No Rights Prior to Exercise. This Warrant shall not entitle the Holder to any voting or other rights as a stockholder of the Company.

2.5   Fractional Shares. No fractional shares shall be issuable upon exercise of this Warrant, and the number of Warrant Shares to be issued shall be rounded up to the nearest whole number. If, upon exercise of this Warrant, the Holder hereof would be entitled to receive any fractional share, the Company shall issue to the Holder one additional share of Common Stock in lieu of such fractional share.

2.6   Escrow. The Company agrees to enter into the Escrow Shares Escrow Agreement and to deposit with the Escrow Agent thereunder stock certificates registered in the name of the Holder, each representing a number of shares of Common Stock (in denominations specified by the Purchaser) equal, in the aggregate, to the total number of Warrant Shares for which this Warrant is exercisable, assuming exercise of this Warrant in full on the date hereof. The Company shall deposit additional certificates for Warrant Shares upon request by the Escrow Agent pursuant to the Escrow Agreement and Exhibit F to the Purchase Agreement.

2.7   Adjustments to Exercise Price and Number of Securities.

(a)   Computation of Adjusted Exercise Price. In case the Company shall at any time after the date hereof and until this Warrant is fully exercised issue or sell any shares of Common Stock (other than the issuances or sales referred to in Section 2.7 (f) hereof), including shares held in the Company's treasury and shares of Common Stock issued upon the exercise of any options, rights or warrants to subscribe for shares of Common Stock and shares of Common Stock issued upon the direct or indirect conversion or exchange of securities for shares of Common Stock (excluding shares of Common Stock issuable upon exercise of options, warrants or conversion rights granted as of the date hereof), for a consideration per share less than the Exercise Price on the date immediately prior to the issuance or sale of such shares, or without consideration, then forthwith upon such issuance or sale, the Exercise Price shall (until another such issuance or sale) be reduced to the price equal to the quotient derived by dividing (A) an amount equal to the sum of (X) the product of (a) the Exercise Price on the date immediately prior to the issuance or sale of such shares, multiplied by (b) the total number of shares of Common Stock outstanding immediately prior to such issuance or sale plus, (Y) the aggregate of the amount of all consideration, if any, received by the Company upon such issuance or sale, by (B) the total number of shares of Common Stock outstanding immediately after such issuance or sale; provided, however, that in no event shall the Exercise Price be adjusted pursuant to this computation to an amount in excess of the Exercise Price in effect immediately prior to such computation, except in the case of a combination of outstanding shares of Common Stock, as provided by Section 2.7 (c) hereof.

For the purposes of any computation to be made in accordance with this Section 2.7(a), the following provisions shall be applicable:

(i)   In case of the issuance or sale of shares of Common Stock for a consideration part or all of which shall be cash, the amount of cash consideration therefor shall be deemed to be the amount of cash received by the Company for such shares (or, if shares of Common Stock are offered by the Company for

3

subscription, the subscription price, or if either of such securities shall be sold to underwriters or dealers for public offering without a subscription offering, the initial public offering price) before deducting therefrom any compensation paid or discount allowed in the sale, underwriting or purchase thereof by underwriters or dealers or others performing similar services, or any expenses incurred in connection therewith.

(ii)    In case of the issuance or sale (otherwise than as a dividend or other distribution on any stock of the Company) of shares of Common Stock for a consideration part or all of which shall be other than cash, the amount of the consideration therefor other than cash shall be deemed to be the value of such consideration as determined in good faith by the Board of Directors of the Company.

(iii)    Shares of Common Stock issuable by way of dividend or other distribution on any stock of the Company shall be deemed to have been issued immediately after the opening of business on the day following the record date for the determination of stockholders entitled to receive such dividend or other distribution and shall be deemed to have been issued without consideration.

(iv)    The reclassification of securities of the Company other than shares of the Common Stock into securities including shares of Common Stock shall be deemed to involve the issuance of such shares of Common Stock for a consideration other than cash immediately prior to the close of business on the date fixed for the determination of security holders entitled to receive such shares, and the value of the consideration allocable to such shares of Common Stock shall be determined as provided in subsection (ii) of this Section 2.7(a).

(v)    The number of shares of Common Stock at any one time outstanding shall include the aggregate number of shares issued or issuable (subject to readjustment upon the actual issuance thereof) upon the exercise of options, rights, warrants and upon the conversion or exchange of convertible or exchangeable securities; provided, however, that shares issuable upon the exercise of the Warrants shall not be included in such calculation.

