August C. Venturini, Esq. (AV 2804)
Sean W. Higgins, Esq. (SH 4190)
VENTURINI & ASSOCIATES
230 Park Avenue, Suite 545
New York, NY 10169
Tel: (212) 826-6800

Attorneys for Defendants

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

-------------------------------------------------------------x

YORKVILLE ADVISORS MANAGEMENT,  :   Civil Action No. 06-5212 (JAG)
LLC, a Delaware limited liability company;   :
HIGHGATE HOUSE FUNDS, LTD., a   :
Cayman Islands exempted company,   :
                                                                     :
                          Plaintiffs,                         :
                                                                     :
            -v-                                               :   **AFFIDAVIT OF ADAM S.**
                                                                     :   **GOTTBETTER IN OPPOSITION**
                                                                     :   **TO PLAINTIFFS' MOTION FOR**
ADAM S. GOTTBETTER; HH ADVISORS,   :   **A PRELIMINARY INJUNCTION**
LLC, a New York limited liability company;   :   **AND IN SUPPORT OF DEFENDANTS'**
GOTTBETTER AND PARTNERS LLP, a   :   **CROSS-MOTION TO**
New York limited liability partnership;   :   **COMPEL ARBITRATION**
JASON RIMLAND, ESQ.; TIM L.   :
DOCKERY, ESQ. and MICHAEL CHORSKE,   :
                                                                     :
                          Defendants.                     :
-------------------------------------------------------------x

STATE OF NEW YORK        )
                                            ) ss.:
COUNTY OF NEW YORK   )

        ADAM S. GOTTBETTER, being duly sworn, deposes and says:

        1.        I am named as an individual defendant in the above-captioned action and am the

principal of defendant HH Advisors ("HHA") and a partner of defendant Gottbetter & Partners

LLP ("G&P").  I make this affidavit: (a) in opposition to the motion of plaintiffs Yorkville

Advisors Management, LLC ("YAM") and Highgate House Funds, Ltd. ("Highgate") (YAM and

1

Highgate are referred to herein collectively as "Plaintiffs") for a preliminary injunction; and (b) in support of the cross-motion of defendants Adam S. Gottbetter, HHA, G&P, Jason Rimland, Esq., Tim L. Dockery, Esq., and Michael Chorske  for an order, pursuant to 9 U.S.C. § 4, dismissing this action and compelling arbitration of the parties' dispute.

2.      Prior to November 2004, YAM's operations consisted of managing a hedge fund known as Cornell Capital Partners, LP ("Cornell").  In August 2004, YAM contacted me and another individual about managing two additional hedge funds it had decided to create.

3.      To induce me to commit to managing a hedge fund, YAM advised me that  my compensation would be comprised of five elements: cash fees, stock fees from SEDA (Standby Equity Distribution Agreement), warrants, management fees, and incentive fees.

4.      On or before November 1, 2004, YAM formed Highgate and Montgomery Equity Partners, Ltd. ("Montgomery").

5.      Under a letter agreement dated November 1, 2004 (the "Letter Agreement"), YAM hired HHA to co-manage Highgate, and using the same form but a separate agreement, hired Bob Press to co-manage Montgomery.

6.      I was named as a co-portfolio manager of Highgate.  YAM's principal, and majority owner, Mark Angelo[1], was named as the other co-portfolio manager.  The parties agreed that all investment decisions made by HHA would be made by me and that all such decisions made by me were subject to the approval of Mark Angelo.

7.      Also, in or around January 2005, I became an investor in Highgate.  I still am an investor in Highgate although I have requested to be redeemed and I have received a partial redemption.

---

[1]   Mark Angelo is also the majority owner of Yorkville Advisors, LLC ("YA"), which also provided management services to Highgate and, upon information and belief, succeeded YAM as manager of Highgate, Cornell, and Montgomery.

2

8.      At the end of 2005, Cornell had total assets of approximately $350 million. Highgate was always much smaller and did not exceed approximately $70 million at any time that I was a co-portfolio manager.

9.      Highgate's investors were typically sophisticated institutions and other experienced high net worth individuals.

10.     I co-managed Highgate from HHA's offices located in Manhattan.  Although the offices of HHA and G&P are on the same floor, at all times, HHA maintained physical offices separate and apart from G&P's offices.  Highgate's transaction documents, including the subject Charys Warrants, are maintained by HHA in its offices.

11.     Throughout my tenure as co-portfolio manager, I met weekly with Mark Angelo at YAM's offices in Jersey City to apprise him of my management decisions and to obtain his approval of those decisions.

