# In The Matter Of:

*YORKVILLE ADVISORS MANAGEMENT, LLC, ET AL., v.*
*ADAM S. GOTTBETTER, ET AL.,*

---

## CHRISTOPHER J. MALONEY
*November 17, 2006*

---

*RAYVID REPORTING SERVICE, INC.*
*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
*PH: 212-599-3642 / FAX:*

MALONEY, CHRISTOPHER J. - Vol. 1

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

------------------------------------x

YORKVILLE ADVISORS MANAGEMENT, LLC, a

Delaware limited liability company;

HIGHGATE HOUSE FUNDS, LTD., a Cayman

Islands exempted company,

                        Plaintiffs,

                                    Civil Action No.

            -against-              06-5212(JAG)


ADAM S. GOTTBETTER; HH ADVISORS, LLC,

a New York limited liability company;

GOTTBETTER AND PARTNERS, LLP, a New York

limited liability partnership; JASON

RIMLAND, ESQ.; TIM L. DOCKERY, ESQ.

and MICHAEL CHORSKE,

                        Defendants.

------------------------------------x

                        November 17, 2006

                        11:10 a.m.




      Deposition of CHRISTOPHER J. MALONEY, taken

by Defendants, pursuant to Notice, at the offices

of Venturini & Associates, 230 Park Avenue, New

York, New York, before William Visconti, a

Shorthand Reporter and Notary Public within and

for the State of New York.

Page 2

APPEARANCES:
    BUDD LARNER, P.C.
    Attorneys for Plaintiffs
        150 John F. Kennedy Parkway
        Short Hills, New Jersey 07078

    BY:   MICHAEL M. ROSENBAUM, ESQ.


    VENTURINI & ASSOCIATES
    Attorneys for Defendants
        230 Park Avenue
        New York, New York  10169
    BY:   AUGUST C. VENTURINI, ESQ.


ALSO PRESENT:
    MARK ANGELO
    TROY RILLO

Page 3

            IT IS HEREBY STIPULATED AND AGREED
by and between the attorneys for the
respective parties herein that filing and
sealing be and the same are hereby waived.
            IT IS FURTHER STIPULATED AND AGREED
that all objections, except as to the form
of the question, shall be reserved to the
time of the trial.
            IT IS FURTHER STIPULATED AND AGREED
that the within deposition may be signed
and sworn to before any officer authorized
to administer an oath with the same force
and effect as if signed and sworn to before
the Court.

Page 4

    CHRISTOPHER  J.  MALONEY,
having been first duly sworn by the Notary Public
(William Visconti), was examined and testified as
follows:
            EXAMINATION BY MR. VENTURINI:
    Q.   Please state your name and address
for the record.
    A.   Christopher J. Maloney, 200 East 66th
Street, Apartment D 601 and that is New York, New
York. Zip code 10021.
    Q.   Good morning, Mr. Maloney.
    A.   Good morning.
    Q.   My name is August Venturini and I
represent the Defendant in this action. We will
be asking you questions under a notice of
deposition that we have issued in this action.
If at any time you don't understand any question
that I ask, let me know. If at any time you need
to take a break, also let me know, although we
will ask that if a question is pending that you
answer the question first and then we will take
the break.
    A.   Sure.
    Q.   Are you represented by counsel today?

Page 5

    CHRISTOPHER J. MALONEY
    A.   Yes.
    Q.   Is that Mr. Rosenbaum?
    A.   Correct.
    Q.   Do you understand that you're under
oath?
    A.   Yes, I do.
    Q.   Do you understand that you're
obligated to tell the truth?
    A.   Yes, I do.
    Q.   You understand that if you do not
tell the truth you can be subject to court
sanctions?
    A.   Yes, I do.
    Q.   Do you understand that this case is
brought by Yorkville Advisors Management?
    A.   Yes.
    Q.   Do you know who the defendants are in
this action?
    A.   Yes.
    Q.   Who are they?
    A.   Adam Gottbetter, Michael Chorske and
I believe Jason Rimland and Dockery.
    Q.   What is your current occupation?
    A.   Vice president of corporate finance

Page 6

CHRISTOPHER J. MALONEY
for Cornell Capital.
Q. Is that Cornell Capital LP?
A. I don't know. Cornell Capital LLC, I believe.
Q. What is Cornell Capital?
A. Cornell Capital is a private equity fund.
Q. Is it commonly called a hedge fund?
A. Commonly, yes.
Q. What entity manages the fund?
A. What entity, that would be Yorkville.
Q. How many Yorkville entities are you aware of?
A. I'm aware of -- right now, just Yorkville that I'm aware of.
Q. Is that Yorkville Advisors Management?
A. It is Yorkville Advisors -- I believe it is Yorkville Advisors Management, correct.
Q. Does Yorkville Advisors Management also go under the name of its acronym YAM?
A. It used to, as I recall I believe we changed the name from Yorkville Advisors Management to Yorkville Advisors.

Page 7

CHRISTOPHER J. MALONEY
Q. Is it your understanding that that Yorkville entity is the manager of Cornell Capital?
A. That's correct.
Q. Do you also work for Yorkville?
A. I do. I work for the management company, correct.
Q. In what capacity?
A. As a banker.
Q. Is that a separate position from your status as vice president of Cornell?
A. It is one and the same.
Q. Are you paid by Yorkville?
A. Correct.
Q. Are you also paid by Cornell?
A. No, strictly by Yorkville, the management company. Technically I would be employed by Yorkville Advisors.
Q. Who are the principals of Yorkville Advisors?
A. Mark Angelo, Jerry Eicke, Matt Beckman and David Gonzalez.
MR. VENTURINI: Off the record.
(Discussion off the record.)

Page 8

CHRISTOPHER J. MALONEY
MR. VENTURINI: Can you read back the last question.
(Requested portion of record read.)
Q. Anyone else?
A. No.
Q. Would those same four individuals be principals of Cornell?
A. I don't know the answer to that.
Q. How long have you worked for Yorkville?
A. Approximately two years.
Q. During that two years were you employed in the same capacity?
A. Correct.
Q. That is as banker and vice president?
A. Correct.
Q. Who do you report to?
A. I report to Mark Angelo.
Q. Anyone else?
A. I'm on a banking team, a newly designed banking team in the healthcare unit where the new portfolio managers are David Reese and Jeff Sledge.
Q. During the time that you have worked

Page 9

CHRISTOPHER J. MALONEY
for Yorkville, have you reported to anyone else besides Mr. Angelo?
A. No.
Q. Does anyone report to you?
A. No.
Q. Where did you work prior to joining Yorkville?
A. Strausberger, Pierce, Tulcin & Wolf.
Q. How long did you work at Strausberger?
A. Approximately two years.
Q. What you did do for Strausberger?
A. I was head of their sales.
Q. What kind of business is Strausberger in?
A. They are a member firm of the New York Stock Exchange.
Q. Are they commonly known as a broker/dealer?
A. Correct.
Q. What type of sales were you the head of?
A. Private client.
Q. Tell us what your duties were.

Page 10

CHRISTOPHER J. MALONEY

A. The hiring of brokers, the sales function and handling a small amount of my own clients.

Q. What types of clients did you have?

A. High net worth individuals.

Q. Did you work in any particular sectors?

A. No.

Q. What did you do prior working for Strausberger?

A. I was the national sales manager for CIBC Oppenheimer.

Q. How long were you at CIBC?

A. Approximately three years.

Q. What did you do as the sales manager there?

A. I was responsible for the marketing effort for the entire firm, from the sales function from interacting with corporate finance, to all the various departments.

Q. Did you do any deals with them?

A. I interacted with corporate finance to take the temperature of the deals. The interest that retail would have on certain deals.

Page 11

CHRISTOPHER J. MALONEY

Q. Did you do any deals with Strausberger?

A. We did -- we participated as a salesperson on transactions, correct.

Q. What does that mean participated as a salesperson?

A. Place deals to our clients.

Q. Meaning interacted with the clients to invest in the deals that the company is doing?

A. That's correct.

Q. During the time that you worked for CIBC and Strausberger, did your position change?

A. From where, CIBC to Strausberger? I don't understand the question.

Q. I will rephrase it.
You said that you worked for CIBC for three years, correct?

A. Correct.

Q. And that you were a sales manager?

A. Correct.

Q. Were you a sales manager for all of the three years?

A. At CIBC?

Q. Yes.

Page 12

CHRISTOPHER J. MALONEY

A. I was national sales manager and then prior to that I was a sales manager in their second largest branch.

Q. Where is the branch?

A. That was down at One World Financial, downtown.

Q. Prior to CIBC where did you work?

A. Prior to CIBC, Prudential Securities.

Q. How long were you at Prudential?

A. Almost 10 years.

Q. What position did you have with Prudential?

A. At Prudential I was branch manager, regional sales manager, training center. I was a trainer in the training center and prior to that I was a broker with the firm. Financial advisor.

Q. What did you trade when you were a trader?

A. I didn't say trader, I said training.

Q. Okay. What do you mean by training?

A. I trained brokers for the firm.

Q. When you say brokers, you mean account representatives?

A. I mean brokers, financial advisors.

Page 13

CHRISTOPHER J. MALONEY

Q. Meaning the people that interface with the clients?

A. Correct.

Q. Did you work for Prudential here in New York?

A. I did not.

Q. Where?

A. La Jolla, California. Scottsdale, Arizona.

Q. Anywhere else?

A. No.

Q. And prior to Prudential, did you work anywhere?

A. Before Prudential Securities I worked for Bear Stearns.

Q. How long did you work for Bear Stearns?

A. I worked for Bear Stearns approximately six years, but I had returned there, so I was there for a short period of time before I joined Prudential. My wife had gotten sick and that is what brought us to Arizona.

Q. I'm not sure that I follow that. Did you work for Bear Stearns entirely --

Page 14

CHRISTOPHER J. MALONEY

A. I worked for Bear Stearns in New York prior to joining Prudential Securities.

Q. And after you joined Prudential you didn't go back to work for Bear Stearns?

A. No.

Q. But all in all you worked for Bear Stearns for six years?

A. Yes.

Q. But the six years were not consecutive?

A. They were not consecutive, it was prior to that.

MR. VENTURINI: Off the record.

(Discussion off the record.)

MR. VENTURINI: Read the last question and answer back.

(Requested portion of record read.)

Q. During your hiatus from working at Bear Stearns, did you work in anywhere else?

A. Yes. I worked let's see before Bear Stearns I was with PaineWebber. We are back in the '80s now.

Q. Okay. Did you work for Bear Stearns then PaineWebber and back to Bear Stearns?

Page 15

CHRISTOPHER J. MALONEY

A. Would you like the beginning of my career?

Q. Why not, that is where we are going. If you want to do it quickly that is fine with me?

A. Right that would be much better. I started in the business in 19, I believe, 83 with Merrill Lynch in the wire room. Budget cuts, ended up at Bear Stearns six months later. Bear Stearns for two years, so that would be '85 or approximately '84 to I guess '86 or so. Went too a small firm by name of Laidlaw, Adam Aspeck, institutional sales. Six months later back at Bear Stearns. Bear Stearns for two years. Stock market crash, Drexel Burnham, 13 months, from Drexel Burnham, Smith Barney which Drexel became part of Smith Barney, Cowan & Company and from Cowan it would bring you to PaineWebber.

Q. What did you do for Bear Stearns?

A. Financial advisor. I think there thing was registered rep.

Q. Meaning that you interacted with their customers?

A. Clients, yes, my clients.

Page 16

CHRISTOPHER J. MALONEY

Q. Can you describe your educational background?

A. I went to Emmory Riddle for one year. Pace University, graduated 1989.

Q. What was the first college?

A. Emmory Riddle Aeronautical University, Daytona Beach, Florida.

Q. Then you went to Pace?

A. Pace University.

Q. Anywhere else?

A. No.

Q. Do you have any degrees?

A. Yes.

Q. From?

A. Pace.

Q. Which one?

A. BBA, general business.

Q. When did you get that?

A. 1989.

Q. Any post graduate degrees?

A. No.

Q. Any post graduate education?

A. No.

Q. Do you hold any licenses?

Page 17

CHRISTOPHER J. MALONEY

A. Series 7, 63. I had, I don't know if they are still current, the 65, California life insurance which is expired. And I think a series 3. I think they may have expired those.

Q. Do you currently hold a Series 7 and 63 licenses with a broker/dealer?

A. I did as of -- actually I resigned from a broker/dealer by the name of Emerald Securities.

Q. Do you plan on rejoining a broker/dealer to maintain your licenses?

A. No, I don't. As of now I don't.

Q. How long did you hold your Series 7 and 63 licenses through Emerald?

A. Approximately three or four months, five months, maybe.

Q. Before that what broker/dealer did you hold your licenses with?

A. Well, Emerald was -- they were at Sure Trade -- they were Sure Trade and before that they were Lempert and then the principals of that firm were starting their own broker/dealer, so they moved my license over to Sure Trade and then to Emerald.

Page 18

CHRISTOPHER J. MALONEY

Q. Over what time period are we talking about with Lempert and Sure Trade?

A. It has to be probably about nine months or so.

Q. When you first joined Yorkville, where was your Series 7 and 63 licenses?

A. They were -- I was U5'd. So, that -- I was U5'd with Strausberger.

Q. And U5 means termination?

A. Correct.

Q. And then the next broker/dealer you joined, would that be Lempert?

A. Right. Our firm compliance officer was totally aware of my situation.

Q. Reading off your business card, is it correct to say Cornell Capital operates out of 101 Hudson Street, in Jersey City, New Jersey?

A. Correct.

Q. Is that its main office?

A. Correct.

Q. Is that also the plain office for Yorkville?

A. Yes.

Q. How did you first learn of this

Page 19

CHRISTOPHER J. MALONEY

action?

A. Of this action?

Q. Yes, the one that you're testifying in.

A. By getting the letter, your letter to the firm and I was told about it last, I believe, last Thursday.

Q. You're referring to my letter coming from me personally?

A. Yes, yes, requesting my presence here on this date.

Q. Is that something that you saw last week?

A. I saw it Friday, told about it on Thursday and saw it Friday, I believe.

Q. That is last week?

A. Yes, correct.

Q. Who first told you about the lawsuit?

MR. ROSENBAUM: Excuse me, when you answer, if it was counsel, don't answer. If it was someone other than counsel, you can answer it.

MR. VENTURINI: Well, I don't think that would be an attorney-client privileged

Page 20

CHRISTOPHER J. MALONEY

communication.

Q. I don't want to know about communications that you had with counsel. The fact that you spoke to them is not privileged, but I'm not going to ask you about what you said to Mr. Rosenbaum or his firm or what he said back to you. But how did you first learn about the action?

MR. ROSENBAUM: If you learned something through me or my law firm, you can't answer it. If it is someone else, you can answer.

A. I learned about it from Mark Angelo.

Q. What did he tell you?

A. That there was going to be a deposition on an action against the members mentioned earlier and then Troy Rillo gave me a copy the following day of the paperwork.

Q. Is that the Notice Of Deposition?

A. The notice of deposition, yes.

Q. Prior to that did you know there had been a lawsuit?

A. No.

Q. What did they tell you about the

Page 21

CHRISTOPHER J. MALONEY

action?

MR. ROSENBAUM: At the time that he got the Notice Of Deposition?

MR. VENTURINI: Yes.

Q. By they I'm referring to Mr. Angelo and Mr. Rillo.

A. That there was a lawsuit against the parties mentioned before and that I was going to be deposed. That I was called upon by your client.

Q. Did they tell you what the lawsuit was about?

A. Yes.

Q. What did they tell you?

A. That essentially there were -- that essentially Adam Gottbetter had taken warrants illegally out of the possession of Highgate House Funds/Yorkville Advisors.

Q. Did they say which warrants he had taken?

A. No.

Q. Did you ask?

A. No.

Q. Sitting here today do you know what

Page 22

CHRISTOPHER J. MALONEY

warrants they are talking about?

A. No.

Q. Sitting here today do you know what warrants are the subject of the lawsuit, if any?

A. I do not. Just warrants.

Q. Are there any other reasons for the lawsuit that they mentioned to you?

A. No.

Q. Since learning last week about the lawsuit, have you had any further conversations with either Mr. Angelo or Mr. Rillo regarding this lawsuit?

MR. ROSENBAUM: You can talk about conversations that you may have had with them outside of my presence or the presence of anyone from my firm.

MR. RILLO: Michael, I'm counsel also.

MR. ROSENBAUM: Right, and outside of Troy's presence.

A. Just with counsel present.

Q. Did you have discussions with anyone else connected with either Cornell or Yorkville regarding this lawsuit or the allegations made?

Page 23

CHRISTOPHER J. MALONEY

MR. ROSENBAUM: Anyone other than Mark?

MR. VENTURINI: Yes.

A. The only person that I recall is my wife.

Q. Other than the parties in this room, did you tell anyone else that you were being deposed today?

A. I don't recall. I don't think so.

Q. Have you heard any rumors about this lawsuit from anyone?

MR. ROSENBAUM: Rumors?

MR. VENTURINI: Yes.

A. Well, the answer is yes.

Q. What have you heard?

A. I have heard that Adam has done numerous things to Cornell and put the firm in a bad position. Because he received compensation that he should not have received and done a number of unethical things while at the firm and after leaving.

Q. Where did you hear those from?

A. Just chatter.

Q. Chatter around the firm?

Page 24

CHRISTOPHER J. MALONEY

A. But nothing specific.

Q. Did you hear anyone allege that Adam Gottbetter stole any money from Yorkville?

A. Money, clarify money?

MR. ROSENBAUM: You mean cash?

A. Cash?

Q. Yes, I guess so.

A. We don't deal in cash at Yorkville.

MR. ROSENBAUM: Other than the warrants, that's why he asked.

Q. Is it the rumors that you heard about things that he had done, is it connected to the warrants or something else?

MR. ROSENBAUM: He doesn't know which warrants that he allegedly took, so it is difficult to answer the question. If you understand the question, do the best to answer it. If you don't, tell Mr. Venturini.

A. Why don't you rephrase the question for me.

Q. Okay. You said that you had heard that Adam had done numerous bad things to Cornell?

A. Yes.

Page 25

CHRISTOPHER J. MALONEY

Q. Do you know what that was in connection with?

MR. ROSENBAUM: You mean what did he hear it was in connection with?

MR. VENTURINI: Yes, exactly.

A. It would probably go back to taking these warrants from --

Q. Aside from the allegation that he took warrants, have you heard any other rumors that he had done anything else?

A. No, I just know what he has done to me.

Q. What has he done to you?

A. Warrants that were not -- that I was supposed to receive as a banking fee that would later be monetized when sold. And then cutting me out of a transaction on Cenuco so Mike Chorske could get the banker's fee. Completely cutting me out of that and reducing my fee. And then trying to get at my fees when he was getting fees as well paid by Yorkville.

Q. Let me see if I could take that one at time.

A. Please.

Page 26

CHRISTOPHER J. MALONEY

Q. With respect to the warrants, you mention Cenuco, was there another transaction that warrants were connected with?

A. Uluru, U L U R U.

Q. Is that also known as the Oxford transaction?

A. I referred to it as the Uluru transaction, but Oxford was the company that we did the reverse merger through.

Q. Okay, we could call it Uluru.

A. Okay.

Q. Tell me what happened there in connection with the warrants that you say were not given to you?

A. The firm was to receive -- excuse me, the transaction included 5 million warrants and Highgate House Funds was to receive 1.16 million warrants and Prentice was supposed to receive 3.8 as I remember it. Totaling 5 million. And then the bankers which was myself and Brian Keane were to receive 20 percent of the warrants which would be 1 million shares split. 90 percent to me, 10 percent to Brian Keane. And you received warrants to the firm which should have been 1.9

Page 27

CHRISTOPHER J. MALONEY

million reflecting the 1.1 million as well as the 766,000 shares from the 20 percent banker's fee from Prentice or Prenox totaling 1.9.

And we only received 1.5. 1.16 Highgate House Funds and we received I guess it was about 350,000 representing the 20 percent from Prentice. So we were minus 400 some odd thousand warrants that went to HH Advisors which is Adam Gottbetter.

I wasn't even familiar with HH Advisors until March. And he cut those out himself and took them for himself and the fund received their portion.

MR. ROSENBAUM: The fund being Highgate?

A. Highgate House Funds received their portion and when I heard how they were cutting these warrants out and I went to Mark Angelo and told him, I said this is absolutely crazy, we are entitled to these, they warrants should have come in and that is how it was. And so Mark and myself being very frustrated by this as well and not seeing the full composition coming in and Adam cutting up himself with his firm, and I

Page 28

CHRISTOPHER J. MALONEY

talked to Mark about it who was equally frustrated. He said as long as the fund gets their portion, you're getting screwed Chris and we are all get being screwed. We have gotten screwed by this guy in a number of ways.

Q. Let me see if I understand this.

A. If you like I will show you the math.

Q. I think we will be able to do that because of some documents.

If I understand correctly, there were a portion of the warrants that were supposed to go to Prentice?

A. Correct.

Q. Of the portion of the warrants that went to Prentice, were you supposed to get 20 percent of those warrants?

A. Correct, the bankers and myself and Brian Keane under the 90/10 split.

Q. Are they supposed to go to you directly?

A. No, to the fund. And our compensation is derived only when those shares are sold, then warrants were exercised and sold then we would receive whatever that compensation

Page 29

CHRISTOPHER J. MALONEY

was.

Q. 20 percent of the warrants issued to Prentice were they delivered to Yorkville?

MR. ROSENBAUM: One more time, please.

MR. VENTURINI: I will rephrase it.

MR. ROSENBAUM: You said you had documents.

MR. VENTURINI: Yes, why the don't we do that.

Q. Who was the other banker?

A. Brian Keane.

Q. What is Brian Keane's position with Yorkville?

A. I don't know his exact title, but he is a banker for Yorkville/Cornell.

Q. Is he equivalent to you, in other words?

A. Equivalent -- he is a banker with the firm.

Q. The same position as you have?

A. Correct, yes.

Q. Is he also called a vice president?

A. I don't know of. I don't know his

Page 30

CHRISTOPHER J. MALONEY

title.

MR. VENTURINI: Mark this as Maloney Exhibit 1.

(Maloney Exhibit 1 for identification, Two-page document Bates stamped number P 01516 and P 01517.)

Q. I show you what is marked as Maloney Exhibit 1. It's a two-page document Bates stamped number P 01516 and P 01517. It's an e-mail string and I ask you if you have ever seen this document before or this e-mail string before?

A. Let me read it.

(Witness reviewing document.)

MR. ROSENBAUM: When you ask him whether he has seen a document, these are obviously printed versions of e-mails. I don't know whether the document was printed.

MR. VENTURINI: That's why I said have you seen this document or the e-mail string before?

A. So this is from Jason Rimland to Keane and myself, the second page. I'm reading backwards.

Page 31

CHRISTOPHER J. MALONEY

Q. Yes.

A. And this is from Rimland to myself and Brian Keane.

Q. Do you recall receiving any of these e-mails?

A. Yes, I'm sure I received this, yes.

Q. Let me direct your attention to the first page where he says Brian Keane he is listed at the top and in the middle. Is this the same Brian Keane that we are talking about?

A. It is.

Q. In the middle of the page it has his name with a little auto signature it looks like below his name. Have you seen that auto signature caption before? This is on the first page where it says Brian Keane, senior vice president, corporate finance.

MR. ROSENBAUM: Where are you looking?

Q. Right in the middle of the page. Right here.

A. Yes, okay.

Q. Have you seen that caption before?

A. No. I don't recall seeing it. I

Page 32

CHRISTOPHER J. MALONEY

don't recall it being important enough for me to see. How's that.

Q. By having looked at it now, does that refresh your recollection as to what his position might be?

A. No, it doesn't refresh -- I didn't know what his title was. I just knew he was a banker in corporate finance at Cornell Capital and Yorkville.

Q. And you understand him to be employed by Yorkville just like you?

A. Yes.

Q. Is it correct that Mr. Keane worked with you on the Uluru deal?

A. Yes, absolutely.

Q. Is it correct to say that both you and he were the bankers on that transaction?

A. That would be correct.

Q. What did you do as the banker on that transaction?

A. I interacted between Kerry Gray who would be the new CEO of Uluru and handled the interaction of the documents between the legal department and Adam Gottbetter's firm.

Page 33

CHRISTOPHER J. MALONEY

Q. Let me just take it a step back. What is a banker in terms of one that works for Yorkville?

A. Someone that sources transactions.

Q. When you say sources transactions, what do you mean?

A. We look for companies that are in need of funding and that are interesting investment opportunities for the fund.

Q. When you find such a company, what do you do?

A. Do a level of due diligence, we visit with the company, it can be numerous times, review their Qs, Ks. Visiting with the company and then interacting with the portfolio managers here at the firm as well as the legal counsel.

Q. In connection with the Uluru transaction, did you source that transaction?

A. Yes, I did.

Q. Did you then institute the due diligence that you described earlier?

A. Yes.

Q. What does a banker then do after the due diligence phase?

Page 34

CHRISTOPHER J. MALONEY

A. After the due diligence, I mean we complete the due diligence. It would be brought to Mark's attention as to what the transaction is about and it would be up to Mark to make an approval as to whether or not we would go ahead and invest in that transaction.

Q. Is it correct to say that Mark Angelo's approval is required on all investments made by Cornell?

A. Yes.

Q. Is there anyone else at Cornell that can approve an investment in Mark's absence?

A. Generally I have only dealt with Mark, so, on the approval process.

Q. Did Mr. Angelo approve of the Uluru transaction?

A. Yes.

Q. After he approved of the Uluru transaction, what did you do in connection with that transaction?

A. We made sure that all documents for the transaction that were necessary to close the transaction were completed. And once again interacted with the company, interacted with

Page 35

CHRISTOPHER J. MALONEY

Jason Rimland, Tim Dockery and Adam.

Q. Did you interact with any other attorneys on that deal?

A. There was one other --

MR. ROSENBAUM: Besides Gottbetter.

MR. VENTURINI: Okay.

THE WITNESS: Besides Gottbetter?

MR. ROSENBAUM: Yes.

A. There was one other attorney that Adam Gottbetter referred to the client that the client absolutely couldn't stand and thought was ripping him off. I forget his name. That was the client's feeling.

