# In The Matter Of:

## *YORKVILLE ADVISORS MANAGEMENT, LLC, ET AL., v. ADAM S. GOTTBETTER, ET AL.,*

---

## *MARK ANGELO*
### *December 12, 2006*

---

## *RAYVID REPORTING  SERVICE, INC.*
### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
#### *PH: 212-599-3642 / FAX:*

ANGELO, MARK - Vol. I

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

----------------------------------------x

YORKVILLE ADVISORS MANAGEMENT, LLC,

a Delwawre limited liability

company; HIGHGATE HOUSE FUNDS,

LTD., a Cayman Islands exempted

company,

                    Plaintiffs,

                              Civil Action No.

          v.                  06-5212(JAG)


ADAM S. GOTTBETTER, HHADVISORS,

LLC, a New York  limited liability

company; GOTTBETTER AND PARTNERS,

LLP,  a New York limited liability

partnership, JASON RIMLAND, ESQ.;

TIM L. DOCKERY, ESQ. and MICHAEL

CHORSKE,

                    Defendants.

----------------------------------------x

                    11:45 a.m.

                    December 12, 2006


                    488 Madison Avenue

                    New York, New York



          VIDEOTAPED DEPOSITION of MARK ANGELO, testifying on

behalf of the Plaintiffs in the above entitled matter,

taken pursuant to Notice, before Suzanne F. Moore, a

Registered Professional Reporter, Certified Realtime

Reporter and Notary Public of the State of New York.

Page 2

MARK ANGELO

APPEARANCES:

BUDD LARNER, P.C.
    Attorneys for Plaintiffs
    150 John F. Kennedy Parkway
    Short Hills, New Jersey 07078

BY:   MICHAEL ROSENBAUM, ESQ.

VENTURINI & ASSOCIATES
    Attorneys for Defendants
    230 Park Avenue
    New York, New York  10169

BY:   AUGUST C. VENTURINI, ESQ.

ALSO PRESENT:
    HEATHER ZAMORA-HEGG - VIDEOGRAPHER
    ADAM S. GOTTBETTER
    TROY J. RILLO, ESQ.

Page 3

MARK ANGELO

THE VIDEOGRAPHER:  Good morning, this is the video operator speaking, Heather Zamora-Hegg, of Rayvid Reporting, 420 Lexington Avenue, New York, New York.

Today is December 12, 2006 and the time is 11:45 a.m.

We're at the offices of Gottbetter & Partners, LLP, 488 Madison Avenue, New York, New York, to take the videotaped deposition of Mark Angelo in the matter of Yorkville Advisors Management, LLC versus Adam S. Gottbetter, HH Advisors, LLC, et al. in the United States District Court for the District of New Jersey.

Will counsel please introduce themselves for the record.

MR. VENTURINI:  My name is August Venturini for the Defendants.

MR. ROSENBAUM:  My name is Michael Rosenbaum for the Plaintiffs.

THE VIDEOGRAPHER:  The court reporter today is Suzanne Moore of

Page 4

MARK ANGELO

Rayvid Reporting.

Will the court reporter please swear the witness.

MARK    ANGELO, called as a witness, having been first duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY MR. VENTURINI:

Q    Good morning.
A    Good morning.
Q    I know we've met before.
A    We have.
Q    We'll be asking questions of you today in the litigation that you're aware of.

If at any time you don't understand a question I ask, please let me know.  If you need to take a break, obviously I think you know the rules, but I'll restate them again, also let me know that.

Keep in mind that your answers

Page 5

MARK ANGELO

are being taken down by a court reporter, so all responses need to be verbal.

A    Okay.
Q    And also keep in mind that you should wait until the question is finished before you start giving your answer.

Do you understand that you're under oath?
A    I do.
Q    Do you understand that as such you are obligated to tell the truth?
A    I do.
Q    And do you understand that if you do not tell the truth you could be subject to court sanctions?
A    I do.
Q    Have you ever testified at a deposition before?
A    I have.
Q    How many times?
A    Maybe five or six.
Q    Were they all in connection with different cases or one case?
A    We were in the World Trade

Page 6

MARK ANGELO

Center and we had an insurance claim that was probably four of the five times, if I had to guess, and recently deposed in a different matter.

Q    Okay.  How many matters in all have you been deposed in?

A    To the best of my recollection, two.

Q    Two --

MR. ROSENBAUM:  Besides this one?

A    Sorry, besides this one.

Q    Of course.

And in connection with the World Trade Center, was that for your current firm?

A    Correct.

Q    That's Yorkville?

A    Right.  It was a business interruption claim.

Q    Okay.  And the other action?

A    The other --

MR. ROSENBAUM:  He didn't ask whether it was for Yorkville.

A    Yes, it was for Yorkville.

Page 7

MARK ANGELO

Q    All right, thank you.  And the other claim?

A    The other claim I believe was a breach of contract claim that we made against a portfolio company, and as part of the discovery process they deposed members of Yorkville.

Q    When was that breach of contract action?

A    To be honest with you, I don't know.

Q    Was it more than two years ago?

A    No, it was probably about a year ago.

Q    Were you the Plaintiff?

A    We were the Plaintiff, yes.

Q    Who did you sue?

A    It was a company called Bad Toys.  Bad Toys was the name of the company.

Q    And Bad Toys does what?

A    To be honest with you, I don't know.

MR. ROSENBAUM:  Makes bad toys.

A    It makes bad toys, apparently.

Page 8

MARK ANGELO

Q    What was the nature of the contract?

A    We had sort of, a loan that they had defaulted on and that we had pursued, put through the default, presumably to get our capital back.

Q    Is it correct to say you were on the investor side?

A    We were on the investor side, yes.

Q    I see.  Is that litigation still ongoing?

A    As far as I know, yes.

Q    Is it pending in New Jersey?

A    I have no idea.

Q    Besides the Bad Toys litigation and the World Trade Center litigation have you testified in any other litigation?

A    I don't believe so.

Q    Have you ever testified in court?

A    No.

Q    How would you describe your current occupation?

Page 9

MARK ANGELO

A    My current occupation is a portfolio manager at Yorkville Advisors.

Q    What is the full name of Yorkville Advisors?

A    I presume it's Yorkville Advisors, LLC.

Q    Is it your understanding that that's a limited liability company?

A    I believe so.

Q    Is there a company called Yorkville Advisors Management?

A    There used to be.  I believe we collapsed Yorkville Advisors Management into Yorkville Advisors.

Q    So is it correct to say that Yorkville Advisors Management no longer exists?

A    I'm not quite sure, I believe that to be the case.  I know that we were collapsing it.  I don't know if it happened or it happens at the end of this year.

Q    Is it correct that Yorkville Advisors Management is not functioning or operating?

4 (Pages 10 to 13)

Page 10

MARK ANGELO

A  I believe that's correct to say.

Actually, to be honest with you, I don't know.

Q  All right.  Are you aware of any operations presently by Yorkville Advisors Management?

MR. ROSENBAUM:  He just said he didn't know.

A  I don't know.

Q  Who are the principals of Yorkville Advisors Management?

A  The principals of Yorkville Advisors Management would be myself, Matthew Beckman, David Gonzalez and Jerry Eike.

Q  Was Yorkville Advisors Management also a limited liability company?

A  I believe so.

Q  Were the four individuals including yourself that you just mentioned the members of that entity?

A  I believe so.

Q  By members I really mean owners.

Page 11

MARK ANGELO

A  I know that we -- I know that Jerry and David were getting equity phased in over time.  I don't know at the time that it was going on whether or not they were official owners or were income and the equity was being phased in.

Q  Were you the majority owner of that company?

A  Yes.

Q  Now, with respect to Yorkville Advisors, who are the owners of that company?

A  It is the same four.

Q  Same four, okay.

A  Yes.

Q  Is it also correct to say that you are the majority owner of Yorkville Advisors?

A  That is correct.

Q  Aside from the four you mentioned, there are no other owners of Yorkville Advisors, is that correct?

A  That is correct.

Q  Are you the managing member?

A  Define managing member.

Page 12

MARK ANGELO

Q  The managing member as I understand it, and correct me if I'm wrong, is the one that is empowered to act on behalf of the limited liability company.

MR. ROSENBAUM:  Was he appointed that in the LLC agreement, is that really what you want to know?

MR. VENTURINI:  That would be a separate question, but that's also a good question.

MR. ROSENBAUM:  Let's figure out, do you want to know whether he knows whether he's the managing member in the LLC agreement?

MR. VENTURININI:  We can do it that way.

MR. ROSENBAUM:  Do you know?

MR. VENTURINI:  We're going to get to it all.

A  I don't know.

Q  Is it safe to say that you have authority to bind Yorkville Advisors --

MR. ROSENBAUM:  That's a legal question.

Page 13

MARK ANGELO

Q  -- in agreements and contracts?

MR. ROSENBAUM:  That's a legal question, that's a legal conclusion.

Q  Do you know?

MR. ROSENBAUM:  He can't know the answer or he's not going to tell you his opinion whether he has the authority to bind, because that's a legal conclusion.

MR, VENTURINI:  Are you instructing him not to answer?

MR. ROSENBAUM:  Yes.

Q  Have you ever signed contracts on behalf of Yorkville Advisors?

A  Yes, I have signed contracts on behalf of Yorkville Advisors.

Q  Who else besides yourself has signed contracts on behalf of Yorkville Advisors?

A  I don't know.

Q  Have you given authority to anyone else to sign contracts on behalf of Yorkville Advisors?

A  Have I given authority to -- we

Page 14

MARK ANGELO

enter into a lot of contracts, and I travel from time to time. I don't -- I mean, there are four partners, we vote on everything. The answer is I don't know.

Q    Okay. Does Troy Rillo have authority to signs contracts on behalf of Yorkville Advisors?

A    No.

Q    Does Matt Beckman have authority to sign contracts on behalf of Yorkville Advisors?

A    Again, I don't know, but if someone would, presumably he would.

Q    What about Jerry Eike?

A    It's the same answer.

Q    And David Gonzalez?

A    Same answer.

Q    How long have you been the majority owner of Yorkville Advisors?

A    Since inception.

Q    Okay. When was it created?

A    I believe it was 2001.

Q    Did Yorkville Advisors continue the operations of Yorkville Advisors

Page 15

MARK ANGELO

Management?

A    It's sort of as a legal question. I believe so.

Q    When was Yorkville Advisors created?

A    I believe the same year, 2001, or it could have been -- it was at the beginning of '01, both of those events, so I don't know if they were incorporated in 2000 and we started business in 2001 or they both were incorporated and started doing business in '01.

Q    What does Yorkville Advisors do?

A    Yorkville Advisors is the general partner for Cornell Capital Partners, also the general partner for Highgate House and for Montgomery Equity Partners.

Q    Is it correct to say that the Cornell, Highgate House and Montgomery, the entities that you just defined, are funds?

A    Yes.

Q    Are they commonly known as hedge funds?

Page 16

MARK ANGELO

A    I would call them hedge funds. I don't know from a legal perspective.

Q    Is Yorkville Advisors the sole general partner of each of those three entities?

A    Yes.

Q    Are those entities structured as partnerships?

A    Are which entities?

Q    In other words, Cornell Capital Partners, is that a limited partnership?

A    I believe that it is.

Q    Are Highgate House and Montgomery structured as limited partnerships?

A    I believe they would be the same, yes.

Q    Other than Yorkville have there ever been any other general partners of any of those three entities?

A    No.

Q    Is it correct to say that Yorkville Advisors is responsible for making the investment decisions of those three funds?

A    Yes.

Page 17

MARK ANGELO

Q    Are you employed by any of those funds?

A    Am I personally employed by those funds?

Q    Yes.

A    Again, it strikes me as a legal question. I would tend to say no.

Q    When you get compensation, does it come from Yorkville Advisors?

A    To be honest with you I don't know. I know that we get paid, I believe it flows through Yorkville Advisors, but the answer is I don't know.

Q    I think just for the sake of ease we'll refer to Yorkville Advisors as Yorkville, is that okay?

A    Sure.

Q    Does Yorkville make any investments in its own name?

A    I don't know. I don't believe so.

Q    You mentioned that you were the portfolio manager of Yorkville, is that correct?

Page 18

MARK ANGELO

A    I would characterize it as a portfolio manager of Cornell.

Q    Okay. Were you also the portfolio manager of Highgate?

A    Yes.

Q    Was that a co-portfolio manager?

A    Yes.

Q    And were you also a portfolio manager of Montgomery?

A    A co-manager, yes.

Q    Co-manager, right.
How long have you been the or a manager --

MR. VENTURINI: Withdrawn.

Q    How long have you been a portfolio manager of Cornell?

A    Since inception.

Q    And again, by Cornell, we're referring to Cornell Capital Partners?

A    Yes.

Q    When was Cornell Capital Partners created?

A    The same as Yorkville and

Page 19

MARK ANGELO

Yorkville Advisors, I believe, so it would be 2001, either early 2001 or late 2000.

Q    When was Highgate --

MR. VENTURINI: Withdrawn.

Q    Were you the --

MR. VENTURINI: Withdrawn.

Q    Have you been the "co-portfolio manager" of Highgate since Highgate was created?

A    Yes.

Q    When was it created?

A    I don't have a date off the top of my head.

Q    Was it approximately two years ago?

A    Yes.

Q    Have you been the co-portfolio manager for Montgomery since Montgomery was created?

A    Yes.

Q    Was that also created about two years ago?

A    Yes.

Q    Over the last two years who

Page 20

MARK ANGELO

besides you has been a portfolio manager for Cornell?

MR. ROSENBAUM: What does that have to do with this suit?

MR. VENTURININI: I'm trying to get an idea who the players are.

MR. ROSENBAUM: You know who the players are. Cornell has nothing to do with this lawsuit, this is Highgate and Yorkville.

MR. VENTURININI: I understand, it's background that I need --

MR. ROSENBAUM: I'll let you answer this one.

A    Can you repeat the question?

MR. VENTURININI: Let's have it read back.

(The question requested was read back by the reporter.)

A    I believe I would be the, over the last two years, the sole portfolio manager of Cornell.

Q    0kay. Over the last two years what is Troy Rillo's position with Yorkville?

Page 21

MARK ANGELO

A    He's been an employee of Yorkville.

Q    What does he do?

MR. ROSENBAUM: Now?

Q    Over the last two years.

A    You want me to describe his job duties?

Q    Please.

A    Well, he's an attorney by training, so we certainly rely on him as counsel. I mean, that would encompass more or less what he does.

Q    You're saying he's in-house counsel?

A    Well, we have a total of four, five attorneys in-house, so David Gonzalez would be our in-house general counsel. Troy's main role is supporting David.

Q    Is he an associate counsel or is he assistant general counsel, do you know?

A    I don't know.

Q    Aside from duties as attorney does Mr. Rillo have any other job responsibilities over the last two years?

Page 22

MARK ANGELO

A    He helped with Highgate.

Q    What does that mean?

A    It means he helped with Highgate in terms of just helping with the positions.

MR. ROSENBAUM:  I'm sorry, I didn't hear the last part.

THE WITNESS:  Helping with the positions.

MR. ROSENBAUM:  Okay.

Q    What do you mean by helping with the positions?

A    I mean after Adam left, you know, we needed someone specifically to help with those positions, so we brought Troy in, in addition to his other responsibilities, to help us there.

Q    You mean to help manage the portfolio?

A    Yes.

Q    I see.  Had he any experience in managing portfolios prior to that?

A    I think it's a separate question you'd have to ask him.

Page 23

MARK ANGELO

Q    So sitting here today you're unaware of any prior experience he had in managing portfolios prior to giving him that responsibility?

MR. ROSENBAUM:  He answered, he said you have to ask him.

MR. VENTURININI:  You have to wait until I'm done asking the question before you object.

MR. ROSENBAUM:  I'm sorry.  He said you have to ask Mr. Rillo.  It's the same question.

A    I'm sorry, I'll decline to answer.

Q    Decline to answer?

MR. ROSENBAUM:  It's not the -- he answered it already.

A    I've answered it, you'd have to ask him.

Q    Has Mr. Rillo at any time ever acted as a banker in any transaction?

A    You know, I don't know.

Q    Is it possible that he had?

MR. ROSENBAUM:  Anything is

Page 24

MARK ANGELO

possible, come on.

A    Depending on your definition of a banker, I would say absolutely it's possible.

Q    Well, has Mr. Gonzalez ever acted as a banker in any transaction?

A    In the history of Cornell capital, I do not know.  It's possible. I would say this, it's a lot more likely that Mr. Rillo than Mr. Gonzalez.

Q    Why do you say that?

A    It just strikes me as more likely, again, depending on your defmition of banker, that, you know, Mr. Rillo would more likely have received economics for originating transactions.

Q    How do you define banker?

A    How do you define banker?  I mean --

Q    Well, how is a banker defined at Yorkville?

MR. ROSENBAUM:  Jeez, go ahead.

MR. VENTURININI:  Let the record reflect that Mr. Rosenbaum is sighing

Page 25

MARK ANGELO

again in response to a question.  Please let me ask the questions.

MR. ROSENBAUM:  I didn't say a word.  If I'm going to say something you'll hear me.

A    I'm sorry, can I have the question again.

Q    Let me start over. While working at Yorkville have you heard the term banker used?

A    I have.

Q    And are some employees of Yorkville referred to as bankers?

A    Yes.

Q    Is in fact Chris Maloney referred to as a banker?

A    Yes.

Q    What does a banker do?

A    A banker would be somebody who goes out and originates transactions.

Q    What do you mean by originates transactions?

A    I mean exactly that.

Q    You mean he finds the potential

Page 26

MARK ANGELO

deal to do?

A    Yes.

Q    What does the banker do next?

A    Well, as we sit here today what the banker does is he gathers a lot of information, a lot of due diligence, builds a relationship with the issuer, presents it to investment committee.

Q    Anything else?

A    I mean, I guess I can provide you with an org chart and a description, I just don't, off the top of my head, I could be missing something, but off the top of my head that pretty much is it.

Q    Well, we're not talking about an organization chart.

A    A description of everybody's duties, I'm giving you --

Q    We're just talking about bankers now.

A    I'm giving you very layman's terms of what a banker does.  I'm sure if you speak to a banker he would probably tell you there's twenty things more than I'm

Page 27

MARK ANGELO

describing.

Q    You mentioned investment committee.  What is that?

A    Investment committee is a committee that we have that the bankers present their potential companies to.

Q    Who is on the investment committee?

A    You have Michael Roselli, Anthony Ghee, you have David Fine, and you have Troy Rillo.

Q    Is it correct to say that any investment made by the funds that we mentioned earlier have to be approved by you ultimately?

A    Yes.

Q    So considering the roles that you say the bankers play that we just mentioned, to the best of your recollection has Mr. Rillo fulfilled any of those roles at any time that he worked for Yorkville?

A    Has he -- I'm sorry --

Q    Let me ask the question differently.

Has Mr. Rillo ever sourced a

Page 28

MARK ANGELO

transaction or originated a transaction?

A    Absolutely.

Q    How many times?

A    I have no idea.

Q    Is it more than ten?

A    To be honest with you I have no idea.

Q    Could it be more than twenty?

MR. ROSENBAUM:  He just said he has no idea.

A    I don't know.

Q    If he had originated any transaction, the approval of that transaction would eventually have gone to you, is that correct?

A    The ultimate approval.

Q    Right.

A    After it went through layers of due diligence.

Q    Exactly.

A    Credit, legal and so forth, it would have to come to me, yes.

Q    Right.  And at that time when the deal is ready for your approval would you

Page 29

MARK ANGELO

know who the banker on that deal was?

A    Not necessarily, but typically I would know, yes.  And again, it would be presented to myself, Jerry Eike and David Gonzalez.

Q    Has Yorkville Advisors ever been licensed as a broker/dealer?

A    No.

Q    Has Yorkville Advisors Management ever been licensed as a broker/dealer?

A    No.

Q    Do you currently hold any licenses in connection with the securities industry?

A    I was Series 7, 63, 24 but I believe they've all lapsed for quite some time, so the answer would be no.

Q    Since 2001 did you hold either the Series 7, 24 or 63 licenses?

A    Since 2001, I believe I was registered in 2001.

Q    For which license?

A    For all of those.

Page 30

MARK ANGELO

Q    Which broker/dealer?

A    I believe it was May Davis. At some point they lapsed, I just don't know if they lapsed in '01, '02 or '03.

Q    But some were in that time frame?

A    It seems about right to me. I worked at May Davis, which was a broker/dealer, so I'm just thinking it would be I would think difficult to work there if I wasn't licensed so I'm pretty sure I was licensed there.

Q    Is it correct to say that it was your idea to form Yorkville Advisors?

A    I don't know if it was my sole idea, but, you know, me and my partners at the time formed Yorkville Advisors.

Q    By partners at that time who are you referring to?

A    I'm referring to, when that was formed, I believe it was myself, Matthew Beckman, a gentleman by the name of Mair Levin, Dave Donahue, and a Robert Farrell.

Q    Is it correct to say that the

Page 31

MARK ANGELO

last three individuals you named are no longer with Yorkville?

A    That is correct.

Q    Prior to forming Yorkville Advisors where did you work?

A    I worked at the May Davis Group.

Q    How long were you there?

A    Close to three years.

Q    What did you do?

A    I ran the investment banking placement agent business there.

MR. ROSENBAUM:  Did you say placement agent?

THE WITNESS:  I ran the investment banking, capital markets group, placement agent division.

Q    Prior to May Davis where did you work?

A    Prior to May Davis I worked at a firm called AIBC Securities.

Q    How long were you there?

A    I would say probably less than a year.

Page 32

MARK ANGELO

Q    What did you do there?

A    The same job responsibilities as May Davis.

Q    Okay. That's running the investment banking operations?

A    No, I don't know if they would say I was running it, but that was the department that I was working in. I was sort of -- it was just starting out.

Q    Okay. Prior to AIB where did you work?

A    I worked at a company called GKN Securities.

Q    I'm sorry?

A    GKN Securities.

Q    Where is that located?

A    I think they were acquired. It was located in downtown Manhattan.

Q    Manhattan?

A    Yes.

Q    How long did you work there?

A    Probably a year, year and a half.

Q    What were your job

Page 33

MARK ANGELO

responsibilities there?

A    I was really a retail, what I would call a retail broker there. I think the title might have been financial advisor.

Q    What types of accounts did you handle?

A    Both retail and institutional, but the majority, although we did work, to be frank, we did work on a couple of transactions, but it was really the investment bankers there that were sourcing the transactions and would bring in some of the financial advisors who had larger books of business to help on the distribution.

We had little input on structure, though, to be honest with you.

Q    Can you just describe the rest of your employment history dating back before then.

A    Prior to that was a firm called The Boston Group, which is a very similar job description as GKN.

The Boston Group did a lot of, took a lot of companies public, and we did

10 (Pages 34 to 37)

Page 34

MARK ANGELO

have, again, a little bit of input on some of the structures and so forth, but mainly our job I would have to say is probably distribution.

Q    When did you work for The Boston Group?

A    I believe '95 to '97.

Q    Did you work anywhere before then?

A    I worked at a firm that I essentially got licensed at for a period of about two or three months, they would sponsor people to take their Series 7.

Q    And before that?

A    I was in college.

Q    Where did you go to college?

A    I went to Rutgers University.

Q    Did you earn a degree there?

A    I did.

Q    In what?

A    In economics.

Q    Is that a Bachelor's?

A    It was a Bachelor's, yes.

Q    What year?

Page 35

MARK ANGELO

A    1994.

Q    Any postgraduate degrees?

A    No.

Q    Did you do anything to prepare for this deposition?

A    I met with our counsel yesterday for about a half hour.

Q    Is that Mr. Rosenbaum?

A    That is Mr. Rosenbaum.

Q    Did you review any documents in his presence?

MR. ROSENBAUM: You can answer yes or no, just yes or no.

A    Yes.

Q    Did you speak to anyone else besides Mr. Rosenbaum?

A    No.

Q    Did you review Mr. Maloney's testimony?

A    I did not, actually.

Q    I know you were present for part of his testimony.

A    Um-hum.

Q    But you did not see a

Page 36

MARK ANGELO

transcript, did you?

A    I did not.

Q    With respect to Highgate House Fund, is it correct to say that you and Adam Gottbetter were the first portfolio managers of that fund?

A    Yes.

Q    When was Adam hired to be a co-portfolio manager of Highgate?

A    I don't know the exact date.

Q    Was it approximately two years ago?

A    Yes.

Q    How did you first come to meet him?

A    Just through the industry.

Q    How did he come to be hired as a co-portfolio manager?

A    We had several conversations and we ended up hiring him.

Q    Who initiated the conversations?

A    We did.

Q    We being?

Page 37

MARK ANGELO

A    Yorkville.

Q    Yorkville. And at Yorkville was it yourself who initiated the conversation with Adam?

A    The specific conversation?

Q    Yes.

A    That would be myself, yes.

Q    What made you call him?

A    I mean, I don't know what specifically prompted me to call him.

Q    Were you contemplating opening up another fund?

A    Yes.

Q    And did you think you needed someone else to manage the additional fund?

A    Well, we were planning on launching more than one fund and we wanted to obviously target people in the space who we felt had knowledge of the space, knowledge of the transactions.

Q    Were you speaking to a gentleman by the name of Bob Press at the same time?

A    Yes.

Page 38

MARK ANGELO

Q    Did you know Bob Press prior to speaking to him approximately two years ago?

A    We knew him from the space.

Q    From the space?

A    We knew him from the space, from the industry, sorry.

Q    Okay. In other words, you had heard of him being in the same industry that he is in?

A    We knew he was in the industry. He had shown us transactions, similar to Adam.

Q    Okay.

A    We had worked with him on other transactions before.

Q    Did you approach Mr. Press prior to approaching Mr. Gottbetter about managing a fund?

A    I believe we approached him simultaneously.

Q    Were you considering anyone else to be portfolio managers at that time for the new funds?

A    There's no one that comes to mind. I mean, I know we spoke to, I know

Page 39

MARK ANGELO

internally we spoke about expanding our business and talking to other people to, you know, to help co-manage funds with us, but I think the primary targets from the beginning were Mr. Gottbetter and Mr. Press.

Q    Is it correct to say that Mr. Press was hired to co-manage the Montgomery fund?

A    Yes.

Q    And were you also a co-portfolio manager of the Montgomery fund?

A    I was.

Q    At the time that Mr. Press was hired were you and he the sole managers of the Montgomery fund?

A    Yes.

Q    And at the time Mr. Gottbetter was hired to be the portfolio manager were you and he the sole portfolio managers for Highgate House?

A    Yes.

Q    Is Mr. Press still the manager of Montgomery?

A    We have collapsed Montgomery

Page 40

MARK ANGELO

into Cornell.

Q    And by collapsed do you mean its positions were merged into Cornell's?

A    Yes.

Q    When did that happen?

A    Within the last six months.

Q    Is Mr. Press providing any services to Yorkville in any capacity at the present time?

A    Yes.

Q    What does he do now?

A    He is essentially working helping us, I would say consultant to the portfolio.

Q    By portfolio are you referring to Cornell's portfolio?

A    No, I'm referring to the Montgomery portfolio.

Q    Which is now being held by Cornell.

A    Yes.

Q    I see. Is there another manager that's been employed to manage the Montgomery portfolio that's now in Cornell?

Page 41

MARK ANGELO

A    No.

Q    So is it correct to say that it's managed, then, by the Cornell managers with assistance from Mr. Press?

A    Yes.

Q    Why was the Montgomery fund merged into Cornell?

A    It's just a decision that we made.

Q    Based upon, what facts was the decision based upon?

A    We just decided that we really wanted to, we just decided that there was not a portfolio management position available for Mr. Press.

Q    In other words, you didn't want him to be a portfolio manager anymore?

MR. ROSENBAUM: He didn't say that. He didn't say that.

Q    Well, you said there wasn't a portfolio management position available.

A    We just decided we wanted to have one entity and not two or three.

Q    With respect to Highgate House

Page 42

MARK ANGELO

Q Funds, was that ever merged or collapsed into Cornell?

A Yes.

Q When did that occur?

A Probably within the last ten or twelve months; shortly after, shortly after Adam left.

Q So sometime early this year?

A Yes.

Q So is it correct to say there's no current portfolio manager for Highgate?

A The portfolio managers of Highgate would really be myself -- again, it's sort of a legal question, I don't -- I believe Highgate exists, but the investors in Highgate have now interests in Cornell.

MR. ROSENBAUM: He asked about the portfolio managers. Who besides yourself, yourself and who?

A Well, it would be myself and, you know, and Troy Rillo.

Q So if I understand correctly you're saying for the Highgate positions, they're being managed by Troy Rillo and

Page 43

MARK ANGELO

yourself?

A Correct.

Q But the positions have been merged into Cornell's positions and are part of the Cornell fund?

A Correct.

Q And Highgate House Fund may still be in existence with respect to its limited partners and with respect to what the limited partners are entitled to in terms of receiving gains from the fund?

A Yeah, absolutely, but again, I know, again, it's sort of a legal question. I'm trying to answer, but I know that their investments I believe have, all the money in Highgate is now in an interest in Cornell.

Q Is it correct to say that Mr. Press and Mr. Gottbetter were hired at the same time?

A Yes.

Q Did they have the same compensation package?

A They did.

Q Did they have the same

Page 44

MARK ANGELO

responsibilities with respect to managing their respective funds?

A I believe so, yes.

Q Is it correct to say that all investments made by Highgate had to be ultimately approved by yourself?

A And to be signed off and approved by me, but again, myself and the other partners would discuss it.

Q During the time that Adam was a co-portfolio manager of Highgate, did you meet with him to discuss Highgate's investments?

A Yes.

Q Did you meet with him on a regular basis?

A We did.

Q How often?

A Typically once a week.

Q Where would those meetings take place?

A Almost always in Jersey City.

Q Is that Yorkville Advisors' offices?

A Yes.

Page 45

MARK ANGELO

Q Was that on a particular day of the week?

A I think it was Wednesday.

Q Is it correct to say that every Wednesday and you Adam met?

A Yes, more or less.

Q Okay. And during those meetings did you discuss what investments Highgate House was making?

A Amongst other things, yes.

Q What investments it was contemplating making?

A Absolutely.

Q What other things did you discuss at those meetings?

MR. ROSENBAUM: There must have been a hundred meetings, you want to know what he discussed at a hundred meetings?

MR. VENTURINI: Well, if it's in connection to the fund.

A It was mainly I would say existing positions and potential new investments that we were thinking of making.

Page 46

MARK ANGELO

Q    Did there come a time when Adam resigned as a co-portfolio manager of Highgate House?

A    Yes.

Q    When did that occur?

A    January.

Q    Of 2006?

A    Yes, that seems right.

Q    Was his resignation unexpected by you?

A    Not entirely, but --

MR. ROSENBAUM:  You've answered.

A    Yeah.

Q    When you say not entirely, had you been given any indication that he was contemplating resigning as a co-portfolio manager?

A    I'd heard rumors to that effect.

Q    Were those rumors from sources other than Adam?

A    Were those rumors --

MR. ROSENBAUM:  Were you told that by people other than Mr.

Page 47

MARK ANGELO

Gottbetter?

A    Yes, I don't think Adam -- Adam did not create any rumors about himself and then reflect them to me.

Q    Where had you heard that before?

A    I don't know.

MR. ROSENBAUM:  Come on, can we get to something that's relevant to this lawsuit, please.

MR. VENTURINI:  We are.

MR. ROSENBAUM:  Now?

MR. VENTURINI:  Let's have --

Q    Do you know what date in January Adam gave notice of his resignation?

A    I do not.

MR. VENTURINI:  Let's mark this as Angelo Exhibit 1.

(The above described document was marked Angelo Exhibit 1 for identification, as of this date.)

Q    I'll show you what's been marked as Angelo Exhibit 1.  It is a one page e-mail string Bates stamped number D 01417.

Page 48

MARK ANGELO

Have you seen these e-mails before?

A    Yes.

Q    Do you recall receiving an e-mail on or about January 11th from Adam that's listed on the middle to bottom half of that page?

A    I don't know if I -- now that I see it, obviously I probably received it.

Q    Okay.  The first line says, "Mark, after reviewing our agreement more carefully yesterday, I sent you a revised termination letter."

Did you have a meeting --

MR. VENTURINI:  Withdrawn.

Q    Did you have a conversation with Mr. Gottbetter prior to January 11th, 2006 regarding his resignation as a co-portfolio manager?

A    Prior to getting this e-mail I believe we spoke the day before.

Q    Then do you recall having such discussion regarding a ten day notice provision?

Page 49

MARK ANGELO

A    I don't know.

Q    Is it your understanding that Mr. Gottbetter's resignation occurred a few days before January 11th?

MR. ROSENBAUM:  Where is this?

A    It's what the letter says.

Q    Do you have any reason to believe that the letter is incorrect?

A    I don't.  Again, I don't remember the exact day that we met.  I don't know if I received this the next day or five days later, but we met, and at some point after that I received this e-mail.

Q    The meeting you described, was that in person?

A    Yes.

Q    After Mr. Gottbetter resigned as a co-portfolio manager, did anyone take his place?

A    As I mentioned earlier, we had Mr. Rillo help us with those positions.

Q    Was Mr. Press ever asked to provide any portfolio manager services with respect to Highgate after Mr. Gottbetter

14 (Pages 50 to 53)

Page 50

MARK ANGELO

resigned?

A    No, I think Mr. Press probably had wanted to provide those services, I know we had a couple of conversations and we had him take a look at some of those transactions, but we never asked Mr. Press to do that.

Q    Okay. Is it correct to say that --

MR. VENTURINI: Withdrawn.

Q    If I understand your testimony correctly, did Mr. Rillo become the co-portfolio manager with you upon Mr. Gottbetter's resignation?

A    I'm not sure if that was immediate or if there was some period of time.

MR. VENTURINI: Let's have this marked as Exhibit 2.

(The above described document was marked Angelo Exhibit 2 for identification, as of this date.)

Q    I show you what has been marked as Angelo Exhibit 2. This is a three page document, the Bates stamp number is P 09153 through 09155 consecutively.

Page 51

MARK ANGELO

Have you ever seen this document before?

A    I haven't seen it in the last -- recently. I don't know if I've seen it before or I have not.

Q    Okay, so -- okay. Do you know who Liang, is that Liang Zhao, am I pronouncing it correctly?

A    That's a good question. I'm not sure if you're pronouncing it correctly. Liang was in our accounting department approximately a year ago.

Q    When you say our accounting department, are you referring to Yorkville Advisors?

A    Yes, I mean he was an employee of Yorkville Advisors.

Q    Do you know why she's sending this attachment to Bob Press on January 13, 2006?

A    It's a he.

Q    Thank you.

A    It's a he.

I just believe --

Page 52

MARK ANGELO

MR. ROSENBAUM: He asked if you know. Do you know?

A    I don't know.

Q    Was Mr. Press --

MR. VENTURINI: Withdrawn.

Q    You had mentioned earlier that, you said he wanted to provide services with respect to Highgate.

A    I mean, to be frank, I think it was more of less after Adam left he said is there anything I could do to help. So, another set of eyes or something on the portfolio.

You know, it's probably, again, I'm speculating --

MR. ROSENBAUM: Don't speculate. If you know something, tell it to Mr. Venturini. If you don't know, then tell him you don't know.

Q    What was Mr. Liang Zhao's responsibilities in the accounting department at Yorkville?

A    He would have called very low level accounts.

Page 53

MARK ANGELO

Q    What did he do?

A    I'm the wrong person to ask.

Q    We're done with that.

MR. ROSENBAUM: Off the record.

(Discussion off the record.)

Q    Regarding Highgate, did Yorkville ever remit fees to Highgate to cover a loss or a shortfall in performance?

MR. ROSENBAUM: What do you mean by fees? I'm confused by that myself. Money, did Yorkville ever give money to Highgate, is that really what you want to know?

MR. VENTURINI: Yes.

MR. ROSENBAUM: Can you answer the question I asked? If you know.

A    We have the audited financials, we can probably just check the audit.

MR. ROSENBAUM: But he wants to know if you remember. If you remember, tell him. If you don't remember, tell him.

A    The answer is I don't know.

Q    Do you recall an approximately

Page 54

MARK ANGELO

$2 million shortfall in Highgate House in 2005 with respect to what it was reporting as its net asset value?

MR. ROSENBAUM: That question didn't make sense to me. $2 million shortfall?

MR. VENTURINI: It's essentially if it makes sense to the witness.

MR. ROSENBAUM: If I can't understand it I'm not going to let him answer.

MR. VENTURINI: Let's see if the witness understands it.

MR. ROSENBAUM: If I don't understand it I can't give him an appropriate instruction if one is necessary. Rather than spar with me --

A     If not rephrase it, will you repeat it.

MR. ROSENBAUM: Would you rephrase it, because I can't understand what he's talking about.

Q     Did YAM ever remit any of its fees back to Highgate House to cover any kind

Page 55

MARK ANGELO

of shortfall?

A     Again, it's sort of an accounting or legal question. We have audited financials, so.

MR. ROSENBAUM: If you know, tell him. If you don't know, tell him you don't know.

A     I'd rather go to the audit and have somebody look it up so I don't say something that's wrong or inappropriate.

Q     Was Mr. Gottbetter ever asked to give some of his fee compensation back to either Yorkville or Highgate House at any time?

MR. ROSENBAUM: By Mr. Angelo?

Q     By anyone?

A     A question you'd have to ask Mr. Gottbetter.

MR. ROSENBAUM: Do you know?

A     Do --

MR. ROSENBAUM: He just wants to know whether you know.

A     The answer is I don't know.

Q     Did you ever have a

Page 56

MARK ANGELO

conversation with Adam regarding his giving any fees back to either Yorkville or to Highgate House?

A     I don't know.

Q     Did you ever have a conversation with Adam regarding the net asset value of Highgate where the net asset value was calculated to be $2 million less than what it was reported to its investors?

A     I'm sorry, repeat the question?

Q     Did you ever have a conversation with Adam regarding the net asset value of Highgate where the net asset value was calculated to be $2 million less than what was reported to the investors?

A     The answer is I don't know.

Q     Did Mr. Gottbetter receive all the compensation he was entitled to receive in 2005?

A     I believe that he was, yes.

Q     Was any compensation that he was entitled to held for any reason?

A     To be honest with you, I don't know.

Page 57

MARK ANGELO

THE WITNESS: Actually, can I go to the bathroom?

MR. VENTURINI: Let's take a break.

THE VIDEOGRAPHER: Going off the record, the time is 12:45.

(At this point in the proceedings there was a recess, after which the deposition continued as follows:)

THE VIDEOGRAPHER: Returning to the record, the time is 12:55 p.m. This marks the beginning of tape number 2.

Q     Mr. Angelo, do you understand that you're still under oath?

A     I do.

Q     I show you what has been marked as Angelo Exhibit 3.

(The above described document was marked Angelo Exhibit 3 for identification, as of this date.)

MR. VENTURINI: It is a one page document, for the record, P 08440.

