## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| YORKVILLE ADVISORS MANAGEMENT, LLC, a Delaware limited liability company; HIGHGATE HOUSE FUNDS, LTD., a Cayman Islands exempted company,<br><br>       Plaintiffs,<br><br>       vs.<br><br>ADAM S. GOTTBETTER; HH ADVISORS, LLC, a New York limited liability company; GOTTBETTER AND PARTNERS LLP, a New York limited liability partnership; JASON RIMLAND, ESQ.; TIM L. DOCKERY, ESQ., and MICHAEL CHORSKE,<br><br>       Defendants. | Civil Action No. 06-5212 (JAG) |

---

# PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF APPLICATION FOR PRELIMINARY INJUNCTION AND IN OPPOSITION TO DEFENDANTS' CROSS-MOTION TO DISMISS

---

BUDD LARNER, P.C.
Michael M. Rosenbaum, 6304
150 John F. Kennedy Parkway
Short Hills, New Jersey 07078
(973) 379-4800

Attorneys for Plaintiffs

On the brief:

    Michael M. Rosenbaum
    Richard M. DeAgazio

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...........................................................................................1

REPLY STATEMENT OF FACTS.....................................................................................2

The Charys Warrants Were Issued to and Owned by Highgate House ............................2

Defendants Assigned the Charys Warrants in Secret ......................................................2

Defendants Obtained Reissuance of the Charys Warrants Fraudulently and in Secret..................3

There Was No Agreement With Gottbetter to Issue Warrants Directly To HHA or Chorske ........5

LEGAL ARGUMENT.......................................................................................................8

POINT I:  THE CROSS-MOTION TO DISMISS AND TO COMPEL ARBITRATION
SHOULD BE DENIED BECAUSE THE ARBITRATION CLAUSE DOES NOT
REQUIRE ARBITRATION OF INJUNCTION CLAIMS ........................................................8

POINT II:  PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION
RESTORING THE STATUS QUO ANTE BY RESTORING ALL OF THE CHARYS
WARRANTS TO HIGHGATE HOUSE..............................................................................9

     A.   Plaintiffs Have a Probability of Succeeding on Their Claims That Defendants
         Converted Highgate House's Property in Violation of Their Fiduciary Duties ................9

     B.   Plaintiffs Will Suffer Immediate and Irreparable Harm If the Preliminary
         Injunction Is Not Granted ..........................................................................................11

     C.   The Court Is Authorized to Grant Preliminary Injunctive Relief Restoring
         The Charys Warrants to Highgate House ....................................................................14

POINT III:  THE COURT SHOULD EXERCISE ITS DISCRETION AND FOREGO
THE NECESSITY OF POSTING A BOND.........................................................................15

CONCLUSION................................................................................................................15

## TABLE OF AUTHORITIES

Cases

183/620 Group Joint Venture v. SPF Joint Venture, 765 S.W.2d 901 (Texas App. 1989) .......... 12

American Express Travel Related Servs. Co. v. Laughlin, 623 A.2d 854
(Pa. Super. 1993) ................................................................................................ 11, 12, 13, 14

Castillo v. Vlaminck de Castillo, 701 So.2d 1198, 1199 (Fla. App. 3rd Dist. 1997) .................... 11

Clark v. Judge, 84 N.J. Super. 35 (Ch. Div. 1964), aff'd o.b., 44 N.J. 550 (1965) ........................ 10

Coane v. American Distilling Co., 81 N.E.2d 87, 90 (N.Y. 1948) ................................................. 11

CTF Hotel Holdings, Inc. v. Marriott Intern., Inc., 381 F.3d 131 (3rd Cir. 2004) .......................... 8

Delaware River and Bay Auth. v. York Hunter Constr., Inc., 344 N.J. Super. 361
(Ch. Div. 2001) ............................................................................................................... 12

District 50, United Mine Workers of Amer. v. International Union, 412 F.2d 165
(D.C. Cir. 1969) ............................................................................................................... 14

Dominion Video Satellite, Inc. v. Echostar Satellite Corp., 269 F.3d 1149 (10th Cir. 2001) ...... 14

Dynasty Building Corp. v. Ackerman, 376 N.J. Super. 280 (App. Div. 2005) .......................... 9, 10

Erving v. Virginia Squires Basketball Club, 349 F. Supp. 716 (E.D.N.Y. 1972) ........................ 14

Fitzgerald v. Mountain Laurel Racing, Inc., 607 F.2d 589 (3rd Cir. 1979) .............................. 13, 14

Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp., 847 F.2d 100 (3d Cir. 1988) ..................... 15

GoTo.com v. Walt Disney Co., 202 F.3d 1199 (9th Cir. 2000) ................................................. 14

Hussong Dyeing Mach. Co. v. Morris, 89 A. 249 (N.J. Ch. 1913) ................................. 11, 12, 13

In re Estate of Barsanti, 773 So.2d 1206 (Fla. App. 3rd Dist. 2000) ..................................... 11, 12

In re Gifis, 156 N.J. 323 (1998) ...................................................................................... 10

In re Gold, 98 N.J. 53 (1984) ......................................................................................... 10

In re Hollendonner, 102 N.J. 21 (1985) ........................................................................... 10

In re Honig, 10 N.J. 74 (1952) ....................................................................................... 12

In re Mushroom Transp. Co., Inc., 382 F.3d 325 (3rd Cir. 2004) ......................................... 10

- ii -

In re Stein, 97 N.J. 550 (1984)........................................................................................ 9

In re Wilson, 81 N.J. 451 (1979) ............................................................................... 9, 10

Livewire Publishing, Inc. v. Best Software, Inc., 125 Fed. Appx. 428 (3d Cir. 2005)................. 15

Marchak v. Claridge Commons, Inc., 134 N.J. 275, 633 A.2d 531 (1993) .................................... 8

Marilyn Manson, Inc. v. New Jersey Sports & Exposition Auth., 971 F. Supp. 875
(D.N.J. 1997)................................................................................................................. 14

Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc., 72 F.3d 361
(3rd Cir. 1995)................................................................................................................ 13

Ortho Pharmaceutical Corp. v. Amgen, Inc., 882 F.2d 806 (3rd Cir. 1989) ........................... 8, 14

Pappan Enterprises, Inc. v. Hardee's Food Systems, Inc., 143 F.3d 800
(3rd Cir. 1998)................................................................................................................ 13

Sure-Fit Plastics, LLC v. C&M Plastics, Inc., 700 N.Y.S.2d 273
(App. Div. 3rd Dept. 1999).......................................................................................... 10, 11

United States v. Price, 688 F.2d 204 (3rd Cir. 1982)................................................................. 14

Warner Bros. v. Gittone, 110 F.2d 292 (3rd Cir. 1940)............................................................. 14

RULES

RPC 1.15 ......................................................................................................................... 9, 12

OTHER

Moore's Federal Practice, §65.20 (3rd ed. 1997) ...................................................................... 14

## PRELIMINARY STATEMENT

Discovery has proven that the Defendants' actions were even more reprehensible than first thought. Defendants' theft of Highgate House's Charys Warrants was carried out in secret and effectuated through fraudulent misrepresentations made to Charys. To make matters worse, Defendants concealed "smoking gun" evidence during this lawsuit in order to cover up their defalcation.

Gottbetter and Rimland admitted in their depositions that Defendants surreptitiously retained the original Charys Warrants in January 2006 while leading Yorkville to believe that the Warrants had been returned. What Yorkville did not know when this lawsuit was filed, but which discovery has revealed, is that on January 10, 2006 – *after* Gottbetter and HHA resigned as fund Manager – Gottbetter executed "Assignments" of the Charys Warrants. These Assignments were executed in secret, without Yorkville's knowledge or consent. Thereafter, Defendants secretly and fraudulently induced Charys to reissue the Warrants. On June 14, 2006 G&P, claiming that it was an "escrow agent" with authority to request transfer of the Charys Warrants, emailed Charys requesting reissuance of the Warrants to HHA, Chorske, Rimland, and Yorkville. Yet now Defendants claim they were *not* escrow agents at all.

Defendants intentionally withheld production of this June 14, 2006 Email despite several discovery requests for documents concerning their communications with Charys. Luckily, Plaintiffs' counsel obtained this document from Charys and confronted Defendants with it in depositions. They could not explain why they *falsely* told Charys that they were escrow agent, or why they failed to produce the key email in discovery. But the reason is simple: There *is* no explanation other than the fact that Defendants stole Highgate House's Warrants by duping Charys, and then tried to cover it up in this lawsuit. This Court cannot allow them to get away with this thievery, committed in breach of *lawyers'* fiduciary duties owed to their client.

