# EXHIBIT F

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL ACTION NO. 06-5212


YORKVILLE ADVISORS MANAGEMENT, LLC,
A DELAWARE LIMITED LIABILITY COMPANY,
HIGHGATE HOUSE FUNDS, LTD, A CAYMAN
ISLANDS EXEMPTED COMPANY,

     Plaintiffs,

     vs.

ADAM S. GOTTBETTER, HH
ADVISORS, LLC, A NEW YORK
LIMITED LIABILITY COMPANY,
GOTTBETTER AND PARTNERS, LLP, A
NEW YORK LIMITED LIABILITY
PARTNERSHIP, JASON RIMLAND,
ESQ., TIM L. DOCKERY, ESQ. AND
MICHAEL CHORSKE,

     Defendants.
----------------------------------

       VIDEOTAPED
       DEPOSITION OF:

       ADAM S. GOTTBETTER


     T R A N S C R I P T of the stenographic notes of the proceedings, taken in the above-entitled matter, by and before SHAUNNA H. MORAN, a Certified Shorthand Reporter, License No. X100213700, Registered Professional Reporter, and Notary Public of the State of New Jersey, held at the offices of BUDD LARNER, P.C., 150 JFK Parkway, Short Hills, New Jersey, on Thursday, December 21, 2006, commencing at 10:14 A.M.

Page 2

APPEARANCES:

BUDD LARNER, P.C.
BY: MICHAEL M. ROSENBAUM, ESQ.
AND: RICHARD DeAGAZIO, ESQ.
150 JFK Parkway
Short Hills, New Jersey 07078
(973) 379-4800
Attorneys for Plaintiff

VENTURINI & ASSOCIATES, ESQS.
BY: AUGUST C. VENTURINI, ESQ.
230 Park Avenue
New York, New York 10169
(212) 826-6800
Attorneys for Defendant

ALSO PRESENT:
Stephen Rivera, Videographer
Jason M. Rimland, Gottbetter & Associates
Troy J. Rillo, Esq., Cornell Capital Partners

Page 4

EXHIBITS

| No. | | Ident. |
|---|---|---|
| P-28 | Assignment of Charys warrants | 4 |
| P-30 | 6/14/06 e-mail to Charys | 4 |
| P-42 | Mr. Rimland's affidavit | 4 |
| P-44 | Interrogatories | 4 |
| P-45 | Answers to Interrogatories | 4 |
| P-47, A, B, C | 11/17/06 Warrants | 249 |
| P-48 | 12/31/05 Balance sheet | 289 |

Page 3

INDEX

WITNESS          DIRECT   CROSS   REDIRECT   RECROSS

MR. GOTTBETTER:

By Mr. Rosenbaum  4

EXHIBITS

| No. | | Ident. |
|---|---|---|
| P-1 | Document Demand | 4 |
| P-2 | November 1, 2004 Document | 4 |
| P-3 | Termination Letter to Mr. Angelo | 4 |
| P-4 | January 11th e-mail to Mr. Angelo | 4 |
| P-5 | January 13th fax to Mr. Angelo | 4 |
| P-7 | E-mail from Mr. Rimland | 4 |
| P-14 | Exhibit bates stamped P01483 | 4 |
| P-16 | Charys closing binder | 4 |
| P-22 | 5/19/06 e-mail | 4 |
| P-26 | 10/26/06 Letter to Mr. Rillo | 4 |

Page 5

(All Documents marked for identification by Mr. Rosenbaum prior to the commencement of the deposition.)

MR. RIVERA: My name is Stephen Rivera of Nationwide Video Productions located in Roseland, New Jersey. The date today is December 21st, 2006 and the time is approximately 10:14 a.m. This deposition is being held in the office of Budd Larner located at 150 John F. Kennedy Parkway, Short Hills, New Jersey.

The caption of this case is Yorkville Advisors Management, LLC versus Adam S. Gottbetter, et al. in the United States District Court for the District of New Jersey, Civil Action Number 06-5212. The name of the witness today is Adam Gottbetter and at this time the attorneys will identify themselves and the parties they represent. After which our court reporter, Shaunna Moran, will swear in the witness and we can proceed.

MR. ROSENBAUM: Good morning. My name is Michael Rosenbaum and I represent the plaintiffs.

MR. VENTURINI: My name is August Venturini. I represent the defendants.

ADAM GOTTBETTER, Gottbetter & Partners, 488 Madison Avenue, 12th Floor, New York, New York, having first

Page 6

been duly sworn by the Notary, testifies as follows:

DIRECT EXAMINATION BY MR. ROSENBAUM:

Q. Good morning, Mr. Gottbetter. You have to answer verbally to any question I ask you. The court reporter can't take down nods of the head or even uh-huhs. So, if it's a yes, say yes. If it's a no, say no and -- or whatever other explanation you wish to give you're certainly free to give, clear?

A. I understand.

Q. Have you ever had your deposition taken before?

A. Yes, I have.

Q. All right. You know basically the rules are that you answer the questions that I ask subject to any objections your attorney has. If you answer a question we'll presume you understand the question. If you don't understand a question you'll tell me that, okay?

A. Yes, I will.

Q. Okay. If you answer the question we'll presume you understand it. If you don't know an answer tell me you don't know. Just as important for us to know what you know or what you don't know. We don't want you to guess or speculate. Unless I

Page 7

ask you for your best recollection or best opinion, clear?

A. Yes.

Q. Okay. You're an attorney?

A. Yes, sir.

Q. What states do you practice in?

A. I practice in the State of New York. I'm also admitted in the State of Connecticut.

Q. Okay. Where did you go to law school?

A. Benjamin Cardozo School of Law in New York.

Q. When did you graduate?

A. 1992.

Q. Before you went to law school obviously you went to college?

A. Yes, sir.

Q. Where?

A. Lehigh University in Bethlehem, Pennsylvania.

Q. Okay. After you graduated law school in 1992 can you trace your legal career for me.

A. Yes. I worked -- I started at a firm called Kaplan and Gottbetter in February 1993. It then became Kaplan, Gottbetter and Levnson in the

Page 8

end of 1996. I split the firm up in mid 2003 and Gottbetter and Partners is the firm that I own today.

Q. Gottbetter and -- and Goldberg was it was it you said? What was the first name you had --

A. Kaplan, K-A-P-L-A-N.

Q. I'm sorry, Kaplan.

A. And Gottbetter. Kaplan, Gottbetter and Levnson, L-E-V-N-S-O-N. And currently Gottbetter and Partners, same name.

Q. The -- the Kaplan Gottbetter Firm that you started in 2000 -- 2000 -- I'm sorry, 1993 I think you said?

A. Yes, sir.

Q. When did that dissolve?

A. It didn't. We added a partner, Levnson, as I said, at the end of '96. So it became Kaplan, Gottbetter and Levnson.

Q. Well, then you became Gottbetter and Associates in 2003?

A. No. In 2003 I broke the firm in half and Kaplan and Levnson stayed and I took Gottbetter and Partners on -- on my own.

Q. Okay. Before you -- before you broke the firm in half how many lawyers did Kaplan,

Page 9

Gottbetter and Levnson have?

A. I have to count so give me a second. About 11 or 12.

Q. And what type of work generally did that -- did that law firm do?

A. That law firm did corporate securities and finance work, as well as litigation and longshore property.

Q. Okay. And did you -- did you work also in that -- in the -- in the securities field for the Kaplan Gottbetter Law Firm?

A. Yes, sir.

Q. Did you litigate?

A. No, sir.

Q. All right. So, is it fair to say that you -- that you specialize in securities type law when you were with -- when you were with Kaplan Gottbetter?

A. Yes, sir.

Q. Okay. And you broke the firm up you said in 2003 became Gottbetter and Partners?

A. Yes.

Q. And which lawyers went with you to that firm?

A. The lawyers at the time?

Page 10

Q. Yeah.

A. Robert Davidson, who is now deceased, Jason Rimland, R-I-M-L-A-N-D, Scott Rapfogel.

Q. I'm sorry?

A. Scott Rapfogel, R-A-P-F-O-G-E-L.

Q. Okay.

A. Give me a minute to think. Who am I missing?

Q. Who was the first person you named that you said that was deceased?

A. Robert Davidson, now deceased. D-A-V-I-D-S-O-N. I know I'm missing somebody. I can't remember the others. There's a couple more I just can't remember.

Q. All right. And how many lawyers now are with Gottbetter and Partners?

A. We are six lawyers and two paralegals.

Q. And who are the six lawyers?

A. Adam Gottbetter, Paul Gottbetter.

Q. Who is Paul Gottbetter?

A. He's my father.

Q. Okay. He's a lawyer obviously?

A. He is a lawyer, sir.

Q. Okay.

Page 11

A. Jason Rimland, Scott Rapfogel, Ken Goodwin, G-O-O-D-W-I-N, Timothy Dockery, D-O-C-K-E-R-Y.

Q. That's six.

A. Yes, sir.

Q. Are all six of you partners?

A. No.

Q. Who are the partners of the firm?

A. Officially the partners of the firm today are myself and my father, Paul.

Q. Jason Rimland, what's his relationship with the firm?

A. He's an associate and about to be partner in the firm.

Q. Effective when?

A. January 1st.

Q. Okay. He was with Kaplan, Gottbetter and Levnson also?

A. Yes, sir.

Q. Was he -- what was his relationship to that firm, associate or partner?

A. An associate.

Q. Okay. How old is Mr. Rimland?

A. I don't know, you'd have to ask Mr. Rimland, but I would guess, if you want me to

Page 12

guess, in his 30s. I don't know for sure.

Q. How did you meet Mr. Rimland?

A. I don't remember. Most of the attorneys we -- we hire are from placement agency firms.

Q. What type of work does Gottbetter and Partners do?

A. We do corporate finance, securities and securities compliance work.

Q. And what type of work do you do on behalf of Gottbetter and Partners?

A. Do those same types of things.

Q. Securities?

A. Yes, sir.

Q. Finance?

A. Yes, sir.

Q. You don't litigate?

A. Never have.

Q. Okay. What type of matters have you had your deposition taken in?

A. Fee disputes.

Q. With clients?

A. Yes, with a client we were a plaintiff in one action and then I've also been deposed by the SEC.

Page 13

Q. And what matter?

A. I'm sorry?

Q. In what -- in what matter?

MR. VENTURINI: All right let me just note an objection to the extent you can answer, you can answer, but normally SEC matters are private and they normally ask you not to talk about it. So, if you can talk about it you can answer, but if you can't then don't.

THE WITNESS: I understand.

A. Three SEC matters involving clients of mine where I was a witness.

Q. They weren't -- were they enforcement proceedings that you were involved in as a party or just as a witness?

A. As I just said, as a witness.

Q. Okay. All right. In connection with this litigation what role did you play in gathering documents responsive to our document requests?

A. I delegated that responsibility.

Q. To who?

A. Well, Jason Rimland, August Venturini, he's my counsel, and then we hired a young lawyer to cull through the hundreds and thousands of e-mails and documents to help put it

4 (Pages 10 to 13)

Page 14

together.

Q. Okay. Let me show you our document demand. Off the record.

(Discussion held off the record.)

Q. P-1 is our document demand. Have you seen that before?

A. Yes, sir.

Q. All right. Did you go through this prior to looking or -- or delegating the responsibility to -- to find responsive documents?

A. I discussed this with my counsel.

Q. Okay. Did you discuss it with Mr. Rimland?

A. Not specifically.

Q. Well, you said you delegated it to Jason Rimland and this other person, the responsibility to go through the e-mails and that sort of thing?

A. Well, I discussed -- the question you asked me if I discussed this document with Mr. Rimland. The answer is, no. I discussed this document with my counsel and then in a general context I delegated the responsibility to locate the documents to Mr. Rimland and we hired an outside attorney to come in and cull through the documents.

Page 15

Q. Did you give this document to Mr. Rimland?

A. No, I did not.

Q. Well, how did he know what to look for?

A. Well, Mr. Rimland is also a defendant in this case and is also communicating with Mr. Venturini.

Q. So you think that perhaps Mr. Rimland got a copy of this document from Mr. Venturini?

MR. VENTURINI: Objection to the form. You can answer.

Q. You can answer.

A. To the best of my knowledge.

Q. Okay. Did you ever discuss the work that Mr. Rimland was doing to find documents responsive to this request?

MR. VENTURINI: Sorry, with who?

MR. ROSENBAUM: Mr. Rimland.

A. Other than getting updates from Mr. Rimland or Mr. Venturini that the document production was ongoing, it would be more of a general comment like that.

Q. Did you -- did you see that -- well, who -- what was the name of the person that you

Page 16

hired to -- to go -- to go through the documents, the e-mails that -- you said you hired a lawyer.

A. Yes, sir. His name -- his name was Todd.

Q. Todd. Does he have a last name?

A. I'm sure that he does, but I don't know it.

Q. Does he still work for you?

A. We hired him on a temporary basis for this project. So, it's as needed. I don't know if he's still -- I saw him most recently maybe last week in the office.

Q. Okay. So, he was working for you on this project as of last week?

A. Yes.

Q. Looking for documents?

A. Looking through documents, looking through e-mails, whatever he was being directed by Mr. Rimland and Mr. Venturini to search for.

Q. Okay. When -- his name is Todd you said?

A. Yes, sir.

Q. Todd. When Todd would come up with documents that he thought perhaps were responsive to some of the document demands would he show them to

Page 17

you?

MR. VENTURINI: Objection to form. You can answer if you know.

A. No, I didn't really deal with Todd other --

Q. Sorry.

A. It's okay. My interactions with Todd were somewhat limited. He was in the office, I saw him. I knew what he was doing generally. I would say, how's it going? He'd say, it's going pretty good.

Q. Would you -- would you interact more with Jason Rimland with respect to documents?

MR. VENTURINI: Objection to form. You can answer.

A. Yes. As I said before, I would get updates from Jason that we found documents, we're looking through documents, we're sending them to Auggie, Auggie's reviewing them. It seemed to be -- seemed to be going pretty well.

Q. Did you -- were documents given to you by either Todd or Jason Rimland before they were given over to Mr. Venturini?

A. No.

Q. Did you --

5 (Pages 14 to 17)

Page 18

A.    Not that I'm aware of, no.

Q.    Did you look at any of the documents that were produced before they were given over to Mr. Venturini?

A.    No.

MR. VENTURINI: Well, you mean in the -- obviously he may have seen them when they were created, but you're talking about in the course of litigation after the document request was --

MR. ROSENBAUM: Right.

MR. VENTURINI: Okay.

A.    No.

Q.    You didn't? You didn't -- just let me clarify the question.

A.    Sorry.

Q.    When -- when Jason or this fellow Todd would -- would find documents responsive to the request would they show them to you before they were turned over?

A.    Maybe in one instance they may have shown me something and whether it was shown to Mr. Venturini prior to me reviewing it I wouldn't know.

Q.    Do you think you reviewed all the documents that were turned over to Mr. Venturini?

Page 19

MR. VENTURINI: You mean, again, after the litigation?

MR. ROSENBAUM: After the litigation, yeah, started.

A.    No.

Q.    You don't -- you don't -- you didn't look at all the documents?

A.    Before they were turned to Mr. Venturini?

Q.    Right.

A.    No.

Q.    What about after they were turned over?

A.    Mr. Venturini would meet with me as my attorney and discuss the documents that I guess he felt were appropriate. Some documents he asked me questions about. I would give him my input about those documents, but I certainly did not review all the documents.

Q.    Okay. Well, let's just go through a few of these. Do you have them in front of you?

A.    Yes, sir. What page?

Q.    Page ten. Just pick something at random, say number two asks for, quote, "All notes --" excuse me, I have a cough. "All notes,

Page 20

correspondence, e-mails, memorandum -- memoranda and other documents concerning any agreements between or among any of Highgate House, Charys, HHA," that's your security -- your management firm, "Gottbetter, G," amper sign, "P and Chorske concerning the Charys transactions including, but not limited to any agreement relating to fees or commissions to be paid in connection with the Charys transaction." Do you see that?

A.    Yes, sir.

Q.    I assume you saw it at the time you first looked at this document demand as well?

A.    Yes, sir.

Q.    All right. Did you give any instructions to either Todd or Mr. Rimland concerning what efforts they're to make to -- to look for documents responsive to that request?

MR. VENTURINI: You mean other than he's already testified in general what he's done. You're saying -- asking him if he made a specific -- asked him specifically for number two and a specific instruction regarding number two?

MR. ROSENBAUM: Yes.

A.    My general instruction to Mr. Rimland and, therefore, to Todd, was to produce all the

Page 21

documents that were requested by your request subject to Mr. Venturini's screening and review.

Q.    So, you didn't discuss the specific requests with him -- with Mr. Rimland or with Todd?

A.    No.

MR. VENTURINI: He just answered that.

A.    I'll answer again, no.

Q.    Just taking another one at random. Number five --

MR. VENTURINI: Well --

Q.    -- asked for "All notes, correspondence, e-mails, memorandum and other documents concerning communications between and among -- between or among any of Defendants and Charys, including, but not limited to any communications with Morris, Manning and -- and Martin Law Firm concerning the Charys warrants and reissued warrants." Do you know whether Mr. Rimland or Todd looked for documents responsive to that request?

MR. VENTURINI: Objection, asked and answered.

Q.    You can answer it.

MR. VENTURINI: You can answer it.

6 (Pages 18 to 21)

Page 22

A. My same answer is, no, sir.

Q. You don't know whether they -- you don't know whether they looked for documents responsive to that request?

MR. VENTURINI: Well, he said it was the same answer as he gave before.

A. Exactly as my counsel just said, my answer is the same as the previous one, I did not discuss item number five with Mr. Rimland specifically or with Todd.

Q. Do you know whether any documents responsive to request number five were found, but not produced to us?

A. No, I do not know that.

Q. Okay. Do you know whether any documents responsive to number five were turned over to Mr. Venturini? Do you know?

A. Specifically with regard to number five?

Q. Yes.

A. If any documents existed in compliance with this document request we would have turned those documents over to Mr. Venturini.

Q. All right. Did you ever give instructions to anybody, whether it be Mr. Rimland,

Page 23

Todd or even Mr. Venturini, not to turn over specific documents to us?

A. No, I did not give such instruction to anyone involved in this matter.

Q. You're sure?

A. I am positive.

Q. Okay, let's go on. HA Associates, what is that? HH Advisors, I'm sorry.

A. It's okay, I know what you meant. HH Advisors is an entity that I created to enter into an agreement to be the co-manager of Highgate House Funds, the fund I was asked to manage.

Q. Okay. What experience did you have in management of funds before you formed HH Advisors?

A. Technically, I formed a fund, Highgate House, in August of 2004 days before I was approached by Mr. Angleo. So, technically only a few days, but other than that I did not have experience running or managing a hedge fund or private fund like Highgate House.

Q. So is it fair to state that your -- your relationship with Yorkville was the first time you had responsibilities to manage a fund?

A. Yes, sir.

Page 24

Q. Before you were employed by Yorkville did you have any -- did you have any experience with respect to -- strike that. Did you have any business experience regarding management of securities portfolios?

A. Management of securities portfolios? Yes, my own securities portfolio. I've been trading stock and making investments since the age of 15.

MR. RIVERA: Getting a little black berry interference.

THE WITNESS: Is it mine, sir?

MR. RIVERA: Yeah. Can you put it on the floor or something.

MR. ROSENBAUM: Off the record.

(Discussion held off the record.)

(Requested portion read back by the Reporter.)

A. Yes. And in addition, I've been making structured investments in public companies since 1993.

Q. When you say structured investments, just explain please what you mean by that.

A. Today they're commonly known as pipes, but essentially where we structure an investment directly into a public company. We give money to a public company and in return receive some

Page 25

sort of security from that public company.

Q. And you say you've been involved in that since 1993?

A. Yes, sir.

Q. As a lawyer or as a business person?

A. As both.

Q. Have you formed pipes -- strike that. Withdraw that. Have you formed public companies?

A. Have I formed public companies?

Q. Yeah.

A. I've taken companies public, yes, sir.

Q. How many companies did you take public before 2003?

A. I would guess probably about 50 companies.

Q. Okay. Did any of those companies end up to be the conduit through which you raised money before 2003? Any of the companies that you took public were they involved in pipes before 2003?

A. Yes.

MR. VENTURINI: Let me object to the form. You can answer.