(b)    Options, Rights, Warrants and Convertible and Exchangeable Securities. In case the Company shall at any time after the date hereof and until this Warrant is fully exercised issue options, rights or warrants to subscribe for shares of Common Stock, or issue any securities convertible into or exchangeable for shares of Common Stock, for a consideration per share less than the Exercise Price immediately prior to the issuance of such options, rights or warrants (excluding shares of Common Stock issuable upon exercise of options, warrants or conversion rights granted as of the date hereof and shares of Common Stock issuable upon exercise of stock options at or above the closing market price per share of Common Stock under any stock option plan of the Company), or such convertible or exchangeable securities, or without consideration, the Exercise Price in effect immediately prior to the issuance of such options, rights or warrants, or such convertible or exchangeable securities, as the case may be, shall be reduced to a price

4

determined by making a computation in accordance with the provision of Section 2.7(a) hereof, provided that:

(i)    The aggregate maximum number of shares of Common Stock, as the case may be, issuable under such options, rights or warrants shall be deemed to be issued and outstanding at the time such options, rights or warranties were issued, and for a consideration equal to the minimum purchase price per share provided for in such options, rights or warrants at the time of issuance, plus the consideration (determined in the same manner as consideration received on the issue or sale of shares in accordance with the terms of the Warrants), if any, received by the Company for such options, rights or warrants.

(ii)    The aggregate maximum number of shares of Common Stock issuable upon conversion or exchange of any convertible or exchangeable securities shall be deemed to be issued and outstanding at the time of issuance of such securities, and for a consideration equal to the consideration (determined in the same manner as consideration received on the issue or sale of shares of Common Stock in accordance with the terms of the Warrants) received by the Company for such securities, plus the minimum consideration, if any, receivable by the Company upon the conversion or exchange thereof.

(iii)    If any change shall occur in the price per share provided for in any of the options, rights or warrants referred to in subsection (a) of this Section 2.7, or in the price per share at which the securities referred to in subsection (b) of this Section 2.7 are convertible or exchangeable, such options, rights or warrants or conversion or exchange rights, as the case may be, shall be deemed to have expired or terminated on the date when such price change became effective in respect of shares not theretofore issued pursuant to the exercise or conversion or exchange thereof, and the Company shall be deemed to have issued upon such date new options, rights or warrants or convertible or exchangeable securities at the new price in respect of the number of shares issuable upon the exercise of such options, rights or warrants or the conversion or exchange of such convertible or exchangeable securities.

(iv)    If any options, rights or warrants referred to in subsection (a) of this Section 2.7, or any convertible or exchangeable securities referred to in subsection (b) of this Section 2.7, expire or terminate without exercise or conversion, as the case may be, then the Exercise Price of the remaining outstanding Warrant shall be readjusted as if such options, rights or warrants or convertible or exchangeable securities, as the case may be, had never been issued.

(c)    Subdivision and Combination. In case the Company shall at any time subdivide or combine the outstanding shares of Common Stock, the Exercise Price shall forthwith be proportionately decreased in the case of subdivision or increased in the case of combination.

(d)    Adjustment in Number of Securities. Upon each adjustment of the Exercise Price pursuant to the provisions of this Section 2.7, the number of Warrant

5

Shares issuable upon the exercise of each Warrant shall be adjusted to the nearest whole number by multiplying a number equal to the Exercise Price in effect immediately prior to such adjustment by the number of Warrant Shares issuable upon exercise of the Warrants immediately prior to such adjustment and dividing the product so obtained by the adjusted Exercise Price.

(e)    Merger or Consolidation.  In case of any consolidation of the Company with, or merger of the Company with, or merger of the Company into, another corporation (other than a consolidation or merger which does not result in any reclassification or change of the outstanding Common Stock), the corporation formed by such consolidation or merger shall execute and deliver to the Holder a supplemental warrant agreement providing that the Holder of each Warrant then outstanding or to be outstanding shall have the right thereafter (until the expiration of such Warrant) to receive, upon exercise of such Warrant, the kind and amount of shares of stock and other securities and property (except in the event the property is cash, then the Holder shall have the right to exercise the Warrant and receive cash in the same manner as other stockholders) receivable upon such consolidation or merger, by a holder of the number of shares of Common Stock of the Company for which such warrant might have been exercised immediately prior to such consolidation, merger, sale or transfer. Such supplemental warrant agreement shall provide for adjustments which shall be identical to the adjustments provided in Section 2.7. The foregoing provisions of this paragraph (e) shall similarly apply to successive consolidations or mergers.

(f)    No Adjustment of Exercise Price in Certain Cases.  No adjustment of the Exercise Price shall be made upon the issuance of any securities (i) under an Approved Stock Plan (as such term is defined in the Convertible Debenture dated as of the date hereof), (ii) that constitute Excluded Securities (as such term is defined in the Convertible Debenture dated as of the date hereof) and/or (iii) that constitute Other Securities (as such term is defined in the Convertible Debenture dated as of the date hereof).