12.     As fees for my services, HHA was entitled to 44.4% of the net fees earned by YAM, including cash, stock, and warrants.  HHA also earned additional fees in special situations not contemplated by the Letter Agreement.

**YAM Agrees To The Issuance Of Warrants to HHA and Chorske**

13.     In or around June 2005, YAM, through Mark Angelo, and I agreed on two key items, among others, regarding Highgate (the "June 2005 Agreement").

14.     First, YAM agreed that my profit payout percentage would increase to 44.4% from 40%.  Under the Letter Agreement, my profit percentage was not due to increase to 44.4% until 2008.  YAM, as far as I know, has honored that percentage increase.

15.     Second, YAM agreed that, with two exceptions (transactions under Rule 504 of Reg. D and transactions where warrants were the actual investment), 44.4% of the warrants

3

issued on investments made by Highgate (after subtracting warrants due to bankers if any) could be issued directly to HHA.[2]  Specifically, Mark Angelo agreed that such warrants could be issued to HHA directly as long as HHA sold any warrant stock through Sloan Securities, as he required persons connected to YAM to sell securities through Sloan so he could monitor the sales.

16.     Inasmuch as all of YAM's expenses incurred in operating Highgate were more than covered by the cash fees YAM had been earning in connection with Highgate, Mark Angelo and I agreed that there would be no need to offset any capital gains realized following the exercise of the warrants and the sale of the stock; therefore, there was no need to run the warrants or the underlying stock through YAM before paying them to HHA.  (Also, at this time, Mark Angelo said that later in 2005, YAM would begin contributing certain banking fees, cash, and warrants received on Cornell transactions to Cornell and said "you're going to have to do that as well" at some point in the future, and he proposed that we'll wait until Highgate's Net Asset Value ("NAV") hits $100 million before fees, such as warrants, would be contributed to Highgate.  Angelo said that the transfer to Highgate of HHA's fees (cash, warrants, and stock) that HHA would otherwise have earned under the Letter Agreement and June 2005 Agreement would be used to increase the size of the fund by attracting those additional investors who had been wary of YAM's funds because of its fee structure, which allocated certain equity to the managers instead of the fund.  Angelo further explained that HHA's future loss of fees would eventually be offset by the increase in the 2% management fee and 20% incentive fee as Highgate grew in excess of $100 million).

---

[2]   The so-called "504" investments were made by a Minnesota subsidiary of Highgate; in those instances, the warrants were required to be, and were, held by Highgate's subsidiary.  HHA and I have never asserted any claim that we are entitled to possession of those warrants.

17.     Moreover, as the co-manager of Highgate, HHA entered into a fee agreement with Michael Chorske to provide investment banking services to Highgate.[3] The fee agreement provided Chorske with between 5-15% of the banking fees in cash and warrants that were issued in any transaction in which he acted as banker. (The exact percentage depended on his role in the particular transaction as well as whether there were any co-bankers). HHA agreed that such warrants would be issued directly to Chorske.

18.     I obtained YAM's prior approval of the fee arrangement with Chorske. In a memo dated June 1, 2005, which I gave to Mark Angelo (the "June 2005 Memo"), I confirmed Angelo's oral approval of HHA's offer to Chorske comprised of a $150,000 salary per year plus certain percentages of the cash and equity fees earned. (A true and correct copy of the June 2005 Memo is attached hereto as Ex. "A", marked as Angelo Ex. 13). HHA paid Chorske his salary, and YAM reimbursed HHA for all of Chorske's salary. The June 2005 Memo (¶ 3) explicitly details the components of the fees Chorske was entitled to receive:

> Fees include banker fees of cash **and equity** on [Highgate] financings and the equity component only (not the cash component) of related Cornell financings. (emphasis added).

19.     The "equity" referred to in the June 2005 Memo expressly includes warrants and stock as YAM expressly had approved the issuance of warrants directly to Chorske. Also, considering that warrants were to be issued directly to HHA, it followed that Chorske would be paid the same way. At no time, did Mark Angelo ever indicate to me that the equity portion of the fees could not be issued directly to Chorske or that it was the practice of YAM not to have equity issued directly to bankers, but rather to pay bankers a cash fee after the warrants were "monetized." Monetized refers to the proceeds of the sale following an exercise of the warrants

---

[3]  The banker typically is the person who finds the transaction, structures the deal and makes sure it progresses to closing.

and sale of the underlying stock. This would have required Highgate to report as a liability the fees owed to the portfolio managers and bankers, which did not occur to my knowledge.