Q. Where were the attorneys located?

A. Here in New York. I mean I have record of it in my own records, but I will think of the name.

Q. Okay, thank you.

MR. ROSENBAUM: What does this have to do with the issues?

MR. VENTURINI: We are getting to that.

MR. ROSENBAUM: We agreed before Judge Greenway that we are going to limit

Page 36

CHRISTOPHER J. MALONEY

ourselves to the Charys warrants.

MR. VENTURINI: I would appreciate no speaking objections, but I understand what you're saying.

MR. ROSENBAUM: I hear you, but where are we going?

MR. VENTURINI: We will get to that very shortly.

THE WITNESS: Could we take a break?

MR. VENTURINI: Would you like to take a break?

THE WITNESS: Yes.

MR. VENTURINI: Let's take a break.

(Recess taken).

MR. VENTURINI: Read the last question and answer back.

(Requested portion of record read.)

BY MR. VENTURINI:

Q. In the Uluru transaction, who represented Oxford?

A. Oxford was represented by Adam Gottbetter's firm.

Q. Did Uluru have separate counsel?

Page 37

CHRISTOPHER J. MALONEY

A. Yes. They had -- they had the gentleman that I can't think of his name that will come to me.

Q. That is the same one that you referred to before?

A. Yes, it is, right. But there was very limited conversation between him the CEO and myself.

MR. VENTURINI: Mark this as Exhibit 2.

(Maloney Exhibit 2 for identification, Two-page document Bates stamped P 00253 and P 00260.)

MR. VENTURINI: Exhibit 2, is a two-page document Bates stamped on the first page is P 00253 and on the second page it is P 00260.

Q. It was produced like this in this order. So let me just show you the first page and the second page. Have you seen any of these pages before?

A. Yes.

Q. Can you tell me what they are?

A. This is it looks like the front cover of my due diligence books. This is the front.

Page 38

CHRISTOPHER J. MALONEY

Q. Can you continue?

A. This is the front page of one of my due diligence books on this transaction.

Q. The second page?

A. The second page would be, this is a break down --

MR. ROSENBAUM: Whose notes are they.

THE WITNESS: He didn't ask that question.

MR. ROSENBAUM: Yes, he did.

MR. VENTURINI: I asked him what it was. If you want me to ask more detailed question, I will.

Q. Is this your handwriting?

A. It is my handwriting.

Q. This second page is also in connection with the Uluru transaction, is it?

A. That's correct.

Q. In the middle of the page where it says warrants, are those the 5 million warrants that you referred to earlier?

A. That's correct.

Q. Were those 5 million warrants issued

Page 39

CHRISTOPHER J. MALONEY

by Oxford or to be issued by Oxford?

A. They were to be issued by Oxford, yes.

Q. Because Oxford is the public company?

A. Oxford is the public company and eventually the name changed to Uluru.

Q. Was there a reverse triangular merger?

A. Yes.

Q. With Uluru being the target company?

A. Yes.

Q. Oxford being the acquirer?

A. Correct.

Q. Was Oxford a public shell?

A. Yes.

Q. Again on the second page in the middle where it says 1,166,667 then it says HGH, what does it say there?

A. HGH would be Highgate House. The Cornell fund.

Q. To right side, does that reflect the 20 percent warrants that were to go to you?

A. Correct. Broken down.

Q. As to how many warrants you were to

Page 40

CHRISTOPHER J. MALONEY

receive and how many warrants Mr. Keane was to receive?

A. That's correct.

Q. So is it correct to state of the 1.1 million warrants, you were entitled to 210,000 warrants?

A. That's correct.

Q. And Mr. Keane was entitled to 23,333 warrants?

A. That's correct.

Q. Continuing, the 3.8 million figure is the same warrant figure that you mentioned earlier going to Prentice?

A. Correct.

Q. Of that 3.8 million, was 766,666 warrants supposed to go to the bankers in that transaction?

A. Yes.

Q. The bankers were you and Mr. Keane?

A. Correct.

Q. Is the break down right underneath it as to what amount is going to you and what amount is going to Mr. Keane?

A. Correct.

Page 41

CHRISTOPHER J. MALONEY

MR. ROSENBAUM: Supposed to go.

MR. VENTURINI: Right.

A. Supposed to go. We were supposed to receive and eventually when the fund monetizes out we would be paid.

Q. By the fund what are you talking about?

A. When the fund exercised those warrants.

Q. Are you referring to Yorkville, Cornell or Highgate?

A. It would be Yorkville.

Q. Is Yorkville a fund?

A. Yorkville is the management company.

Q. Does Yorkville make any investments on its own?

A. Not that I'm aware of.

Q. So as far as you know all the investments that you were working on while working for Yorkville were either done by Cornell or Highgate House?

A. Yes.

Q. Any others?

A. There was one other fund, Montgomery.

Page 42

CHRISTOPHER J. MALONEY

Q. Is that still in existence?

A. No.

MR. VENTURINI: Mark this as Exhibit 3.

(Maloney Exhibit 3 for identification, Two-page document Bates number P 005993 and P 005994.)

Q. Exhibit 3 is a two-page document Bates number P 005993 and P 005994 and I ask you to look at this two-page document and have you seen this e-mail and this attachment before?

A. Yes, I have.

Q. Are these two e-mails in fact on the first page?

A. Let me review it.

Q. Please.

(Witness reviewing document.)

A. Okay.

Q. Did you send the second e-mail on the first page on or about January 19, 2006?

A. Yes.

Q. Did you send that e-mail to Jason Rimland?

A. Correct.

Page 43

CHRISTOPHER J. MALONEY

Q. Did you copy it to Mark Angelo?

A. Yes.

Q. Did you copy it to Troy Rillo?

A. Yes.

Q. Is it correct to say that the subject matter of this e-mail is the warrants that were issuable in the Uluru transaction?

A. I'm sorry, say that again. I zoned out for a second.

Q. Is it correct to say that the subject matter of this e-mail is the warrants that are issuable in the Uluru transaction?

A. In this -- that looks correct considering what we felt what we were owed on the banking side, correct.

Q. Do you recall receiving the e-mail on the top of page 1 from Mr. Rimland on January 19, 2006?

A. I don't recall receiving it, but obviously I read it.

Q. Do you have any reason to believe that you did not receive it?

A. No.

Q. Let me direct your attention to page 2?

Page 44

CHRISTOPHER J. MALONEY

A. Yes.

Q. Have you seen this document before?

A. Yes.

Q. Can you tell me what it is?

A. It's a break down of the Highgate House -- it's a break down of the warrants on this transaction that Adam's firm put together.

Q. When you mean Adam's firm, are you referring to Gottbetter & Partners?

A. Yes, I am.

Q. When you say put together, was it put together in January, 2006 as far as you know?

A. As far as I can recollect, yes.

Q. Again, the warrants that we are talking about is the 5 million warrants that are to be issued or were to be issued by Oxford in the Uluru transaction?

A. That's correct.

Q. Looking in the upper left quadrant of the second page, under the heading of warrants, is that the 1.166 million warrants that you referred to earlier?

A. That's correct.

Q. Were those warrants the ones that

Page 45

CHRISTOPHER J. MALONEY

were to go to Highgate House Funds?

A. Correct.

Q. And on the lower left quadrant are those the 3.8 million warrants that was to go to Prentice Capital?

A. 3.8 right here.

Q. Exactly, yes, under the heading of warrants.

A. Yes.

THE WITNESS: Can you read the question back for me.

(Requested portion of record read.)

A. Correct.

Q. Again on the top left, the top left quadrant, again, on line B where it says banking fee, CJM, does that refer to you?

A. Yes.

Q. And on the same line under the heading of warrants, does that refer to the 233,333 warrants that would go to you as the banking fee?

A. That's correct.

MR. ROSENBAUM: You mean the monetized version? He said before he wouldn't

Page 46

CHRISTOPHER J. MALONEY

get the warrants, he would get the cash once they are sold.

MR. VENTURINI:  I understand that. But we are talking about the warrants.

MR. ROSENBAUM:  He said the warrants would not go to him.  The warrants would go to the fund.

A.  These warrants were not issued to me.

Q.  I understand that.  But here it says it lists you as getting a banking fee, does it not?

A.  It does.

Q.  And it lists you as getting the 233,000 warrants, does it not?

A.  Yes, it does.

Q.  Turning to the upper right quadrant now where it says Yorkville Advisors Management and it says cash fee and warrants?

A.  Yes.

Q.  Under the heading warrants, the first thing that we have listed is 933,334 warrants. Do you see that?

A.  Yes, I do.

Q.  You understand that number to be the

Page 47

CHRISTOPHER J. MALONEY

balance that would remain after subtracting 233,333 warrants from the 1.1666 million warrants listed in quadrant upper left?

A.  I would.  I would understand that.

Q.  Do you understand that those 933,334 warrants are further broken down on the next two lines in 414,400 warrants and 518,933 warrants?

A.  Say that again?

Q.  Yes.  Do you understand that in the top right quadrant the 933,334 warrants listed there, do you understand those to then be broken down into two parts, 414,400 warrants and the other is 518,933 warrants?

A.  Yes, I understand that.  I understand that.

Q.  Do you understand that this shows that the 414,400 were to be issued to HH Advisors?

A.  I do.

Q.  And do you see that the 518,933 warrants were to be issued to YAM?

A.  Yes.

Q.  And do you understand YAM to be Yorkville Advisors Management?

A.  Yes.

Page 48

CHRISTOPHER J. MALONEY

Q.  When you received this e-mail on January 19th, do you recall having a conversation with anyone regarding the break down of warrants that are on page 2?

A.  I immediately had a conversation with Mark Angelo about this because I was completely furious by the fact that we were not -- that the 414 was not -- all of this wasn't coming in.  The 1.16 and -- 1.9 should have come in to Cornell Capital and -- excuse me, into Yorkville, into the fund.  1.16 coming in Highgate with the remaining -- 1.9 should have come in and we would be earmarked as bankers on the remaining when they were sold and that did not happen.

Q.  Does the fact --

MR. ROSENBAUM:  He wants to know about your conversation with Mark Angelo.  That was the question.  Have you finished answering that part of the question?

A.  What is your question?

MR. ROSENBAUM:  Time out.

MR. VENTURINI:  Let's reread the last question and answer back.

(Requested portion of record read.)

Page 49

CHRISTOPHER J. MALONEY

MR. ROSENBAUM:  Finish your conversation with Mr. Angelo.

A.  I had a conversation with Mark, Mark Angelo and showed him this and Mark equally agitated by this said to me, as long as the Highgate House Fund is getting 1.16, we are just going to -- Adam has screwed all of us and now he is screwing all of us and you're not going to get the piece from Prentice that we were entitled to.

Since there was so many things going on from -- so many things going on, problems, we just said he could have his 414,000 and be gone with him.

Q.  Was that conversation in January, 2006?

A.  Right when we received this.

Q.  That was on January 19, 2002?

A.  When we received this document, so whatever that date is.

Q.  By this document are you referring to Exhibit 3?

A.  Yes.

Q.  Did you understand at that point that

Page 50

CHRISTOPHER J. MALONEY

Highgate House Advisors was going to get the 414,400 warrants of Oxford?

A. Yes, Adam was cutting his own warrants out for himself.

Q. Did you have a conversation with anyone connected to Mr. Gottbetter regarding the 414,000 warrants that we are referring to?

A. We went back and forth over the 1.9, I believe with Tim Dockery and how I felt it was wrong and then afterwards talking with Mark it was going to stand that way, with me getting screwed out of that piece.

Q. Let's discuss that.

MR. ROSENBAUM: This has nothing to do with --

MR. VENTURINI: I believe it does.

MR. ROSENBAUM: Well, I don't mind doing this outside of the presence of the witness, if you could show me how it does, I will let him answer. If you can't, then we have a problem. You're the one that wanted these depositions limited to the allegations in the complaint as it relates to the Charys warrants. That is fine with me, but this has nothing to do

Page 51

CHRISTOPHER J. MALONEY

with that.

MR. VENTURINI: I'm surprised you're saying that, you did hear my oral argument and you have seen my correspondence. It is directly related to that.

MR. ROSENBAUM: If your question, is this your course of dealing argument?

MR. VENTURINI: I don't want to have this conversation in front of the witness.

MR. ROSENBAUM: He can leave.

THE WITNESS: Do you want me to step out?

MR. ROSENBAUM: It is fine with me if he steps out.

(Witness leaves the room).

MR. VENTURINI: It is of course what it is, isn't that obvious?

MR. ROSENBAUM: If this is the best that you could do with it, that's fine with me.

MR. VENTURINI: That's your opinion. If you don't like the quality of our defense, I'm still allowed to pursue it.

MR. ROSENBAUM: Are you going to be much longer with it?

Page 52

CHRISTOPHER J. MALONEY

MR. VENTURINI: Yes.

MR. ROSENBAUM: You are?

MR. VENTURINI: Yes.

MR. ROSENBAUM: On Uluru.

MR. VENTURINI: Yes.

(Recess taken.)

MR. VENTURINI: Read the last question and answer back.

(Requested portion of record read.)

BY MR. VENTURINI:

Q. I remind you that you're still under oath.

A. Yes.

Q. In connection with the same exhibit, Exhibit 3, in terms of the break down, under this break down isn't it correct to say that this break down reflects that you're going to get 1 million warrants?

A. That is what it reflects.

Q. And does the issuance of the 414,400 warrants to HH Advisors on this sheet, this break down, affect the warrants that are going to you?

A. It does.

Q. How does it?

Page 53

CHRISTOPHER J. MALONEY

A. Because we didn't receive 1.9. We received 1.5 and all of the way in which it works is that all of the warrants come in, they are never given to the banker, they are never given to any one until they are monetized. And when a million-5 came in the break down, the break down is significantly different because of that 414 not coming in.

Q. Let's go through that. Under here the way this is broken down you said that you received --

MR. ROSENBAUM: Just so we are clear. This e-mail is from Jason Rimland to Chris Maloney in January, the warrants weren't even issued in January.

MR. VENTURINI: Let me ask the questions, please.

MR. ROSENBAUM: I want you to know that.

MR. VENTURINI: I do know that.

Q. Is it correct to say that you said earlier that 1.5 million warrants came into Yorkville?

A. That's correct.

Page 54

CHRISTOPHER J. MALONEY

Q.   And does that 1.5 consist of the 1 million warrants with the banker's fee?

A.   They didn't come in.  They came in as 1.5.

Q.   Let's break it down less than that. With respect to the allocation on the second page of Exhibit 3, does it affect that 1 million warrants were supposed to go to you for the banker's fee?

A.   Rephrase that for me, that question.

Q.   Okay.  Up again in the upper left quadrant.

A.   We are moving back to the upper left.

Q.   It says banking fee CJM, 20 percent 223,333 warrants.

A.   According to that paper, yes.

Q.   That is the 20 percent banker's fee, that is your fee?

A.   Yes.

Q.   On the bottom left where it says banking fee CJM 20, 766,667 warrants, is that your understanding that that is the warrants that should be issued for your banking fee?

A.   According to this exhibit, yes.

Page 55

CHRISTOPHER J. MALONEY

Q.   Does that mean that 1 million warrants should be issued for your banking fee?

A.   According to this exhibit, yes.

Q.   Is it your understanding that you're entitled to 1 million warrants from the Oxford transaction?

A.   The answer is yes, I am.  However, because 1.166 was supposed to come in to the fund --

Q.   I didn't ask you that.

MR. ROSENBAUM:  He is not done.

A.   Yes, can't I answer that?

Q.   You have to answer the question.

MR. ROSENBAUM:  Finish your answer and then he will object or do whatever.  Finish your answer.

A.   1.9 was supposed to come in reflecting 1.1667 and then --

MR. ROSENBAUM:  To who?

A.   To the fund.  To Highgate House Funds.  All of the 1.9 should have come in and HH Advisors never should have cut their warrants.

Q.   If you subtract from 1.9 million the 414,000 that is listed in the upper right quadrant to HH Advisors, do you come up with 1.5

Page 56

CHRISTOPHER J. MALONEY

million?

MR. ROSENBAUM:  Arithmetically?

MR. VENTURINI:  Yes.

MR. ROSENBAUM:  We will stipulate to the math.

MR. VENTURINI:  Okay.

Q.   So then if you take out HH Advisor's fee of 414,000, you're left with 1.5 million warrants; is that correct?

A.   That's correct.

Q.   And under the sheet 518,000 is for YAM, and 500,000 is for you the banker?

A.   According to the sheet it is the policy of our firm.

Q.   I didn't ask you what the policy of the firm was.

MR. ROSENBAUM:  You have to wait for him to finish the answer.

MR. VENTURINI:  He is going off on a tangent.

MR. ROSENBAUM:  Finish your answer.

Q.   I understand Mr. Rosenbaum wants you to say certain things.

A.   I'm saying what I want to say because

Page 57

CHRISTOPHER J. MALONEY

I have been financially screwed by what Adam Gottbetter did in breaking the firm's policy by cutting those warrants outright as he was gone from the firm.  This reflected to me.

Q.   Are you saying that you received 20 percent --

A.   I haven't received anything.

Q.   But are you saying that you're not going to get the benefit of the million warrants under this transaction?

A.   No, I'm not, because Adam took his shares and he never should have done that.  He would have realized that when and if those warrants were exercised and sold and that was again the policy of the firm and he just did it.

Q.   Are you saying that you're getting 20 percent of the 1.5 million warrants that came into Yorkville?

MR. ROSENBAUM:  He said he is not getting any part of the warrants.

A.   I don't know what percentage that is going to be.  I should be getting 20 percent of what is coming in and that is what is going to happen.

Page 58

CHRISTOPHER J. MALONEY

Q. You're saying you're no longer getting the benefit of the 1 million warrants in this transaction?

A. No, I'm not.

Q. When did you first learn that that was going to be the case?

A. When you talked to Mark Angelo when basically Mark had thrown his hands up in frustration because of previous dealings that he had with Adam Gottbetter.

Q. Do you know that for a fact?

MR. ROSENBAUM: You have to let him answer and then ask him your next question. Finish your answer either that or we will stop the deposition. Finish your answer.

A. I'm sorry.

MR. ROSENBAUM: Read back where August cut him off and we will pick up from there.

(Requested portion of record read.)

MR. ROSENBAUM: Finish your answer from where the reporter just finished reading.

A. So, Mark said it is going to fall where it falls because those warrants did not

Page 59

CHRISTOPHER J. MALONEY

come in and Adam has taken them.

MR. ROSENBAUM: Let me stop. For now on so we are clear. You ask your question. No interruption when you're asking your questions and on the other hand when the witness is in the middle of an answer, it is improper to interrupt him, you can move to strike, but let the witness answer.

MR. VENTURINI: I can stop him if he is going off in a tangent.

MR. ROSENBAUM: You can't.

MR. VENTURINI: He is not answering the question that I asked.

MR. ROSENBAUM: He did answer it.

MR. VENTURINI: I have a right to have my question answered.

MR. ROSENBAUM: He did answer it and he is giving you an explanation and that is when you interrupted him.

MR. VENTURINI: Let's continue.

MR. ROSENBAUM: Under those ground rules. That you don't interrupt him and he won't interrupt you and I won't interrupt you and you don't interrupt me.

Page 60

CHRISTOPHER J. MALONEY

MR. VENTURINI: I will stipulate that you won't interrupt me.

Q. Is that a conversation that you had on January 19, 2006?

A. On or about. As soon as this came out.

Q. Have you received any compensation from the warrants in the Uluru transaction?

A. No.

Q. Sitting here today do you know whether you're going to get the benefit of the 1 million warrants or something less?

A. It will definitely be something less because of Adam's actions now.

Q. What are you getting?

A. It is -- first of all, they haven't even monetized, so, whatever agreement Mark and I can work out on that given if this is how this stands, then that is what it is going to be.

Q. Is it correct to say that you don't have an agreement right now with your employer as to what you're going to receive from the sale of the underlying stock from the million warrants?

A. It is going to be worked out when

Page 61

CHRISTOPHER J. MALONEY

those are sold. That is how it is going to be. It's a special situation right now that because of what Adam has done I am getting screwed on this as well as Brian Keane.

Q. You just said you don't know what you're getting?

A. I don't know what that is going to be.

Q. How do you know that you're getting screwed?

A. Because according to the way it stands now there is less warrants in this piece.

Q. According to this sheet. Isn't it true that a million of the warrants that came in were earmarked for your banker's fee?

MR. ROSENBAUM: He said no.

MR. VENTURINI: Please don't give speaking objections.

MR. ROSENBAUM: I am not. You have asked that question five times.

MR. VENTURINI: Then say objection.

MR. ROSENBAUM: You have asked it and he answered the question.

MR. VENTURINI: Then say objection.

Page 62

CHRISTOPHER J. MALONEY

THE WITNESS: Can you repeat his question?

(Requested portion of record read.)

A. According to the sheet the answer is yes. However, the policy of the firm is not to have warrants issued on behalf of someone's benefit to the fund. It doesn't happen. They would come in and 1.5 million warrants and then there would be a break down when they are realized. When the profits are realized. This is a sheet. This means absolutely nothing as to who is getting those warrants.

Q. Did you receive a communication in the last month from anyone at Yorkville regarding whether warrants were to be issued to bankers or not?

MR. ROSENBAUM: In general.

MR. VENTURINI: Yes, in general?

A. The answer is yes.

Q. What communication was that?

MR. RILLO: Hold on, there is -- this is privileged.

MR. ROSENBAUM: Is it an communication from counsel?

Page 63

CHRISTOPHER J. MALONEY

THE WITNESS: It is a communication from David Gonzalez and Troy Rillo.

Q. Is David Gonzalez counsel?

A. Yes, he is.

MR. RILLO: Yes, he is.

MR. VENTURINI: Are you saying that -- let me ask the question, if you instruct him not to answer then we will see where we go.

(RULING).

Q. When were you asked to sign anything in the last month regarding banker fees payable in warrants directly to the banker?

MR. ROSENBAUM: Asked my whom?

MR. VENTURINI: By Yorkville.

MR. ROSENBAUM: By the same people, by Mr. Gonzalez and Mr. Rillo?

MR. RILLO: It is privileged.

MR. ROSENBAUM: Let me finish. Did Mr. Rillo and/or Mr. Gonzalez ask the witness, it is privileged.

MR. VENTURINI: Let's go to the question first.

MR. ROSENBAUM: You just asked it.

MR. VENTURINI: Let me hear the

Page 64

CHRISTOPHER J. MALONEY

question first.

(Requested portion of record read.)

MR. ROSENBAUM: That is privileged.

MR. VENTURINI: How is that privileged?

MR. ROSENBAUM: If the request came from counsel, any communication between counsel and Mr. Maloney is privileged.

MR. VENTURINI: Counsel doesn't represent Mr. Maloney individually.

MR. ROSENBAUM: It doesn't matter, they are representing the company, it is privileged.

MR. VENTURINI: Mark it in the transcript and we will seek a ruling on it. I don't believe that is privileged that has to do with compensation. You're saying --

MR. ROSENBAUM: I don't want to argue with you.

MR. VENTURINI: All right.

Q. Did the document that you were asked to sign say that bankers were not going to be receiving warrants?

MR. ROSENBAUM: Hold it, let me

Page 65

CHRISTOPHER J. MALONEY

think this out.

MR. RILLO: It is the same question.

MR. ROSENBAUM: You want to know what the document says?

MR. VENTURINI: Yes.

MR. ROSENBAUM: Can I talk to the witness for a second?

MR. VENTURINI: Yes.

(Recess taken.)

MR. VENTURINI: Read back the question.

(Requested portion of record read.)

MR. ROSENBAUM: You can answer the question as to what the document said.

A. Yes, we did receive it, however, it was clarifying existing policy in place. I never received not once on any transaction that I have ever done warrants in my own name nor has any banker, as I understand.

Q. Why were you asked to sign a policy that was already in effect?

A. Because of --

MR. ROSENBAUM: Is the why something

Page 66

CHRISTOPHER J. MALONEY

that Mr. Gonzalez or Mr. Rillo told you? If it is, you can't answer it. If it isn't, then you can answer it?

A. It is my understanding that that was done because of what has happened with all of these missing warrants. That is my understanding.

Q. When you are referring to all of these missing warrants, what are you referring to?

A. Mine, and then obviously the warrants on the Charys deal.

Q. When you say mine, you're referring to the Uluru Oxford warrants?

A. Yes.

Q. Those warrants aren't missing, are they?

A. We know where they are, they are at HH Advisors and they should not have been cut that way.

Q. Right, I understand what you're saying.

When did you sign such a document regarding the policy of the firm regarding

Page 67

CHRISTOPHER J. MALONEY

payment of warrants to bankers?

A. I probably signed that the day after it was sent out.

Q. Was that in November of 2006?

A. Yes, probably the past two weeks. It wasn't a hard thing for me to sign because all it was was the existing policy, so.

Q. Did you have a discussion with anyone before you signed it?

MR. ROSENBAUM: Anyone other than Mr. Rillo or Mr. Gonzalez?

A. Did I have a discussion with anybody. Probably just normal what did you think about that letter. I can't remember who I did. It was probably --

MR. ROSENBAUM: Don't guess.

A. I can't guess, I'm not going to guess, I can't.

Q. Did you have a conversation with Steve Goldstein?

MR. RILLO: He is counsel as well.

MR. VENTURINI: In-house?

MR. RILLO: Yes.

(RULING).

Page 68

CHRISTOPHER J. MALONEY

Q. Did you have a conversation with Mr. Goldstein about it?

MR. ROSENBAUM: Don't answer it.

MR. VENTURINI: He can tell me whether he had a conversation.

MR. ROSENBAUM: He said he did.

MR. VENTURINI: Let the witness answer.

MR. ROSENBAUM: He can tell you whether he spoke to Mr. Goldstein.

MR. VENTURINI: I know that. That is what I asked.

MR. ROSENBAUM: No, you said about something.

MR. VENTURINI: Let's have the question read back.

(Requested portion of record read.)

MR. ROSENBAUM: That's the point.

MR. VENTURINI: That's a good question.

MR. ROSENBAUM: No, it is not. It implies the subject matter of the conversation which is privileged.

MR. VENTURINI: The subject matter

Page 69

CHRISTOPHER J. MALONEY

is not privileged.