Q     Have you seen this document before?

16 (Pages 58 to 61)

Page 58

MARK ANGELO

A    You know, I don't know. I could have been cc'd on it.

MR. ROSENBAUM: I'm sorry?

A    I could have been cc'd on it.

Q    Do you know what this --

MR. VENTURINI: Withdrawn.

Q    With respect to the column on the top, it says, "Fees remitted back to the fund." Do you know what that is?

MR. ROSENBAUM: You're talking about the 2,178 --

MR. VENTURINI: Yes, exactly.

A    I assume it's fees remitted back to the fund.

Q    Okay. By the fund, are we referring to Highgate House Fund?

A    I imagine we're referring to Highgate House.

Q    Do you recall $2,178,000 in fees being remitted back to Highgate House Fund at any time?

A    Well, if we, going by this e-mail, it would appear that that is the case.

Q    Do you have any independent

Page 59

MARK ANGELO

recollection of that occurring?

A    It was really a question for the CFO, Ed Schinik, just the way hedge funds are paid. I'm not trying to not answer it.

Q    So you're saying Ed Schinik would have more knowledge than you about that?

A    About how this would work, yes.

Q    But at the time this occurred you were a "co-portfolio manager" of Highgate, correct?

A    That is correct.

Q    So wouldn't a $2 million remittance back to the fund be a significant transaction?

A    I would imagine a $2 million remittance back to the fund would be a significant transaction.

Q    How big was the fund at that time?

A    I don't know. We can look it up. I don't know what it is off the top of my head.

Q    Was it approximately $50 million?

Page 60

MARK ANGELO

A    I would have thought it was actually a little bit more than that.

Q    A little more? Less than $75 million?

A    I thought it was around 70, but I could be wrong.

Q    Okay. Did you have any conversations with Ed Schinik regarding $2 million being remitted back to the fund?

A    Any conversations with Ed Schinik -- I mean, I don't recall any specific conversation.

Q    Do you recall any conversations, specific or otherwise, with respect to $2 million being remitted back to the fund?

A    You know, again, you're out of my field of expertise.

Q    I didn't ask you what your expertise was, I asked you --

A    The answer is I don't know.

Q    The question is whether you had a conversation, any type of conversation with Mr. Schinik.

Page 61

MARK ANGELO

MR. ROSENBAUM: About fees being --

MR. VENTURINI: Exactly.

MR. ROSENBAUM: -- being remitted back? Go ahead, answer, if you remember.

A    I don't. Well, I'm sure we had -- the answer is I really don't remember. I don't know, I'm sure there was conversation. Again, I don't handle that part of it.

Q    Okay. Do you recall having a conversation with anyone else besides Mr. Schinik and Mr. Gottbetter regarding $2,178,000 being remitted back to Highgate House Fund?

A    I don't remember.

Q    Do you recall having any conversation with anyone regarding whether Mr. Gottbetter would contribute a portion of the $2,178,000 that was remitted back to the fund?

MR. ROSENBAUM: One more time? You can read it back.

(The question requested was read back by the reporter.)

Page 62

MARK ANGELO

MR. ROSENBAUM: Contribute to whom? Contribute to whom? I got confused by the question.

Q    Well, did you understand the question?

A    I'm sorry, give me the question again.

(The question requested was read back by the reporter.)

MR. ROSENBAUM: Hold on, my objection is I don't understand the question. Contribute to --

MR. VENTURINI: Just say objection.

MR. ROSENBAUM: I'm doing more than that, I'm telling him not to answer unless you clarify. I don't understand the question, I can't instruct him one way or the other until I understand the question.

I don't whether it's appropriate to instruct him.

MR. VENTURINI: It's inappropriate for you to object on that

Page 63

MARK ANGELO

basis, because you don't understand. Objection to form is the appropriate response.

MR. ROSENBAUM: Just clarify it, that's all.

Q    Do you know what contribute means?

A    Am I familiar with the word contribute? In fact, I am.

Q    Was any portion of the $2,178,000 that was remitted back to the fund taken from Mr. Gottbetter's compensation?

A    I mean, I have no idea.

Q    Did you ever have any conversations with anyone regarding Adam Gottbetter having to contribute a portion of the $2 million that was remitted back to the fund?

A    I have no idea.

Q    The next column says, "AG portion of fees remitted back, 44.4 percent." Do you see that on Exhibit 3?

A    Yes, I do.

Q    Do you know what the 44.4

Page 64

MARK ANGELO

percent refers to?

A    I presume that refers to the other -- I'm trying to think -- the split, the split of -- you understand the transaction. I --

Q    I do, but you have to say it for the record.

A    You know, Adam's employment agreement was 44 percent.

MR. ROSENBAUM: Of what?

A    Of the net profit.

Q    Meaning that was his percentage, that was his profit percentage share?

A    Profit calculation, yes.

Q    Then do you see under --

MR. VENTURINI: Withdrawn.

Q    Where it says AG, do you understand AG to mean Adam Gottbetter?

A    I would presume that means Adam Gottbetter.

Q    Did you have any conversation with anyone regarding Adam contributing $967,032 to Highgate House Fund?

Page 65

MARK ANGELO

A    You keep asking me those questions.

Q    It's a slightly different question.

A    I'm sorry, did I have any conversation -- this is with anyone?

Q    Yes, with anyone, regarding $967,032 being contributed by Adam back to Highgate House.

A    I don't recall any conversations.

Q    Okay. Going over to the next column, do you recall having a conversation with anyone at any time regarding Adam not collecting any fees to which he was entitled?

A    Not collecting any fees? I mean, what Adam was entitled to was, again, a profit calculation.

I do remember getting some e-mail from Adam saying that he had spoken to Ed and the balance was he said small, roughly $5,000.

Q    Do you recall how they got to that $5,000 figure?

Page 66

MARK ANGELO

A    I do not.

Q    The $5,000 that you just referred to, is that the $5,000 that appears to be on the extreme right column of Exhibit 3?

A    I believe so, yes.

Q    Okay. So is it your understanding that this document then does reflect the compensation that Adam was entitled to with respect to his position as co-portfolio manager?

MR. ROSENBAUM: As of when?

MR. VENTURINI: We haven't established that, but that's my next question.

A    You know, again, I didn't prepare the document. I just remember after Adam resigned, him and Ed had spoke about, you know, trueing up what was owed for 2005, and I remember that the amount, I got some e-mail from Adam saying it was relatively small, about $5,000. So that's --

MR. ROSENBAUM: This isn't the e-mail from Adam.

Page 67

MARK ANGELO

THE WITNESS: No, I have not seen this before, or if I have, I don't remember seeing this.

A    That encompasses my scope of knowledge on the matter.

Q    Okay. And those conversations --

MR. VENTURINI: Withdrawn.

Q    Did you have conversations with Mr. Schinik regarding what compensation Adam was entitled to in 2006?

MR. ROSENBAUM: Compensation for 2005? Conversations that he had in 2006 concerning the 2005 compensation, is that what you're referring to?

MR. VENTURINI: I think you just have to say objection.

MR. ROSENBAUM: I'm trying to get to clarifying it.

MR. VENTURINI: You're being obstructive.

MR. ROSENBAUM: If I was trying to be obstructive I would be a lot more obstructive.

Page 68

MARK ANGELO

MR. VENTURINI: I think the question was clear, but I'll restate it.

Q    Did you have any conversations in 2006 with Mr. Schinik regarding any compensation at that Adam was entitled to?

A    I don't recall any specific conversations.

Q    But you stated earlier that you did recall that Mr. Schinik and Mr. Gottbetter were discussing the compensation, and then there was a calculation that resulted in an amount owed in the amount of $5,000.

A    Yes.

Q    How do you know that?

MR. ROSENBAUM: He said just to --

MR. VENTURINI: Please let him answer the question.

MR. ROSENBAUM: He did answer it. He said he got an e-mail from Mr. Gottbetter. That's exactly what he said. It's precisely what he said twice.

MR. VENTURINI: He said --

Page 69

MARK ANGELO

MR. ROSENBAUM: He got an e-mail from Mr. Gottbetter.

Q    Let me explore that. Are you referring to an e-mail that you got from Mr. Gottbetter in 2006?

MR. ROSENBAUM: Referring --

A    Again, I don't remember when I received an e-mail, but I presume it was in 2006 because he resigned in early 2006.

Him and Ed were speaking, they sorted it out, there was an e-mail, and someone said the dollars we owe Adam are $5,000.

Q    Did you have any discussions with Mr. Rillo regarding how much Adam was entitled to in compensation?

A    No.

Q    During your meetings with Adam when he was the co-portfolio manager, did you discuss how banking fees would be paid on particular transactions?

A    Did we discuss the banking fees -- we had an understanding. We'd meet in our Wednesday meetings. That wasn't always

Page 70

MARK ANGELO

the topic of conversation.

Q    What was your understanding as to how banking fees were paid?

A    Banking fees were, I mean -- I'm trying to think the best way to verbalize it.

Banking fees were always a profit calculation, but we paid bankers, to the extent -- to the extent that there was a third party that brought in a transaction, or a banker that brought in a transaction, that person would get paid first out of the, I think out of the residual, and again, it was a profit calculation. Adam would get 44 percent of it.

Q    And the remaining percentage would go to Yorkville?

A    I believe so, yes. And I believe that Yorkville then remitted that to the fund.

Q    Would the fund receive fees that Yorkville received for managing the fund?

A    Did the fund receive -- I'm sorry?

Page 71

MARK ANGELO

Q    You just said that the fees were remitted back to the fund. So you're saying that when, after you take off the banker fee, whatever is left, you're saying 44.4 percent went to Adam.

A    No.

MR. ROSENBAUM: That's not what he said. The profit, he said 44 percent of the profit.

Q    I see, of the profit. I understand we're speaking about a couple of different things, I got it.

A    Sorry.

Q    Right. With respect to fees that YAM charged, I'm sorry, fees that Yorkville charged for its services, incentive fees, other types of fees, did those fees go to Yorkville and were not remitted to the fund?

A    You know --

MR. ROSENBAUM: I don't understand that question.

Q    Let me break it up, let me break it up.

Page 72

MARK ANGELO

Did the 44 percent, 44.4 percent apply to things other than profits that the fund realized?

A    No. I just want to just be clear on this. It was always a profit calculation. So if there was a million dollars in gains and that represented 44 percent and there was a million dollars in losses, no one got 44 percent and someone just walked, was stuck with the losses.

It was always net, it was a pure profit calculation.

Q    Okay. Did Yorkville charge fees in connection with investments that Highgate House Fund made?

A    I presume that it did, sure.

Q    What types of fees did it charge?

A    It could be a fee in the form of what we would call an OID, an original issue discount, it could be some sort of banking fee, it could be a structuring fee.

But again, I mean, you can't, this is an important point, you can't cherry

Page 73

MARK ANGELO

pick, you can't say we generated $2 million in fees and I want 44 percent of that and we have $2 million in losses and forget about the $2 million in losses.

It was always, again, a net profit calculation.

Q    I understand that. I don't think that was my question, but I understand.

A    I'm just trying to --

Q    I understand.

Did you ever have any discussions with Adam regarding the breakdown of warrants that were issued on any particular transaction?

A    Breakdown?

Q    Yes.

A    It's what I've just previously described.

Q    You mean the 44.4 percent?

MR. ROSENBAUM: No.

A    No. Meaning that, you know, first of all, no one is entitled to any warrants. What we're entitled to is the, you know, the proceeds after they've been

Page 74

MARK ANGELO

monetized on a net basis, on a net profit basis.

Q    Well, has there ever been a time when you agreed to have warrants issued directly to Adam's company, HH Advisors?

MR. ROSENBAUM:  From Highgate's share of warrants?

Q    From anywhere?

A    Well, there's never any time while Adam was employed by Yorkville Advisors that that was allowed.

I mean, never, you know, it's, I'm trying to think of a nice way to say it. We would view it as illegal, as wrong, after Adam left and he essentially got warrants -- do you want me to get into this?

MR. ROSENBAUM:  He'll get into it.

Q    Go ahead.

MR. VENTURINI:  Please don't interrupt him.

MR. ROSENBAUM:  He'll get into it.  Please ask your question.

MR. VENTURINI:  I'd like to hear

Page 75

MARK ANGELO

his answer, him to finish his answer.

A    The short answer to your question is no, whether it was myself, Adam, Troy, any employee of Yorkville Advisors does not get any securities in their individual names.  Period, end of story.

Let me qualify that.  In the last four or five years, I don't remember if in '01, but since we became what I'll call an institutional grade fund, no employee ever gets securities in his own individual name.

Q    Okay.  And by employee are you referring to Adam, or is Adam not an employee?

MR. ROSENBAUM:  Now?

Q    At the time.

A    At the time he was an employee?

Q    He was a co-portfolio manager.

A    When he was a co-portfolio manager.

Q    Right.

A    We viewed him as an employee.

Q    You did.

A    Yes.

Q    Because I believe that he was

Page 76

MARK ANGELO

employed through his firm, HH Advisors, is that correct?

A    I believe so, but --

Q    Okay.  Let me show you what's previously been marked as Maloney Exhibit 3.

MR. ROSENBAUM:  Do you have a copy?

MR. VENTURINI:  I do have an extra copy.

MR. ROSENBAUM:  Thanks.

MR. VENTURINI:  Maloney Exhibit 3 is a two page document, Bates stamp number P 005993 and 005994.

Q    Have you ever seen this document before?

A    I have.

Q    You have?

A    Yes.

Q    Did you receive this document on or about January 19, 2006?

MR. ROSENBAUM:  Did he receive it?

MR. VENTURINI:  Yes.

A    Well, there's an e-mail that

Page 77

MARK ANGELO

says I was cc'd on it.

Q    Yes?  And do you recall receiving that e-mail?

A    No.  I mean, I'm sure I did, but I don't, to be honest with you, I'm not a big e-mail person.

Q    Do you check your e-mails on a daily basis?

A    I probably delete 150 e-mails, delete not read, probably a hundred e-mails a day.  But yeah, I go through them.

Q    On a daily basis?

A    Not every day, but yeah, some days I guess I don't get to them, but I would say more or less I'm trying to delete the e-mails.

Q    You testified you saw this document before.  Can you tell me when you first saw it?

A    The first time I really became familiar with it was at the Christopher Maloney deposition.

Q    Do you recall reviewing this spreadsheet that's attached on Page 2 at any

Page 78

MARK ANGELO

time?

A    I recall looking at it two weeks ago at the Maloney deposition.

Q    Let me direct your attention to Page 2.

First of all, let me just ask a question. Do you understand that this document is in connection with the Oxford/Uluru transaction?

A    Yes.

Q    Have you heard of the Oxford/Uluru transaction before?

A    I have.

Q    Is that an investment that Highgate House made?

A    It is.

Q    Was it made with your approval?

A    It was.

Q    Directing your attention to Page 2, have you ever seen Page 2 before today, or before Maloney's deposition?

A    Again, I don't recall seeing it prior to Maloney's deposition.

Can I actually say what I was

Page 79

MARK ANGELO

trying to say before?

Q    Go ahead.

A    Along all these lines, and again, to sort of give you the history of it, Adam and Chris Maloney were friends. In fact, I think Adam brought Chris in.

And what's important to me, you know, we're a fiduciary, and the most important thing for me is earning the, the warrants that Highgate House Fund earned, and it earned, it made a $3 million investment and it earned approximately 1.1 million warrants.

That was the warrants that that fund was entitled to for taking a risk position, a $3 million risk position in this company.

Everything else, and this is where, this is a separate Adam and Chris issue, you know, another fund, Prentice Capital Management, participated in this raise, and it's really the Prentice warrants that apparently Adam and Chris got into some dispute over.

So when these guys are sending

Page 80

MARK ANGELO

e-mails back and forth to me, this is irrelevant. These aren't -- the warrants that I'm responsible for are the warrants that Highgate House Fund, you know, received and earned.

The Prentice warrants is a separate fight between Adam and Chris, but it's an entirely different transaction.

And we've done approximately 70 transactions, you know, Adam and I as the co-manager. Every single time those warrants are always in the name of Highgate House Funds.

This is the outlier because it's really the Prentice warrants that either, depending on who you talk to, that either Chris or Adam separately negotiated with Prentice to get a piece of their warrants for introducing the transaction.

But again, you'll never see any e-mail from me back and forth saying agreed. There is none. All I was concerned about is the 1,100, whatever the number is, 1.1 million warrants that Highgate is entitled to for

Page 81

MARK ANGELO

making a $3 million investment.

The Prentice warrants, which are really agency warrants, is a whole separate issue between these guys. These guys are fighting over who would get part of the agency warrants and they're trying to come up with these things. This is meaningless to me.

MR. ROSENBAUM: While they're looking, did Prentice contribute money on top of the $3 million?

THE WITNESS: Yes, Prentice put considerable money in the transaction. And it's the Prentice warrants that this is, I mean to me, I couldn't believe that Prentice was giving up their warrants, but that's -- it's not my issue.

My issue is being a fiduciary and protecting, you know, making sure that Highgate got the 1.1 million warrants it was getting for its investment.

And after we monetize those warrants, which will be God knows when, but to the extent that we do monetize

22 (Pages 82 to 85)

Page 82

MARK ANGELO

those warrants, then we would pay, Chris would be getting a cash equivalent after the warrants are monetized.

Q    What is Mr. Maloney entitled to on, in terms of the warrants with respect to the Oxford/Uluru transaction?

A    What he's entitled to, he's entitled to the cash equivalent after we monetize those warrants, to 20 percent of the 1.166,000. There was some balance, which I think is, call it roughly 400,000, which is what I'll call agency warrants, you know, that Highgate House wasn't -- it was, those were the Prentice warrants.

Q    Well, if you look at Exhibit 3 to Maloney's deposition on Page 2 it breaks out, does it not, the Highgate House warrants on top and the Prentice warrants and the bottom, do you see that? Highgate House on the top left?

A    Okay.

Q    And Prentice on the bottom left.

A    Okay.

Page 83

MARK ANGELO

Q    And is your understanding that the Highgate House warrants numbered 1,166,667?

A    Correct.

Q    And that the Prentice warrants totaled 3,833,333?

A    That's what this says. I have no idea how many warrants Prentice got or didn't get.

Q    Do you see on the right quadrant it says HH Advisors, 44.4 percent?

MR. ROSENBAUM:  The upper right?

Q    Upper right.

A    Right.

Q    Do you see where it says 414,400 warrants?

A    Correct.

Q    Do you know if HH Advisors got those 414,400 warrants?

A    I have no idea. But again, this occurred after Adam was no longer employed.

You know, to give you the whole picture as well, Adam has a very close

Page 84

MARK ANGELO

friendship and relationship with Prentice, you know, and if Prentice chose to give warrants to Adam after he was employed at Yorkville, that's between Prentice and Adam, and if Chris Maloney thinks that he's entitled to X, that's a separate -- it's got nothing to do with us.

The sole issue again is, you know, Highgate made a $3 million investment, Highgate was entitled to 1,667,000 of those warrants.

After they were monetized, 20 percent, 20 percent of the proceeds after we monetized, that would go to the banker, which was Chris.

Q    Maloney -- I'm sorry, are you done?

A    I'm sorry.

Q    Maloney testified that you approved the issuance of 414,400 warrants directly to HH Advisors.

MR. ROSENBAUM:  That's not what he said.

Q    With respect to the Oxford Uluru transaction.

Page 85

MARK ANGELO

MR. ROSENBAUM:  Let's get it out.

A    That's not -- can I answer the question?

Q    Yes, please.

A    What Chris kept wanting me to do was to fight on his behalf in what I'll call splitting the agency warrants, and what he's considering approval is he's saying -- that's not my fight, and my issue is the Highgate warrants, whatever you and Adam are trying to, whatever you're trying to do with Prentice is just not our issue.

Q    By the agency warrants are you referring to -- well, what are you referring to?

MR. ROSENBAUM:  He just said the Prentice warrants.

Q    Prentice?

A    If Prentice received 3,833,000 warrants, those are what I'll call the agency warrants.

Q    All right.

So are you saying that you did not give the approval to have the 414,400

Page 86

MARK ANGELO

warrants issued directly to HH Advisors?

A    It's not my approval to give. It's Prentice's warrants, giving X to --

Q    No, we're talking out of the 1.1 million Highgate House warrants, because the top row on this exhibit is all Highgate House, so this has nothing to do with the Prentice warrants.

A    This spreadsheet means nothing to me. What I'm saying is if our position, as again, a fiduciary to Highgate, got 1,166,000 warrants, which it was entitled to for its $3 million investment.

Separate it got an extra 400,000 warrants, I believe 1.5 which relates to whatever the agency warrants are, which are the Prentice warrants.

So from my standpoint, we ended up with 1.5 instead of 1.16. What Maloney is saying in this whole separate issue between him and Chris is the agency piece he feels that, you know, Adam and him are in a dispute over the agency piece, but that's not my cross to bear.

Page 87

MARK ANGELO

My responsibility is to Highgate House, the warrants they received for the $3 million investment. Period, end of story.

MR. ROSENBAUM:  Off the record.

(Discussion off the record.)

MR. VENTURINI:  Let's go off the record.

THE VIDEOGRAPHER:  Going off the record, the time is 1:27 p.m.

(At this point there was a luncheon recess, after which the deposition continued as follows:)

THE VIDEOGRAPHER:  Returning to the record, the time is 2:07 p.m.

Q    Do you understand that you're still under oath?

A    I do.

Q    Continuing our discussion of the Oxford/Uluru transaction, did Yorkville get a fee on that transaction?

I don't know if it's in the document or not.

A    I believe so.

Page 88

MARK ANGELO

Q    Would that be called a banking fee, or a banker's fee?

A    I don't know what it was called.

MR. ROSENBAUM:  Look at the document.

Q    Well, it may not be in the document.

A    I would imagine that Highgate got a fee on the money that it invested, and again, I don't know if there was a balance, I believe they were the same thing, they were going through Prentice to try and essentially get some of the Prentice fees as an agency fee.

Q    Well, in the typical transaction where Highgate is buying a convertible debenture, say, what fees would either Yorkville or Highgate get that from transaction?

A    It could get due diligence fees, it could get structuring fees, and it could get, you know, a cash fee as part of doing the transaction.

Page 89

MARK ANGELO

Q    Could there also be a banker's fee?

A    Well, the cash fee if there was a banker, you know, I think they're the same thing.

Q    Is the cash fee based upon a percentage of the total investment?

A    Typically, yeah.

Q    What's a typical cash or banker's fee?

A    Now or then?

Q    In, say, 2005.

A    A cash fee, probably somewhere between 7 and 10 percent, but a fair amount were at 10 percent.

Q    Walk me through how that fee would then be distributed within Yorkville or the bankers, whoever is working on that transaction.

A    If there was a cash fee generated and a banker brought that transaction in, he would receive 20 percent of the cash fee.

Q    And then the balance would go

24 (Pages 90 to 93)

Page 90

MARK ANGELO

where?

A    You're talking in respect to Highgate House?

Q    Yes, in a Highgate House typical investment in 2005, you're saying that there is an up to 10 percent cash fee that's earned.

A    Right.

Q    And you're saying that 20 percent of that 10 percent would go straight to the banker, and where would the other 80 percent go?

A    The other 80 percent, well, if it was a Highgate House transaction, then 40 percent, 44 percent of the cash would be in the reconciliations with Adam.

Q    In other words, it would be earmarked for Adam's compensation?

A    It would be part of the, again, the profit calculation, but yeah, it went into his reconciliations.

Maybe reconciliation is the wrong word.  You know what I'm trying to say.

Q    I think I do.

Page 91

MARK ANGELO

And the rest of it?

A    And the rest of it went to Yorkville, to the extent that there was any other expenses associated with the transaction was taken, and then the balance I believe was remitted back, to the extent that there was a balance, it was remitted back to the fund.

Q    Let me show you an exhibit.  It was previously marked as Maloney Exhibit 9 on November 17, 2006.

MR. ROSENBAUM:  Do you have a copy?

MR. VENTURINI:  I don't have an extra one.

MR. ROSENBAUM:  Let me just get mine.  Maloney 9?

MR. VENTURINI:  Exhibit 9.  Yes.  For the record, it's a warrant to purchase Oxford Ventures.

Q    Have you seen this warrant before?

A    I knew of the existence of it.  I don't know if I saw this specific -- in this form.

Page 92

MARK ANGELO

Q    When you referred earlier to a 1.5 million warrant piece that Highgate was entitled to, was this the warrant that you were referring to?

MR. ROSENBAUM:  He didn't say that.  He said 1.167 I think he said is what Highgate was entitled to plus they got a piece of Prentice's warrant.  That's what he said.

MR. VENTURINI:  Well, I think you're incorrect.

MR. ROSENBAUM:  That's exactly what he said.  I heard him and you heard him.

The record will speak for itself, but that's what he said.

MR. VENTURINI:  Let's leave it at that.

Q    But is this the warrants you were referring to earlier?

A    Again, I know that Highgate House was entitled to 1.1, whatever that number is.

Q    Right, based on the document we

Page 93

MARK ANGELO

saw earlier.

A    Based on that.  There was a balance of warrants that between Adam and Chris were trying to negotiate as what I'll call agency warrants with Prentice.

Q    So, do you understand that part of this 1.5 million warrants consists of warrants that are in essence Maloney's warrants or warrants that go to Maloney for his banker's fee?

A    Well, no, what I understand is after we monetize the position, if we choose to exercise the warrants, and if we choose to sell the underlying stock, then he would get a cash equivalent.

Q    Okay.  Was there ever a discussion --

MR. VENTURINI:  Withdrawn.

Q    Is it correct to say that the bankers, in addition to getting 20 percent of whatever cash fee, also get a percentage of warrants that are part of an investment in which they act as the banker?

MR. ROSENBAUM:  He just answered

Page 94

MARK ANGELO

that, August.

MR. VENTURINI: No.

MR. ROSENBAUM: He said --

MR. VENTURINI: Please say objection, don't keep speaking.

MR. ROSENBAUM: You've asked him the same question, he just answered it.

MR. VENTURINI: You're giving speaking objections.

MR. ROSENBAUM: Answer the question again.

A    In many cases bankers would receive both 20 percent of the cash fees and the non-cash fees after the position was monetized.

MR. ROSENBAUM: Off the record.

MR. VENTURINI: We're not off the record.

Q    Do you understand that --

MR. VENTURINI: Withdrawn.

Q    Is it your understanding that Maloney claimed that he was entitled to receive a certain portion of the warrants that were earmarked for Prentice in the

Page 95

MARK ANGELO

Oxford/Uluru transaction?

MR. ROSENBAUM: When you say warrants, you mean the monetized value?

MR. VENTURINI: No, the warrants, this is the Prentice part.

MR. VENTURINI: This is the --

MR. ROSENBAUM: I understand.

MR. VENTURINI: Mr. Maloney testified that he was entitled to the monetized portion -- You're really interfering with the deposition.

MR. ROSENBAUM: I'm not interfering, I'm correcting your statement. You made an erroneous statement as to what Maloney testified to. We'll get out the transcript. You have it here.

He testified that he was entitled to the monetized value of whatever it was.

MR. VENTURINI: My question has nothing regarding what Maloney testified to. I'm asking whether Maloney had a

Page 96

MARK ANGELO

claim to a certain part of the Prentice warrants. I have not asked that question.

MR. ROSENBAUM: You did. You said are you aware that Mr. Maloney said. She'll read it back. That's what you said, August, she'll read it back. I heard you.

Read back the question just prior to the dialogue --

MR. VENTURINI: We don't have to do that, I'm going to ask a question that has nothing to do with the testimony.

If you have an objection, please say objection, don't give a speaking objection.

MR. ROSENBAUM: I'm not.

MR. VENTURINI: You've been speaking for the last minute.

MR. ROSENBAUM: I'm objecting.

MR. VENTURINI: I'll ask a new question.

MR. ROSENBAUM: Go ahead.

Page 97

MARK ANGELO

Q    Do you understand that Chris Maloney has a claim or claims that he's entitled to receive a portion of the warrants that are part of the Prentice warrant piece in the Oxford/Uluru transaction?

MR. ROSENBAUM: A claim against who?

MR. VENTURINI: If you have an objection, please say objection.

A    Maybe I can just answer the question so we can move on.

Chris Maloney is not entitled to a physical warrant in his name, even the agency Uluru warrants, at any point that he's ever employed by Yorkville Advisors.

Q    But --

A    Wait, just to be clear, if you think about it from -- I think I'm answering the question that you're asking.

If you think about it from if you're an investor in Highgate House, would you want an employee, and let's say he got securities that has nothing to do with your investment in Highgate House, would you want

Page 98

MARK ANGELO

him to have the ability to front run, to sell ahead of time?

You can't do it, it's illegal, it doesn't work.

What Christopher Maloney's claim was, when the warrants were monetized was he entitled to X percentage of the Prentice?

And again, that just wasn't our battle to fight. What we're responsible for is the warrants that Highgate House was entitled to.

Q    Well, that's actually my point. What I'm saying is, asking you is whether there was an agreement with Prentice and Maloney as to whether Maloney was going to get some of the warrants that Prentice was entitled to under this transaction?

A    No.

Q    How do you know that?

A    Well, if there was, then Maloney would be breaking -- he would be breaking some sort of law, or he would be fired.

Page 99

MARK ANGELO

Prentice never called us and said hey, we want to give Chris Maloney personal warrants. I can't imagine they'd be speaking about that without speaking to us. I mean, it's --

Q    Okay.

So you're saying, you said before that you expected Highgate to get the 1.1 million Oxford warrants.

A    Correct.

Q    It's issued now at 1.5 million shares, right, of --

A    1.5 warrants.

Q    Warrants, thank you.

You're saying that the difference between the 1.5 and the 1.1 has something to do with Prentice?

A    Right, those were the agency warrants.

Q    Okay. Do you know exactly why it's 1.5 and not some other number?

A    I don't. That's a subject of the dispute.

MR. ROSENBAUM: If you know you

Page 100

MARK ANGELO

know.

A    I don't know.

Q    All right. Now, what does Yorkville or Highgate plan to do with the 1.5 million warrants if it's only expecting 1.1 million?

A    Yorkville or Highgate on the 1.1, when it monetizes the 1.1, 20 percent of the proceeds of what gets monetized would be paid to Chris Maloney.

Q    What will happen to the other 400 or so thousand warrants?

A    That has yet to be decided.

Q    Who would decide that?

A    Yorkville would decide that.

Q    Has Yorkville taken the position that those warrants belong to Yorkville?

MR. ROSENBAUM: He just said it hasn't been decided yet.

MR. VENTURINI: No --

A    Let's be clear. They don't belong to Chris Maloney, that's all I can tell you.

Page 101

MARK ANGELO

Q    Do they belong to Prentice?

A    Well, they were Prentice warrants that they've issued to Yorkville.

Q    So why were Prentice warrants issued to Yorkville?

A    As the agency warrants on this transaction.

Q    Do you know why any Prentice warrants were issued to Yorkville?

MR. ROSENBAUM: He just answered the same question. He said it's the agency warrants. He just said it.

THE WITNESS: I'll answer.

MR. ROSENBAUM: Please. It's the identical question. He just answered it. I don't understand why you're asking the same question twice.

MR. VENTURINI: Because the answer is as the agency warrants on the transaction.

MR. ROSENBAUM: Right.

MR. VENTURINI: I don't know what that means.

Q    What does the agency

Page 102

MARK ANGELO

warrants --

A    I assume that what Prentice was saying we were, Prentice being entitled to, I guess that number is 3.66, whatever Prentice was entitled to, and were giving up a portion of their warrants, I assume as sort of the agency introducing them to the transaction, you'd have to ask Prentice, I don't know why they gave up whatever the number is of their warrants, 400 something thousand.

Q    So sitting here today you don't know why?

A    My logical conclusion is what I just deduced.

I don't think they're a charity. I think that as an agency business, as a fee for introducing them to the transaction.

And apparently they put warrants in the name of HH Advisors, which if Adam was working at Yorkville we would have stopped, but we couldn't, he was no longer an employee of Yorkville.

But Chris Maloney certainly

Page 103

MARK ANGELO

knows that no securities can go into his individual name.

Q    Did you have any discussions with Adam regarding the distribution of the Oxford/Uluru warrants, any of the warrants?

A    Again, the only thing I cared about was the 1,100,000 that Highgate, the fund, was entitled to.

And I knew that Adam and Chris were friends and they were trying to, and Adam, Chris and the gentleman from Prentice are all friends, so I viewed it as they were sorting out whatever they were trying to sort out.

Q    The question was whether you had a conversation --

A    I don't remember any specific conversation.

Q    Can you tell me why the 1.5 million warrants are issued to Yorkville?

A    To be frank, that was a mistake that, you know, that Adam made. They should have been issued in Highgate, the 1.1, and the balance should have been issued to Yorkville,

Page 104

MARK ANGELO

or it all should have been put in Highgate, I'm not sure if it necessarily matters.

But again, Adam was the attorney for Uluru, the escrow agent, he was a co-portfolio manager of us, and he represented us in this issue.

And at that time he still -- I still trusted Adam. I just didn't, I knew we were getting warrants, we got warrants in this name. We probably should have double checked it, but we didn't.

I mean --

MR. ROSENBAUM: You've answered the question.

Let me just check something.

MR. VENTURINI: Let's go off the record.

THE VIDEOGRAPHER: Going off the record, the time is 2:24 p.m.

(Discussion off the record.)

THE VIDEOGRAPHER: Returning to the record, the time is 2:24 p.m.

Q    Has Yorkville assigned the Oxford warrants over to Highgate House?

Page 105

MARK ANGELO

A    I don't know.

Q    As far as you know are they still in Yorkville's name?

A    As far as I know.

Q    Has Chris Maloney gotten any equity issued to him directly in connection with the Oxford/Uluru transaction?

A    No.

Q    Has he gotten any stock in Oxford or Uluru?

A    Issued to him directly, no.

Q    Has he gotten any of the warrants --

MR. VENTURINI: Withdrawn.

Q    Has he gotten any of the stock underlying the warrants issued to him directly?

A    No.

MR. VENTURINI: Let's have this marked as the next exhibit.

(The above described document was marked Angelo Exhibit 4 for identification, as of this date.)

MR. VENTURINI: For the record,

28 (Pages 106 to 109)

Page 106

MARK ANGELO

Exhibit 4 is a four page document, it's an e-mail string, the Bates number is P 08648 running through P 08651.

Q Have you seen either this document or these e-mail strings before?

A I have not. Oh, actually I'm cc'd on this.

Q Are you referring to the one at the bottom of Page 2?

A I am.

Q Are you also cc'd on the one on Page 3?

THE VIDEOGRAPHER: Going off the record, the time is 2:27 p.m.

(Discussion off the record.)

THE VIDEOGRAPHER: Returning to the record, the time is 2:28 p.m.

Q Do you understand you're still under oath?

A I do.

Q Have you had the opportunity to look at the e-mails that are on the first three pages of this Exhibit 4?

A I have.

Page 107

MARK ANGELO

Q Have you seen any of these e-mails before?

A I mentioned prior it appears I was cc'd on these, but again, I'm not a big reader of e-mails.

Q Okay. Let's go to the last one, which is on Page 3. It's dated Thursday, October 26, 2006.

A Um-hum.

Q It's Army time 1539.

It starts off, it says Gator. Do you know who Gator is?

A It would be the nickname for the trader at Sloan.

Q What's his real name?

A I think it's Jonathan Gellis, which is the JGellis.

Q I see. What is Sloan?

A Sloan is a broker/dealer that handles a lot of our sale side.

Q Do you see in this e-mail that Mr. Maloney is referring to his personal account at Sloan?

A Um-hum.

Page 108

MARK ANGELO

Q Does he have a personal account at Sloan?

A I have no idea.

Q Does any employee of Yorkville have a personal account at Sloan?

A Any employee, I would imagine so.

I believe them to have an account. Again, it's a compliance officer question. I believe to have a brokerage account we have to know where it is.

Q Would you ever require Mr. Maloney to have a brokerage account at Sloan?

A Require him?

Q Yes.

A I can't think of a reason we'd require him. I thought the law, from a compliance standpoint you just have to have confirmation, you have to know where it was.

Q I'm sorry?

A The compliance officer would always have to know where your account was.

Q I see.

Page 109

MARK ANGELO

Did you ever ask anyone associated with Yorkville to open an account at Sloan if they wanted to trade securities in which one of the funds were invested in?

A Did I have that conversation?

Q Yes, with anyone.

A I don't -- I can't recall having that conversation.

Q After that sentence he says, "My comp shares are 546,815." Do you know what he's referring to?

A I assume he's referring -- I assume he's referring to the shares issued under, I think there was a SEDA, a different instrument that generated shares.

Q Can you just describe for the record is a SEDA is?

A It's something called a standby equity distribution agreement, which is another financing mechanism.

Q Does it function like a line of credit?

A Yeah.

Q In the first sentence he says,

Page 110

MARK ANGELO

"I confirmed with Mark for an OK to carve out my portion of the Uluru shares." Do you know what he was referring to there?

A    Yeah. I mean, the sentence isn't accurate.

Q    Okay.

A    What Mr. Maloney came to me and said was that he was trying to, I think he said his building was going co-op and he was try to buy his apartment.

And for purposes of getting a mortgage, he gave me a whole story, for purposes of getting a mortgage could he open an account at Sloan, have securities, he was really trying to show something for the bank.

And when he presented to us, again, he was very familiar with the policy that none of those securities could be sold, he was only entitled to take the cash equivalent, and he gave us a whole presentation on that.

At the end of the day we decided no. So no. And this was sort of his e-mail chain going back and forth. But that

Page 111

MARK ANGELO

was the genesis of it.

MR. ROSENBAUM: You said no as to what, so I'm clear?

A    No, you can't, even if you're putting it in an account and you're getting a letter saying they're not really your securities and that you couldn't trade them, that doesn't matter.

Again, he was presenting it, again, a very sad story how he desperately needed this to get a mortgage.

And we just said we would look into it, but at the end of the day it's not something we could do.

Q    I'm not sure if I follow. What ultimately happened? Did he got stock?

A    No, of course not.

Q    No, you're saying no Uluru shares were ever issued to him.

A    No.

Q    Continuing up the line, it begins at the bottom of Page 2 and it continues to the top of Page 3, he says, "The official amount was 993,300."

Page 112

MARK ANGELO

Do you know if that refers to the SEDA shares?

A    I have no idea.

Q    Let me direct your attention to Page 1, the very first e-mail on that page. Do you know who Scott Cubeta is?

A    I assume he's somebody that works at Sloan Securities.

Q    Does he work with Gator?

A    I believe he does, yes.

Q    The e-mail says, "This cert was delivered to Cornell Capital Partners on Friday." Do you know what --

MR. VENTURINI: Withdrawn.

Q    I assume cert refers to certificate?

A    I assume so.

Q    Is that a common abbreviation in the industry?

A    I would imagine.

Q    Do you know what --

MR. VENTURINI: Withdrawn.

Q    Is it referring to the Uluru stock that's the subject of the prior e-mails?