## REPLY STATEMENT OF FACTS

### The Charys Warrants Were Issued to and Owned by Highgate House

The Charys Warrants were issued on November 17, 2005 and registered in the name of *Highgate House* in return for Highgate House's $4 million investment in Charys. The common shares underlying the Charys Warrants were also to be "registered in the name" of *Highgate House*. Verified Complaint, Exhibit B [Securities Purchase Agreement, §§ 1 and 6]. The Charys deal documents prohibit assignment of the Charys Warrants unless three conditions are first met: (1) prior written consent of Charys is obtained; and (2) an investment representation letter and (3) a legal opinion are delivered to Charys. Id., § 10(g); Id., Exhibit C, § 3.1. Defendants satisfied *none* of these conditions precedent in transferring the Charys Warrants. On the contrary, Defendants accomplished the transfer in a deceitful and fraudulent manner.

### Defendants Assigned the Charys Warrants in Secret

Gottbetter delivered a resignation notice on January 9, 2006 terminating his and HHA's engagement as co-Manager of Highgate House. Angelo Reply Aff., Exhibit B. The very next day, on January 10, 2006, Gottbetter executed "Assignments" of the Charys Warrants on behalf of Highgate House, without advising Plaintiffs that he was doing so and without delivering those Assignments to Plaintiffs.[1] Rosenbaum Reply Aff., Exhibit F [Gottbetter Dep. at 125-126, 198-200, 207, 210]; Exhibit G [Rimland Dep. at 92-95, 102, 148-149]. Gottbetter was not authorized to execute such documents when engaged by Yorkville and certainly had no authority to execute them *after his resignation*. Angelo Reply Aff., ¶10. The Assignments assigned the Charys Warrants as follows: 10% to Chorske (100,000); 44.4% of the remaining balance to HHA (399,600) and 55.6% of that balance to Yorkville (500,400). Gottbetter Aff., Exhibit D.

---

[1] The Assignments were dated "January __, 2006," but Gottbetter did not fill in the execution date, thereby calling into question the true date he signed them. Gottbetter Aff., Exhibit D.

On January 11, 2006, Gottbetter emailed Mark Angelo stating, in part, "We will of course advise you in advance of any action we propose to take during this time period" [between January 9, 2006 and January 19, 2006, the "effective" date of his termination]. Two days later, on January 13, 2006, Gottbetter sent Angelo a comprehensive 7-page letter, purporting to summarize the status of *all* outstanding Highgate House portfolio issues, including Charys. Angelo Reply Aff., Exhibit D. That letter similarly stated: "Without your written permission, we will not perform any material actions or omit to take any actions that would have a material effect on Highgate or Highgate LLC outside the normal course of business except as set forth in this letter." Despite these promises, nowhere in the January 11, 2006 email or the January 13, 2006 letter – or in any other communication prior to the litigation – did Gottbetter mention that he had assigned the Charys Warrants. Gottbetter Dep. at 157-160; Rimland Dep. at 148-152.

Moreover, despite telling Angelo in his January 13, 2006 letter that G&P would be returning "a full set of originally executed documents" for all Highgate House transactions on which G&P had worked, Defendants secretly retained the original Charys Warrants without advising Plaintiffs. Gottbetter Dep. at 157-159; Rimland Dep. at 81-85.

<u>Defendants Obtained Reissuance of the Charys Warrants Fraudulently and in Secret</u>

Defendants' underhanded tactics did not stop there. Discovery has revealed that in June 2006 Defendants secretly, and through fraudulent misrepresentations, induced Charys to reissue the Charys Warrants to HHA, Chorske, Rimland, and Highgate House.

On June 9, 2006, Rimland forwarded drafts of the 16 Reissued Warrants to Charys' CFO. Rosenbaum Reply Aff., Exhibit H. Then, on June 14, 2006, Rimland (on behalf of G&P) emailed Charys' outside counsel and CFO in an effort to induce Charys to reissue the Charys Warrants ("the June 14, 2006 Email"). Rimland Dep. at 37-46. In the June 14, 2006 Email – *which*

*Defendants conspicuously did not produce in discovery* – Rimland stated that G&P was holding the Charys Warrants in escrow and had the authority to have them transferred:

> Attached are the original warrants issued in the November 16, 2005 transaction with Highgate House Funds. As Michael [Chorske] discussed with Billy Ray [Charys' CEO], ***G&P as escrow agent of the warrants requests that you subdivide the warrants pursuant to the attached chart***. The number of warrants has not changed and the terms of the warrants have not changed. The only changes that were made were to the denominations and the names. If you would like a blackline, please let us know. If there is another way you would like to accomplish the transfer, also let us know. ***Once we receive the new warrants, we will send back the warrants that we are holding in escrow***. Thanks.