A. Yes, sir.

Q. How many?

DOERNER & GOLDBERG, INC.
5 Becker Farm Road * Roseland, NJ 07068

973-740-1100
1161 Broad St. * Ste. 110 * Shrewsbury, NJ 07702

Page 26

A.    If I understand your question, it's of the companies we took public how many do we do ongoing pipes for?

Q.    Yes.

A.    A number of them. It's quite common in our business to do a structured finance transaction with a public company.

Q.    Did you act as a business person with respect to these types of transactions or as the lawyer --

A.    It depends --

Q.    -- or both?

A.    It depends on the transaction. There are times where we're just the attorney, there are times where we introduce parties and there are times where we do both.

Q.    How is it that you first -- first became associated with Yorkville, what prompted that?

MR. VENTURINI: Well, let me object to the form. Go ahead.

A.    Okay. I was approached by Mark Angelo in the Summer of 2004.

Q.    Go ahead, to do what?

A.    Mark said to me that he wanted to

Page 27

give me a pool of capital to manage with him to do what I've been doing for all these years, which are structured finance with public companies.

Q.    How did you meet Mr. Angleo?

A.    I first met Mark Angelo in the early part of 2003 at a meeting with Scores Holding Company, a public company that Cornell was considering doing financing for. I met him there.

Q.    What type of business was Scores in?

A.    Scores is in the adult entertainment business. They own adult clubs in the United States.

Q.    Okay. And you were at -- you were at a meeting at Scores or about Scores?

A.    I was in a meeting with Mark Angelo in the business office for the public company --

Q.    Okay.

A.    -- that owns it.

Q.    Where was that, New York?

A.    On East 56th Street.

Q.    And that was in 2003 you said?

A.    Yes, sir.

Q.    All right. And how many times did you speak with Mr. Angleo after that initial meeting at Scores, but before the Summer of 2004?

Page 28

A.    Well, to correct what you just said, it wasn't at Scores. It was at the business offices on East 56th Street. After that meeting?

Q.    Yes.

A.    Mark and I had some contact, but we really reengaged in 2004. We were reintroduced in 2004.

Q.    When?

A.    My recollection is the Spring of 2004.

Q.    And who -- who reintroduced you?

A.    A gentleman named Avi Mirman, A-V-I, last name Mirman, M-I-R-M-A-N.

Q.    Who is Mr. Mirman?

A.    Mr. Mirman now is a -- owns a broker dealer, but at the time was what we call an independent agent. He would find deals and bring them to funding sources like Cornell.

Q.    Did you have a relationship with Mr. Mirman before he introduced you to Mark Angelo?

A.    Yes, I did.

Q.    What kind of relationship?

A.    Mr. Mirman would bring transactions to me either as a lawyer or to look to help find financing for.

Page 29

Q.    Do you know whether Mr. Angleo had a relationship with Mr. Mirman before the introduction, before he introduced you?

A.    I do recall Mr. Mirman mentioning Cornell and I had a positive memory of Mark from our meeting in January or early part of 2003 and when Mr. Mirman suggested we get together, you know, I thought that was a good idea.

Q.    Okay. So, you met Mister -- you then reacquainted yourself with Mr. Angleo in when, the early part of '04, Spring of '04?

A.    My recollection is around the second quarter of '04.

Q.    What type of meeting, a lunch meeting or just a face-to-face meeting?

A.    I believe our first meeting was at my office.

Q.    Okay. Tell me what you discussed.

A.    I can't recall the transaction, but we were discussing possible transactions to finance.

Q.    Together?

A.    Transactions that we would bring to Cornell to fund 'cause Cornell is a funding source.

Q.    So he was talking to you about perhaps you bringing some of your -- your client's

8 (Pages 26 to 29)

Page 30

financing needs to Cornell?

A. Not my client's financing needs. Deals that we may have sourced that are not necessarily a client of ours that we would then bring to Cornell for funding.

Q. He's looking -- he's looking for you to -- to source deals for Cornell?

A. Exactly.

Q. Okay. What happened as a result of that meeting, Mr. Gottbetter?

A. We had another meeting which I would call a summit type meeting that we had at -- that I actually hosted at -- it's no longer open, but it's above Grand Central Station, Sky Club, and Mr. Angleo was there, Mr. Mirman and I believe some of Mark's partners and we were talking about a broader relationship and different ideas and different transactions to do.

Q. When you say a summit meeting, why would you classify that as a summit meeting?

A. 'Cause there were so many people in the room. I think Mr. Mirman had somebody with him. Mark had several people with him. There was a number of us and it was a, you know, a long meeting in the City.

Page 31

Q. Okay. Can you tell me what was discussed at that meeting please.

A. Same types of things, transactions, deal flow, how we do transactions, specific transactions. It's my sense that Mark wanted to develop a broader relationship.

Q. With you?

A. With -- with me and I assume at the time with Mr. Mirman.

Q. Did you have anybody from your -- your firm there, from your law firm with you at this meeting at Grand Central Station -- above Grand Central Station?

A. Yeah. It's the Sky Club. It's closed now, but no, just myself I believe.

Q. Do you remember which of Mr. Angelo's partners were there?

A. I don't want to speculate, but I -- I seem to remember Jerry Eicke, E-I-C-K-E, being in attendance. I don't know if Mr. Rillo was there, but there were several people from Cornell.

Q. Okay. And what was the result of that meeting, Mr. Gottbetter?

A. Cornell did a financing for one of the companies that it was actually a client of mine

Page 32

that I had brought to Mr. Mirman and Mr. Mirman had brought that company to Cornell.

Q. Was that financing discussed at the meeting at the Sky Club?

A. I believe it was, yes.

Q. How long did this meeting last, approximately?

A. Over an hour for sure. Maybe longer, hour-and-a-half.

Q. Okay. Was -- were issues discussed in addition to the financing that Cornell did for this company?

A. As I said I think earlier, a broader base about bringing deal flow to Cornell. Mark was always looking for deal flow. So, deal flow, how we do transactions, specific deals, other ideas. Mark was always interested in acquiring broker dealers so I think we discussed that. It was sort of a broad conversation.

Q. Okay. You said this meeting to the best of your recollection occurred in the second quarter of '04?

A. Yes, sir.

Q. What happened as a result of this meeting as between you and Cornell?

Page 33

MR. VENTURINI: I think you asked that already.

MR. ROSENBAUM: I didn't.

THE WITNESS: He did ask it.

Q. It was a prior meeting I asked you about.

A. Well, I'll answer it. Mark and I continued to have conversations and he, over the course of the summer, would discuss what other transactions we had, what we could talk about until we lead up to August when he then made a more concrete offer.

Q. Okay. Then let's fast forward to August. Tell me about the offer -- the precise terms of the offer that Mark made to you, to the best of your recollection.

A. I remember it clearly.

Q. Okay.

A. Mark said he was going to hand me the keys to the kingdom were the words that he used. And what he further went on to say is that he would give me help to launch a fund with me and I had said to him I had just started a fund literally two days prior with only a few million dollars and he said he would give me -- commit at least 20 million dollars

9 (Pages 30 to 33)

Page 34

to a fund. What he offered was he had excellent back office administration operation in Jersey City that -- that he would provide. He would raise all the money for the fund and all I had to do was do what I've been doing for many years, which is source deals, structure them, document them and close them and we would do it in partnership.

Q. Okay. What was your reaction?

A. I was interested because the -- the -- the promise of excellent back office operation and a money raising operation is a big part of the load of building a fund. Doing the transactions for me that's the easier part and sourcing them. So, this was -- seemed to be a good -- a good -- good match, good partnership.

Q. Did you agree at this August meeting to -- to the terms that he proposed?

A. Well, that was a broad concept and, yes, I said I was interested and then we'd spent the next several weeks, if you will, negotiating the specifics of it. The financial aspects of the business transactions we actually got done over a couple of meetings and then I -- well, we got done over a couple of meetings over the next few weeks after that.

Page 35

Q. When you say the financial aspects, what do you mean by that?

A. Very simply, Mark told me I would be making money five ways and he laid them out for me very clearly. The first way you're going to make money, Adam, he said to me, is that Cornell charges a banking fee of 10 percent of the cash that they invest in companies. He said, let's assume that the fund will have 35 million dollars in it over the course of a year because if we start with 15 or 20 and we end up at 60 or 70 at the end of the year, let's use 35 million as the average to figure out what your compensation will be for the following year 'cause this is now going to be the end of 2004.

So, as I said, Cornell charges a or YAM charges a 10 percent banking fee.

Q. Before -- who is YAM?

A. Yorkville Advisors Management, which is what Mark's entity is which controls the fund, Cornell and then Highgate once we started it, but he said that on these deals a 10 percent banking fee is charged. Typically there's a banker on the deal. A banker is someone who sources the deal and is paid 20 percent of that cash.

Q. 20 percent of the 10 percent?

Page 36

A. Yes. Of the remaining 80 percent I would receive 40 percent. So, following Mr. Angelo's pitch to me, if there's 35 million dollars of capital and you deploy that and the banking fees are 10 percent, which would be three-and-a-half million dollars, and you paid 20 percent of that to the banker's, you'd have 2.7 million dollars available to be split between myself or HH Advisors and YAM. And in that example I would have realized about -- about a million dollars.

The second way we were going to make money is warrants. Mr. Angleo explained that in all their deals there are warrants. Typically 25 to 35 percent warrant coverage.

Q. What does that mean?

A. Warrant coverage is calculated based upon the amount of the investment that's being made and the price of the investment. You want me to --

Q. Yeah.

A. -- give you more detail?

Q. Uh-huh.

A. Okay. It's a little bit complicated. To make it simple, if you had a million dollar transaction and the stock price for the transaction was a dollar a share and you had 30 percent warrant

Page 37

coverage, you would have the right to buy 300,000 warrants at a dollar a share. That's 30 percent warrant coverage.

So, back to Mr. Angelo's five points. With regard to warrants if we assume 35 million dollars of deployed capital over the course of the year on an average basis, and 30 percent warrant coverage as the midpoint between 25 and 35, we would have about ten million dollars of warrants. 20 percent of which would go to the banker's which would be two million, thereby, leaving eight million dollars of warrant value to be split between HH Advisors, my entity, and Yorkville Advisors Management and Mark. At 40 percent that would be 3.2 million dollars of value and Mark said, you have to take a discount of course on warrants and they would be worth about a million to a million-and-a-half dollars. That's the second way we were going to make money.

The third way we were going to make money was in the event that Highgate did a transaction which then resulted in Cornell having to give that company a SEDA, S-E-D-A, which stands for Standby Equity Distribution Agreement, I would then be entitled to some of the shares that Cornell

10 (Pages 34 to 37)

Page 38

charges as a fee to those companies.

The fourth way we were going to make money is Highgate -- I'm sorry.

Q. Go ahead.

A. I was waiting for you. The fourth way we were going to make money is Highgate is going to charge a 2 percent management fee on the money that it manages. So, again, taking Mark's 35 million dollar example, that 2 percent would be $700,000 of which I would receive 40 percent or $320,000.

The fourth way we would make money would be what's called the incentive fee which is 20 percent. The 20 percent is 20 percent of the profits generated by the fund. Again, using Mark's example, if there's 35 million dollars of deployed capital and we generated 20 percent return, or seven million dollars, we'd be -- be entitled to 20 percent of the seven million dollars or 1.4 million dollars. Did I lose you?

Q. No.

A. Of the 1.4 million dollars HHA's piece would be 40 percent or $560,000. So when you add up those five ways it came in around three-and-a-half million dollars which was the

Page 39

number that Mark asked me how much I make and that's what I told him. That was the basis for our financial arrangement.

Q. Okay. When you were in the process of working this out did you ultimately enter into a written agreement to reflect that to which you were entitled?

A. Yes. Mark told me to deal with Troy on an agreement, but with regard to the business elements of the -- of the agreement that was -- I dealt with Mark.

Q. All right so -- excuse me. You and Mark negotiated the business elements and it was up to Troy to get it documented, is that a fair -- fair depiction of what happened?

A. Yes, it is.

Q. Okay. So, that whatever agreement you entered into was reflective of the business deal that you put together with Mark?

MR. VENTURINI: Well, let me object to the form. He said not that exactly.

A. Yeah. No, that's not correct. The business arrangement I had with Mark I was to deal with Mark on. The actual document was a formality that we both wanted, of course, and Troy was not

Page 40

part or party to any of my conversations with Mark on the business transaction. It took me -- it took us, excuse me, about three months to get the written document done, whereas, Mark and I were able to negotiate the business elements over the course of a couple of meetings.

Q. But looking at it more simplistically, was the written document intended to reflect the business deal you entered into with Mark?

A. Yes, that was the intent.

Q. Okay. So, somebody told Troy what that business arrangement was, either you or Mark or both of you, and he in turn was to -- to be the scribner of that document?

A. Yes, sir.

Q. Okay. Before the document was prepared and signed by you did you do any work for Yorkville?

A. If I did any work? We started a -- a working relationship because Mark and I agreed to work together end of August of '04. The document may not have been officially signed until after we had sort of gotten running and started talking about transactions. I had been working on some deals.

Page 41

So, technically you can say I was working under the premise that Mark and I had a handshake agreement and it was taking Troy quite some time to reflect our agreement in writing for a number of reasons. So I would say yes.

Q. Okay. Did you receive any monies from any company associated with Mark Angelo, Yorkville or Highgate or any of the funds that Yorkville managed, before you signed the agreement?

A. Not to my recollection, no.

Q. Is it fair to state that both you and Mark were waiting for the -- the signatures on this agreement before you formally started your business relationship?

MR. VENTURINI: Well, except as to what he just testified.

A. Yeah. No, as I just testified to, we started our working relationship on good faith. There was no money passing hands. And, yes, I'm sure -- I know for myself that I wanted the document signed just to make sure that if Mark got run over by a bus that we had an agreement in place.

Q. Okay. Who reviewed the document on your behalf before you signed it?

A. My counsel, Mr. Venturini.

11 (Pages 38 to 41)

Page 42

Q.    Okay. I assume you had discussions with him concerning that which he was reviewing?

A.    Yes.

Q.    Were there any changes made as a result of Mr. Venturini reviewing the document?

A.    Yes.

Q.    Okay. Excuse me. Do you have drafts of the document in your -- in the possession of either your law firm or your advisory company?

A.    Not to my knowledge, no.

Q.    What did you do with the drafts?

A.    It's customary whenever we complete a transaction we usually destroy drafts and throw them out.

Q.    Do you know whether Mr. Venturini destroyed the drafts that he got from you?

A.    I do not know.

Q.    In connection with this litigation did you ask anybody to look for drafts of this agreement?

A.    I asked for people to look for all documentation regarding what was requested in the document request as I previously testified to.

Q.    The reason I asked, we didn't see any drafts of documents -- of this document from you

Page 43

anyway.

A.    Well, then I guess it's consistent with my testimony that --

Q.    You throw it out?

A.    -- that it's our policy that once a document is signed and done that we would have destroyed the -- the drafts as being unnecessary.

Q.    Did you or anyone else ask Mr. Venturini for drafts he may have had?

MR. VENTURINI:  Well, I think he's asked and answered. I don't recall seeing any drafts on your end either.

Q.    Can you answer my question?

A.    I don't know.

Q.    You didn't ask Mr. Venturini for drafts?

MR. VENTURINI:  Asked and answered.

Q.    Did you?

THE WITNESS:  Do I answer this question?

MR. VENTURINI:  Well --

Q.    Did you ask -- my question is, did you ask Mr. Venturini for any drafts of the document -- of the agreement?

MR. VENTURINI:  Specifically that

Page 44

request you can answer.

A.    No, I did not specifically ask Mr. Venturini for drafts of the compensation agreement between HHA and YAM dated on or about November 2004, no, sir.

Q.    Did you ask Todd or Mr. Rimland to have communications with Mr. Venturini concerning the production of drafts?

MR. VENTURINI:  Of that specific document?

MR. ROSENBAUM:  Yeah.

A.    As I've testified earlier, I did not ask Mr. Rimland or Mister -- or Todd, I was about to call him Mr. Todd, about specific document requests as notated on page ten of your requests.

Q.    Okay. All right. Let me show you a copy of --

A.    Do you want this back, sir?

Q.    You can just leave it there. Let me show you what we've marked as Exhibit 2, which is a November 1, '04 document on the letterhead of Yorkville Advisors Management and this one is countersigned by you on behalf of HH Advisors and it's countersigned by you individually. Do you see that?

Page 45

MR. VENTURINI:  You on page ten?

MR. ROSENBAUM:  Yes, unless you see another signature page there.

MR. VENTURINI:  Well, he's flipping through. There's a number of pages here.

A.    I'm sorry, what was the question?

Q.    There was no question. Just showing you the document. It's on the letterhead of Yorkville Advisors and it's countersigned by you individually and you as managing member of HH Advisors. Do you see that?

A.    Yes, sir.

Q.    All right. Just a couple of questions about it.

(Discussion held off the record.)

Q.    HH Advisors is an LLC. Who are the members of HH Advisors?

A.    The members are myself individually and a company Spncer Investment Group, comma, Inc., S-P-N-C-E-R.

Q.    Who are the members of Spncer?

A.    The shareholder of Spncer is myself.

Q.    So you basically are the sole owner of -- of HH Advisors, LLC then?

MR. VENTURINI:  Asked and answered.

12 (Pages 42 to 45)

Page 46

He just told you who the owners are.

Q.   Is that correct? Is that correct?

A.   I am the owner both directly and indirectly of HHA.

Q.   Okay. Mr. Chorske who is he employed by?

MR. VENTURINI:  Currently?

Q.   You can answer the question.

MR. VENTURINI:  Well --

A.   I'm asking for clarification, sir.

Q.   What don't you understand I'll be happy to clarify it?

A.   Who's he employed by when?

Q.   Now?

A.   He's employed by Gottbetter Capital Management.

Q.   Was he ever employed by HH Advisors?

A.   Yes, sir.

Q.   When?

A.   I believe Mr. Chorske became employed by HH Advisors on or about June 2005 until he was no longer employed in the first quarter of 2006.

Q.   And that's when he went to work for the Gottbetter firm you just mentioned?

A.   Yes, at some point.

Page 47

Q.   All right. And tell me how you came to meet Mr. Chorske?

A.   Mr. Chorske was introduced to me by a friend, business associate and client of mine.

Q.   When?

A.   Some time in the beginning of 2005.

Q.   Okay. And what was his experience when he was -- when -- when you first met him in the securities industry?

A.   Mr. Chorske had worked at a couple of private equity funds. He had crossed over and worked at a technology company that one of the funds had purchased. Essentially been in the securities industry in one capacity or another for -- for many years.

Q.   Okay. Approximately how old is he, approximately?

A.   Mr. Chorske is 39-years-old, to the best of my knowledge.

Q.   Okay. All right. This letter, the Exhibit 2 you have in front of you.

A.   Yes, sir.

Q.   I want to go through it a little bit with you. Paragraph two starting on page two deals with your compensation?

Page 48

A.   Yes, sir.

Q.   Okay. And it says, and I'll read it -- I'll paraphrase it. Paragraph 2-A-1, Roman numeral one, excuse me, says that each -- "In connection with each investment the company" -- sorry, let me start all over. "In connection with each investment the company," and that means Yorkville, correct? The company is defined as Yorkville?

A.   Yes, sir.

Q.   "Shall pay to the co-manager," that's HH Advisors, correct?

A.   Yes, sir.

Q.   And you, I guess, shall pay to HH Advisors and you because you countersigned the agreement individually?

A.   Co-manager is defined as HH Advisors, LLC.

Q.   Well, why did you sign this individually?

A.   Mr. Rillo asked me to.

Q.   Do you know what -- what affect that had on you individually by signing it in that fashion?

A.   I imagine to create personal

Page 49

liability for myself under this agreement.

Q.   Let's continue then. "In connection with each investment the company, Yorkville, shall pay to the co-manager," that's HH Advisors, "an amount equal to the payout percentage of net profits." Do you see that?

A.   Yes, sir.

Q.   All right. And what was the payout percentage?

A.   The payout percentage started at 40 percent and was to increase 100 basis points for the first three years and then 140 basis points in the fourth year to total 44.4 percent.

Q.   And that's set forth in Roman numeral 7 on page three?

A.   Yes, sir.

Q.   Okay. By the way, the copy that you have has handwriting on the -- in the right margin, do you see that? And the left margin and the right margin actually. Do you see that? Do you see the handwriting?

A.   Yes, sir.

Q.   Whose handwriting is that?

A.   I don't know, but it's not mine.

Q.   No. What about the handwriting on

13 (Pages 46 to 49)

Page 50

the right margin on page three where it says N vertical slash A, is that yours?