(g)    Dividends and Other Distributions.  In the event that the Company shall at any time prior to the exercise of all Warrants declare a dividend (other than a dividend consisting solely of shares of Common Stock) or otherwise distribute to its stockholders any assets, property, rights, evidences of indebtedness, securities (other than shares of Common Stock), whether issued by the Company or by another, or any other thing of value, the Holders of the unexercised Warrants shall thereafter be entitled, in addition to the shares of Common Stock or other securities and property receivable upon the exercise thereof, to receive, upon the exercise of such Warrants, the same property, assets, rights, evidences of indebtedness, securities or any other thing of value that they would have been entitled to receive at the time of such dividend or distribution as if the Warrants had been exercised immediately prior to such dividend or distribution. At the time of any such dividend or distribution, the Company shall make appropriate reserves to ensure the timely performance of the provisions of this subsection 2.7 (g). Nothing contained herein shall provide for the receipt or accrual by a Holder of cash dividends prior to the exercise by such Holder of the Warrants.

2.8    Registration Rights.  The Holder shall have the registration rights set forth in the Investor Registration Rights Agreement.

6

## ARTICLE 3. MISCELLANEOUS

3.1    Transfer.  This Warrant may not be offered, sold, transferred, pledged, assigned, hypothecated or otherwise disposed of, in whole or in part, at any time, except in compliance with applicable federal and state securities laws by the transferor and the transferee (including, without limitation, the delivery of an investment representation letter and a legal opinion reasonably satisfactory to the Company).

3.2    Transfer Procedure.  Subject to the provisions of Section 3.1, the Holder may transfer or assign this Warrant by giving the Company notice setting forth the name, address and taxpayer identification number of the transferee or assignee, if applicable (the "Transferee"), and surrendering this Warrant to the Company for reissuance to the Transferee and, in the event of a transfer or assignment of this Warrant in part, the Holder. (Each of the persons or entities in whose name any such new Warrant shall be issued are herein referred to as a "Holder").

3.3    Loss, Theft, Destruction or Mutilation.  If this Warrant shall become mutilated or defaced or be destroyed, lost or stolen, the Company shall execute and deliver a new Warrant in exchange for and upon surrender and cancellation of such mutilated or defaced Warrant or, in lieu of and in substitution for such Warrant so destroyed, lost or stolen, upon the Holder filing with the Company an affidavit that such Warrant has been so mutilated, defaced, destroyed, lost or stolen.  However, the Company shall be entitled, as a condition to the execution and delivery of such new Warrant, to demand reasonably acceptable indemnity to it and payment of the expenses and charges incurred in connection with the delivery of such new Warrant.  Any Warrant so surrendered to the Company shall be canceled.

3.4    Notices.  All notices and other communications from the Company to the Holder or vice versa shall be deemed delivered and effective when given personally, by facsimile transmission with confirmation sheet at such address and/or facsimile number as may have been furnished to the Company or the Holder, as the case may be, in writing by the Company or the Holder from time to time.

3.5    Waiver.  This Warrant and any term hereof may be changed, waived, or terminated only by an instrument in writing signed by the party against which enforcement of such change, waiver, discharge or termination is sought.

3.6    Governing Law.  This Warrant shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to its principles regarding conflicts of law.  Any action to enforce the terms of this Warrant shall be exclusively heard in the county, state and federal Courts of New York and Country of the United States of America.

3.7    Signature.  In the event that any signature on this Warrant is delivered by facsimile transmission, such signature shall create a valid and binding obligation of the

party executing (or on whose behalf such signature is executed) the same, with the same force and effect as if such facsimile signature page were an original thereof.

3.8    Legal Fees.    In the event any Person commences a legal action or proceeding to enforce its rights under this Warrant, the non-prevailing party to such action or proceeding shall pay all reasonable and necessary costs and expenses (including reasonable and necessary attorney's fees) incurred in enforcing such rights.

Dated:    November 17, 2005

**CHARYS HOLDING COMPANY INC.**

By:    _____
Name: Billy Ray, Jr.
Title:  Chief Executive Officer

Attest:

_____
Name:
Title:

8

## APPENDIX I

### NOTICE OF EXERCISE

1.  The undersigned hereby elects (please check the appropriate box and fill in the blank spaces):

    ☐ to purchase _____ shares of Common Stock, $.001 par value per share, of Charys Holding Company Inc. at [$.25] [$.01] per share for a total of $_____ and pursuant to the terms of the attached Warrant, and tenders herewith payment of the aggregate Exercise Price of such Warrant Shares in full; or

    ☐ to purchase _____ shares of Common Stock, $.001 par value per share, of Charys Holding Company Inc. pursuant to the cashless exercise provision under Section 2.2 (b) of the attached Warrant, and tenders herewith the number of Warrant Shares to purchase such Warrant Shares based upon the formula set forth in Section 2.2 (b).

2.  Please issue a certificate or certificates representing said Warrant Shares in the name of the undersigned or in such other name as is specified below:


Dated: _____     By: _____

                                        Name: _____

Title: _____