20. Relying upon the June 2005 Agreement, I informed others that warrants were to be issued directly to HHA and the banker.

21. For example, on October 7, 2005, I informed another fund, Prentice Capital, that was co-investing in the same deal as Highgate (the Oxford/Uluru transaction), that "20% of the Banking Fees are paid to the Banker…. This includes warrants, shares and cash." (A true and correct copy of my October 7, 2005 e-mail and the accompanying e-mail string is attached hereto as Ex. "B", D 01617, 2:40 p.m. e-mail). Also, on October 7, 2005, I informed Prentice that "Prentice and Highgate will share on a net pro rata basis … banking fees of 4 M[illion] warrants…." (A true and correct copy of my October 7, 2005 e-mail and the accompanying e-mail string is attached hereto as Ex. "C", D 01611, 10:20 a.m. e-mail).

22. I would never have made representations to third parties that warrants would be issued directly to bankers and that the warrants were considered to be "fees" if I did not believe that all relevant parties, and specifically YAM, were in agreement and notified accordingly.

**The Charys Warrants Were Not Part of Highgate**

23. The allegation that Defendants have misappropriated the warrants to purchase common stock of Charys Holding Company Inc. ("Charys") is untrue. The allocation of those warrants both to HHA and to Chorske was expressly approved by YAM in the June 2005 Agreement.

24. Moreover, Mark Angelo represented to me that, with a few exceptions, warrants were part of HHA's compensation. There was never any representation by YAM that such

warrants would be considered part of Highgate, and if YAM added such warrants as an asset of the fund, such change in policy was never disclosed to me.

25.    In November 2005, Highgate purchased from Charys a secured $4 million convertible debenture (the "Charys Convertible Debenture"). As part of the investment (the "Charys Transaction"), warrants to purchase one million shares of Charys' common stock (the "Charys Warrants") were issued in the name of Highgate as was the standard practice.

26.    As was the case with numerous other transactions involving the purchase of convertible debentures, the Charys Convertible Debenture was included as an asset in Highgate's reported NAV, and the Charys Warrants were not included in Highgate's NAV to my knowledge.

27.    In January 2006, while HHA was still managing Highgate, it assigned a portion of the Charys Warrants to Chorske and HHA to cover the banking and portfolio management fees owed, respectively. (True and correct copies of the assignments of the Charys Warrants (the "Assignments") are attached hereto as Ex. "D"). If in fact someone at YAM made a decision, after my resignation on January 9, 2006, to include the Charys Warrants, or any other warrant, as an asset, I was never notified of it.

28.    In reviewing the Assignments, we have discovered a mathematical error in computation. The Assignments indicate that 10% of the warrants (100,000) are assigned to Chorske as banker and that the remaining 90% are assigned as follows: 500,400 (55.6% of the 90%) to Highgate and 399,600 (44.4% of the 90%) to HHA. When the Charys Warrants were reallocated, it was assumed that the banker's fee was 20% (as was often the case) and thus Highgate received 444,800 or 55.6% of 80%. The difference between 500,400 and 444,800 is

7

55,600. Thus, regardless of how the Court decides the pending motion, HHA will consent to assigning forthwith 55,600 of the Charys Warrants to Highgate, YAM or YA.

29.    HHA has held all of the Charys Warrants in its offices. The portion of the Charys Warrants issued to Highgate (444,480) were returned to Plaintiffs, immediately upon their request, on October 26, 2006.

30.    The portions of the Charys Warrants assigned to HHA and to Chorske are also held by HHA and at no time prior to this Court's restraining order were those warrants exercised.[4]

31.    There is no doubt in my mind that the Charys Warrants were part of my compensation, and I was never advised that they were an asset of Highgate.

32.    At the time of the assignment, every document I had seen, including but not limited to, financial statements and portfolio summary reports from YAM, omitted the Charys Warrants as an asset of Highgate.

33.    Moreover, part of the inducement to hire me was the inclusion of warrants as compensation. As confirmed in my other conversations with Mark Angelo after June 2005, it was the practice of YAM to consider such warrants as fees. This was always the case even though the warrants were usually issued to Highgate.

34.    Angelo also informed me that, just as Cornell has to, Highgate can never report a down month and that YAM will do whatever is necessary to avoid that including, but not limited to, the occasional contribution by YAM of its share of warrants to Highgate.