MR. ROSENBAUM: The subject matter is privileged.

MR. VENTURINI: Are you instructing him not to answer?

MR. ROSENBAUM: Yes, on the grounds of privilege.

MR. VENTURINI: Mark that part of the transcript.

Q. Were all the bankers asked to sign that document regarding the firm policy?

MR. ROSENBAUM: You can answer.

A. Yes.

Q. Did that policy say that all warrants were not to be issued to the bankers directly?

MR. ROSENBAUM: If you remember what it said you can tell him.

A. Yes.

Q. Prior to signing that document were there any meetings at Yorkville at any time regarding whether warrants would be paid directly to bankers?

A. Clarify who would hold the meeting, clarify who would say something.

Page 70

CHRISTOPHER J. MALONEY

Q.   Anyone at Yorkville.
      MR. ROSENBAUM:   He wants to know whether there were meetings.
A.   By management saying -- clarify that.
Q.   Anyone. There is no clarification. Anyone.
A.   Were there any meetings about --
Q.   Yes.
A.   Not that an I recall.
Q.   Did you have any discussions with any other bankers regarding whether warrants would be given directly to the bankers?
A.   Well, warrants -- I mean warrants -- I mean it is possible. It is possible that that has come up.
      MR. ROSENBAUM:   He doesn't want to know what is possible. He wants to know what you remember.
A.   I don't remember.
Q.   Did there come a time when you told anyone connected to Adam Gottbetter that the Oxford warrants that were a part of the banker's fee should be issued to Yorkville?
A.   Say that again.

Page 71

CHRISTOPHER J. MALONEY

Q.   Did you ever tell Gottbetter & Partners or HH Advisors that the million warrants that are on the exhibit that we are looking at, Exhibit 3, should be issued not to you, but to Yorkville?
A.   Jason Rimland, Dockery all asked me do you want your warrants issued to you or Yorkville and I said they are not going to me, they are going to Yorkville.
Q.   When did you first tell him that?
      MR. ROSENBAUM:   Were you done with your answer? I couldn't tell whether you were finished with your answer. If not, just finish. If not, ask your next question?
A.   I think I was finished with my answer.
Q.   And then I had a question.
      MR. VENTURINI:   Read it back.
      (Requested portion of record read.)
A.   I don't recall. I don't recall the date, but there was -- there were numerous conversations about these warrants because obviously after they left they had a different stance against us and I recall Jason Rimland

Page 72

CHRISTOPHER J. MALONEY

saying to me you really should have those warrants issued in your name because Cornell is going to be out of business. And I just would never do that because to me it was unethical and I didn't even have the right to do that. To have them in my name.
Q.   You said after they left they had a different stance against us?
A.   Completely.
Q.   Who is they?
A.   I wouldn't know it to be Adam because I didn't talk to Adam after he left, but it was clearly Jason Rimland, Dockery, those two individuals.
Q.   You're saying Mr. Rimland and Mr. Dockery had a different stance?
A.   Yes.
Q.   What do you mean by different stance?
A.   I would say a negative attitude toward us.
Q.   By us you're referring to Yorkville?
A.   Yorkville, Cornell, the whole entity.
Q.   You said you had numerous conversations regarding the warrants, is that

Page 73

CHRISTOPHER J. MALONEY

with Jason and Tim?
A.   Jason and Tim, yes.
Q.   And that was --
A.   It would be more Jason. Jason I believe was responsible for the direction -- taking the direction of the warrants.
Q.   When you say taking the direction of the warrants, you mean the warrants that were issued to HH Advisors?
A.   Yes, taking direction from Adam because he works for Adam.
Q.   You understand that Adam was a portfolio manager of Highgate House?
A.   Yes, up until January, the first couple of days in January.
Q.   Of 2006?
A.   Correct. I don't know his exact date that he resigned.
Q.   Do you know what HH Advisors is?
A.   It's an entity -- I believe it's an entity owned by or owned by Adam Gottbetter. Can you clarify that for me?
Q.   No.
      MR. ROSENBAUM:   He can, but won't.

Page 74

CHRISTOPHER J. MALONEY

MR. VENTURINI: Mark this as the next Exhibit?

A. Kerry Gray our client thought HH Advisors was Highgate House. The CEO of Uluru, he thought that it was Highgate House and he thought that we were getting those warrants.

Q. How do you know that?

A. I spoke with him.

Q. When was this?

A. I spoke with him yesterday.

Q. What did he tell you?

A. He said that these warrants were -- he thought that -- he thought that we got 1.9 million warrants.

Q. Why were you discussing warrants with him yesterday?

A. Just because we were -- I wanted to clarify some things in my own mind.

Q. Is that for purposes of this deposition?

A. No.

Q. Did you know that the warrants would be the subject of this deposition?

MR. ROSENBAUM: How would he know.

Page 75

CHRISTOPHER J. MALONEY

He just got here.

MR. VENTURINI: Do not instruct the witness. I'm asking him a question?

A. No.

Q. Is it correct to say that you don't know what warrants are the subject of this litigation?

MR. ROSENBAUM: He said he didn't.

A. I definitely don't. Other than what I have told you and other than what I feel that I have been personally screwed out of, I don't know anything about -- your thing together.

Q. Did you think that the Oxford Uluru warrants were the subject of this litigation?

A. No.

Q. What did you do to prepare for this deposition?

A. I just spoke to my attorney.

Q. Anything else?

A. No.

Q. Did you look at any documents?

A. No.

Q. Were you asked to look for any documents?

Page 76

CHRISTOPHER J. MALONEY

A. No. I was asked to hand over all materials to the matter, all my due diligence books, that's it.

MR. VENTURINI: Mark this as the next exhibit. Exhibit 4.

(Maloney Exhibit 4 for identification, One-page document reflecting two e-mails both dated March 30th, 2006.)

Q. Maloney Exhibit 4 is a one-page document, two e-mails both dated March 30th, 2006. Have you seen these e-mails before?

A. I don't remember seeing them, but -- I don't remember seeing them.

Q. Look at the bottom one, can you tell me what that is about?

A. March 30th. Yes, it appears to me that -- well, it looks like Tim has asked for the full name of Yorkville Management and it appears as if I'm telling him that they need to be made out to Yorkville Management and not Yorkville Advisors Management because there was a name change from YAM to Yorkville Management.

Q. Was there a discussion at the end of March regarding the issuance of the warrants in

Page 77

CHRISTOPHER J. MALONEY

the Uluru transaction?

A. I think I have already answered that question.

Q. No, I asked you if there was a conversation at the end of March.

A. I would imagine that there would be.

Q. When did the Uluru transaction close?

A. The Uluru transaction closed -- well, fully closed it would be March. We funded --

Q. March of?

MR. ROSENBAUM: March of what year?

A. The whole thing was closed at the end of March.

MR. ROSENBAUM: Of what year?

THE WITNESS: This year, 2006. What part of the closing -- clarify closing for me.

Q. That's a good point. Let's break it down.

A. There is funding.

Q. That's right. Let's walk through the deal. What is the first thing that happened in this transaction in terms of closing?

MR. VENTURINI: And let me just note for the record that Mr. Rosenbaum is sighing.

Page 78

CHRISTOPHER J. MALONEY

Please don't sigh during my deposition?

MR. ROSENBAUM: I will sigh if I have to sigh because of these inane questions, but I'm not instructing him not to answer.

A. We had a first funding for the acquisition, to complete the acquisition. And those numbers 10 and 3, 10 million from Prentice and 3 million from Cornell.

Q. Was it Cornell or Highgate House?

A. It was Highgate House Funds. I'm sorry; a fund of Cornell.

Q. When was the first funding done?

A. I want to say some time around October.

Q. 2005?

A. 2005, yes.

Q. In that funding Prentice and Highgate put up a combined $13 million?

A. Yes.

Q. They invested in what company?

A. They invested it in Oxford to buy the assets of Uluru.

Q. Did Uluru use that money to buy assets from another company?

Page 79

CHRISTOPHER J. MALONEY

A. Yes.

Q. What company was that?

A. That was Access Pharmaceutical.

Q. In conjunction with the $13 million financing was it contemplated that there would be a reverse merger?

A. Yes.

Q. That is the reverse merger into Oxford that you described earlier?

A. That I answered, yes.

Q. After the first funding in October of 2005 did anything else close in connection with that overall deal?

A. No, we did one funding.

Q. Was the next closing then the closing of the reverse merger?

A. Correct.

Q. Did that take place in March of 2006?

A. Yes, there was a shareholder vote of proxy and I believe that that is the case.

MR. ROSENBAUM: Off the record.

(Discussion off the record.)

Q. When the first funding closed in October, 2005, were 5 million warrants issued in

Page 80

CHRISTOPHER J. MALONEY

connection with that financing?

MR. ROSENBAUM: In October of '05.

MR. VENTURINI: Yes.

A. Yes.

MR. VENTURINI: Let's have this marked as the next exhibit. Exhibit 5.

(Maloney Exhibit 5 for identification, Seven-page document entitled warrant to purchase common stock of Oxford Ventures, Inc..)

Q. I show you what is marked as Exhibit 5. It's a seven-page document entitled warrant to purchase common stock of Oxford Ventures, Inc. The warrants are 1,166,667 shares. Have you seen this document before?

A. Yes.

Q. Was this warrant issued in October of 2005? Well, let's -- I could make it easier for you. We could turn to page it looks like 5 of the warrant.

A. Page 5 of the fax 5 or --

Q. No, of the document.

A. Okay.

Q. Do you understand this warrant to

Page 81

CHRISTOPHER J. MALONEY

have been issued on or about October 7th, 2005?

A. Correct.

Q. Is that the signature of Mr. Leonard?

A. That's correct. I believe that is the signature. I never compared his signature to anyone, but I believe so.

Q. Turning to page 1. Were these warrants issued to Highgate House Funds LTD? You may see it in the middle of the first page?

A. That's correct.

Q. Is it your understanding that the amount of the warrants were to purchase 1.166 million shares of common stock, roughly?

A. Yes.

MR. VENTURINI: Let's introduce the next exhibit?

A. Are we finished with this.

MR. VENTURINI: Yes, we are. Mark this as Exhibit 6.

(Maloney Exhibit 6 for identification, A warrant to purchase common stock, 3.833333, to Prenox.)

Q. I show you what is marked as Exhibit 6, can you tell me what this document is?

Page 82

CHRISTOPHER J. MALONEY

A. Yes, I can.

Q. What is it?

A. A warrant to purchase common stock, 3.833333 and it is to Prenox.

Q. Turning to the signature page for ease of reference, was this warrant issued in October, 2005 as far as you know?

MR. ROSENBAUM: When you say issued, do you mean delivered or just signed?

A. It is not dated.

MR. ROSENBAUM: I just want to clarify. Do you mean delivered or signed?

Q. Let's break it down.

Do you understand what it means to issue a warrant?

A. Yes.

Q. Do you understand if this warrant was issued in October of 2005?

A. Some date, it is not dated.

Q. Do you have an understanding as to when this warrant was issued?

A. By the document, October, '05.

Q. Is there any reason that this warrant, Exhibit 6, would not have been issued at

Page 83

CHRISTOPHER J. MALONEY

the same time that the warrant in Exhibit 5 was?

A. I don't know -- no -- no, I don't think there would be any reason.

Q. Is it correct to say that the warrants in Exhibit 5 and Exhibit 6 together form the 5 million warrants that we were talking about earlier?

A. That's correct.

Q. I think you testified to this, but let me just clarify.

In Exhibit 6, these warrants were issued to Prenox?

A. Correct.

Q. Is that in connection with the financing by Prentice?

A. Correct.

Q. Do you know what Prenox is?

A. Prenox -- it would be a company of Prentice Management. We referred to them as Prentice.

Q. With respect to the warrants that we discussed in Exhibits 5 and 6, were those warrants reissued at any time?

A. Well, they had to be because of the

Page 84

CHRISTOPHER J. MALONEY

later break down, the change in the break down.

Q. Is that the change in the break down that we saw in Exhibit 3 on the second page?

A. That's correct.

MR. VENTURINI: Mark this as Exhibit 7.

(Maloney Exhibit 7 for identification, Warrant for 3,066,667 shares of common stock issued to Prenox on October 14th.)

THE WITNESS: Can we take a quick break?

MR. VENTURINI: Sure.

(Recess taken)

BY MR. VENTURINI:

Q. Back on the record, I remind you that you're still under oath. I show you what is marked as Exhibit 7. Can you identify Exhibit 7?

A. Yes, this is a warrant -- this is a warrant for 3,066,667 shares of common stock issued to Prenox on October 14th. The revised number from the previous warrant.

Q. Does this change the amount of warrants that were going to Prenox?

A. It does.

Page 85

CHRISTOPHER J. MALONEY

Q. Is that based on the second page of Exhibit 3 that we saw earlier?

A. These numbers do correspond.

Q. So your understanding is that this is the amount of warrants that Prenox was supposed to get; is that correct?

A. Right now looking at this, yes.

Q. And by this you're referring to the second page of Exhibit 3?

A. By the second page, yes.

Q. Of Exhibit 3?

A. Of 3, yes.

Q. Turning to the signature page which is on the fifth page of Exhibit 7.

A. The second to last page?

Q. Yes. Where it says the date -- is it your understanding that this warrant was issued on March 31, 2006?

A. Yes, but it doesn't say who it is signed by. And I don't see who this is signed by. What exhibit is the previous warrant to Prenox?

MR. ROSENBAUM: Exhibit 6.

Q. Normally I don't answer questions,

Page 86

CHRISTOPHER J. MALONEY

but I will --

A. That's okay.

Q. I will give it to you, it is right here.

A. I have it right here.

Q. Does it look like the same signature on both lines?

A. I'm not a signature expert, so. It could be. I don't know who signed that though.

Q. Do you have any reason to believe that that warrant was not issued by Oxford Ventures and I'm referring to Exhibit 7?

A. No, I don't. I just brought it up that there wasn't a name under the signature.

Q. But does that mean anything?

A. No. I was just curious myself.

Q. As far as you know Oxford Ventures issued this warrant on March 31, 2006?

A. As far as I know.

Q. And issued it to Prenox?

A. That's correct.

MR. VENTURINI: Mark this as Exhibit 8.

(Maloney Exhibit 8 for

Page 87

CHRISTOPHER J. MALONEY

identification, Warrant to purchase common stock for 414,400 shares granted to HH Advisors LLC.)

Q. I show you what is marked as Exhibit 8, can you identify this document?

A. This is a warrant to purchase common stock for 414,400 shares granted to HH Advisors LLC.

Q. Have you seen this before?

A. Yes.

Q. Was this warrant also issued on March 31, 2006 by Oxford?

A. Yes, that's correct.

Q. Was the closing of the merger on March 31, 2006?

A. I don't recall. I think we covered that previous too.

Q. Was it your understanding that this warrant was issued in accordance with page 12 of Exhibit 3 of the 414,400 warrants that were issued to HH Advisors?

A. Yes, they correspond.

MR. VENTURINI: Mark this as Exhibit 9.

(Maloney Exhibit 9 for

Page 88

CHRISTOPHER J. MALONEY

identification, Warrant to purchase 1,518,934 of common stock of Oxford Ventures and it is issued to Yorkville Advisors LLC.)

THE WITNESS: Can we go off the record for a second?

MR. VENTURINI: If it is okay with your counsel.

THE WITNESS: Are you okay with that?

MR. ROSENBAUM: Yes.

MR. VENTURINI: Off the record.

(Discussion off the record.)

Q. I show you what is a marked as Exhibit 9, can you identify this document?

A. This is a warrant to purchase 1,518,934 of common stock of Oxford Ventures and it is issued to Yorkville Advisors LLC.

Q. Is it your understanding that Yorkville Advisors is the same Yorkville that we have been talking about?

A. Yes.

Q. That is your employer?

A. That's correct.

Q. Is it your understanding that that

Page 89

CHRISTOPHER J. MALONEY

warrant was also issued on March 31, 2006?

A. Yes, this one is signed by Dan Leonard.

Q. Do you have any reason to believe that Dan Leonard did not sign the previous warrants that we were discussing?

A. This is the only one where it says Dan Leonard's name on it, so, I --

THE WITNESS: Can you read back his question?

(Requested portion of record read.)

A. No.

Q. The warrant in Exhibit 9 is for roughly 1.5 million shares. Does that again comport with the second page of Exhibit 3?

A. Yes, it does.

Q. Do you know why this warrant was issued to Yorkville Advisors as opposed to Highgate House Funds?

A. Because my belief is that Highgate House was closed down after Adam Gottbetter left the firm and was combined into Cornell Capital.

Q. So your understanding was that Highgate House Funds which is the fund that Adam

Page 90

CHRISTOPHER J. MALONEY

was managing?

A. Highgate House Funds was managed by Adam?

Q. Right, and that fund was you said closed down. When was that?

MR. ROSENBAUM: When he said merged in Cornell.

Q. What did you say?

MR. ROSENBAUM: Read it back, please.

(Requested portion of record read.)

Q. When did the close down of the Highgate fund in combination with Cornell occur?

A. I don't know the specific date. I wouldn't be privy to that information. But I believe it would have even happened before March.

Q. Of 2006?

A. Yes, but I'm not privy to that date.

Q. Is it your understanding that it happened at some point in 2006?

A. That's correct.

Q. Is it correct to say that the investments that Highgate House made are now considered to be investments of Cornell Capital?

Page 91

CHRISTOPHER J. MALONEY

MR. ROSENBAUM: If you know.

A. Yes. I would -- yes, the answer is yes.

Q. Is it correct to say that the original warrant in October of 2005 was issued to Highgate House Funds by Oxford, do you recall that?

A. Yes. I recall reading that from the exhibit.

Q. Now, can you tell me why given what you just said, the Exhibit 9 warrant was not issued to Cornell?

A. I don't know the answer to that. I honestly don't.

Q. Okay.

A. It could have been --

MR. ROSENBAUM: Don't guess, if you know you know.

A. I said it could have been -- I don't know.

Q. What could it have been?

MR. ROSENBAUM: That is an improper question. That calls for speculation. Don't answer the question. That question is --

Page 92

CHRISTOPHER J. MALONEY

A. You know what --

MR. ROSENBAUM: Don't answer the question.

MR. VENTURINI: You said before you wanted the witness to answer the question, let the witness answer.

MR. ROSENBAUM: He will not answer the question because that is not a question capable of being answered.

MR. VENTURINI: Let him finish the answer.

MR. ROSENBAUM: Don't answer the question unless you know. Don't guess or speculate.

A. Okay, then I will not guess.

Q. Did you have any conversations with anyone at Yorkville regarding the proper entity to issue this warrant to?

A. I don't recall. But from my previous e-mail obviously I did, but I don't recall that conversation.

Q. Was it the policy of Yorkville to have warrants issued to Yorkville instead of the fund?

Page 93

CHRISTOPHER J. MALONEY

MR. ROSENBAUM: At what time?

MR. VENTURINI: At the time of this issuance here in March of 2006.

A. I don't recall the specific --

MR. ROSENBAUM: If you know, you know?

A. I don't know.

MR. VENTURINI: Don't coach the witness.

MR. ROSENBAUM: I didn't coach him. I said if you know answer. If you don't know tell him you don't know.

MR. VENTURINI: That is always the case if he knows.

MR. ROSENBAUM: I because I just want to make sure that he doesn't guess or speculate. Which is a standard instruction in the beginning which you didn't tell him.

MR. VENTURINI: Read the last question and answer back.

(Requested portion of record read.)

Q. Have you seen any other circumstance while working at Yorkville at any time where a warrant was issued directly to Yorkville and not

Page 94

CHRISTOPHER J. MALONEY

to Cornell?

A.   I would have to go back and look at my own deals.  I don't recall that.  I don't recall what that specific policy was.

Q.   Do you recall a time where warrants were issued in a deal that Cornell invested in where the warrants were issued to Cornell?

A.   No, I don't recall.

Q.   Was it your decision as to which entity this warrant, Exhibit 9, was issued to?

A.   I don't have that kind of authority.

Q.   Is it correct to say that the authority would have come from someone higher than you at Yorkville?

A.   It would come from whatever the stated policy is and the answer would be yes to that.

Q.   Would that have been Mark Angelo?

A.   Yes.

Q.   So even though you don't recall it, would it be correct to say that you had to have had a conversation with Mr. Angelo where he told you that these warrants should be issued to Yorkville Advisors?

Page 95

CHRISTOPHER J. MALONEY

A.   I don't recall that.

Q.   What I'm saying, would it have had to have occurred.

A.   Clarify your question for me.  Be more specific as to --

Q.   I will be happy to.

A.   Please.

Q.   Is it correct to say that you don't have authority at Yorkville to tell the issuer who to make the warrant payable to, whether it is Yorkville or Cornell or Highgate?

A.   The answer would be yes, I don't have that authority.  If someone had asked me I would ask someone where do the warrants go on this transaction.  If there was a change --

MR. ROSENBAUM:  I didn't hear that.

A.   Because we had the change in the -- the only way that I would ever ask -- if I asked for some clarification on that previous e-mail, it was probably because of the change in Yorkville Advisors Management to Yorkville -- to Yorkville Advisors LLC.

Q.   The original warrants went to Highgate House Funds; is that correct?

Page 96

CHRISTOPHER J. MALONEY

A.   That's correct.

Q.   And that is a fund, correct?

A.   Yes.

Q.   And that fund you're saying was closed and merged into Cornell, correct?

A.   Correct.

Q.   And Cornell is a fund?

A.   Yes.

Q.   So my question to you is, did you have the authority to say that the warrants that were issued to Highgate should instead be issued to either Cornell or to Yorkville?

A.   As I answered your question before, I don't have that authority.  However I don't know what the accounting would be on those warrants and how they would affect the fund.  Would they go into the fund, I'm not in that loop.

Q.   I didn't ask you that question.  So that is okay.

The question is, who would have authority at Yorkville to tell you who to make the warrants issuable to?

A.   Mark Angelo, Troy Rillo, those people.

Page 97

CHRISTOPHER J. MALONEY

Q.   Any of the four principals that you named earlier?

A.   Yes, with the exception of Matt Beckman.

Q.   Is it fair to say that you had to have had a conversation with one of those three individuals in connection with the Uluru transaction where you had the authority, given to you by those people to tell Oxford to issue warrants to Yorkville?

A.   Yes.  As evidenced in my e-mail.

Q.   And the e-mail that you're referring to is which one?

A.   Exhibit something.

Q.   Just so we know what we are talking about.  Is that the January 19th or is that -- is it the January 19th e-mail or the March 30th e-mail?

A.   Yes, it would be this one here.

MR. ROSENBAUM:  Identify it.

Q.   Exhibit 4?

A.   Exhibit 4.  You asked me this question.

Q.   Yes, on the March 30th e-mail?

Page 98

CHRISTOPHER J. MALONEY

A.   Correct.

Q.   So is it correct to say that that conversation that you had with one of the three principals had to have occurred before March 30th, 2006?

A.   It could be on or before.  Not just before.

Q.   Okay.  But sitting here right now you still don't have any recollection of that conversation; is that correct?

A.   No.  No.  It wouldn't be an important issue to me.

Q.   The warrant that we have marked as Exhibit 9, was that received by you at Yorkville directly from Oxford?

A.   I don't know how this was received.

Q.   Do you recall receiving any signature pages directly from Oxford of any warrants in March of 2006?

A.   It is possible.  It could have come to Brian Keane because he had the relationship with Dan Leonard.

Q.   Do you recall any conversation with Brian Keane regarding the signature pages of the

Page 99

CHRISTOPHER J. MALONEY

warrants coming directly to Yorkville?

A.   No.

MR. VENTURINI:   Mark this as Exhibit 10.

(Maloney Exhibit 10 for identification, one page e-mail dated April 7, 2006.)

Q.   I show you what is marked as Exhibit 10.  One page e-mail dated April 7, 2006.  Can you identify this e-mail?

A.   I can.

Q.   What is it?

A.   It's an e-mail from me to Jason Rimland and Tim Dockery cc'ing Brian Keane about the Uluru warrants and comp shares to Yorkville Advisors.

Q.   What do you mean by comp shares?

A.   Comp shares on the SEDA.

MR. ROSENBAUM:   Comp shares on?

A.   Comp shares from the standby equity distribution agreement.  I don't know why I put that in there.  It could be erroneous.  These are clearly referring to the warrants.

Q.   Do you see the first sentence that

Page 100

CHRISTOPHER J. MALONEY

you wrote?

A.   Yes.

Q.   Is that referring to the signature pages of the warrants that we just saw in Exhibit 9, Exhibit 8 and Exhibit 7?

Now you have exhibits 7, 8 and 9 before you.

A.   It doesn't involve Exhibit 7.

Q.   That would probably be correct because Exhibit 7 is the one that went to Prenox?

A.   Is that a question?

Q.   Yes.

A.   Yes.

Q.   So having read this e-mail in Exhibit 10, does it refresh your recollection as to whether you received the signature pages of the Oxford warrants, that is Exhibit 8 and Exhibit 9, to your office?

A.   Yes, it does.  Probably it was either Keane got them or I got them.  Someone got them.  Probably Keane because his relationship was with Dan Leonard.

Q.   When Mr. Keane got them was he in Yorkville's offices?

Page 101

CHRISTOPHER J. MALONEY

A.   I don't know that.

Q.   Does Mr. Keane work in the same offers as you do?

A.   Yes, he does.  In the same -- yes, same office.

Q.   I don't mean --

A.   We are not office partners, but we work in the same facility together.

Q.   Thank you, okay.

Is it correct to say that the signature page for both the Oxford warrant to Yorkville and the Oxford warrant to HH Advisors was sent to Yorkville?

A.   Yes.

Q.   Did someone at Yorkville then deliver the HH Advisors signature page to HH Advisors?

A.   Ask me that again.  I zoned out.

Q.   That is okay.

After Yorkville received the signature page of the HH Advisors warrant, and that is Exhibit 8, did someone from Yorkville deliver that signature page to HH Advisors?

A.   I don't know.  First of all my -- this e-mail does not state that I received the

Page 102

CHRISTOPHER J. MALONEY

signature page for the HH Advisor warrants.

Q.   Which signature pages does this e-mail state that you received?

A.   It doesn't -- I don't know from this e-mail.

Q.   But you do know that you did not receive the Prenox warrant signature page because you said that already; is that correct?