Page 113

MARK ANGELO

A    Speculating, I --

MR. ROSENBAUM: Don't speculate. If you know, you know. If you don't know, you don't know.

A    I don't know.

Q    Do you know if any stock certificates were ultimately delivered to Cornell that were in Mr. Maloney's name for Uluru?

A    No stock certificates were ever in Mr. Maloney's name.

Q    Do you know what certificates then were delivered to Cornell?

A    No. I mean, we could call them and find out, but I'm crystal clear that no certificates were ever in his name.

MR. ROSENBAUM: Are you done with this one?

MR. VENTURINI: I think so.

Q    Do you recall if Highgate House ever assigned any Oxford warrants to anyone?

A    No.

MR. VENTURINI: Let's have this marked, are we up to 5?

Page 114

MARK ANGELO

(The above described document was marked Angelo Exhibit 5 for identification, as of this date.)

Q    Exhibit 5 is a four page document entitled "Assignment agreement." The Bates stamp number is P 08493 through P 08496. Have you ever seen this document before?

A    Well, it's got my signature on it.

Q    Is that on Page 2?

A    It is.

Q    Is that under Cornell Capital Partners?

A    It is.

Q    Is that the Cornell fund that we've been referring to?

A    It is.

Q    Above that is that Troy Rillo's signature?

A    It appears to be.

Q    Let me direct your attention to Page 1. Does it appear that Highgate House assigned 1.1 of the warrants that it had for

Page 115

MARK ANGELO

the Oxford Uluru transaction on or about March 31, 2006?

MR. ROSENBAUM:  To Cornell?

MR. VENTURINI:  I'm sorry?

MR. ROSENBAUM:  To Cornell?

MR. VENTURINI:  We haven't gotten to that part.

MR. ROSENBAUM:  It says it.

MR. VENTURINI:  Let me get to the questions.

MR. ROSENBAUM:  I want the record to be complete. He's already testified this morning that Highgate was merged into Cornell. Ask your question.

MR. VENTURINI:  Thank you.

MR. ROSENBAUM:  Go ahead.

Q    Does it refresh your recollection that there was an assignment?

A    It appears that on March 31, 2006, and this probably is related to the merger of Highgate into Cornell, that Highgate assigned its warrants from Highgate to Cornell.

Q    Were assignments done for every

Page 116

MARK ANGELO

position that Highgate House Fund held?

A    You know, I don't know.  I think it probably pertains to whether or not the company was in registration or about to be in registration, but the answer is I don't know.

Q    Okay.  Can you tell me, in Paragraph number 2, why the assignment is for 1.1 million warrants?

A    Because those were the warrants that Highgate House earned for doing the transaction.

Q    So the remaining warrants are still in Yorkville's possession?

A    Yes.

Q    And that's the piece that Yorkville is still deciding what to do with.

A    Correct.

Q    Does Yorkville expect to speak to Prentice about it, or is it an internal transaction?

A    No, it's an internal transaction.

Q    Now, in connection with the

Page 117

MARK ANGELO

Charys transaction, do you know when that deal closed?

A    I'm going to say November or December of '05.

Q    Do you understand that to be an investment that Highgate House Fund made?

A    Yes.

Q    And do you understand that warrants were issued in that transaction?

A    Yes.

Q    And I believe, I know it's the subject of this lawsuit, but it's a million warrants that we're talking about?

A    Yes.

Q    And those warrants were issued at the time of the closing of the transaction?

A    Yes.

Q    Now, in 2005, with respect to Highgate, in connection with transactions where warrants were issued, were those warrants listed as part of the NAV of Highgate House Funds as an asset?

A    They were on our books and records.  We discount them extremely,

31 (Pages 118 to 121)

Page 118

MARK ANGELO

extremely heavily.

Q    But were they listed in the calculation of the net asset value of the fund?

A    Yeah, I mean, a question for the CFO, but yes.

Q    As far as you know?

A    As far as I know, yes.

Q    Let me direct your attention back to Exhibit 2. We spoke about this earlier.

What do you understand that this attachment is? It's basically the listing where it starts with company name and it runs through, for the remainder of the document.

A    I'm sorry?

Q    What do you understand this document to be, in terms of what's presented here?

A    This appears to be, again, I'm, you know, I'm not in the accounting department, a schedule of investments.

Q    On Page 2 do you see where it

Page 119

MARK ANGELO

says "Total outstanding CDs, P-notes, warrants and shares," do you see that?

A    Yes.

Q    Do you understand P-notes to be promissory notes?

A    I do.

Q    And does CD stand for convertible debenture?

A    I would imagine so, yes.

Q    So do you understand this to be a listing of all the outstanding debentures, notes, warrants and shares that are in Highgate House?

A    No, I would call this what's outstanding instruments that we're attributing a value to.

You know, for instance, I know we have warrants in all these companies, but the warrants are probably out of the money or they were so illiquid that there's no value, valuation attribution.

Q    Well, let me direct your attention to line 14 where it says Earth Shell. Do you see where it has a warrant

Page 120

MARK ANGELO

listing there?

A    Earth Shell warrants, yes.

Q    Do you know what the dollar value means?

A    Am I familiar with the term dollar value?

Q    Well, it's listed as a dollar, right, in terms of what its value is?

A    That's what this column says, yes.

Q    Right. Can you tell me why that warrant is listed and, say, the Charys warrants are not listed in this statement?

A    I mean, I have no idea, but again, this is, you know, Liang was again a low level accountant.

This is something internally, but he's apparently misdistributing Mr. Press, but again, we have warrants or shares in substantially all these companies, and if we feel there's no value attributed to them or it's extremely low, then it wouldn't show up on this.

MR. VENTURINI: Let's have this

Page 121

MARK ANGELO

marked as the next exhibit.

(The above described document was marked Angelo Exhibit 6 for identification, as of this date.)

MR. VENTURINI: Exhibit 6 is a four page document. The Bates stamp number is P 01436 through P 01439.

Q    Can you tell me what this document is?

A    It says balance sheet on it.

Q    Is it in fact a balance sheet for Highgate House Funds?

A    Again, that's what it says. I'm -- I'm not in the accounting department.

Q    Have you ever seen a document of this type before?

A    Have I ever seen a balance sheet before?

Q    No, a document of this type, in this layout.

A    Um

Q    Let me ask a different question. Looking at this document can you tell if it was produced by someone at

Page 122

MARK ANGELO

Yorkville?

A    I have no idea.

Q    Well, I can make a representation that it was produced by the Plaintiffs in this action.

Have you ever seen a balance sheet for Highgate House Funds at any time?

A    I'm sure at some point I saw a balance sheet for Highgate House Funds.

Q    Did you ever see it in a printed out version?

A    I mean, I don't recall.

Q    You normally look at it on your computer?

A    I would guess I've probably seen it on my computer, or, not my computer, but walking by accounting, or maybe they gave me a printout and I reviewed it.

Q    When you saw a printout of a balance sheet for Highgate House did it look something like this in terms of the layout?

A    Again, I don't know.

Q    Who at Yorkville was responsible for preparing the balance sheet

Page 123

MARK ANGELO

for Highgate House?

A    That would be the accounting department.

Q    Who is in charge of the accounting department?

A    Ed Schinik.

Q    With respect to the balance sheet in December 2005, was Ed Schinik in charge of accounting at that time?

A    I believe so, yes.

Q    When did he begin working for Yorkville?

A    I think December of 2005.

Q    Who was there in that position prior to him?

A    His name was James or Jim Huff.

Q    Looking at the balance sheet can you tell me if Charys warrants are listed as an asset on the balance sheet?

A    On this sheet I do not see that.

Q    Do you see any investments in Charys on this balance sheet?

A    I do.

Page 124

MARK ANGELO

Q    Is that on Page 2?

A    It is.

Q    Is that next to the $4 million figure?

A    I thought it is the $4 million figure.

Q    Okay. It's the same question. Does the $4 million figure refer to the debenture that Highgate House Fund bought from Charys?

A    Again, I'm not in the accounting department, but I would -- I don't prepare this. I would imagine it would be.

Q    But to the best of your recollection did Highgate House buy a debenture in the principal amount of $4 million from Charys?

A    Yes.

Q    Turning to the next page do you see any of the Oxford warrants listed on this balance sheet?

A    I do not. I see Oxford $3 million.

Q    Does that refer to the

Page 125

MARK ANGELO

debenture that Highgate House purchased from Oxford?

A    I would imagine it does.

MR. ROSENBAUM:  Could we have a five minute break?

MR. VENTURINI:  Already? All right. Let's take a break.

THE VIDEOGRAPHER:  Going off the record, the time is 2:52 p.m.

(At this point in the proceedings there was a recess, after which the deposition continued as follows:)

THE VIDEOGRAPHER:  Returning to the record, the time is 2:57 p.m. This marks the beginning of tape number 3.

Q    Are you familiar with the Cenuco transaction?

A    Yes.

Q    Is Cenuco a company in which Highgate invested?

A    Yes.

Q    Were there warrants issued in connection with the Cenuco transaction?

A    You know, I don't know.

Page 126

MARK ANGELO

Q    Did you ever have any conversation with Adam regarding the issuance of warrants in the Cenuco matter?

A    I vaguely remember having a conversation. I just don't know if any warrants were ever issued or what ultimately happened with the transaction.

It was one we were redeemed on, again, by Prentice.

Q    Prior to the redemption do you recall having a discussion with anyone regarding the issuance of warrants with respect to Cenuco?

A    Again, I don't recall.

MR. VENTURINI: The next exhibit.

(The above described document was marked Angelo Exhibit 7 for identification, as of this date.)

MR. VENTURINI: Exhibit 7 is a four page document, the Bates stamp number is D 01247 through D 01250. The first page is an e-mail, then there's a three page attachment.

Q    Have you seen either the e-mail

Page 127

MARK ANGELO

or any of the attachments before?

A    If I have, I don't recall seeing them.

Q    Let me direct your attention to the first, I'm sorry, the second page where it says First Look Studios. Do you see that?

A    I do.

Q    Okay. Do you see on the upper right quadrant where it says warrants?

A    I do.

Q    And do you see Yorkville Advisors listed and you see HH Advisors and YAM?

A    I do.

Q    Does YAM refer to Yorkville Advisors Management?

A    Yes.

Q    Was YAM in business in January 2006?

A    I presume so.

Q    Do you recall when YAM ceased operations?

A    This is sort of a legal question. I know the entity exists, but it

Page 128

MARK ANGELO

collapsed into YA, so.

Q    Do you know when the collapsing took place?

A    I do not.

Q    Was it some point this year?

A    I don't know. I would have thought it was last year, but it could be this year, I don't know.

Q    Let me clarify, when you say YA, you mean Yorkville Advisors?

A    Yes.

Q    Seeing this document, does it refresh your recollection as to having any discussions as to whether warrants would be issued directly to HH Advisors in the First Look Studios transaction?

A    Again, I don't recollect any conversations that -- what they have in common both First Look, Uluru and Cenuco, is that it was all, Prentice was the investor. It's a complete different situation than Charys.

These were agency warrants, and I believe Adam represented Prentice, he had something to do with Prentice in First Look or

Page 129

MARK ANGELO

Prentice in Cenuco, and he was representing them in some way.

Q    My question was whether you had any conversations with Adam regarding the issuance of warrants directly to HH Advisors in the First Look transaction.

A    I don't recall conversations.

Q    Did you have any conversations with anyone else about warrants being issued to HH Advisors in the First Look Studios transaction?

A    I don't recall.

Q    Let me direct your attention to the next page, where it says Cenuco. Have you seen this document before?

A    I don't recall seeing it. I could have, I don't, you know --

Q    Do you recall having any conversations with Adam at any time regarding warrants in the Cenuco matter being issued directly to HH Advisors?

A    I do not recall, but again, it's a, you know, it's a Prentice deal.

Q    I think I got that.

Page 130

MARK ANGELO

A    Got you, okay.

Q    The question is whether you had any conversations.

A    No. I do know in both of these transactions, both Cenuco and First Look, we usually gave back to Prentice.

MR. ROSENBAUM: I'm sorry, I didn't hear you.

A    Gave back to Prentice, sold to Prentice.

Q    What do you mean?

A    The instruments that we had in Cenuco and in First Look with Prentice was the majority owner and we were the minority participant in the transaction, both of those transactions Prentice bought from us.

Q    I understand. They were redeemed, in other words.

A    They were redeemed by Prentice.

Q    Right, I understand. So, in other words, Highgate purchased the position then later on Prentice bought that position from Highgate.

A    Correct, and when it bought

Page 131

MARK ANGELO

that position, to the extent that there was any warrants with it, that went with that position.

So again, it's not that I -- that's why I know very little about these transactions. We enter into them, we were redeemed in a relatively short period of time, and I know we hold no -- again, it's not my department, but we hold no warrants in any of these positions because they were redeemed by Prentice.

Q    Okay, I completely understand that.

My next question is whether you had any conversations with anyone other than Adam regarding any issuance of warrants in Cenuco directly to HH Advisors?

A    I can -- I can't recall a specific conversation.

Q    And with respect to Oxford I believe you testified that you cannot recall any conversation that you had with Adam or anyone else regarding the issuance of warrants directly to HH Advisors, is that correct?

Page 132

MARK ANGELO

A    Yes, I mean again, I can't recall -- what you just said is correct. The answer is yes.

Q    Thank you, okay.

You can give back that exhibit.

A    Actually, something popped into my head on this.

Q    Which this is that?

A    Sorry, the balance sheet.

Q    Exhibit what, Exhibit 6?

A    Exhibit 6.

Q    All right.

A    This is sort of more of a question. I don't know if you know the answer. I think this is a draft.

Q    I don't know the answer, and I can't --

A    I would just be curious, because I was just thinking about what you were saying before. I believe the final balance sheet has an attribution to the warrants and a list of all the warrants.

MR. ROSENBAUM: Which warrants, Charys?

Page 133

MARK ANGELO

THE WITNESS: Every warrant.

MR. ROSENBAUM: Including Charys?

THE WITNESS: Including Charys.

A    I'm almost positive, because I think there was an e-mail we were looking for to support the valuation of the warrant in Charys.

So somewhere there's an e-mail, I think you provided or we provided to you, actually, from Mike Chorske involving a Black-Schoels valuation or something like that.

MR. VENTURINI: I have that, actually, but if there is another balance sheet as of December 31, 2005, we call for the production of that because we have not seen it.

MR. ROSENBAUM: I think we produced it. I do.

MR. VENTURINI: This is the only version I've seen. A balance sheet?

MR. ROSENBAUM: It was part of the year-end.

MR. VENTURINI: What he was

Page 134

MARK ANGELO

talking about, the Black-Schoels valuation?

THE WITNESS: No, that's a separate e-mail.

MR. ROSENBAUM: I think we produced for you the year-end Highgate balance sheet that has the Charys warrants on it.

MR. VENTURINI: We'll double check. I don't recall seeing that. But let me call for the production in case we don't have it.

MR. ROSENBAUM: I think it was part of the disks that we sent you, August.

MR. VENTURINI: Disk?

MR. ROSENBAUM: You got hard copies of documents and I think you got disks, too.

MR. VENTURINI: Not to my recollection.

MR. ROSENBAUM: All right, the hard copy.

MR. VENTURINI: I would ask you

Page 135

MARK ANGELO

also to check your records, because if some of the documents were produced by disk to us, we haven't gotten it.

MR. ROSENBAUM: We got the disks, we hard copied off the disk.

MR. VENTURINI: All right.

MR. ROSENBAUM: That's right, because we couldn't Bates stamp them on the disk, so we hard copied and Bates stamped them.

Q    Let me direct your attention again back to Exhibit 6. Does this balance sheet reflect that it was at least printed on February 22, 2006?

A    That's what it says, yeah.

Q    Would the balance sheet as of the year-end 2005 still be in draft form on February 22, 2006?

MR. ROSENBAUM: If this is a draft it's a draft form.

MR. VENTURINI: Please let me ask the question.

A    Could it be? Absolutely. Our audit came out for Highgate probably two

Page 136

MARK ANGELO

months after this.

Q    So is it correct to say that any changes to the balance sheet would have been made after February 22, 2006?

A    I'm not sure if there's changes, and I'm not sure -- again, I think, it's coming from Liang, who is again, a lower level person.

The person would be Ed Schinik and obviously our auditors. This is sort of an internal, I don't know, but I know that the audit came out I think two or three months after that.

So, again, I don't know if this is the draft or the final. I presume it's the draft.

MR. VENTURINI: Let's have this marked as the next one.

(The above described document was marked Angelo Exhibit 8 for identification, as of this date.)

MR. VENTURINI: Exhibit 8 is a multi-page document, the Bates stamp number is P 09335 running through P

Page 137

MARK ANGELO

09341 entitled "Highgate House Asset Reconciliation."

Q    Have you been able to look through the document?

MR. ROSENBAUM: You mean now at the dep has he looked through it?

MR. VENTURINI: I'm asking because I see him looking through it?

A    I'm looking through it now, yes.

For the record, this is a lot more -- when you asked me before does it look like, this is what I'm used to looking at.

Q    I see. Can you tell me what this document is?

A    It says "Highgate House Funds, Asset Reconciliation."

Q    Can you describe to us what an asset reconciliation is?

A    I would imagine exactly that. It is a reconciliation of all the assets in Highgate House Funds.

Q    Was this report run on November 17, 2006?

36 (Pages 138 to 141)

Page 138

MARK ANGELO

A    There's a sentence at the bottom that says it was run at 10:37 a.m. on Friday, November 17th, so I'll assume that it was.

Q    All right.  Have you seen this particular document before?

A    The first time that I am seeing it I believe is today, although it's possible I could have looked at it on somebody's screen.

Q    But as you mentioned earlier, this is a document that's at least in the format that you're familiar with?

A    The format is a lot more familiar than the previous formats, yes.

Q    Okay.  Then is it correct to say that this document was prepared by someone at Yorkville?

A    I assume you got it from someone at Yorkville.

Q    Well, we did, actually.

A    Then --

Q    Is it prepared by the accounting department?

Page 139

MARK ANGELO

A    I would imagine this is prepared by the accounting department, yes.

Q    Let's just go through a few of these.  Where it says, Aerotelesis is the first I guess security listed on Page 1 on the top.  Are you familiar with that transaction?

A    I am.

Q    Is that a transaction that Highgate House entered into when Adam was the co-portfolio manager?

A    I believe so, yes.

Q    Where it says 750,000 and 750,000.  Does that refer to debentures that Highgate House had purchased?

A    I believe that to be correct.

Q    Below where it says Aerotelesis, Inc., then it says 3.00, then underneath that it says 4.00.  Can you tell me what that is?

A    It could be a, I don't know, it could be a warrant that has an exercise price of $3 a share, and the other one could be another warrant with an exercise price of $4 a share.

Page 140

MARK ANGELO

Q    Do you recall there being warrants in the Aerotelesis transaction?

A    I don't recall.  I mean, again, we could look it all up or I could get you an exact answer.

Q    Let me direct your attention to Cenuco, which is the fourth security listed.  Does it appear that the first two entries, where it says 3.29 and 4.56, refer to warrants in Cenuco?

A    It could very well be that.

Q    Sitting here today can you think of anything else it could refer to other than warrants?

A    Unless there was a staggered exercise price on the convertible or something, but if I had to, if I were a betting man, I would bet that it was the warrants.

Q    Can you tell me, where it says withdrawals/sales and realized gains, where it says $198, can you tell me what that is?

A    Realized gains, I would imagine -- I know we didn't trade in the

Page 141

MARK ANGELO

security, because it never got registered and we ended up selling it back to Prentice, and maybe there's an interest for $198.

Again, you're out of my field of expertise, but apparently we made $198 from what this says.

Q    Does it appear that Highgate sold the warrants or the warrant positions that it owned?

A    I don't know.  I don't know how we would sell -- again, we sold the entire position to Prentice, which included the instrument and the warrant.

Q    Where it says, under the column withdrawals/sales where it says Cenuco, minus $6,231,519, does that refer to the sale of the Cenuco debenture?

A    Again, this is not -- you want me to speculate?  I mean, I presume that it is.

Q    And that's based upon reading the column on the left where it says market value, it says $6 million?  Does that appear to refer to the debentures?

Page 142

MARK ANGELO

A    Right, I would -- I'd be -- again, guessing that you had a $6 million convertible debenture plus accrued interest that was sold back to Prentice, and maybe you're in between --

MR. ROSENBAUM:  If you're guessing, don't guess.

THE WITNESS:  I'm sorry.

MR. ROSENBAUM:  A guess doesn't help anybody.

Q    But in fact does the document support that conclusion, that Highgate House purchased a $6 million debenture, and then sold the debenture for $6,231,519, which would consist of interest, and no longer has a position in that security?

A    Again, we could look it up.  I just --

MR. ROSENBAUM:  If you know, tell him.  If you don't know, tell him.

A    I don't know.

Q    Based upon how the document reads, what I'm trying to do is understand how the document reads, and you're familiar with

Page 143

MARK ANGELO

these types of reports, because you see them all the time.

So is my analysis correct that based upon what this report says, that's in fact what happened?

MR. ROSENBAUM:  If you know.

A    Look, I know we had an instrument in Cenuco, I knew that we sold it to Prentice.

Q    Okay.

A    That --

Q    And the $6 million, getting back to the first column, where it says 12-31-05 market value.

A    Correct.

Q    It says $6 million.  So according to this document, the $6 million was --

MR. VENTURINI:  Withdrawn.

Q    According to this document the debenture for $6 million was purchased on or before 12/31/05, correct?

A    Well, I'm assuming it was before 12/31 because you have an accrued

Page 144

MARK ANGELO

interest of $92,000.

Q    Okay.  Fair enough.

A    Some period of time before.

Q    Right.

Going down to the next security, Charys Holdings, the first line says Charys Holdings Restricted, then it says zero as of 12/31/05.  Do you see that?

A    Yes.

Q    Then the next column where it says additions, purchases.

A    Yes.

Q    It says 773,096?

A    Correct.

Q    Do you know what that is?

A    Yes.  I believe we converted a portion of our convertible debenture into restricted stock and got 773,000 shares of restricted, 773,096.

Q    Okay.  Then on the next line where it says Charys Holdings, 8 percent, under the column market value, it says 4 million.  Does that refer to the debentures?

A    That would refer to, yes, I

Page 145

MARK ANGELO

would imagine that's the 4 million convertible debentures.

Q    Okay.  Then two columns where it says withdrawals/sales, where it has the minus 4 million figure, does that refer to the redemption of the Charys debenture that you testified to earlier?

A    I don't recall testifying to a Charys redemption, but putting that aside --

Q    Okay.

A    -- I do believe that that is a redemption in Charys.

Q    That may have been my mistake, but was Highgate's position in Charys at some point redeemed?

A    Correct.

Q    Okay, we'll get into that a little bit later.

Now, continuing where it says Charys Holding Company, .01, does that refer to warrants also?

A    I believe it does, yes.

Q    And as of 12/31/05 is it showing a zero value for the Charys warrants?

38 (Pages 146 to 149)

Page 146

MARK ANGELO

A    I believe it is.

Q    Then do you see where it says additions/purchases, 517,885?

A    Yes.

Q    Can you tell me what that is?

A    You know, I don't know.

Q    Now, continuing again where it says Charys Holdings, 0.01, it's a duplicative line, I guess, the second of four warrants.

Is your answer the same with respect to the 517,885 that's in the column under additions/purchases?

In other words, do you know what the second $517,885 figure refers to?

A    I do not.

Q    Now --

MR. ROSENBAUM:  You said dollar figure.  It doesn't have a dollar sign.

A    This might not be dollars.  I don't -- again, I don't know.

Q    Well, what else could it be if it's not dollars?

A    If it's additions/purchases, maybe it's number.  The answer is I don't

Page 147

MARK ANGELO

know.

Q    Well, let's get back to that. Where it says Charys Holdings, 8 percent, and it says 4 million, do you understand that to be $4 million?

A    I would understand that to be $4 million.

Q    The same with Cenuco, $6 million, you would think that would be dollars?

A    Dollars.

Q    And when Cenuco was redeemed out, that's $6,230,000?

A    I imagine it would be.

Q    The same with Charys, the minus $4.1 million?

A    I would imagine it's the comma in between which I believe to be dollars, but I'm not sure.

Q    Then on the third line for warrants of Charys it also says 0.1.  The first column in market value says zero.  The second column under additions/purchases says zero.  Do you see that line?

Page 148

MARK ANGELO

A    I do.

Q    Then continuing over there's a figure under unrealized gains for $447,635. Do you know what that means?

A    I mean, I do not.  I imagine it's some unrealized gains.

Q    Continuing to the last one it says Charys Holding, then it says .50.  Do you understand that to be the exercise price, by the way?

A    I would imagine so, yes.

One thing to point out in Charys, because Highgate made a $4 million investment, because that investment wasn't redeemed when we first made the investment, one of the reasons that we made it, that Highgate made the investment was for the warrants, because the company ensured us we'd get redeemed in a relatively short period of time.

When we weren't redeemed, the warrants reset to a substantially lower price.

Q    They reset to a penny, right?

A    I don't have it in front of me,

Page 149

MARK ANGELO

but it's something like that.

Q    Do you recall the period of time being 120 days after the closing of the Charys transaction?

A    It sounds right.  We probably have, again, we probably have it here somewhere, but that seems right.

Q    Again, to your understanding the closing of the Charys transaction occurred sometime in either November or December of 2005?

A    I believe it was November.

Q    Okay.

Again continuing with the last line under Charys Holding, where it says additions/purchases, 928,847, do you know what that figure refers to?

A    You know, I don't.  Again, it could be what I previously described.

Q    Being what?

A    The convertible could have been exercised into shares.  But I'm --

Q    Well, these are warrants, right?

Page 150

MARK ANGELO

A    Again, I'm sorry, I do not know.

Q    Okay.  These four warrants that are listed here, are these the four warrants that is the subject of this litigation?

A    They are.

Q    So these are in essence the total of a million warrants that we're talking about.

A    Correct.

Q    Did Highgate House acquire any other warrants in Charys other than the million that we're talking about?

A    Not that I'm aware of, no.

Q    Can you tell me why the warrants appear --

MR. VENTURINI:  Withdrawn.

Q    Is it your understanding that considering the first column is market value as of 12/31, that any additions/purchases listed on the second column would occur between 1/1/06 and 10/31/06, which is the date of this printout?

A    I'm sorry, can you repeat that?

Page 151

MARK ANGELO

Q    Yes.

Considering that the first column says market value as of 12/31/05, is it your understanding that the second column, additions and purchases, covers the time period from January 1, 2006 through the end of the period?

A    Again, I didn't run this, but that seems to imply what you said.

Q    Let me direct your attention to Page 4 of the same Exhibit 8.  Do you have Page 4?

A    I do.

Q    And specifically the security Oxford Ventures.  Do you see that?

A    I do.

Q    The $3 million figure that we see on 12/31/05, does that refer to the $3 million debenture that Highgate House purchased?

A    I would imagine it does.

Q    Then under that, where it says, under security, Oxford Ventures, Inc., 0.01, does that refer to the warrants that were

Page 152

MARK ANGELO

issued in that transaction?

A    Again, I'm guessing, but that --

MR. ROSENBAUM:  Don't guess.  If you know, you know.  If you don't know, tell him you don't know.

A    I don't know.

Q    Well, what other securities did Highgate House purchase from Oxford other than debentures and warrants?

A    I would say off the top of my head I don't recall anything else other than the debentures and warrants.

Q    Okay.  So it has to refer to the warrants, is that correct?

A    I would assume that it does.

Q    Okay.  Then it says zero under 12/31/05 for market value.  Can you tell me why that is?

A    I would imagine that the warrants were out of the money or, again, we take two discounts, the warrants are heavily valued -- heavily discounted.

One discount is a liquidity

Page 153

MARK ANGELO

discount.  I know this particular company does not have a lot of liquidity, as was Charys at the time, too, there was very, very little liquidity.

And the second discount would be a time discount, because you cannot exercise and sell these until they're registered, and that could take two months, four months, it could be a year.

Q    Is it correct to say that it was the practice of Yorkville to value warrants based upon, say, a spread between market price and exercise price, taking into account then the two discounts that you just mentioned?

A    A question for Ed Schinik, but what you described seems right.

Q    Continuing with Oxford Ventures where it says, under the warrant line, where it says withdrawals/sales, that column, it says minus $198.  Can you tell me what that is?

A    No, I do not.

Q    Do you think that's in

Page 154

MARK ANGELO

reference to the assignment of the Oxford warrants?

A    It could be. And now that you mention, because, again, I'm the wrong person to ask, but the -- wasn't the other number $198 on Cenuco?

Q    Yes, it was. You're referring to Cenuco 3.92?

A    I am. To be clear, this is sort of a matter for, you know, a whole separate matter, but, you know, when Adam had fully invested the fund prior to leaving, which is, you know, again, a different issue, and part of the reason that I'm upset with him, and really, and then we believe caused redemptions.

And what we were forced to do with Cornell is have Cornell buy some of the Highgate positions to honor the redemptions in Highgate.

So when you see the $198, I'm just thinking maybe that's a transfer of some amount. That's why the positions were assigned from Highgate to Cornell.

Page 155

MARK ANGELO

And maybe the $198 represents, again, I'm guessing, but you know, if it was 3 million warrants, assigning 001, and at the end it being $198.

Q    Earlier you said you thought the assignment was in connection with the whole merger of the funds, but now you said there was an actual purchase by Cornell of the positions?

A    Yes, I believe so. I believe that was with Cenuco and Oxford, that we needed to raise capital in Highgate for redemptions and Cornell purchased them, and I think subsequent to that their positions were probably assigned relating to the integration of the two entities.

Q    When you said you needed to raise capital for redemptions, what do you mean, who is doing the redeeming?

A    The investors in Highgate House. Adam had a lot of investors in Highgate House who put in redemption notices.

Again, this is a whole separate issue, but we did not know that Adam was

Page 156

MARK ANGELO

leaving. The rumors that I spoke about earlier, I heard in January, and he fully invested all the money and got significant economics on fully investing all the money, and a lot of the people that he had sort of introduced to the fund and was responsible for all coincidentally all redeemed, and now that -- putting the fund in a very grave position, and really harming his investors through Cornell.

So one of the ways we were able to satisfy the redemptions of those investors was have Cornell purchase the Highgate positions to raise capital to handle the Highgate redemptions.

Q    Do I understand you correctly that some of the positions that Cornell purchased include the Cenuco and the Oxford warrants?

A    It would be not just the Oxford warrants, the entire Oxford --

Q    The whole position?

A    The whole position, and both of them, we didn't split them.

Page 157

MARK ANGELO

Q    So under Oxford on Page 4 where it says minus $3,140,635, that reflects a sale of that position to Cornell?

A    Correct. And I'm assuming that the $3,140,635 represents $3 million face and $140,635 of interest.

Q    Let me direct your attention to Page 6. Our copy is really hard to read, but is it your understanding that here there would then be given a total portfolio value for each of the columns that were listed on the pages?

It seems to be in that gray area line. Do you see that?

A    Yes.

Q    So it says total portfolio, so that would be the sum of all the listings in the securities for each column on the prior pages, is that correct?

A    Yes, but something else also just occurred to me.

On the asset reconciliation, and again, I don't know if we have it here, the warrants I believe were always listed here, but the value attribution was listed on

Page 158

MARK ANGELO

a separate, separate spreadsheet.

Do we have that spreadsheet here?

Q    We might.

A    Okay.  Just because in your previous question, you said you're showing market value of zero, and what I'm saying is that that's for --

MR. RILLO:  That's at 12/31, you're referring to?

THE WITNESS:  Right.

A    But I'm saying that the value may not have been zero.  I think the way accounting does it is they break it out separately.

There is this, which just goes through the securities, when we define securities, you know, convertible debentures, promissory notes, convertible preferred, long stock and so forth, and then there's a separate sheet that is the warrant portfolio.  That's where the value is.

Q    Are you done?

A    Yes.  I'm sorry to ask you

Page 159

MARK ANGELO

questions.  Is there a separate, I haven't seen it, but isn't there a separate sheet with the warrants?

Q    I asked that question but I didn't want to cut you off.

A    I'm done.

MR. VENTURINI:  I'm sorry, Mr. Rillo, I know you wanted to jump in, but we just have to let the witness testify.

THE WITNESS:  Sorry.

Q    Why were the warrants valued on a separate schedule?

A    You have to ask accounting, but I know, I knew they valued them separately.  And then recently, within the last couple of months, I think they've got it all on one schedule.

Q    Well, if the warrants are given a value, wouldn't the value be included in Highgate House's NAV?

A    Yeah, I believe they would be.

Q    Okay.

MR. VENTURINI:  Let's have this

Page 160

MARK ANGELO

marked as the next exhibit.

(The above described document was marked Angelo Exhibit 9 for identification, as of this date.)

MR. VENTURINI:  Exhibit 9 is a two page document Bates stamped P 08535 to 536.

Q    Is this the document that you were referring to?

MR. ROSENBAUM:  As what, the NAV, August?  He was referring to an NAV before.  You want to know whether this is an NAV?

MR. VENTURINI:  No, I asked if this is the document he's referring to.

MR. ROSENBAUM:  Time out.  The last thing he said was, in response to your question, was the value of the warrants would be listed in the NAV.  You want to know therefore whether this is the NAV?

MR. VENTURINI:  No, no, no.  He had referred to another valuation.  I'm asking --

Page 161

MARK ANGELO

MR. ROSENBAUM:  Oh, I got it.

MR. VENTURINI:  Exactly.

MR. ROSENBAUM:  Is this the other document you were referring to before is what he wants to know.

A    It doesn't look like the typical one.  But again, these are real accounting questions.  Again, we can certainly get all the answers, but to the extent there's a warrant attribution, it has to be in the NAV.

Q    Okay.

MR. VENTURINI:  We call for the production of whatever the witness is referring to in terms of the calculation of the value of warrants.

MR. ROSENBAUM:  Just send me a note on it.

MR. VENTURINI:  I'm doing it on the record.

MR. ROSENBAUM:  I'll respond when you send me just a short note.

MR. VENTURINI:  The only reason why I'm mentioning it now is we have a

Page 162

MARK ANGELO

very tight deadline and it seems like an important document.

MR. ROSENBAUM: I doubt it, but that's besides the point.

MR. VENTURINI: Well, we'll see.

MR. ROSENBAUM: Just so I'm clear, you want what the other document is he was referring to.

MR. VENTURINI: Yes, which has the listing of the value of warrants.

MR. ROSENBAUM: It may have been supplied already. If you want the Bates stamp number I'll give you that.

MR. VENTURINI: If it's been supplied, then please give us the Bates stamp number. If it hasn't been supplied, then we call for its production.

Q    Can you tell me what Exhibit 9 is?

A    Maybe just because it's blurry I'm -- it looks unfamiliar to me.

Q    Is this --

MR. VENTURINI: Withdrawn.

Page 163

MARK ANGELO

Q    Is the format different than a format that would be produced by Yorkville?

A    I don't -- is this produced by Yorkville?

Q    Yes.

A    I'm just unfamiliar with it, to be honest.

Q    Okay. I don't know if I asked this specific question, but let me just make sure I have.

Have you seen this document before in any way, at any time?

A    I mean, I don't know. Do you have a better copy or better version of it?

Q    This is the way it was produced to us. The answer is no. But thank you.

MR. VENTURINI: Let's introduce this as the next exhibit.

(The above described document was marked Angelo Exhibit 10 for identification, as of this date.)

MR. VENTURINI: Exhibit 10 is a multi-page document. The Bates stamp number on the first page is P 01472

Page 164

MARK ANGELO

through P 01478.

Q    Have you ever seen this document before or any of the pages of this document?

A    I don't recall specifically seeing this, but this looks more like when you asked me before what I'm familiar with, this looks a little more like it.

Q    Can you tell me what, at least on the first page can you tell me what this document is?

A    It appears to be -- I don't know, there's not a title on it. It just appears to be a list of securities.

Q    Does this document appear to have been created by Yorkville?

A    You know, again, I'm not in the accounting department and I typically don't -- to the extent that I see these I'm looking at someone's screen.

If there's a problem, someone lets me know. It very well could be. I mean, if we produced it to you I'm sure it was created by us.

Page 165

MARK ANGELO

Q    But --

A    I would imagine it would be created by us.

Q    You did say that it was familiar to you?

A    It does look familiar, yeah, this looks -- this looks like the format that I was referring to.

Q    And when you say you were referring to, is that when we were talking about warrants and the valuation of the warrants?

A    Yes.

Q    Do you know who wrote January in script on the side or top of the page, depending on how you're looking at it?

A    I have no idea.

Q    Do you know what period of time this first page covers?

A    I do not.

Q    Does this document --

MR. VENTURINI: Withdrawn.

Q    Does it appear to you that this document assigns valuations to various

Page 166

MARK ANGELO

securities?

A    It appears that way. But this still looks different than what I was previously describing, because you have value -- I was just looking at the bottom.

You, in that valuation you have valuation of the actual instruments. It's not the separate warrant schedule.

MR. ROSENBAUM:  That's the next page.

THE WITNESS:  Oh, that's the next page? Okay.

A    Okay.

MR. ROSENBAUM:  You were looking at the second page.

THE WITNESS:  I was looking at the first page.

MR. ROSENBAUM:  Now are you looking at the second page?

THE WITNESS:  Now I'm looking at the second page.

MR. ROSENBAUM:  Are those the warrants?

THE WITNESS:  This appears to be,

Page 167

MARK ANGELO

again, this is not -- but actually no, because you have -- again, I'm just the wrong person to ask this. I keep looking at the one company at the bottom and the number seems high or wrong.

Q    Well, have you seen -- this appears to be covering the period of January 2006, is that your understanding?

MR. ROSENBAUM:  If you have an understanding. I don't think he said he has one.

A    I didn't write the January on top.

Q    Right.

A    The answer is I don't know.

Q    Okay. The only date I see on it, and correct me if I'm wrong, but, is on the column in the middle, it says 1/31/2006, price.

A    I see that.

Q    But I do notice, it says, if you look at the last three columns, it says volume, then volume discount, and valuation applied. Do you see that?

Page 168

MARK ANGELO

A    Yes.

Q    Does that look like what you were saying before in terms of valuing warrants that you have to apply one of two discounts, one of them being volume?

A    I know that we have a volume discount and a time discount.

Q    Where it says, under name, do you see where it has four Charys listings?

A    Yes.

Q    Then under position, it says 400,000, 200,000, 200,000 and 200,000?

A    Yes.

Q    Does that look to be the 1 million warrants that we've been talking about?

A    I would assume that it is.

Q    And if you go all the way over to the right column, does it assume that those four warrants are being given a value beginning with $132,251?

A    That's what it says.

Q    Have you ever seen a valuation of the Charys warrants prior to January 2006,

Page 169

MARK ANGELO

meaning covering the period prior to January 2006?

A    Well, again, it's not my position in the firm, but I know they had, just going by memory, I would say they had very, very little value using our methodology, because the stock was at substantially lower price and was very illiquid.