Rosenbaum Reply Aff., Exhibit E (emphasis added). Defendants did not advise Plaintiffs of these communications. Gottbetter Dep. at 129-131; Rimland Dep. at 36-37, 132-136.

The June 14, 2006 Email is remarkable in two respects. First, Rimland told Charys that "G&P" was serving "as escrow agent of the warrants." Yet Defendants now admit that G&P *never* served as "escrow agent" of the Charys Warrants. Gottbetter Dep. at 145-146, 149, 158; Rimland Dep. at 51-52, 62. Thus, Defendants admit that the basis upon which they induced Charys to reissue the Warrants – the assertion that G&P was an "escrow agent" authorized to request reissuance of the Warrants – was ***KNOWINGLY FALSE***. Rimland had no explanation for this false statement. Rimland Dep. at 70 ("I don't know why I said it").

Second, Defendants' opposition papers assert that the original Charys Warrants were held in "HHA's offices." Gottbetter Aff., ¶ 57; Rimland Aff., ¶ 11. However, the June 14, 2006 Email makes clear that it was G&P, *not* HHA, which held the original Charys Warrants. Not only did the Email forward the original Charys Warrants from G&P to Charys, but Rimland also stated: "Once we receive the new warrants, we will send back the warrants *that we are holding in escrow.*" Thus, Defendants' assertions that HHA was holding the Charys Warrants have also proven to be ***KNOWINGLY FALSE***.

- 4 -

Charys apparently did not recognize the alleged reissuance of the Warrants because on October 17, 2006, it filed a Registration Statement with the SEC in which Highgate House, and not defendants, was listed as the registered owner of all 1,000,000 Charys Warrants. Verified Complaint, Exhibit E.

### There Was No Agreement With Gottbetter to Issue Warrants Directly to HHA or Chorske

The centerpiece of Defendants' opposition is Gottbetter's claim that in June 2005 – five months before the Charys Transaction even closed – Angelo orally agreed that warrants "could" be issued directly to HHA as fees in connection with future Highgate House investments. Gottbetter Aff., ¶¶ 13-22. This assertion is false, and the evidence proves that it is false:

➢ The November 1, 2004 Sub-Manager Agreement states that "all fees and compensation payable in connection with an Investment or related to the Funds *shall be paid exclusively to [Yorkville],*" and only gives HHA a right to receive 40% of Yorkville's "Net Profits." Verified Complaint, Exhibit A, § 2(a). Nothing in that Agreement gives HHA the right to receive warrants directly as compensation. Angelo Reply Aff., ¶¶ 36-40.

➢ Gottbetter and Angelo had discussions in or about June 2005 in which several issues were discussed, including increasing Gottbetter's profit percentage to 44.4%. However, they neither discussed nor agreed that warrants could be issued directly to HHA. Gottbetter's own June 1, 2005 memo, which memorialized the conversations, proves this. Gottbetter Aff., Exhibit A. That memo only referred to the agreed-upon increase in profit percentage and other unrelated matters, but did not mention any agreement that warrants could be issued directly to HHA. The reason Gottbetter did not memorialize such an agreement – then or ever – is that he and Angelo never *made* such an agreement. Angelo Reply Aff., ¶¶ 26-30; Gottbetter Dep. at 94-97.

➢ All of the warrants issued during HHA's tenure as Co-Manager – including those issued after the supposed June 2005 oral agreement – were issued in the name of Highgate House, *not in the names of HHA or Chorske.* Angelo Reply Aff., ¶ 34 and Exhibits E-J thereto.

➢ Despite Gottbetter knowing that all portfolio decisions required Angelo's approval (Gottbetter Aff., ¶ 6), he admitted that he did not seek or obtain Angelo's explicit approval for the transfer of the Charys Warrants. Moreover, there is no writing that would evidence any agreement for HHA to receive any of the Charys Warrants directly in its name. Angelo Reply Aff., ¶¶ 2(d), 5, 10, 26-30; Gottbetter Dep. at 103-104, 170-172.

➢ The Defendants assigned the Charys Warrants in secret; lied to Charys to induce the reissuance of the Warrants by claiming to be "escrow agent"; and then concealed documents in discovery relating to their June 2006 communications with Charys. If there had been an agreement for HHA and Chorske to receive Charys Warrants, there would have been no reason for the Defendants to act in secret, lie, and cover up their actions while every other detail of HHA's departure was discussed openly (as illustrated by Gottbetter's January 13, 2006 letter).