A.   Not to my knowledge.

Q.   Do you know whose it is?

A.   To the best of my knowledge Mr. Rillo.

Q.   Did you see him actually write these -- these notes here on page three?

A.   No. No, but the only person I dealt with on this document was Mr. Rillo --

Q.   Okay.

A.   -- but again, I'm speculating.

Q.   Okay, let's go on. You -- you -- under paragraph 2-A-1 you're to get, at least in the first year of this agreement, 40 percent of the net profits of Yorkville?

A.   Yes, sir.

Q.   Okay. And then it defines what net profits means, correct?

A.   Yes, sir.

Q.   All right. Just so we're clear, it says, quote, "Net profits shall mean the difference between all revenue earned by the company, Yorkville, and its affiliate Yorkville -- Yorkville Advisors, in connection with an investment made by

Page 51

the Funds," capital F, "including, without limitation, cash, common stock, debentures, warrants and/or any other security from the Funds as defined and limited below, reduced by any and all expenses incurred by the company," meaning Yorkville or Yorkville Advisors, "with respect to the Funds." That was the first part of your compensation, correct?

A.   That's what it says.

Q.   All right. So, just to shorten it, is it correct that you're to get 40 percent of the Yorkville profits as part of your compensation?

MR. VENTURINI:  I'm gonna -- objection to form.

A.   Yes.

Q.   Okay. And then in addition -- I'm sorry, it goes on to state, excuse me, "Revenue shall also include without limitation all management and other fees, including the 2 percent fixed management fee, 20 percent investment fee charged to the Funds and received by the company or Yorkville Advisors, LLC with respect to the Funds." Do you see that?

A.   Yes, I do.

Q.   Okay. With respect to the revenues

Page 52

that Yorkville receives can you explain what its relationship is with the funds that entitles Yorkville to revenues?

A.   Well, Yorkville is the investment manager for the funds. Your question is how --

Q.   How does Yorkville get paid by the funds?

A.   Yorkville takes a 10 percent -- as I've laid out earlier, Yorkville takes 10 percent of the banking fee in cash, Yorkville takes the 2 percent management fee, Yorkville takes the 20 percent incentive fee, Yorkville takes the warrants, and Yorkville takes the stock fees it charges on SEDAs, S-E-D-A, and there's another element that's mentioned here, debentures. At the time Mark had created what was called a fee debenture. So, this is not the debenture that's purchased by the company -- excuse me, purchased by the fund, but rather a way to create additional fees for Yorkville for -- in what they called fee debentures. Debentures that Yorkville didn't pay for, but had values that Yorkville then could convert the debentures into stock. So, these elements were all comprised of the revenue part of what Yorkville received from its investment -- from the funds

Page 53

investment in a company, excuse me.

Q.   Okay. I just want to review that with you.

A.   Sure.

Q.   You said -- you said that Yorkville would get a banker's fee of 10 percent?

A.   Cash bank -- cash fee of 10 percent, yes, sir.

Q.   10 percent of what?

A.   Of the amount invested in the particular company.

Q.   By a fund?

A.   By the fund.

Q.   Okay. So what fund was Yorkville managing that was the subject of this agreement? Was it Highgate House?

A.   Highgate House.

Q.   So, let's assume hypothetically that Highgate House made a million dollar investment in the company. Yorkville would first get 10 percent of that as a banker's fee?

A.   Off the top.

Q.   So, if they -- they were entitled to $100,000?

A.   Yes.

14  (Pages 50 to 53)

Page 54

Q. Okay. And let's just assume that this is the only investment that Yorkville had for use of illustration. They would then get a 2 percent management fee?

A. No. No. I think you're confusing two items. The 2 percent management fee would be on the assets of the fund. If the fund only had a million dollars in it --

Q. That's what I'm saying?

A. But you said it was only investment that it made, didn't say it was the only dollars in the fund.

Q. Let's assume it was the only dollars in the fund for illustration purposes.

A. Okay.

Q. Yorkville would get 2 percent of that or $20,000?

A. Right.

Q. Okay. And when you said it would get --

MR. VENTURINI: I think there's an error there because I don't know if you subtracted the 10 percent that went to Yorkville.

Q. Well do you subtract the 10 percent first?

Page 55

A. Well, that's a very interesting question.

Q. Since Mr. Venturini brought it up.

A. Probably opening a whole line of questioning that would involve a whole bunch of people.

Q. Well, I'm asking you. Do you take the 10 percent off first and then take 2 percent of what's left?

A. My understanding is that when Highgate made an investment of a million dollars in a particular company, that's a million dollar asset on the books of Highgate House and we are going to get paid a 2 percent fee on the million dollars.

Q. Okay.

A. In spite of the fact that 10 percent of those dollars are now in Yorkville's hands.

Q. Okay. And then you said Yorkville is entitled to a 20 percent incentive fee. Is that 20 percent of the profits of the fund that it manages?

A. Yes, after the expenses of the fund, not the expenses referred to in 2-A-1.

Q. And how does the fund go about determining its profits? Excuse me, Highgate House, how does it do that?

Page 56

A. It's too broad a question. I don't understand the question.

Q. Okay. Well, let's assume that instead of making one investment you made 50 investments during the course of a period. How does Highgate House determine what its profits are on the 50 investments it made during -- during a particular period?

A. My understanding is that between the accrued interest that Highgate received on its convertible debentures, which charge an interest rate.

Q. So let me go through -- let's say there's five debentures at 12 percent with a 12 percent coupon.

A. Okay. So, you're accruing interest on an annual basis of $600,000 and then in addition you will convert those debentures into stock and sell that stock in the market at a gain or a loss. So that would also impact your profit.

Q. So -- so one of the things you would -- Highgate House would have to do is determine whether it made a gain or a loss on the sale of the stock to which the debenture converted?

A. Yes, sir.

Page 57

Q. Okay. And ultimately when it amalgamated all 50 investments for a given period it would determine whether it had a profit, and if so, Yorkville would get 20 percent of that profit if there was a profit?

A. After the expenses of the fund were paid.

Q. Right.

A. That would be my understanding.

Q. Okay. So, first -- just to clarify it so I can make sure I understand. The first thing Highgate would have to do to determine whether it pays Yorkville the 20 percent is -- is determine whether it had gains or losses on the sale of stock to which debentures it invested were converted, correct?

A. Yes.

Q. On a wholesale basis for 50 transactions?

A. Yes.

Q. And then it would net out the gains against the losses and then determine whether there's a profit?

A. Yes.

Q. And then it would deduct from, let's

15 (Pages 54 to 57)

DOERNER & GOLDBERG, INC.
5 Becker Farm Road * Roseland, NJ  07068

973-740-1100
1161 Broad St. * Ste. 110 * Shrewsbury, NJ  07702

Page 58

assume there was a profit, it would deduct from that profit its operating expenses?

A. Yes.

Q. Okay. And the difference would be the profit upon which the 20 percent is based?

A. Yes.

Q. Okay. Excuse me. Now, in addition you said that Yorkville would get warrants?

A. Yes.

Q. All right. Explain to me in the -- in the context of this hypothetical million dollar investment, how -- how warrants are issued generally, how and to whom.

A. On --

MR. VENTURINI: Let me object to the form, go ahead.

A. Okay. On each of the transactions as part of the fees there would be --

Q. Fees to who?

A. Yorkville. My compensation is based upon the fees that Yorkville is going to generate.

Q. Okay.

A. So Yorkville would generate fees from the cash banking fees, warrants and stock fees. Does that answer your question?

Page 59

Q. Well, partially. So you're saying that Yorkville would receive warrants on account of an investment made by Highgate House?

A. Well, when you say receive can you be more specific?

Q. Yeah. Warrants were issued in Yorkville's name?

A. No. We were instructed that the warrants would be -- were to be issued in the name of the fund.

Q. Highgate?

A. Highgate House.

Q. Why?

A. But there were exceptions to that.

Q. Tell me why you were given those instructions?

A. I would be speculating, but --

MR. VENTURINI: Don't speculate. If you know why --

A. Strike that. To the best of my knowledge, the reason why that was done is that it was common practice at Yorkville to use those warrants as a way to top up return when needed.

Q. Top up return of Highgate?

A. Well, that was the policy at Cornell,

Page 60

the other fund that Yorkville manages, and evidently what they were doing at Highgate.

Q. When you say top up you mean, include the value of the warrants in the assets of the fund?

A. On -- at their discretion when they needed to --

Q. Okay.

A. -- with regard to their share of those warrants.

Q. Okay. So if there were on this hypothetical million -- million dollar funding by Highgate, if there were 300,000 warrants, those warrants would be issued to Highgate to be included in the assets of Highgate?

A. No, I did not say that and no, that's not a true statement.

Q. All right. Well, let's -- let's break it down. On this hypothetical million dollar transaction if there's 300,000 warrants you said typically the warrants would be issued in the name of Highgate?

A. Yes.

Q. Okay. And Highgate could use those warrants as an asset in its -- in its financial statements? I think that's what you said also; is

Page 61

that correct?

A. No, I did not. What I did say, in spite of the spin.

Q. I didn't spin it. I thought I was repeating what you said. If I'm wrong, I'm wrong.

A. Let me make it clear.

Q. Go ahead.

A. Yorkville at their discretion could take their share of the warrants and do whatever they wanted with them. The other comment you made that the warrants were included as the asset of the fund is not a true statement. It would -- was never represented to me that way and never appeared in any documentation that way.

Q. So you're saying that in no instance were you aware -- sorry. You're saying in no instance, to the best of your knowledge, did Highgate ever show any of the warrants as an asset of its fund?

MR. VENTURINI: Objection.

Q. Is that what you're telling me?

MR. VENTURINI: That's not what he said.

Q. I thought that's what you said. If I'm wrong you'll tell me.

16 (Pages 58 to 61)

Page 62

MR. VENTURINI: Well we're -- first of all we're talking about a hypothetical transaction.

MR. ROSENBAUM: No, he's talking about a real one, but let's go ahead.

MR. VENTURINI: Well --

MR. ROSENBAUM: I don't want to argue with you.

Q.    Just answer the question.

A.    I wasn't talking about a real transaction I was -- you asked me to walk you through it how it worked.

Q.    Let's be clear. Are you telling me that Highgate did not carry the warrant as an asset on its books and records?

MR. VENTURINI: In any transaction, right? That was your prior question?

Q.    You can answer the question.

A.    Highgate did not carry the warrants on its books to my knowledge on transactions. I've come to understand later that there may have been exceptions to that which would be consistent with my testimony that YAM, in its discretion, in 2005 would use warrants when needed to augment return. That's my testimony.

Page 63

Q.    Yorkville would use what warrants to augment return, its warrants?

A.    Its share of the warrants.

Q.    Well, on this -- on this transaction -- this hypothetical million dollar transaction where there's 300,000 warrants issued what would Yorkville's share of those warrants be?

MR. VENTURINI: Objection to form.

A.    20 percent off the top goes to the banker, if there's a banker on the transaction.

Q.    20 percent of the warrants. So, if there's 300,000 warrants 60,000 would go to the banker?

A.    Yes.

Q.    And then the remaining 240,000?

A.    40 percent of those warrants, based upon my agreement in November of 2004, 40 percent would go to HH Advisors and 60 percent would go to YAM. For clarification, so there's no confusion of the record, my agreement says 40 percent with this step up of my percentage interest and it got accelerated to 44.4 percent. So, I just don't want the record to be confusing about my percentage. So, if you could also say the time that you want me --

Q.    Well, we're just using 40 percent

Page 64

hypothetically. I understand --

A.    Okay. I just don't want to be, you know, contradicting myself.

Q.    Okay. So you're saying of the -- of the warrants remaining after the banker got his 20 percent or 60,000, 40 percent would go to HH -- 40 percent of the balance would go to you and 60 percent of the balance would go to -- to Yorkville?

A.    As Mark explained to me in September 2004 when he induced me into this agreement by saying, as I pointed out earlier, the five ways I was going to make money, the answer is yes.

Q.    So I assume after you signed this agreement for the year or so that it was in effect 'till you left in January of '06, the warrants that were obtained on transactions entered into by Highgate were issued in a way that you just described, 20 percent of the warrants were issued to the banker, 40 percent of the balance to you and 60 percent to the -- to Yorkville?

MR. VENTURINI: Objection.

A.    Mr. Rosenbaum, that's not what I testified to.

Q.    I thought that's what you just said. I thought you said the 20 percent --

Page 65

A.    Want me to clarify it rather than you speculate. What I said to you was, you asked me who -- who's warrants are these? I never said they were issued to the banker. What I said was, 20 percent belonged to the banker and the balance of the 80 percent, 40 percent belonged to HH Advisors and 60 percent belonged to YAM.

Q.    Okay. But who were the warrants issued to? I think you said Highgate House.

A.    That's correct.

Q.    So, in what way then did YAM get its 60 percent and you get your 40 percent after the banker's 20 percent, if there was a banker's warrant?

A.    Well, I know what I discussed with Mark in the middle of 2000 — I'm answering the question.

Q.    Let me repeat my question. You said that YAM was entitled to 60 percent of the balance after the banker's 20 percent and you were entitled to 40 percent, off the warrants?

A.    Yes, sir.

Q.    In what way did YAM receive its 60 percent and did you receive your 40 percent after the banker's fee?

17 (Pages 62 to 65)

Page 66

MR. VENTURINI: Let me note an objection because first of all we're speaking hypothetically and now it seems like you're speaking about a specific transaction. So you can't -- I'm not sure if your question is a hypothetical or if you're -- you're regarding this specific transaction.

Q.   In this specific -- let's talk about generally. Generally.

A.   Theoretically?

Q.   Yeah.

A.   First of all, take a step back. To answer the question correctly, not all transactions was HH Advisors entitled to a percentage of the warrants.

Q.   Why?

A.   'Cause there were a couple of exceptions. Exception number one, there were certain transactions that we did in the State of Minnesota that you had to be a resident or a domiciled in Minnesota in order to do this structure. It's called a rule 50 --

Q.   Six?

A.   Rule 504 transaction. We wouldn't -- I wouldn't and -- and Mark wouldn't be entitled to

Page 67

take those warrants personally. It would have to be sold in a Minnesota entity which we had known as Highgate House, LLC. So we couldn't have any direct interest in those warrants.

Q.   Let's put those aside.

A.   Second exception, there were a couple of occasions where the fund actually bought warrants. So the actual investment was the warrants. Whereas, most of our transactions the warrants are additional fees like the banking fees are additional fees and not the basis of the actual investment by the fund.

Q.   Those are -- the latter is what we're talking about, where -- where the warrants are issued as part of the fees as opposed to purchased by the fund.

A.   I just wanted to clarify it so again I'm not contradicting myself.

Q.   Here's my question, with respect to the latter types the way where fees -- where warrants are issued as part of the fees, how -- you said title to the actual name on the warrant would be Highgate House?

A.   Yes, sir.

Q.   How then did Yorkville receive its

Page 68

percentage of the warrants?

MR. VENTURINI: Well, again, it's -- objection. Are we talking about a specific deal or are we talking hypothetical?

MR. ROSENBAUM: In general.

A.   Good question. I didn't know the answer to that question until I approached Mr. Angleo in the middle of 2005 and requested that my 40 percent, or 44.4 percent share of the warrants, be retitled in my name.

Q.   In the name of HH Advisors?

A.   Yes, sir.

Q.   Okay. And that was around June or so of '05?

A.   Yeah. The fund had just been opened six or seven months and having warrants in one's name wasn't as important because we were just starting to do the transactions, the shares have to be registered. So to monetize these warrants is still down the road, but I did address this administrative issue with Mr. Angleo in the middle of 2005.

Q.   Okay. Is that when at the same time that you -- that Mr. Angleo agreed to increase your percentage from 44 to 44.4 percent to accelerate the

Page 69

increase?

MR. VENTURINI: Objection to form.

A.   Yes. It's actually from 40 to 44.4 percent.

Q.   I thought that's what I just said.

A.   And -- well, it sounded like you were stepping on it, but, yes, that's correct.

Q.   In this one conversation Mr. Angleo agreed to increase your -- your profit percentage from 40 to 44.4 percent and agreed to issue you warrants in your name, in the name of HH Advisors?

A.   I didn't say it was one conversation, you said that.

Q.   It was all around the same time?

A.   It was in or about the same time period. I don't recall it being in the same conversation.

Q.   It may have been, it may not have been, you don't remember?

A.   Mr. Angleo and I met every week at his office for three hours, often had lunch afterwards, and we spoke on the phone almost daily.

Q.   Okay.

A.   So I couldn't tell you if it was a few days apart or a few weeks apart, but in or

18 (Pages 66 to 69)

Page 70

around the same period of time.

Q. Just so we're clear, in or around the same period of time Mr. Angleo agreed to increase your profit participation from 40 to 40 -- from 40 to 44.4 percent and also agreed to issue warrants directly to HH Advisors, correct? That's what you're saying?

A. Yes.

Q. Okay. And that occurred in approximately June of '05?

A. In or about. It could have been May, it could have been July.

Q. Okay.

MR. VENTURINI: We've been going about an hour and ten minutes.

MR. ROSENBAUM: You want to take a break? Sure.

MR. VENTURINI: I don't know, do you want to take a break?

THE WITNESS: No, sir.

MR. VENTURINI: You want to keep going forward?

THE WITNESS: Do you need a break?

MR. VENTURINI: No, I don't need a break.

Page 71

A. No, it could be tiring to sit there.

Q. He's awake. As long as he's awake he's okay.

A. No, I prefer to keep going.

MR. VENTURINI: Okay.

Q. We'll go on a little bit. Okay. Still looking at document two.

A. Yes, sir.

Q. Directing your attention to paragraph four on page four. Do you see that?

A. Yes, sir.

Q. All right. This talks about what happens in the event your relationship with Yorkville is terminated, correct?

A. Yes, sir.

Q. Okay. If you look at, excuse me, paragraph 4B on page five. Just read that to yourself for a moment, 4-B-1 through three.

(Pause.)

A. Okay, sir.

Q. All right. I want to ask you a few questions about this. It says under -- under paragraph 4B --

A. Excuse me. Yes, sir.

Q. It says, quote, "In the event of

Page 72

termination the company, Yorkville, in addition to the payment described in section 4A shall pay the co-manager," that's HH Advisors, "as applicable the following," and little I says, quote, "If pursuant to section 4-A-1 the company shall pay the co-manager in accordance with the terms and conditions of section three." Section three refers to paragraph three on page four, is that your understanding?

A. Yes, sir.

Q. Okay. That would not -- that was an event -- it's not an event that we -- that's involved in this case, that is, the sale of the assets of Yorkville, all of the assets of Yorkville, correct?

A. Yes, sir.

Q. So, let's focus now on B2. "If pursuant to section 4A ii" and tripple -- I'm sorry, let me start all over. "If pursuant to section 4A double I, tripple I and IV, without cause or V -- or V," meaning if the company elects to terminate the funds, "the co-manager shall be entitled to the -- to the payout percentage of the tail profits as here and after defined for a period of 18 months after the effective date of the -- of the termination."

Page 73

Do you see that?

A. Yes, sir.

Q. All right. Is it your understanding that you terminated your relationship with Yorkville in June -- in January of '06?

MR. VENTURINI: I'm sorry, can you repeat --

Q. Did you terminate your relationship with Yorkville in January of '06?

A. Yes, sir.

Q. By the way, what -- what was the effective date, do you know?

A. The -- I gave notice on January 9th making the effective date January 19th, 2006.

Q. Okay. And then it says that you get your percentage of the tail profits for the -- for 18 months after the effective date of the termination, correct?

A. Yes, sir.

Q. Okay. And then it defines tail profits as being equal to the net profits with respect to any and all investments made by the funds prior to the effective date of your termination, which was June 19th, correct?

A. I think specifically it says, "but

19 (Pages 70 to 73)

DOERNER & GOLDBERG, INC.
5 Becker Farm Road * Roseland, NJ  07068

973-740-1100
1161 Broad St. * Ste. 110 * Shrewsbury, NJ  07702

Page 74

only with respect to the investments made by the funds."

Q.    Yeah.

A.    Yes.

Q.    So, in order to determine what your percentage -- sorry. What the dollar amount you're entitled to, if anything, you have to look at the profits of the fund after the 18 months starting January 19th of '06, correct?

A.    With regard to my share of profits from the fund, Highgate House.

Q.    Right. Okay. And obviously that can't be done until June or so, June -- I'm sorry, July 19th of '07?

A.    With regard to '06, but with regard to the six months of '07 you won't really know that until July of '08.

Q.    All right. So, in other words, we have to wait until the future to determine whether or not you're entitled to anything under this part of the termination benefits, correct?