35.    It was important to YAM to report an increase in the value of its funds every month, including Highgate. Angelo often boasted of never having a down month for Cornell

---

[4]    Included in the warrants being held is a portion (40,000) of the Charys Warrants issuable to HHA and Chorske which were further assigned to Jason Rimland. Mr. Rimland's warrants have never been exercised and are held by HHA.

since its inception in 2001. YAM and Mark Angelo had an expression that they used when facing a reduction in NAV for a month. The expression was called: "Let's go to the safe." The expression means taking YAM's warrants from the safe where they were warehoused and then contributing those warrants, and/or cash fees, to the fund to offset the particular reduction in NAV for that month. This is apparently what Plaintiffs had decided, after my departure, to do with the Charys Warrants.

36.    I am aware that Plaintiffs will argue that the Charys Warrants are listed as an asset of Highgate as of December 31, 2005 in its audited financials or other financials created in 2006. However, the audited financial statements were finalized in or around March 2006, two months after my resignation as fund manager. No one from YAM ever informed me that the Charys Warrants were added to Highgate or, in its parlance, were taken "from the safe" thereby depriving HHA of its rights to its share of the Charys Warrants.

37.    In fact, Plaintiffs' records show that the Charys Warrants were *added* to Highgate at some point after December 31, 2005.

38.    A report entitled "Asset Reconciliation" of Highgate purportedly covering the period from December 31, 2005 to October 31, 2006 shows a $0 value for the Charys Warrants as of December 31, 2005. It then shows in Column 2 ("Additions Purchases") values for the Charys Warrants. (A true and correct copy of the Asset Reconciliation is attached hereto as Ex. "E", P 09335-41, marked as Angelo Ex. 8).

39.    Similarly, other warrants issued to Highgate as part of purchases of convertible debentures were not included in Highgate's NAV and were considered to be fees.

40.    A Portfolio Summary of Highgate's NAV created by YAM containing all of the components of the NAV was given to me by YAM on several occasions, and the latest version I

9

maintained, which YAM sent to HHA on January 3, 2006, covers the period ended November 30, 2005 (the "Nov. 30, 2005 NAV Listing"). The Nov. 30, 2005 NAV Listing as well as other monthly NAV listings during 2005 were created by Liang Zhao, YAM's in-house accountant, who I understand consulted with YAM's CFO in preparing Highgate's monthly NAV. (A true and correct copy of the e-mail dated January 3, 2006 from Liang Zhao to my office is attached hereto as Ex. "F", and a true and correct copy of the Nov. 30, 2005 NAV Listing is attached hereto as Ex. "G" – highlighting added).

41.     The Charys Warrants are not listed as Highgate's asset on the Nov. 30, 2005 NAV Listing while the $4 million Charys Convertible Debenture (abbreviated as, "CD") is reported as a Highgate asset.

42.     HHA created its own ledger of all of Highgate's deals which included all warrants for accounting purposes entitled daily portfolio summary. (A true and correct copy of HHA's Daily Portfolio Summary dated December 6, 2005 (the "December 6, 2005 Daily Summary") is attached hereto as Ex. "H", D 01299-302 – highlighting added).

43.     The December 6, 2005 Daily Summary lists the Charys Warrants, all of the 504 transaction warrants, and all of the non 504 transaction warrants issued to Highgate.

44.     However, considering only those transactions that closed on or before November 30, 2005, YAM's Nov. 30, 2005 NAV Listing excludes all of the 504 warrants as well as non 504 warrants issued in nine other transactions as follows (the number of warrants are in parenthesis): AeroTelesis (225,000), City Networks (25,000), DirectView (4,000,000), First Look (600,000), SmartTire Systems (4,162,500), Dyadic (75,075), Magnetech (528,645), SuperNova (8,196) and Oxford (1,166,667). The Convertible Debentures ("CD") purchased by Highgate in each of those nine transactions are listed by YAM on the Nov. 30, 2005 NAV

10

Listing, but not the warrants. The nine sets of warrants are listed on the December 6, 2005 Daily Summary as transactions closing prior to November 30, 2005, but are not counted towards YAM's calculation of Highgate's NAV as of that date because they were considered fees to YAM and HHA and not an asset of Highgate.