A.   Yes, we wouldn't -- no, I don't believe I said that.  Did I say that?  I don't believe I said that.

Q.   Is it possible that you received the Prenox?

A.   It is possible -- it is possible that we received all three.  It possible that we received just the warrants on Yorkville, but I imagine --

MR. ROSENBAUM:  Don't guess, if you know, you know.  If you don't know, don't guess.

A.   I don't know which signature pages we received.  I'm not looking at my records right now, so I can't answer that question.

Q.   Well continuing with your e-mail, are you referring to the two warrants that I just

Page 103

CHRISTOPHER J. MALONEY

mentioned, the one to Yorkville and the one to HH Advisors in the body of your e-mail in Exhibit 10?

A.   Well, this e-mail would only, as I read this, it would only refer to the signature pages for the Yorkville Advisors warrant, as I read it.

Q.   How many signatures pages are there on the Yorkville Advisors warrant?

A.   One.  We just looked at them.

Q.   Exactly.  So it can't refer to just one page if you wrote signature pages; is that correct?

A.   Semantically, yes, it is correct.

Q.   So your e-mail refers to more than one signature page?

A.   Right, but as I stated earlier, counselor, I don't know which pages came in. They all could have come in, I don't know.  I don't know the answer to that.

Q.   I understand.  Continuing again, what are you saying in the rest of your e-mail in Exhibit 10?

MR. ROSENBAUM:  You want him to read

Page 104

CHRISTOPHER J. MALONEY

it to you?

MR. VENTURINI:  No, I want to know what it means, what this is all about.

MR. ROSENBAUM:  What is the purpose of the e-mail?

MR. VENTURINI:  Yes.

A.   These are the combined warrants of Yorkville Advisors and HH Advisors, just as it says.  And it says Adam Gottbetter's claim on Highgate's participation.

Q.   The claim is 414,400 warrants?

A.   That is what it says there.

Q.   Is it your understanding that as of this date, April 7, 2006 Yorkville still consented to the issuance of the 414,400 warrants to HH Advisors?

A.   As I stated in my previous testimony before, --

Q.   I think it's a yes or no question.

MR. ROSENBAUM:  You don't have to answer it yes or no.  Answer it anyway you can.

THE WITNESS:  Can I hear the question again, please?

(Requested portion of record read.)

Page 105

CHRISTOPHER J. MALONEY

A.   The answer is yes to that.

MR. ROSENBAUM:  Off the record.

(Discussion off the record.)

Q.   Does this e-mail also address the amount of the warrants that should be issued to Yorkville Advisors?

A.   Yes.

Q.   Was there a prior discrepancy in the exact amount of the warrant that was ultimately issued?

A.   Yes.

Q.   Are you trying to bring that error to Mr. Rimland and Mr. Dockery's attention?

A.   As it relates to these two warrants, Tim in a previous e-mail had the 1-518 number wrong.

Q.   Was the warrant ultimately issued correctly?

A.   According to who?

Q.   Well, according to your e-mail.

A.   According to the e-mail, yes.  Not according to me.

Q.   And you're referring to the issue --

A.   The issue that I brought up earlier

Page 106

CHRISTOPHER J. MALONEY

and as I referred to Mark Angelo --

Q. I understand.

MR. VENTURINI: Mark this as --

MR. ROSENBAUM: He is not finished.

MR. VENTURINI: He is going off on a tangent.

MR. ROSENBAUM: We had a rule if you don't like his answer move to strike it. He is not finished with his answer. You started to say and just finish what you were going to say.

A. 1.9 million shares, 1,933,334 should have come into Yorkville Advisors and the 414 should have never been cut to Highgate advisors.

Q. I understand that is your argument.

A. That is my argument and that is my discrepancy.

Q. That is my question and I understand that you want to make that argument.

MR. ROSENBAUM: Off the record.

Page 107

CHRISTOPHER J. MALONEY

A F T E R N O O N    S E S S I O N

1:40 p.m.

C H R I S T O P H E R    M A L O N E Y, resumed, having been previously duly sworn, was examined and testified further as follows:

BY MR. VENTURINI:

Q. I remind you that you're still under oath.

A. Sure.

I clarified the Highgate thing. Highgate is still in existence, they are not taking new money, but they are still in effect. Any positions that were in Highgate are still there. And I clarified that with Troy Rillo.

Q. So you just had a conversation with Troy Rillo?

A. Yes, I did. That is the only thing that we discussed.

Q. Did you call him?

A. I called him.

Q. And you asked him about the Highgate House Funds?

A. Yes.

Q. So prior to your conversation you

Page 108

CHRISTOPHER J. MALONEY

understood that it was closed and merged?

A. I understood that it was closed and merged into the fund.

Q. Now, you understand it's a separate entity and still in existence?

A. It is still in existence, yes, that is what I understand right now.

MR. VENTURINI: Could we have the last question and answer read back?

(Requested portion of record read.)

MR. VENTURINI: Mark this as Exhibit 11.

(Maloney Exhibit 11 for identification, Three-page e-mail string with the first e-mail on top dated April 7, 2006.)

Q. I show you what is marked as Exhibit 11. For the record it's a three-page e-mail string with the first e-mail on top dated April 7, 2006.

A. The first is on top and it goes down?

Q. No, I was doing it in terms of sight. What see first for purposes of identifying it on the record.

Page 109

CHRISTOPHER J. MALONEY

A. So I should read backwards from the last page?

Q. You could take a quick glance, my question is whether you recall these string of e-mails?

A. You need to give me some time to read this.

Q. Please.

(Witness reviewing document.)

A. Okay.

Q. Do you recall sending the e-mail that is first on the first page?

A. I don't recall sending the e-mail, but I probably sent it.

Q. Let me direct your attention to the second message on the first page where it says, original message from Timothy L. Dockery. Do you see that?

A. Yes, I do.

Q. It says to DLKS Leonard?

A. Dan Leonard.

Q. Is that the principal of Oxford that we discussed earlier?

A. Yes.

Page 110

CHRISTOPHER J. MALONEY

Q.   Do you understand that these communications are in connection with the Oxford Uluru transaction?

A.   Yes, I do.

Q.   Go back to the top e-mail where you say, "I have the original SIG pages."  Do you know what that is referring to?

A.   That would be sig pages.

Q.   Signature?

A.   Signature pages, yes.

Q.   Are you referring to the warrants that we discussed earlier?

A.   Yes.  As I stated earlier before, they obviously -- Brian obviously contacted him and got them sent to him.

Q.   Is that, looking at this does it refresh your recollection as to whether you received more than one signature page for more than one warrant?

A.   Once again, I don't know if it was just for the warrants that were due to Yorkville Advisors or if it was for all three of them.

Q.   But it seems to be a writing --

A.   Counsel, tell me where you're going,

Page 111

CHRISTOPHER J. MALONEY

I will gladly answer question.  I don't understand why you keep bringing this up so let me know where you're going so we could get out of here.

Q.   The reason why I introduced the document is to see if this e-mail string refreshed your recollection.

MR. ROSENBAUM:  About what?

MR. VENTURINI:  As to what he received.

MR. ROSENBAUM:  One or more warrants you mean?  Does it refresh your recollection?

A.   I may have just used --

MR. ROSENBAUM:  Don't guess.  The question is does this e-mail refresh your recollection as to the number of warrants that you received.  It either does or it doesn't.

A.   No.  I'm going to say no, because I don't know what this -- I don't know if it was for our warrant or all three of them, I don't know.

Q.   Does this refresh your recollection as to whether you had any conversation with anyone at Gottbetter & Partners regarding

Page 112

CHRISTOPHER J. MALONEY

Gottbetter & Partners' looking for the signature pages to the three warrants that were issued by Oxford on March 31st?

A.   Reword that for me.

MR. ROSENBAUM:  Off the record.

(Discussion off the record.)

Q.   Do you recall after receiving the signature pages, whether you sent any of the signature pages over to Gottbetter & Partners?

A.   I imagine --

MR. ROSENBAUM:  Don't guess, he wants to know what you remember.

A.   I remember sending signature pages to Gottbetter & Partners so we would receive the warrants and I sent up Jason Lagamacino, I believe that it was him, my intern, to pick up the warrants.  That is what I believe.

Q.   Is that because the body of the warrants were with Gottbetter & Partners?

A.   Yes, that's correct.

Q.   And the signature pages were with you?

A.   That's correct.

Q.   So then you sent the messenger over

Page 113

CHRISTOPHER J. MALONEY

to deliver the signature page to Gottbetter & Partners?

A.   Right.

Q.   And pick up the body of the warrant?

A.   Correct.

Q.   Having said that, does it refresh your recollection that you sent over more than one signature page to more than one warrant?

A.   Whatever was in that package.  Whatever Dan Leonard sent to us that is what went to them.  It was that so we could receive our warrants.

Q.   At the end of the day, all the parties had all the warrants they needed; is that correct?

MR. ROSENBAUM:  They needed for what?

MR. VENTURINI:  Good objection.

Q.   At the end of the day, all the parties had all the warrants to which they were entitled to from Oxford?

A.   According to the break down on the exhibit that was talked about earlier.

Q.   That is Exhibit 3, the second page?

Page 114

CHRISTOPHER J. MALONEY

A. Okay, that's fine, I understand.

Q. Do you know what Adam Gottbetter's compensation was as the portfolio manager for Highgate House?

A. Yes, I do.

Q. What is it?

MR. ROSENBAUM: What was it you mean.

Q. What was it, thank you.

A. It was he received 44 percent of all profits after expenses.

Q. How do you know that?

A. Mark Angelo told me. Mark Angelo told me after a disagreement that I had with him on Uluru where Adam was trying to make me split my banker's fees and equity and Mark told me, and it relates to your question, Mark told me there is no way that Adam Gottbetter is going to try to snake you out of your 20 percent of fees and warrants when he is getting 44 percent of the pie as well. And that is when -- that is when Mark told me what his compensation was.

Q. That is a good point. Is it correct to say that as a banker

Page 115

CHRISTOPHER J. MALONEY

for Yorkville you were entitled to 20 percent of the fees?

MR. ROSENBAUM: You mean him?

MR. VENTURINI: Yes.

Q. That is your compensation?

A. Yes, of fees and warrants.

Q. Originally the way the warrants were broken down, you were going to get 20 percent of the warrants that Oxford was issuing, that is the 5 million warrants?

A. 20 percent split 90/10 with Brian Keane.

Q. So the 20 percent would go collectively to you and Mr. Keane?

A. Would go to us once they are realized, if realized we would receive that compensation.

Q. At some point you're saying in January of 2006 Mark Angelo agreed to give 414,000 of the Oxford warrants to HH Advisors; is that correct?

A. Yes, that is correct. We covered this before.

Q. We have. Did he seek your consent

Page 116

CHRISTOPHER J. MALONEY

when he did that?

A. As I mentioned before, it was something that he just -- I think I used the term threw his hands up and said this is the way it is going to be, Chris.

Q. Did he tell you then at that point that you would not be getting the benefit of the one million warrants between you and Mr. Keane?

MR. ROSENBAUM: You already covered this.

A. The answer is yes. And unfortunately, yes.

Q. Do you know if Adam and Mark had a separate deal where Adam would get his certain percentage of the warrants on the Uluru transaction?

A. I would have -- I would not be in that loop.

Q. Did Adam ever say that you're not supposed to get the 1 million warrants?

MR. ROSENBAUM: You asked that question?

MR. VENTURINI: No, I didn't.

MR. ROSENBAUM: Answer it again. Go

Page 117

CHRISTOPHER J. MALONEY

ahead. He answered it this morning.

A. He never asked me that question, no.

Q. Did anyone at Gottbetter & Partners --

A. Never made that statement to me, sorry.

Q. Did anyone at Gottbetter & Partners ever tell that you and Mr. Keane should get less than 1 million warrants for Oxford?

A. Did anywhere where?

Q. At Gottbetter & Partners?

A. No.

Q. Did anyone at HH Advisors ever tell you that you should get less than 1 million of the Oxford warrants?

A. No, but the fact that less warrants were delivered would mean that I would get less.

Q. But the less warrants were delivered pursuant to some agreement that Mr. Angelo made?

A. It wasn't an agreement. He acquiesced because of numerous problems that he said were going on that he didn't get into.

Q. Was he having conversations with Adam at that time about whatever problems they were having?

Page 118

CHRISTOPHER J. MALONEY

A. I can't tell you that. I am not privy to that. I haven't talked to Adam Gottbetter. I saw him at a PIPEs conference and a couple of days in January. That is the last time that I talked to him.

Q. Did you at any time tell anyone at Gottbetter & Partners that you and Mr. Keane were entitled to be issued 1 million warrants collectively?

MR. ROSENBAUM: You mean in their name?

MR. VENTURINI: In their name.

MR. ROSENBAUM: You have asked him had.

MR. VENTURINI: No, I haven't.

MR. ROSENBAUM: I will not say what he answered.

MR. VENTURINI: Just note your objection.

MR. ROSENBAUM: I did.

A. Jason Rimland repeatedly said, Chris, you should take these in your name. I said that would be unethical and they felt that the firm would go out of business. They felt that if that

Page 119

CHRISTOPHER J. MALONEY

was the case or if I was to leave that firm I should have them issued in my name and ethically and morally I could not do that.

MR. ROSENBAUM: Off the record.

(Discussion off the record.).

MR. VENTURINI: Mark this as the next exhibit. Exhibit 12.

(Maloney Exhibit 12 for identification, two-page document e-mail string dated March 30, 2006 page 2 is blank.)

MR. VENTURINI: For the record Exhibit 12 is a two-page document e-mail string page 2 is blank. Page 1 begins with was an e-mail dated March 30th, 2006 at 1:47 p.m.

Q. Have you seen these e-mail strings before?

A. Let me read this.

Q. Please.

(Witness reviewing document.)

A. Yes. I don't recall -- the answer is yes, I have sent these e-mails.

Q. Let me direct your attention to the one in the middle dated March 30th, 2006 at 12:05 p.m.

Page 120

CHRISTOPHER J. MALONEY

A. Okay.

Q. Where it says it is from Tim to Jason Rimland; is that correct?

A. Yes.

Q. And you were cc'd on that e-mail?

A. Yes.

Q. Do you recall receiving that e-mail?

A. I don't recall receiving it, but I don't say that I didn't.

Q. Where it says, "Jason, I just spoke to Chris about the warrant amounts." Do you recall having a conversation on March 30th, 2006 --

A. This is from him to Jason.

Q. You have to let me finish.

A. I'm sorry.

Q. Do you recall having a conversation with Tim Dockery on March 30th prior to the sending of this e-mail about the amounts?

A. No. But it goes back to what we have been talking all along.

Q. Do you see where it says the sole difference is that instead of three warrants, I'm skipping a little bit, there will be two warrants?

Page 121

CHRISTOPHER J. MALONEY

A. Yes.

Q. Do you recall having a conversation with Tim Dockery on March 30th telling him that instead of having warrants issued to you they would be issued to YAM?

A. No, but it is possible.

MR. ROSENBAUM: Don't guess.

A. The answer is no. Tim and Rimland always were, you should have these issued in your name and I just wasn't going to do that. Whether or not they wanted to know my reason, I was not going to do that.

Q. Addressing the e-mail right above that at 12:52 p.m. It says "Chris, are we cool de la." You have no idea what that means?

A. I never studied French.

Q. And you wrote back "you're always cool in my book my man.".

A. I guess I did.

Q. Do you have any reason to believe you didn't?

A. No. I never had any problem with Jason Rimland. He is a good guy.

Q. You testified earlier that there was

Page 122

CHRISTOPHER J. MALONEY

a change in the way Jason and Tim were interacting with you --

A. With the firm. I think I testified with the firm. And they were. They left the firm and they always made a number of harsh comments about Cornell after doing so. I don't recall what those comments exactly would be.

Q. Is it fair to say at the time of these e-mails you had a pretty good relationship with both Jason and Tim Dockery?

A. Yes, I had I would say a good working relationship with them. And they obviously had to deal accordingly to what Adam wanted and how he steered them.

Q. At this time did you have a good relationship with Adam Gottbetter?

A. What date is this, March 30th?

Q. March 30th.

A. The answer would be I had no relationship with Adam Gottbetter. There was not a single phone call from me to him since he left the firm on I guess it would be January 3rd or so.

Q. Is it also correct to say that you

Page 123

CHRISTOPHER J. MALONEY

have had no communication with Adam since he left Yorkville?

A. None whatsoever until the PIPEs conference last week for two -- I saw him for two seconds.

Q. Did you say hello or did he say hello?

A. Yes, we said hello.

Q. Did you ask him why he was screwing you in the Uluru transaction?

A. No, but the reason that I didn't talk to him was because he totally screwed me on this and Cenuco.

Q. Did you have any involvement in a transaction with an entity known and Charys?

A. None, whatsoever.

Q. Do you know anything about the Charys transaction?

A. None, whatsoever.

Q. Were you the banker on the Cenuco deal?

A. Yes.

Q. Was your role in the Cenuco deal similar to the role that you described in the

Page 124

CHRISTOPHER J. MALONEY

Uluru transaction?

A. No, it was not.

Q. What was different?

A. Adam chose to bring in Mike Chorske. I sourced the transaction, it came to me from one of my contacts. I sourced the transaction. Cornell was not going to be in a position to act upon that transaction and knowing that it was a consumer item, I sent it over to a gentleman by the name of Michael Zimmerman at Prentice who was also the lead investor in the Uluru transaction and then didn't hear anything about it.

The next thing I heard we got -- we received a phone call from Adam Gottbetter's secretary. He requested that she ask me if we could do her a big favor because there is going to be a meeting on Saturday and needed 10 Cornell Capital presentation books for the meeting. I said absolutely fine. I had a very good relationship with Gladys. We sent up the books. And then the following week I heard that they had a meeting with Prentice. Adam Gottbetter, Mike Chorske and they did not include me in the transaction.

Page 125

CHRISTOPHER J. MALONEY

Q. If I understand your answer correctly, you initially started out by saying that you sourced the deal; is that correct?

A. Yes.

Q. Meaning you found the company?

A. Right. The company came to me through -- from Stanford Group a contact at Stanford Group.

Q. And you pursued a possible investment in that company by Cornell?

A. I did.

Q. And then you said that Cornell could not invest in Cenuco?

A. We would not -- first of all they were very -- Stanford was very -- they wanted us to sign an NDA and our policy was we were not signing NDAs at that point and I told the banker to contact Michael over at Prentice.

Q. Is an NDA a nondisclosure agreement?

A. Correct.

Q. Who is Stanford?

A. Stanford is a broker/dealer group.

Q. Were they the broker/dealer on behalf of Cenuco?

Page 126

CHRISTOPHER J. MALONEY

A. That's correct.

Q. And you're saying that Stanford wanted the NDA?

A. Yes.

Q. Stanford wanted the NDA?

A. Correct.

Q. From Cornell?

A. Yes.

Q. And Cornell said they won't do that?

A. Yes. It was the firm's policy.

Q. So Cornell could not invest in Cenuco; is that correct?

A. Well, the fact that we were not going to sign the NDA they weren't going to show us the transaction and so Stanford told us that it is consumer related and I said speak with Michael Zimmerman, he is known on the street for doing consumer transactions.

Q. Prior to this time had you spoken to Adam Gottbetter about that possible deal?

A. Adam Gottbetter was away, from what I understand, from what I believe. As I remember I should say.

Q. Was there anyone that managed

Page 127

CHRISTOPHER J. MALONEY

Highgate House Funds besides Adam Gottbetter?

A. No. Adam was the lead portfolio manager on Highgate.

Q. Is it your understanding that Prentice then made an investment in Cenuco?

A. It was, yes. Prentice made an investment in Cenuco and I was out of the loop on all meetings.

Q. Then is it safe to say that you didn't get involved in the structuring of that transaction?

A. That is absolutely correct. Adam brought in Mike Chorske as the banker into that first meeting and that continued on with Mike as the banker.

Q. At the time Adam did that, did he know that you sourced the possible investment into Cornell?

A. Yes.

Q. How did he know that?

A. I would imagine that he found out from Michael Zimmerman because they are friendly and Zim, Michael Zimmerman and Adam met that following Saturday.

Page 128

CHRISTOPHER J. MALONEY

Q. Are you guessing?

A. No, I'm not guessing.

Q. You're guessing?

A. I said I imagine, so.

Q. Because you don't know, do you?

MR. ROSENBAUM: There is five questions there. You're guessing, you don't know.

MR. VENTURINI: He answered that one.

MR. ROSENBAUM: Which question do you want him to answer, he will answer it?

Q. You're guessing that Zimmerman told Adam that you originally sourced the deal?

A. No, it may have been Adam when they met --

Q. You don't know?

MR. ROSENBAUM: Let him finish.

MR. VENTURINI: No, because you told him -- let me finish.

MR. ROSENBAUM: No.

MR. VENTURINI: Let me finish.

MR. ROSENBAUM: No, the deposition is going to be over -- we had a rule.

Page 129

CHRISTOPHER J. MALONEY

MR. VENTURINI: No, I have to be able to speak first without you interrupting me.

MR. ROSENBAUM: We have a rule. You did --

MR. VENTURINI: We have a court reporter here -- let me finish my question.

MR. ROSENBAUM: No. No I would permit you --

MR. VENTURINI: You have to let me finish.

THE WITNESS: Ask me the question, please.

Q. The original question was, did Adam know that you sourced the Cenuco deal with Cornell originally?

A. The answer would be yes and the way he would know about that, apparently Zim e-mailed Adam and said we have this company that Maloney showed to us and Adam wasn't aware of that company and Adam called me and he said, did you go to Zimmerman with the transaction and I said yes and I got back to him with the name Cenuco. That is as I understand it.

Q. When Zimmerman e-mailed Adam were you

Page 130

CHRISTOPHER J. MALONEY

copied?

A. No.

Q. How did you learn that he e-mailed Adam?

A. From Adam.

Q. What did the e-mail say?

A. I don't know the string.

MR. ROSENBAUM: Off the record.

(Discussion off the record.)

Q. Other than sourcing the deal to Cornell on the Cenuco matter, did you play any role in the Cenuco transaction?

A. None whatsoever because Gottbetter cut me out of it and had Chorske do the work.

Q. Did Highgate House Funds invest in Cenuco?

A. The -- they did. They did a small piece, I believe.

Q. And the other piece was done by Prentice?

A. Yes.

MR. VENTURINI: Mark this as Exhibit 13.

(Maloney Exhibit 13 for

Page 131

CHRISTOPHER J. MALONEY

identification, One-page document entitled Cenuco, Inc. (ICU).)

Q. Exhibit 13 is a one-page document entitled Cenuco, Inc. and in parentheses it says ICU, have you seen this document before?

A. I don't recall seeing this document before.

Q. Did you ever have any discussions with anyone regarding the break down of warrants that were to be issued in the Cenuco transaction?

A. Yes.

Q. Who is that with?

A. With Adam.

Q. When was that?

A. Are we talking warrants or fees?

Q. Warrants.

A. Okay. Well, counselor, your question would relate to both because it would be on the split that we talked about.

Q. Okay, answer to that, that's fine.

A. Adam and myself had a conversation about some disagreements that we had -- actually I will back up from that.

We had had a meeting right before the

Page 132

CHRISTOPHER J. MALONEY

Uluru transaction was closed. Actually it was -- I think it was the day of or the day before Uluru was closing and the fees were going to be administered. Adam said to me, he said Chris, what is your impression of what you're going to get paid on the Uluru transaction. And I said 20 percent of the banker's fee and 20 percent just like the policy is at Cornell. And he says that is not going to happen. And I said what are you talking about, and he said you and I are splitting the Uluru fees.

And we had an explosive argument in his office and he said on top of which we are also splitting the fees on Cenuco where I'm getting 10 percent and Mike Chorske is getting 5 and you're getting 5. I thought that was preposterous and I also thought it was out of line about him trying to split my fee in the 11th hour.

I left the office and then I got a call from him on my cell phone approximately a half hour later and he said that on the Uluru transaction that he has changed his mind and that we are not going to split those fees. You're

Page 133

CHRISTOPHER J. MALONEY

going to keep all the fees on the Uluru transaction.

The following day I immediately went to Mark Angelo and had a full discussion with him of what took place and Mark told me that that was not going to be the case. That -- and that is when Mark told me about what Adam's compensation was and Mark thought it was completely off the wall, not only would he get his compensation but he would go after the banker's compensation as well. That was probably November or -- or October right before the Uluru transaction close.

Q. 2005?

A. That would be 2005, right.

Q. At the time when the financing closed?

A. Correct. When we funded. When every one funded.

Q. Did you get the 20 percent fee on the Uluru transaction?

A. I got 20 percent of the fee.

Q. Did you receive that?

A. Yes, I did.

MR. ROSENBAUM: Cash fee?

Page 134

CHRISTOPHER J. MALONEY

THE WITNESS:  Cash fee, correct.

Q.   Is that reflected in the second page of Exhibit 3?

A.   It reflects it collectively on the left end, left bottom, top and bottom.

Q.   So the fee was $260,000?

A.   That's correct.

Q.   So now moving to the Cenuco, what then transpired with respect to any fee that you were to get in the Cenuco matter?

A.   We had had -- we had had numerous conversations and I think at that point Adam knew that I was not a happy camper with the way in which he did that.  Bringing Mike Chorske in when he had no basis for doing that upon -- Mike had nothing to do with sourcing that transaction.

Q.   Did you ultimately receive anything on the Cenuco transaction?

A.   Yes, I did.  I received the banking fee, the 5 percent banking fee.

Q.   Is that $141,500.

A.   That's correct.

Q.   To the extent that is listed on Exhibit 13, that was correct, right?

Page 135

CHRISTOPHER J. MALONEY

A.   Yes.  In here -- I don't believe I have ever seen this exhibit, so.

MR. ROSENBAUM:  Here it says 18 and there it says 141.

A.   There were two fees.  There was a small fee paid and a larger fee paid when it closed.  The transaction took a long time to close.

Q.   So did you receive the 18,000 that is also listed in the upper left quadrant?

A.   Yes, I believe I did.

Q.   In addition to the 141,500?

A.   Correct.  And also Mike Chorske received 141,500 which should not be the case.

Q.   What did Mike Chorske do in connection with his involvement with Cenuco?

A.   I wouldn't know that, because once again I was completely cut out of the loop on Cenuco other than them answering questions as to when they thought it might close.