Q    Did anything happen in January 2006 to give value to the Charys warrants?

A    I mean liquidity could have picked up. You have to look at the chart. I don't recall.

You could have one of three things, I would imagine. One, an increase in the share price, B, an increase in liquidity, or maybe the company filed a registration statement, which got it closer to the anticipated time to effective.

But again, this is not me.

Q    Okay. Do you know for a fact if any of those instances occurred in the month of January?

A    I have no idea, although the

Page 170

MARK ANGELO

registration statement or their preparing it seems familiar.

Q    But you don't know if the registration statement was filed in January 2006, do you?

A    We could look it up, or I remember, they had 120 days to do it. I don't know, I mean, again, the valuation is not -- I'm not in the valuation department.

Q    Before you said you could look at the chart. Is that the document you were referring to earlier that I called for the production of in terms of the valuation of the warrants?

A    No, I just meant like a chart of the stock.

Q    Oh, I see.

MR. ROSENBAUM: By the way, this document may be the "other document" you were asking for.

MR. VENTURINI: Well, he hasn't indicated that.

MR. ROSENBAUM: I just did.

A    It may be.

Page 171

MARK ANGELO

Q    Have you seen any -- this appears to start in January 2006. Are there any valuations of any warrant positions in Highgate for December 2005, and prior? Because I have not seen that.

A    What I'm saying is I believe that there is.

Q    Okay.

A    And I, again, we can find it, but I thought that was provided, or --

Q    Okay.

A    Again, I don't know what I'm looking at.

Q    Right.

A    I would have prepared -- I just don't know. These are sort of our CFO type questions.

Q    Okay. Let me direct your attention to the next page. It says MAR. It appears to cover the month of March. Is any of the handwriting on this page yours?

A    No.

Q    It says MTM. Do you know what MTM means?

Page 172

MARK ANGELO

A    I have no idea.

Q    Could it mean mark to market?

A    It could.

Q    What does the term mark to market mean to you?

A    That would, that term would mean if you weren't taking a liquidity or a time discount, really what the intrinsic value of the warrants are.

So, as an example, if you had a million shares of something at a dollar and it was trading at $5, your mark to market would be $5 million.

Q    I see.

Let me direct your attention to, I'll give you the Bates stamp number, P 01477.

MR. ROSENBAUM: I think our copies are --

A    Mine's cut off.

Q    Sorry about that.

MR. ROSENBAUM: How many pages in?

MR. VENTURINI: I'll count. It's

Page 173

MARK ANGELO

the sixth page in.

MR. ROSENBAUM: Right after the one that says July MMF?

MR. VENTURINI: Actually it does say July HHF on the top.

Q    Since this is a slightly different format, let me ask you have you ever seen this document before?

A    I mean, it's possible. It's what I keep describing.

Q    Does this appear also to be a valuation of warrants?

A    It appears to be a valuation of warrants.

Q    And it also includes warrants owned by Montgomery. Do you see that?

A    I do.

Q    Does that seem to be your --

MR. VENTURINI: Withdrawn.

Q    Does it appear to you that Montgomery warrants are also listed here?

A    Yes.

Q    Turning to the next page where it says August, have you seen this document

Page 174

MARK ANGELO

before?

A    Again, I don't know, I do not recall.

Q    Okay.

MR. VENTURINI:  Let's have this marked as Exhibit 11.

(The above described document was marked Angelo Exhibit 11 for identification, as of this date.)

MR. VENTURINI:  Exhibit 11 is a multi-page document that begins P 01440 and runs consecutively through P 01461. It's entitled "Highgate House Funds, Unrealized Gains and Losses."

Q    I ask that you take a look at this document.

Have you seen it before?

A    To be honest with you, I don't think so.

Q    Does it appear to you based on the format that this was produced by Yorkville?

A    It's not the one I typically see. I wish I had one. I would show you.

Page 175

MARK ANGELO

But it very well could be.

Q    Do you know if it was the practice of Highgate House to have a fund --

MR. VENTURINI:  I'm sorry, withdrawn.

Q    Was it the practice of Yorkville to have a report generated for any of its funds that's entitled "Unrealized Gains and Losses"?

A    I'm sorry, ask me the question again.

Q    Sure.

Was it the practice of Yorkville to have a report generated such as this for any of the funds?

A    Again, I'm not -- I'm not the CFO, this is just -- I do not know.

Q    All right.

A    I would imagine that someone generates such a report, but just not my --

Q    Do you recall seeing an unrealized gains and loss run, and by run I mean report, for any of the funds at any time?

A    Each month I receive the, what

Page 176

MARK ANGELO

the P&L is.

Q    Would the P&L include unrealized gains and losses?

A    You'd have to ask the CFO.

Q    Let me direct your attention to Charys on the first page. It says Charys Holdings. Do you see that?

A    I do.

Q    Do you see the warrants listing, the four warrants?

A    I do.

Q    Directing your attention to the column under market value, it has zero listed for each of the four warrants.

Do you have any reason why the market value listed here is zero?

A    For all the same reasons we've already gone over.

Q    Well, it was listed in the prior exhibit as having a value in January 31, 2006.

A    Again, I just don't know. I'm sorry, this is just not --

Q    Okay.

Page 177

MARK ANGELO

A    I don't know.

Q    Do you see on the bottom of Page 1 it says this report was run on November 15, 2006?

A    Yes.

Q    Do you know who asked that this report be run on that date?

A    I have no idea.

Q    Did you ever have any conversations with anyone regarding the creating of any reports for the purposes of this litigation?

A    I had -- no.

Q    Have you had any conversations with Mr. Schinik regarding the creating or running of any reports in connection with this litigation?

A    No.

Q    Have you had any conversations with anyone else at Yorkville regarding the running of any reports in connection with this litigation?

A    No. I mean, are we -- are we supposed to generate reports that we didn't?

Page 178

MARK ANGELO

You keep asking me questions, I don't know.

Q   The answer is no?

A   The answer is no.  I mean --

Q   Have you had any conversations with Mr. Rillo regarding running any reports in connection with this litigation?

MR. ROSENBAUM:  Wait, Mr. Rillo is counsel.

MR. VENTURINI:  I can ask if he had a conversation regard it.

MR. ROSENBAUM:  You can ask the question, he's not going to answer it.  Attorney-client.

MR. VENTURINI:  Let me ask the question.

MR. ROSENBAUM:  You just did, and I instructed him not to answer.

MR. VENTURINI:  All right, we'll seek a ruling.

MR. ROSENBAUM:  Go ahead.  Don't answer it.

THE WITNESS:  I'm sorry, it's more of a question.

MR. ROSENBAUM:  Go ahead.

Page 179

MARK ANGELO

Q   Let me direct your attention to the fifth page of Exhibit 11.  It's P 01 --

MR. ROSENBAUM:  The month?

MR. VENTURINI:  The month is March 31, 2006.  P 01445.

Q   It says Cornell Capital on top.  Have you seen this page before?

A   I'm sorry, what page is it?

Q   It says Page 19 on the bottom.

A   Okay.

Q   That one, there.

A   I've got 1 --

Q   01445.

MR. ROSENBAUM:  Go back.

THE WITNESS:  Somebody do this.

Q   Well, Page 19 is not where you would expect it.

MR. ROSENBAUM:  It follows 23.

MR. VENTURINI:  Right.

Q   The question was whether you've seen this page before.

A   Again, I have not.

MR. VENTURINI:  Let's mark this as Exhibit 12.

Page 180

MARK ANGELO

(The above described document was marked Angelo Exhibit 12 for identification, as of this date.)

THE WITNESS:  Can I use the bathroom one more time?

MR. VENTURINI:  Let's take a break.

THE VIDEOGRAPHER:  Going off the record, the time is 4:01.

(At this point in the proceedings there was a recess, after which the deposition continued as follows:)

THE VIDEOGRAPHER:  Returning to the record, the time is 4:16 p.m.  This marks the beginning of tape number 4.

Q   Do you understand you're still under oath?

A   I do.

Q   I think you want to make a statement on the record?

A   I do.

We have a third-party administrator that calculates the NAV every month, and just because you've asked me a

Page 181

MARK ANGELO

number of questions I really don't know the answer, and the response is it's possible -- we could get you the information, but it's coming from a third-party administrator, not me.

And I just don't want to keep trying to interpret the accounting statements that I don't know.

I don't know if this is a draft, if there's a different -- I know that there's different software, one software ran one report, another software ran another report.

But we can get you the exact answers.  I just don't want to bumble through it and say something that's wrong, because then again, this is not my area, I'm not an accountant, but a third-party administrator has it all.

Q   I understand.  Which third-party administrator are you referring to?

A   Now it is, at the time it was, I believe it was Swiss Financial was doing

Page 182

MARK ANGELO

our, calculating our NAV, and now it switched from Swiss Financial to -- give me one second. SEI.

And also even our -- we have audited financials. So in the 12/31 audit and everything since then an accounting firm, an independent accounting firm, our accounting firm is GGR, which is now owned by RSM McGladrey.

We can provide you -- I don't want to say anything that's incorrect. Again, accounting is not my strong suit.

Q    So is it correct that during 2005 Swiss Financial was --

A    Was the administrator, yes.

Q    And did Swiss Financial carry over into 2006?

A    There was a switchover. I don't know if it happened in January of '06. The answer is I don't know.

Q    How did Swiss Financial get the data that it needed to calculate the NAV?

MR. ROSENBAUM: If you know, tell him what you know.

Page 183

MARK ANGELO

MR. VENTURINI: That's always the case. Please don't instruct the witness --

MR. ROSENBAUM: I'm telling the witness to answer without speculating, and I'll tell him every single time. Period, end of sorry.

A    The answer is I don't know.

Q    Did anyone from Swiss Financial visit the offices of Yorkville to obtain accounting information?

A    I would not know.

Q    But you do know their calculation was done based upon the books and records that were maintained by Yorkville, right?

A    I would imagine. Again --

MR. ROSENBAUM: Don't guess or speculate. If you know, tell him. If you don't know, tell him you don't know. Don't guess.

A    The answer is I don't know.

Q    Before the break I think I marked Exhibit 12. I don't know if we put it

Page 184

MARK ANGELO

before you, but here it is.

MR. VENTURINI: Exhibit 12 begins with Bates stamp P 01479 and runs through P 01484.

Q    Have you ever seen this document before?

A    It's possible. It looks familiar, but I don't specifically remember it.

Q    Does it look like a document that was created by Yorkville?

A    It does look like a document that would be created by Yorkville.

Q    On the top, if you're reading it the way you are, landscape, on the top left it says W, it looks like an RNT.

Do you know what that refers to?

A    I have no idea.

Q    Do you know what this document is?

A    I do not.

Q    Under the column on top it says P/L. Do you understand that to be P&L?

Page 185

MARK ANGELO

A    I would imagine that's what P/L is.

Q    You mentioned earlier that you saw P&L reports for Highgate House. Were any of the P&L reports in a form that looked like this at all?

A    It could have been a condensed version of this.

Q    When you've seen the P&L reports, did they come on Excel spreadsheets?

A    I don't know. It's on a spreadsheet. I don't know if it's an Excel spreadsheet. I would imagine it would be.

Q    Is it a hard copy form or run on the computer?

A    Many times I'd look at it right on the computer. If there's a question or something they'd give me a printout, which I could --

Q    When it comes to your computer, does it come in a hard copy form?

A    It does not come on my computer. I swing by the accounting department and review it.

Page 186

MARK ANGELO

Q    So you're saying you don't have access to P&L reports from your computer in your office?

A    I do not have access to the P&L reports from my computer in my office, correct.

Q    Do you maintain an office in Yorkville?

A    Yes.

Q    Does anyone share your office?

A    Yes.

Q    How many people?

A    Two other people.

Q    Is this also true for 2005?

A    Yes.

Q    Who else shares your office?

A    Jerry Eike and David Gonzalez.

Q    Does Troy Rillo have a separate office?

A    He does.

Q    Does Matt Beckman have a separate office?

A    Matt Beckman is based in Florida. He has a desk in our office, sort of

Page 187

MARK ANGELO

a symbolic desk. So he comes up a few times a year, and to the extent he's there, he sort of has again a symbolic desk.

Q    Was that true in 2005?

A    Yes.

Q    Earlier we discussed the Charys transaction and we touched on a redemption that occurred. Did that redemption occur in 2006?

A    Yes.

Q    Were you involved in that redemption?

A    To the extent that I was redeemed and didn't want to be, I was involved.

Q    Can you tell me what happened?

A    I would say the short answer would be that Adam violated the terms of his non-solicit, and along with another group of investors redeemed Highgate House out of its investment in Charys, which struck me as incredible, given the fact that it had a huge detrimental effect on Highgate House and those investors that Adam was the portfolio manager

Page 188

MARK ANGELO

of.

Q    Who were the other investors that you're referring to?

A    I'm talking to all the investors that were in Highgate House, the people who contributed the $70 million to Highgate House.

Q    Do you know which entities contributed the money, the $70 million financing?

MR. ROSENBAUM:  How is this related -- excuse me, how is this related -- your questions presume facts that aren't accurate. Put that aside. How is that related to the limited issues that are before Judge Greenaway? I don't get it.

MR. VENTURINI:  We'll it's, it might have some bearing on the warrants. I think I'm entitled to explore it. It's Charys, it's the same transaction, he was redeemed out.

MR. ROSENBAUM:  He was redeemed out after Adam left.

Page 189

MARK ANGELO

MR. VENTURINI:  Right, but it's the same --

MR. ROSENBAUM:  It has nothing to do with the warrants, it has to do with the debentures.

MR. VENTURINI:  I haven't gone there. Let me explore this.

MR. ROSENBAUM:  Don't answer the question.

MR. VENTURINI:  Are you instructing him not to answer?

MR. RILLO:  Just to cut time, you guys are talking about different things. You're talking about the group of investors that Adam brought into Charys, he's talking about Highgate's investors. Just to try to simplify it, maybe. You're talking beyond each other.

MR. ROSENBAUM:  You said the $70 million that Highgate had invested in Charys. It doesn't have $70 million in Charys.

But besides that, he's not going to answer the question. It has nothing

Page 190

MARK ANGELO

to do with the issues --
MR. VENTURINI: He did say my client breached the terms of his non-solicit.
MR. ROSENBAUM: That has nothing to do with the issues before Judge Greenaway.
MR. VENTURINI: Then you should agree to have that testimony stricken. Otherwise I'm going to go into this.
MR. ROSENBAUM: You're not going to go into it and I'm not going to strike it. Period, end of story.
MR. VENTURINI: I'm going to ask the question.
MR. ROSENBAUM: You can ask it, he's not going to answer it.
MR. VENTURINI: I'm going to seek a ruling, and if it draws this out --
MR. ROSENBAUM: I'm not going to agree to any extension.
MR. VENTURINI: I'm not asking you to, I would go to the court for that request. So if you want to bring this

Page 191

MARK ANGELO

all up to the court --
MR. ROSENBAUM: I'm not bringing anything up to the court, but we'll have a phone call tomorrow if you like with the judge.
MR. VENTURINI: If you instruct him not to answer on all these issues then I have to go back to the judge.
MR. ROSENBAUM: It has nothing to do with the issue before Judge Greenaway.
MR. VENTURINI: It has to do with the Charys --
MR. ROSENBAUM: It doesn't --
MR. VENTURINI: Let me ask the questions.
MR. ROSENBAUM: Go ahead.
Q    With respect to the redemption of Highgate's position in Charys, I think you testified earlier that Charys' debentures were redeemed, is that correct?
MR. ROSENBAUM: Don't answer it.
A    I'll decline to answer.
Q    Do you know the group of

Page 192

MARK ANGELO

investors that invested, that purchased the position that Highgate had in Charys?
MR. ROSENBAUM: Don't answer the question.
A    I'll decline to answer it.
Q    Did you have any conversations regarding whether the warrants would be part of the redemption?
MR. ROSENBAUM: That you can answer, as to whether warrants were part of the redemption.
A    We were redeemed by the company.
Q    Charys?
A    Yes.
Q    Okay.
MR. ROSENBAUM: How does that relate to the warrants? He wants to know if it has any relation.
A    We always keep the warrants.
Q    So what you're saying is Charys raised money through some other source --
MR. ROSENBAUM: Through Adam.
Q    -- and used that money to take

Page 193

MARK ANGELO

out Highgate's position in Charys?
A    Correct. Just leaving Highgate with the warrants that it owned.
Q    Okay. Do you know who the investors were that invested the money in --
MR. ROSENBAUM: Don't answer the question.
A    I decline to answer.
Q    Did any of the funds that Yorkville advised consider investing more money in Charys in 2006?
MR. ROSENBAUM: Don't answer the question.
A    I decline to answer.
Q    Did you have any conversations with Adam Gottbetter in 2006 regarding any of Yorkville's funds investing further money in Charys?
MR. ROSENBAUM: Don't answer the question.
A    I decline to answer.
Q    With respect to the Charys warrants, is your position that --
MR. VENTURINI: Withdrawn.

Page 194

MARK ANGELO

Q   With respect to the Charys warrants, is Adam entitled to any part of either the warrants or the monies that would be realized once the position is monetized?

A   Adam is entitled to, after that position is monetized, he's entitled to 44 percent of the 20 percent of the monetized value of those warrants.

Q   I understand that the 44 percent comes from your agreement with Adam in terms of the letter agreement that's part of this action.

Where does the 20 percent come from?

A   The warrants that we earned in Charys -- again, when Highgate, the investors of, you know, when Highgate put $4 million into this company, I mean the stock wasn't very liquid, it was a stretch to put $4 million.

One of the reasons that we put $4 million in was the warrants. And if Highgate wasn't quickly redeemed, I think it was 120 days, the investors in Highgate got

Page 195

MARK ANGELO

the benefit of those warrants being reduced.

The agent or anybody associated would not get that benefit. Why would an agent or somebody else get the benefit of the exercise price being reduced? It was Highgate's money at risk.

So my understanding of the warrants is after we monetize the warrants, and the fund made whatever it made on that, 20 percent of that would go to Yorkville, and Adam would be entitled to 44 percent of the 20 percent.

But even playing devil's advocate, if Adam's position was that that wasn't the case, that he was entitled to 44 percent prior to going to the 20 percent, you still have no right to transfer them.

First off, it was a profit calculation, not -- I mean, I just never thought that he would invoke self-help and just move warrants.

I mean, at the time that those warrants were transferred they were worth $4 1/2 million, and when you give me all these

Page 196

MARK ANGELO

transactions with Uluru, there's so much correspondence going back and forth, what everybody is saying, there's not one correspondence, we were never notified and never knew that $4 1/2 million of securities were transferred out of the name of the fund.

MR. ROSENBAUM:  When you say profit --

MR. VENTURINI:  Wait, you can ask him questions later on.

MR. ROSENBAUM:  I don't have to --

MR. VENTURINI:  You can ask questions later on.  It's my turn to ask questions.

Q   How was the 20 percent calculated?

A   We're a 2 and 20 fund, meaning if an investor has a hundred dollars with us, we take 2 percent or 2 of the hundred as a management fee, then we're entitled to 20 percent of the profits.

So if we invested $4 million in Charys, as an example, and the $4 million

Page 197

MARK ANGELO

turned into $8 million and we had a $4 million profit, Yorkville Advisors would get 20 percent of the $4 million profit, and the balance, and that 20 percent would be split 56/44.

Q   Do you recall any conversations that you had with Adam regarding the split of the Charys warrants?

A   The conversations I had, I mean, the short answer is no.

All I ever remember was him trying to get, him and Maloney fighting over what I'll call the agency -- I'm sorry, I'm mixed up.

No, I never had any conversations with Adam regarding Charys, Charys warrants.

Q   Did you have conversations with Adam in general about warrants and how warrants would be distributed?

A   No.

Q   Did you --

A   Other than the Uluru cut your own deal with Prentice conversation.

Page 198

MARK ANGELO

Q    Did you ever have a conversation with Adam in which he stated that he was entering into an agreement with Michael Chorske as a banker?

MR. ROSENBAUM:  Relating to Charys?

Q    Related to anything?

A    Entering into an agreement with Michael Chorske?  A conversation?

Q    Yes.

A    It's possible.  I don't recall.

Q    Do you know what Michael Chorske's agreement was with Adam or HH Advisors?

A    I do not know, but I do know this.  I mean, just to be fair, Michael Chorske was a banker on the transaction.

MR. ROSENBAUM:  Which transaction?

THE WITNESS:  Charys.

A    What Michael Chorske is entitled to, and his payroll and his e-mail I believe would support this, is 10 percent of the proceeds of the warrants when we sell

Page 199

MARK ANGELO

them.

But yet when $4 1/2 million of securities were transferred out of a fund that we co-managed, Chorske went from 10 percent to 20 percent, which no one can explain to me.

Which is probably the reason we weren't noticed when an extra $800,000 of securities was transferred out of the funds' name into Michael Chorske's name and then separately the piece that Adam took.

I mean, it's outrageous.

Again, I just never thought he would do this.

Q    When you say that Chorske was entitled to 10 percent of the warrants, do you mean of the total?

A    Assuming we monetized all the warrants, again, not, you know, if we want to monetize all the warrants for $2 million and we made that investment decision to monetize the warrants and those warrants yielded a profit of $2 million, we would pay Michael Chorske $200,000.

Q    And were there any other banker fees payable on the Charys transaction other

Page 200

MARK ANGELO

than to Chorske?

A    I don't believe so, no.

Q    So if I understand you correctly, the way you see it, the Charys warrants will be exercised, then they will, you will get underlying stock, Highgate House will?

MR. ROSENBAUM:  What --

Q    The underlying stock, then Highgate House will sell that stock?

A    Correct.

Q    And the sale proceeds will come into Highgate?

A    Yeah, absolutely.

Q    Then Highgate then remits the portion that goes to Chorske, Gottbetter and what, YAM?

A    No.  It would be 10 percent to Chorske, the balance of, you know, the balance, the 44 percent, the Adam piece -- again, it's a profit calculation.

We would, you know, that is remitted, again, from an accounting perspective, I'm not exactly sure of the

Page 201

MARK ANGELO

process, but, you know, it's a profit calculation.

We would go against all the positions in the book, we monetize them, to the extent that there was a profit, it's clearly showing up in his plus column.

But he could have lots of minuses.  He can't cherry pick the one transaction that he thinks is worth a lot of money and try to extract 44 percent of that and then disregard lots of other transactions that aren't.

Q    How will the fund account for the payments after the warrants are monetized to Chorske and Gottbetter?

MR. ROSENBAUM:  He didn't say there would be payments to Gottbetter, just Chorske.

MR. VENTURINI:  Yes, he did.

MR. ROSENBAUM:  He just said he paid 10 percent to Chorske, then you look at whether the fund, meaning the Highgate Fund, has profits beyond just the Charys position, then

Page 202

MARK ANGELO

Mr. Gottbetter -- I'm just repeating what he said -- gets 44 percent, if there are total profits, 40 percent of those profits.

THE WITNESS: Right.

MR. ROSENBAUM: Not just Charys, but the entire portfolio.

A    Let me back up.

In the case of Charys, my understanding, my belief, my memory is that it was a transaction that we did where Adam wasn't getting 44 percent of the warrants, what he was getting was 44 percent of the 20 percent, assuming we ever monetized that.

That whole transaction, the only reason that we did it on Highgate was performance, and we were supposed to get pulled back, we were supposed to be redeemed in a short period of time.

All those warrants were reset when we weren't redeemed. So the fund -- think about it.

Highgate House ended up in a far riskier position, because the company,

Page 203

MARK ANGELO

Charys, did not redeem them in 120 days.

So Highgate, the investors in Highgate were in a far riskier position, and the person by your client's estimation who benefits the most is him, because of the reset of the warrants. It doesn't make sense.

But what I'm saying is my understanding of the transaction, Chorske would get 10 percent of the proceeds of the sales.

MR. ROSENBAUM: The banker's fees.

A    The banker's fees. And if we monetized $5 million, let's say, the balance of it, 20 percent of that would go to YA.

MR. ROSENBAUM: Who?

THE WITNESS: Yorkville Advisors.

A    Yorkville Advisors makes a million dollars, 44 percent of that is credited to his profit calculation and 56 percent of that is credited to our profit calculation.

Q    I think that's a little bit different from what you said before. You're

Page 204

MARK ANGELO

saying that the 20 percent, instead of going to Highgate House Fund, actually goes to Yorkville?

A    20 percent of the profits -- that's the incentive, yes, 20 percent going to Yorkville.

Q    It's paid to Yorkville, then from Yorkville it's paid --

MR. ROSENBAUM: Only if --

MR. VENTURINI: I understand. But then that's how it gets paid. I'm just going by the accounting. I just want the accounting string.

MR. ROSENBAUM: Just so you're clear, if there's profits in Yorkville after you take into account the Charys transaction and whatever other transactions there are, Mr. Gottbetter gets 44 percent of whatever profits there are in Yorkville.

MR. VENTURINI: But you're not testifying. I appreciate --

MR. ROSENBAUM: You're trying to misstate what he said. I'm just making

Page 205

MARK ANGELO

it clear.

MR. VENTURINI: I'm not misstating --

MR. ROSENBAUM: I stated accurately what he said.

Q    Before that we were discussing what Michael Chorske's agreement was with Adam.

You recall having --

A    I don't recall.

Q    -- no discussion with Adam regarding Michael Chorske?

A    If I had a discussion with him I don't recall it.

MR. VENTURINI: Let me just have this marked as the next exhibit.

(The above described document was marked Angelo Exhibit 13 for identification, as of this date.)

Q    I show you what has been marked as Angelo Exhibit 13. It is a one page document dated June 1 of 2005.

Have you ever seen this before?

A    I'm cc'd on it.

Page 206

MARK ANGELO

Q   Do you recall receiving this document?

A   Well, if it has my name on it, I'm guessing that I did receive it.

Q   Having seen this document, does it refresh your recollection as to having a conversation on or about June 1, 2005 with Adam regarding any offers made to Michael Chorske?

A   I'm sorry, repeat the question.

MR. VENTURININI: Let me withdraw that.

Q   Where it says on -- let me direct your attention to Paragraph 1, where it says, "Accelerate increase of net profit participation by ASG to 44.4 percent." Do you see that?

A   Yes.

Q   Did you have a conversation with Adam in which the profit participation was increased to 44.4 percent?

A   I do remember that conversation.

Q   When did that take place?

Page 207

MARK ANGELO

A   I don't know.

Q   Was it sometime prior to June 1, 2005?

A   I would image it would be.

Q   Let me direct your attention to Paragraph 3. It says, "Made offer to Michael Chorske comprised of a $150,000 salary per year." Do you see that?

A   I do.

Q   Did you have a conversation with Adam regarding the offer to Chorske for that salary?

A   I believe so, yes.

Q   Did you ultimately approve that salary for Mr. Chorske?

A   I did.

Q   With respect to the salary payable to Chorske, did Yorkville ultimately pay that salary?

A   Yes, I believe so.

Q   Then it says, "Banking fees of 15 percent on deals generated by him." Do you recall having a discussion with Adam regarding the banking fees going to Chorske?

Page 208

MARK ANGELO

A   You know, again, I don't -- I vaguely remember conversations, but I'm sure it's -- we could clearly figure out what he got paid. We can just check his payroll.

Q   All right. Continuing to the next sentence in the same paragraph where it says, "Fees. Include banker fees of cash and equity." Do you see that?

It's also in Paragraph 3, it's the second sentence.

A   Yes.

Q   Do you recall having a discussion with Adam regarding Mr. Chorske getting banker fees of cash and equity?

A   I recall him having similar economics to the regular brokers, the regular bankers that work at Cornell Capital, with the only difference that he had a salary of 150 and there was obviously a reduction, rather than being 20 percent, it was just 10 and 15.

Q   Was Mr. Gottbetter seeking your approval for the arrangement that he was entering into with Mr. Chorske?

A   He was asking me to pay for the

Page 209

MARK ANGELO

$150,000, so yes, I would say he was seeking our approval.

Q   And did you ultimately agree to the compensation package that Mr. Chorske received from Mr. Gottbetter or through the conversations with Mr. Gottbetter?

A   I mean, again, I'd have to check the payroll runs, because I thought on some transactions Chorske's payroll was 20 percent, not 10 percent.

Q   Okay.

A   I don't know if this was a framework. Again, he closed a few transactions. We can clearly figure out what he got paid and what he didn't.

Q   And in connection with the portion that says he gets fees of cash and equity, did you ever have a conversation with Adam that said that or where you said that Chorske as not entitled to receive equity?

MR. ROSENBAUM: Excuse me, before he answers, this doesn't have a Bates stamp on it.

MR. VENTURINI: I couldn't find

Page 210

MARK ANGELO

the Bates stamped document. I'm pretty sure it's produced.

MR. ROSENBAUM: By who?

MR. VENTURINI: Us. It could be you, but I know we have it.

MR. ROSENBAUM: If it was us --

MR. VENTURINI: That's true, so it was us, and I'm pretty sure it was produced.

MR. ROSENBAUM: If it has, and I'll check my records, can you just get me the Bates stamp number?

MR. VENTURINI: Of course.

MR. ROSENBAUM: By tomorrow?

MR. VENTURINI: As soon as I can.

MR. ROSENBAUM: I'll take a look for it, because I don't remember seeing it.

MR. VENTURINI: Okay.

MR. ROSENBAUM: Go ahead, I'm sorry.

A    I'm sorry, could you repeat the question?

Q    Do you recall having a

Page 211

MARK ANGELO

conversation with Adam where you told him that Chorske would not be entitled to receive equity?

MR. ROSENBAUM: When you say equity, what do you mean by equity? What do you mean by equity, you mean stock or warrants --

MR. VENTURINI: I think the witness understands equity. Please don't interrupt the deposition.

MR. ROSENBAUM: I'm asking you a question.

MR. VENTURINI: I'm not being deposed.

MR. ROSENBAUM: Do you understand what he means?

A    To be honest with you, I don't.

Q    What do you understand equity to be?

A    There's an equity ownership in an entity. What are you referring to? I don't --

Q    Well, it says here he's getting banker's fees of cash and equity. We all know

Page 212

MARK ANGELO

what cash is, right?

A    Right.

Q    So what's your understanding as to what equity is?

A    The same as any other banker. I mean, after we monetize the warrant or if it's compensation shares, the cash equivalent.

Q    So you're saying that, your interpretation of equity is the cash equivalent of what's left after the position is monetized?

MR. ROSENBAUM: That's what he just said.

Q    Okay. Did you have that conversation with Adam at the time you were discussing Mr. Chorske's compensation package?

A    I don't know, but it's standard procedure. I would image so.

Q    It's standard procedure at Yorkville.

A    Yeah. No one got equity, your definition of equity, or anything else in their own individual names.

Q    Okay.

Page 213

MARK ANGELO

A    And again, just to be clear from a -- just thinking about this from a compliance standpoint, you couldn't give an individual equity in his name, because how would you know if he sold it, if he pledged it, if he borrowed it, if he was acting on inside information?

That's why it's always in the name of the fund. The fund monetizes -- it makes the investment decision after it monetizes.

If it chooses to pay the person who brought the transaction, then so be it, but you can't transfer equity to an individual's name.

What if he ended up front running the fund or dumped the shares, drove the stock down? Then you're in, I don't know what it is, a fraud position. Someone would say why did you do that.

Q    Do you recall any situation where any portfolio manager for Yorkville was issued equity directly to the manager?

A    Any portfolio manager -- again,

Page 214

MARK ANGELO

in the last four, three, four, five years, no. I mean, five, six years ago, with a smaller fund, I mean, we had a million and a half dollars, our friends and family.

So is it possible in 2001? But when we became what I'll call an institutional grade fund, no, no one gets anything in their individual names. Again, that I'm aware of.

Q      Has any equity ever been issued to Mr. Rillo directly?

A      I don't know.

MR. ROSENBAUM:  Is it time for the half hour notice yet, Augie?

MR. VENTURINI:  Not yet.

Q      Last month did you have the bankers at Yorkville sign off on an agreement stating that they were not going to receive equity directly in their name?

MR. ROSENBAUM:  Last month, you said?

MR. VENTURINI:  Last month.

MR. ROSENBAUM:  You can answer.

A      I know from a compliance -- I know our compliance officer circulated

Page 215

MARK ANGELO

something along those lines.

Q      Who is the compliance officer?

A      Steve Goldstein.

Q      Did you have any conversations with Mr. Goldstein regarding what he was circulating with respect to equity being issued to bankers?

A      I had no such conversations.

Q      Do you know what prompted his sending out the statement that he asked to be signed?

A      I don't know what directly prompted it.  Again, I think it was a confirmation of an existing policy, but I don't know.  You'd have to ask him.

Q      Why was there a need to clarify an existing policy at that time?

A      You'd have to ask him.

Q      So you're saying you have no knowledge as to why it was circulated?

MR. ROSENBAUM:  He just said ask Goldstein.

A      Ask Goldstein or the general counsel, David Gonzalez.

Page 216

MARK ANGELO

Q      Prior to --

MR. VENTURINI:  Withdrawn.

Q      Is it discretion that the bankers were asked to sign a statement stating that they were not entitled to receive equity directly to them?

A      I didn't review the document.

Q      To your knowledge were the bankers ever asked to sign a document before?

A      I don't know.

MR. VENTURINI:  Let's take a five minute break.  Off the record.

THE VIDEOGRAPHER:  Going off the record, the time is 4:52 p.m.

(At this point in the proceedings there was a recess, after which the deposition continued as follows:)

THE VIDEOGRAPHER:  Returning to the record, the time is 5:13 p.m.

Q      Do you understand you're still under oath?

A      I do.

Q      Okay.  Did there ever come a time when anyone at Yorkville to your

Page 217

MARK ANGELO

knowledge asked Adam or Michael Chorske to provide a valuation of the warrants in connection with any of the transactions Highgate House had made?

A      You know, I don't remember, but I remember seeing an e-mail that I guess was produced as part of this in the last week or two.

MR. VENTURINI:  Let's bring it out.

(The above described document was marked Angelo Exhibit 14 for identification, as of this date.)

MR. VENTURINI:  For the record, Angelo 14 is a one page document Bates stamped P 09237 through P 09248.

Q      Please take a look at this. Have you ever seen this document before?

A      I mentioned previously I saw it a couple of days ago, or last week.

Q      On the very top, where it says "e-mail dated December 21, 2005," do you recall getting a copy of that e-mail on or about that date?

Page 218

MARK ANGELO

A    I don't recall getting it, but if it says I got it, I'm sure I was cc'd on it.

Q    With respect to the e-mail on the bottom, December 16, do you also recall whether you received that copy of the e-mail on that date?

A    I'm sorry, where are you?

MR. ROSENBAUM:  On the bottom.

Q    The first page, December 16.

A    December 16.

Q    December 16, right.

A    You're asking me if I recall receiving the e-mail?

Q    Yes, that particular one.

A    Again, I don't recall, but it says that I received it.

Q    Okay, and you have no reason to believe that you didn't, correct?

A    I have no reason to believe that I didn't.

Q    Turning to the attachment which begins on the third page, have you seen that document before?

Page 219

MARK ANGELO

A    If it says I received it, then presumably I received it.

Q    But you're saying you don't have any independent recollection of looking at that document in December 2005?

A    No.

Q    Do you recall providing any response to any of the e-mails that are on Page 1?

A    I'm not an e-mailer, so.

Q    Okay.

A    I pull the e-mails.  I don't know if I responded or did not.  The chances are, if I had to guess, would be no, but it's a guess.

Q    Do you recall at any time in December 2005 having a conversation with either Adam or Michael Chorske regarding the valuation of Highgate House warrants?

A    I don't recall.

Q    Did you ask anyone in-house in Yorkville to perform a valuation of Highgate House's warrants?

A    Again, it's just not my

Page 220

MARK ANGELO

department.

Q    Do you have any idea why Michael Chorske is attaching a spreadsheet of an estimate of the value of warrants in Highgate House?

A    Well, I'm just reading the paragraph that Ed Schinik wrote him.

Q    Do you want more time?

A    No, my answer is -- give me your question again, I'm sorry.

Q    Okay.  What I was asking before was do you have any idea why in the December 16th e-mail Michael Chorske is attaching a spreadsheet providing an estimate of the value of Highgate's warrant position?

A    I don't know.  If you ask me if I have any idea, I'm presuming based on this paragraph it's a conversation that Ed had with Mike Chorske.

Q    Okay.  In the first e-mail where Ed Schinik says, "Mike, I introduce myself as the newly hired CFO of Cornell," that's dated December 21, and I think you testified earlier that Mr. Schinik was hired

Page 221

MARK ANGELO

sometime at the end of 2005.

Do you recall if that was in December of 2005?

A    I don't recall.

Q    But it was sometime just before December 21, 2005?

A    We can look it up.  Yes, we hired him at some point in either -- we might have hired him in November but his start date wasn't until December.

Again, we can look it up.

Q    Do you recall Mr. Chorske --

MR. VENTURINI:  Withdrawn.

Q    Do you recall a conversation with anyone in December 2005 regarding whether to put warrants of Highgate into the Highgate NAV for December 2005?

A    I don't recall.  Again, that's not my area.

Q    Prior to December 2005 do you recall seeing any valuation of any of the warrants held by Highgate?

A    Again, to reiterate some of things I've previously said, the answer is I

Page 222

MARK ANGELO

don't know.

MR. ROSENBAUM: Are you done with this one?

MR. VENTURINI: Yes. Let's have this marked as the next one, Exhibit 15.

(The above described document was marked Angelo Exhibit 15 for identification, as of this date.)

Q    I show you what's been marked as Exhibit 15. It's a two page e-mail string. The Bates number is D 01329 and D 01330.

Have you seen any of these e-mails before?

A    Well, I corresponded in one of these, so presumably I saw it.

Q    Well, it seems like you sent the second one, right, the one on January 20 at 4:43?

A    Yes.

Q    Do you know what these e-mails are in reference to?

A    It appears to be in reference to, it appears to be in reference to an investor, whose name I thought was Chiltern,

Page 223

MARK ANGELO

but it could be under another name, who was looking for a redemption on the end of December.

Q    What investment is that related to?

A    I'm sorry?

Q    What investment is that related to?

A    No, the fund that -- again, there was an outfit called Chiltern, I think it was called Chiltern. Again, we can look it up.

They were an investor, they were a good friend of Adam. Adam was friends with the gentleman who ran that money, and it's sort of what I touched on earlier, was that, you know, we obviously believed that they, you know, Adam tipped them off that he was planning on resigning, and they put in a redemption notice.

I remember there was some dispute over it because they had provided us some e-mail correspondence with Adam.

We didn't get an official

Page 224

MARK ANGELO

notice until after the 1st of December, which I believe was the official notice period, I believe you could take out your money on the quarter and with 30 days' notice.

But then Adam showed me an e-mail that he had corresponded back and forth with them prior to let's say December 1st, asking if he could take his money out ahead of time, or asking to be put in on the notice.