➢ The Defendants have made no less than three different calculations of the reissuance of the Charys Warrants – further evidence of wrongdoing. In the Assignments, Chorske was assigned a total of 100,000 (or 10%) of the Charys Warrants. In the June 14, 2006 Email and Chart, Chorske was given a total of 135,200 (or 13.52%) of the Charys Warrants. In his October 26, 2006 letter, Gottbetter advised Yorkville that Chorske had received 200,000 (or 20%) of the Charys Warrants. Angelo Reply Aff., ¶¶ 21-24. Defendants could not explain these discrepancies. Gottbetter Dep. at 224-225, 229-235; Rimland Dep. at 86-92, 105-108, 113-129.

➢ In affidavits, Yorkville bankers, managers, and partners state that individuals never receive warrants in their own names. Rather, the "equity" portion of fees is received only after

warrants have been "monetized," i.e., they receive a percentage of the warrant *proceeds* after the underlying stock is sold. See Affidavit Binder; Angelo Reply Aff., ¶¶ 31-35.

➢ The Charys Warrants were carried on the books of Highgate House as an asset. Although the initial warrant *value* was priced at zero, this was only because Yorkville has historically been conservative in valuing warrants. But as a result of the 2005 year end audit, Highgate House assigned fair market values to the Charys Warrants as of 12/31/05. See Schinik Reply Aff., ¶¶ 2-7 and Exhibits A and B thereto.

➢ The Oxford/Uluru transaction does not prove a course of dealing. That transaction was unique and complex because it involved a co-investor, Prentice Capital, which invested $10 million in Oxford/Uluru. Highgate House invested only $3 million, for which it was entitled to and received 1,166,667 warrants. It was the warrants to which *Prentice* was entitled (and not the warrants issued to Highgate House) that were the subject of assignment to HHA, and that was only done because Gottbetter referred the deal to Prentice and thus became entitled to a banker's fee *from Prentice.* Highgate House was entitled to and received 1,166,667 Oxford/Uluru warrants, which it still currently holds. Angelo Aff., ¶¶ 43-51.

- 7 -

## LEGAL ARGUMENT

### POINT I

**THE CROSS-MOTION TO DISMISS AND TO COMPEL ARBITRATION SHOULD BE DENIED BECAUSE THE ARBITRATION CLAUSE DOES NOT REQUIRE ARBITRATION OF INJUNCTION CLAIMS.**

Defendants have cross-moved to dismiss this action and to compel arbitration on the basis of the arbitration clause in the Sub-Manager Agreement ("Section 10"). Def. Br. at 5; see Verified Complaint, Exhibit A, § 10. This motion is without merit and should be denied.

First, Highgate House is not even a party to the Sub-Manager Agreement and is thus not bound by the arbitration clause. Second, even if Highgate House were bound by Section 10, the contract here *expressly* permits the parties to file injunction claims in court. Although Section 10 states that claims "shall be settled by arbitration," it also states: "For injunctive relief, it is agreed that any court of competent jurisdiction may also entertain an application by either party" – thereby giving the Court concurrent jurisdiction over claims for injunctive relief. See CTF Hotel Holdings, Inc. v. Marriott Intern., Inc., 381 F.3d 131, 137 (3rd Cir. 2004) (courts are bound by language of arbitration provision); Marchak v. Claridge Commons, Inc., 134 N.J. 275, 633 A.2d 531 (1993) (arbitration clause did not preclude lawsuit where it gave plaintiff *option* to choose between arbitration and litigation). Finally, it is well settled that "a district court has the authority to grant injunctive relief in an arbitrable dispute, provided that the traditional prerequisites for such relief are satisfied." Ortho Pharmaceutical Corp. v. Amgen, Inc., 882 F.2d 806, 812 (3rd Cir. 1989).

In sum, this Court has been conferred both contractual and legal authority to grant preliminary injunctive relief, and therefore Defendants' cross-motion should be denied.

- 8 -

## POINT II

### PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION RESTORING THE STATUS QUO ANTE BY RESTORING ALL OF THE CHARYS WARRANTS TO HIGHGATE HOUSE.

Plaintiffs are entitled to a preliminary injunction not only enjoining Defendants' further disposition of the Reissued Warrants, but also *restoring* the 1,000,000 Charys Warrants to Highgate House's sole name and ownership.

### A.   Plaintiffs Have a Probability of Succeeding on Their Claims That Defendants Converted Highgate House's Property in Violation of Their Fiduciary Duties.