MR. VENTURINI: Let me just object to the extent it calls for a legal conclusion. You can obviously state -- testify to what your understanding is of the agreement.

Page 75

A.    My understanding is with regard to the profits of Highgate House Fund we will not know what my share, if any, would be until June or July of '07 with regard to the 12 months of '06, and until June or July of '08 with regard to the first six months of '07.

Q.    Okay. Just bear with me a second.

(Pause.)

Q.    You said a moment ago that with respect to the profits of the Highgate House Fund you won't know that until some time in 2007, 2008. So you're distinguishing Highgate House from Yorkville in that answer?

A.    I was distinguishing it because it's distinguished here in the agreement.

Q.    Just tell me where.

A.    According to your cite of 4-B-2 little I line --

Q.    Wait two I or two double I?

A.    Two little I. Two Is.

Q.    Okay.

A.    Double I, is that a better way to say it? I apologize. Let me do it again. 4B double I.

Q.    Okay.

A.    Line six, halfway into the line, "The

Page 76

Funds," capital F, the funds is defined in this agreement is defined -- may not even be defined. Oh, it is. In section one, line five referring to "Highgate House Funds, the two feeders and the master."

Q.    Okay. Okay, I understand. So, on -- on -- based upon your understanding of -- of paragraph 4B double I, the two little Is, you can't determine what the profit of Highgate House -- Highgate House Funds will be until some time in 2007 and 2008?

A.    Yes, sir, that's my testimony.

Q.    Okay, good. Now, I want to ask you based upon this hypothetical investment of one million dollars by Highgate House, if warrants were issued, the 300,000 warrants that Highgate House you said gets 60 percent of.

A.    No, I did not.

Q.    Well, after deducting the banker's fee.

A.    That's not what I said. What I said was, it was my understanding that 20 percent off the top belonged to the banker.

Q.    Right.

A.    Of the remaining 80 percent, 40

Page 77

percent belonged to HH Advisors -- let me finish -- and 60 percent was to YAM to do what it wanted. That was to their discretion. Whether it went to Highgate House or it went to YAM, that really wasn't my decision or my business.

Q.    Okay. Let's assume that it went to Highgate -- the 60 percent went to Highgate House, operate under that assumption. You can't -- under this -- under the 18 month provision you can't make a determination as to whether Highgate House made a profit on that 60 percent until some time in 2007 and 2008, correct?

MR. VENTURINI: Objection to form. First of all, again, it's another hypothetical. He's not an expert witness. And secondly, you don't have a time period as to what period you're covering.

MR. ROSENBAUM: We did. We understand it.

MR. VENTURINI: We understand?

Q.    Let me rephrase the question because we got to go for the video fellow. If Highgate House received title to the warrants in its name, and you're entitled to a percentage of that Fund's profits 18 months after January 19th of '06, you

20  (Pages 74 to 77)

Page 78

can't make -- Highgate House can't make a determination as to whether it has a profit or loss on those and other warrants until 18 months after January of '0 -- January of '06, correct?

MR. VENTURINI: Objection. That's a completely convoluted question and you're talking about -- I think you're talking about the tails and you're talking -- first of all, you're talking hypothetically in the first part --

MR. ROSENBAUM: Do you have an objection? Just state it.

MR. VENTURINI: Yeah, but let me -- let me note my objection. It's hypothetical in the first part and concrete in the second. It's not a fair question.

Q. Answer the question.

MR. VENTURINI: I -- I think that --

Q. Do you understand the question, Adam?

A. On a general basis whatever the funds -- whatever the profits of the funds are in 2006 will not be known until June or July of '07 and whatever the profits are of the funds for the -- contributed to the first six months of '07 will not be known until June or July of 2008. I think I've answered this question three times now, sir.

Page 79

Q. And that includes whether or not a profit is made on these hypothetical warrants issued in the name of Highgate House; is that correct?

MR. VENTURINI: Objection, that's --

Q. Is that correct, Mr. Gottbetter?

MR. VENTURINI: Let me note an objection. I don't think that's a fair question. Let's have it read back.

(Requested portion read back by the Reporter.)

MR. VENTURINI: Well, that's -- if you understand that. I think it's just a convoluted question.

A. Let me answer it this way, in your hypothetical example if 20 percent of the warrants under the policy in play in 2005 belonged to the banker, and my 40 percent that went to HH&A was given to me, as was my agreement, and Mark Angelo decided to take Yorkville's 60 percent interest in those warrants and put them in the fund to augment return by including those warrants and those warrants would then result in return, I imagine Mark Angelo might say to me, as he did in other examples, I would not be entitled to a percentage of the profits resulting from the sale of those warrants since I've already benefitted or actually, he's been

Page 80

detrimentally impacted by having to contribute his warrants into the fund to make return.

Q. So you wouldn't be entitled to any portion of the profit on those warrants?

A. That's not what I said. What I said was what Mark might say to me and I think because it's theoretical and it's speculative I don't know what the conversation would be.

Q. Well, forget what --

MR. VENTURINI: Well, let's take a break now, we have to.

MR. RIVERA: We're going off the record. The time is --

MR. ROSENBAUM: How much time do you have on the tape?

MR. RIVERA: -- 11:31 a.m. This ends tape one.

MR. ROSENBAUM: How much time -- before you end, how much time do you have left on this tape?

MR. RIVERA: Three minutes.

(Discussion held off the record.)

MR. VENTURINI: Are we back on the record?

MR. RIVERA: Go back on?

Page 81

MR. ROSENBAUM: Yeah.

A. Back on the record?

MR. RIVERA: We're back on the record. The time is 11:32 a.m.

Q. The example that we were just using where 60 percent of the warrants are given by Yorkville to Highgate and registered in Highgate's name, is it correct that you can't determine whether the -- whether Highgate's will have -- Highgate will have a profit on those warrants until some time at least 18 months after January 19th based upon the determination benefits you're entitled to?

MR. VENTURINI: Asked and answered.

A. No, that's not -- that's not a true statement.

Q. Because?

A. Because the warrants have -- could have a value at the time that Mark decided to contribute them to the fund which could then help the return and then you'd be incentive fee based upon the actual return of the fund.

Q. I'm sorry, the profit, the incentive is --

MR. VENTURINI: Let him finish.

A. Let me finish the question. I think

21 (Pages 78 to 81)

Page 82

maybe the misunderstanding here is the difference between realized return and unrealized return. The NAV doesn't have to include realized return. The warrants can have a value even though you have haven't sold the shares underlying the warrants to realize that profit. So, if the warrants had an intrinsic value or a value under some model like Black Scholes, S-C-H-O-L-E-S, hyphenated, then it would contribute positive return to the NAV for the month. And then if it ended there, and I was being paid based upon that month, I would be entitled to share in the profits of the incentive fee based upon the NAV, whether it was realized or unrealized.

Q. Is the incentive fee based upon realized or unrealized profit?

A. It's based upon the profits of the fund. I am not an accounting expert, but I do know that — it's my belief, and to the best of my knowledge the profits of the fund do not have to be realized in order to be profits of the fund to be paid upon. That's my understanding.

Q. That's fine. So, in order to determine what the profits of the fund are you have to look at the value of all the assets on the fund at a particular given time, correct? That's one of

Page 83

the things you have to look at? That's what you just said.

A. Could you repeat the question?

Q. Sure. In order to determine whether the fund is profitable at a given time you have to look at the value of the assets on the Fund's books versus the costs of those assets; is that correct?

A. Plus all the offsetting liabilities attached to those assets.

Q. Okay.

MR. VENTURINI: We off the record?

MR. RIVERA: We're going off the record. The time is 11:34 a.m. This ends tape number one.

(Recess was taken.)

MR. VENTURINI: So, it's all objections except as to form are reserved for trial. We're -- the other one is -- let me paraphrase it, we're waiving the -- what is it, the filing or something? Something the filing with the court, but normally just put them in. I think under Jersey rules might be a different one. I can't think of anything else.

MR. RIVERA: We're back on the record. The time is 12 o'clock p.m. This begins

Page 84

tape number two.

Q. Ready? All right. The agreement that you said you had with Mark that -- that Yorkville would get warrants and you would get 40 percent of the warrants, was that reduced to writing?

A. Yes, my employment agreement.

Q. And just point -- point to me please a provision in that agreement which says that.

A. Under compensation --

Q. Hold on. Hold on. Hold on. Go ahead, I'm sorry.

A. Under compensation, 2-A-1, refers to the fact that the cash banking fee, common stock from the SEDA, fee debentures and warrants that we earned on deals that the fund did, I had my 40 percent or 44.4 percent of those items. And the reality was that the offsetting expenses for YAM would be insignificant as compared to the cash banking fees that wasn't as if they needed my warrants in order to pay those fees. That's why, to clarify your other question, I went to Mark, as I testified earlier, in the middle of 2005 and said, I want the warrants in my name. And --

Q. And he agreed to that?

Page 85

A. He agreed to that. And with a condition, he sort of said as an afterthought, well, okay, but, you know, open an account with Gator at Sloan just so I can see you're selling them there. I said, fine.

Q. And just to -- to review what you said. You said that that conversation was around the same time you had the conversation increasing your percentage from 40 percent to 44.4 percent?

A. Yeah, in or around the same time. Not necessarily the same meeting.

Q. Do you have any memos or any writings reflecting Mr. Angelo's agreement to give you warrants in HHA's name? Any writings at all?

A. Yes.

Q. Can you show me them?

MR. VENTURINI: Well, where is he going to show them from?

A. You have them.

Q. I do?

A. Yes.

Q. I that the -- the writings attached to Mr. Venturini's affidavit that he filed yesterday? Yesterday? The day before yesterday I guess.

22 (Pages 82 to 85)

Page 86

A.    I think you're being a little bit vague. You're saying do I have any documents. I don't have any documents with me, sir.

Q.    Let me show you the affidavit. Document 43 is Mr. Venturini's affidavit which he attached various documents to rely upon.

MR. ROSENBAUM: Here. Here. Here. Here.

MR. VENTURINI: That's for me?

A.    Thank you.

MR. ROSENBAUM: Yeah.

Q.    Can you tell me what writing that you attached to that affidavit --

A.    Yes.

Q.    -- with regards to the agreement?

A.    Yes. I think the box is in the way. You can't see my tie.

No. No. I need the -- this. These things.

It was our usual course of my understanding of my agreement with Mark that I had 40 percent of the warrants. There were a few instances where my interest in the warrants directly to HH Advisors was a little bit more complex and on those occasions I reduced it to a spreadsheet which

Page 87

has been provided to you in my affidavit. Three particular deals where it was a little bit more complicated because it wasn't a plain, vanilla type transaction like your theoretical million dollar example with the 300,000 warrants you described earlier. So, on occasions where it was more complex, and I had multiple takings of warrants, I reduced it to writing for a spreadsheet so we could see it. Many things I discussed with Mark we discussed in a weekly meeting and then I would go out and act according to what we discussed and that's what I did.

Q.    And my question is different though. My question is, as a result of these meetings that you had with Mark Angelo where you discussed increasing your percentage to 44.4 percent and giving the warrants directly to the name of HH Advisors --

A.    Right.

Q.    -- is there any writings reflecting those conversations? That's my question.

A.    Well, there's two parts to your question. With regard to the 44.4 percent, there's not an amendment to this document which says we're now going to accelerate it, but --

Page 88

Q.    Go ahead.

A.    -- there are e-mails where I refer to my 44.4 percent interest and acknowledgment by the fact that YAM actually paid me 44.4 percent of the banking fees. So, not to make a legal conclusion, but the reality was we worked as if I had 44.4 percent and there are e-mails to that effect and I am paid according to that.

Q.    Are there e-mails reflecting your agreement reached at the same time that you agreed to the 44.4 percent to the affect that the warrants will be issued in the name of HH Advisors, yes or no?

A.    I don't know if there's an agreement at the time in writing. The writings that I have --

Q.    No, not any writing. Whether it's an agreement, whether it's an e-mail, anything.

A.    I was in the middle of answering. Which is the writings that I have, again, are practical writings having to do with the cut up of the warrants pursuant to my agreement with Mark as evidenced in my affidavit with regard to certain situations that required more complex breaking up of the warrants versus a plain, vanilla type of breaking up of the warrant, as in your million

Page 89

dollar example -- your theoretical million dollar example.

Q.    Well, why don't you turn, using Mr. Venturini's affidavit, to Exhibit -- I think it's the first exhibit in that affidavit. It's the June 1, 2005 memo from you to Mr. Angleo. Exhibit A -- Exhibit --

A.    Where do I find that, I'm sorry?

Q.    First exhibit.

A.    I don't know how it's numbered, I'm sorry.

MR. VENTURINI: Well, let me start an objection because this is presented with my affidavit alone and then the exhibits. So, this is not necessarily an exhibit to my affidavit.

MR. ROSENBAUM: Well, all right, I don't even understand that.

Q.    But anyway, do you see this exhibit?

A.    Just for clarification, if I may.

Q.    Sure.

A.    Is this the exhibit to my affidavit that I submitted?

Q.    This is an exhibit to Mr. Venturini's affidavit. He submitted an affidavit --

MR. ROSENBAUM: Yes, it is.

DOERNER & GOLDBERG, INC.
5 Becker Farm Road * Roseland, NJ 07068

973-740-1100
1161 Broad St. * Ste. 110 * Shrewsbury, NJ 07702

Page 90

MR. VENTURINI: No, it's not.

MR. ROSENBAUM: It sure is.

MR. VENTURINI: Well, I wrote an affidavit I should know what I --

MR. ROSENBAUM: Well, I can tell you right now it's an exhibit to it, first exhibit.

Q. The June 1, 2005 memo, do you have it in front of you?

A. Yes, sir.

Q. It's the first exhibit to Mr. Venturini's affidavit.

MR. VENTURINI: Objection, it's not my -- an exhibit to my affidavit.

MR. ROSENBAUM: Do you have -- do you have your file copy?

MR. VENTURINI: No, I don't.

MR. ROSENBAUM: Well, I have it. In fact, I have the copy you sent me yesterday. And this was -- the June 1 memo was the first exhibit in that affidavit.

MR. VENTURINI: Right. There were -- all the affidavits were together. So, they're affidavits from a number of defendants.

MR. ROSENBAUM: Your affidavit, your's, you're Mr. Venturini, your affidavit has

Page 91

this document as the first exhibit to it, okay. That's my representation to you. You should know because you put the thing together.

MR. VENTURINI: Well, I'm reading my affidavit and it doesn't refer to Exhibit A. So, I do know. It's not an exhibit to my affidavit. It's an exhibit to the affidavits, plural, that were all submitted together.

Q. In any event, do you see the June 1 memo -- the June 1st, 2005 memo?

A. Yes, sir.

Q. And that memo was drafted by you?

A. Yes, sir.

Q. And reflects a conversation you had with Mr. Angleo concerning the items in that memo?

A. Not exactly.

Q. Well, let's review it. It's dated June 1, correct?

A. Yes.

Q. And it's from you to Mr. Angleo regarding Highgate House Funds, correct?

A. Yes.

Q. All right.

A. Your characterization of your question though is not accurate.

Page 92

Q. I didn't ask a question yet. The first -- the first numbered point in this memo refers to the acceleration of your profit percentage to 44.4 percent?

A. Yes.

Q. All right. And you said you had a conversation with Mr. Angleo about that in the same time frame you had the conversation increasing -- where -- where he agreed to issue warrants in the name of HH Advisors, there's no question about that, is there?

A. My conversation with Mr. Angleo was some time, as I said it could have been before or after, but not -- not at this particular meeting on June 1st.

Q. Well, there wasn't -- there's nothing in here that references a June 1st meeting, is there? I didn't see anything that referenced a June 1st meeting.

MR. VENTURINI: Well --

Q. Is there? Is there? That's my question. Is there anything in this memo that refers to a June 1st meeting?

MR. VENTURINI: Just let me note an objection to the extent you're arguing with the

Page 93

witness. The question you asked is proper, but the previous comment was improper.

Q. Is there anything in this memo that refers to a June 1st meeting? There is or there isn't.

A. No, sir.

Q. Okay. All you can tell from this memo it was written on June 1st, correct?

A. No, sir. I can tell more from this memo other than the fact that it was written on June 1st.

Q. You can tell, amongst other things, that the memo was drafted on June 1st, correct?

A. Yes.

Q. It doesn't tell -- it doesn't tell when the subject of the memo was discussed, does it?

A. No.

Q. Okay. So all you can -- all you can say is that you discussed with Mr. Angleo at some point on or before June 1st the acceleration of your profit percentage from 40 to 44.4 percent, correct?

MR. VENTURINI: Objection, that's not all he can say. He can say plenty of things.

Q. Is that correct? As it relates to that item.

24 (Pages 90 to 93)

Page 94

MR. VENTURINI: Mischaracterization.

A. You're mischaracterizing from your very first question on this memo and I'd like to clarify.

Q. I haven't -- I haven't said anything. Let me ask you --

A. You asked me a question. You did.

MR. VENTURINI: If you want to withdraw the question withdraw it.

Q. I'll withdraw it and ask you another question. The first numbered item on this -- in this memo refers to the agreement between you and Mr. Angleo to increase your percentage from 40 to 44.4 percent; is that correct?

A. Yes, sir.

Q. And you had a conversation with Mr. Angleo on or before June 1st of '05 concerning that, correct?

A. Definitely before June 1st, 2005.

Q. Okay. Okay. Now, the remaining items, two through five -- two through six in this memo, is it correct that you had conversations with Mr. Angleo concerning those items also on or before June 1st, '05?

A. No, it was all prior to June 1st,

Page 95

2000--

Q. I said on or before.

A. Okay, but I am clarifying. It's prior to June 1st, 2005. That's important.

Q. Okay. And you said before that your conversations as it related to increasing your profit percentage to 44.4 percent and you getting the warrants issued in Highgate House's name -- in -- in HH Advisor's name occurred some time between May and July, that's what you said before the break. Do you recall that?

A. That's correct.

Q. Okay. And you can't remember when precisely that occurred, correct?

A. Correct, can't tell you the date.

Q. But you said it was the same general time frame as you had the conversation concerning increasing your profit percentage to 44.4 percent. You don't deny that, do you?

A. That's my recollection --

MR. VENTURINI: I'm sorry, can I have that read back?

Q. You don't deny that the conversation that you had with Mr. Angleo concerning HH Advisors getting warrants in its name was around the same

Page 96

time as the conversation increasing your profit percentage to 44.4 percent? You don't deny that, do you?

MR. VENTURINI: Objection, asked and answered. He gave you the time frame.

Q. You don't deny that, do you?

MR. VENTURINI: His answer was different than that.

MR. ROSENBAUM: It was not. Look, August, just object to form and then let the witness answer.

Q. Answer the question.

MR. VENTURINI: But don't mischaracterize what he said.

Q. I said, you don't deny that, do you? That's my question.

A. I'm now confused.

Q. I don't blame you because that was the purpose of the objection, to confuse everybody.

MR. VENTURINI: No, it wasn't. The purpose is to make sure we have a clear question.

Q. Let me re-ask the question. You don't deny that you testified before the break that you had a conversation with Mr. Angleo concerning increasing your profit percentage to 44.4 percent at

Page 97

about the same time that you had the conversation with Mr. Angleo concerning issuing warrants directly to HHA?

A. I think my testimony was that those two items were not linked. My conversation with Mark Angelo regarding the warrants being issued in my name was a conversation that we had, could have been May, could have been July, an administerial conversation that we had in passing, much different than the content of this memorandum and what lead up to it. That's my testimony.

Q. Okay. Is there any memos that you can point to where you confirmed to Mr. Angleo in writing his agreement to have the warrants that you say you were entitled to issued in the name of HHA, yes or no?

A. As I previously --

Q. Other than the -- other than the three memos that you spoke about before that were more complicated transactions is there anything else that you can point to?

A. I don't recall other than those -- other than those three memos, no.

Q. Okay. Now, at any time between June -- well, let's go back. Between May of '05 and

25 (Pages 94 to 97)

Page 98

December of '05 were warrants issued in the name of HHA pursuant to this agreement you say you had with Mr. Angleo, yes or no? Between May of '05 and December of '05.

A.    My recollection is the only transaction where -- again, we're going to get into some fine language here, but the only transaction that I can recall where warrants were written out was in the Oxford Eu LaRu transaction in or about November of '05. The reason why it's a little bit tricky is because those warrants actually weren't issued, although they were physically created, but they weren't formally issued by the company.