45.    Moreover, YAM expressly approved the issuance of warrants to HHA in three analogous transactions.

**YAM Approves The Issuance of Warrants Directly to HHA in Three Other Deals**

46.    In connection with three separate investments by Highgate, HHA prepared a spreadsheet detailing the splitting up of the fees and warrants generated by Highgate's investment in First Look Studios, Inc., Cenuco, Inc., and Oxford Ventures Inc. ("OXFV"). On January 18, 2006, Jason Rimland sent a copy of the aforementioned spreadsheet (the "January 18, 2006 Spreadsheet") to Troy Rillo who was appointed by YAM to be my successor as co-portfolio manager of Highgate. (A true and correct copy of the January 18, 2006 Spreadsheet is attached hereto as Ex. "I", D 01247-01250, marked as Angelo Ex. 7). The January 18, 2006 Spreadsheet explicitly shows that warrants would be issued to HHA in all three transactions.

47.    It also shows warrants allocated to YAM, not Highgate.

48.    No one from YAM has ever communicated to me or HHA any disagreement of any nature with the allocations listed on the Ex. "I" January 18, 2006 Spreadsheet.

49.    Ultimately, the First Look warrants were issued, but Highgate sold its position to Prentice which demanded inclusion of the warrants. In the Cenuco transaction, warrants have not been issued yet, but if they are issued they will be issued in accordance with the January 18, 2006 Spreadsheet in Ex. "I".

11

50.    The Ex. "I" January 18, 2006 Spreadsheet was created because those three transactions were more complex and included another investor and to show that HHA was getting bankers fees in the deals in addition to its usual 44.4% of the remaining warrants. No spreadsheet was created in the Charys Transaction because it was a relatively simple and typical Highgate transaction.

**The Oxford/Uluru Transaction**

51.    There can be no dispute that YAM explicitly agreed to the issuance of warrants directly to HHA in the OXFV/Uluru Transaction (the "OXFV Warrants").

52.    With YAM's consent, the OXFV Warrants issuable to Highgate were issued by OXFV to HHA and YAM in accordance with the June 2005 Agreement. The amounts of the issuance were detailed in a final spreadsheet sent to YAM's principals, Mark Angelo and Troy Rillo, as well as YAM's banker on the transaction, Christopher Maloney (the "OXFV Spreadsheet"). (A true and correct copy of the OXFV Spreadsheet is annexed hereto as Exhibit "J", P 005994, marked as Maloney Ex. 3).

53.    The OXFV Warrants were issued in accordance with the OXFV Spreadsheet. In connection with Highgate's portion of the OXFV/Uluru Transaction, Highgate was entitled to receive 1,166,667 OXFV Warrants. Of this amount, the bankers, Maloney and Keane, were entitled to 20% or 233,333 warrants leaving 933,334 warrants remaining which were split as follows: 414,400 to HHA (44.4%) and 518,933 to YAM (55.6%). None of the OXFV Warrants were issued to Highgate.

54.    HHA's 414,400 OXFV Warrants were issued and delivered to HHA with the full knowledge and consent of YAM/YA. (A true and correct copy of (A) HHA's OXFV warrant is attached hereto as Ex. "K", marked as Maloney Ex. 8, and true and correct copies of (B) e-mail

12

correspondence dated January 19, 2006, March 30, 2006 (two separate e-mail exhibits), and April 7, 2006 are attached hereto as Ex. "J", P 005993, marked as Maloney Ex. 3, Ex. "L", marked as Maloney Ex. 12, Ex. "M", marked as Maloney Ex. 4, and Ex. "N", marked as Maloney Ex. 10 respectively).

55.    Maloney and Keane's 233,333 warrants plus another 766,667 warrants to which they were entitled under the Prentice portion of the OXFV investment were added to YAM's 518,933 warrants.  Thus a total of 1,518,933 OXFV Warrants were issued to YA (233,333 + 766,667 + 518,933) (at YAM's request, the warrants were issued to YA).  (A true and correct copy of the OXFV Warrant issued to YA is attached hereto as Ex. "O").

56.    As the OXFV transaction closed two months after my resignation as co-portfolio manager, YAM's or YA's in house legal counsel David Fine and Troy Rillo represented Highgate in the OXFV closing.  G&P did not represent Highgate in the closing of the OXFV transaction.

**The Charys Warrants Were Never Held By G&P**

57.    G&P acted as the transactional attorneys for Highgate on the Charys transaction which closed in November 2005 as it usually did on Highgate's investments.  After the closing of the transaction, G&P's legal role ended.  Plaintiffs' allegation that the Charys Warrants were held by attorneys is untrue.  The Charys Warrants have been held in HHA's offices just as all other deal documents were held.

58.    Further, Mark Angelo told me in the spring of 2005 that G&P was not authorized to perform any legal service unless authorized by him.  Thus, Plaintiffs' allegations in this motion that G&P has acted as legal counsel regarding the Charys Warrants is untrue.