Q.   With respect to warrants, are you entitled to any fees from the warrants that were issued in Cenuco?

A.   Initially I was and then Mark Angelo

Page 136

CHRISTOPHER J. MALONEY

and Michael Zimmerman made -- did a, for lack of a better word, a recap of the warrants where, as I understand it, Prentice or Prenox bought out Cornell's position in the Cenuco transaction and took back the warrants.

Q.   Did you get any compensation from that transaction?

A.   From the warrants, no, I wasn't compensated on any of the warrants.

MR. ROSENBAUM:  He wants to know whether you were compensated on account of Prentice taking over Cornell's position.

A.   No.  That was a decision that Mark made and that was his decision.  That is what he told me he was doing.

Q.   Do you know if Yorkville received any compensation for transferring the warrant position over?

A.   I don't know.

Q.   Do you think if Yorkville did, you would be entitled to a percentage of that remuneration?

MR. ROSENBAUM:  That is hypothetical.

Page 137

CHRISTOPHER J. MALONEY

MR. VENTURINI:  No, it is not.

MR. ROSENBAUM:  It didn't happen.  Yes, it is.

A.   If there was a banking fee earned, according to my compensation agreement, the way the firm compensates us, yes, I would say yes.  But I'm not aware of any fee.  I have been treated very fairly at Cornell Capital.

MR. VENTURINI:  Mark this as the next exhibit, Exhibit 14.

(Maloney Exhibit 14 for identification, E-mail dated May 5th, 2006.)

Q.   Exhibit 14 is a two-page document.  It looks like an e-mail dated May 5th, 2006.

A.   Yes.

Q.   Have you seen this before?

A.   Yes.

Q.   Can you tell me what it is?

A.   It's a letter to Mark Angelo and Troy Rillo, essentially breaking down the fees that should be entitled to Yorkville as well as Adam's claim on the banker's fee which was 566,000.  And I felt it should have been calculated at 638 with the break down of 566, according to Adam, 283 to

Page 138

CHRISTOPHER J. MALONEY

him and 141-5 each to Chorske and myself.

Q. Does that reflect 10 percent of the fee going to Adam and 5 percent --

A. Five each going to us.

Q. Chorske and yourself?

A. Yes. Don't think for a moment that I ever felt good or agreed to that.

Q. I didn't ask you that question.

With respect to the very bottom where it says there should also be warrants on the banker's side.

A. That's correct.

Q. Meaning what?

A. Meaning that? Meaning that the bankers would receive warrants.

Q. That is 20 percent of the total warrants issued?

A. Right.

Q. Is 20 percent pretty standard?

A. 20 percent for bankers?

Q. Yes.

A. I don't know what the other compensation agreements are for other firms.

Q. Getting back to the Uluru

Page 139

CHRISTOPHER J. MALONEY

transaction. Is there anything that is left to be done from your end in connection with that transaction?

MR. ROSENBAUM: You said the Uluru transaction?

MR. VENTURINI: Yes.

A. The final piece where Prentice paid $3 million and refused to pay the banker's fee on that $3 million.

Q. Is that a dispute that you have with Prentice?

A. It's a dispute that Cornell had with Prentice and they came back and said they were not going to pay that fee.

Q. You mentioned a conversation that you had with Dan from Oxford yesterday.

A. No. Not Dan.

Q. Who was it?

A. Kerry Gray. I talked to my -- I talk to Kerry pretty much every other day.

Q. Kerry is now the CEO of Oxford?

A. Yes.

Q. Have you ever testified at a deposition before?

Page 140

CHRISTOPHER J. MALONEY

A. A grand jury.

Q. Other than the grand jury testimony, have you ever testified at a deposition before?

A. No.

Q. Is this your first time?

A. Yes.

Q. Have you ever testified at a trial other than the grand jury that you told me about earlier?

A. At a jury, no, I don't believe so.

MR. VENTURINI: I don't have any more questions at this time. We did get a whole slew of documents and we went through them quickly and I don't think there is anything left that we need to ask you about, but we are ending the deposition at this point.

MR. ROSENBAUM: I have a couple of questions.

EXAMINATION CONDUCTED BY MR. ROSENBAUM:

Q. Mr. Maloney, you testified in response to Mr. Venturini's questions that it is the policy of Cornell Highgate not to give warrants to bankers. Do you recall that?

A. Yes, that's correct. That is the

Page 141

CHRISTOPHER J. MALONEY

policy.

Q. What is the reason behind that policy?

A. It would have to go to -- if you had bankers with their warrants and equity, they technically could sell out before the investor and hurt the investor. So, it's a way to keep everything in check and compliant.

Q. To the extent that a banker is entitled to at least a portion of the warrant, is it your testimony that he is entitled to a portion of the monetized warrant after the stock to which it is converted is sold?

A. When that is monetized, when that warrant is converted and sold, that is when the banker is going to receive 20 percent of whatever that compensation is. It could be higher, it could be lower, it could be nothing.

Q. It depends on how much cash is received on account of the warrant?

A. On the valuation of when it is sold, that's correct.

Q. I want to talk to you for a moment about the Uluru transaction. In the Uluru

Page 142

CHRISTOPHER J. MALONEY

transaction you testified that Highgate Cornell was entitled to 1,167,000 warrants, correct?

A. Correct.

Q. Was that pursuant to a securities agreement that Highgate had with Uluru Oxford?

MR. VENTURINI: I need the amount read back.

MR. ROSENBAUM: 1,167,000.

A. Let's go to the exhibit.

Q. Exhibit 3, it should be there.

A. Can you state your question again?

Q. You said that Highgate was entitled to 1,166,667 warrants?

A. Yes.

Q. Was that pursuant to a written agreement that Highgate House had, to your knowledge?

A. Yes, that was the break down on the original warrants, yes.

Q. Ultimately you said pursuant to an agreement that Mr. Angelo reluctantly agreed to, Highgate received 1,518,000 warrants?

MR. VENTURINI: Objection to form.

A. Yes.

Page 143

CHRISTOPHER J. MALONEY

MR. VENTURINI: Mischaracterizes his testimony.

Q. In any event. Of the 1,518,000 warrants, what did Mr. Angelo tell you as it relates to the 1,167,000 warrants that Highgate was entitled to pursuant to the securities agreement?

MR. VENTURINI: Can I have the question read back?

A. I'm not getting the question.

MR. ROSENBAUM: Forget about reading it back.

Q. With respect to the warrants that Highgate was entitled to, the 1,167,000, are you with me so far?

A. The -- yes, okay.

Q. Ultimately it received 1,518,000.

A. That's correct.

Q. Out of that 1,518,000, to your knowledge had Highgate received 1,167,000 warrants?

A. Absolutely, yes. As he said to me, the bottom line is as long as Highgate gets the 1 million 166 then that is what it is going to be.

Page 144

CHRISTOPHER J. MALONEY

Q. So the minimum Highgate will get is what it was entitled to pursuant to the agreement that it entered into?

A. That's correct. And I'm screwed on the rest.

Q. Do you know of any situation other than the 414,000 Uluru warrants that were given to HH Advisors where a banker or a fund manager associated with Highgate was given warrants as opposed to the proceeds of warrants once it is sold?

A. No.

MR. VENTURINI: Let me have the question read back?

(requested portion of record read.)

Q. Approximately how many transactions were done by Highgate where Highgate received warrants during the period that you were associated with Highgate, approximately?

A. In the two-year period --

MR. VENTURINI: I don't think he said he was associated with Highgate.

MR. ROSENBAUM: You can answer the question.

Page 145

CHRISTOPHER J. MALONEY

MR. VENTURINI: Objection, mischaracterizes the testimony.

Q. You can answer the question.

A. What am I allowed to do?

Q. Answer the question.

A. I have been with Cornell Capital for two years, approximately, as I said and I would imagine in those two years, and I'm making an estimation, let's say if there were 200 transactions, I wouldn't know of any banker that received warrants directly.

Q. Mr. Venturini asked you about some sort of memo that you signed in November of this year, I guess this month, it is talking about the inability of bankers to get warrants. Do you recall that question?

A. Yes.

Q. Was that memo reflective of the theretofore existing policy of Cornell and Highgate?

A. They were reiterating of what the ongoing policy has always been or what the policy has always been.

MR. ROSENBAUM: Nothing further.

Page 146

CHRISTOPHER J. MALONEY

MR. VENTURINI:  Let me have some redirect.

MR. ROSENBAUM:  Okay.

EXAMINATION CONTINUED BY MR. VENTURINI:

Q.   You mentioned the reason behind the policy as to whether Cornell or Yorkville gives warrants to bankers.

A.   Yes.

Q.   How do you know what the policy is?

A.   How do I know what the policy is?

Q.   Yes, what is the basis for your knowledge?

A.   Of not to receive --

Q.   Exactly.

A.   Just, it is -- there is -- I'm not sure that I understand your question.

Q.   How do you know that that is the reason behind the policy?

A.   How do I know I can't get warrants in my name?

Q.   How do you know what the reason is? Let's back up.  You said the reason was with respect to having bankers trading ahead of investors, as I recall.  Do you recall that

Page 147

CHRISTOPHER J. MALONEY

testimony?

MR. ROSENBAUM:  You just gave it.

THE WITNESS:   I just said it?

A.   I'm sorry, it has been four hours now.  Can you restate the question.

THE WITNESS:  Can you come back to the question, please?

(Requested portion of record read.)

MR. ROSENBAUM:  I guess you mean who told him?

A.   How do I know what is -- restate the question.

Q.   Let's make sure that we know what we are talking about.

We are talking about the question that Mr. Rosenbaum asked whether it is the policy of Cornell not to issue warrants -- not to have warrants issued directly to bankers and then he asked you what is the reason behind the policy.

A.   Yes.

Q.   And you explained to him what the reason was behind the policy?

A.   How do I know that?

Q.   The question is, how do you know

Page 148

CHRISTOPHER J. MALONEY

that?

A.   Just because being in the business as a fiduciary you can't have all of these people out there with equity and selling it not being able to police it.  Plus compliance internally would have to be able to police that.

Q.   Did you ever have a conversation with any of the principals of Yorkville regarding the reason why Yorkville did not have warrants issued directly to bankers?

A.   I imagine in the past.  Who wouldn't want to have their warrants and equity cut to them?

Q.   The question is whether you had a conversation with any of them.

A.   I don't recall.

Q.   Do you recall seeing any communication or anything in writing which stated what Yorkville's policy was or the reasons behind the policy not to have warrants issued directly to bankers?

A.   No.

Q.   Do you know if there is a policy with respect to having warrants issued directly to

Page 149

CHRISTOPHER J. MALONEY

portfolio managers?

A.   I don't know if there is a policy or not.  I just know what is directly related to me.  My compensation.

Q.   Meaning bankers?

A.   Yes.

MR. VENTURINI:  I have nothing further.

MR. ROSENBAUM:  That's it.

MR. VENTURINI:  Thank you for your time.

(TIME NOTED:  3:15 P.M.)

_____

CHRISTOPHER J. MALONEY

Subscribed and sworn to before me this _____ day of _____, 2006.

_____

Page 150

STATE OF NEW YORK      )  Pg__of__Pgs
              ss:
COUNTY OF NEW YORK      )
    I wish to make the following changes, for
the following reasons:
PAGE LINE
____ ____ CHANGE: _____
          REASON: _____
____ ____ CHANGE: _____
          REASON: _____
____ ____ CHANGE: _____
          REASON: _____
____ ____ CHANGE: _____
          REASON: _____
____ ____ CHANGE: _____
          REASON: _____
____ ____ CHANGE: _____
          REASON: _____
____ ____ CHANGE: _____
          REASON: _____
____ ____ CHANGE: _____
          REASON: _____

---

Page 151

CERTIFICATE
STATE OF NEW YORK  )
        : ss.
COUNTY OF NEW YORK  )

    I, WILLIAM VISCONTI, a Shorthand
Reporter and Notary Public within and for the
State of New York, do hereby certify:
        That CHRISTOPHER MALONEY, the witness
whose deposition is hereinbefore set forth, was
duly sworn by me and that such deposition is a
true record of the testimony given by the
witness.
        I further certify that I am not
related to any of the parties to this action by
blood or marriage, and that I am in no way
interested in the outcome of this matter.
        IN WITNESS WHEREOF, I have hereunto
set my hand this ____ day of _____, 2006.


        _____
              WILLIAM VISCONTI

---

Page 152

EXHIBITS
DESCRIPTION                          PAGE

(Maloney Exhibit 1 for identification,
Two-page document Bates stamped number P
01516 and P 01517.)........................... 30

(Maloney Exhibit 2 for identification,
Two-page document Bates stamped P 00253 and
P 00260.).................................... 37

(Maloney Exhibit 3 for identification,
Two-page document Bates number P 005993 and P
005994.).................................... 42

(Maloney Exhibit 4 for identification,
One-page document reflecting two e-mails
both dated March 30th, 2006.)................. 76

(Maloney Exhibit 5 for identification,
Seven-page document entitled warrant to
purchase common stock of Oxford Ventures,
Inc..)........................................ 80

---

Page 153

EXHIBITS
DESCRIPTION                          PAGE

(Maloney Exhibit 6 for identification, A
warrant to purchase common stock, 3.833333,
to Prenox.)................................... 81

(Maloney Exhibit 7 for identification,
Warrant for 3,066,667 shares of common
stock issued to Prenox on October 14th.)...... 84

(Maloney Exhibit 8 for identification,
Warrant to purchase common stock for 414,
400 shares granted to HH Advisors LLC.)....... 86

(Maloney Exhibit 9 for identification,
Warrant to purchase 1,518,934 of common
stock of Oxford Ventures and it is issued
to Yorkville Advisors LLC.).................. 87

(Maloney Exhibit 10 for identification, one
page e-mail dated April 7, 2006.)............. 99

---

Page 154

EXHIBITS

DESCRIPTION                              PAGE

(Maloney Exhibit 11 for identification,
Three-page e-mail string with the first
e-mail on top dated April 7, 2006.).......... 108

(Maloney Exhibit 12 for identification,
two-page document e-mail string dated March
30, 2006 page 2 is blank.)................... 119

(Maloney Exhibit 13 for identification,
One-page document entitled Cenuco, Inc.
(ICU).)..................................... 130

(Maloney Exhibit 14 for identification,
E-mail dated May 5th, 2006.)................ 137

Page 155

REQUESTS BY COUNSEL                      PAGE

(RULING)..................................... 63

(RULING)..................................... 67

**A**

able 28:9 129:3
148:6,7
absence 34:13
absolutely 27:20
32:16 35:12
62:12 124:20
127:13 143:23
Access 79:4
account 12:24
136:12 141:21
accounting 96:16
acquiesced
117:21
acquirer 39:13
acquisition 78:7,7
acronym 6:22
act 124:8
action 1:8 4:15,17
5:19 19:2,3 20:9
20:17 21:2
151:16
actions 60:15
Adam 1:9 5:22
15:13 21:17
23:17 24:3,23
27:10,25 32:25
35:2,11 36:23
49:8 50:4 57:2
57:12 58:11
59:2 61:4 70:22
72:12,13 73:11
73:12,13,22
89:22,25 90:4
104:10 114:3,16
114:19 116:14
116:15,20
117:23 118:3
122:14,17,21
123:2 124:5,15
124:23 126:21
126:22 127:2,3
127:13,17,24
128:15,16
129:14,19,20,21
129:25 130:5,6
131:14,22 132:5

134:13 137:25
138:4
Adam's 44:8,9
60:15 133:8
137:22
addition 135:13
address 4:7 105:5
Addressing
121:14
administer 3:13
administered
132:5
advisor 12:17
15:21 102:2
advisors 1:5,9
5:16 6:17,19,20
6:21,24,25 7:19
7:21 12:25
21:19 27:9,12
46:18 47:18,24
50:2 52:22
55:22,25 66:20
71:3 73:10,20
74:5 76:22 87:3
87:7,21 88:4,18
88:20 89:19
94:25 95:22,23
99:17 101:13,17
101:17,21,23
103:3,7,10
104:9,9,17
105:7 106:13,14
110:23 115:21
117:13 144:9
153:15,20
Advisor's 56:8
Aeronautical
16:7
affect 52:23 54:8
96:17
agitated 49:6
agreed 3:2,6,10
35:24 115:20
138:8 142:22
agreement 60:18
60:22 99:22
117:19,20

125:20 137:6
142:6,17,22
143:8 144:3
agreements
138:24
ahead 34:6 117:2
146:24
allegation 25:9
allegations 22:25
50:23
allege 24:3
allegedly 24:16
allocation 54:7
allowed 51:23
145:5
amount 10:3
40:23,23 81:13
84:23 85:6
105:6,10 142:7
amounts 120:12
120:19
and/or 63:20
Angelo 2:14 7:22
8:19 9:3 20:14
21:6 22:12
27:19 34:16
43:2 48:7,18
49:3,5 58:8
94:19,23 96:24
106:2 114:14,14
115:20 117:19
133:5 135:25
137:20 142:22
143:5
Angelo's 34:9
answer 4:22 8:9
14:17 19:21,21
19:22 20:12,13
23:15 24:17,18
36:18 48:24
50:21 52:9 55:8
55:12,13,14,16
56:19,22 58:14
58:15,16,22
59:7,9,15,18
62:5,20 63:9
65:15 66:3,4

68:4,9 69:6,13
71:13,14,17
78:5 85:25 91:3
91:14,25 92:3,6
92:7,8,12,13
93:12,21 94:17
95:13 102:23
103:21 104:22
104:22 105:2
106:9,10 108:10
111:2 116:12,25
119:21 121:9
122:20 125:2
128:13,13
129:17 131:21
144:24 145:4,6
answered 59:17
61:24 77:3
79:11 92:10
96:14 117:2
118:18 128:10
answering 48:19
59:13 135:20
anybody 67:14
anyway 104:22
Apartment 4:10
apparently
129:18
appears 76:17,19
appreciate 36:3
approval 34:6,9
34:15
approve 34:13,16
approved 34:19
approximately
8:12 9:12 10:15
13:20 15:12
17:16 132:22
144:17,20 145:8
April 99:7,10
104:15 108:16
108:20 153:23
154:7
argue 64:20
argument 51:4,8
106:15,16,19
132:13

Arithmetically
56:3
Arizona 13:10,23
Aside 25:9
asked 24:11 38:13
59:14 61:21,23
63:11,14,24
64:22 65:22
68:13 69:11
71:7 75:24 76:2
76:18 77:5
95:14,19 97:23
107:22 116:22
117:3 118:14
145:13 147:17
147:20
asking 4:16 59:5
75:4
Aspeck 15:13
assets 78:23,25
associated 144:10
144:20,23
Associates 1:22
2:7
attachment 42:12
attention 31:8
34:4 43:25
105:14 109:16
119:23
attitude 72:20
attorney 35:10
75:19
attorneys 2:3,8
3:3 35:4,15
attorney-client
19:25
August 2:10 4:14
58:19
authority 94:12
94:14 95:10,14
96:11,15,22
97:9
authorized 3:12
auto 31:14,15
Avenue 1:22 2:8
aware 6:14,15,16
18:15 41:18

129:20 137:8
a.m 1:15

**B**

B 45:16 152:2
153:2 154:2
back 8:2 14:5,17
14:22,25 15:14
20:7 25:7 33:2
36:18 45:12
48:24 50:9 52:9
54:14 58:18
65:12 68:17
71:19 84:16
89:10 90:10
93:21 94:3
108:10 110:6
120:20 121:18
129:23 131:24
136:6 138:25
139:14 142:8
143:10,13
144:15 146:23
147:7
background 16:3
backwards 30:25
109:2
bad 23:19 24:23
balance 47:2
banker 7:10 8:16
29:12,17,20
32:9,20 33:3,24
53:5 56:13
63:12,13 65:21
114:25 123:21
125:18 127:14
127:16 141:10
141:17 144:9
145:11
bankers 26:21
28:18 32:18
40:17,20 48:14
62:16 64:23
67:2 69:11,16
69:23 70:12,13
138:16,21
140:24 141:6

145:16 146:8,24
147:19 148:11
148:22 149:6
banker's 25:19
27:3 54:3,10,18
61:16 70:23
114:17 132:8
133:11 137:23
138:12 139:9
banking 8:21,22
25:16 43:16
45:16,22 46:11
54:15,22,24
55:3 134:20,21
137:5
**Barney** 15:17,18
based 85:2
basically 58:9
basis 134:16
146:12
**Bates** 30:6,9
37:13,16 42:7
42:10 152:6,10
152:14
**BBA** 16:18
**Beach** 16:8
**Bear** 13:16,17,19
13:25 14:2,5,7
14:20,21,24,25
15:10,10,15,15
15:20
**Beckman** 7:23
97:5
beginning 15:2
93:19
begins 119:14
behalf 62:7
125:24
belief 89:21
believe 5:23 6:5
6:19,23 15:8
19:7,16 43:22
50:10,17 64:17
73:6,21 79:21
81:5,7 86:11
89:5 90:17
102:11,12

112:17,18
121:21 126:23
130:19 135:2,12
140:11
benefit 57:10 58:3
60:12 62:8
116:8
best 24:18 51:19
better 15:7 136:3
big 124:17
bit 120:24
blank 119:11,14
154:11
blood 151:17
body 103:3
112:19 113:5
book 121:19
books 37:25 38:4
76:4 124:19,21
bottom 54:21
76:15 134:6,6
138:10 143:24
bought 136:4
branch 12:4,5,14
break 4:20,23
36:11,13,15
38:7 40:22 44:6
44:7 48:4 52:16
52:17,18,22
53:7,7 54:6
62:10 77:18
82:14 84:2,2,3
84:12 113:23
131:10 137:25
142:19
breaking 57:3
137:21
**Brian** 26:21,24
28:19 29:13,14
31:4,9,11,17
61:5 98:22,25
99:15 110:15
115:12
bring 15:19
105:13 124:5
bringing 111:3
134:15

broken 39:24
47:7,12 53:11
115:9
broker 12:17
brokers 10:2
12:22,23,25
broker/dealer
9:20 17:7,9,12
17:18,23 18:12
125:23,24
brought 5:16
13:23 34:3
86:14 105:25
127:14
**BUDD** 2:3
Budget 15:9
Burnham 15:16
15:17
business 9:15
15:8 16:18
18:16 72:4
118:25 148:3
buy 78:22,24

**C**

C 2:2,10 4:2
107:4 151:2,2
calculated 137:24
California 13:9
17:3
call 26:11 107:20
122:22 124:15
132:22
called 6:9 21:10
29:24 107:21
129:21
calls 91:24
camper 134:14
capable 92:10
capacity 7:9 8:14
Capital 6:2,3,4,6
6:7 7:4 18:17
32:9 45:6 48:11
89:23 90:25
124:19 137:9
145:7
caption 31:16,24

card 18:16
career 15:3
case 5:15 58:7
79:21 93:15
119:2 133:7
135:15
cash 24:6,7,9 46:2
46:19 133:25
134:2 141:20
Cayman 1:6
cc'd 120:6
cc'ing 99:15
cell 132:22
center 12:15,16
Cenuco 25:18
26:3 123:14,21
123:24 125:14
125:25 126:13
127:6,8 129:15
129:23 130:12
130:13,17 131:3
131:5,11 132:15
134:9,11,19
135:17,20,24
136:5 154:14
CEO 32:23 37:8
74:5 139:22
certain 10:25
56:24 116:15
certify 151:9,15
change 11:13
76:23 84:2,3,23
95:16,18,21
122:2 150:8,10
150:12,14,16,18
150:20,22
changed 6:24
39:7 132:24
changes 150:5
**Charys** 36:2
50:24 66:13
123:16,18
chatter 23:24,25
check 141:9
**Chorske** 1:12
5:22 25:18
124:5,24 127:14

| | | | | |
|---|---|---|---|---|
| 130:15 132:16 | 113:1 114:1 | 15:25,25 | communications | 24:13 26:4 50:7 |
| 134:15 135:14 | 115:1 116:1 | client's 35:14 | 20:4 110:3 | 70:22 |
| 135:16 138:2,6 | 117:1 118:1 | close 34:23 77:8 | comp 99:16,18,19 | connection 25:3,5 |
| chose 124:5 | 119:1 120:1 | 79:13 90:13 | 99:20,21 | 26:14 33:18 |
| Chris 28:4 53:15 | 121:1 122:1 | 133:13 135:9,21 | companies 33:8 | 34:20 38:19 |
| 116:6 118:22 | 123:1 124:1 | closed 77:9,10,13 | company 1:5,6,10 | 52:15 79:13 |
| 120:12 121:15 | 125:1 126:1 | 79:24 89:22 | 7:8,18 11:10 | 80:2 83:15 97:8 |
| 132:5 | 127:1 128:1 | 90:6 96:6 108:2 | 15:18 26:9 | 110:3 135:17 |
| Christopher 1:20 | 129:1 130:1 | 108:3 132:2 | 33:11,14,15 | 139:3 |
| 4:9 5:1 6:1 7:1 | 131:1 132:1 | 133:17 135:8 | 34:25 39:5,6,11 | consecutive 14:11 |
| 8:1 9:1 10:1 | 133:1 134:1 | closing 77:17,17 | 41:15 64:13 | 14:12 |
| 11:1 12:1 13:1 | 135:1 136:1 | 77:23 79:16,16 | 78:21,25 79:3 | consent 115:25 |
| 14:1 15:1 16:1 | 137:1 138:1 | 87:14 132:4 | 83:19 125:6,7 | consented 104:16 |
| 17:1 18:1 19:1 | 139:1 140:1 | coach 93:9,11 | 125:11 129:19 | considered 90:25 |
| 20:1 21:1 22:1 | 141:1 142:1 | code 4:11 | 129:21 | considering 43:15 |
| 23:1 24:1 25:1 | 143:1 144:1 | collectively | compared 81:6 | consist 54:2 |
| 26:1 27:1 28:1 | 145:1 146:1 | 115:15 118:10 | compensated | consumer 124:10 |
| 29:1 30:1 31:1 | 147:1 148:1 | 134:5 | 136:10,12 | 126:17,19 |
| 32:1 33:1 34:1 | 149:1,16 151:10 | college 16:6 | compensates | contact 125:8,19 |
| 35:1 36:1 37:1 | CIBC 10:13,14 | combination | 137:7 | contacted 110:15 |
| 38:1 39:1 40:1 | 11:13,14,17,24 | 90:14 | compensation | contacts 124:7 |
| 41:1 42:1 43:1 | 12:8,9 | combined 78:19 | 23:19 28:23,25 | contemplated |
| 44:1 45:1 46:1 | circumstance | 89:23 104:8 | 60:8 64:18 | 79:6 |
| 47:1 48:1 49:1 | 93:23 | come 27:21 37:4 | 114:4,23 115:6 | continue 38:2 |
| 50:1 51:1 52:1 | City 18:18 | 48:10,13 53:4 | 115:18 133:8,10 | 59:21 |
| 53:1 54:1 55:1 | Civil 1:8 | 54:4 55:9,17,21 | 133:11 136:7,18 | continued 127:15 |
| 56:1 57:1 58:1 | CJM 45:17 54:15 | 55:25 59:2 62:9 | 137:6 138:24 | 146:5 |
| 59:1 60:1 61:1 | 54:22 | 70:16,21 94:14 | 141:18 149:5 | continuing 40:12 |
| 62:1 63:1 64:1 | claim 104:10,12 | 94:16 98:21 | complaint 50:24 | 102:24 103:22 |
| 65:1 66:1 67:1 | 137:23 | 103:20 106:13 | complete 34:3 | conversation 37:8 |
| 68:1 69:1 70:1 | clarification 70:6 | 147:7 | 78:7 | 48:3,6,18 49:3,4 |
| 71:1 72:1 73:1 | 95:20 | coming 19:9 | completed 34:24 | 49:16 50:6 |
| 74:1 75:1 76:1 | clarified 107:11 | 27:24 48:9,12 | completely 25:19 | 51:10 60:4 |
| 77:1 78:1 79:1 | 107:15 | 53:9 57:24 99:2 | 48:7 72:10 | 67:20 68:2,6,23 |
| 80:1 81:1 82:1 | clarify 24:5 69:24 | comments 122:7 | 133:9 135:19 | 77:6 92:22 |
| 83:1 84:1 85:1 | 69:25 70:5 | 122:8 | compliance 18:14 | 94:23 97:7 98:4 |
| 86:1 87:1 88:1 | 73:23 74:19 | common 80:10,14 | 148:6 | 98:11,24 107:16 |
| 89:1 90:1 91:1 | 77:17 82:13 | 81:14,22 82:4 | compliant 141:9 | 107:25 111:24 |
| 92:1 93:1 94:1 | 83:11 95:5 | 84:10,20 87:2,6 | comport 89:16 | 120:13,17 121:3 |
| 95:1 96:1 97:1 | clarifying 65:18 | 88:3,17 152:23 | composition | 131:22 139:16 |
| 98:1 99:1 100:1 | clear 53:14 59:4 | 153:6,10,14,18 | 27:24 | 148:8,16 |
| 101:1 102:1 | clearly 72:14 | commonly 6:9,10 | CONDUCTED | conversations |
| 103:1 104:1 | 99:24 | 9:19 | 140:20 | 22:11,15 71:23 |
| 105:1 106:1 | client 9:24 21:11 | communication | conference 118:4 | 72:25 92:17 |
| 107:1 108:1 | 35:11,12 74:4 | 20:2 62:14,21 | 123:5 | 117:23 134:13 |
| 109:1 110:1 | clients 10:4,5 | 62:25 63:2 64:8 | conjunction 79:5 | converted 141:14 |
| 111:1 112:1 | 11:8,9 13:3 | 123:2 148:19 | connected 22:24 | 141:16 |
| | | | | |