Q    I'm sorry, who asked who?

A    Again, I wish I had the name. Andreas, in this e-mail it's EFG Wealth Management.

Let's say Andreas at EFG is good friends with Adam, and they had invested in Highgate House, and this sort of leads to our whole separate issue.

And that money was invested, you know, and fees were generated and so forth, and we believe that Adam in advance told Andreas that he was, after he had invested all the money, that he was planning on leaving, and Andreas then sent in a redemption notice on or about 12/1, Adam

Page 225

MARK ANGELO

knowing full well we wouldn't be in a position to meet that redemption.

Then Andreas began coming back demanding his money back.

Q    Well, if an investor redeemed on December 1, wouldn't that impact on the profits that Adam would be entitled to?

A    Would it impact on the profits that he would be entitled to, on December 1st?

Q    Yes, wouldn't that impact on the fund's performance?

A    No.

Q    Well, wouldn't the fund have to liquidate one of its positions as you stated earlier to fund the liquidation?

A    I'm sorry, say it again.

Q    Wouldn't the fund have to liquidate one of its positions to fund the redemption?

A    I mean, if it could. I mean, the reality is had there not been a Cornell this would have been a major, a major issue.

I mean, these aren't freely tradeable stocks. These are debentures,

Page 226

MARK ANGELO

they're not registered.  It would be a huge problem.

Q    Did you inform the investors of Adam's resignation as the portfolio manager of the fund?

A    After he resigned?

Q    Yes.

A    Yes.

Q    Now, when you said that you are officially killing me, what did you mean by that?

A    Well, at this point I just felt what I previously described, that, you know, that Adam had fully invested all the money, and then, you know, told the investors that he was friendly with to put in redemption notices, which they did, and there was some dispute when we got those redemption notices, knowing that it would be almost impossible for us to meet those redemptions.

Q    You said you got the redemption notice prior, 6 to 7 weeks prior to the date of this e-mail?

MR. ROSENBAUM:  He's talking

Page 227

MARK ANGELO

about EFG.

A    Actually, come to think of this, now I remember this entire thing.

What Andreas at EFG said, I remember the term, he said that we're not really taking our money out, we need to take it out for something he called bed and breakfast, which was some sort of tax term, and he said I just need to take out December 1, and then we'll reallocate January 1, and is there any way you could take me out December 1 even though I haven't properly noticed.

You know, there was a couple of day discrepancy, we didn't get any official notice to pass.  If the date was supposed to be December 1, as an example, it was some point after that.

So we were sort of scrambling to see if it was at all possible, and the presentation to us was if you can accommodate him this for this tax structure, he would then allocate a lot more money on January 1.

And then subsequently we had a conversation with Andreas or his partner, I

Page 228

MARK ANGELO

think his partner's name was Massimo, who came in looking for the redemption, and I sort of asked him, you never had any intention of reallocating January 1, you were just trying to pull your money out because you knew Adam was leaving, and he more or less agreed with that.  He didn't dispute it.

Q    So did he actually get a redemption on December 1 or thereafter?

A    He -- no, since we didn't have the money, he would have been entitled, had he properly noticed the fund, he would have been entitled for his money on January 1.

Since he didn't properly notice the fund, and then it became apparent to us that this whole thing was contrived, we said look, the next time you're due out of the fund is the following quarter, which was March, and I said to the extent that it's at all possible, we'll try to accommodate you and get you out earlier.

Q    So did you redeem him out in March?

A    He was fully redeemed.  I don't

Page 229

MARK ANGELO

have the dates, but yes.

Q    But it was after the dates of these e-mails.

A    Yes, I would image, yes.  We can check the record.

Q    Then with respect to the same exhibit, the first e-mail says, for the record, you have officially killed me first.  Do you know what Adam is referring to?

A    I have no idea.

Q    Did you ever ask him?

A    I don't know.

MR. VENTURINI:  Let's have this marked as the next exhibit.

(The above described document was marked Angelo Exhibit 16 for identification, as of this date.)

Q    Do you have Exhibit 16 in front of you?

A    I do.

MR. VENTURINI:  Exhibit 16 is a three page document Bates stamped number P 06055 through 06057.

Q    Have you seen this document

Page 230

MARK ANGELO

before?

A    Well, I've signed it, so I'm assuming I've seen it.

Q    So, the first page, can you tell me what the first page is?

A    It appears to be a letter to our investors noticing them that Adam had resigned and that Troy is taking over the co-portfolio manager position.

Q    When Mr. Rillo took over as co-portfolio manager, did he have some of his legal duties diminished?

A    You'd have to ask him. We ask an awful lot of him, so I'm guessing, but he would probably say no, that he did all his regular stuff and managed to squeeze this in as well, but that's a conversation between you and him.

Q    The first paragraph says Adam's resignation was amicable. Do you agree with that statement?

A    At the time that he resigned, until we began putting the pieces together, what happened, yeah, at the time he resigned

Page 231

MARK ANGELO

it was amicable.

Q    Was this letter sent out on or about January 18, 2006?

A    That's the date at the top, so I assume that it went out then.

MR. ROSENBAUM: You're not doing this just to kill time, are you?

MR. VENTURINI: I never do that.

MR. ROSENBAUM: It seems it.

THE WITNESS: I need more water.

MR. VENTURINI: Let me just take a quick one and we can wrap this up pretty quickly after that.

THE VIDEOGRAPHER: Going off the record, the time is 5:32 p.m.

(At this point in the proceedings there was a recess, after which the deposition continued as follows:).

THE VIDEOGRAPHER: Returning to the record, the time is 5:42 p.m.

Q    With respect to Highgate's positions you mentioned earlier being merged into Cornell, is there still a separate accounting being maintained of the Highgate

Page 232

MARK ANGELO

positions?

A    Again, I don't know the answer. I believe so, but I don't know.

Q    Is there a separate accounting being maintained of the Montgomery positions that are now in Cornell?

A    Again, I don't know the answer.

MR. VENTURINI: I'm going to end the deposition at this time. I will hold it open obviously to the extent we can do so, but I have no further questions.

MR. ROSENBAUM: I just have a couple.

EXAMINATION BY MR. ROSENBAUM:

Q    YAM, Yorkville Asset Management, at the beginning of the dep you said that was merged into Yorkville Asset --

A    Advisors.

Q    Yorkville Advisors, I'm sorry.

A    Yes.

Q    And the survivor of that merger

Page 233

MARK ANGELO

was Yorkville Advisors?

A    Correct. Again, I'm not an attorney, but just to be clear, Yorkville Advisors Management hasn't been dissolved. It still has ongoing legal obligations. It was merged into Yorkville Advisors.

Q    You said Yorkville Advisors, you mean YAM wasn't dissolved?

A    Yorkville Advisors Management wasn't dissolved, it merged into Yorkville Advisors.

Q    Its assets were transferred into Yorkville Advisors, including the agreement with Mr. Gottbetter to the extent there's any remnant of that agreement still in effect?

A    Yes.

Q    With respect to the agreement with Mr. Gottbetter, the November '04 agreement, that was between Yorkville Asset Management and Mr. Gottbetter?

A    Yorkville Advisors Management.

Q    Yorkville Advisors Management. We'll use the acronym YAM for that, Y-A-M.

Page 234

MARK ANGELO

A    Yes.

Q    And pursuant to that agreement, was Mr. Gottbetter entitled only to a percentage of YAM's profits, if it had profits?

A    He was entitled to, again, 44 percent of a profit calculation of what YAM received.

Q    And if YAM didn't receive any, if YAM didn't have any profit or if it's profits were de minimis, he would get 44 percent of its profits or 44 percent of zero if it had no profits, correct?

A    You only get 44 percent of what YAM actually received, yes.

Q    Has YAM received any profit at all on account of the Charys transaction?

A    No.

Q    Has YAM received anything to date on account of the Charys transaction?

A    No.

Q    The warrants issued to Highgate, the Charys warrants issued to Highgate, was it your understanding that

Page 235

MARK ANGELO

through at least the end of October that all of those warrants were still in Highgate's name?

A    Yes.

Q    Were any of them liquidated or sold at any time before the end of October?

A    No.  And the company's public filings all had them this Highgate's name. That's why we were shocked.

Q    You were shocked about what?

A    I was shocked after the fact to find out that they were transferred.

Q    By Mr. Gottbetter?

A    By Mr. Gottbetter, yes.

Q    Let me address that for a moment.

When he left, when Mr. Gottbetter left in January of '06, did he leave the Highgate closing binder at Yorkville?

A    He provided, either when he left or shortly thereafter, 20, a bunch of boxes of all the deal documents.

And there was approximately, I

Page 236

MARK ANGELO

want to say somewhere between 50 and 70 different transactions, and all the documents that went with them.

And, you know, he was our attorney, we trusted him.  I didn't, we didn't go through 20 boxes because, you know, the first 19 all had original debentures, original warrants.

It only came to after the fact, in the month of November --

Q    '06?

A    Of '06, that Charys provided original debentures, all the original documents with the exception of the warrant.

Q    Let me go back.  You said the first 19 boxes contained --

A    Again, I don't know how many boxes there were, but there was an awful lot of boxes.

Q    However many there were --

A    And all of those deals, all those boxes, all had transactions and had original debentures, original warrants, original security purchase agreements, all the

Page 237

MARK ANGELO

original documents.

Q    And what about the Charys box? When did you first go through that box?

A    In November.

Q    Of this year?

A    Of this year, yes.

Q    What did you find with respect to what originals were in the Charys documents and what were copies?

A    All the deal documents, which include, again, securities purchase agreement, the debenture, the security, registration rights, all of that was original.

Q    What about the warrants?

A    That was on the last page, it wasn't original, that was a copy, and then we just couldn't believe it.

Q    Did you ultimately find out what happened to the original warrants?

A    We asked to have the originals sent to us.

Q    Who did you ask?

A    We noticed Gottbetter Partners to have the originals sent to us.

61 (Pages 238 to 241)

Page 238

MARK ANGELO

Q    When you say you noticed, you sent them some sort of written communication?

A    Some sort of written communication to please send us the originals.

Q    And what was the response you got back?

A    That we had transferred them.

Q    Transferred them, that's what Gottbetter said?

A    Gottbetter had said that Gottbetter had transferred them out of the name of Highgate House and redistributed the amounts and sent 20 percent of them to Michael Chorske, some percentage to him, and sent us the greatly diminished amount, less than half back to us.

Q    Did you ever give Mr. Gottbetter or anyone associated with his company permission to do that?

A    Absolutely not.

Q    Did he ever tell you that you had given him --

A    Absolutely not.

Q    Let me finish.

Page 239

MARK ANGELO

That you had given him permission?

A    Sorry, absolutely not.

MR. ROSENBAUM:  That's all I have.  Thank you.

MR. VENTURINI:  I have one or two follow-up.

CONTINUED EXAMINATION BY MR. VENTURINI:

Q    In connection with the questioning by Mr. Rosenbaum of YAM in terms of what it was assigning over to Yorkville Advisors, did it actually assign the subject letter agreement with Adam Gottbetter and HH Advisors over to Yorkville Advisors?

MR. ROSENBAUM:  You mean did it execute a written assignment?

MR. VENTURINI:  I asked him if they assigned it in writing or otherwise.

MR. ROSENBAUM:  You can answer.

A    Again, I'm not an attorney, I don't know.  I know the entities merged.

Page 240

MARK ANGELO

Q    But Yorkville -- you're saying YAM is still in existence.

A    Yes.

Q    So the operations merged as far as you know.

A    Again, at the risk of sounding -- again, it seems to me you're asking me a legal question.  The answer is I don't know.

Q    When Mr. Rosenbaum asked if you had received anything on the Charys transaction, you said no.

MR. ROSENBAUM:  No, I said did YAM or YA receive anything on the Charys transaction.

Q    Are you excluding from your answer whatever it received from the debenture sale?

A    Yes.

MR. RILLO:  No.

A    The debenture sale -- I'm trying to think.  I'm sorry, you're asking me if YAM received --

MR. ROSENBAUM:  Or YAS.

Page 241

MARK ANGELO

MR. RILLO:  YA.

A    Give me the question again.

MR. ROSENBAUM:  Did YAM or YA receive anything in connection with the debenture sale, anything from Highgate.  That was the question.  If you know.

A    It seems no.

Q    Okay.  With respect to the Charys warrants that Highgate House has --

MR. ROSENBAUM:  Highgate House doesn't have them.  Mr. Gottbetter has them.

Q    Highgate House does have Charys warrants, doesn't it?

A    It has less than half the amount of warrants that it's supposed to have, but yes.

Q    It does have warrants.

A    Yes.

Q    Has Highgate House exercised the warrants?

A    I don't believe so.

Q    It's free to do so, right?

A    Well, we have restricted stock

Page 242

MARK ANGELO

in the company.

Q    I'm sorry?

A    We had converted a debenture and we have restricted stock in the company, and I believe we're contractually obligated not to convert into more than 4.99 percent.

So until we're able to sell the other position, I don't believe we can exercise the warrants.

Q    So you're saying there's a restriction on how much you can exercise on the warrants based upon the position you have in the restricted stock?

A    I believe that we -- that's sort of it, yes. We can't convert into more than 4.99 percent of the -- we can't have more than 4.9 percent ownership of the company at any one time.

Q    Is that something that's in the debenture, or is that just a firm policy?

A    No, it's something in the deal documents. It's probably both in the debenture and the warrant.

MR. VENTURINI: I have nothing

Page 243

MARK ANGELO

further.

MR. ROSENBAUM: We're done.

Do you have a copy, Augie, of the Goldstein memo that you asked Mr. Maloney about, and you also asked Mark Angelo about that was circulated fairly recently about the inability of a banker to get equity, stock, warrants?

MR. VENTURINI: I'm not sure exactly that I know what you're talking about, but I want to go off the record.

MR. ROSENBAUM: I'm asking you a question on the record because I'd like an answer. Do you or your client have a copy of that?

MR. VENTURINI: I don't think so. I'm not exactly sure what you're talking about.

MR. ROSENBAUM: I'll make it very clear. You asked Maloney about a document, you said last month, meaning October, when you took his deposition it was November, so you meant October, did you sign a document, you asked Maloney,

Page 244

MARK ANGELO

where you agreed not to take stock or warrants, physical possession or title to stock or warrants, and he said yes, he did, and you asked the same question of Mr. Angelo.

I just want to know whether you or your client have a copy of that document.

MR. VENTURINI: I don't believe so. Can we go off the record?

MR. ROSENBAUM: Sure.

THE VIDEOGRAPHER: This marks the end of tape number 4. Going off the record, the time is 5:53 p.m.

_____

MARK ANGELO

Subscribed and sworn to before me this _____ day of _____, 200_.

_____

NOTARY PUBLIC

Page 245

MARK ANGELO
EXHIBITS
ANGELO                          FOR IDENT.

1    E-mail string    D 01417         47

2    E-mail from Liang Zhou to Bob Press    50
     dated January 13, 2006 with
     attachment    P 09153 through
     09155

3    E-mail    P 08440              57

4    E-mail string    P 08648 through P    105
     08651

5    Four page document entitled         114
     "Assignment Agreement"    P
     08493 through P 08496

6    Balance sheet for Highgate House    121
     Funds

7    E-mail with three page attachment    126
     D 01247 through D 01250

8    Document entitled "Highgate House    136
     Asset Reconciliation"    P 09335
     through P 09341

9    Two page document    P 08535 to    160
     536

10   Listing of securities    P 01472    163
     through P 01478

11   Document entitled "Highgate House    174
     Funds, Unrealized Gains and Losses"
     P 01440 through P 01461

12   Multi-page document    P 01479    180
     through P 01484

13   One page document dated June 1 of    205
     2005

Page 246

MARK ANGELO

EXHIBITS

ANGELO                          FOR IDENT.

14  E-mail string    P 09237 through    217
    P 09248

15  E-mail string    D 01329 and D      222
    01330

16  Letter to investors    P 06055     229
    through 06057

INDEX
REQUESTS FOR DOCUMENTS/INFORMATION
        Page    Line
        133     14
        161     14

DIRECTIONS NOT TO ANSWER
        Page    Line
        13      7
        178     12
        189     9
        191     23
        192     4
        193     7
        193     13
        193     20

Page 247

MARK ANGELO


CERTIFICATE



        I, SUZANNE F. MOORE, a Shorthand
Reporter and Notary Public of the State of
New York, do hereby certify:

        That, MARK ANGELO, the
witness whose deposition is hereinbefore
set forth, was duly sworn, and that such
deposition is a true and accurate record of
the testimony given by such witness.

        I further certify that I am not
related to any of the parties to this action
by blood or marriage; and that I am in no
way interested in the outcome of this
matter.


        _____
        SUZANNE F. MOORE, RPR, CRR

Page 248

MARK ANGELO


ERRATA SHEET

PAGE/LINE      CHANGE FROM      CHANGE TO

**A**

abbreviation 112:19
ability 98:2
able 137:4 156:12 242:8
absolutely 24:4 28:3 43:13 45:14 135:24 200:15 238:21 238:24 239:4
Accelerate 206:16
access 186:3,5
accommodate 227:21 228:21
account 107:24 108:2,6,10,12 108:14,24 109:3 110:15 111:6 153:15 201:14 204:17 234:18 234:21
accountant 120:17 181:19
accounting 51:12 51:14 52:22 55:4 118:23 121:15 122:18 123:3,6,10 124:13 138:25 139:3 158:15 159:15 161:9 164:19 181:8 182:7,8,8,13 183:12 185:24 200:24 204:13 204:14 231:25 232:5
accounts 33:6 52:25
accrued 142:4 143:25
accurate 110:6 188:15 247:13
accurately 205:6
acquire 150:12
acquired 32:18

acronym 233:25
act 12:4 93:24
acted 23:22 24:7
acting 213:7
action 1:6 6:21 7:10 122:6 194:13 247:17
actual 155:9 166:8
Adam 1:8 2:20 3:14 22:14 36:5 36:9 37:5 38:12 42:8 44:11 45:6 46:2,22 47:3,3 47:16 48:6 52:11 56:2,7,13 63:16 64:20,21 64:24 65:9,15 65:18,21 66:10 66:19,22,25 67:11 68:6 69:13,16,19 70:15 71:6 73:13 74:11,16 75:4,14,14 79:6 79:7,19,23 80:8 80:11,18 83:22 83:25 84:4,5 85:11 86:23 90:17 93:4 102:22 103:5,10 103:12,23 104:4 104:9 126:3 128:24 129:5,20 131:17,23 139:10 154:12 155:22,25 187:19,25 188:25 189:16 192:24 193:17 194:3,6,11 195:12 197:8,17 197:20 198:3,14 199:11 200:21 202:12 205:9,12 206:9,21 207:12 207:24 208:14

209:20 211:2 212:16 217:2 219:19 223:15 223:15,19,24 224:6,16,21,25 225:8 226:15 228:6 229:10 230:8 239:16
Adam's 64:9 74:6 90:19 195:15 226:5 230:20
addition 22:17 93:21
additional 37:16
additions 144:12 151:6
additions/purc... 146:4,13,24 147:24 149:17 150:21
address 235:16
administrator 180:24 181:5,19 181:22 182:16
advance 224:21
advised 193:11
advisor 33:5
advisors 1:2 3:13 3:15 9:3,5,7,12 9:14,15,17,24 10:7,13,15,17 11:12,18,22 12:23 13:15,17 13:20,24 14:8 14:12,20,24,25 15:5,14,16 16:4 16:23 17:10,13 17:16 19:2 29:7 29:10 30:15,18 31:6 33:14 44:23 51:16,18 74:6,11 75:5 76:2 83:12,19 84:21 86:2 97:16 102:21 127:13,13,17 128:11,16 129:6

129:11,22 131:18,25 197:3 198:15 203:18 203:19 232:22 232:23 233:2,5 233:7,8,10,12 233:14,23,24 239:15,17,17
advocate 195:15
Aerotelesis 139:5 139:18 140:3
AG 63:21 64:19 64:20
agency 81:4,7 82:13 85:8,14 85:21 86:17,22 86:24 88:15 93:6 97:15 99:19 101:7,13 101:20,25 102:8 102:17 128:23 197:14
agent 31:13,15,18 104:5 195:3,5
ago 7:13,15 19:16 19:23 36:13 38:3 51:13 78:4 214:3 217:21
agree 190:10,22 209:4 230:21
agreed 74:5 80:22 228:7 244:2
agreement 12:7 12:15 48:12 64:10 98:16 109:20 114:6 194:11,12 198:4 198:9,14 205:8 214:17 233:15 233:16,19,21 234:3 237:12 239:16 245:11
agreements 13:2 236:25
ahead 24:23 61:6 74:20 79:3 96:25 98:3

115:17 178:21 178:25 191:18 210:21 224:9
AIB 32:11
AIBC 31:22
al 3:15
allocate 227:23
allowed 74:12
amicable 230:21 231:2
amount 66:21 68:13,13 89:15 111:25 124:17 154:24 238:16 241:17
amounts 238:14
analysis 143:4
Andreas 224:13 224:15,22,24 225:4 227:5,25
Angelo 1:18 2:1 3:1,12 4:1 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1,19,21 47:24 48:1 49:1 50:1,20,23 51:1 52:1 53:1 54:1 55:1,16 56:1 57:1,14,18,20 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1

| | | | | |
|---|---|---|---|---|
| 76:1 77:1 78:1 | 178:1 179:1 | 75:2,2,3 85:3 | 107:4 114:22 | 216:5,10 217:2 |
| 79:1 80:1 81:1 | 180:1,3 181:1 | 94:11 97:11 | 115:20 118:22 | 224:11 228:4 |
| 82:1 83:1 84:1 | 182:1 183:1 | 101:14,20 116:6 | 164:13,15 166:3 | 237:21 239:20 |
| 85:1 86:1 87:1 | 184:1 185:1 | 132:4,16,17 | 166:25 167:8 | 240:11 243:5,6 |
| 88:1 89:1 90:1 | 186:1 187:1 | 140:6 146:11,25 | 171:3,21 173:14 | 243:21,25 244:5 |
| 91:1 92:1 93:1 | 188:1 189:1 | 163:17 167:16 | 222:23,24 230:7 | **asking** 4:17 23:9 |
| 94:1 95:1 96:1 | 190:1 191:1 | 178:3,4,13,18 | **applied** 167:25 | 65:2 95:25 |
| 97:1 98:1 99:1 | 192:1 193:1 | 178:22 181:3 | **apply** 72:3 168:5 | 97:20 98:15 |
| 100:1 101:1 | 194:1 195:1 | 182:21 183:6,9 | **appointed** 12:6 | 101:18 137:8 |
| 102:1 103:1 | 196:1 197:1 | 183:23 187:18 | **appreciate** 204:23 | 160:25 170:21 |
| 104:1 105:1,23 | 198:1 199:1 | 189:9,12,25 | **approach** 38:16 | 178:2 190:23 |
| 106:1 107:1 | 200:1 201:1 | 190:18 191:8,23 | **approached** | 208:25 211:12 |
| 108:1 109:1 | 202:1 203:1 | 191:24 192:4,6 | 38:19 | 218:14 220:12 |
| 110:1 111:1 | 204:1 205:1,19 | 192:11 193:7,9 | **approaching** | 224:9,10 240:9 |
| 112:1 113:1 | 205:22 206:1 | 193:13,15,20,22 | 38:17 | 240:23 243:13 |
| 114:1,3 115:1 | 207:1 208:1 | 197:11 214:23 | **appropriate** | **asset** 54:4 56:7,8 |
| 116:1 117:1 | 209:1 210:1 | 220:10 221:25 | 54:17 62:22 | 56:13,14 117:23 |
| 118:1 119:1 | 211:1 212:1 | 232:3,8 239:23 | 63:3 | 118:4 123:20 |
| 120:1 121:1,4 | 213:1 214:1 | 240:9,18 243:15 | **approval** 28:14 | 137:2,18,20 |
| 122:1 123:1 | 215:1 216:1 | 246:15 | 28:17,25 78:18 | 157:22 232:19 |
| 124:1 125:1 | 217:1,13,16 | **answered** 23:6,18 | 85:9,25 86:3 | 232:21 233:21 |
| 126:1,18 127:1 | 218:1 219:1 | 23:19 46:13 | 208:23 209:3 | 245:16 |
| 128:1 129:1 | 220:1 221:1 | 93:25 94:8 | **approve** 207:15 | **assets** 137:22 |
| 130:1 131:1 | 222:1,8 223:1 | 101:11,16 | **approved** 27:15 | 233:13 |
| 132:1 133:1 | 224:1 225:1 | 104:14 | 44:7,9 84:20 | **assign** 239:15 |
| 134:1 135:1 | 226:1 227:1 | **answering** 97:19 | **approximately** | **assigned** 104:24 |
| 136:1,21 137:1 | 228:1 229:1,17 | **answers** 4:25 | 19:15 36:12 | 113:22 114:25 |
| 138:1 139:1 | 230:1 231:1 | 161:10 181:16 | 38:3 51:13 | 115:23 154:25 |
| 140:1 141:1 | 232:1 233:1 | 209:23 | 53:25 59:24 | 155:16 239:21 |
| 142:1 143:1 | 234:1 235:1 | **Anthony** 27:11 | 79:13 80:10 | **assigning** 155:4 |
| 144:1 145:1 | 236:1 237:1 | **anticipated** | 235:25 | 239:14 |
| 146:1 147:1 | 238:1 239:1 | 169:20 | **area** 157:14 | **assignment** 114:6 |
| 148:1 149:1 | 240:1 241:1 | **anybody** 142:11 | 181:18 221:20 | 115:19 116:9 |
| 150:1 151:1 | 242:1 243:1,7 | 195:3 | **Army** 107:11 | 154:2 155:7 |
| 152:1 153:1 | 244:1,6,17 | **anymore** 41:18 | **arrangement** | 239:19 245:11 |
| 154:1 155:1 | 245:1,3 246:1,3 | **apartment** 110:11 | 208:23 | **assignments** |
| 156:1 157:1 | 247:1,10 248:1 | **apparent** 228:16 | **ASG** 206:17 | 115:25 |
| 158:1 159:1 | **answer** 5:7 13:8 | **apparently** 7:25 | **aside** 11:20 21:23 | **assigns** 165:25 |
| 160:1,4 161:1 | 13:12 14:5,16 | 79:23 102:20 | 145:10 188:15 | **assistance** 41:5 |
| 162:1 163:1,21 | 14:18 17:14 | 120:19 141:6 | **asked** 42:18 49:23 | **assistant** 21:21 |
| 164:1 165:1 | 20:15 23:15,16 | **appear** 58:24 | 50:7 52:2 53:17 | **associate** 21:20 |
| 166:1 167:1 | 29:19 35:13 | 114:24 140:9 | 55:12 60:21 | **associated** 91:5 |
| 168:1 169:1 | 43:15 53:16,24 | 141:8,24 150:17 | 94:7 96:3 | 109:3 195:3 |
| 170:1 171:1 | 54:12 55:24 | 164:16 165:24 | 137:13 159:5 | 238:19 |
| 172:1 173:1 | 56:17 59:5 | 173:12,21 | 160:15 163:9 | **ASSOCIATES** |
| 174:1,9 175:1 | 60:22 61:6,9 | 174:21 | 164:8 177:7 | 2:11 |
| 176:1 177:1 | 62:17 68:19,20 | **appears** 66:4 | 180:25 215:11 | **assume** 58:14 |

102:3,7 109:13
109:14 112:8,16
112:18 138:4,20
152:17 168:18
168:20 231:6
**assuming** 143:24
157:5 199:17
202:15 230:4
**attached** 77:25
**attaching** 220:4
220:14
**attachment** 51:20
118:14 126:24
218:23 245:6,14
**attachments**
127:2
**attention** 78:5,20
112:5 114:23
118:10 119:24
127:5 129:14
135:12 140:7
151:11 157:8
171:20 172:16
176:6,13 179:2
206:15 207:6
**attorney** 21:10,23
104:5 233:4
236:6 239:24
**attorneys** 2:5,12
21:17
**Attorney-client**
178:14
**attributed** 120:22
**attributing**
119:16
**attribution**
119:22 132:22
157:25 161:11
**audit** 53:19 55:9
135:25 136:13
182:6
**audited** 53:18
55:4 182:6
**auditors** 136:11
**Augie** 214:14
243:4
**August** 2:16 3:20

94:2 96:8
134:16 160:12
173:25
**authority** 12:23
13:9,22,25 14:7
14:11
**available** 41:15
41:22
**Avenue** 1:15 2:13
3:5,11
**aware** 4:18 10:6
96:6 150:15
214:9
**awful** 230:15
236:19
**a.m** 1:13 3:8
138:3

_____
**B**
_____
**B** 169:17 245:2
246:2
**Bachelor's** 34:23
34:24
**back** 8:7 20:18,20
33:19 54:25
55:13 56:3 58:9
58:15,21 59:14
59:17 60:10,16
61:6,15,21,23
61:25 62:10
63:12,18,22
65:9 71:3 80:2
80:22 91:7,8
96:7,8,10
110:25 118:11
130:7,10 132:6
135:13 141:3
142:5 143:14
147:3 179:15
191:9 196:3
202:9,19 224:7
225:4,5 236:16
238:7,17
**background**
20:13
**bad** 7:19,20,21,24
7:25 8:17
**balance** 65:22

82:11 88:12
89:25 91:6,8
93:4 103:25
121:11,12,18
122:7,10,21,25
123:8,18,20,24
124:22 132:10
132:22 133:16
133:22 134:8
135:13,17 136:4
197:5 200:20,21
203:15 245:12
**bank** 110:16
**banker** 23:22
24:4,7,15,18,19
24:21 25:11,17
25:19,20 26:4,6
26:23,24 29:2
70:12 71:5
84:14 89:5,22
90:12 93:24
198:5,18 199:24
208:8,15 212:6
243:9
**bankers** 25:14
26:21 27:6,18
33:12 70:9
89:19 93:21
94:13 208:18
214:17 215:8
216:5,10
**banker's** 88:3
89:2,11 93:11
203:12,14
211:25
**banking** 31:12,17
32:6 69:21,23
70:4,5,8 72:23
88:2 207:22,25
**based** 41:11,12
89:7 92:25 93:3
141:22 142:23
143:5 153:13
174:21 183:15
186:24 220:18
242:13
**basically** 118:14

**basis** 44:16 63:2
74:2,3 77:9,13
**Bates** 47:25 50:24
76:13 106:3
114:7 121:7
126:21 135:9,10
136:24 160:7
162:13,16
163:24 172:17
184:4 209:23
210:2,13 217:16
222:12 229:23
**bathroom** 57:3
180:6
**battle** 98:11
**bear** 86:25
**bearing** 188:20
**Beckman** 10:16
14:10 30:23
186:22,24
**bed** 227:8
**began** 225:4
230:24
**beginning** 15:9
39:5 57:13
125:16 168:22
180:16 232:20
**begins** 111:23
174:12 184:3
218:24
**behalf** 1:19 12:4
13:15,17,19,23
14:7,11 85:7
**belief** 202:11
**believe** 7:4 8:20
9:10,13,19 10:2
10:19,23 14:23
15:4,7 16:13,16
17:12,21 19:2
20:21 29:18,22
30:3,22 34:8
38:19 42:15
43:16 44:4
48:22 49:9
51:25 56:21
66:7 70:19,20
75:25 76:4

81:15 86:16
87:25 88:13
91:6 108:9,11
112:11 117:12
123:11 128:24
131:22 132:21
138:9 139:12,16
144:17 145:12
145:23 146:2
147:19 149:13
154:16 155:11
155:11 157:24
159:23 171:7
181:25 198:24
200:3 207:14,21
218:20,21 224:3
224:4,21 232:4
237:18 241:23
242:6,9,15
244:10
**believed** 223:18
**belong** 100:18,24
101:2
**benefit** 195:2,4,5
**benefits** 203:6
**best** 6:8 27:19
70:6 124:15
**bet** 140:19
**better** 163:15,15
**betting** 140:19
**beyond** 189:19
201:24
**big** 59:19 77:7
107:5
**bind** 12:23 13:10
**binder** 235:20
**bit** 34:2 60:3
145:19 203:24
**Black-Schoels**
133:12 134:2
**blood** 247:18
**blurry** 162:22
**Bob** 37:23 38:2
51:20 245:5
**book** 201:5
**books** 33:14
117:24 183:15

borrowed 213:7
**Boston** 33:22,24
  34:7
**bottom** 48:7
  82:20,23 106:10
  111:23 138:3
  166:6 167:5
  177:3 179:10
  218:6,10
**bought** 124:10
  130:17,23,25
**box** 237:3,4
**boxes** 235:24
  236:7,17,19,20
  236:23
**breach** 7:5,9
**breached** 190:4
**break** 4:22 57:5
  71:24,25 125:6
  125:8 158:15
  180:8 183:24
  216:13
**breakdown** 73:13
  73:16
**breakfast** 227:9
**breaking** 98:23
  98:24
**breaks** 82:17
**bring** 33:13
  190:25 217:10
**bringing** 191:3
**broker** 33:4
**brokerage** 108:11
  108:14
**brokers** 208:17
**broker/dealer**
  29:8,12 30:2,10
  107:20
**brought** 22:16
  70:11,12 79:7
  89:22 189:16
  213:14
**BUDD** 2:4
**building** 110:10
**builds** 26:7
**bumble** 181:16
**bunch** 235:23

**business** 6:19
  15:11,12 31:13
  33:15 39:3
  102:17 127:19
**buy** 110:11
  124:16 154:19
**buying** 88:18

_____
          **C**
_____
**C** 2:2,16 247:3,3
**calculate** 182:23
**calculated** 56:9
  56:15 196:18
**calculates** 180:24
**calculating** 182:2
**calculation** 64:16
  65:19 68:12
  70:9,15 72:7,13
  73:7 90:21
  118:4 161:16
  183:15 195:20
  200:22 201:3
  203:21,23 234:8
**call** 16:2 33:4
  37:9,11 72:21
  75:10 82:12,13
  85:8,21 93:6
  113:15 119:15
  133:17 134:12
  161:14 162:18
  191:5 197:14
  214:7
**called** 4:6 7:19
  9:11 31:22
  32:13 33:21
  52:24 88:2,5
  99:2 109:19
  170:13 223:11
  223:12 227:8
**capacity** 40:9
**capital** 8:7 15:17
  16:11 18:21,23
  24:9 31:17
  79:21 112:13
  114:14 155:13
  155:19 156:15
  179:7 208:18
**cared** 103:7

**carefully** 48:13
**carry** 182:17
**carve** 110:2
**case** 5:24 9:20
  58:24 134:12
  183:3 195:16
  202:10
**cases** 5:24 94:13
**cash** 82:3,9 88:24
  89:4,7,10,14,21
  89:24 90:7,16
  93:16,22 94:14
  110:20 208:8,15
  209:18 211:25
  212:2,8,10
**caused** 154:16
**Cayman** 1:4
**cc'd** 58:3,5 77:2
  106:8,12 107:5
  205:25 218:3
**CD** 119:8
**CDs** 119:2
**ceased** 127:22
**Center** 6:2,15
  8:18
**Cenuco** 125:18,20
  125:24 126:4,14
  128:20 129:2,15
  129:21 130:6,14
  131:18 140:8,11
  141:16,18 143:9
  147:9,13 154:7
  154:9 155:12
  156:19
**cert** 112:12,16
**certain** 94:24
  96:2
**certainly** 21:11
  102:25 161:9
**certificate** 112:17
**certificates** 113:8
  113:11,13,17
**Certified** 1:21
**certify** 247:8,16
**CFO** 59:4 118:7
  171:17 175:18
  176:5 220:23

**chain** 110:25
**chances** 219:14
**CHANGE** 248:4
  248:4
**changes** 136:4,7
**characterize** 18:2
**charge** 72:14,19
  123:5,10
**charged** 71:16,17
**charity** 102:17
**chart** 26:12,17
  169:13 170:12
  170:16
**Charys** 117:2
  120:13 123:19
  123:24 124:11
  124:18 128:22
  132:25 133:3,4
  133:8 134:8
  144:7,8,22
  145:7,10,13,15
  145:21,25 146:9
  147:4,16,22
  148:9,14 149:5
  149:10,16
  150:13 153:3
  168:10,25
  169:11 176:7,7
  187:7,22 188:22
  189:16,22,23
  191:14,20,21
  192:3,15,22
  193:2,12,19,23
  194:2,17 196:25
  197:9,17,18
  198:7,21 199:25
  200:5 201:25
  202:7,10 203:2
  204:17 234:18
  234:21,24
  236:13 237:3,9
  240:12,15
  241:10,14
**check** 53:19 77:8
  104:16 134:11
  135:2 208:5
  209:9 210:12

  229:6
**checked** 104:11
**cherry** 72:25
  201:9
**Chiltern** 222:25
  223:11,12
**choose** 93:13,14
**chooses** 213:13
**Chorske** 1:11
  133:11 198:5,10
  198:18,22 199:5
  199:14,23 200:2
  200:17,20
  201:16,19,22
  203:9 205:13
  206:10 207:8,12
  207:16,19,25
  208:14,24 209:5
  209:21 211:3
  217:2 219:19
  220:4,14,20
  221:13 238:15
**Chorske's** 198:14
  199:10 205:8
  209:10 212:17
**chose** 84:3
**Chris** 25:16 79:6
  79:7,19,23 80:8
  80:18 82:2 84:5
  84:15 85:6
  86:22 93:5 97:2
  97:13 99:3
  100:11,24
  102:25 103:10
  103:12 105:6
**Christopher**
  77:22 98:6
**circulated** 214:25
  215:21 243:7
**circulating** 215:7
**City** 44:22
**Civil** 1:6
**claim** 6:2,20 7:3,4
  7:5 96:2 97:3,7
  98:7
**claimed** 94:23
**claims** 97:3

clarify 62:18 63:5
128:10 215:17
clarifying 67:20
clear 68:3 72:6
97:18 100:23
111:4 113:16
154:10 162:8
204:16 205:2
213:2 233:4
243:21
clearly 201:7
208:4 209:15
client 190:4
243:15 244:8
client's 203:5
close 31:10 83:25
closed 117:3
209:14
closer 169:19
closing 117:17
149:4,10 235:20
coincidentally
156:8
collapsed 9:14
39:25 40:3 42:2
128:2
collapsing 9:21
128:3
collecting 65:16
65:17
college 34:16,17
column 58:8
63:21 65:14
66:5 120:10
141:15,23
143:14 144:11
144:23 146:12
147:23,24
150:20,22 151:4
151:5 153:21
157:18 167:19
168:20 176:14
184:24 201:7
columns 145:4
157:12 167:23
come 17:10 24:2
28:23 36:15,18