The undisputed facts make clear that the Lawyer Defendants converted their client's (or former client's) property and breached their fiduciary duties in secretly transferring that property to themselves and others.

Discovery has confirmed that G&P surreptitiously retained possession of the original Charys Warrants in January 2006, while leading Plaintiffs to believe that all original documents had been returned.[2]   The Charys Warrants constituted client property and should have been returned in January 2006.  G&P's secret retention of that client property violated attorney ethics rules.  See RPC 1.15; In re Stein, 97 N.J. 550, 564 (1984) (attorney violated ethics rules "by withdrawing the funds from the client's trust account and not giving the client prior notice").

G&P's retention of the Charys Warrants created a trust relationship.  Whenever a lawyer comes into "possession" of client property – whether that possession is authorized or not – that lawyer has assumed a duty to hold the property in trust for his client's exclusive benefit and separate from his own property.  See RPC 1.15(a) and (b).  This rule applies even when the lawyer does not represent the client.  See Dynasty Building Corp. v. Ackerman, 376 N.J. Super. 280, 287 (App. Div. 2005) (fiduciary relationship existed between lawyer who held certain

---

[2] Even if the Charys Warrants were physically held in HHA's offices as claimed by Defendants, the only way the Charys Warrants could have gotten there is if *G&P* improperly gave them to Chorske.

- 9 -

moneys and individuals who proved ownership thereof "even though he did not represent them"). A lawyer's misappropriation of trust funds or property constitutes both a crime and an ethics violation that subjects the lawyer to disbarment. See In re Wilson, 81 N.J. 451 (1979).

Here, the Lawyer Defendants' surreptitious assignment of the Charys Warrants in January 2006, and their secret demand to Charys in June 2006 to transfer the Charys Warrants – on the basis of misrepresentations that G&P was authorized as the "escrow agent" to make such a demand – constitute conversion, breach of fiduciary duty, and misappropriation of client trust funds or property. Id. at 454; In re Gifis, 156 N.J. 323, 359 (1998) (lawyer's use of client's funds without consent constituted misappropriation); In re Gold, 98 N.J. 53 (1984) (same); see also Dynasty Building, 376 N.J. Super. at 288 ("An attorney, as any fiduciary, owes a high duty in the handling of trust funds"); In re Mushroom Transp. Co., Inc., 382 F.3d 325, 341 (3rd Cir. 2004) (lawyer committed abuse of "fiduciary, lawyer-client relationship" by misappropriating client's escrow funds). Even if G&P was an "escrow agent" of the Charys Warrants as they falsely claimed to Charys, G&P would *still* owe a duty to not transfer the Warrants to themselves without notice to and consent of Yorkville. See In re Hollendonner, 102 N.J. 21, 22 (1985).

Gottbetter and his cohorts defend these reprehensible actions by claiming that they were contractually entitled – based on an alleged June 2005 oral agreement – to receive a portion of the Charys Warrants individually. However, as set forth in the Statement of Facts, the evidence *overwhelmingly* refutes this claim. But even assuming *arguendo* that there was such an agreement, it would still not give Defendants the right to use self-help by simply *taking* the Warrants to satisfy that claim. See Clark v. Judge, 84 N.J. Super. 35, 59 (Ch. Div. 1964), aff'd o.b., 44 N.J. 550 (1965) (even if trustee honestly believed he was owner of disputed trust funds, transfer was still void because trustee does not have the power to borrow money from trust assets unless such power is conferred by trust instrument); Sure-Fit Plastics, LLC v. C&M Plastics,

- 10 -

Inc., 700 N.Y.S.2d 273, 274 (App. Div. 3rd Dept. 1999) (affirming preliminary injunction requiring defendants to return property they took from plaintiff under claim of ownership, because defendants' "use of self-help" was improper). The Charys Warrants were *issued in the name of Highgate House*. And nothing can change that one simple truth. As such, Defendants had no right to surreptitiously convert the Charys Warrants to their own names.

**B.      Plaintiffs Will Suffer Immediate and Irreparable Harm If the Preliminary Injunction is Not Granted.**

Defendants argue that the preliminary injunction should be denied because Plaintiffs cannot prove irreparable harm. Def. Br. at 8-12. This assertion is without merit.