Q.    All right. I'm talking about -- excuse me. I'm talking about warrants issued by the company to whom funds were given. Were any --

A.    Well, then you didn't understand the answer to my question.

Q.    No, I understood it. I understood it. I'm talking about --

A.    We gave money to a company called Oxford.

Q.    But warrants weren't issued until some time --

A.    Well they physically -- physical

Page 99

paper was created, but it was an impossibility of issuance because there wasn't enough shares underlying the warrants.

Q.    I understand that.

A.    So it was later determined that they couldn't be issued -- parties agreed they were not to be issued. Other than that instance, to the best of my knowledge, no.

Q.    No, what? There were no warrants issued to HHA with respect to the time period of May 1 -- May 1 of '05 through December of '05?

A.    That's my recollection, sir.

Q.    And there were deals done between that time period; is that correct?

A.    Yes.

Q.    And there were warrants issued in that time period by the various companies to whom monies were -- were given, correct?

A.    Yes.

Q.    And -- and the warrants were always in the name of Highgate House; is that correct? Best of your recollection.

A.    To the best of my knowledge, yes.

Q.    And none of those warrants that were issued to Highgate House were ever issued to HHA,

Page 100

correct?

MR. VENTURINI: Do you understand --

Q.    Strike that. Strike that. None of the warrants that were issued to Highgate House between May of '05 and December of '05 were issued to HHA during that time frame; is that correct?

A.    Yes.

Q.    Okay. So if there was this agreement, as you say there was, you didn't enforce it between May and December of '05, correct?

A.    No.

MR. VENTURINI: Objection.

Q.    You did enforce it?

A.    No. The answer to your question is, no, it's not a correct characterization.

Q.    Did you enforce this agreement?

A.    Yes.

Q.    In what way?

A.    I went to Mark Angelo not knowing -- not understanding how the warrants are going to be handled and I said to him, I'd like the warrants to be issued in HHA's name. And his agreement with me was, okay, you can do that, but just open an account with Gator at Sloan Securities so I can see when you're selling the stock.

Page 101

Now, as I testified earlier, there was no rush to do that at the time because first of all, deals have to be done, have to close, registration names have to be filed and become effective before you can even sell the shares underlying the warrants which is going to be months into the future. Not even to mention the fact that Cornell had two regulatory problems with the Commission in regard how we were doing our deal structure. So the reality is registration names for many deals were months away from being filed on Moda (sic.) deals so there was no pressure to have to effectuate this agreement I had with Mark.

Q.    So the agreement that you had with Mark was simple, it was not effectuated to the best of your knowledge at any time between May of '05 and December of '05? That's what you just said, correct? That's just what you just said. I'm not paraphrasing, I'm repeating.

A.    No, repeating, sir, is to repeat exactly what I said. You are paraphrasing. So, I'll answer your question and testify that there was no pressure on my part to have -- to actually have each warrant retitled in HH Advisor's name in June, July or August 'cause there was no pressure. We

26 (Pages 98 to 101)

Page 102

were no where near being able to sell the shares underlying the warrants. That's my answer.

Q. Okay. So you saying that basically you only -- you were concerned with having warrants in your name, in the name of HHA, only at the time they were converted to shares and thereafter -- and the shares were thereafter sold?

A. No, I didn't say that either. What I --

Q. Go ahead.

A. Sir, please, I'm answering your question. The question you asked me is not what I testified to. What I said was there was no pressure to have -- to have the shares -- the warrants retitled at the time I made my agreement with Mark. It doesn't mean I was going to wait until the shares were free trading. Why? Because the registration statement would have to include my name as the title holder of the warrants.

So, although there was no pressure June 1st or July 1st, as we got closer to filing registration statements I would then want to have them retitled, but as I've also testified to, there were two times during the course of 2005 where we had to stop doing deals because of issues Cornell

Page 103

was having with the Commission on the structure of their deals. We pulled registration statements on deals or told companies we had to restructure deals. So the idea of registration names being filed were months and months away, probably at the end of '05 on a lot of deals. So, there was no pressure to do it right then, but it doesn't mean we were waiting for the registration statements to go effective and for stock to be sold. You're -- it's too broad of -- of a time frame that you're creating as the answer which is not my answer to the question.

Q. Let me be very specific.

A. Please.

Q. At no time between May of '05 -- strike that. Between May of '05 and December of '05 Highgate did a variety of deals, correct? Several deals, correct?

A. I don't understand the question. I thought you said at no time in the beginning of your question.

Q. I withdrew it. Listen to my question. Between May of '05 and December of '05 Highgate did several transactions, correct?

A. Yes, sir.

Q. And in connection with those

Page 104

transactions warrants were issued; is that correct?

A. Yes, sir.

Q. And the warrants were issued in the name of Highgate, correct?

A. To the best of my knowledge, yes.

Q. And at no time between May of '05 and December of '05, other than those three deals you spoke about before, did you ever ask for warrants to be issued in the name of HHA, correct?

A. The only person I asked to have the warrants issued in HHA Advisors was Mark Angelo in or about May or July of 2005.

Q. But the warrants that were issued after you had that conversation were not issued in the name of HHA as of December of '05; is that correct?

A. That's correct.

Q. Okay. Do you know whether any registration statements concerning any of the warrants issued to Highgate were done between May of '05 and December of '05 for the warrants?

MR. VENTURINI: In any transaction?

MR. ROSENBAUM: Yes.

A. As I testified earlier, some registration statements were filed and some had to

Page 105

be pulled because we had to restructure the deals on a couple of occasions.

Q. With respect to the registration -- the warrant registration statements that were filed and not pulled, were any of those done between May of '05 and December of '05, to your knowledge?

A. I don't recall.

Q. Let's assume that there was.

A. Okay.

Q. You would want your name upon the registration statement as -- as -- HHA's name on the registration statement as an -- as an owner of some of the warrants, correct?

MR. VENTURINI: Well, let me object.

Q. Is that correct?

MR. VENTURINI: Let me object. It's -- it's a hypothetical question. And number two is, I'm not exactly sure I understand what you're talking about. Well, no. No. Just ask a new question.

MR. ROSENBAUM: I did.

Q. Answer it please.

MR. VENTURINI: Let's have it read back.

(Requested portion read back by the Reporter.)

27 (Pages 102 to 105)

Page 106

MR. VENTURINI: In -- in what particular deal?

Q.    I just told you, on any deal that warrants were issued at Highgate?

A.    It would be my preference to have warrants titled in the name of HH Advisors.

Q.    Do you know whether HHA Advisor's name was on any registration statement for warrants in Highgate's name between May of '05 and December of '05? Either you know or you don't know.

A.    I don't know.

Q.    Okay. Let's assume that there were registration statements for Highgate warrants between May and December of '05 and HHA Advisor's name was not on those registration statements. That would be contrary to this oral arrangement you had with Mr. Angleo, correct?

A.    No.

MR. VENTURINI: Objection.

Q.    Why?

A.    Because just because a registration statement was filed with Highgate House's name on the warrants doesn't mean it's contrary to my agreement with Mark. Warrants can --

Q.    Go ahead.

Page 107

A.    Warrants can be transferred easily to whoever you want to transfer them to because our warrants are assignable. It would be my preference to be included in the registration statement, but not a requirement.

Q.    At any time between May of '05 and December of '05, other than those three deals, and we'll get to those, were any of the warrants issued in connection with any of the transactions issued -- given -- I'm sorry, let me withdraw that question.

With respect to deals done between May and December of '05, other than the three deals that are in your affidavit which we'll get to, were any of the warrants in connection with those deals issued in the name of HH Advisors?

MR. VENTURINI: At any time?

MR. ROSENBAUM: No, between May and December of '05.

MR. VENTURINI: Asked and answered.

A.    Is this a different question?

Q.    Same question. The answer is no? You're right. The answer is no, correct?

A.    I -- if -- I was trying to find what the difference was in the two questions. So there's no difference in the question. Why don't you read

Page 108

the question back then please.

Q.    At any time, in any deal between May -- May of '05 and December of '05 in which warrants were issued, other than the three in your affidavit, were any of those warrants ever issued in the name of HH Advisors?

MR. VENTURINI: And issued during that period?

MR. ROSENBAUM: Right.

A.    I think my testimony just was, not to my recollection.

MR. VENTURINI: Right.

Q.    Let's go on. Let me show you your affidavit. It's document 41. The three deals you're referring to before as somewhat complicated, what paragraph of your affidavit are you talking about?

A.    One of the transactions appears on page 12 in paragraph 51.

Q.    Hold on, page 12 you said?

A.    Oh, actually it begins on page 11, I apologize, paragraph 46.

Q.    Okay. The three deals were First Look Studios, Sanuco and Oxford?

A.    Yes, sir.

Page 109

Q.    Okay. And then you -- the balance of your affidavit talks about the warrants in each of those deals, correct? Just generally speaking.

MR. VENTURINI: Well, objection.

Q.    Correct?

MR. VENTURINI: Objection, that's -- that's incorrect.

A.    No.

Q.    The balance of your affidavit talks about the issuance of the warrants in each of Oxford --

A.    No, sir.

Q.    You're right, talks about the issuance of the warrants in Oxford Eu LaRu, correct?

A.    I didn't hear the first part of your question.

Q.    I was just trying to generalize it. With respect to the three deals, First Look Studios, Sanuco and Oxford, the balance of your affidavit in paragraph 51 talks about -- begins to talk about the Oxford Eu LaRu transaction --

MR. VENTURINI: Objection.

Q.    -- correct?

MR. VENTURINI: That's an incorrect characterization of the affidavit.

28 (Pages 106 to 109)

Page 110

Q.    Is that correct? You can answer it if you understand it.

MR. VENTURINI: Well, let him go through the rest of the affidavit to see if the balance of it speaks about those three transactions.

Q.    Sure.

A.    The balance of the affidavit speaks about more than those three transactions. If you look at paragraph 57 it talks about Charys, 59 talks about the Shortfall and the Highgate Fund, and paragraph ends 69.

Q.    That's not what I asked you. I'm talking just about the three transactions -- the three transactions --

MR. VENTURINI: Please don't argue with the witness.

MR. ROSENBAUM: I'm not arguing --

MR. VENTURINI: I understand his -- his interpretation of your question to be the same and -- and it's you that are incorrect. So don't argue with the witness.

Q.    The three transactions that you said were complicated are the Eu LuRu, First Look Studios and Sanuco transactions, correct?

A.    As I've said now three times, yes,

Page 111

sir, that's correct.

Q.    All right. And you talk about at least the Eu LaRu transaction at page 12 of your affidavit, correct?

A.    Yes, sir.

Q.    All right. You don't go into much detail about Sanuco or First Look in your affidavit; is that correct?

MR. VENTURINI: Objection to the characterization.

A.    I provided the information that I thought was relevant to my affidavit.

Q.    We'll come back to Eu LaRu. Let me go on. I want to talk about your termination of -- of your relationship. If you look at Exhibit 3.

A.    In this document, sir?

Q.    No, I'm going to give it to you.

A.    Thank you.

Q.    You drafted Exhibit 3; is that correct?

A.    Yes, sir.

Q.    It's a letter from you -- from you to Mark Angelo at Yorkville dated January 9th?

A.    That's correct.

Q.    Okay. And basically, according to

Page 112

the first part of the letter, you wanted to terminate your relationship effective as of January 9th, that's what the first sent -- first line of the letter says, correct?

A.    Well, it was a typo on my part. It should have said January 19th 'cause I have to provide ten days notice.

Q.    When did you first make the decision to terminate your relationship with Yorkville?

A.    I think my first concerns arose in the beginning of November of 2005 when it became apparent to me that Mark was overstating the return in the fund.

Q.    Which fund, Highgate?

A.    Highgate House. I don't know about Cornell 'cause I don't -- I'm not part of that inner circle. And I expressed my concern in a conversation with Mr. Angleo and Matt Beckman walking on the street on the way to a lunch, and I recall very explicitly saying to them that these kind of things where you falsify return and then hope to make it up can get -- can get out of control and the expression I used, I said this is like Refco plus Zeros. And I told Mark in that discussion I didn't want to be part of any organization that was

Page 113

going to create false returns.

Mark assured me that wasn't going to happen. There were a couple of instances where the Fund had sold positions from Cornell to Highgate to help make return and he then advised me that those transactions are not -- are not allowed because they're intercompany transactions, not arms length. So, with those transactions I sort of gave him the benefit of the doubt, but on the estimating NAV on a monthly basis and then trying to make it up was giving me concern. So that's when I started to have concerns.

Q.    By the way, you mentioned that your -- your affiliation or your concerned express overstating the net asset rate of Highgate, what was your relationship with Highgate?

A.    I was a co-portfolio manager.

Q.    Were you an officer, do you know, of Highgate?

A.    I think on --

Q.    If you know, I don't want you to guess.

A.    To the best of my recollection I'm a director of the fund.

Q.    Director of the Highgate -- meaning,

29 (Pages 110 to 113)

Page 114

you determined -- you make recommendations as to what types of companies to invest in and that sort of thing?

A. Well, that's mixing two things. As co-portfolio manager my job, which you will not find by the way in my compensation agreement, was to, as Mark asked me, to find deals, structure them and get them done. It was Mark's responsibility, Mark's offer, to handle the back office, the accounting and the money raising.

Q. So when you say you were a co-director though of the Highgate Fund, what did that -- what did that responsibility involve?

MR. VENTURINI: Objection. You can answer.

Q. You can answer.

A. To the best of my recollection Highgate is set up as an offshore base, Cayman Island fund which has a board of directors and I believe I'm a director of one of the -- one aspect of the fund. That's my recollection. I may be incorrect, but I think that's correct.

Q. When you say one aspect of the fund, what do you mean by that?

A. Well, the fund is set up with a

Page 115

number of feeders and a master. So I don't know if I'm a member of the board of directors of the master or the feeder, I'm not sure which.

Q. How many feeders are there or were there?

A. To the best of my recollection there was an onshore feeder, an offshore feeder and then an offshore master fund.

Q. So, two feeders and one master fund -- one master fund, correct?

A. That is my recollection.

Q. And you don't know which of those three entities you may have been a director of?

A. I don't recall.

Q. Do you recall performing any duties as a director of any of those three funds?

A. Other than signing some basic formation documents, I had no other responsibilities, meetings or otherwise.

Q. Okay. All right. In any event, getting back to your June -- January 9th letter. You said it was a typo, it should have been January -- the effective date of your termination should have been January 19th?

A. Yes, sir. And I think I sent a

Page 116

corresponding, corrective memo to Mr. Angleo immediately thereafter.

Q. Okay. We'll get to that, but let me just ask you this. Paragraph little I, do you see that, the first paragraph? It says, quote, "we wish --"

A. I'm just reading it.

Q. I'll put it in the record. "We wish to confirm that we are entitled to all compensation provided for under the letter agreement, including, but not limited to little I, 44.4 percent of the 20 percent incentive fee earned by the Funds in the calendar year 2005 based on its profits, approximately -- of approximately $7,456,000 and 44. -- 44.4 percent of the tail profits for a period of 18 months from and after the effective date." End quote. I read that accurately?

A. Yes, sir.

Q. All right. So, this letter or this claim, this entitlement was -- I'm sorry, this entitlement, as I've just read it, was that which you were claiming to Mr. Angleo you were entitled to from Yorkville, correct?

A. As -- yes. As part of the fees that were not in my control. These are two elements that

Page 117

I was notifying Mark of that I would be dependent upon Yorkville to make sure about.

Q. Okay. And then you said you corrected the June 9th date to June 19th at some point?

A. That is my recollection that I sent a corrective correspondence indicating the typo.

Q. I'm going to show you an e-mail and a letter and you tell me which of the -- which one does that.

A. Thank you.

Q. Showing you P-4 and I'm also going to show you P-5. P-4 is an e-mail from you to Mark Angelo dated June 11 -- June -- I'm sorry, 11th?

A. January 11th.

Q. January 11th, yeah, of '06, correct?

A. It appears to be that, yes.

Q. All right. Is this the e-mail where you corrected the -- the effective date of the termination?

A. Yes, sir.

Q. Okay. If you look at this e-mail, Exhibit, what is it, four? In the middle of it starting with the sentence, also. Do you see that, "Also I will prepare a more thorough summary of

30 (Pages 114 to 117)

Page 118

compensation issues as they relate to me as I had mentioned two items that I thought my -- that I thought of in my termination letter." Do you see that?

A. Yes.

Q. All right. You indicated that you're going to prepare -- I'm sorry. You indicated you're going to prepare a more thorough statement of the compensation issues that deal with what, your entitlements?

A. Things that are beyond my control and one of the items from my recollection is my carried interest in Apprentice Capital's investment in Cornell. An item, by the way, which is also not in my compensation agreement from November 1st, 2004.

Q. As of January 11th of '06 you had not received warrants issued in HHA's name, correct? Other than -- other than the three that we spoke about before?

MR. VENTURINI: Well, are you asking him because you haven't asked that question before?

Q. Answer it, is it correct?

MR. ROSENBAUM: What's so difficult about this, August?

Q. Is it correct that you had not

Page 119

received warrants in -- in HHA's name as of January 11th of '06, other than the three that are subject of the affidavit?

A. I believe that is correct.

Q. All right. So, I would imagine you would want those warrants -- now that you're no longer associated with Yorkville I assume that would be an issue that would be of importance to you to get all the warrants that you're entitled to issued in your name, correct?

A. Yes, that's something we had previously handled.

Q. Right. At any time after January 11th of '06 did you ever write to anybody at Yorkville to have them issue warrants in the name of HH Advisors?

A. What's the time period?

Q. After January 11th of '06.

A. Yes.

Q. When?

A. Multiple occasions.

Q. Does that -- does that pertain to the Oxford, Sanuco and First Look transactions?

A. Yes.

Q. All right. What about the other

Page 120

warrants that were issued in the name of Highgate to which you claim an entitlement?

A. Did we send a writing?

Q. Yes.

A. I don't know. I don't remember.

Q. And you acknowledge or you agree that there were warrants issued in connection with transactions other than First Look, Sanuco and Oxford issued to Highgate to which you're entitled to 40 percent?

A. Yes. To set the framework, there is about six transactions that we're talking about that would fit the perimeters of not being a 504 transaction, not being an investment by the Fund, not being an investment made by Cornell. There's only five or six warrants that fit the perimeter of what you're discussing.

Q. And you never asked for those in writing after January 11th of '06; is that correct?

A. Didn't have to.

Q. Why didn't you?

A. Because I had an agreement with Mark that those were my warrants and I effectuated the assignment when we needed to do it.

Q. What do you mean? I don't understand

Page 121

what you mean, you effectuated the assignment. You effectuated an assignment of those warrants from Highgate to HH Advisors?

A. Pursuant to my agreement with Mark, yes.

Q. Did you -- other than -- we're not talking about -- well, irrespective of Charys, and we'll get to Charys, did you effectuate assignments of other warrants besides Charys?

A. Yes.

Q. Which ones?

A. I don't know the names. There's about five or six companies that do not fit the perimeters. Let me clarify.

Q. That don't fall within the exceptions?

A. Right. There's another exception. If Cornell generated the deal and sold it to us, whether it was to help make return or for whatever reason --

Q. You are speaking of Gottbetter who?

A. Let me clarify. If Cornell generated a deal that I had nothing to do with at Highgate, and Cornell decided or YAM decided on Cornell's behalf, to sell or transfer that position into

31 (Pages 118 to 121)

Page 122

Highgate, which happened many times, those warrants I was not entitled to a percentage of because those are transactions that neither Highgate originally financed or originated. That was Mark's direction and I agreed to that. There are a limited number of transactions which are transactions that I generated, or was credited with generating, that Highgate financed of which I was entitled to the warrants and it's only about five or six companies.

Q. All right. Those five or six companies --

A. Like the Charys example.

Q. So is Charys included in those five or six?

A. Yes, sir.

Q. So there's either five -- there's either four or five additional transactions besides Charys that you are entitled to warrants for, correct? That's what you're telling me.

A. In addition to your other three exceptions 'cause you have a lot of exceptions so.

Q. Let's just deal with the five or six you --

A. I want to be clear that those are in addition to the three transactions that you keep

Page 123

carving out.

Q. Right. Right. So you're -- you're telling me in addition to Charys you're entitled to warrants on four or five other companies?

A. Give or take one, that's my recollection.

Q. Okay. And you're saying Highgate has not issued those warrants to you, at least as of today?

MR. VENTURINI: I'm sorry?

Q. Highgate has not issued those warrants to you, HH Advisors, as of today, December 21, '06, correct?

A. No, that's not correct.

Q. They have issued the warrants to you?

A. Just as the Charys warrants were retitled, warrants in the other five transactions have been assigned pursuant to my agreement with Mark.