**Highgate's $2 Million Shortfall in 2005 & Gottbetter's Resignation**

59.     In November 2005, Mark Angelo informed me that YAM's accounting department had overstated Highgate's NAV by around $1.4 million and that certain actions had to be taken to increase Highgate's NAV to make up for the shortfall rather than restating NAV in accordance with Highgate's actual performance.  Angelo told me that the first step was that I would forego all fees I was entitled to earn between November 15, 2005 and the end of that year. Mr. Angelo also told me that YAM would forego its fees over the same time period.

60.     Second, by early December 2005, Mark Angelo told me that YAM was considering adding some of the warrants issued in connection with Highgate's transactions into Highgate's NAV to boost its performance.

61.     Mark Angelo then asked me to calculate a valuation of the warrants for use.  I, in turn, asked Chorske to value the warrants not included in Highgate's NAV, including the Charys Warrants.

62.     Chorske provided the valuation to Mark Angelo and me via e-mail on December 16, 2005.  (A true and correct copy of Chorske's December 16th e-mail with the attached valuation is attached hereto as Ex. "P", P 09237-48, marked as Angelo Ex. 14).

63.     Shortly thereafter, by the end of December 2005, Mark Angelo told me that the value of the warrants was too small to be of any use to correct the shortfall and, as a result, I would have to remit cash fees due to me back to Highgate and that YAM would also remit its fees back to the fund.  My understanding from that conversation is that no warrants already issued would be added to Highgate's reported assets.

64.     In large part because of these events, HHA and I resigned on or about January 9, 2006 as the co-portfolio manager of Highgate, effective January 19, 2006.

14

65.    After my resignation and in or around March 2006, I was directed by Angelo to deal with YAM's/YA's CFO to reconcile fees due to me. The CFO informed me that the shortfall was much larger than the $1.4 million shortfall that Angelo disclosed in December 2005. After stating he consulted with Angelo, the CFO drafted a spreadsheet showing that a total of $2,178,000 in fees was remitted by YAM back to Highgate and that I would be responsible for 44.4% of the $2,178,000 and will pay it through the forfeiture of my share of the incentive and banking fees owed to me by Plaintiffs. According to YAM/YA, my forfeiture totaled $967,032 and was debited by YAM against the fees it owed me. (A true and correct copy of the spreadsheet is attached hereto as Ex. "Q", P 08440, marked as Angelo Ex. 3).

66.    Significantly, no one at YAM informed me at any time that, as Plaintiffs claim occurred here, warrants that previously were not counted as fund assets were added to Highgate's NAV. If Plaintiffs are correct, then it means that the shortfall of $2,178,000 should have been reduced by the addition of the warrants meaning that the shortfall was overstated to me and that YAM/YA failed to inform me of such addition so that I would not know that my portion of the fees given back to the fund ($967,032) were higher than necessary to cover the shortfall. Accordingly, HHA appears to be entitled to additional fees in this fee dispute with YAM/YA.

67.    If Plaintiffs did in fact put warrants into Highgate, there would need to be a corresponding liability offset for fees owed back to bankers and portfolio managers. I have never seen such a corresponding liability listed in Highgate's financial statements nor was it ever discussed with me. Additionally, in all of the meetings Angelo and I attended with Highgate's auditors, with its investors, and with YAM's principals, over the period of a year, the issue of

15

calculating and reporting a liability to bankers and portfolio managers from the monetization of warrants was never discussed.

68.     After my resignation, I continued to assist YAM/YA with the administration of Highgate, have turned over documents and provided written summaries of outstanding issues on all deals, and have continued to make ourselves available even to this day.

69.     Finally, Plaintiffs have made serious and damaging allegations against me which are false.  As an attorney and current fund manager, I could never and certainly would never, steal any property that belonged to any fund or that was held "in trust."  The Assignments of the Charys Warrants were meant to cover the fees owed to HHA and to Chorske under the June 2005 Agreement.  As such this entire action relates to a fee dispute, not a conversion of fund assets.

WHEREFORE, Defendants respectfully requests that Plaintiffs' motion for a preliminary injunction be denied, that Defendants' cross-motion for an order dismissing this action and compelling arbitration of the parties' dispute be granted, and that the Court award Defendants such other and different relief that is just and proper.

_____
ADAM S. GOTTBETTER

Sworn to before me this
_____ day of December 2006

_____
Notary Public

SCOTT RAPFOGEL
Notary Public, State of New York
No. 02RA6094568
Qualified in New York County
Commission Expires June 23, 2007

16