**cool** 121:15,19
**copied** 130:2
**copy** 20:19 43:2,4
**Cornell** 6:2,3,4,6
  6:7 7:3,12,16
  8:8 18:17 22:24
  23:18 24:24
  32:9 34:10,12
  39:21 41:12,21
  48:10 72:3,23
  78:9,10,12
  89:23 90:8,14
  90:25 91:13
  94:2,7,8 95:12
  96:6,8,13 122:7
  124:8,18 125:11
  125:13 126:8,10
  126:12 127:19
  129:16 130:12
  132:9 137:9
  139:13 140:23
  142:2 145:7,20
  146:7 147:18
**Cornell's** 136:5
  136:13
**corporate** 5:25
  10:20,23 31:18
  32:9
**correct** 5:4 6:20
  7:5,8,15 8:15,17
  9:21 11:5,11,18
  11:19,21 13:4
  18:11,17,19,21
  19:18 28:14,18
  29:23 32:14,17
  32:19 34:8
  38:20,24 39:14
  39:24 40:4,5,8
  40:11,15,21,25
  42:25 43:6,11
  43:14,16 44:19
  44:24 45:3,14
  45:23 52:17
  53:22,25 56:10
  56:11 60:21
  73:18 75:6
  79:18 81:3,5,11

83:5,9,14,17
84:5 85:7 86:22
87:13 88:24
90:22,23 91:5
94:13,22 95:9
95:25 96:2,3,6,7
98:2,3,11
100:10 101:11
102:9 103:14,15
112:21,24 113:6
113:16 114:25
115:22,23 120:4
122:25 125:4,21
126:2,7,13
127:13 133:18
134:2,8,23,25
135:14 138:13
140:25 141:23
142:3,4 143:19
144:5
**correctly** 28:11
  105:19 125:3
**correspond** 85:4
  87:22
**correspondence**
  51:5
**counsel** 4:25
  19:21,22 20:4
  22:18,22 33:17
  36:25 62:25
  63:4 64:8,8,10
  67:22 88:8
  110:25 155:2
**counselor** 103:19
  131:18
**COUNTY** 150:4
  151:5
**couple** 73:16
  118:5 140:18
**course** 51:8,17
**court** 1:2 3:15
  5:12 129:6
**cover** 37:24
**covered** 87:16
  115:23 116:10
**Cowan** 15:18,19
**crash** 15:16

**crazy** 27:20
**curious** 86:17
**current** 5:24 17:3
**currently** 17:6
**customers** 15:24
**cut** 27:12 55:22
  58:19 66:20
  106:14 130:15
  135:19 148:13
**cuts** 15:9
**cutting** 25:17,19
  27:18,25 50:4
  57:4

---
**D**

**D** 4:10
**Dan** 89:3,6,9
  98:23 100:23
  109:22 113:11
  139:17,18
**date** 19:12 49:21
  71:22 73:18
  82:20 85:17
  90:15,19 104:15
  122:18
**dated** 76:9,11
  82:11,20 99:7
  99:10 108:16,19
  119:11,15,24
  137:13,15
  152:19 153:23
  154:7,10,18
**David** 7:23 8:23
  63:3,4
**day** 20:19 67:3
  113:14,20 132:3
  132:3 133:4
  139:21 149:19
  151:20
**days** 73:16 118:5
**Daytona** 16:8
**de** 121:16
**deal** 24:9 32:15
  35:4 66:13
  77:22 79:14
  94:7 116:15
  122:14 123:22

123:24 125:4
126:21 128:15
129:15 130:11
**dealing** 51:8
**dealings** 58:10
**deals** 10:22,24,25
  11:2,8,10 94:4
**dealt** 34:14
**decision** 94:10
  136:14,15
**Defendant** 4:15
**defendants** 1:13
  1:21 2:8 5:18
**defense** 51:23
**definitely** 60:14
  75:10
**degrees** 16:13,21
**Delaware** 1:5
**deliver** 101:16,23
  113:2
**delivered** 29:4
  82:10,13 117:17
  117:18
**department** 32:25
**departments**
  10:21
**depends** 141:20
**deposed** 21:10
  23:9
**deposition** 1:20
  3:11 4:17 20:17
  20:20,21 21:4
  58:16 74:21,24
  75:18 78:2
  128:24 139:25
  140:4,17 151:11
  151:12
**depositions** 50:23
**derived** 28:23
**describe** 16:2
**described** 33:22
  79:10 123:25
**DESCRIPTION**
  152:3 153:3
  154:3
**designed** 8:22
**detailed** 38:14

**difference** 120:23
**different** 53:8
  71:24 72:9,17
  72:19 124:4
**difficult** 24:17
**diligence** 33:13
  33:22,25 34:2,3
  37:25 38:4 76:3
**direct** 31:8 43:25
  109:16 119:23
**direction** 73:6,7,8
  73:11
**directly** 28:21
  51:5 63:13
  69:16,22 70:13
  93:25 98:16,19
  99:2 145:12
  147:19 148:11
  148:21,25 149:4
**disagreement**
  114:15
**disagreements**
  131:23
**discrepancy**
  105:9 106:17
**discuss** 50:14
**discussed** 83:23
  107:19 109:24
  110:13
**discussing** 74:16
  89:7
**discussion** 7:25
  14:15 67:9,13
  76:24 79:23
  88:13 105:4
  112:7 119:6
  130:10 133:5
**discussions** 22:23
  70:11 131:9
**dispute** 139:11,13
**distribution**
  99:22
**DISTRICT** 1:2,3
**DLKS** 109:21
**Dockery** 1:11
  5:23 35:2 50:10
  71:7 72:14,17

99:15 109:18
120:18 121:4
122:11
**Dockery's** 105:14
**document** 30:6,9
30:12,15,17,19
30:21 37:13,16
42:7,9,11,18
44:3 49:20,22
64:22 65:6,16
66:24 69:12,20
76:8,11 80:9,13
80:16,23 81:25
82:23 87:5
88:15 109:10
111:7 119:10,13
119:20 131:2,4
131:6,7 137:14
152:6,10,14,18
152:22 154:10
154:14
**documents** 28:10
29:9 32:24
34:22 75:22,25
140:14
**doing** 11:10 50:19
108:23 122:7
126:18 134:16
136:16
**downtown** 12:7
**Drexel** 15:16,17
15:17
**due** 33:13,21,25
34:2,3 37:25
38:4 76:3
110:22
**duly** 4:3 107:5
151:12
**duties** 9:25

**E**

**E** 2:2,2 4:2,2
107:2,2,4,4
151:2,2 152:2
153:2 154:2
**earlier** 20:18
33:22 38:23

40:14 44:23
53:23 79:10
83:8 85:3 97:3
103:18 105:25
109:24 110:13
110:14 113:24
121:25 140:10
**earmarked** 48:14
61:16
**earned** 137:5
**ease** 82:7
**easier** 80:19
**East** 4:9
**education** 16:23
**educational** 16:2
**effect** 3:14 65:23
107:13
**effort** 10:19
**Eicke** 7:22
**either** 22:12,24
41:21 58:15
96:13 100:20
111:18
**Emerald** 17:9,15
17:20,25
**Emmory** 16:4,7
**employed** 7:19
8:14 32:11
**employer** 60:22
88:23
**ended** 15:10
**entered** 144:4
**entire** 10:19
**entirely** 13:25
**entities** 6:13
**entitled** 27:21
40:6,9 49:10
55:6 80:9,13
113:22 115:2
118:9 131:2,5
135:23 136:22
137:22 141:11
141:12 142:3,13
143:7,15 144:3
152:22 154:14
**entity** 6:11,12 7:3
72:23 73:21,22

92:18 94:11
108:6 123:16
**equally** 28:2 49:5
**equity** 6:7 99:21
114:17 141:6
148:5,13
**equivalent** 29:18
29:20
**erroneous** 99:23
**error** 105:13
**ESQ** 1:11,11 2:5
2:10
**essentially** 21:16
21:17 137:21
**estimation** 145:10
**ethically** 119:3
**event** 143:4
**eventually** 39:7
41:5
**evidenced** 97:12
**exact** 29:16 73:18
105:10
**exactly** 25:6 45:8
103:12 122:8
146:15
**EXAMINATION**
4:6 140:20
146:5
**examined** 4:4
107:6
**exception** 97:4
**Exchange** 9:18
**excuse** 19:20
26:16 48:11
**exempted** 1:6
**exercised** 28:24
41:9 57:15
**exhibit** 30:4,5,9
37:11,12,15
42:5,6,9 49:23
52:15,16 54:8
54:25 55:4 71:4
71:5 74:3 76:6,6
76:7,10 80:7,7,8
80:13 81:17,20
81:21,25 82:25
83:2,6,6,12 84:4

84:7,8,18,18
85:3,10,12,15
85:22,24 86:13
86:24,25 87:5
87:20,24,25
88:15 89:14,16
91:10,12 94:11
97:15,22,23
98:15 99:5,6,10
100:6,6,6,9,11
100:15,18,18
101:22 103:4,24
108:13,14,18
113:24,25 119:8
119:8,9,13
130:24,25 131:4
134:4,25 135:3
137:11,11,12,14
142:10,11 152:5
152:9,13,17,21
153:5,9,13,17
153:22 154:5,9
154:13,17
**exhibits** 83:23
100:7
**existence** 42:2
107:12 108:6,7
**existing** 65:18
67:8 145:20
**expenses** 114:12
**expert** 86:9
**expired** 17:4,5
**explained** 147:22
**explanation**
59:19
**explosive** 132:13
**extent** 134:24
141:10
**e-mail** 30:11,12
30:21 42:12,20
42:23 43:7,12
43:17 48:2
53:14 92:21
95:20 97:12,13
97:18,19,25
99:7,10,11,14
100:15 101:25

102:4,6,24
103:3,5,16,23
104:6 105:5,16
105:21,22
108:15,16,19,19
109:12,14 110:6
111:7,16 119:10
119:13,15,16
120:6,8,19
121:14 130:7
137:13,15
153:23 154:6,7
154:10,18
**e-mailed** 129:18
129:25 130:4
**e-mails** 30:18
31:6 42:14 76:9
76:11,12 109:6
119:22 122:10
152:18

**F**

**F** 2:4 107:2 151:2
**facility** 101:9
**fact** 20:5 42:14
48:8,16 58:12
117:16 126:14
**fair** 97:6 122:9
**fairly** 137:9
**fall** 58:24
**falls** 58:25
**familiar** 27:11
**far** 41:19 44:13
44:14 82:8
86:18,20 143:16
**favor** 124:17
**fax** 80:22
**fee** 25:16,19,20
27:3 45:17,22
46:11,19 54:3
54:10,15,18,19
54:22,24 55:3
56:9 61:16
70:24 132:8,19
133:20,22,25
134:2,7,10,21
134:21 135:7,7

137:5,8,23
138:4 139:9,15
**feel** 75:11
**feeling** 35:14
**fees** 25:21,21
63:12 114:17,20
115:3,7 131:16
132:4,12,15,25
133:2 135:6,23
137:21
**felt** 43:15 50:10
118:24,25
137:24 138:8
**fiduciary** 148:4
**fifth** 85:15
**figure** 40:12,13
**filing** 3:4
**final** 139:8
**finance** 5:25
10:20,23 31:18
32:9
**financial** 12:6,17
12:25 15:21
**financially** 57:2
**financing** 79:6
80:2 83:16
133:16
**find** 33:11
**fine** 15:5 50:25
51:14,20 114:2
124:20 131:21
**finish** 49:2 55:14
55:15 56:19,22
58:15,16,22
63:19 71:14
92:11 106:11
120:15 128:19
128:21,23 129:7
129:11
**finished** 48:19
58:23 71:14,16
81:18 106:5,10
**firm** 9:17 10:19
12:17,22 15:13
17:23 18:14
19:7 20:7,11
22:17 23:18,21

23:25 26:16,25
27:25 29:21
32:25 33:17
36:24 44:8,9
56:15,17 57:5
57:16 62:6
66:25 69:12
89:23 118:24
119:2 122:4,5,6
122:23 137:7
**firms** 138:24
**firm's** 57:3
126:11
**first** 4:3,22 16:6
18:6,25 19:19
20:8 31:9,16
37:16,19 42:15
42:21 46:21
58:6 60:17
63:23 64:2
71:11 73:15
77:22 78:6,13
79:12,24 81:10
99:25 101:24
108:16,19,21,24
109:13,13,17
125:15 127:15
129:3 140:6
154:6
**five** 17:17 61:21
128:7 138:5
**Florida** 16:8
**follow** 13:24
**following** 20:19
124:22 127:25
133:4 150:5,6
**follows** 4:5 107:6
**force** 3:13
**forget** 35:13
143:12
**form** 3:7 83:6
142:24
**forth** 50:9 151:11
**found** 125:6
127:22
**four** 8:7 17:16
97:2 147:5

**French** 121:17
**Friday** 19:15,16
**friendly** 127:23
**front** 37:24,25
38:3 51:10
**frustrated** 27:23
28:3
**frustration** 58:10
**full** 27:24 76:19
133:5
**fully** 77:10
**function** 10:3,20
**fund** 6:8,9,11
27:13,15 28:3
28:22 33:10
39:21 41:5,7,9
41:14,25 46:8
48:12 49:7 55:9
55:20 62:8
78:12 89:25
90:5,14 92:25
96:3,5,8,17,18
108:4 144:9
**funded** 77:10
133:18,19
**funding** 33:9
77:20 78:6,13
78:18 79:12,15
79:24
**Funds** 1:6 26:18
27:6,17 45:2
55:21 78:11
81:9 89:20,25
90:3 91:7 95:25
107:23 127:2
130:16
**Funds/Yorkville**
21:19
**furious** 48:8
**further** 3:6,10
22:11 47:7
107:6 145:25
149:9 151:15

—————— G ——————

**general** 16:18
62:18,19

**Generally** 34:14
**gentleman** 37:3
124:10
**getting** 19:6 25:21
28:4 35:22
46:11,14 49:7
50:12 57:17,21
57:23 58:3
60:16 61:4,7,10
62:13 74:7
114:21 116:8
132:16,16,17
138:25 143:11
**give** 61:18 86:4
109:7 115:20
140:23
**given** 26:15 53:5
53:5 60:19
70:13 91:11
97:9 144:8,10
151:13
**gives** 146:7
**giving** 59:19
**gladly** 111:2
**Gladys** 124:21
**glance** 109:4
**go** 6:22 14:5 25:7
28:13,20 34:6
39:23 40:17
41:2,4 45:2,5,21
46:7,7 53:10
54:9 63:9,22
88:5 94:3 95:15
96:18 110:6
115:14,16
116:25 118:25
129:22 133:11
141:5 142:10
**goes** 108:21
120:20
**going** 15:4 20:6
20:16 21:9
35:25 36:7
40:14,23,24
49:8,9,12,13
50:2,12 51:24
52:18,23 56:20

57:10,23,24
58:7,24 59:11
60:12,20,23,25
61:2,8 64:23
67:18 71:9,10
72:4 84:24
106:6,11 110:25
111:4,19 114:19
115:9 116:6
117:22 121:11
121:13 124:8,17
126:14,15
128:25 132:4,6
132:10,25 133:2
133:7 138:4,5
139:15 141:17
143:25
**Goldstein** 67:21
68:3,11
**Gonzalez** 7:23
63:3,4,17,20
66:2 67:12
**good** 4:12,13
68:20 77:18
113:19 114:24
121:24 122:10
122:12,16
124:20 138:8
**Gottbetter** 1:9,10
5:22 21:17 24:4
27:10 35:6,8,11
44:10 50:7 57:3
58:11 70:22
71:3 73:22
89:22 111:25
112:2,10,15,20
113:3 114:19
117:4,7,11
118:4,8 122:17
122:21 124:23
126:21,22 127:2
130:14
**Gottbetter's**
32:25 36:24
104:10 114:3
124:15
**gotten** 13:22 28:5

graduate 16:21
16:23
graduated 16:5
grand 140:2,3,9
granted 87:3,7
153:15
Gray 32:22 74:4
139:20
Greenway 35:25
ground 59:22
grounds 69:7
group 125:8,9,23
guess 15:12 24:8
27:6 67:17,18
67:19 91:18
92:14,16 93:17
102:19,20
111:15 112:12
121:8,20 122:23
145:15 147:10
guessing 128:2,3
128:4,8,14
guy 28:6 121:24

**H**

H 4:2,2 107:4,4
152:2 153:2
154:2
half 132:23
hand 59:6 76:2
151:20
handled 32:23
handling 10:3
hands 58:9 116:5
handwriting
38:16,17
happen 48:15
57:25 62:8
132:10 137:3
happened 26:13
66:6 77:22
90:17,21
happy 95:7
134:14
hard 67:7
harsh 122:6
head 9:14,22

heading 44:21
45:8,20 46:21
healthcare 8:22
hear 23:23 24:3
25:5 36:6 51:4
63:25 95:17
104:23 124:13
heard 23:11,16
23:17 24:12,22
25:10 27:18
124:14,22
hedge 6:9
hello 123:7,8,9
hereinbefore
151:11
hereunto 151:19
HGH 39:18,20
HH 1:9 27:9,11
47:18 52:22
55:21,25 56:8
66:20 71:3
73:10,20 74:4
87:3,7,21
101:13,17,17,21
101:23 102:2
103:2 104:9,17
115:21 117:13
144:9 153:15
hiatus 14:19
High 10:6
higher 94:14
141:18
Highgate 1:6
21:18 26:18
27:6,16,17
39:20 41:12,22
44:6 45:2 48:12
49:7 50:2 55:20
73:14 74:5,6
78:10,11,18
81:9 89:20,21
89:25 90:3,14
90:24 91:7
95:12,25 96:12
106:14 107:11
107:12,14,22
114:5 127:2,4

130:16 140:23
142:2,6,13,17
142:23 143:6,15
143:21,24 144:2
144:10,18,18,20
144:23 145:21
Highgate's
104:11
Hills 2:4
hiring 10:2
hold 16:25 17:6
17:14,19 62:22
64:25 69:24
honestly 91:15
hour 132:20,23
hours 147:5
House 1:6 21:18
26:18 27:6,17
39:20 41:22
44:7 45:2 49:7
50:2 55:20
73:14 74:5,6
78:10,11 81:9
89:20,22,25
90:3,24 91:7
95:25 107:23
114:5 127:2
130:16 142:17
How's 32:3
Hudson 18:18
hurt 141:8
hypothetical
136:25

**I**

ICU 131:3,6
154:15
idea 121:16
identification
30:6 37:13 42:7
76:8 80:9 81:22
84:9 87:2 88:2
99:7 108:15
119:10 131:2
137:13 152:5,9
152:13,17,21
153:5,9,13,17

153:22 154:5,9
154:13,17
identify 84:18
87:5 88:15
97:21 99:11
identifying
108:25
illegally 21:18
imagine 77:7
102:18 112:11
127:22 128:5
145:9 148:12
immediately 48:6
133:4
implies 68:23
important 32:2
98:12
impression 132:6
improper 59:7
91:23
inability 145:16
inane 78:4
include 124:24
included 26:17
individually
64:11
individuals 8:7
10:6 72:15 97:8
information
90:16
initially 125:3
135:25
institute 33:21
institutional
15:14
instruct 63:8 75:3
instructing 69:5
78:5
instruction 93:18
insurance 17:4
interact 35:3
interacted 10:23
11:9 15:23
32:22 34:25,25
interacting 10:20
33:16 122:3
interaction 32:24

interest 10:25
interested 151:18
interesting 33:9
interface 13:2
intern 112:17
internally 148:6
interrupt 59:7,23
59:24,24,25
60:3
interrupted 59:20
interrupting
129:3
interruption 59:5
introduce 81:16
introduced 111:6
invest 11:10 34:7
125:14 126:12
130:16
invested 78:21,22
94:7
investment 33:10
34:13 125:10
127:6,8,18
investments 34:9
41:16,20 90:24
90:25
investor 124:12
141:7,8
investors 146:25
involve 100:9
involved 127:11
involvement
123:15 135:17
In-house 67:23
Islands 1:6
issuable 43:8,13
96:23
issuance 52:21
76:25 93:4
104:16
issue 82:16 92:19
97:10 98:13
105:24,25
147:18
issued 4:17 29:3
38:25 39:2,3
44:17,17 46:9

47:18,21 53:16
54:24 55:3 62:7
62:16 69:16
70:24 71:5,8
72:3 73:10
79:25 80:18
81:2,9 82:7,9,19
82:22,25 83:13
84:10,21 85:18
86:12,19,21
87:11,19,21
88:3,18 89:2,19
91:6,13 92:24
93:25 94:7,8,11
94:24 96:12,12
105:6,11,18
112:3 118:9
119:3 121:5,6
121:10 131:11
135:24 138:18
147:19 148:10
148:21,25
153:11,19
**issuer** 95:10
**issues** 35:21
**issuing** 115:10
**item** 124:10

_____
**J**
_____

**J** 1:20 4:2,9 5:1
6:1 7:1 8:1 9:1
10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1

58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1 75:1
76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1
102:1 103:1
104:1 105:1
106:1 107:1
108:1 109:1
110:1 111:1
112:1 113:1
114:1 115:1
116:1 117:1
118:1 119:1
120:1 121:1
122:1 123:1
124:1 125:1
126:1 127:1
128:1 129:1
130:1 131:1
132:1 133:1
134:1 135:1
136:1 137:1
138:1 139:1
140:1 141:1
142:1 143:1
144:1 145:1
146:1 147:1
148:1 149:1,16
**January** 42:21
43:18 44:13
48:3 49:16,19
53:15,16 60:5
73:15,16 97:17
97:18 115:20
118:5 122:23
**Jason** 1:11 5:23

30:23 35:2
42:23 53:14
71:7,25 72:14
73:2,3,5,5 99:14
112:16 118:22
120:3,11,14
121:24 122:2,11
**Jeff** 8:24
**Jerry** 7:22
**Jersey** 1:3 2:4
18:18,18
**John** 2:4
**joined** 13:22 14:4
18:6,13
**joining** 9:7 14:3
**Jolla** 13:9
**Judge** 35:25
**jury** 140:2,3,9,11

_____
**K**
_____

**Keane** 26:21,24
28:19 29:13
30:24 31:4,9,11
31:17 32:14
40:2,9,20,24
61:5 98:22,25
99:15 100:21,22
100:24 101:3
115:13,15 116:9
117:8 118:8
**Keane's** 29:14
**keep** 111:3 133:2
141:8
**Kennedy** 2:4
**Kerry** 32:22 74:4
139:20,21,22
**kind** 9:15 94:12
**knew** 32:8 134:13
**know** 4:19,20
5:18 6:4 8:9
17:2 20:3,22
21:25 22:4
24:15 25:2,12
29:16,25,25
30:19 32:8
41:19 44:13
48:17 53:19,21