46:2 47:9 81:7
185:11,22,23
194:14 200:13
216:24 227:3
comes 38:24
185:21 187:2
194:11
coming 136:8
181:5 225:4
comma 147:18
committee 26:9
27:4,5,6,9
common 112:19
128:19
commonly 15:24
communication
238:3,5
comp 109:11
companies 27:7
33:25 119:19
120:21
company 1:3,4,9
7:6,19,20 9:9,11
10:18 11:9,12
12:5 32:13 74:6
79:17 116:5
118:15 125:20
145:21 148:19
153:2 167:5
169:18 192:14
194:19 202:25
238:20 242:2,5
242:18
company's 235:8
compensation
17:9 43:23
55:13 56:19,22
63:13 66:10
67:11,13,15
68:6,11 69:17
90:19 209:5
212:8,17
complete 115:13
128:22
completely
131:13
compliance

108:10,20,23
213:4 214:24,25
215:3
comprised 207:8
computer 122:15
122:17,17
185:16,18,21,24
186:3,6
concerned 80:23
concerning 67:15
conclusion 13:5
13:10 102:14
142:13
condensed 185:8
confirmation
108:21 215:15
confirmed 110:2
confused 53:11
62:4
connection 5:23
6:14 29:15
45:22 72:15
78:9 105:7
116:25 117:20
125:24 155:7
177:17,22 178:7
209:17 217:4
239:12 241:5
consecutively
50:25 174:13
consider 193:11
considerable
81:13
considering 27:17
38:21 85:9
150:20 151:3
consist 142:16
consists 93:8
consultant 40:14
contained 236:17
contemplating
37:12 45:13
46:17
continue 14:24
continued 57:10
87:14 125:13
180:13 216:18

231:19 239:10
continues 111:24
continuing 87:20
111:22 145:20
146:8 148:3,8
149:15 153:19
208:6
contract 7:5,10
8:3
contracts 13:3,14
13:16,19,23
14:2,7,11
contractually
242:6
contribute 61:20
62:2,3,13 63:7
63:10,17 81:10
contributed 65:9
188:7,10
contributing
64:24
contrived 228:17
conversation 37:4
37:6 48:17 56:2
56:7,13 60:13
60:24,24 61:10
61:13,19 64:23
65:7,14 70:2
103:17,19 109:6
109:9 126:3,6
131:20,23
178:11 197:25
198:3,10 206:8
206:20,24
207:11 209:19
211:2 212:16
219:18 220:19
221:15 227:25
230:18
conversations
36:20,23 50:5
60:9,11,15
63:16 65:12
67:8,10,14 68:4
68:8 128:19
129:5,8,9,20
130:4 131:16

177:11,15,20
178:5 192:7
193:16 197:7,10
197:17,19 208:3
209:7 215:5,9
convert 242:7,16
converted 144:17
242:4
convertible 88:19
119:9 140:17
142:4 144:18
145:2 149:22
158:19,20
copied 135:6,10
copies 134:19
172:20 237:10
copy 76:8,10
91:13 134:24
157:9 163:15
185:15,22
217:24 218:7
237:17 243:4,16
244:8
Cornell 15:17,21
16:11 18:3,18
18:20,21,23
20:3,9,23 24:8
40:2,21,25 41:4
41:8 42:3,17
43:6,17 112:13
113:9,14 114:14
114:17 115:4,6
115:15,22,24
154:19,19,25
155:9,14 156:11
156:14,18 157:4
179:7 208:18
220:23 225:22
231:24 232:7
Cornell's 40:4,17
43:5
correct 6:17 8:8
9:16,23 10:2
11:16,19,22,23
12:3 15:20
16:22 17:25
27:13 28:16

30:14,25 31:4
36:5 39:7 41:3
42:11 43:3,7,18
44:5 45:5 50:8
59:11,12 76:3
83:5,18 93:20
99:11 116:19
130:25 131:25
132:3 136:3
138:17 139:16
143:4,16,23
144:15 145:17
150:11 152:16
153:11 157:5,19
167:18 182:14
186:7 191:22
193:3 200:12
218:20 233:3
234:14
**correcting** 95:15
**correctly** 42:23
50:12 51:9,11
156:17 200:5
**corresponded**
222:15 224:7
**correspondence**
196:3,5 223:24
**counsel** 3:18
21:12,15,18,20
21:21 35:7
178:9 215:25
**count** 172:25
**couple** 33:10 50:5
71:12 159:17
217:21 227:14
232:15
**course** 6:13
111:18 210:14
**court** 1:1 3:16,24
4:3 5:2,16 8:22
190:24 191:2,4
**cover** 53:8 54:25
171:21
**covering** 167:8
169:2
**covers** 151:6
165:20

**co-manage** 39:4,8
**co-managed**
199:5
**co-manager**
18:12,13 80:12
**co-op** 110:10
**co-portfolio** 18:7
19:8,18 36:10
36:19 39:12
44:12 46:3,17
48:20 49:19
50:13 59:10
66:12 69:20
75:18,19 104:6
139:11 230:10
230:12
**create** 47:4
**created** 14:22
15:6 18:24
19:10,12,20,22
164:17,25 165:4
184:12,14
**creating** 177:12
177:16
**credit** 28:22
109:23
**credited** 203:21
203:22
**cross** 86:24
**CRR** 247:23
**crystal** 113:16
**Cubeta** 112:7
**curious** 132:19
**current** 6:15 8:25
9:2 42:12
**currently** 29:14
**cut** 159:6 172:21
189:13 197:24

---
**D**
---
**D** 47:25 126:22
126:22 222:12
222:12 245:4,14
245:14 246:6,6
246:10
**daily** 77:9,13
**data** 182:23
**date** 19:13 36:11

47:15,22 50:21
57:21 105:24
114:4 121:5
126:19 136:22
150:23 160:5
163:22 167:17
174:10 177:8
180:4 205:20
217:14,25 218:8
221:10 222:9
226:23 227:16
229:18 231:5
234:21
**dated** 107:8
205:23 217:23
220:24 245:6,24
**dates** 229:2,3
**dating** 33:19
**Dave** 30:24
**David** 10:16 11:3
14:17 21:17,19
27:11 29:5
186:18 215:25
**Davis** 30:3,9 31:7
31:19,21 32:4
**day** 45:2 48:22,24
49:11,12 77:12
77:14 110:23
111:14 227:15
244:20
**days** 49:5,13
77:15 149:4
170:8 194:25
203:2 217:21
224:5
**de** 234:12
**deadline** 162:2
**deal** 26:2 28:25
29:2 117:2
129:24 197:25
235:24 237:11
242:22
**deals** 207:23
236:22
**debenture** 88:19
119:9 124:10,17
125:2 141:18

142:4,14,15
143:22 144:18
145:7 151:20
237:13 240:18
240:22 241:6
242:4,21,24
**debentures**
119:12 139:14
141:25 144:24
145:3 152:11,14
158:19 189:6
191:21 225:25
236:8,14,24
**December** 1:13
3:7 117:5 123:9
123:14 133:16
149:11 171:5
217:23 218:6,11
218:12,13 219:6
219:18 220:13
220:24 221:4,7
221:11,16,18,21
223:4 224:2,8
225:7,10 227:10
227:12,17
228:10
**decide** 100:15,16
**decided** 41:13,14
41:23 100:14,21
110:24
**deciding** 116:18
**decision** 41:9,12
199:20 213:11
**decisions** 16:24
**decline** 23:14,16
191:24 192:6
193:9,15,22
**deduced** 102:15
**default** 8:6
**defaulted** 8:5
**Defendants** 1:11
2:12 3:21
**define** 11:25
24:18,19 158:18
**defined** 15:22
24:21
**definition** 24:3,14

212:23
**degree** 34:19
**degrees** 35:3
**delete** 77:10,11,16
**delivered** 112:13
113:8,14
**Delwawre** 1:3
**demanding** 225:5
**dep** 137:7 232:20
**department** 32:9
51:12,15 52:22
118:24 121:15
123:4,6 124:13
131:10 138:25
139:3 164:19
170:10 185:25
220:2
**depending** 24:3
24:14 80:17
165:17
**deposed** 6:4,7 7:7
211:15
**deposition** 1:18
3:12 5:19 35:6
57:10 77:23
78:4,22,24
82:17 87:13
95:13 125:13
180:13 211:11
216:18 231:19
232:10 243:23
247:11,13
**describe** 8:24
21:7 33:18
109:17 137:19
**described** 47:20
49:15 50:19
57:19 73:19
105:22 114:2
121:3 126:17
136:20 149:20
153:18 160:3
163:20 174:8
180:2 205:18
217:12 222:7
226:14 229:16
**describing** 27:2

166:5 173:11
description 26:12
26:18 33:23
desk 186:25 187:2
187:4
desperately
111:11
detrimental
187:24
devil's 195:14
dialogue 96:11
difference 99:17
208:19
different 5:24 6:4
65:4 71:13 80:9
109:15 121:23
128:22 154:14
163:2 166:4
173:8 181:11,12
189:14 203:25
236:3
differently 27:24
difficult 30:11
diligence 26:7
28:20 88:22
diminished
230:13 238:16
direct 78:5 112:5
114:23 118:10
119:23 127:5
129:14 135:12
140:7 151:11
157:8 171:19
172:16 176:6
179:2 206:15
207:6
Directing 78:20
176:13
DIRECTIONS
246:15
directly 74:6
84:21 86:2
105:7,12,18
128:16 129:6,22
131:18,25
213:24 214:11
214:19 215:13

216:7
discount 72:22
117:25 152:25
153:2,6,7
167:24 168:8,8
172:9
discounted
152:24
discounts 152:23
153:15 168:6
discovery 7:7
discrepancy
227:15
discretion 216:4
discuss 44:10,13
45:9,16 69:21
69:23
discussed 45:19
187:7
discussing 68:11
205:7 212:17
discussion 48:24
53:6 87:7,20
93:18 104:21
106:16 126:12
205:12,14
207:24 208:14
discussions 69:15
73:13 103:4
128:15
disk 134:17 135:4
135:6,10
disks 134:15,20
135:5
dispute 79:24
86:23 99:24
223:23 226:19
228:8
disregard 201:12
dissolved 233:5,9
233:11
distributed 89:18
197:21
distribution
33:15 34:5
103:5 109:20
District 1:1,1 3:16

3:17
division 31:18
DOCKERY 1:10
document 47:20
50:19,24 51:3
57:19,23,24
66:9,18 76:13
76:16,20 77:19
78:9 87:24 88:7
88:9 92:25
105:22 106:2,6
114:2,6,9
118:17,20 121:3
121:7,10,16,20
121:24 126:17
126:21 128:13
129:16 136:20
136:24 137:5,16
138:7,13,18
142:12,23,25
143:18,21 160:3
160:7,9,16
161:5 162:3,8
163:12,20,24
164:4,5,12,16
165:22,25
170:12,20,20
173:9,25 174:8
174:12,17 180:2
184:7,11,13,21
205:18,23 206:3
206:6 210:2
216:8,10 217:12
217:16,19
218:25 219:6
222:7 229:16,23
229:25 243:22
243:25 244:9
245:10,15,17,20
245:22,24
documents 35:11
134:19 135:3
235:24 236:3,15
237:2,9,11
242:23
DOCUMENTS...
246:11

doing 15:12 62:16
88:25 116:12
155:20 161:20
181:25 231:7
dollar 120:4,7,8
146:18,19
172:12
dollars 69:13 72:8
72:9 146:20,23
147:11,12,19
196:20 203:20
214:5
Donahue 30:24
double 104:11
134:10
doubt 162:4
downtown 32:19
draft 132:16
135:18,21,21
136:16,17
181:11
draws 190:20
drove 213:18
due 26:7 28:20
88:22 228:18
duly 4:7 247:12
dumped 213:18
duplicative 146:9
duties 21:8,23
26:19 230:13

—————
E
—————

E 2:2,2 4:6 245:2
246:2,10 247:3
247:3
earlier 27:15
49:21 52:7 68:9
92:2,21 93:2
118:12 138:12
145:8 155:6
156:3 170:13
185:4 187:7
191:21 220:25
223:17 225:16
228:22 231:23
early 19:3 42:9
69:10
earmarked 90:19

94:25
earn 34:19
earned 79:11,12
79:13 80:6 90:8
116:12 194:16
earning 79:10
Earth 119:24
120:3
ease 17:16
economics 24:16
34:22 156:5
208:17
Ed 59:4,6 60:9,11
65:22 66:19
69:11 123:7,9
136:10 153:17
220:8,19,22
effect 46:20
187:24 233:17
effective 169:20
EFG 224:13,15
227:2,5
Eike 10:16 14:15
29:5 186:18
either 19:3 29:20
55:14 56:3
80:16,17 88:20
106:5 126:25
149:11 194:4
219:19 221:9
235:22
employed 17:2,4
40:24 74:11
76:2 83:23 84:4
97:16
employee 21:2
51:17 75:5,11
75:13,14,17,22
97:23 102:24
108:5,7
employees 25:13
employment
33:19 64:9
empowered 12:4
encompass 21:12
encompasses 67:5
ended 36:21

86:19 141:3 202:24 213:17
ensured 148:19
enter 14:2 131:7
entered 139:10
entering 198:4,9 208:24
entire 141:12 156:22 202:8 227:4
entirely 46:12,15 80:9
entities 15:22 16:6,8,10,20 155:17 188:9 239:25
entitled 1:19 43:11 56:19,23 65:16,18 66:11 67:12 68:6 69:17 73:23,24 79:15 80:25 82:5,8,9 84:6,10 86:13 92:4,8,23 94:23 95:11,20 97:4,13 98:8,13 98:19 102:4,6 103:9 110:20 114:6 137:2 174:14 175:9 188:21 194:3,6 194:7 195:12,16 196:22 198:23 199:15 209:21 211:3 216:6 225:8,10 228:12 228:14 234:4,7 245:10,15,20
entity 10:22 41:24 127:25 211:22
entries 140:9
equity 11:3,6 15:19 105:7 109:20 208:9,15 209:19,21 211:4 211:6,6,7,10,19 211:21,25 212:5

212:10,22,23 213:5,15,24 214:10,19 215:7 216:6 243:9
equivalent 82:3,9 93:16 110:21 212:8,11
ERRATA 248:3
erroneous 95:16
escrow 104:5
ESQ 1:10,10 2:9 2:16,21
essence 93:9 150:8
essentially 34:12 40:13 54:8 74:16 88:14
established 66:15
estimate 220:5,15
estimation 203:5
et 3:15
events 15:9
eventually 28:15
everybody 196:4
everybody's 26:18
exact 36:11 49:11 140:6 181:15
exactly 25:24 28:21 58:13 61:4 68:22 92:13 99:21 137:21 161:3 200:25 243:11 243:18
EXAMINATION 4:11 232:17 239:10
examined 4:8
example 172:11 196:25 227:17
Excel 185:11,13
exception 236:15
excluding 240:17
excuse 188:13 209:22
execute 239:19

exempted 1:4
exercise 93:14 139:22,24 140:17 148:10 153:8,14 195:6 242:10,12
exercised 149:23 200:6 241:21
exhibit 47:19,21 47:24 50:18,20 50:23 57:18,20 63:23 66:5 76:6 76:12 82:16 86:7 91:9,10,18 105:21,23 106:2 106:24 114:3,5 118:11 121:2,4 121:6 126:16,18 126:20 132:6,11 132:11,12 135:13 136:21 136:23 151:12 160:2,4,6 162:20 163:19 163:21,23 174:7 174:9,11 176:21 179:3,25 180:3 183:25 184:3 205:17,19,22 217:13 222:6,8 222:11 229:8,15 229:17,19,22
existence 43:9 91:23 240:3
existing 45:24 215:15,18
exists 9:18 42:16 127:25
expanding 39:2
expect 116:20 179:18
expected 99:9
expecting 100:6
expenses 91:5
experience 22:22 23:3
expertise 60:19

60:21 141:6
explain 199:6
explore 69:4 188:21 189:8
extension 190:22
extent 70:10,10 81:25 91:4,7 131:2 161:10 164:20 187:3,14 201:6 228:20 232:11 233:15
extra 76:10 86:15 91:15 199:8
extract 201:11
extreme 66:5
extremely 117:25 118:2 120:23
eyes 52:13
e-mail 47:25 48:6 48:21 49:14 58:24 65:21 66:21,25 68:21 69:2,5,9,12 76:25 77:4,7 80:22 106:3,6 107:22 110:25 112:6,12 126:23 126:25 133:6,9 134:5 198:23 217:7,23,24 218:5,7,15 220:14,21 222:11 223:24 224:7,13 226:24 229:8 245:4,5,8 245:9,14 246:5 246:6
e-mailer 219:11
e-mails 48:2 77:8 77:10,11,17 80:2 106:23 107:3,6 112:25 219:9,13 222:14 222:21 229:4

──────────
**F**
──────────

F 1:20 2:6 247:3,6 247:23

face 157:6
fact 25:16 63:10 79:6 121:12 142:12 143:6 169:22 187:23 235:12 236:10
facts 41:11 188:14
fair 89:15 144:3 198:17
fairly 243:8
familiar 63:9 77:22 110:18 120:6 125:17 138:14,16 139:7 142:25 164:8 165:6,7 170:3 184:9
family 214:5
far 8:14 105:3,5 118:8,9 202:25 203:4 240:5
Farrell 30:24
February 135:15 135:19 136:5
fee 55:13 71:5 72:20,23,23 87:22 88:3,3,11 88:16,24 89:3,4 89:7,11,14,17 89:21,24 90:7 93:11,22 102:18 196:22
feel 120:22
feels 86:22
fees 53:8,11 54:25 56:3 58:9,14,21 61:2 63:22 65:16,17 69:21 69:24 70:4,5,8 70:22 71:2,15 71:16,18,18,18 72:15,18 73:3 88:15,19,23,23 94:14,15 199:25 203:13,14 207:22,25 208:8

208:8,15 209:18
211:25 224:20
**felt** 37:20 226:13
**fiduciary** 79:9
81:19 86:12
**field** 60:19 141:5
**fifth** 179:3
**fight** 80:8 85:7,10
98:11
**fighting** 81:6
197:13
**figure** 12:12
65:25 124:5,7,9
145:6 146:15,19
148:4 149:18
151:18 208:4
209:15
**filed** 169:18 170:5
**filings** 235:9
**final** 132:21
136:16
**financial** 33:5,14
181:25 182:3,15
182:17,22
183:10
**financials** 53:18
55:5 182:6
**financing** 109:21
188:11
**find** 113:16
171:10 209:25
235:13 237:8,19
**finds** 25:25
**Fine** 27:11
**finish** 75:2 238:25
**finished** 5:6
**fired** 98:25
**firm** 6:16 31:22
33:21 34:11
76:2 169:5
182:7,8,9
242:21
**first** 4:7 36:6,15
48:11 70:13
73:23 77:20,21
78:7 106:23
109:25 112:6

126:23 127:6,7
128:16,20,25
129:7,11 130:6
130:14 138:8
139:6 140:9
143:14 144:7
147:23 148:16
150:20 151:3
163:25 164:11
165:20 166:18
176:7 195:19
218:11 220:21
229:8,9 230:5,6
230:20 236:8,17
237:4
**five** 5:22 6:3
21:17 49:12
75:9 125:6
214:2,3 216:12
**Florida** 186:25
**flows** 17:13
**follow** 111:16
**following** 228:19
**follows** 4:9 57:10
87:14 125:13
179:19 180:13
216:18 231:19
**follow-up** 239:8
**forced** 154:18
**forget** 73:4
**form** 30:15 63:3
72:20 91:25
135:18,21 185:6
185:15,22
**format** 138:14,15
163:2,3 165:8
173:8 174:22
**formats** 138:16
**formed** 30:18,22
**forming** 31:5
**forth** 28:22 34:3
80:2,22 110:25
158:21 196:3
224:7,21 247:12
**four** 6:3 10:20
11:13,14,20
14:4 21:16 75:9

106:2 114:5
121:7 126:21
146:10 150:4,5
153:10 168:10
168:21 176:11
176:15 214:2,2
245:10
**fourth** 140:8
**frame** 30:7
**framework**
209:14
**frank** 33:10 52:10
103:22
**fraud** 213:20
**free** 241:24
**freely** 225:24
**Friday** 112:14
138:4
**friend** 223:15
**friendly** 226:17
**friends** 79:6
103:11,13 214:5
223:15 224:16
**friendship** 84:2
**front** 98:2 148:25
213:17 229:19
**fulfilled** 27:20
**full** 9:4 225:2
**fully** 154:13 156:3
156:5 226:15
228:25
**function** 109:22
**functioning** 9:24
**fund** 36:5,7 37:13
37:16,18 38:18
39:9,12,16 41:7
43:6,8,12 45:22
58:10,15,16,17
58:22 59:14,17
59:19 60:10,17
61:16,21 63:12
63:19 64:25
70:21,22,23,24
71:3,20 72:4,16
75:11 79:11,15
79:20 80:5 91:8
103:9 114:17

116:2 117:7
118:5 124:10
154:13 156:7,9
175:4 195:10
196:7,19 199:4
201:14,23,24
202:22 204:3
213:10,10,18
214:4,8 223:10
225:14,16,18,19
226:6 228:13,16
228:18
**funds** 1:3 15:22
15:25 16:2,24
17:3,5 27:14
38:23 39:4 42:2
44:3 59:4 80:14
109:5 117:23
121:13 122:8,10
137:17,23 155:8
174:14 175:9,16
175:24 193:10
193:18 199:9
245:13,21
**fund's** 225:12
**further** 193:18
232:12 243:2
247:16

_____
**G**
_____
**G** 4:6
**gains** 43:12 72:8
140:22,24 148:4
148:7 174:15
175:9,23 176:4
245:21
**gathers** 26:6
**Gator** 107:12,13
112:10
**Gellis** 107:17
**general** 15:17,18
16:5,19 21:18
21:21 197:20
215:24
**generate** 177:25
**generated** 73:2
89:22 109:16
175:8,15 207:23

224:20
**generates** 175:21
**genesis** 111:2
**gentleman** 30:23
37:23 103:12
223:16
**getting** 11:3 48:21
65:20 81:22
82:3 93:21
104:10 110:12
110:14 111:6
143:13 202:13
202:14 208:15
211:24 217:24
218:2
**GGR** 182:9
**Ghee** 27:11
**give** 53:12 54:16
55:13 62:7 79:5
83:24 84:3
85:25 86:3
96:17 99:3
132:6 162:14,16
169:11 172:17
182:3 185:19
195:25 213:4
220:10 238:18
241:3
**given** 13:22,25
46:16 157:11
159:20 168:21
187:23 238:23
239:2 247:14
**giving** 5:7 23:4
26:19,22 56:2
81:16 86:4 94:9
102:6
**GKN** 32:14,16
33:23
**go** 24:23 34:17
55:9 57:2 61:6
70:18 71:18
74:20 77:12
79:3 84:14 87:8
89:25 90:11,13
93:10 96:25
103:2 104:17

107:7 115:17
139:4 168:19
178:21,25
179:15 190:11
190:13,24 191:9
191:18 195:11
201:4 203:16
210:21 236:7,16
237:4 243:12
244:11
**God** 81:24
**goes** 25:21 158:17
200:17 204:3
**going** 11:5 12:19
13:8 25:5 54:11
57:6 58:23
65:13 87:10
88:14 96:13
98:17 104:19
106:14 110:10
110:25 117:4
125:9 144:6
169:6 178:13
180:9 189:24
190:11,12,13,15
190:18,19,21
195:17 196:3
204:2,6,13
207:25 214:18
216:14 231:15
232:9 244:14
**Goldstein** 215:4,6
215:23,24 243:5
**Gonzalez** 10:16
14:17 21:17
24:6,11 29:6
186:18 215:25
**good** 3:2 4:13,14
12:11 51:10
223:15 224:16
**Gottbetter** 1:8,9
2:20 3:10,15
36:6 38:17 39:6
39:18 43:19
47:2 48:18
49:18,25 55:12
55:19 56:18

61:14,20 63:17
64:20,22 68:10
68:22 69:3,6
193:17 200:17
201:16,18 202:2
204:19 208:22
209:6,7 233:15
233:20,22 234:4
235:14,15,19
237:24 238:10
238:11,12,19
239:16 241:12
**Gottbetter's** 49:4
50:14 63:13
**gotten** 105:6,10
105:13,16 115:7
135:4
**grade** 75:11 214:8
**grave** 156:9
**gray** 157:13
**greatly** 238:16
**Greenaway**
188:17 190:8
191:12
**group** 31:8,18
33:22,24 34:7
187:20 189:15
191:25
**guess** 6:4 26:11
77:15 102:5
122:16 139:6
142:8,10 146:10
152:5 183:19,22
217:7 219:15,16
**guessing** 142:3,8
152:3 155:3
206:5 230:15
**guys** 79:25 81:5,5
189:14

---
**H**
---
**H** 245:2 246:2
**half** 32:24 35:8
48:7 214:4,14
238:16 241:16
**handle** 33:7 61:11
156:15
**handles** 107:21

**handwriting**
171:22
**happen** 40:6
100:12 169:10
**happened** 9:21
111:17 126:8
143:6 182:20
187:17 230:25
237:20
**happens** 9:22
**hard** 134:18,24
135:6,10 157:9
185:15,22
**harming** 156:10
**head** 19:14 26:13
26:14 59:23
132:8 152:13
**hear** 22:8 25:6
74:25 130:9
**heard** 25:11 38:9
46:19 47:6
78:12 92:14,14
96:9 156:3
**Heather** 2:19 3:4
**heavily** 118:2
152:23,24
**hedge** 15:25 16:2
59:4
**held** 40:20 56:23
116:2 221:23
**help** 22:15,18,19
33:15 39:4
49:22 52:12
142:11
**helped** 22:2,4
**helping** 22:5,9,12
40:14
**hereinbefore**
247:11
**hey** 99:3
**He'll** 74:18,23
**HH** 3:15 74:6
76:2 83:12,19
84:21 86:2
102:21 127:13
128:16 129:6,11
129:22 131:18

131:25 198:14
239:16
**HHADVISORS**
1:8
**HHF** 173:6
**high** 167:6
**Highgate** 1:3
15:18,21 16:14
18:5 19:4,9,9
20:10 22:2,5
36:4,10 39:21
41:25 42:12,14
42:16,16,24
43:8,17 44:6,12
45:10 46:3
49:25 52:9 53:7
53:8,13 54:2,25
55:14 56:4,8,14
58:17,19,21
59:10 61:15
64:25 65:10
72:16 78:16
79:11 80:5,13
80:25 81:21
82:14,18,20
83:3 84:9,10
85:11 86:6,7,12
87:3 88:10,18
88:20 90:4,5,15
92:3,8,22 97:22
97:25 98:12
99:9 100:5,8
103:8,24 104:2
104:25 113:21
114:24 115:14
115:22,22,23
116:2,12 117:7
117:20,22
119:14 121:13
122:8,10,21
123:2 124:10,16
125:2,21 130:22
130:24 134:7
135:25 137:2,17
137:23 139:10
139:15 141:8
142:13 148:14

148:18 150:12
151:20 152:10
154:20,21,25
155:13,21,23
156:14,16
159:22 171:5
174:14 175:4
185:5 187:21,24
188:6,8 189:21
192:3 193:3
194:17,18,24,25
200:7,11,14,16
201:24 202:17
202:24 203:3,4
204:3 217:5
219:20,23 220:6
221:17,17,23
224:17 231:25
234:24,25
235:20 238:13
241:6,10,11,14
241:21 245:12
245:15,20
**Highgate's** 44:13
74:7 145:15
189:17 191:20
193:2 195:7
220:16 231:22
235:3,9
**Hills** 2:7
**hired** 36:9,18
39:8,15,19
43:19 220:23,25
221:9,10
**hiring** 36:21
**history** 24:8
33:19 79:5
**hold** 29:14,20
62:11 131:9,10
232:11
**Holding** 145:21
148:9 149:16
**Holdings** 144:7,8
144:22 146:9
147:4 176:8
**honest** 7:11,22
10:4 17:11 28:7

33:17 56:24
77:6 163:8
174:19 211:18
**honor** 154:20
**hour** 35:8 214:14
**House** 1:3 15:18
15:21 16:14
36:4 39:21
41:25 43:8
45:10 46:4 54:2
54:25 55:14
56:4 58:17,19
58:21 61:16
64:25 65:10
72:16 78:16
79:11 80:5,13
82:14,18,20
83:3 86:6,8 87:3
90:4,5,15 92:23
97:22,25 98:12
104:25 113:21
114:24 116:2,12
117:7,23 119:14
121:13 122:8,10
122:21 123:2
124:10,16 125:2
137:2,17,23
139:10,15
142:13 150:12
151:20 152:10
155:22,23
174:14 175:4
185:5 187:21,24
188:6,8 200:7
200:11 202:24
204:3 217:5
219:20 220:6
224:17 238:13
241:10,11,14,21
245:12,15,20
**House's** 159:22
219:24
**Huff** 123:17
**huge** 187:23
226:2
**hundred** 45:18,19
77:11 196:20,21

**I**

**idea** 8:16 20:7
28:5,8,11 30:15
30:17 63:14,20
83:9,21 108:4
112:4 120:15
122:3 165:18
169:25 172:2
177:9 184:20
220:3,13,18
229:11
**IDENT** 245:3
246:3
**identical** 101:16
**identification**
47:22 50:21
57:21 105:24
114:4 121:5
126:19 136:22
160:5 163:22
174:10 180:4
205:20 217:14
222:9 229:18
**illegal** 74:15 98:4
**illiquid** 119:21
169:9
**image** 207:5
212:19 229:5
**imagine** 58:18
59:16 88:10
99:4 108:7
112:21 119:10
124:14 125:4
137:21 139:2
140:25 145:2
147:15,18 148:6
148:12 151:22
152:21 165:3
169:16 175:20
183:18 185:2,14
**immediate** 50:16
**impact** 225:7,9,11
**imply** 151:10
**important** 72:25
79:8,10 162:3
**impossible**
226:20

**inability** 243:8
**inappropriate**
55:11 62:25
**incentive** 71:17
204:6
**inception** 14:21
18:19
**include** 156:19
176:3 208:8
237:12
**included** 141:13
159:21
**includes** 173:16
**including** 10:21
133:3,4 233:14
**income** 11:6
**incorporated**
15:10,12
**incorrect** 49:9
92:12 182:12
**increase** 169:16
169:17 206:16
**increased** 206:22
**incredible** 187:23
**independent**
58:25 182:8
219:5
**indicated** 170:23
**indication** 46:16
**individual** 75:6
75:12 103:3
212:24 213:5
214:9
**individuals** 10:20
31:2
**individual's**
213:16
**industry** 29:16
36:17 38:7,9,11
112:20
**inform** 226:4
**information** 26:7
181:4 183:12
213:8
**initiated** 36:22
37:4
**input** 33:16 34:2

**inside** 213:8
**instance** 119:18
**instances** 169:23
**institutional** 33:8
75:11 214:7
**instruct** 62:19,23
183:3 191:7
**instructed** 178:18
**instructing** 13:12
189:12
**instruction** 54:17
**instrument**
109:16 141:14
143:9
**instruments**
119:16 130:13
166:8
**insurance** 6:2
**integration**
155:16
**intention** 228:4
**interest** 43:17
141:4 142:4,16
144:2 157:7
**interested** 247:19
**interests** 42:17
**interfering** 95:13
95:15
**internal** 116:21
116:23 136:12
**internally** 39:2
120:18
**interpret** 181:8
**interpretation**
212:10
**interrupt** 74:22
211:11
**interruption** 6:20
**intrinsic** 172:9
**introduce** 3:18
163:18 220:22
**introduced** 156:7
**introducing**
80:20 102:8,18
**invested** 88:11
109:5 125:21
154:13 156:4

189:21 192:2
193:6 196:24
224:16,19,23
226:15
**investing** 156:5
193:11,18
**investment** 16:24
26:9 27:3,5,8,14
31:12,17 32:6
33:11 78:15
79:12 81:2,22
84:9 86:14 87:4
89:8 90:6 93:23
97:25 117:7
148:15,15,16,18
187:22 199:20
213:11 223:5,8
**investments**
17:20 43:16
44:6,13 45:9,12
45:25 72:15
118:24 123:23
**investor** 8:9,10
97:22 128:21
196:20 222:25
223:14 225:6
**investors** 42:16
56:10,16 155:21
155:22 156:10
156:13 187:21
187:25 188:3,6
189:16,17 192:2
193:6 194:17,25
203:3 226:4,16
230:8 246:8
**invoke** 195:21
**involved** 187:12
187:16
**involving** 133:11
**in-house** 21:14,17
21:18 219:22
**irrelevant** 80:3
**Islands** 1:4
**issuance** 84:20
126:3,13 129:6
131:17,24
**issue** 72:22 79:20

81:5,18,19 84:8
85:10,13 86:21
104:7 154:14
155:25 191:11
224:18 225:23
**issued** 73:14 74:5
86:2 99:12
101:4,6,10
103:21,24,25
105:7,12,17
109:14 111:20
117:10,16,21
125:23 126:7
128:16 129:10
129:21 152:2
213:24 214:10
215:8 234:23,24
**issuer** 26:8
**issues** 188:17
190:2,7 191:8

**J**

**J** 2:21
**James** 123:17
**January** 46:7
47:16 48:6,18
49:5 51:20
76:21 127:19
151:7 156:3
165:15 167:8,13
168:25 169:2,10
169:24 170:5
171:3 176:21
182:20 222:18
227:11,23 228:5
228:14 231:4
235:19 245:6
**JASON** 1:10
**Jeez** 24:23
**Jerry** 10:16 11:3
14:15 29:5
186:18
**Jersey** 1:1 2:7
3:17 8:15 44:22
**JGellis** 107:18
**Jim** 123:17
**job** 21:7,24 32:3
32:25 33:22

34:4
**John** 2:6
**Jonathan** 107:17
**judge** 188:17
190:7 191:6,9
191:11
**July** 173:4,6
**jump** 159:9
**June** 205:23
206:8 207:3
245:24

**K**

**K** 4:6
**keep** 4:25 5:5
65:2 94:6 167:4
173:11 178:2
181:7 192:21
**Kennedy** 2:6
**kept** 85:6
**kill** 231:8
**killed** 229:9
**killing** 226:11
**kind** 54:25
**knew** 38:4,6,11
91:23 103:10
104:9 143:9
159:16 196:6
228:6
**know** 4:15,22,23
4:24 7:12,23
8:14 9:20,21
10:5,10,11 11:2
11:2,4 12:8,13
12:18,21 13:6,7
13:21 14:5,13
15:10 16:3
17:12,12,14,21
20:8 21:21,22
22:15 23:23,23
24:9,15 28:12
29:2,4 30:4,16
30:17 32:7
35:22 36:11
37:10 38:2,25
38:25 39:4
42:22 43:14,15
45:19 47:8,15

48:9 49:2,12
50:4 51:5,7,19
52:3,3,4,15,18
52:19,20 53:14
53:17,21,24
55:6,7,8,20,23
55:23,24 56:5
56:17,25 58:2,2
58:6,10 59:21
59:22 60:18,22
61:10 63:7,25
64:9 66:17,20
68:15 71:21
73:22,25 74:13
79:9,20 80:5,11
81:20 82:13
83:19,24 84:3,9
86:23 87:23
88:4,12,24 89:5
90:24 91:24
92:22 98:21
99:21,25 100:2
100:3 101:9,23
102:9,13 103:23
105:2,3,5
107:13 108:12
108:21,24
109:11 110:3
112:2,7,14,22
113:4,4,5,5,6,7
113:13 116:3,3
116:7 117:2,12
118:8,9,23
119:18,18 120:4
120:16 122:23
125:25,25 126:6
127:25 128:3,7
128:9 129:18,24
130:5 131:6,9
132:15,15,17
136:12,12,15
139:21 140:25
141:11,11
142:20,21,22
143:7,8 144:16
146:7,7,14,21
147:2 148:5

149:17,19 150:3
152:6,6,6,7,8
153:2 154:11,12
154:14 155:3,25
157:23 158:19
159:9,16 160:13
160:21 161:6
163:9,14 164:14
164:18,23
165:15,19
167:16 168:7
169:5,22 170:4
170:9 171:13,17
171:24 174:3
175:3,18 176:23
177:2,7 178:2
181:2,9,10,11
182:20,21,24,25
183:9,13,14,20
183:21,21,23,25
184:18,21
185:12,13 188:9
191:25 192:20
193:5 194:18
198:13,16,16
199:18 200:20
200:23 201:2
207:2 208:2
209:13 210:6
211:25 212:18
213:6,19 214:12
214:24,25
215:10,13,16
216:11 217:6
219:14 220:17
222:2,21 223:18
223:19 224:20
226:14,16
227:14 229:10
229:13 232:3,4
232:8 236:5,7
236:18 239:25
239:25 240:6,10
241:7 243:11
244:7
**knowing** 225:2
226:20

**knowledge** 37:20
37:20 59:7 67:6
215:21 216:9
217:2
**known** 15:24
**knows** 12:13
81:24 103:2

**L**

**L** 1:10 4:6
**landscape** 184:16
**lapsed** 29:18 30:4
30:5
**larger** 33:14
**LARNER** 2:4
**late** 19:3
**launching** 37:18
**law** 98:24 108:19
**lawsuit** 20:10
47:11 117:13
**layers** 28:19
**layman's** 26:22
**layout** 121:21
122:22
**leads** 224:17
**leave** 92:18
235:20
**leaving** 154:13
156:2 193:3
224:24 228:7
**left** 22:14 42:8
52:11 71:5
74:16 82:21,24
141:23 184:16
188:25 212:11
235:18,19,23
**legal** 12:24 13:4,5
13:10 15:3 16:3
17:7 28:22
42:15 43:14
55:4 127:24
230:13 233:6
240:9
**letter** 48:14 49:7
49:9 111:7
194:12 230:7
231:3 239:16
246:8

let's 12:12 20:17 47:14,18 50:17 54:13 57:4 85:2 87:8 92:18 97:23 100:23 104:17 105:20 107:7 113:24 120:25 125:8 136:18 139:4 147:3 159:25 163:18 174:6 179:24 180:7 203:15 216:12 217:10 222:5 224:8,15 229:14
level 52:25 120:17 136:9
Levin 30:24
Lexington 3:5
liability 1:3,8,9 9:9 10:18 12:5
Liang 51:8,8,12 52:21 120:16 136:8 245:5
license 29:24
licensed 29:8,11 30:12,13 34:12
licenses 29:15,21
limited 1:3,8,9 9:9 10:18 12:5 16:12,15 43:10 43:11 188:16
line 48:11 109:22 111:22 119:24 144:7,21 146:10 147:21,25 149:16 153:20 157:14 246:12 246:16
lines 79:4 215:2
liquid 194:20
liquidate 225:15 225:19
liquidated 235:6
liquidation 225:16
liquidity 152:25