A fiduciary is not permitted to steal property held in trust and then turn around and prevent the return of that property by arguing that the beneficiary is unable to prove irreparable harm. See Coane v. American Distilling Co., 81 N.E.2d 87, 90 (N.Y. 1948) ("Delinquent fiduciaries may not insist upon being left in possession of property wrongfully obtained on any theory that they could be compelled to pay damages by an action at law"). Under traditional trust law, a fiduciary's depletion of *trust property* gives the beneficiary a right to a preliminary injunction. Under this doctrine, the courts hold either that a strict showing of irreparable harm is unnecessary or that irreparable harm is automatically established by the mere misappropriation of trust funds or property. See Hussong Dyeing Mach. Co. v. Morris, 89 A. 249, 250 (N.J. Ch. 1913) ("Where, as here, a trust is involved and the suit is for the purpose of preserving for the benefit of the *cestui que trust* the existence of the property rights,… it is no answer…that adequate money damages might be recovered against the defendant for a breach of his trust"); accord In re Estate of Barsanti, 773 So.2d 1206, 1208 (Fla. App. 3rd Dist. 2000); Castillo v. Vlaminck de Castillo, 701 So.2d 1198, 1199 (Fla. App. 3rd Dist. 1997); American Express Travel

Related Servs. Co. v. Laughlin, 623 A.2d 854, 856-57 (Pa. Super. 1993); 183/620 Group Joint Venture v. SPF Joint Venture, 765 S.W.2d 901, 903-04 (Texas App. 1989).

Thus, in cases where a trustee has acquired trust funds or property rights in breach of his fiduciary duties, the court can enter a preliminary injunction impounding that property for the plaintiff-beneficiary's benefit. See Hussong Dyeing, 89 A. at 250. For example, in Hussong Dyeing, the Court entered a preliminary injunction not only enjoining the disposition of the wrongfully-acquired property, but also mandating that defendant reveal patent information to plaintiff so that plaintiff could promptly assert its rights to a patent wrongfully obtained. Id. And in Delaware River and Bay Auth. v. York Hunter Constr., Inc., 344 N.J. Super. 361 (Ch. Div. 2001), the Court enjoined the defendant's dissipation of its own assets after it had misappropriated trust funds. "Equity has always been charged with the preservation of the status quo and the management of assets committed to the care of a fiduciary, and the fact that money is involved should not diminish that traditional jurisdiction." Id. at 369. The Court noted that the action was "the substantive equivalent of an action seeking to compel the defendant to re-fund a trust improperly depleted," an action "which is routinely committed to the equity courts" and which is "an appropriate subject for preliminary relief."[3] Id. at 369-70.

Other courts have entered preliminary injunctive relief in similar circumstances to remedy a theft or improper dissipation of trust property. For instance, in Estate of Barsanti, the administrator of a decedent's estate sought a preliminary injunction requiring the defendant to return stock certificates owned by the decedent but taken by the defendant, who claimed a gift. The Court held that "the Estate is subject to immediate and irreparable harm if [defendant] is

---

[3] Defendants attempt to distinguish Delaware River on the basis that the trust there was created by statute. Def. Br. at 9. This distinction is immaterial. The trust here was one created by operation of law under the Rules of Professional Conduct, see RPC 1.15, and under the indisputable tenet that a lawyer owes the utmost fiduciary duty toward his client, see In re Honig, 10 N.J. 74, 78 (1952). Whether the trust is created by statute, rule, or the common law, it is still a trust and therefore subject to the equitable protection described in the cases cited herein.

recognized as the rightful owner of the bearer certificates *because this could subject the assets of the Estate to dissipation*." Estate of Barsanti, 773 So.2d at 1208 (emphasis added).  Similarly, in American Express, a seller of money orders sought a preliminary injunction against its agent to prevent dissipation of trust funds and for remission of trust proceeds to the plaintiff.  The Court held that since the relationship was "that of trustee,...the existence of a remedy at law is irrelevant" because "a trust beneficiary has an option to pursue either equitable or legal relief in an action against a trustee."  American Express, 623 A.2d at 856; accord Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc., 72 F.3d 361, 367 (3rd Cir. 1995).

Here, the Court simply cannot countenance a lawyer retaining possession and ownership of property stolen from a client.  As held in the cases above, preliminary injunctive relief is justified to restore property (the Charys Warrants) taken in violation of a lawyer's fiduciary duty.