Q. Okay. So that which you did with Charys, the assignments that you did with Charys, you've also done that with respect to other -- other transactions?

A. Yes. We didn't cherry pick Charys. It was -- Charys is a part of a group of five or six

Page 124

warrants, in addition to the three special cases, in which HH Advisors was entitled to its 44.4 percent and we assigned those warrants in accordance with the agreement.

Q. The assignment of the Charys warrants you did in January of '06, at least verbally, correct?

A. Yes, sorry.

Q. When did you do these assignments of these other four or five transactions?

A. To my recollection, the same exact time.

MR. ROSENBAUM: Can you -- you didn't produce copies of those assignments. Could you do that please?

MR. VENTURINI: We'll take it under advisement.

MR. ROSENBAUM: You want me to send you a letter? Will you tell me by the end of business tomorrow?

MR. VENTURINI: I think I'm going to be here tomorrow. I'll tell you as soon as I can.

MR. ROSENBAUM: Since you're going to be here tomorrow I ask that you produce them tomorrow, if you intend to produce them. Otherwise

Page 125

we'll assume you don't intend to produce them, but I'll send you a note on them. What time is it? Oh, it's late already. Well you know what we might as well take a break for lunch and just go right downstairs.

MR. RIVERA: We're going off the record. The time is 12:42 p.m.

(Lunch recess was taken.)

MR. RIVERA: We're back on the record. The time is 1:25 p.m. This begins tape number three.

Q. Before the break -- before the break I was asking you about these five other warrants that you said you executed assignments for, do you remember the names of the companies?

A. No, not that I recall.

Q. Pardon?

A. Not that I recall, no.

Q. And you executed these warrants -- I'm sorry, you executed the assignments on behalf of who?

A. Highgate House.

Q. Okay. Did you ever tell anybody associated with Highgate or Yorkville that you had executed -- strike that.

32 (Pages 122 to 125)

Page 126

At any time prior to this litigation, which started November of '06, did you tell anyone at Yorkville or Highgate that you prepared and executed these assignments?

A.   I don't recall whether or not I did.

Q.   You executed assignments with respect to Charys as well, correct?

A.   Yes, I did.

Q.   Did you ever tell anybody associated with Highgate or Yorkville that you executed those assignments before this litigation?

A.   Well, I put the Charys warrants in the same group as the other four or five. So, to me it was an administrarial function that we just carried out in accordance with our agreement. I don't know whether I officially made a big announcement about it. I don't recall, it was a year ago.

Q.   Did you send copies of the assignments to anybody at Yorkville or Highgate?

A.   I don't know. I didn't actually handle the paperwork on it.

Q.   Did you ask the person that did to send the -- the assignments to -- copies of the assignments to Highgate or Yorkville?

Page 127

A.   I don't recall. I would have told the person to assign the warrants, take the 44.4 percent, cut the balance into Yorkville's name and send the warrants.

Q.   Send the warrants to who?

A.   You know, send the paperwork or wherever it needs to go, you know, take care of it.

Q.   Did you assume that the warrants would be reissued once you executed these assignments?

MR. VENTURINI: Objection to form.

A.   Eventually the warrants were to be retitled in the name of HH Advisors and -- and whatever Yorkville wanted.

Q.   When you say eventually, when would you make -- when did you make the decision to trans -- to have the Charys warrants, for example, reissued?

MR. VENTURINI: Objection to form.

A.   Well, they're not reissued. In -- in January as part of our cleaning up we had a lot of administerial duties and part of that would have been assigning the warrants that we had entitlement to, just those warrants.

Q.   But when did you make the decision to

Page 128

notify Charys of the assignment and in turn have them reissued?

A.   Again, as I testified earlier, there was no tremendous pressure to have them retitled. There was no overwhelming need to get it done right away.

Q.   No, that's not my question. When did you -- when did you make the decision to notify Charys? That's all I'm asking you.

A.   I don't remember. Some point in 2006.

Q.   You don't remember when though?

A.   No. I would -- no.

Q.   Did you notify any of the other companies to whom -- that -- that you assigned these warrants for, do you know?

A.   No, 'cause I wouldn't be doing the notifying. I don't know if someone else made the notification.

Q.   Did you direct anybody in your organization to notify the other companies of these assignments, for the companies in addition to Charys?

A.   Again, you know, unless there was a timeliness or a reason I wouldn't have directed

Page 129

someone to do so.

Q.   Did you direct someone to notify Charys of the assignments?

A.   Ask the question again.

Q.   Did you direct someone in your organization to notify Charys of these assignments?

A.   Not to my recollection, no.

Q.   Ultimately you're aware that the Charys issued -- the Charys warrants were reissued in your -- in the name of Highgate and Chorske and -- and Yorkville?

A.   Yes.

MR. VENTURINI: Objection to form.

Q.   How did that happen?

A.   Yes, I became aware of that.

Q.   How did that happen?

A.   How did what happened?

Q.   How did -- how did Charys become aware -- excuse me, I'm sorry, of the assignments? How did they get the knowledge that -- to reissue the warrants?

MR. VENTURINI: Objection to the form.

A.   Someone in my organization, most likely Jason Rimland, would have dealt with Charys

33 (Pages 126 to 129)

---

Page 130

in the retitling of the warrants. When it occurred, I do not remember.

Q. Did you give Jason Rimland direct -- sorry. Did you give Jason Rimland directions to take care of this and get Charys to reissue the warrants, the Charys warrants?

A. My recollection is that I was asked about it and I said to go ahead and do it. I don't recall making the initial instruction.

Q. Asked by whom?

A. Either Jason Rimland or Michael Chorske, I don't recall. It would have been one of the two of them.

Q. What did either of them ask you, Mr. Gottbetter?

A. As I just said, I don't recall --

Q. You don't recall?

A. -- them. No. What I said was -- you asked how it happened. I said, it would have been either one of them and they would have told me and I would have said, okay, go ahead and do it. The instruction I gave was the assignment of the five or six warrants because that was something I knew had to be done. I gave that instruction.

Q. When you said one of the two, one of

Page 131

Chorske or Rimland, asked you about getting the warrants -- the Charys warrants reissued what did -- whoever it was, what did they say to you that's my question?

A. That was not my testimony, sir. My testimony was, you asked me how it would have happened and I said, I don't recall making the instruction. I recall it would have either been Jason Rimland or Michael Chorske saying to me, we're going to retitle the warrants and I would have given my consent or okay, go ahead and do it.

Q. They couldn't do that without your consent or authorization?

A. I don't think of it that way. I think it was as a communication, hey, we need to do this or we're going to do this and I would have said, okay. I don't know if it's a formal, you know, authorization. It's a conversation.

Q. Well, do you know how Charys learned of the -- the assignment? Do you know how they learned of that?

A. No.

Q. Did you ever ask Jason Rimland how he did that?

A. Let me clarify my answer. I don't

Page 132

know -- 'cause your question is very broad. They learned of it from our organization. Who specifically, how, no, I don't recall that.

Q. Okay. Did you -- did you ever see any written communications to Charys from your organization requesting that they reissue the warrants?

A. Not to my recollection.

Q. Have you ever asked Jason whether he was involved in any such communications?

A. What kind of communications?

Q. Communications to Charys to reissue the warrants.

A. I must have misunderstand your question. I said, I think, a few minutes ago that Jason would have, and/or Michael Chorske, would have been dealing with Charys on the retitling of the warrants. So, if I'm familiar with it, I've just said that they would have been dealing with it and would have advised me of such and I would have said, okay.

Q. Did you ever hear how they advised -- either of the two advised Charys to reissue the warrants; telephone, letter, fax, anything?

A. I knew that it -- that it occurred.

Page 133

You know, when exactly or what the communication was or what letters were sent, I don't recall.

MR. VENTURINI: I think it's a yes or no question.

Q. You've answered. The reason I ask you -- let me show you your Answers to Interrogatories. These -- these are the Interrogatories we proposed -- we propounded and here are your answers. Take a look if you would at question -- what number is that, 44?

A. 44.

Q. Take a look at if you would at question --

MR. VENTURINI: Well, do you have the answers because you said you were --

MR. ROSENBAUM: Let me get the questions first.

MR. VENTURINI: I think the answers have the questions.

MR. ROSENBAUM: I think you're right. You're right.

A. Do I need this?

Q. Let me show you -- let me show you the answers because they do have the questions. This is Exhibit 45.

34 (Pages 130 to 133)

Page 134

A.  Thank you.

Q.  Question -- question --

MR. ROSENBAUM: Let me see 46 also.

Q.  Let me just find the right question. Question seven.

A.  What page, sir?

Q.  Eight.

MR. VENTURINI: Exhibit 45?

MR. ROSENBAUM: Yeah.

A.  Yeah.

Q.  Question says, quote, "Identify all communications between and/or among the Defendants and Charys with respect to the issuance of the reissued warrants, including, without limited to the issuance to Highgate House of the reissued warrants annexed as Exhibit C." Do you see the question?

A.  Yes, sir.

Q.  And you answered: "You're objecting to Interrogatory on the grounds it's overly broad, unduly burdensome, vague, ambiguous, not reasonably calculated to lead to the discovery of admissible evidence." Was that your idea or was that Mr. Venturini's idea -- Venturini's idea, sorry?

MR. VENTURINI: Well, I think that objections are basically legal and, you know -- I

Page 135

mean, it -- obviously it's been objected to and we both signed it, but it's --

Q.  Who felt this question was burdensome, you did?

MR. VENTURINI: I think to the extent that, you know, you need to reveal attorney/client communications I'm instructing not to answer.

MR. ROSENBAUM: I'm not asking about your -- let me reask the question.

Q.  Did you feel this question was burdensome?

MR. VENTURINI: I think that's a legal conclusion and I'm instructing you not to answer.

MR. ROSENBAUM: On what grounds?

MR. VENTURINI: Because it's a legal conclusion.

MR. ROSENBAUM: He just -- that's what he said in his written sworn to answers, he felt it was burdensome. So I'm asking.

Q.  Did you feel it was burdensome, that's my question? Did you or didn't you?

MR. VENTURINI: It's a legal conclusion. I'm instructing him not to answer.

MR. ROSENBAUM: He's the one that

Page 136

gave the conclusion.

MR. VENTURINI: Well, they're signed by -- by both counsel and the witness.

Q.  I'm asking the question, did you feel that this was burdensome?

MR. VENTURINI: Instruct not to answer.

MR. ROSENBAUM: On what grounds?

MR. VENTURINI: On the same -- we've been through this three times.

MR. ROSENBAUM: There is no -- there is no right to object on the grounds that something calls for a legal conclusion. I'm not asking for your advice. I'm asking for his opinion.

MR. VENTURINI: I've given my instruction. Please move on.

MR. ROSENBAUM: Okay.

A.  On the advice of counsel --

MR. VENTURINI: You don't need to say that.

A.  -- I've been advised not to answer.

Q.  Okay. Did you see these answers before they went out, Mr. Gottbetter?

A.  Yes, I did.

Q.  And you signed them, obviously?

Page 137

A.  Let me check. Yes, I did.

Q.  Do you know of any verbal communications either Mr. Chorske or Mr. Rimland had with Charys to reissue the warrants?

MR. VENTURINI: Asked and answered.

A.  Not directly, no.

Q.  Did either of them tell you that they had such communications?

MR. VENTURINI: I'm sorry, did they what?

Q.  Did either of them tell you they had such communications?

A.  I was aware that Mr. Rimland and/or Mr. Chorske dealt with Charys on the retitling of the warrants.

Q.  But you don't know how they dealt with Charys? You don't know whether they communicated orally or in writing?

A.  Not that I recall, no. They told me they were dealing with it and that's how they informed me.

Q.  In response to the document demands did you look for any documents such as e-mails or letters from you or your associates?

MR. VENTURINI: That's been asked and

35 (Pages 134 to 137)

Page 138

answered at least for 30 minutes.

MR. ROSENBAUM: Let me ask the question.

Q.   Did you look for any documents?

MR. VENTURINI: Please move on, we've been through this.

MR. ROSENBAUM: I'm going to ask the question. Give whatever instructions you want, but let me finish the question.

MR. VENTURINI: You're wasting your time.

Q.   Did you ask for any documents --

A.   As I previously --

Q.   Let me finish the question, between your organization and Charys dealing with the reissuance of the warrants? Did you ask for people to look for those types of documents?

A.   As I've previously testified, I took the request and I asked Mr. Rimland with the assistance of Mr. Todd to comply with document requests under the guidance of Mr. Venturini.

Q.   Did anybody in the course of the document review show you any communications between anyone in your organization and Charys dealing with request to reissue the warrants?

Page 139

A.   Not that I recall, no.

Q.   And did you ever tell anybody not to produce that document, if there is one?

A.   As I testified earlier, I did not tell anyone in my organization or anyone associated with this matter not to produce any documents that was requested.

Q.   Well, the reason I asked is you haven't produced any documents between your -- between anyone in your organization and Charys. Does that -- can I assume, therefore, that you don't have -- you're not aware of any?

MR. VENTURINI: He's already answered the question.

Q.   Is that a fair -- fair analysis?

A.   Whatever documentation was requested I'm sure that we complied with the request with the advice of counsel.

Q.   Well, let me show you one of the documents then.

A.   Thank you.

Q.   I'm showing you -- I'm showing you a document 30 which is an e-mail from Mr. Rimland to Charys dated June 14th of '06. That's not -- that document wasn't produced by you.

Page 140

MR. VENTURINI: Was it produced by you to us?

MR. ROSENBAUM: No, I don't have -- I didn't get this document. This wasn't gotten from my client's files.

Q.   This -- this document was not produced by you or your associates, whatever --

A.   May I read it.

Q.   You can read it, but let me just finish. Let me give you my statement. This document was not produced by any of the Defendants in this action despite our requests for it, but now you can take a look at it.

A.   Thank you.

(Pause.)

A.   Okay.

Q.   Have you seen this document before, Mr. Gottbetter?

A.   No, sir.

Q.   Obviously it comes from -- it indicates it went from Mr. Rimland to Darcy White, do you see that, on June 14th of '06? You see that?

A.   Yes, sir.

MR. VENTURINI: It's written there.

A.   Yes, sir.

Page 141

MR. ROSENBAUM: Pardon me?

Q.   And it says, attachments and it refers to the attachment that's attached to this e-mail. You see that?

A.   Yes, sir.

Q.   At any time were you aware that Mr. Rimland wrote to a representative of Charys to request that the warrants be reissued?

A.   I was not aware of this communication between Mr. Rimland and Charys.

Q.   Are you sure you didn't see this in response to our document request and ask that it not be produced?

A.   I'll say it again, I did not see this document and I did not tell anyone in my organization to withhold any documents pursuant to the request.

MR. ROSENBAUM: What about you, Mr. Rimland?

MR. VENTURINI: No, he's not -- you can ask him tomorrow. Focus on this witness.

MR. ROSENBAUM: How come this wasn't produce, Mr. Rimland? I'm asking the question. You can direct him what -- how come this document wasn't -- Mr. Rimland is here I'm asking him now.

36 (Pages 138 to 141)

Page 142

Why wasn't this document produced?

MR. VENTURINI: I instruct him not to answer. Please ask the witness questions.

MR. ROSENBAUM: Did you -- did you intentionally not produce this document --

MR. VENTURINI: Same instruction.

MR. ROSENBAUM: -- Mr. Rimland? You're refusing -- he's refusing to answer? I don't blame him.

MR. VENTURINI: He's not a witness today.

MR. ROSENBAUM: I don't blame him.

MR. VENTURINI: He's not a witness today.

MR. ROSENBAUM: I don't blame him.

MR. VENTURINI: He's not a witness. Please ask the witness questions.

MR. ROSENBAUM: I'm not even asking him under oath. Did you have this document and intentionally not produce it, Mr. Rimland?

MR. VENTURINI: You're wasting time, please ask the witness questions.

MR. ROSENBAUM: You won't let him answer; is that correct?

MR. VENTURINI: That's correct.

Page 143

MR. ROSENBAUM: Okay.

Q.    Let's -- let's go through this document together for the moment.

A.    Sure.

Q.    Apparently -- not apparently, the document says that Mr. Rimland is attaching the original warrants issued on November 16th of '05 with Highgate House Funds, correct? That's what the first sentence says.

A.    That's what it says, yes.

Q.    Excuse me. Then it says, quote, "As Michael discussed with Billy Ray," he's the president of Charys, Billy Ray?

A.    Yes, he is.

Q.    And Michael is Michael Chorske?

A.    I believe that's who he's referring to, yes.

Q.    And then it says G&P, is that Gottbetter and Partners?

A.    Yes, sir.

Q.    That's your law firm?

A.    Yes, sir.

Q.    It says, quote, "Gottbetter and G&P as escrow agent of the warrants request that you subdivide the warrants pursuant to the attached

Page 144

chart." I read -- end quote. I read that accurately, correct?

A.    Yes, sir.

Q.    So, Mr. Rimland is indicating that your law firm is serving as escrow agent of the warrants --

MR. VENTURINI: Well, he's saying he's never seen the document.

Q.    -- is that correct?

A.    That's what this e-mail says.

Q.    Okay. Now, you submitted affidavit, you meaning you and your co-defendants, submitted affidavits in this case, correct?

A.    Yes, sir.

Q.    Did you review those affidavits, not just yours, but the others?

A.    I reviewed mine.

Q.    Did you review Mr. Rimland's?

A.    No, I did not.

Q.    Did you review Mr. Chorske's?

A.    No, I did not.

Q.    Let me show you Mr. Rimland's affidavit. Exhibit 42 is Mr. Rimland's affidavit.

A.    Thank you.

Q.    You're more than welcome to read the

Page 145

whole thing, but I'm going to refer you to the last paragraph of it, paragraph 11. You can read the whole thing if you'd like.

MR. VENTURINI: Well, let's just ask a question then he'll address it.

Q.    It's a short affidavit. You want to read the whole thing or you want me to ask the question first --

MR. VENTURINI: Please ask the question first.

Q.    Read the whole thing please. It will take you one second.

(Pause.)

A.    Okay, I've read it.

Q.    Take a look at paragraph 11, the last paragraph on page 3. Do you have it in front of you?

A.    Yes, sir.

Q.    Says, quote, "G&P," Gottbetter and Partners, "has never held the Charys warrants in escrow, trust or other capacity. The Charys warrants have been held by HHA and its offices which are separate from G&P's offices." End quote. I read that accurately, didn't I?

A.    Yes, sir.

37 (Pages 142 to 145)

Page 146

Q. Take a look at Exhibit 30, the e-mail from Mr. Rimland to Ms. White. Do you see that?

A. Yes, sir.

Q. It says in there that G&P -- I'm quoting, "G&P," that's Gottbetter and Partners, "as escrow agent of the warrants request that you subdivide the warrants in accordance with the -- pursuant to the attached chart." End of quote. I read that accurately, correct?

A. Yes, you did.

Q. So, Mr. Rimland is telling the recipient of the June 14th e-mail that Gottbetter and Partners, your law firm, was holding the warrants in escrow, correct? That's what the e-mail says.

A. That's what the e-mail says.

Q. Yet in his affidavit he says that Gottbetter and Partners never held those warrants in escrow, correct?

A. That's what his affidavit says.

Q. So obviously he was misstating something in his affidavit or misstating something in the June 14th letter?

A. That would be a conclusion, yes, that you can draw.

Page 147

Q. Can you draw any other conclusions?

A. Well, the -- perhaps you could.

Q. Okay, let's go on.

MR. ROSENBAUM: You still don't want to answer the question as to why this letter was not produced, Mr. Rimland, correct?

MR. VENTURINI: Please ask the witness questions.

MR. ROSENBAUM: You refuse to answer based on Mr. Venturini's advice?

MR. VENTURINI: You're wasting time. He's not the sworn witness today.

MR. ROSENBAUM: I'll take his testimony whether he's sworn or not.

MR. VENTURINI: Your time to waste.

Q. In any event, do you know of any other documents in your files, meaning your files, HHA or Gottbetter and Partners, that were asked for that were not produced besides this June 14th e-mail?

MR. VENTURINI: Asked and answered.

Q. You can answer it.

A. You want me to repeat my answer, sir?

Q. I want you to give an answer. Whatever it is it is.

Page 148

A. As I said several times now, I did not instruct anyone to withhold any documentation and to comply fully with your request with the advice of counsel.

Q. Do you know why this document, the June 14th, '06 e-mail from Mr. Rimland to -- to Ms. White was not produced?

MR. VENTURINI: Well, he doesn't know whether it was produced or not.

MR. ROSENBAUM: I'm telling you it wasn't produced.

MR. VENTURINI: Well, then we have to take your word for it.