57:22 58:12
60:11 61:6,8,10
65:5 66:19
68:12 70:3,18
70:18 72:12
73:18,20 74:8
74:23,25 75:7
75:12 82:8 83:3
83:18 86:10,18
86:20 89:18
90:15 91:2,14
91:19,19,21
92:2,14 93:6,7,8
93:12,12,13
96:15 97:16
98:17 99:22
101:2,24 102:5
102:7,20,20,20
102:21 103:19
103:20,21 104:3
110:8,21 111:4
111:20,20,22
112:13 114:3,13
116:14 121:12
123:18 127:18
127:21 128:6,9
128:18 129:15
129:18 130:8
135:18 136:11
136:17,20
138:23 144:7
145:11 146:10
146:11,18,20,22
147:12,14,24,25
148:24 149:3,4
**knowing** 124:9
**knowledge**
142:18 143:21
146:13
**known** 9:19 26:6
123:16 126:18
**knows** 93:15
**Ks** 33:15

_____
**L**
_____

**L** 1:11 4:2 26:5
107:4 109:18

**la** 13:9 121:16
**lack** 136:2
**Lagamacino**
112:16
**Laidlaw** 15:13
**larger** 135:7
**largest** 12:4
**LARNER** 2:3
**law** 20:11
**lawsuit** 19:19
20:23 21:8,12
22:5,8,11,13,25
23:12
**lead** 124:12 127:3
**learn** 18:25 20:8
58:6 130:4
**learned** 20:10,14
**learning** 22:10
**leave** 51:11 119:2
**leaves** 51:16
**leaving** 23:22
**left** 44:20 45:4,15
45:15 47:4
54:12,14,21
56:9 71:24 72:8
72:13 89:22
122:5,22 123:2
132:21 134:6,6
135:11 139:2
140:15
**legal** 32:24 33:17
**Lempert** 17:22
18:3,13
**Leonard** 81:4
89:4,6 98:23
100:23 109:21
109:22 113:11
**Leonard's** 89:9
**letter** 19:6,6,9
67:15 137:20
**let's** 14:21 36:15
48:23 50:14
53:10 54:6
59:21 63:22
68:16 77:18,21
80:6,19 81:16
82:14 142:10

145:10 146:23 147:14
**level** 33:13
**liability** 1:5,10,11
**license** 17:24
**licenses** 16:25 17:7,12,15,19 18:7
**life** 17:3
**limit** 35:25
**limited** 1:5,10,11 37:8 50:23
**line** 45:16,19 132:19 143:24 150:7
**lines** 47:8 86:8
**listed** 31:9 46:22 47:4,11 55:24 134:24 135:11
**lists** 46:11,14
**litigation** 75:8,15
**little** 31:14 120:24
**LLC** 1:5,9 6:4 87:3,8 88:4,18 95:23 153:15,20
**LLP** 1:10
**located** 35:15
**long** 8:10 9:10 10:14 12:10 13:17 17:14 28:3 49:6 135:8 143:24
**longer** 51:25 58:2
**look** 33:8 42:11 75:22,24 76:15 86:7 94:3
**looked** 32:4 103:11
**looking** 31:20 44:20 71:5 85:8 102:22 110:17 112:2
**looks** 31:14 37:24 43:14 76:18 80:20 137:15
**loop** 96:18 116:19 127:8 135:19

**lower** 45:4 141:19
**LP** 6:3
**Lynch** 15:9

_____
**M**
_____

**M** 2:5 4:2 107:4
**main** 18:20
**maintain** 17:12
**making** 145:9
**Maloney** 1:20 4:9 4:12 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1,3,5,8 31:1 32:1 33:1 34:1 35:1 36:1 37:1,12 38:1 39:1 40:1 41:1 42:1,6 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 53:15 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1,9 64:11 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1,7,10 77:1 78:1 79:1 80:1,8 81:1,21 82:1 83:1 84:1,8 85:1 86:1,25 87:1,25 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1,6 100:1 101:1 102:1 103:1 104:1 105:1

106:1 107:1 108:1,14 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1,9 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1,19 130:1,25 131:1 132:1 133:1 134:1 135:1 136:1 137:1,12 138:1 139:1 140:1,21 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1,16 151:10 152:5,9 152:13,17,21 153:5,9,13,17 153:22 154:5,9 154:13,17
**man** 121:19
**managed** 90:3 126:25
**management** 1:5 5:16 6:18,20,21 6:25 7:7,18 41:15 46:18 47:24 70:5 76:19,21,22,23 83:20 95:22
**manager** 7:3 10:12,16 11:20 11:22 12:2,3,14 12:15 73:14 114:4 127:4 144:9
**managers** 8:23 33:16 149:2
**manages** 6:11
**managing** 90:2

**March** 27:12 76:9 76:11,17,25 77:6,10,11,12 77:14 79:19 85:19 86:19 87:12,15 89:2 90:17 93:4 97:18,25 98:6 98:20 112:4 119:11,15,24 120:13,18 121:4 122:18,19 152:19 154:10
**Mark** 2:14 7:22 8:19 20:14 23:3 27:19,22 28:2 30:3 34:5,8,15 37:10 42:4 43:2 48:7,18 49:4,4,5 50:11 58:8,9,24 60:18 64:15 69:9 74:2 76:5 81:19 84:6 86:23 87:23 94:19 96:24 99:4 106:2,4 108:12 114:14 114:14,17,18,22 115:20 116:14 119:7 130:23 133:5,6,8,9 135:25 136:14 137:10,20
**marked** 30:8 80:7 80:12 81:24 84:18 87:4 88:14 98:14 99:9 108:17
**market** 15:16
**marketing** 10:18
**Mark's** 34:4,13
**marriage** 151:17
**materials** 76:3
**math** 28:8 56:6
**Matt** 7:22 97:4
**matter** 43:7,12 64:12 68:23,25

69:3 76:3 130:12 134:11 151:18
**mean** 11:6 12:21 12:23,25 24:6 25:4 33:7 34:2 35:16 44:9 45:24 55:2 70:14,15 72:19 73:9 82:10,13 86:16 99:18 101:7 111:13 114:9 115:4 117:17 118:11 147:10
**Meaning** 11:9 13:2 15:23 125:6 138:14,15 138:15 149:6
**means** 18:10 62:12 82:15 104:4 121:16
**meeting** 69:24 124:18,19,23 127:15 131:25
**meetings** 69:21 70:4,8 127:9
**member** 9:17
**members** 20:17
**memo** 145:14,19
**mention** 26:3
**mentioned** 20:18 21:9 22:8 40:13 103:2 116:3 139:16 146:6
**merged** 90:7 96:6 108:2,4
**merger** 26:10 39:9 79:7,9,17 87:14
**Merrill** 15:9
**message** 109:17 109:18
**messenger** 112:25
**met** 127:24 128:17
**Michael** 1:12 2:5

5:22 22:18
124:11 125:19
126:17 127:23
127:24 136:2
**middle** 31:10,13
31:21 38:21
39:18 59:7
81:10 119:24
**Mike** 25:18 124:5
124:23 127:14
127:15 132:16
134:15,16
135:14,16
**million** 26:17,18
26:20,23 27:2,2
38:22,25 40:6
40:12,16 44:16
44:22 45:5 47:3
52:19 53:23
54:3,8 55:2,6,23
56:2,9 57:10,18
58:3 60:13,24
61:15 62:9 71:4
74:15 78:8,9,19
79:5,25 81:14
83:7 89:15
106:12 115:11
116:9,21 117:9
117:14 118:9
139:9,10 143:25
**million-5** 53:7
**mind** 50:18 74:19
132:24
**mine** 66:12,14
**minimum** 144:2
**minus** 27:8
**mischaracterizes**
143:2 145:3
**missing** 66:7,10
66:17
**moment** 138:7
141:24
**monetized** 25:17
45:25 53:6
60:18 141:13,15
**monetizes** 41:5
**money** 24:4,5,5

78:24 107:13
**Montgomery**
41:25
**month** 62:15
63:12 145:15
**months** 15:10,14
15:16 17:16,17
18:5
**morally** 119:4
**morning** 4:12,13
117:2
**move** 59:8 106:9
**moved** 17:24
**moving** 54:14
134:9

—————— **N** ——————
**N** 2:2 4:2 107:2,2
107:2,4
**name** 4:7,14 6:22
6:24 15:13 17:9
31:14,15 35:13
35:18 37:3 39:7
65:20 72:3,7
76:19,22 86:15
89:9 118:12,13
118:23 119:3
121:11 124:11
129:23 146:21
**named** 97:3
**national** 10:12
12:2
**NDA** 125:17,20
126:4,6,15
**NDAs** 125:18
**necessary** 34:23
**need** 4:19 33:9
76:20 109:7
140:16 142:7
**needed** 113:15,17
124:18
**negative** 72:20
**net** 10:6
**never** 53:5,5
55:22 57:13
65:18 72:5 81:6
106:14 117:3,5

121:17,23
**new** 1:3,10,10,22
1:23,25 2:4,9,9
4:10,10 8:23
9:17 13:6 14:2
18:18 32:23
35:16 107:13
150:2,4 151:3,5
151:9
**newly** 8:21
**nine** 18:4
**nondisclosure**
125:20
**normal** 67:14
**Normally** 85:25
**Notary** 1:24 4:3
151:8
**note** 77:24 118:19
**NOTED** 149:13
**notes** 38:8
**notice** 1:21 4:16
20:20,21 21:4
**November** 1:15
67:5 133:12
145:14
**number** 23:21
28:6 30:7,10
42:7,10 46:25
84:22 105:16
111:17 122:6
152:6,14
**numbers** 78:8
85:4
**numerous** 23:18
24:23 33:14
71:22 72:24
117:21 134:12

—————— **O** ——————
**O** 4:2,2 107:2,2,2
107:4,4
**oath** 3:13 5:6
52:13 84:17
107:9
**object** 55:15
**objection** 61:22
61:25 113:19

118:20 142:24
145:2
**objections** 3:7
36:4 61:19
**obligated** 5:9
**obvious** 51:18
**obviously** 30:18
43:21 66:12
71:24 92:21
110:15,15
122:13
**occupation** 5:24
**occur** 90:14
**occurred** 95:4
98:5
**October** 78:15
79:12,25 80:3
80:18 81:2 82:8
82:19,23 84:10
84:21 91:6
133:13 153:11
**odd** 27:8
**offers** 101:4
**office** 18:20,22
100:19 101:6,8
132:14,21
**officer** 3:12 18:14
**offices** 1:21
100:25
**okay** 12:21 14:24
24:22 26:11,12
31:23 35:7,19
42:19 54:12
56:7 80:24 86:3
88:7,9 91:16
92:16 96:20
98:9 101:10,19
109:11 114:2
120:2 131:18,21
143:17 146:4
**once** 34:24 46:2
65:19 110:21
115:16 135:18
144:11
**ones** 44:25
**one-page** 76:8,10
131:2,4 152:18

154:14
**ongoing** 145:23
**operates** 18:17
**opinion** 51:22
**Oppenheimer**
10:13
**opportunities**
33:10
**opposed** 89:19
144:11
**oral** 51:4
**order** 37:19
**original** 91:6
95:24 109:18
110:7 129:14
142:20
**originally** 115:8
128:15 129:16
**outcome** 151:18
**outright** 57:4
**outside** 22:16,20
50:19
**overall** 79:14
**owed** 43:15
**owned** 73:22,22
**Oxford** 26:6,9
36:22,23 39:2,2
39:3,5,6,13,15
44:17 50:3 55:6
66:15 70:23
75:14 78:22
79:10 80:10,14
86:12,18 87:12
88:3,17 91:7
97:10 98:16,19
100:18 101:12
101:13 109:23
110:3 112:4
113:22 115:10
115:21 117:9,15
139:17,22 142:6
152:23 153:19

—————— **P** ——————
**P** 2:2,2 4:2 30:7,7
30:10,10 37:13
37:14,17,17

42:7,8,10,10
107:4 152:6,7
152:10,11,14,14
Pace 16:5,9,10,16
package 113:10
page 30:24 31:9
31:13,17,21
37:16,17,19,20
38:3,5,6,18,21
39:17 42:15,21
43:18,25 44:21
48:5 54:7 80:20
80:22 81:8,10
82:6 84:4 85:2
85:10,11,14,15
85:16 87:19
89:16 99:7,10
101:12,17,21,23
102:2,8 103:13
103:17 109:3,13
109:17 110:19
113:2,9,25
119:11,14,14
134:3 150:7
152:3 153:3,23
154:3,11 155:2
pages 37:21 98:19
98:25 100:5,17
102:3,21 103:7
103:9,13,19
110:7,9,11
112:3,9,10,14
112:22
paid 7:14,16
25:22 41:6
69:22 132:7
135:7,7 139:8
PaineWebber
14:22,25 15:19
paper 54:17
paperwork 20:19
parentheses
131:5
Park 1:22 2:8
Parkway 2:4
part 15:18 48:20
57:21 69:9

70:23 77:17
participated 11:4
11:6
participation
104:11
particular 10:7
parties 3:4 21:9
23:7 113:15,21
151:16
partners 1:10
44:10 71:3
101:8 111:25
112:2,10,15,20
113:3 117:4,7
117:11 118:8
partnership 1:11
parts 47:13
pay 139:9,15
payable 63:12
95:11
payment 67:2
pending 4:21
people 13:2 63:16
96:25 97:10
148:4
percent 26:22,23
26:24 27:3,7
28:17 29:3
39:23 54:15,18
57:7,18,23
114:11,20,21
115:2,9,12,14
132:8,8,16
133:20,22
134:21 138:3,4
138:17,20,21
141:17
percentage 57:22
116:16 136:22
period 13:21 18:2
144:19,21
permit 129:9
person 23:5
personally 19:10
75:12
Pg 150:2
Pgs 150:2

Pharmaceutical
79:4
phase 33:25
phone 122:22
124:15 132:22
pick 58:19 112:17
113:5
pie 114:21
piece 49:10 50:13
61:13 130:19,20
139:8
Pierce 9:9
PIPEs 118:4
123:4
place 11:8 65:18
79:19 133:6
plain 18:22
Plaintiffs 1:7 2:3
plan 17:11
play 130:12
please 4:7 25:25
29:6 42:17
53:18 61:18
78:2 90:11 95:8
104:24 109:9
119:19 129:13
147:8
Plus 148:6
point 49:25 68:19
77:18 90:21
114:24 115:19
116:7 125:18
134:13 140:17
police 148:6,7
policy 56:15,16
57:3,16 62:6
65:18,22 66:25
67:8 69:12,15
92:23 94:5,17
125:17 126:11
132:9 140:23
141:2,4 145:20
145:23,23 146:7
146:10,11,19
147:17,20,23
148:20,21,24
149:3

portfolio 8:23
33:16 73:14
114:4 127:3
149:2
portion 8:4 14:18
27:14,18 28:4
28:12,15 36:19
45:13 48:25
52:10 58:21
62:4 64:3 65:14
68:18 71:20
89:12 90:12
93:22 104:25
108:11 141:11
141:13 144:16
147:9
position 7:11
11:13 12:12
23:19 29:14,22
32:5 124:8
136:5,13,19
positions 107:14
possession 21:18
possible 70:15,15
70:18 98:21
102:13,15,15,16
121:7 125:10
126:21 127:18
post 16:21,23
Prenox 27:4
81:23 82:5
83:13,18,19
84:10,21,24
85:6,23 86:21
100:11 102:8,14
136:4 153:7,11
Prentice 26:19
27:4,8 28:13,16
29:4 40:14 45:6
49:10 78:8,18
83:16,20,21
124:11,23
125:19 127:6,7
130:21 136:4,13
139:8,12,14
prepare 75:17
preposterous

132:18
presence 19:11
22:16,16,21
50:19
present 2:13
22:22
presentation
124:19
president 5:25
7:12 8:16 29:24
31:18
pretty 122:10
138:20 139:21
previous 58:10
84:22 85:22
87:17 89:6
92:20 95:20
104:18 105:16
previously 107:5
principal 109:23
principals 7:20
8:8 17:22 97:2
98:5 148:9
printed 30:18,19
prior 9:7 10:10
12:3,8,9,16
13:13 14:3,13
20:22 69:20
105:9 107:25
120:18 126:20
private 6:7 9:24
privilege 69:8
privileged 19:25
20:5 62:23
63:18,21 64:4,6
64:9,14,17
68:24 69:2,4
privy 90:16,19
118:3
probably 18:4
25:7 67:3,6,14
67:16 95:21
100:10,20,22
109:15 133:12
problem 50:22
121:23
problems 49:13

117:21,24
**proceeds** 144:11
**process** 34:15
**produced** 37:18
**profits** 62:11
114:12
**proper** 92:18
**proxy** 79:21
**Prudential** 12:9
12:10,13,14
13:5,13,15,22
14:3,4
**public** 1:24 4:3
39:5,6,15 151:8
**purchase** 80:10
80:14 81:13,22
82:4 87:2,6 88:2
88:16 152:23
153:6,14,18
**purpose** 104:5
**purposes** 74:20
108:24
**pursuant** 1:21
117:19 142:5,16
142:21 143:7
144:3
**pursue** 51:23
**pursued** 125:10
**put** 23:18 44:8,12
44:12 78:19
99:22
**P.C** 2:3
**p.m** 107:3 119:15
119:25 121:15
149:13

**Q**

**Qs** 33:15
**quadrant** 44:20
45:4,16 46:17
47:4,11 54:13
55:25 135:11
**quality** 51:22
**question** 3:8 4:18
4:21,22 8:3
11:15 14:17
24:17,18,20

36:18 38:11,15
45:12 48:19,20
48:21,24 51:7
52:9 54:11
55:13 58:14
59:4,14,17
61:21,24 62:3
63:8,23 64:2
65:4,13,16
68:17,21 71:15
71:18 75:4 77:4
89:11 91:24,25
91:25 92:4,6,9,9
92:14 93:21
95:5 96:10,14
96:19,21 97:24
100:12 102:23
104:20,24
106:18 108:10
109:5 111:2,16
114:18 116:23
117:3 128:12
129:7,12,14
131:18 138:9
142:12 143:10
143:11 144:15
144:25 145:4,6
145:17 146:17
147:6,8,13,16
147:25 148:15
**questions** 4:16
53:18 59:5 78:4
85:25 128:8
135:20 140:13
140:19,22
**quick** 84:11 109:4
**quickly** 15:5
140:15

**R**

**R** 2:2 4:2,2 26:5
107:2,4,4 151:2
**read** 8:2,4 14:16
14:18 30:14
36:17,19 43:21
45:11,13 48:25
52:8,10 58:18

58:21 62:4 64:3
65:12,14 68:17
68:18 71:19,20
89:10,12 90:10
90:12 93:20,22
100:15 103:6,8
103:25 104:25
108:10,11 109:2
109:7 119:18
142:8 143:10
144:15,16 147:9
**reading** 18:16
30:24 58:23
91:9 143:12
**realized** 57:14
62:11,11 115:17
115:17
**really** 72:2
**reason** 43:22
82:24 83:4
86:11 89:5
111:6 121:12,21
123:12 141:3
146:6,19,22,23
147:20,23
148:10 150:9,11
150:13,15,17,19
150:21,23
**reasons** 22:7
148:20 150:6
**recall** 6:23 23:5
23:10 31:5,25
32:2 43:17,20
48:3 70:10
71:21,21,25
87:16 91:7,9
92:20,21 93:5
94:4,5,6,9,21
95:2 98:18,24
109:5,12,14
112:8 119:21
120:8,9,13,17
121:3 122:8
131:7 140:24
145:17 146:25
146:25 148:17
148:18

**recap** 136:3
**receive** 25:16
26:16,18,19,22
28:25 40:2,3
41:5 43:23 53:2
60:23 62:14
65:17 102:8
112:15 113:12
115:17 133:23
134:18 135:10
138:16 141:17
146:14
**received** 23:19,20
26:24 27:5,6,14
27:17 31:7 48:2
49:18,20 53:3
53:12 57:6,8
60:8 65:19
98:15,17 100:17
101:20,25 102:4
102:13,16,17,22
110:19 111:11
111:18 114:11
124:15 134:20
135:15 136:17
141:21 142:23
143:18,21
144:18 145:12
**receiving** 31:5
43:17,20 64:24
98:18 112:8
120:8,9
**Recess** 36:16 52:7
65:11 84:14
**recollect** 44:14
**recollection** 32:5
98:10 100:16
110:18 111:8,13
111:17,23 113:8
**record** 4:8 7:24
7:25 8:4 14:14
14:15,18 35:17
36:19 45:13
48:25 52:10
58:21 62:4 64:3
65:14 68:18
71:20 77:25

79:22,23 84:16
88:6,12,13
89:12 90:12
93:22 104:25
105:3,4 106:20
108:11,18,25
112:6,7 119:5,6
119:12 130:9,10
144:16 147:9
151:13
**records** 35:17
102:22
**redirect** 146:3
**reducing** 25:20
**Reese** 8:23
**refer** 45:17,20
103:6,12
**reference** 82:7
**referred** 26:8
35:11 37:6
38:23 44:23
83:20 106:2
**referring** 19:9
21:6 41:11
44:10 49:22
50:8 66:9,10,14
72:22 85:9
86:13 97:13
99:24 100:4
102:25 105:24
110:8,12
**refers** 103:16
**reflect** 39:22
138:3
**reflected** 57:5
134:3
**reflecting** 27:2
55:18 76:8
152:18
**reflective** 145:19
**reflects** 52:18,20
134:5
**refresh** 32:5,7
100:16 110:18
111:13,16,23
113:7
**refreshed** 111:8

refused 139:9
regarding 22:12
  22:25 48:4 50:7
  62:15 63:12
  66:25,25 69:12
  69:22 70:12
  72:25 76:25
  92:18 98:25
  111:25 131:10
  148:9
regional 12:15
registered 15:22
reissued 83:24
reiterating
  145:22
rejoining 17:11
relate 131:19
related 51:6
  126:17 149:4
  151:16
relates 50:24
  105:15 114:18
  143:6
relationship
  98:22 100:22
  122:10,13,17,21
  124:21
reluctantly
  142:22
remain 47:2
remaining 48:13
  48:14
remember 26:20
  67:15 69:17
  70:19,20 76:13
  76:14 112:13,14
  126:23
remind 52:12
  84:16 107:8
remuneration
  136:23
rep 15:22
repeat 62:2
repeatedly 118:22
rephrase 11:16
  24:20 29:7
  54:11

report 8:18,19 9:5
reported 9:2
reporter 1:24
  58:23 129:7
  151:8
represent 4:15
  64:11
representatives
  12:24
represented 4:25
  36:22,23
representing 27:7
  64:13
request 64:7
requested 8:4
  14:18 36:19
  45:13 48:25
  52:10 58:21
  62:4 64:3 65:14
  68:18 71:20
  89:12 90:12
  93:22 104:25
  108:11 124:16
  144:16 147:9
requesting 19:11
REQUESTS
  155:2
required 34:9
reread 48:23
reserved 3:8
resigned 17:8
  73:19
respect 26:2 54:7
  83:22 134:10
  135:22 138:10
  143:14 146:24
  148:25
respective 3:4
response 140:22
responsible 10:18
  73:6
rest 103:23 144:6
restate 147:6,12
resumed 107:5
retail 10:25
returned 13:20
reverse 26:10

39:8 79:7,9,17
review 33:15
  42:16
reviewing 30:15
  42:18 109:10
  119:20
revised 84:21
Reword 112:5
Riddle 16:4,7
right 6:15 15:7
  18:14 22:20
  31:21,22 37:7
  39:22 40:22
  41:3 45:7 46:17
  47:11 49:18
  55:24 59:16
  60:22 61:3
  64:21 66:22
  72:6 77:21 85:8
  86:4,6 90:5 98:9
  102:22 103:18
  108:8 113:4
  121:14 125:7
  131:25 133:13
  133:15 134:25
  138:19
Rillo 2:14 20:18
  21:7 22:12,18
  43:4 62:22 63:3
  63:6,17,18,20
  65:3 66:2 67:12
  67:22,24 96:24
  107:15,17
  137:21
Rimland 1:11
  5:23 30:23 31:3
  35:2 42:24
  43:18 53:14
  71:7,25 72:14
  72:16 99:15
  105:14 118:22
  120:4 121:9,24
ripping 35:13
role 123:24,25
  130:13
room 15:9 23:7
  51:16

Rosenbaum 2:5
  5:3 19:20 20:7
  20:10 21:3
  22:14,20 23:2
  23:13 24:6,10
  24:15 25:4
  27:15 29:5,8
  30:16 31:19
  35:6,9,20,24
  36:6 38:8,12
  41:2 45:24 46:6
  48:17,22 49:2
  50:15,18 51:7
  51:11,14,19,24
  52:3,5 53:13,19
  55:11,14,19
  56:3,5,18,22,23
  57:20 58:13,18
  58:22 59:3,12
  59:15,18,22
  61:17,20,23
  62:18,24 63:14
  63:16,19,24
  64:4,7,12,19,25
  65:5,8,15,25
  67:11,17 68:4,7
  68:10,14,19,22
  69:3,7,13,17
  70:3,17 71:12
  73:25 74:25
  75:9 77:12,15
  77:25 78:3
  79:22 80:3 82:9
  82:12 85:24
  88:11 90:7,10
  91:2,18,23 92:3
  92:8,13 93:2,6
  93:11,16 95:17
  97:21 99:20
  102:19 103:25
  104:5,21 105:3
  106:5,8,20
  111:9,12,15
  112:6,12 113:17
  114:8 115:4
  116:10,22,25
  118:11,14,17,21

119:5 121:8
128:7,12,19,22
128:24 129:4,8
130:9 133:25
135:4 136:11,24
137:3 139:5
140:18,20 142:9
143:12 144:24
145:25 146:4
147:3,10,17
149:10
roughly 81:14
  89:15
rule 106:8 128:25
  129:4
rules 59:23
ruling 63:10
  64:16 67:25
  155:4,6
rumors 23:11,13
  24:12 25:10