153:3,5 169:12 169:17 172:8
list 132:23 164:15
listed 48:7 117:22 118:3 120:8,13 120:14 123:19 124:21 127:13 139:6 140:8 150:5,22 157:12 157:24,25 160:20 173:22 176:14,17,20
listing 118:15 119:12 120:2 162:11 176:11 245:19
listings 157:17 168:10
litigation 4:18 8:12,17,18,19 150:6 177:13,18 177:23 178:7
little 33:16 34:2 60:3,4 131:6 145:19 153:4 164:9 169:7 203:24
LLC 1:2,8 3:14 3:15 9:7 12:7,15
LLP 1:9 3:10
loan 8:4
located 32:17,19
logical 102:14
long 14:19 18:14 18:17 31:9,23 32:22 158:20
longer 9:17 31:2 83:22 102:23 142:16
look 50:6 55:10 59:21 82:16 88:6 106:23 111:13 122:14 122:21 127:7 128:17,20,25 129:7,11 130:6 130:14 137:4,13

140:5 142:18 143:8 161:7 165:7 167:23 168:3,15 169:13 170:7,11 174:16 184:11,13 185:17 201:23 210:17 217:18 221:8,12 223:12 228:18
looked 137:7 138:10 185:6
looking 78:3 81:10 121:24 123:18 133:6 137:9,10,14 164:20 165:17 166:6,15,17,20 166:21 167:5 171:14 219:5 223:3 228:3
looks 162:23 164:7,9 165:8,8 166:4 184:8,17
loss 53:9 175:23
losses 72:10,11 73:4,5 174:15 175:10 176:4 245:21
lot 14:2 24:10 26:6,7 33:24,25 67:24 107:21 137:12 138:15 153:3 155:22 156:6 201:10 227:23 230:15 236:19
lots 201:8,12
low 52:24 120:17 120:23
lower 136:8 148:23 169:8
luncheon 87:12

_____ M _____

M 4:6
Madison 1:15 3:10

main 21:19
maintain 186:8
maintained 183:16 231:25 232:6
Mair 30:23
major 225:23,23
majority 11:8,17 14:20 33:9 130:15
making 16:23 45:10,13,25 81:2,20 204:25
Maloney 25:16 76:6,12 77:23 78:4 79:6 82:5 84:6,16,19 86:20 91:10,17 93:10 94:23 95:10,17,24,25 96:6 97:3,13 98:17,17,23 99:3 100:11,24 102:25 105:6 107:23 108:14 110:8 197:13 243:6,21,25
Maloney's 35:19 78:22,24 82:17 93:9 98:6 113:9 113:12
man 140:19
manage 22:19 37:16 40:24
managed 41:4 42:25 230:17
management 1:2 3:14 9:12,14,17 9:24 10:8,13,15 10:18 15:2 29:11 41:15,22 79:21 127:17 196:22 224:14 232:20 233:5,10 233:22,23,24
manager 9:3 17:24 18:3,5,8

18:11,15,18 19:9,19 20:2,22 36:10,19 39:12 39:19,23 40:24 41:18 42:12 44:12 46:3,18 48:20 49:19,24 50:13 59:10 66:12 69:20 75:18,20 104:6 139:11 187:25 213:23,24,25 226:5 230:10,12
managers 36:6 38:22 39:15,20 41:4 42:13,19
managing 11:24 11:25 12:2,14 22:23 23:4 38:18 44:2 70:23
Manhattan 32:19 32:20
MAR 171:20
March 115:2,20 171:21 179:6 228:19,24
mark 1:18 2:1 3:1 3:12 4:1 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1,18 48:1,12 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1

| | | | | |
|---|---|---|---|---|
| 61:1 62:1 63:1 | 168:1 169:1 | 121:2,4 126:18 | 104:13 110:5 | **memo** 243:5 |
| 64:1 65:1 66:1 | 170:1 171:1 | 136:19,21 160:2 | 113:15 118:6 | **memory** 169:6 |
| 67:1 68:1 69:1 | 172:1,3,5,13 | 160:4 163:21 | 120:15 122:13 | 202:11 |
| 70:1 71:1 72:1 | 173:1 174:1 | 174:7,9 180:3 | 128:11 130:12 | **mention** 154:5 |
| 73:1 74:1 75:1 | 175:1 176:1 | 183:25 205:17 | 132:2 137:6 | **mentioned** 10:21 |
| 76:1 77:1 78:1 | 177:1 178:1 | 205:19,21 | 140:4 141:20 | 11:21 17:23 |
| 79:1 80:1 81:1 | 179:1,24 180:1 | 217:13 222:6,8 | 148:6 155:20 | 27:3,14,19 |
| 82:1 83:1 84:1 | 181:1 182:1 | 222:10 229:15 | 163:14 164:23 | 49:21 52:7 |
| 85:1 86:1 87:1 | 183:1 184:1 | 229:17 | 169:12 170:9 | 107:4 138:12 |
| 88:1 89:1 90:1 | 185:1 186:1 | **market** 141:23 | 172:3,6,8 | 153:16 185:4 |
| 91:1 92:1 93:1 | 187:1 188:1 | 143:15 144:23 | 173:10 175:24 | 217:20 231:23 |
| 94:1 95:1 96:1 | 189:1 190:1 | 147:23 150:20 | 177:24 178:4 | **mentioning** |
| 97:1 98:1 99:1 | 191:1 192:1 | 151:4 152:19 | 194:19 195:20 | 161:25 |
| 100:1 101:1 | 193:1 194:1 | 153:14 158:8 | 195:23 197:11 | **merged** 40:4 41:8 |
| 102:1 103:1 | 195:1 196:1 | 172:3,6,13 | 198:17 199:12 | 42:2 43:5 |
| 104:1 105:1 | 197:1 198:1 | 176:14,17 | 199:16 209:8 | 115:14 231:23 |
| 106:1 107:1 | 199:1 200:1 | **markets** 31:17 | 211:6,7,7 212:7 | 232:21 233:7,11 |
| 108:1 109:1 | 201:1 202:1 | **marks** 57:13 | 214:3,4 225:21 | 239:25 240:5 |
| 110:1,2 111:1 | 203:1 204:1 | 125:16 180:16 | 225:21,24 | **merger** 115:22 |
| 112:1 113:1 | 205:1 206:1 | 244:13 | 226:11 233:9 | 155:8 232:25 |
| 114:1 115:1 | 207:1 208:1 | **marriage** 247:18 | 239:18 | **met** 4:15 35:7 |
| 116:1 117:1 | 209:1 210:1 | **Massimo** 228:2 | **meaning** 64:13 | 45:6 49:11,13 |
| 118:1 119:1 | 211:1 212:1 | **Matt** 14:10 | 73:22 169:2 | **methodology** |
| 120:1 121:1 | 213:1 214:1 | 186:22,24 | 196:19 201:23 | 169:7 |
| 122:1 123:1 | 215:1 216:1 | **matter** 1:19 3:13 | 243:22 | **Michael** 1:10 2:9 |
| 124:1 125:1 | 217:1 218:1 | 6:5 67:6 111:9 | **meaningless** 81:8 | 3:23 27:10 |
| 126:1 127:1 | 219:1 220:1 | 126:4 129:21 | **means** 22:4 63:8 | 198:4,10,13,17 |
| 128:1 129:1 | 221:1 222:1 | 154:11,12 | 64:21 86:10 | 198:22 199:10 |
| 130:1 131:1 | 223:1 224:1 | 247:20 | 101:24 120:5 | 199:22 205:8,13 |
| 132:1 133:1 | 225:1 226:1 | **matters** 6:6 104:3 | 148:5 171:25 | 206:9 207:7 |
| 134:1 135:1 | 227:1 228:1 | **Matthew** 10:15 | 211:17 | 217:2 219:19 |
| 136:1 137:1 | 229:1 230:1 | 30:22 | **meant** 170:16 | 220:4,14 238:14 |
| 138:1 139:1 | 231:1 232:1 | **McGladrey** | 243:24 | **middle** 48:7 |
| 140:1 141:1 | 233:1 234:1 | 182:10 | **mechanism** | 167:19 |
| 142:1 143:1 | 235:1 236:1 | **mean** 10:24 14:3 | 109:21 | **Mike** 133:11 |
| 144:1 145:1 | 237:1 238:1 | 21:12 22:3,12 | **meet** 36:15 44:12 | 220:20,22 |
| 146:1 147:1 | 239:1 240:1 | 22:14,19 24:20 | 44:15 69:24 | **million** 54:2,6 |
| 148:1 149:1 | 241:1 242:1 | 25:22,24,25 | 225:3 226:21 | 56:9,15 59:13 |
| 150:1 151:1 | 243:1,7 244:1 | 26:11 37:10 | **meeting** 48:15 | 59:16,25 60:5 |
| 152:1 153:1 | 244:17 245:1 | 38:25 40:3 | 49:15 | 60:10,16 63:18 |
| 154:1 155:1 | 246:1 247:1,10 | 51:17 52:10 | **meetings** 44:20 | 72:7,9 73:2,4,5 |
| 156:1 157:1 | 248:1 | 53:10 60:12 | 45:9,16,18,20 | 79:12,13,16 |
| 158:1 159:1 | **marked** 47:21,24 | 63:14 64:20 | 69:19,25 | 80:24 81:2,11 |
| 160:1 161:1 | 50:18,20,22 | 65:18 70:5 | **member** 11:24,25 | 81:21 84:9 86:6 |
| 162:1 163:1 | 57:17,20 76:6 | 72:24 73:20 | 12:2,14 | 86:14 87:4 92:3 |
| 164:1 165:1 | 91:10 105:21,23 | 74:13 77:5 | **members** 7:7 | 93:8 99:10,12 |
| 166:1 167:1 | 113:25 114:3 | 81:15 95:4 99:6 | 10:22,24 | 100:6,7 103:21 |

116:10 117:13
124:4,6,9,18,24
141:24 142:3,14
143:13,17,18,22
144:24 145:2,6
147:5,6,8,10,17
148:14 150:9,14
151:18,20 155:4
157:6 168:16
172:12,14 188:7
188:10 189:21
189:22 194:18
194:21,23
195:25 196:6,24
196:25 197:2,2
197:4 199:3,19
199:22 203:15
203:20 214:4
**mind** 4:25 5:5
38:25
**mine** 91:17
**Mine's** 172:21
**minimis** 234:12
**minority** 130:15
**minus** 141:16
145:6 147:16
153:22 157:3
**minuses** 201:9
**minute** 96:21
125:6 216:13
**misdistributing**
120:19
**missing** 26:14
**misstate** 204:25
**misstating** 205:4
**mistake** 103:22
145:14
**mixed** 197:15
**MMF** 173:4
**moment** 235:17
**monetize** 81:23
81:25 82:10
93:13 195:9
199:19,20 201:5
212:7
**monetized** 74:2
82:4 84:12,14

94:16 95:4,12
95:21 98:7
100:10 194:5,7
194:8 199:17
201:15 202:15
203:15 212:12
**monetizes** 100:9
213:10,12
**money** 43:16
53:12,12 81:10
81:13 88:11
119:20 152:22
156:4,5 188:10
192:23,25 193:6
193:12,18 195:7
201:11 223:16
224:4,9,19,23
225:5 226:15
227:7,23 228:6
228:12,14
**monies** 194:4
**Montgomery**
15:19,21 16:15
18:11 19:19,19
39:9,12,16,24
39:25 40:19,25
41:7 173:17,22
232:6
**month** 169:24
171:21 175:25
179:4,5 180:25
214:16,20,22
236:11 243:22
**months** 34:13
40:7 42:7 136:2
136:13 153:9,10
159:18
**Moore** 1:20 3:25
247:6,23
**morning** 3:2 4:13
4:14 115:14
**mortgage** 110:13
110:14 111:12
**move** 97:12
195:22
**MTM** 171:24,25
**multi-page**

136:24 163:24
174:12 245:22

---
**N**
---

**N** 2:2 4:6 246:10
**name** 3:20,22
7:20 9:4 17:20
30:23 37:23
75:12 80:13
97:14 102:21
103:3 104:11
105:4 107:16
113:9,12,17
118:15 123:17
168:9 196:7
199:10,10 206:4
213:5,10,16
214:19 222:25
223:2 224:12
228:2 235:4,9
238:13
**named** 31:2
**names** 75:7
212:24 214:9
**nature** 8:2
**NAV** 117:22
159:22 160:11
160:12,14,20,22
161:12 180:24
182:2,23 221:18
**necessarily** 29:3
104:3
**necessary** 54:18
**need** 4:22 5:3
20:13 215:17
227:7,10 231:11
**needed** 22:15
37:15 111:12
155:13,18
182:23
**negotiate** 93:5
**negotiated** 80:18
**net** 54:4 56:7,8,13
56:14 64:12
72:12 73:6 74:2
74:2 118:4
206:16
**never** 50:7 74:10

74:13 80:21
99:2 141:2
195:20 196:5,6
197:16 199:13
228:4 231:9
**new** 1:1,8,9,15,15
1:22 2:7,14,14
3:5,6,11,11,17
8:15 38:23
45:24 96:23
247:8
**newly** 220:23
**nice** 74:14
**nickname** 107:14
**non-cash** 94:15
**non-solicit** 187:20
190:5
**normally** 122:14
**Notary** 1:22 4:7
244:22 247:7
**note** 161:19,23
**notes** 119:6,13
158:20
**notice** 1:20 47:16
48:24 167:22
214:14 223:21
224:2,3,5,10,25
226:23 227:16
228:15
**noticed** 199:8
227:13 228:13
237:24 238:2
**notices** 155:23
226:18,19
**noticing** 230:8
**notified** 196:5
**November** 91:11
117:4 137:24
138:4 149:11,13
177:4 221:10
233:20 236:11
237:5 243:24
**number** 47:25
50:24 57:13
76:14 80:24
92:24 99:22
102:5,10 106:3

114:7 116:9
121:8 125:16
126:22 136:25
146:25 154:6
162:14,17
163:25 167:6
172:17 180:16
181:2 210:13
222:12 229:23
244:14
**numbered** 83:3

---
**O**
---

**O** 4:6
**oath** 5:9 57:15
87:18 106:20
180:18 216:22
**object** 23:10
62:25
**objecting** 96:22
**objection** 62:12
62:15 63:3
67:18 94:6
96:16,17,18
97:10,10
**objections** 94:10
**obligated** 5:12
242:6
**obligations** 233:6
**obstructive** 67:22
67:24,25
**obtain** 183:11
**obviously** 4:22
37:19 48:10
136:11 208:20
223:18 232:11
**occupation** 8:25
9:2
**occur** 42:5 46:6
150:22 187:9
**occurred** 49:4
59:9 83:22
149:10 157:21
169:23 187:9
**occurring** 59:2
**October** 107:9
235:2,7 243:23
243:24

offer 207:7,12
offers 206:9
office 186:4,6,8
  186:11,17,20,23
  186:25
officer 108:10,23
  214:25 215:3
offices 3:9 44:24
  183:11
official 11:5
  111:25 223:25
  224:3 227:15
officially 226:11
  229:9
Oh 106:7 161:2
  166:12 170:18
OID 72:21
OK 110:2
okay 5:4 6:6,21
  11:14 14:6,22
  17:17 18:4
  22:11 32:5,11
  38:8,13 45:8
  48:11 50:8 51:7
  51:7 58:16 60:8
  61:12 65:13
  66:8 67:7 72:14
  75:13 76:5
  82:22,25 93:17
  99:7,21 107:7
  110:7 116:8
  124:8 127:9
  130:2 131:13
  132:5 138:17
  143:11 144:3,21
  145:4,11,18
  149:14 150:4
  152:15,18 158:6
  159:24 161:13
  163:9 166:13,14
  167:17 169:22
  171:9,12,19
  174:5 176:25
  179:11 192:17
  193:5 209:12
  210:20 212:15
  212:25 216:24

218:19 219:12
  220:12,21 241:9
once 44:19 194:5
ongoing 8:13
  233:6
open 109:3
  110:14 232:11
opening 37:12
operating 9:25
operations 10:7
  14:25 32:6
  127:23 240:5
operator 3:3
opinion 13:9
opportunity
  106:22
org 26:12
organization
  26:17
original 72:21
  236:8,8,14,14
  236:24,24,25
  237:2,14,17,20
originals 237:9,21
  237:25 238:5
originated 28:2
  28:13
originates 25:21
  25:22
originating 24:16
outcome 247:19
outfit 223:11
outlier 80:15
outrageous
  199:12
outstanding
  119:2,12,16
owe 69:13
owed 66:20 68:13
owned 141:10
  173:17 182:9
  193:4
owner 11:8,17
  14:20 130:15
owners 10:25
  11:6,12,21
ownership 211:21

242:18
Oxford 84:24
  91:20 99:10
  104:25 105:11
  113:22 115:2
  124:21,23 125:3
  131:21 151:16
  151:24 152:10
  153:19 154:2
  155:12 156:19
  156:21,22 157:2
Oxford/Uluru
  78:10,13 82:7
  87:21 95:2 97:6
  103:6 105:8

_____
P
_____

P 2:2,2 50:24
  57:23 76:14
  106:3,4 114:7,7
  121:8,8 136:25
  136:25 160:7
  163:25 164:2
  172:17 174:12
  174:13 179:3,6
  184:4,5 217:17
  217:17 229:24
  245:6,8,9,9,11
  245:11,16,16,17
  245:19,19,21,21
  245:22,23 246:5
  246:5,8
package 43:23
  209:5 212:17
page 47:24 48:8
  50:23 57:22
  76:13 77:25
  78:6,21,21
  82:17 106:2,10
  106:13 107:8
  111:23,24 112:6
  112:6 114:5,12
  114:24 118:25
  121:7 124:2,20
  126:21,23,24
  127:6 129:15
  139:6 151:12,13
  157:2,9 160:7

163:25 164:11
  165:16,20
  166:11,13,16,18
  166:20,22
  171:20,22 173:2
  173:24 176:7
  177:4 179:3,8,9
  179:10,17,22
  205:22 217:16
  218:11,24
  219:10 222:11
  229:23 230:5,6
  237:16 245:10
  245:14,17,24
  246:12,16
pages 106:24
  157:12,19 164:4
  172:23
PAGE/LINE
  248:4
paid 17:12 59:5
  69:21 70:4,9,13
  100:11 201:22
  204:8,9,12
  208:5 209:16
paragraph 116:9
  206:15 207:7
  208:7,10 220:8
  220:19 230:20
Park 2:13
Parkway 2:6
part 7:6 22:8
  35:23 43:5
  61:11 81:6
  88:24 90:20
  93:7,23 95:6
  96:2 97:5 115:8
  117:22 133:23
  134:15 154:15
  192:8,11 194:3
  194:12 217:8
participant
  130:16
participated
  79:21
participation
  206:17,21

particular 45:2
  69:22 73:14
  138:7 153:2
  218:16
parties 247:17
partner 15:17,18
  16:5 227:25
partners 1:9 3:10
  14:4 15:17,19
  16:12,19 18:21
  18:24 30:17,19
  43:10,11 44:10
  112:13 114:15
  237:24
partnership 1:10
  16:12
partnerships 16:9
  16:15
partner's 228:2
party 70:11
pass 227:16
pay 82:2 199:22
  207:20 208:25
  213:13
payable 199:25
  207:19
payments 201:15
  201:18
payroll 198:23
  208:5 209:9,10
pending 8:15
penny 148:24
people 34:14
  37:19 39:3
  46:25 156:6
  186:13,14 188:7
percent 63:22
  64:2,10 70:15
  71:6,9 72:2,3,9
  72:10 73:3,20
  82:10 83:12
  84:13,13 89:15
  89:16,23 90:7
  90:11,11,13,14
  90:16,16 93:21
  94:14 100:9
  144:22 147:4

194:8,8,11,14
195:11,12,13,17
195:17 196:17
196:21,23 197:4
197:5 198:24
199:5,6,15
200:19,21
201:11,22 202:3
202:4,13,14,15
203:10,16,20,22
204:2,5,6,20
206:17,22
207:23 208:21
209:11,11 234:8
234:13,13,15
238:14 242:7,17
242:18
**percentage** 64:14
64:14 70:17
89:8 93:22 98:8
234:5 238:15
**perform** 219:23
**performance** 53:9
202:18 225:12
**period** 34:12
50:16 75:7 87:4
131:8 144:4
148:20 149:3
151:7,8 165:19
167:8 169:2
183:8 190:14
202:20 224:3
**permission**
238:20 239:3
**person** 49:16 53:3
70:13 77:7
136:9,10 154:5
167:4 203:5
213:13
**personal** 99:4
107:23 108:2,6
**personally** 17:4
**perspective** 16:3
200:25
**pertains** 116:4
**phased** 11:3,7
**phone** 191:5

**physical** 97:14
244:3
**pick** 73:2 201:9
**picked** 169:13
**picture** 83:25
**piece** 80:19 86:22
86:24 92:3,9
97:5 116:17
199:11 200:21
**pieces** 230:24
**place** 44:21 49:20
128:4 206:25
**placement** 31:13
31:15,18
**Plaintiff** 7:16,17
**Plaintiffs** 1:5,19
2:5 3:23 122:6
**plan** 100:5
**planning** 37:17
223:20 224:23
**play** 27:18
**players** 20:7,9
**playing** 195:14
**please** 3:18 4:3,21
21:9 25:2 47:11
68:18 74:21,24
85:5 94:5 96:16
97:10 101:15
135:22 162:16
183:3 211:10
217:18 238:5
**pledged** 213:6
**plus** 92:8 142:4
201:7
**point** 30:4 49:13
57:8 72:25
87:12 97:15
98:14 122:9
125:11 128:6
145:16 148:13
162:5 180:11
216:16 221:9
226:13 227:18
231:17
**policy** 110:18
215:15,18
242:21

**popped** 132:7
**portfolio** 7:6 9:3
17:24 18:3,5,10
18:18 20:2,22
22:20 36:6
38:22 39:19,20
40:15,16,17,19
40:25 41:15,18
41:22 42:12,13
42:19 49:24
52:14 157:11,16
158:22 187:25
202:8 213:23,25
226:5
**portfolios** 22:23
23:4
**portion** 61:20
63:11,17,22
94:24 95:12
97:4 102:6
110:3 144:18
200:17 209:18
**position** 20:25
41:15,22 66:11
79:16,16 86:11
93:13 94:15
100:18 116:2
123:15 130:22
130:23 131:2,4
141:13 142:17
145:15 156:10
156:23,24 157:4
168:12 169:5
191:20 192:3
193:2,24 194:5
194:7 195:15
201:25 202:25
203:4 212:11
213:20 220:16
225:2 230:10
242:9,13
**positions** 22:6,10
22:13,16 40:4
42:24 43:4,5
45:24 49:22
131:11 141:9
154:20,24

155:10,15
156:15,18 171:4
201:5 225:15,19
231:23 232:2,6
**positive** 133:5
**possession** 116:15
244:3
**possible** 23:24
24:2,5,9 138:9
173:10 181:3
184:8 198:12
214:6 227:20
228:21
**postgraduate**
35:3
**potential** 25:25
27:7 45:24
**practice** 153:12
175:4,7,14
**precisely** 68:23
**preferred** 158:20
**Prentice** 79:20,22
80:7,16,19 81:3
81:10,12,14,16
82:15,19,23
83:6,9 84:2,3,5
85:13,18,19,20
86:9,18 88:14
88:15 93:6
94:25 95:6 96:2
97:5 98:9,16,18
99:2,18 101:2,3
101:5,9 102:3,4
102:5,9 103:12
116:21 126:10
128:21,24,25
129:2,24 130:7
130:10,11,14,17
130:20,23
131:12 141:3,13
142:5 143:10
197:25
**Prentice's** 86:4
92:9
**prepare** 35:5
66:18 124:14
**prepared** 138:18

138:24 139:3
171:16
**preparing** 122:25
170:2
**presence** 35:12
**present** 2:18 27:7
35:22 40:10
**presentation**
110:22 227:21
**presented** 29:5
110:17 118:20
**presenting**
111:10
**presently** 10:7
**presents** 26:8
**Press** 37:23 38:2
38:16 39:6,8,14
39:23 40:8 41:5
41:16 43:19
49:23 50:3,7
51:20 52:5
120:19 245:5
**presumably** 8:6
14:14 219:3
222:16
**presume** 9:6 64:3
64:21 69:9
72:17 127:21
136:16 141:20
188:14
**presuming**
220:18
**pretty** 26:15
30:12 210:2,9
231:14
**previous** 138:16
158:7
**previously** 73:18
76:6 91:10
149:20 166:5
217:20 221:25
226:14
**price** 139:22,24
140:17 148:10
148:23 153:14
153:14 167:20
169:9,17 195:6

primary 39:5
principal 124:17
principals 10:12
  10:14
printed 122:12
  135:14
printout 122:19
  122:20 150:24
  185:19
prior 22:23 23:3
  23:4 31:5,19,21
  32:11 33:21
  38:2,17 48:18
  48:21 78:24
  96:10 107:4
  112:25 123:16
  126:11 154:13
  157:18 168:25
  169:2 171:5
  176:21 195:17
  207:3 216:2
  221:21 224:8
  226:23,23
probably 6:3 7:14
  26:24 31:24
  32:23 34:4 42:6
  48:10 50:3
  52:15 53:19
  77:10,11 89:14
  104:11 115:21
  116:4 119:20
  122:16 135:25
  149:6,7 155:16
  199:7 230:16
  242:23
problem 164:22
  226:3
procedure 212:19
  212:20
proceedings 57:8
  125:11 180:11
  216:16 231:17
proceeds 73:25
  84:13 100:10
  198:25 200:13
  203:10
process 7:7 201:2

produced 121:25
  122:5 133:20
  134:7 135:3
  163:3,4,16
  164:24 174:22
  210:3,10 217:8
production
  133:17 134:12
  161:15 162:19
  170:14
Professional 1:21
profit 64:12,14,16
  65:19 70:9,15
  71:9,10,11 72:6
  72:13 73:7 74:2
  90:21 195:19
  196:9 197:3,4
  199:22 200:22
  201:2,6 203:21
  203:22 206:16
  206:21 234:8,11
  234:17
profits 72:3
  196:23 201:24
  202:4,5 204:5
  204:16,20 225:8
  225:9 234:5,6
  234:12,13,14
promissory 119:6
  158:20
prompted 37:11
  215:10,14
pronouncing 51:9
  51:11
properly 227:13
  228:13,15
protecting 81:20
provide 26:11
  49:24 50:4 52:8
  182:11 217:3
provided 133:10
  133:10 171:11
  223:23 235:22
  236:13
providing 40:8
  219:8 220:15
provision 48:25

public 1:22 4:8
  33:25 235:8
  244:22 247:7
pull 219:13 228:6
pulled 202:19
purchase 91:20
  152:10 155:9
  156:14 236:25
  237:12
purchased 125:2
  130:22 139:15
  142:14 143:22
  151:21 155:14
  156:19 192:2
purchases 144:12
  151:6
pure 72:13
purposes 110:12
  110:14 177:12
pursuant 1:20
  234:3
pursued 8:5
put 8:6 81:12
  102:20 104:2
  155:23 183:25
  188:15 194:18
  194:20,22
  221:17 223:20
  224:10 226:17
putting 111:6
  145:10 156:9
  230:24
P&L 176:2,3
  184:25 185:5,6
  185:10 186:3,5
P-notes 119:2,5
P.C 2:4
p.m 57:12 87:11
  87:16 104:20,23
  106:15,18
  125:10,15
  180:15 216:15
  216:20 231:16
  231:21 244:15
P/L 184:25 185:2

_____ Q _____

quadrant 83:12

127:10
qualify 75:8
quarter 224:5
  228:19
question 4:21 5:6
  12:10,11,25
  13:5 15:4 17:8
  20:16,19 22:25
  23:9,13 25:2,8
  27:23 42:15
  43:14 51:10
  53:17 54:5 55:4
  55:18 56:11
  59:3 60:23
  61:24 62:4,6,7,9
  62:13,19,21
  65:5 66:16 68:3
  68:19 71:23
  73:9 74:24 75:4
  78:8 85:4 94:8
  94:12 95:23
  96:4,10,13,24
  97:12,20 101:12
  101:16,18
  103:16 104:15
  108:11 115:15
  118:6 121:24
  124:8 127:25
  129:4 130:3
  131:15 132:15
  135:23 153:17
  158:7 159:5
  160:19 163:10
  175:11 178:13
  178:16,24
  179:21 185:18
  189:10,25
  190:16 192:5
  193:8,14,21
  206:11 210:24
  211:13 220:11
  240:9 241:3,7
  243:14 244:5
questioning
  239:13
questions 4:17
  25:3 65:3

115:11 159:2
  161:9 171:18
  178:2 181:2
  188:14 191:17
  196:11,15,16
  232:13
quick 231:13
quickly 194:24
  231:14
quite 9:19 29:18

_____ R _____

R 2:2 4:6 247:3
raise 79:22
  155:13,19
  156:15
raised 192:23
ran 31:12,16
  181:12,13
  223:16
Rayvid 3:4 4:2
read 20:18,19
  61:23,24 62:9
  77:11 96:7,8,10
  157:9
reader 107:6
reading 141:22
  184:15 220:7
reads 142:24,25
ready 28:25
real 107:16 161:8
reality 225:22
realized 72:4
  140:22,24 194:5
reallocate 227:11
reallocating
  228:5
really 10:24 12:8
  33:3,11 41:13
  42:14 53:13
  59:3 61:9 77:21
  79:22 80:16
  81:4 95:12
  110:16 111:7
  154:16 156:10
  157:9 172:9
  181:2 227:7
Realtime 1:21

reason 49:8 56:23
108:18 154:15
161:24 176:16
199:7 202:17
218:19,21
reasons 148:17
176:18 194:22
recall 48:5,23
53:25 58:20
60:12,14 61:12
61:18 65:11,14
65:24 68:7,10
77:3,24 78:3,23
109:8 113:21
122:13 126:12
126:15 127:3,22
129:8,13,17,19
129:23 131:19
131:22 132:3
134:11 140:2,4
145:9 149:3
152:13 164:6
169:14 174:4
175:22 197:7
198:12 205:10
205:11,15 206:2
207:24 208:13
208:16 210:25
213:22 217:24
218:2,6,14,17
219:8,17,21
221:3,5,13,15
221:19,22
receive 56:18,19
70:22,24 76:20
76:22 89:23
94:14,24 97:4
175:25 206:5
209:21 211:3
214:18 216:6
234:10 240:15
241:5
received 24:16
48:10 49:12,14
69:9 70:23 80:5
85:20 87:3
209:6 218:7,18

219:2,3 234:9
234:16,17,20
240:12,18,24
receiving 43:12
48:5 77:4 206:2
218:15
recess 57:9 87:13
125:12 180:12
216:17 231:18
recollect 128:18
recollection 6:8
27:19 59:2
115:19 124:16
128:14 134:22
206:7 219:5
reconciliation
90:23 137:3,18
137:20,22
157:22 245:16
reconciliations
90:17,22
record 3:19 24:24
53:5,6 57:7,12
57:23 64:8 87:6
87:7,9,11,16
91:19 92:16
94:17,19 104:18
104:20,21,23
105:25 106:15
106:16,18
109:18 115:12
125:10,15
137:12 161:21
180:10,15,21
216:13,15,20
217:15 229:6,9
231:16,21
243:12,14
244:11,15
247:13
records 117:25
135:2 183:16
210:12
redeem 203:2
228:23
redeemed 126:9
130:19,20 131:8

131:11 145:16
147:13 148:16
148:20,22 156:8
187:15,21
188:23,24
191:22 192:13
194:24 202:19
202:22 225:6
228:25
redeeming 155:20
redemption
126:11 145:7,10
145:13 155:23
187:8,9,13
191:19 192:9,12
223:3,21 224:25
225:3,20 226:17
226:19,22 228:3
228:10
redemptions
154:17,20
155:14,19
156:13,16
226:21
redistributed
238:13
reduced 195:2,6
reduction 208:20
refer 17:16 124:9
124:25 127:16
139:14 140:10
140:14 141:17
141:25 144:24
144:25 145:6,21
151:19,25
152:15
reference 154:2
222:22,23,24
referred 25:14,17
66:4 92:2
160:24
referring 18:21
30:20,21 40:16
40:18 51:15
58:17,18 67:16
69:5,7 75:14
85:15,15 92:5

92:21 106:9
107:23 109:12
109:13,14 110:4
112:24 114:18
154:8 158:11
160:10,12,16
161:5,16 162:9
165:9,11 170:13
181:22 188:4
211:22 229:10
refers 64:2,3
112:2,16 146:15
149:18 184:18
reflect 24:25 47:5
66:10 135:14
reflects 157:3
refresh 115:18
128:14 206:7
regard 178:11
regarding 48:19
48:24 53:7 56:2
56:7,13 60:9
61:14,19 63:16
64:24 65:8,15
67:11 68:5
69:16 73:13
95:24 103:5
126:3,13 129:5
129:20 131:17
131:24 177:11
177:16,21 178:6
192:8 193:17
197:8,17 205:13
206:9 207:12,24
208:14 215:6
219:19 221:16
registered 1:21
29:23 141:2
153:9 226:2
registration 116:5
116:6 169:18
170:2,5 237:13
regular 44:16
208:17,17
230:17
reiterate 221:24
relate 192:19

related 115:21
188:13,14,16
198:8 223:5,8
247:17
relates 86:16
relating 155:16
198:6
relation 192:20
relationship 26:8
84:2
relatively 66:22
131:8 148:20
relevant 47:10
rely 21:11
remainder 118:16
remaining 70:17
116:14
remember 49:11
53:21,21,22
61:7,9,17 65:20
66:18,21 67:4
69:8 75:9
103:18 126:5
170:8 184:9
197:12 206:23
208:3 210:18
217:6,7 223:22
227:4,6
remit 53:8 54:24
remits 200:16
remittance 59:14
59:17
remitted 58:9,14
58:21 60:10,16
61:5,15,21
63:12,18,22
70:20 71:3,19
91:7,8 200:24
remnant 233:16
repeat 20:16
54:20 56:11
150:25 206:11
210:23
repeating 202:2
rephrase 54:19
54:22
report 137:24

143:5 175:8,15
175:21,24 177:4
177:8 181:13,14
**reported** 56:10,16
**reporter** 1:21,22
3:25 4:3 5:2
20:20 61:25
62:10 247:7
**reporting** 3:5 4:2
54:3
**reports** 143:2
177:12,17,22,25
178:6 185:5,6
185:11 186:3,6
**representation**
122:5
**represented** 72:8
104:6 128:24
**representing**
129:2
**represents** 155:2
157:6
**request** 190:25
**requested** 20:19
61:24 62:9
**REQUESTS**
246:11
**require** 108:13,16
108:19
**reset** 148:23,24
202:21 203:6
**residual** 70:14
**resignation** 46:10
47:16 48:19
49:4 50:14
226:5 230:21
**resigned** 46:3
49:18 50:2
66:19 69:10
226:7 230:9,23
230:25
**resigning** 46:17
223:20
**respect** 11:11
36:4 41:25 43:9
43:10 44:2
49:25 52:9 54:3

58:8 60:16
66:11 71:15
82:6 84:24 90:3
117:19 123:8
126:14 131:21
146:12 191:19
193:23 194:2
207:18 215:7
218:5 229:7
231:22 233:19
237:8 241:9
**respective** 44:3
**respond** 161:22
**responded** 219:14
**response** 25:2
63:4 160:18
181:3 219:9
238:6
**responses** 5:3
**responsibilities**
21:25 22:17
32:3 33:2 44:2
52:22
**responsibility**
23:5 87:2
**responsible** 16:23
80:4 98:11
122:25 156:7
**rest** 33:18 91:2,3
**restate** 4:23 68:3
**restricted** 144:8
144:19,20
241:25 242:5,14
**restriction** 242:12
**resulted** 68:12
**retail** 33:3,4,8
**Returning** 57:11
87:15 104:22
106:17 125:14
180:14 216:19
231:20
**review** 35:11,19
185:25 216:8
**reviewed** 122:19
**reviewing** 48:12
77:24
**revised** 48:13

**right** 6:19 7:2
10:6 18:13
28:18,24 30:8
46:9 66:5 71:15
75:21 83:11,13
83:14,15 85:23
90:9 92:25
99:13,19 100:4
101:22 120:9,12
125:8 127:10
130:21 132:13
134:23 135:7,8
138:6 142:2
144:5 148:24
149:6,8,25
153:18 158:12
167:15 168:20
171:15 173:3
175:19 178:19
179:20 183:17
185:17 189:2
195:18 202:6
208:6 212:2,3
218:13 222:18
241:24
**rights** 237:14
**Rillo** 2:21 14:6
21:24 23:12,21
24:11,15 27:12
27:20,25 42:22
42:25 49:22
50:12 69:16
158:10 159:9
178:6,8 186:19
189:13 214:11
230:11 240:21
241:2
**Rillo's** 20:25
114:20
**RIMLAND** 1:10
**risk** 79:15,16
195:7 240:7
**riskier** 202:25
203:4
**RNT** 184:17
**Robert** 30:24
**role** 21:19

**roles** 27:17,20
**Roselli** 27:10
**Rosenbaum** 2:9
3:22,23 6:11,23
7:24 10:9 12:6
12:12,18,24
13:4,7,13 20:4,8
20:14 21:5 22:7
22:11 23:6,11
23:17,25 24:23
24:25 25:4
28:10 31:14
35:9,10,13,17
41:19 42:18
45:17 46:13,24
47:9,13 49:6
52:2,17 53:5,10
53:16,20 54:5
54:10,15,21
55:6,16,20,22
58:4,11 61:2,5
61:22 62:2,11
62:16 63:5
64:11 66:13,24
67:13,19,23
68:16,20 69:2,7
71:8,22 73:21
74:7,18,23
75:15 76:7,11
76:22 81:9
83:13 84:22
85:2,17 87:6
88:6 91:12,16
92:6,13 93:25
94:4,7,11,17
95:3,8,14 96:5
96:19,22,25
97:7 99:25
100:20 101:11
101:15,22
104:14 111:3
113:3,18 115:4
115:6,9,12,17
125:5 130:8
132:24 133:3,19
133:23 134:6,14
134:18,23 135:5

135:8,20 137:6
142:7,10,20
143:7 146:18
152:5 160:11,17
161:2,4,18,22
162:4,7,12
166:10,15,19,23
167:10 170:19
170:24 172:19
172:23 173:3
178:8,12,17,21
178:25 179:4,15
179:19 182:24
183:5,19 188:12
188:24 189:4,9
189:20 190:6,12
190:17,21 191:3
191:10,15,18,23
192:4,10,18,24
193:7,13,20
196:8,12 198:6
198:19 200:9
201:17,21 202:7
203:12,17
204:10,15,24
205:5 209:22
210:4,7,11,15
210:17,21 211:5
211:12,16
212:13 214:13
214:20,23
215:22 218:10
222:3 226:25
231:7,10 232:14
232:17 239:5,13
239:18,23
240:11,14,25
241:4,11 243:3
243:13,20
244:12
**roughly** 65:22
82:12
**row** 86:7
**RPR** 247:23
**RSM** 182:9
**rules** 4:23
**ruling** 178:20

190:20
rumors 46:19,21
  46:23 47:4
  156:2
run 98:2 137:24
  138:3 151:9
  175:23,23 177:4
  177:8 185:15
running 32:5,8
  106:4 136:25
  177:17,22 178:6
  213:18
runs 118:16
  174:13 184:4
  209:9
Rutgers 34:18