In any event, Plaintiffs have proven immediate and irreparable harm.  Unless the Charys Warrants are restored to Highgate House's portfolio, Highgate House will be deprived of a unique and irreplaceable asset because there are no other Charys warrants available on the open market, and it therefore cannot replace the nearly 500,000 Charys Warrants stolen from it.  This will injure the Fund's investors – *who are innocent third parties* – because their interests in the Fund will be reduced in value.  Moreover, the investors will be deprived of the benefit of Yorkville's experience and acumen in making investment decisions as to the right time to sell the warrant stock.  Instead, Defendants will be enabled to commit "front running" by trading ahead of Highgate House.  Angelo Aff., ¶¶ 32, 52-53.  Highgate House's loss of reputation, image, and goodwill in the view of its own investors and the public that would flow from these activities constitutes sufficient irreparable harm justifying a preliminary injunction.  See Pappan Enterprises, Inc. v. Hardee's Food Systems, Inc., 143 F.3d 800, 805 (3rd Cir. 1998); Fitzgerald v.

Mountain Laurel Racing, Inc., 607 F.2d 589, 601 (3rd Cir. 1979); Marilyn Manson, Inc. v. New Jersey Sports & Exposition Auth., 971 F. Supp. 875, 890 (D.N.J. 1997).

> **C.   The Court is Authorized to Grant Preliminary Injunctive Relief Restoring the Charys Warrants to Highgate House.**

Defendants argue that any preliminary injunction issued here must only restrict the sale or transfer of the Charys Warrants and should not direct Defendants to return the Charys Warrants to Highgate House, because that would constitute "final relief" or "the ultimate resolution" instead of the mere preservation of the status quo. Def. Br. at 28-29. This argument is incorrect because it misperceives the notion of "status quo."

The term "status quo" refers not simply to the situation existing immediately before the filing of the lawsuit, but rather to the status that existed before the wrongful acts complained of were committed, see American Express, 623 A.2d at 856, i.e., the status that existed "before the last uncontested status that preceded the parties' controversy." 13 James Wm. Moore et al., Moore's Federal Practice § 65.20 (3rd ed. 1997), citing GoTo.com v. Walt Disney Co., 202 F.3d 1199, 1210 (9th Cir. 2000); accord Warner Bros. v. Gittone, 110 F.2d 292, 293 (3rd Cir. 1940); Dominion Video Satellite, Inc. v. Echostar Satellite Corp., 269 F.3d 1149, 1155 (10th Cir. 2001); District 50, United Mine Workers of Amer. v. International Union, 412 F.2d 165, 168 (D.C. Cir. 1969); Erving v. Virginia Squires Basketball Club, 349 F. Supp. 716, 719-20 (E.D.N.Y. 1972). Thus, "if the existing 'status quo' is currently causing one of the parties irreparable injury..., then it is necessary to alter the situation to prevent the injury." Ortho, 882 F.2d at 814; see also United States v. Price, 688 F.2d 204, 212 (3rd Cir. 1982).

Here, it is appropriate to enter a preliminary injunction returning the parties to the status quo that existed before Defendants stole the Charys Warrants, since that was the "the last uncontested status that preceded the parties' controversy." See Moore's Fed. Practice, § 65.20.

Thus, the Court should restore the 1,000,000 Charys Warrants to Highgate House as record owner. This would not be the final resolution of the parties' dispute because Defendants will still have the ability to make a claim in the arbitration for a percentage of the Charys Warrants and/or Warrant proceeds. Without this remedy, the Court would be legitimizing an egregious theft of trust property by lawyers.

**POINT III**

**THE COURT SHOULD EXERCISE ITS DISCRETION AND
FOREGO THE NECESSITY OF POSTING A BOND.**

Defendants argue that Plaintiffs should be required to post a bond if the Court grants the injunction. Def. Br. at 29-30. However, this Court need not require a bond here because Defendants will not suffer any costs or damages if the injunction is granted, because they will still have the right to make a claim in arbitration for a portion of the Warrants or proceeds.[4] See Livewire Publishing, Inc. v. Best Software, Inc., 125 Fed. Appx. 428 (3rd Cir. 2005), *citing* Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp., 847 F.2d 100, 103 (3rd Cir. 1988).

**CONCLUSION**

For the foregoing reasons, a preliminary injunction should be entered as requested in the Order to Show Cause.

Respectfully submitted,

**BUDD LARNER, P.C.**
Attorneys for Plaintiffs

BY: _____
      MICHAEL M. ROSENBAUM (MR-6304)

DATED:  January 8, 2007

---

[4] Alternatively, Plaintiffs respectfully suggest that the Court should exercise its discretion and set the bond for a low amount. Given the equities of the situation – in which Plaintiffs have been forced to sue their former lawyer/fiduciaries to restore stolen property – it would be an injustice to require Plaintiffs to post a substantial bond.

- 15 -