A. I've never seen the document. I don't know the origin of the document. So, therefore, I don't know if we have it, why it wasn't -- I don't know the answer to that question.

Q. You know what -- you're an attorney obviously. You know what your responsibilities as an escrow agent are, generally -- generally speaking? If you're holding something in escrow.

A. Yes, it's a rather broad statement, but I understand what it means to be an escrow agent.

Q. What is your understanding?

Page 149

A. Depends on the transaction.

Q. Well, let's -- let's talk about the Charys transaction that Mr. Rimland says he's holding the warrants as escrowee. What was your understanding as to your response -- your meaning Gottbetter and Partners responsibility as to the escrow agent of the Charys warrants?

A. We were not the escrow agent on the Charys warrants.

Q. So then you shouldn't have been having -- holding the originals of them then?

MR. VENTURINI: Objection.

Q. You shouldn't have had the warrants then if you weren't the escrow agent?

A. Why not?

Q. They weren't issued to -- they weren't issued to either Gottbetter -- either to G&P or to HH Advisors, were they?

A. I haven't agreed that there was an escrow created for the Charys warrants.

Q. I'm sorry, just repeat what you just said, I couldn't hear you.

A. I don't understand. I didn't say that there was an escrow created for the Charys warrants.

38 (Pages 146 to 149)

Page 150

Q. Well, if that's so, if there's no escrow created for the Charys warrants then you had no reason to have the original, you meaning HH Advisors or Gottbetter and Partners had no reason to have the originals of those warrants, correct?

A. No, that's not true. We held original documents for lots of transactions.

Q. Did you hold the original warrant -- sorry. Did you hold all of the original documents for the Charys transaction after you left Gottbetter -- after you left Yorkville in January of '06?

MR. VENTURINI: Well, in what capacity?

Q. Did you?

A. Restate the question.

Q. Did you hold all of the original documents in the Charys stock purchase agreement after you left Yorkville in January of '06?

A. We sent to Yorkville on each transaction after we resigned the original documents, except for documents that we still had an interest in, which we then had to assign.

Q. So, you're saying that with respect to Charys you returned all of the original documents

Page 151

except some?

A. Well, it's my understanding now that that's what happened, yes.

Q. Well, what was your understanding back in January of '06 when you returned the documents?

A. I didn't really have to focus on it. It was an administarial issue. We weren't holding anything in escrow with regards to the Charys warrants.

Q. Did you ever get permission from Highgate or from Yorkville once you resigned in January of '06 to hold any of the Charys documents and not return -- original documents and not return them to -- to Highgate or Yorkville? Did you ever get permission --

A. See if I understand your question. We were holding the documents on lots of deals and then we put the documents together and provided reviews and summaries to Yorkville of the transactions.

Q. That's not what I asked you.

A. Then I don't understand the question.

Q. With respect to Charys --

A. Yes.

Page 152

Q. -- did you ever, after you left Yorkville in January of '06, receive permission from Highgate or from Yorkville to hold any of the original Charys documents?

A. Wasn't an issue.

Q. Just answer my question.

A. I didn't ask for permission to hold documents.

Q. Did you --

A. I was given the permission to hold documents. Yorkville allowed me to hold the documents on these transactions in all -- on all the deals we -- all the deals that we -- as I stated earlier, all the deals that I or Highgate originated, which we financed, we held the documents on all those deals.

Q. And after you left --

A. Yeah.

Q. -- Yorkville did you agree to return the original documents back to Yorkville or Highgate, the originals?

A. We offered to send the documents with deal by deal descriptions back to Yorkville.

Q. Including Charys?

A. With regard to the six transactions

Page 153

of which we had an interest in the warrants we had to assign those warrants before returning the warrants.

Q. That's not what I asked you. Did you get permission --

A. We didn't have that conversation.

Q. Let me finish, then you answer. Did you get permission from Highgate or Yorkville to retain the original of any of the warrants with respect to Charys, yes or no?

MR. VENTURINI: He's already answered the question.

A. It wasn't permission that I needed to get.

Q. Did you get permission from Yorkville or Charys -- strike that. From Yorkville or Highgate to retain any of the warrants in the four or five other deals to which you claim an entitlement?

MR. VENTURINI: Same objection.

A. I didn't --

Q. Either you did or didn't?

A. I didn't -- well, let's be clear. Make sure I understand your demarkation line. At the time of the assignments I was still an

39 (Pages 150 to 153)

DOERNER & GOLDBERG, INC.
5 Becker Farm Road * Roseland, NJ 07068

973-740-1100
1161 Broad St. * Ste. 110 * Shrewsbury, NJ 07702

Page 154

authorized representative of Highgate. After the effective date --

Q.    Of your termination?

A.    Yeah. I didn't take any action on behalf of Highgate.

Q.    That's not my question. My question is, did you get permission at any time from Highgate or Yorkville to retain the original warrants in any of the four or five other deals besides Charys?

A.    At any time?

Q.    That's my question.

A.    Yes.

Q.    When?

A.    Every deal we did. Every deal we did we --

Q.    No, I'm talking about after you left.

A.    You said at any time?

Q.    Let me rephrase it. At any time after you left Yorkville in January of '06 did you get permission from Highgate or Yorkville to retain the original of the warrants in the four or five other deals besides Charys?

A.    It's a misleading question. So it's not an easy yes or no answer.

Q.    Just answer it anyway you can.

Page 155

MR. VENTURINI: He's answered it. He said that he had permission to hold original documents.

MR. ROSENBAUM: That's not what I asked. That's not what I asked. He understands it. We'll clue you in later. We'll clue you in later.

Q.    Answer the question.

MR. VENTURINI: You're talking about renewed permission. He's already saying he had permission. You guys are -- you're asking the same question. He's giving the same answer.

Q.    Just answer the question please.

MR. VENTURINI: He has answered it. If there's a different way to answer it, fine.

Q.    You can answer the question. Anyway you have to answer it answer it.

A.    I think I have answered the question a couple of times though.

Q.    Just answer it one more time for me please.

MR. VENTURINI: Well, you can rely upon your previous answer.

A.    Can you read back my last answer and I'll just restate it?

Q.    Let me reask the question. At any

Page 156

time after you left Yorkville in January of '06 did you receive permission from Yorkville or Highgate to retain original warrants in the four or five deals other than Charys?

MR. VENTURINI: Asked and answered.

Q.    Simple question.

A.    I don't know the answer to the question because there's -- we sent the documents. We had an interest in the original warrants. I didn't need to get another consent from Yorkville to retain my 40 percent interest in the warrants.

Q.    Is the answer no, you didn't ask for it and you didn't receive it, is that -- is that the answer?

MR. VENTURINI: No, I think --

A.    No, that's not what I'm saying. I asked for it prior to my termination, received it prior to my termination and retained my part of the original warrant, but since it's one piece of paper I couldn't rip it in 60/40 and send 60 percent of the warrant back. I had to have them assigned and broken up per me agreement with Angelo which is what I did in January. And then when the warrants finally came back and they were asked for by Yorkville we returned them.

Page 157

Q.    Did -- you said you weren't holding any of the Charys warrants pursuant to any escrow obligations that you know of; is that correct?

A.    Yes, that's correct.

Q.    Okay. Let me show you another document, Exhibit 5. Show you Exhibit 5, which is a fax dated January 13th that you sent to Mark Angelo. I'm going to ask you questions about the first page of it, but you're entitled to read as much of it as you'd like.

A.    Excuse me.

Q.    Are you ready for me -- for the question?

A.    Yes, sir.

Q.    When you sent this -- you signed and sent this fax, correct?

A.    Yes.

Q.    On January 13th of '06?

A.    It appears to be the date.

Q.    Second full paragraph on the first page says, quote, "Gottbetter and Partners, LLP," paren, "G&P worked on several transactions that involved Highgate and Highgate House, LLC," parens, "Highgate, LLC. Next week we will send you a full set of originally executed documents for all of

40 (Pages 154 to 157)

Page 158

these transactions. G&P -- G&P will retain certain of the original documents on a deal by deal basis pursuant to its obligations under the escrow agreement -- escrow arrangements." End quote. I read that accurately, correct?

A. Yes, you did.

Q. Now, you acknowledge that you were not an escrow agent for the Charys warrants? That's what you've said before, despite what Mr. Rimland's said.

A. That's correct.

Q. So, in this -- in this communication you're telling Mr. Angleo that you're going to send back a full set of the originally executed documents for all the transactions that you worked on, correct?

MR. VENTURINI: I'm sorry, say that again.

(Requested portion read back by the Reporter.)

A. That's what it says.

Q. One of the transactions you worked on was Charys?

A. Yes.

Q. You didn't send back the original warrants, did you? Yes or no.

Page 159

A. No, we did not.

Q. Okay. But you did send back the closing binder of the Charys transaction that did contain the original of other documents, correct?

A. For Charys?

Q. Yes.

A. That is my understanding, yes.

Q. Okay.

MR. VENTURINI: But I think there's also a time frame because he said that the warrants -- the Charys --

MR. ROSENBAUM: When I put you under oath you can answer questions.

MR. VENTURINI: That's an interesting position to take.

Q. Let's go on.

MR. VENTURINI: I'm glad you agree with me.

Q. Let's keep going. The third -- the fourth paragraph says -- the one that starts, without your written permission. Do you see that? Do you see where I'm reading?

A. Yes.

Q. It says, quote, "Without your written permission we will not perform any material actions

Page 160

or omit to take any actions that would have a material affect on Highgate or Highgate, LLC outside the normal course of business except as set forth in this letter." Do you see that?

A. Yes.

Q. Now, there's nothing in this letter that says that you're holding the original Charys warrants issued to Highgate, is there? Yes or no.

A. No.

Q. And --

A. Or the other warrants.

Q. -- with respect to the Charys warrants they were issued in the name of Highgate, correct?

A. That is my recollection.

Q. Okay. And this last paragraph, the one we just recited, says, quote, "Without your written permission we will not perform any material actions or omit to take any actions that would have a material affect on Highgate or Highgate, LLC outside of the normal course of business except as set forth in this letter," correct?

A. That's correct.

Q. At any time after January 13th, '06 did you receive written permission from Highgate to

Page 161

have the Highgate/Charys warrants reissued? Yes or no.

A. We didn't need it.

Q. That's not what I asked you. Did you receive it?

A. That does matter because it's not a yes or no answer. I already received that permission from Mark Angelo, acted according with that agreement throughout 2005 and administerally assigned the warrants per my agreement.

Q. You don't have any writing with Mark Angelo that reflects this agreement that you say you entered into in June to -- to have the warrants issued in your name, do you?

MR. VENTURINI: He testified earlier to that.

MR. ROSENBAUM: And he said he didn't. He said he didn't.

MR. VENTURINI: I think he referred to the letter agreement if I remember his testimony correctly.

MR. ROSENBAUM: No, he didn't.

A. I did. I did. I -- I referenced you -- my attorney is correct.

Q. The November '04 letter agreement?

41  (Pages 158 to 161)

Page 162

A.    What I said in my testimony, so you don't mischaracterize it, I referred you to section 2S of the compensation and then combined that with my discussion with Mark in or about June or July of '05. That was my testimony.

Q.    I don't think it was, but let's go over it again.

MR. VENTURINI: It was.

Q.    Look at paragraph 2A. Let's -- you have it here.

A.    No, I don't. It's in your pile somewhere.

Q.    Look at paragraph 2A of the November --

A.    2-A-1.

Q.    -- '04 exhibit. It's Exhibit 2, 2-A-1.

A.    Yes, sir.

Q.    Where in this agreement does -- where in this agreement entered into in November of '04, some almost 17 months before the June '06 -- June '05, sorry.

A.    6.

Q.    6 months before the June '05 agreement, where does it says that warrants, to

Page 163

which you alleged entitlement, will be actually titled in the name of HH Advisors? Does it say that, yes or no?

A.    Let's do this again 'cause I -- to be accurate, my testimony before and again is, this agreement, read in conjunction with my agreement with Mark Angelo in or about June, July of 2005.

Q.    You mean your oral agreement with Mark Angelo?

A.    It's an agreement. Further evidenced by the handling of warrants, including the three complex transactions, is the basis for my receiving consent from Mr. Angleo to title the warrants in HH Advisor's name and it's under those -- it's under that agreement and under that working relationship that I acted.

Q.    So you're saying that -- let me make sure, that in accordance with the November '04 agreement, P-2, and expressed permission given to you by Angelo with respect to First Look, Oxford and Sanuco, that you took it upon yourself to assign the warrants in Charys --

A.    You left out --

Q.    -- is that correct?

A.    You left out a piece intentionally.

Page 164

Q.    No, I didn't. I inadvertently did it. Let me rephrase it. You're saying in accordance with the November '04 letter --

A.    Yes, sir.

Q.    -- and the June -- the conversation you had with Mr. Angleo between May and July.

A.    His instruction.

Q.    His instruction, and his consent to have warrants issued to you with respect to Sanuco, Oxford and First Look, that you took it upon yourself to execute the assignment of the warrants in Charys?

MR. VENTURINI: I'm going to object to the form.

Q.    Is that what you're saying?

A.    Well, I don't agree with your characterization. I didn't take it upon myself. That was the instruction that Mr. Angleo gave me and it's under that instruction that I acted. And part of cleaning up this file, evidenced by this letter -- excuse me, evidenced by Exhibit Plaintiff 5, was to assign my interest in the warrants since the expenses of Yorkville attributable to me would be more than offset by the amount of money they owed me. Therefore, there would be no need for Yorkville

Page 165

to retain the warrants.

Q.    You mean Highgate to retain the warrants?

A.    Yorkville.

Q.    Well, they were issued in the name of Highgate? Charys warrants were in the name of Highgate?

A.    But that was a fiction.

Q.    Whether it was a fiction or not, they were issued in the name of Highgate?

MR. VENTURINI: Please don't argue with the witness.

MR. ROSENBAUM: I'm not. I'm not arguing.

Q.    I'm asking whether or not it's a fiction, they were issued in the name of Highgate, correct?

A.    That was insignificant.

Q.    And they were registered with the Securities Exchange Commission in the name of Highgate, were they not? Yes or no.

A.    For which company?

Q.    Charys.

A.    That's all after the fact. That's not -- you're talking about what happened in January

42 (Pages 162 to 165)

Page 166

of '06?

Q.    No, I'm talking about -- I'm talking about the name of the company in whose -- in whose name the warrants were. One, the warrants were issued in the name of Highgate, correct?

A.    Yes.

Q.    And when they were issued in November I think of '06 they were issued in the name of Highgate, were they not?

A.    I think you mean November of '05.

Q.    Sorry, November -- no, I mean November of '06.

A.    You do?

Q.    Yeah, I'll show you.

A.    Okay. So what's the question?

Q.    I'll start all over. The warrants themselves were in the name of Highgate, correct?

MR. VENTURINI:  The original ones?

MR. ROSENBAUM: Yeah.

Q.    They were in the name of Highgate?

A.    Is that it?

Q.    Yeah.

A.    Yes.

Q.    And they were registered with the Securities -- registered with the Securities

Page 167

Exchange Commission; is that correct?

MR. VENTURINI:  Asked and answered.

A.    But now you're into November of '06.

Q.    Right. They were registered with the Securities Exchange Commission; is that correct?

A.    Irrelevant to me.

Q.    Whether it's relevant or not, they were issued -- they were registered with the Securities Exchange Commission; is that correct?

A.    That was a decision that YAM must have made after the fact.

MR. VENTURINI:  Ask -- if you know.

Q.    And they were registered with the Securities Exchange Commission in the name of Highgate, were they not?

MR. VENTURINI:  If you know.

A.    I don't know directly myself.

Q.    Well, how about if I show it to you. Rich, give me a copy of the complaint, I'm sorry. It's not in here. I've got to get a copy.  Give me a second. We'll take a two minute break.

(Pause.)

Q.    For the record, I sent out my partner Rich DeAgazio to show you the warrant that was registered with the -- the Charys warrant registered

Page 168

with the Securities Exchange Commission in the name of Highgate. Unless you'll agree that it was in which event we can save some time.

A.    I haven't seen it myself.

Q.    I'll show it to you. I'll show it to you. We'll come back to it when he gets back.

Just to wrap up conversation about the January 13th letter.

A.    Yes, sir.

Q.    Despite the second paragraph of the letter, you never sent back the original Highgate warrant -- the originally issued Highgate warrant -- I'm sorry. You never sent back to Highgate the original Charys warrant issued in its name; is that correct?

MR. VENTURINI:  Well, that's -- it mischaracterizes his prior testimony. He's already testified as to what happened to the warrant and which part was sent back to Yorkville.

Q.    Is that correct? Just answer my question. You never sent back the original Highgate warrant issued by Charys back to Highgate, correct?

MR. VENTURINI:  Objection.

Q.    You want me to re-ask it? If you don't understand it just tell me, I'll re-ask it.

Page 169

A.    Re-ask the question please.

Q.    Sure. Notwithstanding the second paragraph in your June 13th letter, you never sent back to Highgate the originally issued Charys warrant issued in the name of Highgate, did you?

MR. VENTURINI:  Objection. You can answer the question.

A.    It is my understanding that we did not send the warrant back 'cause at that time the warrant had not yet been assigned --

Q.    Okay.

A.    -- and the transaction completed.

Q.    Secondly -- fine. Secondly, with respect to the January 13th letter, at no time after January 13th, after January 13th of '06, did you receive written permission from Highgate to act with respect to the Charys warrant; is that correct?

MR. VENTURINI:  Asked and answered.

A.    I wasn't acting on behalf of Highgate after January 19th.

Q.    Well, then when you signed the assignments, and we'll show it to you, you signed on behalf of Highgate.

A.    At the time I had the authority to act on behalf of Highgate.

43 (Pages 166 to 169)

Page 170

Q.    This letter -- this letter is dated January 13th. Exhibit 5 is dated January 13th, not January 19th, but my question is this, at any time after January 13th, did you get written permission from Highgate to assign the warrants or a portion of the warrants to you, HH Advisors and Chorske? Yes or no.

MR. VENTURINI: Objection. He wasn't with Highgate after January 13th.

Q.    That's not my question. Did you get written permission from Highgate on or after January 13th, written permission, to execute the assignments on behalf of Highgate of the Charys warrants?

MR. VENTURINI: Objection.

Q.    Yes or no.

MR. VENTURINI: Objection.

A.    I already had permission from Mr. Angleo to assign the warrants, my 40 percent interest, to be titled in my name and I had that authority for some time from Mr. Angleo.

Q.    No, written permission. What I want to know is, answer my question, at any time after January 13th, on or after January 13th, did you get written permission from Highgate to transfer the Charys warrants? I know you're trying to fence with

Page 171

me, but I'm going to press the question. Yes or no.

A.    I'm not fencing with you, sir. I just want the record to be accurate. I had Mr. Angelo's oral permission to assign the warrants or retitle them in my name for seven months before the assignment was actually done.

Q.    So is the answer to my question, you did not receive written permission from Mr. Angleo, or anyone else associated with Highgate, after January 13th to do that?

A.    I had Mr. Angelo's direct, oral instruction to retitle the warrants in HH Advisor's name since on or about June or July of 2005.

Q.    Oral, not written? Nothing signed by him giving you that authority, correct?

MR. VENTURINI: Well, other than what he's already testified.

Q.    Nothing signed by him giving you that authority after you had this conversation with him between May and July of '05; is that correct?

MR. VENTURINI: Same objection.

A.    I had Mr. Angelo's oral instruction and approval to retitle the Highgate warrant -- specific Highgate warrants, by the way, as previously testified to, and retitle my interest in

Page 172

HH Advisor's name.

Q.    I understand you said that, but what I want to know is whether you had written permission from Mr. Angleo at any time from May of '05 right through today to do that, that's my question.

A.    And I'm answering your question.

Q.    No, you said oral. I want to know whether you had written permission.

A.    To my knowledge, no.

Q.    Okay. Let me show you the filing with the SEC in October of '06 of the Charys filings. Bear with me.

(Pause.)

Q.    Let me show you what was Exhibit E to our verified complaint which is a October 17, '06 registration statement by Charys with the SEC. Do you agree that --

MR. VENTURINI: I'm sorry, I can't hear you, what?

Q.    I'm going to show you what is marked as Exhibit E to our complaint which is an October 17th, 2006 registration statement by Charys with the SEC. Do you see that?

A.    Yes, sir.

Q.    And you've seen this before?

Page 173

A.    No, I don't believe so.

Q.    Well, did you look at it when we served the complaint on you?

A.    This piece of paper?

Q.    Yeah.

A.    No, sir.

Q.    Okay. Well, let's take a first look at it then. This document is obviously dated after Mr. Rimland's e-mail of June 14th, '06 to Charys, correct?