**S**

S 1:9 2:2 4:2
  107:2,2,2,4
  152:2 153:2
  154:2
safe 127:10
sale 60:23
sales 9:14,22 10:2
  10:12,16,19
  11:20,22 12:2,3
  12:15 15:14
salesperson 11:5
  11:7
sanctions 5:13
Saturday 124:18
  127:25
saw 19:13,15,16
  84:4 85:3 100:5
  118:4 123:5
saying 36:5 51:4
  56:25 57:6,9,17
  58:2 63:7 64:18
  66:23 70:5 72:2
  72:16 95:3 96:5
  103:23 115:19

125:3 126:3
says 31:9,17
38:22 39:18,18
45:16 46:10,18
46:19 54:15,21
65:6 85:17 89:8
104:10,10,13
109:17,21 120:3
120:11,22
121:15 131:5
132:9 135:4,5
138:11
Scottsdale 13:9
screwed 28:4,5,6
49:8 50:13 57:2
61:4,11 75:12
123:13 144:5
screwing 49:9
123:10
sealing 3:5
second 12:4 30:24
37:17,20 38:5,6
38:18 39:17
42:20 43:10
44:21 54:7 65:9
84:4 85:2,10,11
85:16 88:6
89:16 109:17
113:25 134:3
seconds 123:6
secretary 124:16
sectors 10:8
securities 12:9
13:15 14:3
17:10 142:5
143:7
SEDA 99:19
see 14:21 25:23
28:7 32:3 46:23
47:20 63:9
81:10 85:21
99:25 108:24
109:19 111:7
120:22
seeing 27:24
31:25 76:13,14
131:7 148:18

seek 64:16 115:25
seen 30:11,17,21
31:15,24 37:20
42:12 44:3 51:5
76:12 80:16
87:9 93:23
119:16 131:6
135:3 137:17
sell 141:7
selling 148:5
Semantically
103:15
send 42:20,23
sending 109:12
109:14 112:14
120:19
senior 31:17
sent 67:4 101:14
109:15 110:16
112:9,16,25
113:8,11 119:22
124:10,21
sentence 99:25
separate 7:11
36:25 108:5
116:15
series 17:2,4,6,14
18:7
set 151:11,20
seven-page 80:9
80:13 152:22
shareholder
79:20
shares 26:23 27:3
28:23 57:13
80:16 81:14
84:9,20 87:3,7
89:15 99:16,18
99:19,20,21
106:12 153:10
153:15
sheet 52:22 56:12
56:14 61:14
62:5,12
shell 39:15
short 2:4 13:21
Shorthand 1:24

151:7
shortly 36:9
show 28:8 30:8
37:19 50:20
80:12 81:24
84:17 87:4
88:14 99:9
108:17 126:15
showed 49:5
129:20
shows 47:17
sick 13:23
side 39:22 43:16
138:12
sig 110:7,9
sigh 78:2,3,4
sighing 77:25
sight 108:24
sign 63:11 64:23
65:22 66:24
67:7 69:11 89:6
125:17 126:15
signature 31:14
31:16 81:4,6,6
82:6 85:14 86:7
86:9,15 98:18
98:25 100:4,17
101:12,17,21,23
102:2,3,8,21
103:6,13,17
110:10,11,19
112:2,9,10,14
112:22 113:2,9
signatures 103:9
signed 3:11,14
67:3,10 82:10
82:13 85:21,21
86:10 89:3
145:14
significantly 53:8
signing 69:20
125:18
similar 123:25
single 122:22
sitting 21:25 22:4
60:11 98:9
situation 18:15

61:3 144:7
six 13:20 14:8,10
15:10,14
skipping 120:24
Sledge 8:24
slew 140:14
small 10:3 15:13
130:18 135:7
Smith 15:17,18
snake 114:20
sold 25:17 28:24
28:24 46:3
48:15 57:15
61:2 141:14,16
141:22 144:12
sole 120:22
someone's 62:7
soon 60:6
sorry 43:9 58:17
78:12 117:6
120:16 147:5
sort 145:14
source 33:19
sourced 124:6,7
125:4 127:18
128:15 129:15
sources 33:5,6
sourcing 130:11
134:17
speak 126:17
129:3
speaking 36:4
61:19
special 61:3
specific 24:2
90:15 93:5 94:5
95:6
speculate 92:15
93:18
speculation 91:24
split 26:23 28:19
114:16 115:12
131:20 132:19
132:25
splitting 132:12
132:15
spoke 20:5 68:11

74:9,11 75:19
120:11
spoken 126:20
ss 150:3 151:4
stamped 30:6,10
37:13,16 152:6
152:10
stance 71:25 72:9
72:17,19
stand 35:12 50:12
standard 93:18
138:20
standby 99:21
stands 60:20
61:13
Stanford 125:8,9
125:16,22,23
126:3,6,16
started 15:8
106:10 125:3
starting 17:23
state 1:25 4:7
40:5 101:25
102:4 142:12
150:2 151:3,9
stated 94:17
103:18 104:18
110:14 148:19
statement 117:5
STATES 1:2
status 7:12
Stearns 13:16,18
13:19,25 14:2,5
14:8,20,22,24
14:25 15:10,11
15:15,15,20
steered 122:15
step 33:2 51:12
steps 51:15
Steve 67:21
stipulate 56:5
60:2
STIPULATED
3:2,6,10
stock 9:18 15:15
60:24 80:10,14
81:14,23 82:4

84:10,20 87:2,7
88:3,17 141:13
152:23 153:6,11
153:14,19
**stole** 24:4
**stop** 58:15 59:3
59:10
**Strausberger** 9:9
9:11,13,15
10:11 11:3,13
11:14 18:9
**street** 4:10 18:18
126:18
**strictly** 7:17
**strike** 59:8 106:9
**string** 30:11,12
30:21 108:15,19
109:5 111:7
119:10,13 130:8
154:6,10
**strings** 119:16
**structuring**
127:11
**studied** 121:17
**subject** 5:12 22:5
43:6,11 68:23
68:25 69:3
74:24 75:7,15
**Subscribed**
149:18
**subtract** 55:23
**subtracting** 47:2
**supposed** 25:16
26:19 28:12,16
28:20 40:17
41:2,4,4 54:9
55:9,17 85:6
116:21
**sure** 4:24 13:24
17:21,21,24
18:3 31:7 34:22
84:13 93:17
107:10 146:17
147:14
**surprised** 51:3
**sworn** 3:12,14 4:3
107:5 149:18

151:12

—————
**T**
—————
**T** 4:2 107:2,4
151:2,2 152:2
153:2 154:2
**take** 4:20,22
10:24 25:23
33:2 36:10,13
36:15 56:8
79:19 84:11
109:4 118:23
**taken** 1:20 21:17
21:21 36:16
52:7 59:2 65:11
84:14
**talk** 22:14 65:8
72:13 123:12
139:20 141:24
**talked** 28:2 58:8
113:24 118:3,6
131:20 139:20
**talking** 18:2 22:2
31:11 41:7
44:16 46:5
50:11 83:7
88:21 97:16
120:21 131:16
132:11 145:15
147:15,16
**tangent** 56:21
59:11 106:7
**target** 39:11
**team** 8:21,22
**technically** 7:18
141:7
**tell** 5:9,12 9:25
20:15,25 21:12
21:15 23:8
24:19 26:13
37:23 44:5 68:5
68:10 69:18
71:2,11,13
74:12 76:15
81:25 91:11
93:13,19 95:10
96:22 97:10

110:25 116:7
117:8,13 118:2
118:7 137:19
143:5
**telling** 76:20
121:4
**temperature**
10:24
**term** 116:4
**termination**
18:10
**terms** 33:3 52:16
77:23 108:23
**testified** 4:4 83:10
107:6 121:25
122:4 139:24
140:4,8,21
142:2
**testifying** 19:4
**testimony** 104:18
140:3 141:12
143:3 145:3
147:2 151:13
**thank** 35:19
101:10 114:10
149:11
**theretofore**
145:20
**thing** 15:22 46:22
67:7 75:13
77:13,22 107:11
107:18 124:14
**things** 23:18,21
24:13,23 49:12
49:13 56:24
74:19
**think** 15:21 17:4
17:5 19:24
23:10 28:9
35:17 37:3 65:2
67:14 71:16
75:14 77:3 83:4
83:10 87:16
104:20 116:4
122:4 132:3
134:13 136:21
138:7 140:15

144:22
**thought** 35:12
74:4,6,7,14,14
132:17,18 133:9
135:21
**thousand** 27:9
**three** 10:15 11:18
11:23 17:16
97:7 98:4
102:16 110:23
111:21 112:3
120:23
**three-page**
108:15,18 154:6
**threw** 116:5
**thrown** 58:9
**Thursday** 19:8,16
**Tim** 1:11 35:2
50:10 73:2,3
76:18 99:15
105:16 120:3,18
121:4,9 122:2
122:11
**time** 3:9 4:18,19
8:25 11:12
13:21 18:2 21:3
25:24 29:5
48:22 69:21
70:21 78:14
83:2,24 93:2,3
93:24 94:6
109:7 117:24
118:6,7 122:9
122:16 126:20
127:17 133:16
135:8 140:6,13
149:12,13
**times** 33:14 61:21
**Timothy** 109:18
**title** 29:16 30:2
32:8
**today** 4:25 21:25
22:4 23:9 60:11
**told** 19:7,15,19
27:20 66:2
70:21 75:11
94:23 114:14,15

114:17,18,23
125:18 126:16
128:14,20 133:6
133:8 136:16
140:9 147:11
**top** 31:10 43:18
45:15,15 47:11
108:16,19,21
110:6 132:14
134:6 154:7
**total** 138:17
**totaling** 26:20
27:4
**totally** 18:15
123:13
**trade** 12:18 17:21
17:21,24 18:3
**trader** 12:19,20
**trading** 146:24
**trained** 12:22
**trainer** 12:16
**training** 12:15,16
12:20,21
**transaction** 25:18
26:3,7,9,17
32:18,21 33:19
33:19 34:4,7,17
34:20,21,23,24
36:21 38:4,19
40:18 43:8,13
44:8,18 55:7
57:11 58:4 60:9
65:19 77:2,8,9
77:23 95:16
97:9 110:4
116:17 123:11
123:16,19 124:2
124:6,7,9,12,25
126:16 127:12
129:22 130:13
131:11 132:2,7
132:24 133:3,13
133:21 134:17
134:19 135:8
136:5,8 139:2,4
139:6 141:25
142:2

transactions 11:5
33:5,6 126:19
144:17 145:11
transcript 64:16
69:10
transferring
136:18
transpired
134:10
treated 137:9
trial 3:9 140:8
triangular 39:8
Troy 2:14 20:18
43:4 63:3 96:24
107:15,17
137:20
Troy's 22:21
true 61:15 151:13
truth 5:9,12
try 114:19
trying 25:21
105:13 114:16
132:19
Tulcin 9:9
turn 80:20
Turning 46:17
81:8 82:6 85:14
two 8:12,13 9:12
15:11,15 42:14
47:7,13 67:6
72:14 76:8,11
102:25 105:15
120:24 123:5,5
135:6 145:8,9
152:18
two-page 30:6,9
37:13,16 42:7,9
42:11 119:10,13
137:14 152:6,10
152:14 154:10
two-year 144:21
type 9:22
types 10:5

**U**

U 26:5,5,5
ultimately 105:10

105:18 134:18
142:21 143:18
Uluru 26:5,8,11
32:15,23 33:18
34:16,19 36:21
36:25 38:19
39:7,11 43:8,13
44:18 52:5 60:9
66:15 74:5
75:14 77:2,8,9
78:23,24 97:8
99:16 110:4
114:16 116:16
123:11 124:2,12
132:2,3,7,12,23
133:2,13,21
138:25 139:5
141:25,25 142:6
144:8
underlying 60:24
underneath 40:22
understand 4:18
5:5,8,11,15
11:15 24:18
28:7,11 32:11
36:4 46:4,10,25
47:5,6,10,12,15
47:15,17,23
49:25 56:23
65:21 66:22
73:13 80:25
82:15,18 103:22
106:3,15,18
108:5,8 110:2
111:3 114:2
125:2 126:23
129:24 136:4
146:17
understanding
7:2 54:23 55:5
66:5,8 81:12
82:21 85:5,18
87:18 88:19,25
89:24 90:20
104:14 127:5
understood 108:2
108:3

unethical 23:21
72:5 118:24
unfortunately
116:13
unit 8:22
UNITED 1:2
University 16:5,8
16:10
upper 44:20
46:17 47:4
54:12,14 55:24
135:11
use 78:24
U5 18:10
U5'd 18:8,9

**V**

valuation 141:22
various 10:21
Ventures 80:11
80:15 86:13,18
88:3,17 152:23
153:19
Venturini 1:22
2:7,10 4:6,14
7:24 8:2 14:14
14:16 19:24
21:5 23:4,14
24:19 25:6 29:7
29:10 30:3,20
35:7,22 36:3,8
36:12,15,17,20
37:10,15 38:13
41:3 42:4 46:4
48:23 50:17
51:3,9,17,21
52:2,4,6,8,11
53:17,21 56:4,7
56:20 59:10,13
59:16,21 60:2
61:18,22,25
62:19 63:7,15
63:22,25 64:5
64:10,15,21
65:7,10,12
67:23 68:5,8,12
68:16,20,25

69:5,9 71:19
74:2 75:3 76:5
77:24 80:4,6
81:16,19 84:6
84:13,15 86:23
87:23 88:7,12
92:5,11 93:3,9
93:14,20 99:4
104:3,7 106:4,6
107:7 108:9,12
111:10 113:19
115:5 116:24
118:13,16,19
119:7,12 128:10
128:20,23 129:2
129:6,10 130:23
137:2,10 139:7
140:12 142:7,24
143:2,9 144:14
144:22 145:2,13
146:2,5 149:8
149:11
Venturini's
140:22
version 45:25
versions 30:18
vice 5:25 7:12
8:16 29:24
31:17
Visconti 1:23 4:4
151:7,23
visit 33:13
Visiting 33:15
vote 79:20

**W**

wait 56:18
waived 3:5
walk 77:21
wall 133:10
want 15:5 20:3
38:14 51:9,12
53:19 56:25
64:19 65:5
70:17 71:8
78:14 82:12
93:17 103:25

104:3 106:19
128:13 141:24
148:13
wanted 50:22
74:18 92:6
121:12 122:14
125:16 126:4,6
wants 48:17
56:23 70:3,18
112:13 136:11
warrant 40:13
80:10,14,18,21
80:25 81:22
82:4,7,16,18,22
82:25 83:2 84:9
84:19,20,22
85:18,22 86:12
86:19 87:2,6,11
87:19 88:2,16
89:2,14,18 91:6
91:12 92:19
93:25 94:11
95:11 98:14
101:12,13,21
102:8 103:7,10
105:10,18
110:20 111:21
113:5,9 120:12
136:18 141:11
141:13,16,21
152:22 153:6,10
153:14,18
warrants 21:17
21:20 22:2,5,6
24:11,14,16
25:8,10,15 26:2
26:4,14,17,19
26:22,25 27:9
27:19,21 28:12
28:15,17,24
29:3 36:2 38:22
38:22,25 39:23
39:25 40:2,6,7
40:10,17 41:10
43:7,12 44:7,15
44:16,21,22,25
45:5,9,20,21

46:2,5,6,7,9,15
46:19,21,22
47:3,3,7,8,8,11
47:13,14,21
48:4 50:3,5,8,24
52:19,22,23
53:4,15,23 54:3
54:9,16,22,23
55:3,6,22 56:10
57:4,10,15,18
57:21 58:3,25
60:9,13,24
61:13,15 62:7,9
62:13,16 63:13
64:24 65:20
66:7,10,12,15
66:17 67:2
69:15,22 70:12
70:14,14,23
71:4,8,23 72:3
72:25 73:7,9,9
74:7,13,15,16
74:23 75:7,15
76:25 79:25
80:15 81:9,13
83:6,7,12,22,24
84:24 85:6
87:20 89:7
92:24 94:6,8,24
95:15,24 96:11
96:16,23 97:11
98:19 99:2,16
99:24 100:5,18
102:2,17,25
104:8,12,16
105:6,15 110:12
110:22 111:12
111:17 112:3,16
112:18,20
113:13,15,21
114:21 115:7,8
115:10,11,21
116:9,16,21
117:9,15,16,18
118:9 120:23,25
121:5 131:10,16
131:17 135:22

135:23 136:3,6
136:9,10 138:11
138:16,18
140:24 141:6
142:3,14,20,23
143:5,6,14,22
144:8,10,11,19
145:12,16 146:8
146:20 147:18
147:19 148:10
148:13,21,25
**wasn't** 27:11 48:9
67:7 86:15
117:20 121:11
129:20 136:9
**way** 50:12 53:3
53:11 61:12
66:21 95:19
114:19 115:8
116:5 122:2
129:17 134:14
137:6 141:8
151:17
**ways** 28:6
**week** 19:14,17
22:10 123:5
124:22
**weeks** 67:6
**went** 15:12 16:4,9
27:9,19 28:16
50:9 95:24
100:11 113:11
133:4 140:14
**weren't** 53:15
126:15
**whatsoever** 123:4
123:17,20
130:14
**WHEREOF**
151:19
**wife** 13:22 23:6
**William** 1:23 4:4
151:7,23
**wire** 15:9
**wish** 150:5
**witness** 30:15
35:8 36:10,14

38:10 42:18
45:11 50:20
51:10,12,16
59:6,8 62:2 63:2
63:20 65:9 68:8
75:4 77:16
84:11 88:5,9
89:10 92:6,7
93:10 104:23
109:10 119:20
129:12 134:2
147:4,7 151:10
151:14,19
**Wolf** 9:9
**word** 136:3
**words** 29:19
**work** 7:6,7 9:7,10
10:7 12:8 13:5
13:13,17,25
14:5,20,24
60:19 101:3,9
130:15
**worked** 8:10,25
11:12,17 13:15
13:19 14:2,7,21
32:14 60:25
**working** 10:10
14:19 41:20,21
93:24 122:12
**works** 33:3 53:3
73:12
**World** 12:6
**worth** 10:6
**wouldn't** 45:25
72:12 90:16
98:12 102:10
135:18 145:11
148:12
**writing** 110:24
148:19
**written** 142:16
**wrong** 50:11
105:17
**wrote** 100:2
103:13 121:18

_____
**X**
_____

**x** 1:4,14 152:2
153:2 154:2

_____
**Y**
_____

**Y** 4:2 107:4
**YAM** 6:22 47:21
47:23 56:13
76:23 121:6
**year** 16:5 77:12
77:15,16 145:15
**years** 8:12,13
9:12 10:15
11:18,23 12:11
13:20 14:8,10
15:11,15 145:8
145:9
**yesterday** 74:11
74:17 139:17
**York** 1:10,10,23
1:23,25 2:9,9
4:10,11 9:18
13:6 14:2 35:16
150:2,4 151:3,5
151:9
**Yorkville** 1:5
5:16 6:12,13,16
6:17,19,20,21
6:24,25 7:3,6,14
7:17,19,20 8:11
9:2,8 18:6,23
22:24 24:4,9
25:22 29:4,15
32:10,12 33:4
41:11,13,14,15
41:16,21 46:18
47:24 48:11
53:24 57:19
62:15 63:15
69:21 70:2,24
71:6,9,10 72:22
72:23 76:19,21
76:21,23 88:4
88:18,20,20
89:19 92:18,23
92:24 93:24,25
94:15,25 95:10
95:12,22,22,23

96:13,22 97:11
98:15 99:2,16
101:13,14,16,20
101:22 102:17
103:2,7,10
104:9,15 105:7
106:13 110:22
115:2 123:3
136:17,21
137:22 146:7
148:9,10 153:20
**Yorkville's**
100:25 148:20
**Yorkville/Corn...**
29:17

_____
**Z**
_____

**Zim** 127:24
129:18
**Zimmerman**
124:11 126:18
127:23,24
128:14 129:22
129:25 136:2
**Zip** 4:11
**zoned** 43:9
101:18

_____
**$**
_____

**$13** 78:19 79:5
**$141,500** 134:22
**$260,000** 134:7
**$3** 139:9,10

_____
**0**
_____

**00253** 37:14,17
152:10
**00260** 37:14,17
152:11
**005993** 42:8,10
152:14
**005994** 42:8,10
152:15
**01516** 30:7,10
152:7
**01517** 30:7,10
152:7
**05** 80:3 82:23

**06-5212(JAG)** 1:8
**07078** 2:4

_____ **1** _____

**1** 26:23 30:4,5,9
  43:18 52:18
  54:2,8 55:2,6
  58:3 60:12 81:8
  116:21 117:9,14
  118:9 119:14
  143:24 152:5
**1,166,667** 39:18
  80:15 142:14
**1,167,000** 142:3,9
  143:6,15,21
**1,518,000** 142:23
  143:4,18,20
**1,518,934** 88:2,17
  153:18
**1,933,334** 106:12
**1-518** 105:16
**1.1** 27:2 40:5
**1.16** 26:18 27:5
  48:10,12 49:7
**1.166** 44:22 55:9
  81:13
**1.1666** 47:3
**1.1667** 55:18
**1.5** 27:5 53:3,23
  54:2,5 55:25
  56:9 57:18 62:9
  89:15
**1.9** 26:25 27:4
  48:10,13 50:9
  53:2 55:17,21
  55:23 74:14
  106:12
**1:40** 107:3
**1:47** 119:15
**10** 12:11 26:23
  78:8,8 99:5,6,10
  100:16 103:4,24
  124:18 132:16
  138:3 153:22
**10021** 4:11
**101** 18:18
**10169** 2:9

**108** 154:7
**11** 108:13,14,18
  154:5
**11th** 132:19
**11:10** 1:15
**119** 154:11
**12** 87:19 119:8,9
  119:13 154:9
**12:05** 119:24
**12:52** 121:15
**13** 15:16 130:24
  130:25 131:4
  134:25 154:13
**130** 154:15
**137** 154:18
**14** 137:11,12,14
  154:17
**14th** 84:10,21
  153:11
**141** 135:5
**141,500** 135:13
  135:15
**141-5** 138:2
**150** 2:4
**166** 143:25
**17** 1:15
**18** 135:4
**18,000** 135:10
**19** 15:8 42:21
  43:18 49:19
  60:5
**19th** 48:3 97:17
  97:18
**1989** 16:5,20

_____ **2** _____

**2** 37:11,12,15
  43:25 48:5
  119:11,14 152:9
  154:11
**20** 26:22 27:3,7
  28:16 29:3
  39:23 54:15,18
  54:22 57:6,17
  57:23 114:20
  115:2,9,12,14
  132:7,8 133:20

133:22 138:17
  138:20,21
  141:17
**200** 4:9 145:10
**2002** 49:19
**2005** 78:16,17
  79:13,25 80:19
  81:2 82:8,19
  91:6 133:14,15
**2006** 1:15 42:21
  43:19 44:13
  49:17 60:5 67:5
  73:17 76:9,12
  77:16 79:19
  85:19 86:19
  87:12,15 89:2
  90:18,21 93:4
  98:6,20 99:8,11
  104:15 108:16
  108:20 115:20
  119:11,15,24
  120:13 137:13
  137:15 149:19
  151:20 152:19
  153:23 154:7,11
  154:18
**210,000** 40:6
**223,333** 54:16
**23,333** 40:9
**230** 1:22 2:8
**233,000** 46:15
**233,333** 45:21
  47:3
**283** 137:25

_____ **3** _____

**3** 17:4 42:5,6,9
  49:23 52:16
  54:8 71:5 78:8,9
  84:4 85:3,10,12
  85:13 87:20
  89:16 113:25
  134:4 142:11
  152:13
**3rd** 122:23
**3,066,667** 84:9,20
  153:10

**3.8** 26:19 40:12
  40:16 45:5,7
**3.833333** 81:23
  82:5 153:6
**3:15** 149:13
**30** 119:11 152:7
  154:11
**30th** 76:9,11,17
  97:18,25 98:6
  119:15,24
  120:13,18 121:4
  122:18,19
  152:19
**31** 85:19 86:19
  87:12,15 89:2
**31st** 112:4
**350,000** 27:7
**37** 152:11

_____ **4** _____

**4** 76:6,7,10 97:22
  97:23 152:17
**400** 27:8 153:15
**414** 48:9 53:8
  106:13 153:14
**414,000** 49:14
  50:8 55:24 56:9
  115:21 144:8
**414,400** 47:8,13
  47:18 50:3
  52:21 87:3,7,20
  104:12,16
**42** 152:15
**44** 114:11,21

_____ **5** _____

**5** 26:17,20 38:22
  38:25 44:16
  79:25 80:7,8,13
  80:20,22,22
  83:2,6,7,23
  115:11 132:16
  132:17 134:21
  138:4 152:21
**5th** 137:13,15
  154:18
**500,000** 56:13

**518,000** 56:12
**518,933** 47:8,14
  47:20
**566** 137:25
**566,000** 137:23

_____ **6** _____

**6** 81:20,21,25
  82:25 83:6,12
  83:23 85:24
  153:5
**601** 4:10
**63** 17:2,7,15 18:7
  155:4
**638** 137:24
**65** 17:3
**66th** 4:9
**67** 155:6

_____ **7** _____

**7** 17:2,6,14 18:7
  84:7,8,18,18
  85:15 86:13
  99:7,10 100:6,7
  100:9,11 104:15
  108:16,20 153:9
  153:23 154:7
**7th** 81:2
**76** 152:19
**766,000** 27:3
**766,666** 40:16
**766,667** 54:22

_____ **8** _____

**8** 86:24,25 87:5
  100:6,7,18
  101:22 153:13
**80** 152:24
**80s** 14:23
**81** 153:7
**83** 15:8
**84** 15:12 153:11
**85** 15:11
**86** 15:12 153:15
**87** 153:20

_____ **9** _____

**9** 87:24,25 88:15

| | | | | |
|---|---|---|---|---|
| 89:14 91:12 | | | | |
| 94:11 98:15 | | | | |
| 100:6,7,18 | | | | |
| 153:17 | | | | |
| **90** 26:23 | | | | |
| **90/10** 28:19 | | | | |
| 115:12 | | | | |
| **933,334** 46:22 | | | | |
| 47:6,11 | | | | |
| **99** 153:23 | | | | |