_____ S _____

S 1:8 2:2,20 3:14
  245:2 246:2
sad 111:11
safe 12:22
sake 17:15
salary 207:8,13
  207:16,18,20
  208:19
sale 107:21
  141:17 157:3
  200:13 240:19
  240:22 241:6
sales 203:11
sanctions 5:16
satisfy 156:13
saw 77:18,20
  91:24 93:2
  122:9,20 185:5
  217:20 222:16
saying 21:14
  42:24 59:6
  65:21 66:22
  71:4,5 80:22
  85:9,24 86:11
  86:21 90:6,10
  98:15 99:8,16
  102:4 111:7,19
  132:21 158:8,13
  168:4 171:7
  186:2 192:22

196:4 203:8
204:2 212:9
215:20 219:4
240:2 242:11
says 48:11 49:7
  58:9 63:21
  64:19 77:2 83:8
  83:12,16 107:12
  109:10,25
  111:24 112:12
  115:9 119:2,24
  120:10 121:11
  121:14 127:7,10
  129:15 135:16
  137:17 138:3
  139:5,13,17,18
  139:19 140:10
  140:21,23 141:7
  141:15,16,23,24
  143:5,14,17
  144:7,8,12,14
  144:22,23 145:5
  145:20 146:3,9
  147:4,5,22,23
  147:24 148:9,9
  149:16 151:4,23
  152:18 153:20
  153:21,22 157:3
  157:16 167:19
  167:22,23 168:9
  168:12,23
  171:20,24 173:4
  173:25 176:7
  177:4 179:7,10
  184:17,24
  206:14,16 207:7
  207:22 208:8
  209:18 211:24
  217:22 218:3,18
  219:2 220:22
  229:8 230:20
schedule 118:24
  159:14,19 166:9
Schinik 59:4,6
  60:9,12,25
  61:14 67:11
  68:5,10 123:7,9

136:10 153:17
177:16 220:8,22
220:25
scope 67:5
Scott 112:7
scrambling
  227:19
screen 138:11
  164:21
script 165:16
second 127:6
  146:10,15
  147:24 150:22
  151:5 153:6
  166:16,20,22
  182:3 208:11
  222:18
securities 29:15
  31:22 32:14,16
  75:6,12 97:24
  103:2 109:4
  110:15,19 111:8
  112:9 152:9
  157:18 158:18
  158:19 164:15
  166:2 196:6
  199:4,9 237:12
  245:19
security 139:6
  140:8 141:2
  142:17 144:7
  151:15,24
  236:25 237:13
SEDA 109:15,18
  112:3
see 8:12 22:22
  35:25 40:23
  48:10 54:13
  63:23 64:17
  71:11 80:21
  82:20 83:11,16
  107:19,22
  108:25 118:25
  119:3,25 122:11
  123:21,23
  124:21,23 127:7
  127:9,12,13

137:9,15 143:2
144:9 146:3
147:25 151:16
151:19 154:22
157:14 162:6
164:20 167:17
167:21,25
168:10 170:18
172:15 173:17
174:25 176:8,10
177:3 200:5
206:18 207:9
208:9 227:20
seeing 67:4 78:23
  127:4 128:13
  129:17 134:11
  138:8 164:7
  175:22 210:18
  217:7 221:22
seek 178:20
  190:19
seeking 208:22
  209:2
seen 48:2 51:2,4,5
  57:24 67:2
  76:15 78:21
  91:21 106:5
  107:2 114:8
  121:16,18 122:7
  122:17 126:25
  129:16 133:18
  133:22 138:6
  159:3 163:12
  164:3 167:7
  168:24 171:2,6
  173:9,25 174:18
  179:8,22 184:6
  185:10 205:24
  206:6 217:19
  218:24 222:13
  229:25 230:4
SEI 182:4
self-help 195:21
sell 93:15 98:2
  141:12 153:8
  198:25 200:11
  242:8

selling 141:3
send 161:18,23
  238:5
sending 51:19
  79:25 215:11
sense 54:6,9
  203:7
sent 48:13 134:15
  222:17 224:24
  231:3 237:22,25
  238:3,14,15
sentence 109:10
  109:25 110:5
  138:2 208:7,11
separate 12:10
  22:24 79:19
  80:8 81:5 84:7
  86:15,21 134:5
  154:12 155:24
  158:2,2,22
  159:2,3,14
  166:9 186:19,23
  224:18 231:24
  232:5
separately 80:18
  158:16 159:16
  199:11
Series 29:17,21
  34:14
services 40:9
  49:24 50:4 52:8
  71:17
set 52:13 247:12
share 64:15 74:8
  139:23,25
  169:17 186:11
shares 99:13
  109:11,14,16
  110:3 111:20
  112:3 119:3,13
  120:20 144:19
  149:23 172:12
  186:17 212:8
  213:18
sheet 121:11,12
  121:19 122:8,10
  122:21,25 123:9

123:18,20,21,24
124:22 132:10
132:22 133:16
133:22 134:8
135:14,17 136:4
158:22 159:3
245:12 248:3
**Shell** 119:25
120:3
**she'll** 96:7,8
**shocked** 235:10
235:11,12
**short** 2:7 75:3
131:8 148:20
161:23 187:18
197:11 202:20
**shortfall** 53:9
54:2,7 55:2
**Shorthand** 247:6
**shortly** 42:7,7
235:23
**show** 47:23 50:22
57:17 76:5 91:9
110:16 120:23
174:25 205:21
222:10
**showed** 224:6
**showing** 145:25
158:7 201:7
**shown** 38:12
**side** 8:9,10 107:21
165:16
**sighing** 24:25
**sign** 13:23 14:11
146:19 214:17
216:5,10 243:25
**signature** 114:10
114:21
**signed** 13:14,16
13:19 44:8
215:12 230:3
**significant** 59:14
59:18 156:4
**signs** 14:7
**similar** 33:22
38:12 208:16
**simplify** 189:18

**simultaneously**
38:20
**single** 80:12 183:7
**sit** 26:5
**sitting** 23:2
102:12 140:13
**situation** 128:22
213:22
**six** 5:22 40:7
214:3
**sixth** 173:2
**slightly** 65:4
173:7
**Sloan** 107:15,19
107:20,24 108:3
108:6,15 109:4
110:15 112:9
**small** 65:22 66:22
**smaller** 214:3
**software** 181:12
181:12,13
**sold** 110:19
130:10 141:9,12
142:5,15 143:9
213:6 235:7
**sole** 16:4 20:22
30:16 39:15,20
84:8
**somebody** 25:20
55:10 112:8
179:16 195:5
**somebody's**
138:10
**someone's** 164:21
**soon** 210:16
**sorry** 6:12 22:7
23:11,14 25:7
27:22 32:15
38:7 56:11 58:4
62:7 65:6 70:25
71:14,16 84:16
84:18 108:22
115:5 118:18
127:6 130:8
132:10 142:9
150:2,25 158:25
159:8,12 172:22

175:5,11 176:24
178:23 179:9
183:8 197:14
206:11 210:22
210:23 218:9
220:11 223:7
224:11 225:17
232:23 239:4
240:23 242:3
**sort** 8:4 15:3 32:9
42:15 43:14
55:3 72:22 79:5
98:24 102:7
103:14 110:24
127:24 132:14
136:11 154:11
156:6 171:17
186:25 187:3
223:17 224:17
227:9,19 228:3
238:3,4 242:16
**sorted** 69:12
**sorting** 103:14
**sounding** 240:8
**sounds** 149:6
**source** 192:23
**sourced** 27:25
**sources** 46:21
**sourcing** 33:12
**space** 37:19,20
38:4,5,6
**spar** 54:18
**speak** 26:24 35:16
92:16 116:20
**speaking** 3:3
37:22 38:3
69:11 71:12
94:6,10 96:17
96:21 99:5,5
**specific** 37:6
60:12,15 68:7
91:24 103:18
131:20 163:10
**specifically** 22:15
37:11 151:15
164:6 184:9
**speculate** 52:17

113:3 141:20
183:20
**speculating** 52:16
113:2 183:6
**split** 64:4,5
156:25 197:5,8
**splitting** 85:8
**spoke** 38:25 39:2
48:22 66:19
118:11 156:2
**spoken** 65:21
**sponsor** 34:13
**spread** 153:13
**spreadsheet**
77:25 86:10
158:2,3 185:13
185:14 220:4,15
**spreadsheets**
185:11
**squeeze** 230:17
**staggered** 140:16
**stamp** 50:24
76:13 114:7
121:7 126:21
135:9 136:24
162:14,17
163:24 172:17
184:4 209:24
210:13
**stamped** 47:25
135:11 160:7
210:2 217:17
229:23
**stand** 119:8
**standard** 212:18
212:20
**standby** 109:19
**standpoint** 86:19
108:20 213:4
**start** 5:7 25:9
171:3 221:10
**started** 15:11,12
**starting** 32:10
**starts** 107:12
118:15
**State** 1:22 247:7
**stated** 68:9 198:3

205:5 225:15
**statement** 95:16
95:17 120:14
169:19 170:2,5
180:21 215:11
216:5 230:22
**statements** 181:8
**States** 1:1 3:16
**stating** 214:18
216:5
**Steve** 215:4
**stock** 93:15
105:10,16
111:17 112:25
113:7,11 144:19
158:21 169:8
170:17 194:19
200:7,10,11
211:8 213:19
241:25 242:5,14
243:9 244:2,4
**stocks** 225:25
**stopped** 102:23
**story** 75:7 87:5
110:13 111:11
190:14
**straight** 90:11
**stretch** 194:20
**stricken** 190:10
**strike** 190:14
**strikes** 17:7 24:13
**string** 47:25
106:3 204:14
222:11 245:4,9
246:5,6
**strings** 106:6
**strong** 182:13
**struck** 187:22
**structure** 33:17
227:22
**structured** 16:8
16:15
**structures** 34:3
**structuring** 72:23
88:23
**stuck** 72:11
**Studios** 127:7

128:17 129:11
stuff 230:17
subject 5:15
99:23 112:25
117:13 150:6
239:15
Subscribed
244:19
subsequent
155:15
subsequently
227:24
substantially
120:21 148:23
169:8
sue 7:18
suit 20:5 182:13
sum 157:17
supplied 162:13
162:16,18
support 133:7
142:13 198:24
supporting 21:19
supposed 177:25
202:18,19
227:16 241:17
sure 9:19 17:18
26:23 30:12
50:15 51:11
61:8,10 72:17
77:5 81:20
104:3 111:16
122:9 136:6,7
147:20 163:11
164:24 175:13
200:25 208:3
210:3,9 218:3
243:10,18
244:12
survivor 232:25
Suzanne 1:20
3:25 247:6,23
swear 4:4
swing 185:24
Swiss 181:25
182:3,15,17,22
183:10

switched 182:2
switchover
182:19
sworn 4:7 244:19
247:12
symbolic 187:2,4

_____
T
T 245:2 246:2
247:3,3
take 3:11 4:22
34:14 44:20
49:19 50:6 57:4
71:4 110:20
125:8 152:23
153:9 174:16
180:7 192:25
196:21 204:17
206:25 210:17
216:12 217:18
224:4,9 227:7
227:10,12
231:12 244:2
taken 1:20 5:2
63:13 91:6
100:17
talk 80:17
talking 26:16,20
39:3 54:23
58:11 86:5 90:3
117:14 134:2
150:9,14 165:11
168:16 188:5
189:14,15,17,19
226:25 243:11
243:18
tape 57:13 125:16
180:16 244:14
target 37:19
targets 39:5
tax 227:9,22
tell 5:12,15 13:8
26:24 52:18,20
53:22,22 55:6,7
77:19 100:24
103:20 116:8
120:12 121:9,25
123:19 137:15

139:19 140:21
140:23 142:20
142:21 146:6
150:16 152:7,19
153:22 162:20
164:10,11
182:24 183:7,20
183:21 187:17
230:6 238:22
telling 62:17
183:5
ten 28:6 42:6
48:24
tend 17:8
term 25:11 120:6
172:5,7 227:6,9
termination
48:14
terms 22:5 26:23
43:11 82:6
118:20 120:9
122:22 161:16
168:4 170:14
187:19 190:4
194:12 239:13
testified 4:8 5:18
8:19,21 77:18
84:19 95:11,17
95:20,24 115:13
131:22 145:8
191:21 220:25
testify 159:11
testifying 1:18
145:9 204:23
testimony 35:20
35:23 50:11
96:15 190:10
247:14
thank 7:2 51:23
99:15 115:16
132:5 163:17
239:6
Thanks 76:11
they'd 99:4
185:19
thing 79:10 88:13
89:6 103:7

148:13 160:18
227:4 228:17
things 26:25
45:11,15 71:13
72:3 81:8
169:16 189:14
221:25
think 4:23 17:15
22:24 30:11
32:18 33:4
37:15 39:5 45:4
47:3 50:3 52:10
64:4 67:17 68:2
70:6,14 73:9
74:14 79:7
82:12 89:5
90:25 92:7,11
97:19,19,21
102:16,17
107:17 108:18
109:15 110:9
113:20 116:4
123:14 129:25
132:16 133:6,10
133:19 134:6,14
134:19 136:7,13
140:14 147:10
153:25 155:15
158:14 159:18
167:11 172:19
174:20 180:20
183:24 188:21
191:20 194:24
202:23 203:24
211:9 215:14
220:24 223:11
227:3 228:2
240:23 243:17
thinking 30:10
45:25 132:20
154:23 213:3
thinks 84:6
201:10
third 70:11
147:21 218:24
third-party
180:23 181:5,19

181:22
thought 60:2,6
108:19 124:6
128:8 155:6
171:11 195:21
199:13 209:9
222:25
thousand 100:13
102:11
three 16:5,20,24
31:2,10 34:13
41:24 50:23
106:24 126:24
136:13 167:23
169:15 214:2
229:23 245:14
Thursday 107:8
tight 162:2
TIM 1:10
time 3:8 4:20 11:4
11:4 14:3,3
23:21 27:21
28:24 29:19
30:6,18,19
37:24 38:22
39:14,18 40:10
43:20 44:11
46:2 50:16
55:15 57:7,12
58:22 59:9,20
61:22 65:15
74:5,10 75:16
75:17 77:21
78:2 80:12
87:11,16 98:3
104:8,20,23
106:15,18
107:11 117:17
122:8 123:10
125:10,15
129:20 131:8
138:8 143:3
144:4 148:21
149:4 151:6
153:4,7 160:17
163:13 165:19
168:8 169:20

Page 24

172:9 175:24 180:6,10,15 181:24 183:7 189:13 195:23 202:20 212:16 214:13 215:18 216:15,20,25 219:17 220:9 224:10 228:18 230:23,25 231:8 231:16,21 232:10 235:7 242:19 244:15
**times** 5:21 6:3 28:4 185:17 187:2
**tipped** 223:19
**title** 33:5 164:14 244:3
**today** 3:7,25 4:18 23:2 26:5 78:22 102:12 138:9 140:13
**told** 46:24 211:2 224:22 226:16
**tomorrow** 191:5 210:15
**top** 19:13 26:13 26:14 58:9 59:22 81:11 82:19,21 86:7 111:24 139:7 152:12 165:16 167:14 173:6 179:7 184:15,16 184:24 217:22 231:5
**topic** 70:2
**total** 21:16 89:8 119:2 150:9 157:11,16 199:16 202:4
**totaled** 83:7
**touched** 187:8 223:17
**toys** 7:20,20,21,24 7:25 8:17

**trade** 5:25 6:15 8:18 109:4 111:8 140:25
**tradeable** 225:25
**trader** 107:15
**trading** 172:13
**training** 21:11
**transaction** 23:22 24:7 28:2,2,14 28:14 59:15,18 64:6 70:11,12 73:15 78:10,13 80:9,20 81:13 82:7 84:25 87:21,22 88:18 88:21,25 89:20 89:23 90:15 91:5 95:2 97:6 98:19 101:8,21 102:8,19 105:8 115:2 116:13,22 116:24 117:2,10 117:17 125:18 125:24 126:8 128:17 129:7,12 130:16 139:7,9 140:3 149:5,10 152:2 187:8 188:22 198:18 198:20 199:25 201:10 202:12 202:16 203:9 204:18 213:14 234:18,21 240:13,16
**transactions** 24:17 25:21,23 33:11,13 37:21 38:12,15 50:6 69:22 80:11 117:20 130:6,17 131:7 196:2 201:12 204:19 209:10,15 217:4 236:3,23
**transcript** 36:2 95:18

**transfer** 154:23 195:18 213:15
**transferred** 195:24 196:7 199:4,9 233:13 235:13 238:8,9 238:12
**travel** 14:2
**Troy** 2:21 14:6 20:25 22:16 27:12 42:22,25 75:5 114:20 186:19 230:9
**Troy's** 21:18
**true** 186:15 187:5 210:8 247:13
**trueing** 66:20
**trusted** 104:9 236:6
**truth** 5:12,15
**try** 88:14 110:11 189:18 201:11 228:21
**trying** 20:6 43:15 59:5 64:4 67:19 67:23 70:6 73:10 74:14 77:16 79:2 81:7 85:12,12 90:24 93:5 103:11,14 110:9,16 142:24 181:8 197:13 204:24 228:5 240:23
**turn** 196:15
**turned** 197:2
**Turning** 124:20 173:24 218:23
**twelve** 42:7
**twenty** 26:25 28:9
**twice** 68:24 101:18
**two** 6:9,10 7:13 19:15,22,25 20:22,24 21:6 21:25 34:13 36:12 38:3

41:24 76:13 78:3 135:25 136:13 140:9 145:4 152:23 153:9,15 155:17 160:7 168:5 186:14 217:9 222:11 239:7 245:17
**type** 60:24 121:17 121:20 171:17
**types** 33:6 71:18 72:18 143:2
**typical** 88:17 89:10 90:6 161:8
**typically** 29:3 44:19 89:9 164:19 174:24
**T0** 248:4

_____

**U**
_____
**ultimate** 28:17
**ultimately** 27:15 44:7 111:17 113:8 126:7 207:15,19 209:4 237:19
**Uluru** 84:25 97:15 104:5 105:11 110:3 111:19 112:24 113:10 115:2 128:20 196:2 197:24
**Um** 121:22
**Um-hum** 35:24 107:10,25
**unaware** 23:3
**underlying** 93:15 105:17 200:7,10
**underneath** 139:19
**understand** 4:21 5:8,11,14 12:3 20:12 42:23 50:11 54:11,16 54:22 57:14

62:5,12,18,20 63:2 64:5,20 71:12,23 73:8,9 73:11 78:8 87:17 93:7,12 94:20 95:8 97:2 101:17 106:19 117:6,9 118:13 118:19 119:5,11 130:18,21 131:13 142:24 147:5,7 148:10 156:17 180:17 181:21 184:25 194:10 200:4 204:11 211:16 211:19 216:21
**understanding** 9:8 49:3 66:9 69:24 70:3 83:2 94:22 149:9 150:19 151:5 157:10 167:9,11 195:8 202:11 203:9 212:4 234:25
**understands** 54:14 211:10
**unexpected** 46:10
**unfamiliar** 162:23 163:7
**United** 1:1 3:16
**University** 34:18
**unrealized** 148:4 148:7 174:15 175:9,23 176:4 245:21
**upper** 83:13,14 127:9
**upset** 154:15
**use** 180:5 233:25
**usually** 130:7

_____

**V**
_____
**v** 1:6
**vaguely** 126:5 208:3
**valuation** 119:22

133:7,12 134:3
160:24 165:12
166:7,8 167:24
168:24 170:9,10
170:14 173:13
173:14 217:3
219:20,23
221:22
**valuations** 165:25
171:4
**value** 54:4 56:8,8
56:14,14 95:4
95:21 118:4
119:17,21 120:5
120:7,9,22
141:24 143:15
144:23 145:25
147:23 150:20
151:4 152:19
153:12 157:11
157:25 158:8,13
158:23 159:21
159:21 160:19
161:17 162:11
166:6 168:21
169:7,11 172:9
176:14,17,21
194:9 220:5,15
**valued** 152:24
159:13,16
**valuing** 168:4
**various** 165:25
**Ventures** 91:20
151:16,24
153:19
**Venturini** 2:11,16
3:20,21 4:11
12:9,19 13:11
18:16 19:5,7
45:21 47:12,14
47:18 48:16
50:10,17 52:6
52:19 53:15
54:8,13 57:4,22
58:7,13 61:4
62:14,24 64:18
66:14 67:9,17

67:21 68:2,18
68:25 74:21,25
76:9,12,24 87:8
91:14,18 92:11
92:18 93:19
94:3,5,9,18,21
95:5,7,10,23
96:12,20,23
97:9 100:22
101:19,23
104:17 105:15
105:20,25
112:15,23
113:20,24 115:5
115:7,10,16
120:25 121:6
125:7 126:16,20
133:14,21,25
134:10,17,21,25
135:7,22 136:18
136:23 137:8
143:20 150:18
159:8,25 160:6
160:15,23 161:3
161:14,20,24
162:6,10,15,25
163:18,23
165:23 170:22
172:25 173:5,20
174:6,11 175:5
178:10,15,19
179:5,20,24
180:7 183:2
184:3 188:19
189:2,7,11
190:3,9,15,19
190:23 191:7,13
191:16 193:25
196:10,14
201:20 204:11
204:22 205:3,16
209:25 210:5,8
210:14,16,20
211:9,14 214:15
214:22 216:3,12
217:10,15
221:14 222:5

229:14,22 231:9
231:12 232:9
239:7,10,20
242:25 243:10
243:17 244:10
**VENTURININI**
12:16 20:6,12
20:17 23:8
24:24 206:12
**verbal** 5:3
**verbalize** 70:6
**version** 122:12
133:22 163:15
185:9
**versus** 3:14
**video** 3:3
**VIDEOGRAP...**
2:19 3:2,24 57:6
57:11 87:10,15
104:19,22
106:14,17 125:9
125:14 180:9,14
216:14,19
231:15,20
244:13
**videotaped** 1:18
3:12
**view** 74:15
**viewed** 75:22
103:13
**violated** 187:19
**visit** 183:11
**volume** 167:24,24
168:6,7
**vote** 14:4

———————

**W**

**W** 184:17
**wait** 5:6 23:9
97:18 178:8
196:10
**Walk** 89:17
**walked** 72:11
**walking** 122:18
**want** 12:8,13 21:7
41:17 45:18
53:13 72:5 73:3
74:17 97:23,25

99:3 115:12
141:19 159:6
160:13,21 162:8
162:13 180:20
181:7,16 182:12
187:15 190:25
199:18 204:14
220:9 236:2
243:12 244:7
**wanted** 37:18
41:14,23 50:4
52:8 109:4
159:9
**wanting** 85:6
**wants** 53:20
55:22 161:6
192:19
**warrant** 91:19,21
92:3,4,9 97:5,14
119:25 120:13
133:2,7 139:22
139:24 141:9,14
153:20 158:22
161:11 166:9
171:4 212:7
220:16 236:15
242:24
**warrants** 73:14
73:24 74:5,8,16
79:11,13,14,22
80:3,4,7,12,16
80:19,25 81:3,4
81:7,14,17,21
81:24 82:2,4,6
82:10,13,15,18
82:19 83:3,6,9
83:17,20 84:3
84:11,20 85:8
85:11,14,18,21
85:22 86:2,4,6,9
86:13,16,17,18
87:3 92:20 93:4
93:6,8,9,10,10
93:14,23 94:24
95:4,5 96:3 97:4
97:15 98:7,12
98:18 99:4,10

99:14,15,20
100:6,13,18
101:4,5,7,10,13
101:20 102:2,7
102:11,21 103:6
103:6,21 104:10
104:10,25
105:14,17
113:22 114:25
115:23 116:10
116:11,14
117:10,14,16,21
117:22 119:2,13
119:19,20 120:3
120:14,20
123:19 124:21
125:23 126:4,7
126:13 127:10
128:15,23 129:6
129:10,21 131:3
131:10,17,24
132:23,23,24
134:9 140:3,10
140:15,20 141:9
145:22,25
146:10 147:22
148:19,23
149:24 150:4,5
150:9,13,17
151:25 152:11
152:14,16,22,23
153:13 154:3
155:4 156:20,22
157:24 159:4,13
159:20 160:20
161:17 162:11
165:12,13
166:24 168:5,16
168:21,25
169:11 170:15
172:10 173:13
173:15,16,22
176:10,11,15
188:20 189:5
192:8,11,19,21
193:4,24 194:3
194:4,9,16,23

195:2,9,9,22,24
197:9,18,20,21
198:25 199:15
199:18,19,21,21
200:6 201:15
202:13,21 203:7
211:8 217:3
219:20,24 220:5
221:17,23
234:23,24 235:3
236:9,24 237:15
237:20 241:10
241:15,17,19,22
242:10,13 243:9
244:3,4
**wasn't** 30:12
41:21 69:25
82:14 98:10
148:15 154:6
194:19,24
195:16 202:13
221:11 233:9,11
237:17
**water** 231:11
**way** 12:17 59:4
62:20 70:6
74:14 129:3
148:11 158:14
163:13,16 166:3
168:19 170:19
184:16 200:5
227:12 247:19
**ways** 156:12
**Wealth** 224:13
**Wednesday** 45:4
45:6 69:25
**week** 44:19 45:3
217:8,21
**weeks** 78:4
226:23
**went** 28:19 34:18
71:6 90:21 91:3
131:3 199:5
231:6 236:4
**weren't** 148:22
172:8 199:8
202:22

**we'll** 4:17 17:16
95:18 134:10
145:18 162:6
178:19 188:19
191:4 227:11
228:21 233:25
**we're** 3:9 12:19
18:20 26:16,20
53:4 58:18
71:12 73:24
79:9 86:5 94:18
98:11 117:14
119:16 150:9,14
196:19,22 227:6
242:6,8 243:3
**we've** 4:15 80:10
114:18 168:16
176:18
**wish** 174:25
224:12
**withdraw** 206:12
**withdrawals/sa...**
140:22 141:16
145:5 153:21
**withdrawn** 18:16
19:5,7 48:16
50:10 52:6 58:7
64:18 67:9
93:19 94:21
105:15 112:15
112:23 143:20
150:18 162:25
165:23 173:20
175:6 193:25
216:3 221:14
**witness** 4:4,6 22:9
31:16 54:9,14
57:2 67:2 81:12
101:14 133:2,4
134:4 142:9
158:12 159:10
159:12 161:15
166:12,17,21,25
178:23 179:16
180:5 183:4,6
198:21 202:6
203:18 211:10

231:11 247:11
247:14
**word** 25:5 63:9
90:24
**words** 16:11 38:8
41:17 90:18
130:19,22
146:14
**work** 30:11 31:6
31:20 32:12,22
33:9,10 34:6,9
59:8 98:5
112:10 208:18
**worked** 27:21
30:9 31:7,21
32:13 34:11
38:14
**working** 25:10
32:9 40:13
89:19 102:22
123:12
**works** 112:9
**World** 5:25 6:15
8:18
**worth** 195:24
201:10
**wouldn't** 59:13
120:23 159:21
225:2,7,11,14
225:18
**wrap** 231:13
**write** 167:13
**writing** 239:21
**written** 238:3,4
239:19
**wrong** 12:3 53:3
55:11 60:7
74:15 90:24
154:5 167:4,6
167:18 181:17
**wrote** 165:15
220:8

---
**X**
---
**x** 1:2,12 84:6 86:4
98:8 245:2
246:2,10

---
**Y**
---
**YA** 128:2,11
203:16 240:15
241:2,4
**YAM** 54:24 71:16
127:14,16,19,22
200:18 232:19
233:9,25 234:8
234:10,11,16,17
234:20 239:13
240:3,15,24
241:4
**YAM's** 234:5
**YAS** 240:25
**yeah** 43:13 46:14
77:12,14 89:9
90:21 109:24
110:5 118:6
135:16 159:23
165:7 200:15
212:22 230:25
**year** 7:15 9:22
15:7 31:25
32:23,23 34:25
42:9 51:13
128:6,8,9
153:10 187:3
207:9 237:6,7
**years** 7:13 19:15
19:23,25 20:22
20:24 21:6,25
31:10 36:12
38:3 75:9 214:2
214:3
**year-end** 133:24
134:7 135:18
**yesterday** 35:8
48:13
**yielded** 199:21
**York** 1:8,9,15,15
1:22 2:14,14 3:6
3:6,11,11 247:8
**Yorkville** 1:2
3:13 6:18,24,25
7:8 9:3,5,6,12
9:14,15,17,23
10:7,13,14,17

11:11,17,22
12:23 13:15,17
13:19,24 14:8
14:12,20,24,25
15:5,14,16 16:4
16:18,23 17:10
17:13,16,17,19
17:24 18:25
19:2 20:11,25
21:3 24:22
25:10,14 27:21
29:7,10 30:15
30:18 31:3,5
37:2,3,3 40:9
44:23 51:15,18
52:23 53:8,12
55:14 56:3
70:18,20,23
71:17,19 72:14
74:11 75:5 84:4
87:21 88:20
89:18 91:4
97:16 100:5,8
100:16,17,19
101:4,6,10
102:22,24
103:21,25
104:24 108:5
109:3 116:18,20
122:2,24 123:13
127:12,16
128:11 138:19
138:21 153:12
163:3,5 164:17
174:23 175:8,15
177:21 183:11
183:16 184:12
184:14 186:9
193:11 195:11
197:3 203:18,19
204:4,7,8,9,16
204:21 207:19
212:21 213:23
214:17 216:25
219:23 232:19
232:21,23 233:2
233:4,7,8,10,11

233:14,21,23,24 235:21 239:14 239:17 240:2
**Yorkville's** 105:4 116:15 193:18
**Y-A-M** 233:25

---

**Z**

**Zamora-Hegg** 2:19 3:4
**zero** 144:8 145:25 147:23,25 152:18 158:8,14 176:14,17 234:13
**Zhao** 51:8
**Zhao's** 52:21
**Zhou** 245:5

---

**$**

**$132,251** 168:22
**$140,635** 157:7
**$150,000** 207:8 209:2
**$198** 140:23 141:4,6 153:22 154:7,22 155:2 155:5
**$2** 54:2,6 56:9,15 59:13,16 60:9 60:16 63:18 73:2,4,4 199:19 199:22
**$2,178,000** 58:20 61:15,21 63:12
**$200,000** 199:23
**$3** 79:12,16 81:2 81:11 84:9 86:13 87:4 124:23 139:23 151:18,19 157:6
**$3,140,635** 157:3 157:6
**$4** 124:4,6,9,17 139:24 147:6,8 148:14 194:18 194:20,23 195:24 196:6,24

196:25 197:2,4 199:3
**$4.1** 147:17
**$447,635** 148:4
**$5** 172:13,14 203:15
**$5,000** 65:23,25 66:3,4,23 68:13 69:14
**$50** 59:24
**$517,885** 146:15
**$6** 141:24 142:3 142:14 143:13 143:17,18,22 147:9
**$6,230,000** 147:14
**$6,231,519** 141:17 142:15
**$70** 188:7,10 189:20,22
**$75** 60:4
**$8** 197:2
**$800,000** 199:8
**$92,000** 144:2
**$967,032** 64:25 65:9

---

**0**

**0kay** 20:24
**0.01** 146:9 151:24
**0.1** 147:22
**001** 155:4
**005993** 76:14
**005994** 76:14
**01** 15:9,13 30:5 75:10 145:21 179:3
**01247** 126:22 245:14
**01250** 126:22 245:14
**01329** 222:12 246:6
**01330** 222:12 246:7
**01417** 47:25 245:4

**01436** 121:8
**01439** 121:8
**01440** 174:12 245:21
**01445** 179:6,14
**01461** 174:13 245:21
**01472** 163:25 245:19
**01477** 172:18
**01478** 164:2 245:19
**01479** 184:4 245:22
**01484** 184:5 245:23
**02** 30:5
**03** 30:5
**04** 233:20
**05** 117:5
**06** 182:20 235:19 236:12,13
**06-5212(JAG)** 1:6
**06055** 229:24 246:8
**06057** 229:24 246:8
**07078** 2:7
**08440** 57:23 245:8
**08493** 114:7 245:11
**08496** 114:7 245:11
**08535** 160:7 245:17
**08648** 106:4 245:9
**08651** 106:4 245:9
**09153** 50:24 245:6
**09155** 50:25 245:7
**09237** 217:17 246:5
**09248** 217:17

246:5
**09335** 136:25 245:16
**09341** 137:2 245:16

---

**1**

**1** 47:19,21,24 112:6 114:24 139:6 151:7 168:15 177:4 179:13 205:23 206:8,15 207:4 219:10 225:7 227:11,11,12,17 227:23 228:5,10 228:14 245:4,24
**1st** 224:2,8 225:10
**1,100** 80:24
**1,100,000** 103:8
**1,166,000** 86:12
**1,166,667** 83:4
**1,667,000** 84:10
**1.1** 79:13 80:24 81:21 86:6 92:23 99:10,17 100:6,9,9 103:24 114:25 116:10
**1.16** 86:20
**1.166,000** 82:11
**1.167** 92:7
**1.5** 86:16,20 92:3 93:8 99:12,14 99:17,22 100:5 103:20
**1/1/06** 150:23
**1/2** 195:25 196:6 199:3
**1/31/2006** 167:19
**1:27** 87:11
**10** 89:15,16 90:7 90:11 163:21,23 198:24 199:5,15 200:19 201:22 203:10 208:21 209:11 245:19

**10/31/06** 150:23
**10:37** 138:3
**10169** 2:14
**105** 245:9
**11** 174:7,9,11 179:3 245:20
**11th** 48:6,18 49:5
**11:45** 1:13 3:8
**114** 245:10
**12** 1:13 3:7 179:25 180:3 183:25 184:3 245:22 246:17
**12-31-05** 143:15
**12/1** 224:25
**12/31** 143:25 150:21 158:10 182:6
**12/31/05** 143:23 144:9 145:24 151:4,19 152:19
**12:45** 57:7
**12:55** 57:12
**120** 149:4 170:8 194:25 203:2
**121** 245:12
**126** 245:14
**13** 51:20 205:19 205:22 245:6,24 246:17,20
**133** 246:13
**136** 245:15
**14** 119:24 217:13 217:16 246:5,13 246:13
**15** 177:5 207:23 208:21 222:6,8 222:11 246:6
**150** 2:6 77:10 208:19
**1539** 107:11
**16** 218:6,11,12,13 229:17,19,22 246:8
**16th** 220:14
**160** 245:17
**161** 246:13

**163** 245:19
**17** 91:11 137:25
**17th** 138:4
**174** 245:20
**178** 246:17
**18** 231:4
**180** 245:22
**189** 246:18
**19** 76:21 179:10
  179:17 236:8,17
**191** 246:18
**192** 246:19
**193** 246:19,20,20
**1994** 35:2

---
**2**

**2** 50:18,20,23
  57:13 77:25
  78:6,21,21
  82:17 106:10
  111:23 114:12
  116:9 118:11,25
  124:2 196:19,21
  196:21 245:5
**2,178** 58:12
**2:07** 87:16
**2:24** 104:20,23
**2:27** 106:15
**2:28** 106:18
**2:52** 125:10
**2:57** 125:15
**20** 82:10 84:12,13
  89:23 90:10
  93:21 94:14
  100:9 194:8,14
  195:10,12,17
  196:17,19,22
  197:3,5 199:6
  202:14 203:16
  204:2,5,6
  208:21 209:10
  222:18 235:23
  236:7 238:14
  246:20
**200** 244:20
**200,000** 168:13
  168:13,13
**2000** 15:10 19:3

**2001** 14:23 15:7
  15:11 19:3,3
  29:20,22,23
  214:6
**2005** 54:2 56:20
  66:20 67:14,15
  89:13 90:6
  117:19 123:9,14
  133:16 135:18
  149:12 171:5
  182:15 186:15
  187:5 205:23
  206:8 207:4
  217:23 219:6,18
  221:2,4,7,16,18
  221:21 245:24
**2006** 1:13 3:7
  46:8 48:19
  51:21 67:12,14
  68:5 69:6,10,10
  76:21 91:11
  107:9 115:3,21
  127:20 135:15
  135:19 136:5
  137:25 151:7
  167:9 168:25
  169:3,11 170:6
  171:3 176:22
  177:5 179:6
  182:18 187:10
  193:12,17 231:4
  245:6
**205** 245:24
**21** 217:23 220:24
  221:7
**217** 246:5
**22** 135:15,19
  136:5
**222** 246:6
**229** 246:8
**23** 179:19 246:18
**230** 2:13
**24** 29:17,21
**26** 107:9

---
**3**

**3** 57:18,20 63:23
  66:6 76:6,12

82:16 106:13
107:8 111:24
125:16 155:3
207:7 208:10
245:8
**3,833,000** 85:20
**3,833,333** 83:7
**3.00** 139:18
**3.29** 140:10
**3.66** 102:5
**3.92** 154:9
**30** 224:5
**31** 115:3,20
  133:16 176:21
  179:6

---
**4**

**4** 105:23 106:2,24
  144:23 145:2,6
  147:5 151:12,13
  157:2 180:16
  244:14 245:9
  246:19
**4.00** 139:19
**4.56** 140:10
**4.9** 242:18
**4.99** 242:7,17
**4:01** 180:10
**4:16** 180:15
**4:43** 222:19
**4:52** 216:15
**40** 90:15 202:4
**400** 100:13
  102:11
**400,000** 82:12
  86:16 168:13
**414,400** 83:17,20
  84:20 85:25
**420** 3:5
**44** 64:10 70:15
  71:9 72:2,8,10
  73:3 90:16
  194:7,10 195:12
  195:16 200:21
  201:11 202:3,13
  202:14 203:20
  204:20 234:7,12
  234:13,15

**44.4** 63:22,25
  71:6 72:2 73:20
  83:12 206:17,22
**47** 245:4
**488** 1:15 3:10

---
**5**

**5** 113:25 114:3,5
  245:10
**5:13** 216:20
**5:32** 231:16
**5:42** 231:21
**5:53** 244:15
**50** 148:9 236:2
  245:5
**517,885** 146:4,12
**536** 160:8 245:18
**546,815** 109:11
**56** 203:21
**56/44** 197:6
**57** 245:8

---
**6**

**6** 121:4,6 132:11
  132:12 135:13
  157:9 226:23
  245:12
**63** 29:17,21

---
**7**

**7** 29:17,21 34:14
  89:15 126:18,20
  226:23 245:14
  246:17,19
**70** 60:6 80:10
  236:2
**750,000** 139:13
  139:14
**773,000** 144:19
**773,096** 144:14
  144:20

---
**8**

**8** 136:21,23
  144:22 147:4
  151:12 245:15
**80** 90:12,14

---
**9**

**9** 91:10,17,18
  160:4,6 162:20
  245:17 246:18
**928,847** 149:17
**95** 34:8
**97** 34:8
**993,300** 111:25