A.    It appears to be so, yes.

Q.    Okay. And if you look at page four of this registration statement it's titled, quote, "Other Financings," correct?

MR. VENTURINI: Well, it says what it says. He has no personal knowledge of this document.

Q.    Is that correct?

MR. VENTURINI: Look it says what it says. Just ask him --

Q.    Just answer my question; is that correct?

MR. VENTURINI: I instruct him not to answer. Ask him a question.

MR. ROSENBAUM: I just did, I said,

44   (Pages 170 to 173)

Page 174

is that correct.

MR. VENTURINI: It says what it says. The document speaks for itself. Ask him a real question.

MR. ROSENBAUM: I'm not going to argue with you.

Q.    Look under the -- under the heading, other financing and then it says, Highgate House Funds Limited, correct?

MR. VENTURINI: No. I instruct not to answer. It says what it says.

MR. ROSENBAUM: That's not basis -- that's not a fair basis for instruction.

MR. VENTURINI: The document speaks for itself.

MR. ROSENBAUM: You know that and I know that, Auggie. You may not like the question. You may not like what he has to say, but that's what I'm asking.

MR. VENTURINI: I like what he has to say, but you're asking him questions -- let me finish my objection. You're asking him about a document he has not drafted or seen.

MR. ROSENBAUM: I'm showing it to him. That's why I'm showing it to him.

Page 175

MR. VENTURINI: It says what it says.

Q.    This document --

MR. VENTURINI: Ask him a real question.

Q.    This document reflects the fact that as of October 17th of '06 Highgate House -- Highgate House was the owner of the one million warrants, does it not?

MR. VENTURINI: The agreement speaks for itself.

Q.    You can answer the question.

MR. VENTURINI: No, you don't have to answer the question.

A.    He's actually my counsel, you're not. So I have to take direction from him.

Q.    That's true.

MR. VENTURINI: The agreement speaks for itself.

MR. ROSENBAUM: This isn't an agreement, it's a registration statement.

MR. VENTURINI: Whatever it is it speaks for itself. You can make your argument --

MR. ROSENBAUM: There's nobody to argue to. I can't -- I can't overrule your instructions. So we'll just have to deal with it,

Page 176

as inappropriate as it may be.

MR. VENTURINI: But ask a real question.

MR. ROSENBAUM: I am.

Q.    You did financing for Charys before October 17th of '06 and after you left Yorkville, correct?

A.    That's what Mr. Rillo has indicated to you in your notes.

Q.    Forget what he indicated. That's what you did, didn't you?

A.    What was the timing?

Q.    After January of '06 and before October 17th.

A.    Yes, sir.

Q.    What type of financing?

A.    We participated in a convertible preferred financing in -- I believe in or about May 2006.

Q.    Okay. And were there any warrants issued in connection with that transaction?

A.    Yes, I believe so.

Q.    How many?

A.    Oh, I don't recall.

Q.    Okay. Was there any requirement for

Page 177

Charys to do any registration — any SEC registrations in connection with that transaction?

A.    Yes.

Q.    Okay. And did Charys, to your knowledge, do the registration that it was required to do?

A.    My recollection is that it was filed and then withdrawn.

Q.    Did you review that registration statement when it was filed?

A.    No, sir.

Q.    Did you ever see a copy of it?

A.    No, sir.

Q.    As of today you haven't seen a copy of it?

A.    As of today I've never seen a registration statement filed by Charys in the year 2006 --

Q.    Okay. What was --

A.    -- until you showed me it just now.

Q.    Okay. What was required to be registered pursuant to the deal that you did with Charys?

A.    The shares underlying the convertible preferred and the shares underlying the warrants.

45 (Pages 174 to 177)

**Page 178**

Q. Okay. The warrants that were issued in connection with that transaction?

A. Yes, sir.

Q. You're familiar with SEC registration statements in general, are you not?

A. Yes, sir.

Q. All right. Do those -- do the registration statements require the -- the registrant, Charys, to -- to advise the SEC of all financings that it has?

MR. VENTURINI: Objection.

Q. To your knowledge?

A. I -- honestly, I don't know what the question means.

Q. Of all types of outstanding stocks, warrants, debentures, is there -- is there a requirement by the SEC to notify it, the SEC, of all of that type of financing in any registration?

MR. VENTURINI: Objection.

A. I don't know if that's a simple yes or no question.

Q. Well, answer it any way you can.

MR. VENTURINI: Well, I think he just answered it.

A. I mean, it -- it depends on the time

**Page 179**

frame, the size of the transaction. You have to be more specific.

Q. Well, in the transaction that you negotiated or you dealt with with Charys in May or so of '06, let's talk about that one.

A. Yes, sir.

Q. If Charys filed a registration statement when would it have been filed? I'm sorry, you said Charys did file a registration statement. When was it filed?

A. To the best of my recollection it was filed and withdrawn within the fourth quarter of 2006.

Q. Some time between October and December of '06, correct?

A. Yes, sir.

Q. Is this registration statement, Exhibit C, the one I showed you, the registration statement that was filed pursuant to the transaction you negotiated?

MR. VENTURINI: If you know.

A. It appears from this document, but I couldn't confirm it, but the document is --

MR. VENTURINI: Just say what you know.

**Page 180**

A. -- dated October 17th.

Q. So, it would appear to be -- this would appear to be the registration statement that Charys issued pursuant to the deal that you negotiated, fair statement?

A. I don't know that.

Q. Well, do you know of any other registration statements that it filed with the SEC besides this one in the fourth quarter of '06?

A. Not that I'm aware of.

Q. Okay.

MR. VENTURINI: When it's convenient in the next ten minutes could we take a break?

MR. ROSENBAUM: Take a break now.

MR. RIVERA: We're going off the record. The time is 2:20 p.m. This ends tape number three.

(Recess was taken.)

MR. RIVERA: Back on the record. The time is 2:30 p.m. This begins tape number four.

Q. Mr. Gottbetter, what is Gottbetter Capital Master Limited?

A. It's a private fund like a hedge fund. It's commonly known as a hedge fund.

Q. What's your involvement with that?

**Page 181**

A. I'm the principle.

Q. When did you form that fund?

A. May 1st, 2006.

Q. Okay. Was Gottbetter Capital Master entitled to any securities as a result of the Charys financing that was done in May or so of '06?

A. Yes, as I previously testified to.

Q. What -- what was it entitled to, warrants? What type of securities was it entitled to?

A. It made an investment, as I just think I finished explaining before the break, we invested in a convertible preferred and in our fund we contribute the warrants to the fund. So the fund actually received warrants and convertible preferred stock, and of course, the common stock underlying both of those securities.

Q. The reason I ask you, if you look at Exhibit E to the complaint, that's the -- the registration statement. It refers in several instances to Gottbetter Capital Masters being entitlement to various types of securities, correct?

MR. VENTURINI: Well, again, it speaks for itself. If you want to ask him a question about, you know, what they have and why

46 (Pages 178 to 181)

Page 182

they have it you can do that.

Q. Answer this question first then I will ask that question. It refers to Gottbetter Capital Masters being entitled to certain shares underlying warrants – underlying warrants or convertible securities, correct?

MR. VENTURINI: Well, again, it speaks for itself. So ask a question.

MR. ROSENBAUM: I just did.

Q. Just answer it and I'll ask the next question.

MR. VENTURINI: Document speaks for itself.

MR. ROSENBAUM: You're not instructing him not to answer? Let's not waste time.

MR. VENTURINI: Ask him the real question.

MR. ROSENBAUM: I just did.

Q. Unless he's instructing you not to answer just answer the question.

MR. VENTURINI: Okay. I instruct him not to answer. Ask the next question.

MR. ROSENBAUM: You're a pain in the neck, you know that?

Page 183

Q. This document indicates that Gottbetter Capital Masters is entitled to 3,715,846 shares of Charys; is that correct?

MR. VENTURINI: Well, we'll take your word for it. Ask a real question.

MR. ROSENBAUM: I don't know if I'm correct.

Q. Is that correct?

MR. VENTURINI: No. You can ask him the question if they were entitled to that amount of shares in the transaction.

MR. ROSENBAUM: I just did. I just did.

MR. VENTURINI: No. You asked him what the document showed.

A. I don't know the number of shares that Gottbetter Capital Masters is entitled under that transaction that was done in May of 2006.

Q. Was it in excess of 3 million shares of Charys?

A. I don't know.

Q. Well, this document says it's 3,715,846 shares. Do you have any reason to doubt – to differ from that?

A. I would really have to read the

Page 184

registration statement and review the – the deal that we did in May to answer your question accurately. I'd be guessing. You told me not to guess.

Q. Here's the registration statement. Take a look at all – as much as you need to, just answer the question. Here it is, I'm not hiding it from you.

A. I didn't suggest you were. Do you want me to read the whole thing?

Q. Read as much of it as you have to to – I just want confirm that that was your understanding, that's all.

A. It appears the footnote referencing Gottbetter Masters is missing from your copy 'cause you've chosen selected pages. So I can't read the corresponding footnote. See how they have footnotes numbered? And for Gottbetter Capital Masters our footnote is 15 and 16, but you've only copied certain pages of the registration statement. So the explanatory footnote isn't here for me to review, sir.

Q. Okay. So you can't say whether or not Gottbetter was entitled 3 million, seven hundred and some odd thousand shares?

Page 185

A. As I testified already, I couldn't possibly know that. I'd be guessing. I'd have to review the deal documents and/or a complete registration statement that might summarize that information.

Q. Do you agree though that Gottbetter was entitled to a certain – a specific number of shares as a result of the financing?

MR. VENTURINI: Asked and answered.

Q. You can answer.

MR. VENTURINI: Answer it again.

A. Gottbetter Capital Master was entitled to some number of shares underlying both the convertible preferred that it purchased as well as the warrants it purchased for the fund.

Q. And whatever number shares that would be would be – would or should be included in the registration statement; is that a fair statement?

MR. VENTURINI: Objection. If you know.

A. It should be included. Whether it was or wasn't, I don't know.

Q. All right. All you can tell us is this registration – sorry. This registration – registration statement shows Gottbetter Masters

47 (Pages 182 to 185)

Page 186

being entitled to 3,715,846 shares? That's all you can say?

MR. VENTURINI: I think you're going far afield of this.

Q.    Is that correct?

MR. VENTURINI: Why don't you tell me what the relevance is because you're going far afield of what the subject of this motion is.

Q.    Is that correct?

MR. VENTURINI: Well, why don't you tell me.

MR. ROSENBAUM: I'm not going to tell you anything.

Q.    Is that correct, Mr. Gottbetter?

MR. VENTURINI: I'll instruct him not to answer.

MR. ROSENBAUM: 'Cause I won't tell you what the relevance is? I'm not going to tell you what my legal position is just like you wouldn't let him answer it.

MR. VENTURINI: No, but I told you --

MR. ROSENBAUM: I'm not going to argue with you.

MR. VENTURINI: When I took the depositions of your guys I was polite enough to give

Page 187

you answers to your questions.

Q.    Notwithstanding -- forget how many shares you were entitled, whether it's three million, seven hundred or some other amount.

A.    Yes, sir.

Q.    Is it still your testimony that even though Gottbetter Masters is mentioned as being a -- entitled to certain equity in Charys that you did not review -- you or no one else associated with your firm reviewed this registration statement?

A.    That was not my testimony, sir. What I said was, I did not review it. Again, you keep paraphrasing my testimony inaccurately, although you say it's because you forget. What I said was, I didn't review the registration statement. Which is the question you asked me. I never said nobody else reviewed the registration statement.

Q.    Who else in your association?

A.    I don't know who might have reviewed the registration statement. It's possible Mr. Rimland or Mr. Chorske or Mr. Dockery or someone else may have reviewed it. I don't know.

Q.    Did your association, your firm, receive a copy of this registration statement?

MR. VENTURINI: Are you talking about

Page 188

the firm Gottbetter and Partners?

MR. ROSENBAUM: Any firm that he was associated, Gottbetter Masters.

MR. VENTURINI: Any company?

MR. ROSENBAUM: Yeah.

Q.    Did you receive this registration statement, the October 17th, '06 registration statement?

A.    Yes. To the best of my knowledge we received a copy and Mr. Rimland would have made comments on the registration statement as it relates to Gottbetter Capital Master's interest in that registration statement.

Q.    Okay. And Mr. Rimland then would have seen, if he reviewed it, that Highgate House was listed as being as the owner of one million warrants?

MR. VENTURINI: Well, objection.

Q.    If he read it.

MR. VENTURINI: Objection.

Q.    'Cause that's what it says, correct?

MR. VENTURINI: The document speaks for itself. You can ask Mr. Rimland that question.

Q.    Is that correct?

A.    It is my recollection that Mr.

Page 189

Rimland provided certain commentary to Charys's counsel regarding inaccuracies or corrections needed to take place in the registration statement.

Q.    Do you know whether he told anyone associated with Charys that Highgate was not the owner of the one million warrants as set forth in the registration statement? Do you understand my question? Simple question.

A.    Say it again, I'm sorry.

Q.    Sure. Do you know whether Mr. Rimland told anyone associated with Charys that it was inaccurate to designate Highgate House as being the owner of the one million warrants?

A.    Well, it would be inaccurate.

Q.    That's not what I said. Do you know whether Mr. Rimland told anyone associated with Charys that it was inaccurate? Either you know or you don't know.

A.    Yes, I know that Mr. Rimland would have told Charys that -- as part of his comments or corrections that it would be inaccurate to say Highgate House Funds owned one million Charys warrants as a result of the November '05 financing.

Q.    No, not that he would have, did he tell that to someone in Charys?

48 (Pages 186 to 189)

Page 190

A. To the best of my recollection, yes, he did.

Q. But nevertheless, notwithstanding Mr. Rimland's alleged communications, as you've just told us, this registration statement was filed with the SEC, correct?

A. And withdrawn.

MR. VENTURINI: Well --

Q. It was originally filed -- I know it was withdrawn 'cause you said it was, but it was originally filed as you see it with the SEC, correct?

MR. VENTURINI: He didn't -- he doesn't know this document. If you know that this particular --

MR. ROSENBAUM: That's what it says. It says filed October 17th.

A. To the best of my knowledge a registration statement was filed by Charys and withdrawn.

Q. Okay. Do you know why it was withdrawn?

A. No, I do not.

Q. The registration -- strike that. Did Mr. Rimland have this communication that he told you

Page 191

about with Charys before October 17th of '06, the date of this registration statement? Do you know?

A. I do not know the date that Mr. Rimland had the communication, but it would have to be prior to the filing because what happens is a registration statement is sent for review prior to being filed.

Q. Okay. So just so I get the chronology --

A. So the best -- I'm sorry.

Q. Some time -- some time before October 17th, which is the date of this registration statement, Mr. Rimland had this communication with Charys, the one that you told us about a few moments ago, correct?

A. To the best of my knowledge it would have occurred prior to -- I'm sorry, scratch that. Let me correct that.

Mr. Rimland's communication was before the registration statement was filed. As to the date, I cannot tell you the date 'cause I don't know.

Q. Now this registration statement, the one I just showed you a moment ago, Exhibit E, indicates that it was filed with the Securities

Page 192

Exchange Commission on October 17th of '06. Do you see that?

MR. VENTURINI: Again, the document speaks for itself. Instruction --

Q. Do you see it?

MR. VENTURINI: Yes, you can see it.

A. Yes, I see that date, sir.

Q. All right. Now, assuming that this was the registration statement that was filed as a result of the transaction you did with Charys, Mr. Rimland would have had the communication with someone from Charys before the October 17th, '06 filing date, is that what you're telling me?

MR. VENTURINI: Objection to the hypothetical, but if you know you can answer.

A. My testimony is, I recall Mr. Rimland having a conversation or relaying to me a conversation, communication he had with Charys with regard to corrections, edits, alterations, what have you, with regard to Charys's registration statement. I do not know the date that he had it and I do not know if it was a telephone call or an e-mail.

Q. That's not what I asked you.

A. Well --

Q. Whatever he said occurred before the

Page 193

registration -- whatever communication he had with Charys occurred before the registration statement was filed, that's all I asked you; is that correct? That's what you said before.

MR. VENTURINI: Then it's correct. He already said it.

A. Then why do you keep asking me the same question?

Q. I'm asking you. Yes or no?

MR. VENTURINI: Instruct not to answer, move on.

MR. ROSENBAUM: Come on, Auggie.

MR. VENTURINI: You just in your question you already said what he -- what you said gave the answer he gave.

MR. ROSENBAUM: It's a premise to the next question. It's a preface to the next question.

MR. VENTURINI: All right, I'll let you answer it again.

MR. ROSENBAUM: Thank you.

Q. The communication between Mr. Rimland and Charys dealing with alleged inaccuracies in the draft registration -- draft registration statement you reviewed obviously occurred before the registration statement was filed with the SEC,

49 (Pages 190 to 193)

Page 194

correct?

A.    My testimony was that Mr. Rimland had a communication of some manner with Charys to reflect inaccuracy or changes, alterations necessary or requested in Charys's registration statement before it was filed.  When it occurred I -- for the fourth time, I don't know the date.

Q.    That's fine.  I didn't ask you the specific date.  Do you know --

A.    Yes, you did.

Q.    Did Mr. Rimland tell you that one of the inaccuracies was the statement that Highgate was the owner of the one million warrants?  Do you know that?

A.    What's your time frame?

Q.    Whenever -- whenever you had the conversation with Mr. Rimland where he told you about his conversation with Charys.  Did he tell you that one of the things that he pointed out to Charys that Highgate was not the owner of the million warrants?  That's my question.

A.    I became aware that Mr. Rimland had communicated to Charys the inaccuracy of the million warrants and the way that Mr. Rimland communicated it to me is he saw the final product that had been

Page 195

filed by Charys showing the change not being made.

Q.    Okay.  What, if anything, did you tell him to do about that?

A.    I don't recall.  Maybe, we'll deal with it later type of thing.

Q.    Did you have any conversation with anyone with Charys after October 17th, '06 as it relates to the alleged inaccuracy in the October 17th registration statement?

A.    Not to my recollection, no.

Q.    Didn't bother you?  Wasn't a sufficient concern to you to have such a conversation?

MR. VENTURINI:  Objection.  He said he didn't review the document or see the document.  How can you ask that question?

MR. ROSENBAUM:  He just said -- he just said he spoke to Mr. Rimland and Mr. Rimland told him that the inaccuracy was not corrected.  Come on listen up, August.

MR. VENTURINI:  Michael, please.  Come on, Michael.  He saw a draft.  We're talking about a draft.  Either the draft --

MR. ROSENBAUM:  That's not what he said.  Let the record speak for itself.  I assure

Page 196

you it's not what he said.

Q.    After Mr. Rimland told you that the inaccuracy was not corrected, you didn't think it important enough to call Charys to have it corrected -- to nevertheless have it corrected?

A.    I assume I would have directed Mr. Rimland at the time to deal with it and get it corrected.

Q.    Not would have.  I want to know what you did.  Did you direct Mr. Rimland?

A.    I told Mr. Rimland to deal with it.

Q.    To deal with it.  Did you tell him how to deal with it, excuse me?

A.    Yes, get it corrected.

Q.    To your knowledge was it ever corrected?  Did Charys ever issue a registration statement after October 17th of '06 with the SEC correcting the statement that Highgate was the owner of one million warrants?  Yes or no.

A.    To my knowledge, no, because -- and because the registration statement was withdrawn.

Q.    For reasons that you're not aware of?

A.    For reasons I do not know.

Q.    Okay, let's go on.  When in relationship to your determination of your -- sorry

Page 197

let me start all over.  When did you form the investment company that you're now associated with, Gottbetter -- off the record.  What's it called, Gottbetter -- Gottbetter Capital?

A.    You asked me that question a few minutes ago.

Q.    I asked you, Gottbetter Capital Masters.

A.    Yes, you asked me that question.

Q.    Is that the only investment company that you're now associated with, Gottbetter Capital Masters?

A.    Yes.

Q.    And you formed that in May of '06?

A.    May 1st, 2006, sir.

Q.    Okay.  When did you decide, make a final decision to leave Yorkville?

MR. VENTURINI:  The final decision?

MR. ROSENBAUM:  Yeah.

A.    Final decision?

Q.    Yeah.

A.    The day I sat down with -- the days leading up to my sitting down with Mark Angelo.

Q.    Which is when?  That's what I'm trying to find ou.

50  (Pages 194 to 197)