# EXHIBIT G

Page 1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
Civil Action No. 06-5212 (JAG)

YORKVILLE ADVISORS
MANAGEMENT, LLC, a Delaware
Limited liability company;
HIGHGATE HOUSE FUNDS, LTD,
A Cayman Islands exempted
Company,                    :
                            :
            Plaintiffs,     :
                            :   VIDEOTAPED
      vs.                   :   DEPOSITION OF:
                            :   JASON RIMLAND
ADAM S. GOTTBETTER; HH
ADVISORS, LLC, a New York
Limited liability company;
GOTTBETTER AND PARTNERS,
LLP, a New York limited
Liability partnership;
JASON RIMLAND, ESQ.; TIM
L. DOCKERY, ESQ., and
MICHAEL CHORSKE,            :
                            :
            Defendants.     :
                            :
  - - - - - - - - - - - -

            TRANSCRIPT of the stenographic notes of

the proceedings in the above-entitled matter, as

taken by and before JANET BAILYN, a Certified

Shorthand Reporter and Notary Public of the State of

New Jersey, held at the office of BUDD LARNER, 150

John F. Kennedy Parkway, Short Hills, New Jersey, on

December 22, 2006, commencing at 10:29 in the

forenoon.

DOERNER & GOLDBERG, INC.                                    973-740-1100
5 Becker Farm Road * Roseland, NJ  07068      1161 Broad St. * Ste. 110 * Shrewsbury, NJ  07702

Page 2

APPEARANCES:

BUDD LARNER, P.C. BY
BY: RICHARD DeAGAZIO, ESQ.
150 John F. Kennedy Parkway
Short Hills, New Jersey 07078-0999
Attorneys for Plaintiffs
VENTURINI & ASSOCIATES
BY: AUGUST C. VENTURINI, ESQ.
230 Park Avenue
New York, New York 10169
Attorneys for Defendants

VIDEOGRAPHER: LEE BOWRY,
Nationwide Video Productions

Page 4

JASON RIMLAND, with offices at Gottbetter & Partners, LLP, 488 Madison Avenue, New York, New York, having been duly sworn by the Notary, testified as follows:

DIRECT EXAMINATION BY MR. DeAGAZIO:

THE VIDEOGRAPHER: My name is Lee Bowry of Nationwide Video Productions located in Roseland, New Jersey. The date today is December 22, 2006 and the time is approximately 10:29 A.M. This deposition is being held in the office of Budd Larner, PC located at 150 JFK Parkway, Short Hills, New Jersey. The caption of this case is Yorkville Management Advisors, LLC, et al, versus Adam S. Gottbetter, et al, in the United States District Court, District of New Jersey, Civil Action Number 06-5212 JAG. The name of the witness is Mr. Jason M. Rimland.

At this time the attorneys will identify themselves and the parties they represent after which our court reporter, Janet Bailyn, of Doerner & Goldberg will swear in the witness and we can proceed.

MR. DeAGAZIO: Richard DeAgazio from Budd Larner, PC on behalf of the plaintiff.

MR. VENTURINI: I am August Venturini for the defendants.

Page 3

INDEX

WITNESS        DIRECT  CROSS  REDIRECT  RECROSS

JASON RIMLAND
  BY MR. DeAgazio  4


          EXHIBITS
NUMBER      DESCRIPTION        PAGE


MARKED PORTION: Page 43

Page 5

Q.    Good morning, Mr. Rimland.

A.    Good morning.

Q.    My name is Richard DeAgazio. I am a partner at Budd Larner. We represent the plaintiffs in this matter. You sat in the deposition yesterday of Mr. Gottbetter, did you not?

A.    I did.

Q.    Okay. Let me give you a set of instructions for today's proceeding so that we're all on the same page. A deposition is a question and answer session. I ask the questions, you give the answers. You need to make sure all of your answers are audible. The court reporter cannot take down gestures and nods of the head and such things.

If your attorney objects during the course of the deposition allow the two attorneys to work out the objection and you will get instructions for an answer. Generally the court rules state that an attorney is not permitted to direct a witness not to answer a question unless something goes to a privilege or a court order limiting deposition testimony and the like. So we will keep those rules in mind.

If you don't understand one of my questions, please just tell me. I'm certainly not

2  (Pages 2 to 5)

Page 6

going to try and trick you or anything like that. All I want is your best recollection, and I want the truth, and you did swear an oath to tell the truth, which is the same oath you would give in a court of law so please keep that in mind but you're not required to guess or speculate. All we want is your best recollection and we want the truth.

If you need to take a break at any time during the deposition please just say so. These proceedings are long but they're not marathons so if you need a break just raise your hand.

Are you under any medication today that might affect your ability to recall events?

A. No.

Q. Have you ever given a deposition before?

A. I did maybe about 15 years ago.

Q. What kind of proceeding was that?

A. My stepfather was suing my mother's estate. She had passed away and I was deposed.

Q. So you're generally familiar with the process. Is that correct?

A. Am I generally familiar with the process? Yes.

Q. And certainly you understand the instruction that if you don't understand one of my

Page 7

questions you will tell me and I will rephrase it. Okay? So that you can understand?

A. I understand.

Q. Okay. Very good. Please just give me your educational background.

A. I graduated Cornell University with a B.S. in 1991, graduated Fordham Law in 1997.

Q. And what was the B.S. in at Cornell?

A. Industrial and labor relations.

Q. Can you tell me what your job history has been since you graduated law school?

A. I worked at Sidley Austin and then I moved to Sherman & Sterling. Then I worked on the Andrew Cuomo for governor campaign in New York and then I went to work at Gottbetter & Partners.

Q. Sidley & Austin right out of law school?

A. Yes, in 1998 I started. I believe it was April.

Q. What did you do between May of '97 and April of '98?

A. I traveled.

Q. And which Sidley & Austin office was it?

A. New York.

Q. New York. And how long were you there?

A. Three years.

Page 8

Q. Through approximately 2001?

A. Approximately.

Q. How long were you at Sherman & Sterling?

A. A little more than a year.

Q. And when did you join -- I'm sorry, you said you worked for the Cuomo campaign and what period of time was that?

A. That was probably -- was it '98 maybe? No. I don't remember the year.

Q. Was that during your time at one of the law firms?

A. It was after I left Sherman & Sterling.

Q. So if you worked at Sidley & Austin from '98 to 2001 and then you worked at Sherman & Sterling for about a year, that would place the governor campaign in 2002?

A. 2002 is probably right.

Q. One other instruction I neglected to give you which I should have is the court reporter can't take down two people speaking at once so please let me finish the question before you commence your answer and I'll give you the same courtesy.

A. Okay.

Q. Although despite our best intentions sometimes we --

Page 9

A. I understand.

Q. We will try not to talk over each other. I realize it's a bit artificial but that's the way we try to do it in a deposition. We try to anyway.

A. I understand.

Q. What did you do after Andrew Cuomo for governor?

A. Went to worked for Adam Gottbetter, Kaplan, Gottbetter & Levinson.

Q. That was before his law firm split?

A. That's correct.

Q. And that was in 2002 you started?

A. I believe it was 2003, April of 2003.

Q. And shortly thereafter the law firm split?

A. Shortly thereafter, yes, I think it was the summer of 2003.

Q. So since the summer of 2003 you have been employed by Gottbetter & Partners?

A. That's correct.

Q. And in the four law firms that you've worked at, you have been an associate at all those law firms?

A. That's correct.

Q. And I understand --

3 (Pages 6 to 9)

Page 10

A. Three law firms.

Q. Well, I was including Kaplan Gottbetter.

A. Four law firms.

Q. And I understand you have made partner of Gottbetter & Partners as of January 2007?

A. That's correct.

Q. Congratulations. What kind of work have you done at these law firms?

A. At Sidley Austin I was doing corporate securities work and general corporate and securitization, structured finance.

Q. And at Sherman?

A. Mergers and acquisitions.

Q. And what about since you joined Kaplan, Gottbetter & Levinson?

A. Securities mostly. What I mostly do is private placements.

Q. Does that include the sort of PIPES that Mr. Gottbetter was doing when he was affiliated with Yorkville?

A. Yes.

Q. I mean PIPES stands for Private Investment in Public Entities?

A. Public Equity -- it's either Private Investment in Public Equity or Private Investment in

Page 11

Public Entity, it's one or the other.

Q. Do you have any affiliation with HH Advisors?

A. I do not.

Q. Do you have any affiliation with any other firm or entity that Mr. Gottbetter is a principal in?

A. Not to my recollection.

Q. Do you know where the offices of HH Advisors is located?

A. Yes.

Q. Where?

A. 488 Madison.

Q. Is that the same office building as Gottbetter & Partners?

A. Yes.

Q. What floor is Gottbetter & Partners on, floor or floors?

A. 12th.

Q. And what floor is HH Advisors on?

A. 12th.

Q. Does Gottbetter & Partners have a separate office suite from HH Advisors or is it all one office suite?

A. Separate entrances.

Page 12

Q. It is? If you're in Gottbetter & Partners, the office suite for Gottbetter & Partners, is it possible to get to HH Advisors without walking out into the main hallway?

A. Is it possible?

Q. Like is there a hallway that leads from Gottbetter & Partners to HH Advisors within the office suite complex?

A. Well, the door -- Adam's office breaks up into two entities and it's locked, so in order to go from one side to the other you have to unlock the door.

Q. I missed the part about Adam's office.

A. Adam's office is in between Gottbetter & Partners and the other businesses.

Q. But if you're in Adam's office can you go from -- can you go to either the G&P side or the HHA side, in other words, there's doors on either side of his particular office?

A. Are you asking me whether I can do that? I don't understand the question.

Q. Yes.

A. No.

Q. If you could?

A. No.

Page 13

Q. All right. Now, if you were in his office sitting at one of his guest chairs let's say --

A. Yes.

Q. -- is the office -- sorry, strike that. Is the door to HH Advisors like right behind his desk or something like that or is it in part of the room?

A. Is it in part of his office?

Q. Yeah.

A. No.

Q. Where is the door to HH Advisors?

A. Where is the door to his office?

Q. No.

A. I'm confused.

Q. Do you me a favor and let's draw a picture.

A. Okay.

MR. VENTURINI: Well, why don't you see if you can get it out of him through speaking.

MR. DeAGAZIO: A picture is worth a thousand words. We'll mark this.

Q. Do me a favor and to the best of your recollection, we realize it's not to scale, draw on one -- just draw your understanding of the layout of Gottbetter & Partners and HH Advisors in relation to

DOERNER & GOLDBERG, INC.
5 Becker Farm Road * Roseland, NJ 07068

973-740-1100
1161 Broad St. * Ste. 110 * Shrewsbury, NJ 07702

Page 14

where Adam's own office is.

MR. VENTURINI: I am going to object and instruct him not to do that because he's not an illustrator and I don't think he will not get it accurately but you can ask him questions.

MR. DeAGAZIO: There's no cause to not allow him to do this. This is done in many depositions where people give lay drawings of their understanding of layouts of things. So there's absolutely no reason to direct him not to do it. We understand that it's not to scale. I'm just trying to get a general idea --

MR. VENTURINI: My instruction still stands but you can ask him questions.

MR. DeAGAZIO: You're going to direct him to not draw the picture?

MR. VENTURINI: I've already done that.

MR. DeAGAZIO: I'll note for the record that's an inappropriate direction as you well know.

Q. All right. So you come out of the elevator on the 12th floor?

A. Yes.

Q. How do you get to Gottbetter & Partners?

A. You make a left.

Q. Okay. And where is the Gottbetter &

Page 15

Partners office suite?

A. I don't understand, where is it? On the 12th floor at 488 Madison.

Q. We're on the 12th floor? You make a left out of the elevator and then what do you do?

A. I make a left and then a right.

Q. Okay. And there's a hallway and then there's a door to Gottbetter & Partners?

A. Yes.

Q. Where in relation to the door to Gottbetter & Partners is the door to HH Advisors?

A. It's -- you can't get to the door to HH Advisors from the door to Gottbetter & Partners.

Q. You can or cannot?

A. Cannot.

Q. So where is the HH Advisors?

A. You walk out of the same elevator and you would make a right.

Q. Instead of a left?

A. Instead of a left.

Q. So the offices are on either side of the elevators. Is that how it works?

A. No. If you come out of the elevator and you are taking the west elevator, on your left would be Gottbetter & Partners and on your right would be

Page 16

the other offices.

Q. And my question is: If you're inside Gottbetter & Partners --

A. Right.

Q. -- if you had a key could you get to HH Advisors without walking out into the main hallway where the elevators are?

A. I don't have a key.

Q. If somebody had a key could they do that?

A. If someone had a key? I mean my answer would be that I cannot do that.

Q. But there is a door that goes from Gottbetter & Partners into HH Advisors without having to go out into the main hallway. Is that correct?

A. That is not correct.

Q. So explain to me how you can get from Gottbetter & Partners to HHA without walking into the hallway. Is there a way to do that?

A. You would walk through the office of Gottbetter Capital Management and then you would walk into the offices of the other entities from Gottbetter & Partners.

Q. There's another entity?

A. There's another entity.

Page 17

Q. I see. All right. And you don't have any position with HH Advisors?

A. I have zero.

Q. Or with Gottbetter Capital?

A. Not that I know of.

Q. Now, directing your attention to the general time frame of October and November of 2004, do you recall that Mr. Gottbetter was negotiating with Mark Angelo and his people to become the co-portfolio manager of a fund which ultimately became Highgate House Funds?

A. Was I aware in November of 2004?

Q. Yes.

A. No.

Q. You were not aware of that at all?

A. I was not aware.

Q. Did you have any participation in the negotiation of the November first, 2004 agreement?

A. No.

Q. So you didn't review it or revise it or anything like that?

A. No.

Q. Okay. Do you know which agreement I'm speaking of, the November first, 2004 agreement?

A. Through the course of the litigation I

5 (Pages 14 to 17)

Page 18

know the agreement that you're talking about.

Q. When did you first become aware that Mr. Gottbetter and his firm HH Advisors had become the co-portfolio manager of Highgate House Funds or really -- strike that.

When did you first become aware that Mr. Gottbetter and his firm HH Advisors had been retained or engaged by Yorkville Advisors Management to become the co-portfolio manager of Highgate House Funds?

MR. VENTURINI: Object to the form. You can answer.

A. Can you read back the question? I am not sure what you're asking.

(The pending question is read by the court reporter.)

A. I would say probably on my first transaction I worked on for Highgate House.

Q. Do you recall when that was?

A. That's my understanding. My understanding is that I probably learned that on the first transaction I worked for for Highgate.

Q. Do you recall when that first transaction was?

A. I don't.

Q. Do you remember what the transaction

Page 19

was?

A. I don't.

Q. What deal it was?

A. I don't.

Q. Can you estimate for me how many transactions you personally worked on that Highgate House Funds participated in?

A. How many transactions?

Q. Yes.

A. Probably seven.

Q. Do you have a recollection of which transactions those were?

A. I remember some of them.

Q. Can you give me the names?

A. Charys, First Look, I worked on Kipling, worked on Strike Force, there are probably others I can't remember.

Q. And generally what would be your participation when working on these deals?

A. It depended on the transaction. So sometimes I would be the sole attorney on it and sometimes I would be working with other people.

Q. Let's take Charys, for example. What was your role on the Charys transaction?

A. I was the sole attorney on that.

Page 20

Q. And as the sole attorney what functions would that entail?

A. Just drafting the documents and negotiating them, putting the documents in final form to be signed, any kind of corporate filings, I would oversee that.

Q. Would corporate filings include registration statements?

A. No. UCCs, maybe -- I don't know if the deal was a preferred stock transaction, but if it was then I would, you know, file the preferred stock certificate, a certificate of designation, maybe there was a Reg D filing, anything that was related to the actual transaction.

Q. Now, my understanding, and you correct me if I am wrong, is that Gottbetter & Partners represented Highgate House on the Charys transaction. Is that correct?

A. That is my understanding.

Q. Which is why you're the one that prepared the documents and negotiated the documents, etcetera. Is that correct?

A. That is correct.

Q. So Gottbetter & Partners was the law firm that served as Highgate House's lawyer on that

Page 21

transaction. Correct?

MR. VENTURINI: Asked and answered.

Q. Is that correct?

A. I mean, I worked -- I mean, to be -- I worked with Cornell's in-house counsel on these transactions, so we were their outside counsel just to be more accurate.

Q. Understood. Now, you recall that Mr. Gottbetter testified yesterday that when the defendants received plaintiffs' discovery requests it was committed to you and I guess Mr. Venturini and a per diem attorney named Todd to --

A. Uh-huh.

Q. To collect documents and produce them. Do you recall that?

A. I do recall that.

Q. Is that correct?

A. I didn't do much of the document production. That was done mostly by Todd Lawlor who was the per diem attorney and by my counsel, August Venturini.

Q. How do I spell Lawlor?

A. L-a-w-l-or.

Q. And Mr. Lawlor is an attorney of the state of New York?

6 (Pages 18 to 21)

Page 22

A. I believe so.

Q. Is he affiliated with any sort of firm?

A. He might be. I don't know.

Q. Handing you what's been previously marked as P-45, which is a copy of Objections and Responses of Defendant to Plaintiffs' First Set of Interrogatories. Now, this document also contained our questions. You understand that?

A. I understand that.

Q. I'm guessing Mr. Venturini included our questions just for ease of reviewing these things. Did you review these interrogatories when we produced them to you, the actual questions?

A. Did I review the questions?

Q. Yes.

MR. VENTURINI: Let me just note a general objection that these objections which are in P-45 were amended in another document.

MR. DeAGAZIO: Understood.

Q. Maybe to make this easier -- I'll withdraw the question.

A. Okay.

Q. I'll hand you what's been marked P-44, the staple didn't go all the way through, there's a couple of loose pages.

Page 23

A. I'm giving this back to you? I am holding it here.

Q. P-44 is a copy of our interrogatories, Plaintiffs First Set of Interrogatories. So that's the form that you may have seen it in when it was propounded upon Mr. Venturini. So my question is: Have you ever seen this document before? Take your time to look it over.

A. It is -- it's possible that I saw this document but I don't remember it specifically.

Q. Were you asked to provide responses to any of the interrogatories?

A. I had conversations with my attorney.

Q. And based on those conversations the answers were prepared?

A. I assume.

Q. Did you review the answers before they were provided back to us?

A. I might have but I don't know.

Q. Directing your attention to page ten of P-44, do you specifically recall being asked to provide information to question number two?

A. Question number two?

Q. Yes, on page ten.

A. Not specifically, no.

Page 24

Q. So you don't recall whether or not you were asked to identify communications that led to and resulted in the reissuance or retitling of the Charys warrants?

A. I think what I've said is that we had someone go through all the e-mails, Todd Lawlor, and all the communications and provide those to Augie. Some of them I did see when he presented them to me, but I did not do the e-mail search or the discovery search in terms of the communications and letters.

Q. Would that be the case for all questions?

A. What does that mean?

Q. Well, I only asked you about number two of the interrogatories and you gave that answer. I'm now broadening the question. Did you provide any specific information in response to any specific of the interrogatory questions?

MR. VENTURINI: Objection to form. You can answer.

A. I don't understand the question. Sorry.

Q. Okay. Were you -- we will go through each one then. Were you asked to provide information in response to interrogatory number three?

A. I think what I've testified to on all of

Page 25

these things is that I asked Todd to go through all the communications and also in addition we asked people to prepare all the documents for Mr. Venturini to have access to. So I might have had conversations with August about all of these different issues, but specifically I don't remember talking about one of the issues or -- or one or the other.

Q. You don't recall talking about any particular question?

A. Right. I mean I don't think it was August saying: So what about three? It's not what happened.

Q. Handing you what's been marked P-1 for identification, which is a copy of our document request --

A. You want me to look at this one?

Q. Yes.

A. Should I hold on to this one?

Q. You can leave that in front of you. Did you ever see a copy of Plaintiffs First Request For Production of Documents before today?

A. Have I seen -- hold on.

Q. Take your time to look it over.

A. I am not a litigator so I don't really understand all these documents, so if you give me a

7 (Pages 22 to 25)

Page 26

little time.

Q. Fair enough.

A. I don't think I read through this document, but I think I understand what it was and made all the documents available to Augie.

Q. You did not personally review the requests?

A. I don't think that I read through the entire request.

Q. Were you specifically asked to provide documents in response to document request number five?

MR. VENTURINI: By whom? In the document or by counsel?

MR. DeAGAZIO: By anybody.

MR. VENTURINI: Well, if it's by counsel I instruct him not to answer. But if someone else asked you you can answer.

A. Can I read it first? What was the question about number five?

Q. Were you asked provide documents in response to number five?

MR. VENTURINI: Other than what your counsel told you.

A. No. I don't think I understand the

Page 27

question.

Q. Let me --

A. I don't understand --

Q. Let me rephrase the question.

A. Sorry. I want to give a truthful answer.

Q. Regardless of who may have asked you, I don't want to know communications, did you personally search for documents that would be responsive to document request number five?

A. No.

Q. Did you personally search for documents that would be response to document request number two?

A. No.

Q. A few moments ago you said you don't believe you read through the entire document request. Did you read portions of it?

A. I'm sure I have.

Q. Were you the person who was directing Todd Lawlor on the search for documents?

A. The person who was directing Todd Lawlor was Augie Venturini.

Q. Tell me what participation you personally had in the collection of documents in

Page 28

response to the plaintiffs' document request?

A. So in terms of deal documents, anything like that, we made everything available to August Venturini. I asked that all documents be set out so he can look at them, and then in terms of all correspondence Todd Lawlor was hired to go through all the correspondence and he did bring my attention to a few e-mails.

Q. When you say correspondence, you're including e-mails in that term?

A. Everything. That's what he was there for.

Q. All right.

A. And he reported to Augie, not to me.

Q. Were there times though that he actually came to you and asked you something about a particular document?

A. Did he ask me -- I don't understand.

Q. Even though he was -- even though Mr. Lawlor was reporting to Mr. Venturini on the document production, were there times that he actually came to you to ask you a question about the document production or about any particular document?

A. The only contact I really had with Todd was when he would sit in with August Venturini and I

Page 29

and Adam.

Q. Were there times separate from the times that you were together with Mr. Venturini that Mr. Lawlor came to you to ask you about any documents?

A. There might have been.

Q. Do you recall --

A. I don't remember.

Q. Do you know how much experience Mr. Lawlor has as a lawyer?

A. I don't.

Q. Do you know who was responsible for retaining his services for the purpose of helping with discovery?

A. Who was responsible?

Q. For retaining his services, for retaining Mr. Lawlor's services.

A. I don't. I mean I don't want to assume but I don't know.

Q. Well, do you know if he was engaged directly by Gottbetter & Partners or was he engaged by Venturini & Associates?

A. I don't know.

Q. Do you know who paid him?

A. I don't know.

Q. Can you estimate for me his age?

8 (Pages 26 to 29)

Page 30

A. I would say he's probably about 40.

Q. Did you speak to him at any point about his experience as a lawyer, about what type of work he does and that sort of thing?

A. Did I talk to him about that? I know he does house closings. I think that's the only thing we talked about.

Q. That's one of the things he does?

A. That's one of the things he does.

Q. Did he mention any other type of work that he might do?

A. No.

Q. Did he mention he does personal injury work or anything like that?

A. No.

Q. Do you know whether Mr. Lawlor has experience in corporate or commercial litigation?

A. I don't know.

Q. Where did Mr. Lawlor obtain the documents to review for purposes of responding to our document request?

A. Where?

Q. Yes.

A. He was sitting in Gottbetter & Partners.

Q. And do you know what he did in order to

Page 31

access particular documents? Let me break it down. Let me withdraw the question. You said that you provided deal documents and things that would have been in your file relating to Charys. Right? Is that correct? And perhaps other deals that are relevant here?

A. Exactly, for everything, it was all made available.

Q. You made available hard copy documents?

A. That's correct.

Q. Did you personally review them?

A. No.

Q. All right. Mr. Lawlor reviewed those. Is that correct?

A. I don't know if he reviewed those or not.

Q. Okay. Was he given -- was Mr. Lawlor given access to electronic files?

A. Yes.

Q. And do you know how that access was provided?

A. What do you mean how?

Q. Was he told to sit on a computer and review e-mails? Was he given a CD of electronic files that were put on there by somebody else? How

Page 32

was he given access?

A. It's my understanding that he was performing e-mail searches.

Q. And do you know on whose computer he was performing an e-mail search or e-mail searches?

A. What do you mean whose computer? Whose files was he searching?

Q. I'll clarify the question. You testified that he sat at G&P to do his work?

A. Yes.

Q. So I'm wondering: Was he only looking on G&P files or was he given acces to HHA files as well?

A. I don't know.

Q. But you do know that he performed e-mail searches on G&P computers?

A. I do know that.

Q. And are you aware of whose e-mail addresses he was searching?

A. Was I aware?

Q. Are you aware at any point?

A. Am I aware?

Q. Are you aware?

A. I mean I can make an assumption.

Q. We don't need you to assume. If you

Page 33

know please answer the question as to whose e-mail addresses he was searching.

A. I mean I know that he searched mine.

Q. Okay.

A. I know that he searched Adam's, I know that he searched -- actually I don't know. That's all I know that he searched.

Q. Well, do you know if he searched Mr. Dockery's?

A. I am sure -- yes, he did.

Q. Does Mr. Chorske have an e-mail address at Gottbetter & Partners that he would have searched?

A. He does. He did.

Q. He --

A. He did.

Q. He did have an e-mail address or are you saying that Mr. Lawlor did search Mr. Chorske's e-mail address?

A. No. He did have an IP address.

Q. Do you know if Mr. Lawlor searched Mr. Chorske's e-mail address?

A. I don't know.

Q. Do you know how he performed those searches?

A. Do I know how?

DOERNER & GOLDBERG, INC.
5 Becker Farm Road * Roseland, NJ  07068

973-740-1100
1161 Broad St. * Ste. 110 * Shrewsbury, NJ  07702

Page 34

Q. Yes.

A. What do you mean? What search terms he used?

Q. I don't even know whether it would be a word search or -- in other words, do you know the mechanics of how he went about the computer e-mail search?

A. No, I don't know.

Q. Do you know what search terms he may have used if he did a search by words?

A. I do not know.

Q. Do you know -- well, strike that. Did you give Mr. Lawlor a set of possible search terms?

A. Personally, no.

Q. Do you know if he was given search terms by anybody?

A. I don't know.

Q. Do you know if Mr. Lawlor was asked to search for communications between Gottbetter & Partners and/or HH Advisors and/or Charys with regard to the reissuance or retitling of the warrants?

A. I don't know.

Q. Going back to P-45, the answer to interrogatory number two on the original answers to interrogatories that you have in front of you, and

Page 35

I'm summarizing, but it was basically an objection with no substantive response.

A. Okay.

Q. Did you feel that these -- that this question number two was overly broad, unduly burdensome, vague, ambiguous and not reasonably calculated to lead to the discovery of admissible evidence?

MR. VENTURINI: Objection, calls for a legal conclusion.

Q. You can answer.

MR. DeAGAZIO: Are you directing him not to answer?

MR. VENTURINI: Yes.

MR. DeAGAZIO: On the basis that it calls for a legal conclusion?

MR. VENTURINI: Exactly. And also the interrogatories were supplemented and amended.

MR. DeAGAZIO: I said that these were the initials answers and I am going to get to the supplemented answers.

Q. Handing you what's been marked P-46. P-46 are Defendants Amended Objections and Responses to Plaintiffs First Set of Interrogatories, which were provided to us last Wednesday, or I should say

Page 36

Wednesday of this week.

A. Okay.

Q. Did you provide any information in response to Interrogatory number two?

A. I had general conversations with Augie but I don't know.

Q. Now, there is an answer given to this number two, but I would note that there is no description in this answer identifying communications with Charys.

A. Okay.

Q. Can you tell me since that identification is not in these answers, can you tell me in your own words what communications were had with Charys with regard to the reissuance or retitling of the Charys -- of the one million Charys warrants that are the subject of this litigation?

A. What communications I had with Charys?

Q. Yes.

A. Asked them -- I sent them warrants, retitled warrants to be executed.

Q. Was that sending of the retitled warrants the first communication you had with Charys on the topic of the retitling of the warrants?

A. The first conversation.

Page 37

Q. Or had there been previous conversations alerting them to this idea?

A. I did not have any conversations with them prior.

Q. And when were those retitled warrants forwarded to Charys?

A. I would say early June, late May.

Q. Of 2006?

A. Correct.

Q. Now, we don't have a document or documents that comprise this communication with Charys. Was this done by e-mail?

MR. VENTURINI: Let me object to the form of the question. I thought you introduced something yesterday.

MR. DeAGAZIO: We marked an e-mail yesterday but it does not contain copies of warrants.

Q. I'll show it to you and you tell me whether this is what you're talking about.

A. Uh-huh.

Q. I'll hand you what's been marked P-30 for identification. Now, I'll represent to you that we obtained this document from Charys, and I do see here now that there are purportedly attachments to the e-mail but we were not provided with the

10 (Pages 34 to 37)

Page 38

attachments, so is this the communication that you were referring to a few moments ago?

MR. VENTURINI: Let me note an objection. I think you do have the attachments.

MR. DeAGAZIO: No, we have one attachment which is a revised warrant calculation but we do not have the actual warrants that are attached.

MR. VENTURINI: You may not have the warrants in the form that was attached to this e-mail but you do have the actual warrants that were attached to this e-mail signed by the company.

MR. DeAGAZIO: Okay. We will let him testify about that.

MR. VENTURINI: What is the question?

Q. My point was that we do not have the attachments to this e-mail which presumably in your testimony were, I'll call them, drafts of retitled warrants. Okay?

A. Uh-huh.

Q. Is this the communication that you were referring to a moment ago when you testified --

A. It might be.

Q. -- that you sent the warrants to Charys?

A. It might be.

MR. VENTURINI: Again, he's got to ask

Page 39

the question before you give an answer.

A. Sorry.

MR. VENTURINI: Even though you know what he's going to say.

THE WITNESS: I will let him finish.

Q. P-30 is dated June 14, 2006 from Jason Rimland to a Darcy White. Who is Darcy White?

A. She's an associate at Paul Hastings.

Q. What role did Paul Hastings participate in on the Charys deal?

A. They were one of their outside counsels.

Q. All right. And there are cc's to Karen Leach as well as others. Who is Karen Leach?

A. She's a partner.

Q. A partner at Paul Hastings?

A. Yes.

Q. And there's also somebody, Mike Brenner at MTGSI dot com. Who is Mike Brenner?

A. He is also an outside counsel for Charys.

Q. Do you know what firm he's with?

A. I don't.

Q. Does seeing MTGSI refresh your recollection?

A. No.

Page 40

Q. But he's one of the outside counsels for Charys?

A. That's right.

Q. And who is Ray Smith?

A. He is the CFO of Charys.

Q. And we know who Michael Chorske is. So is it your testimony that prior to sending this June 14 e-mail with the attachments that you note in the e-mail that you had no conversations with anybody on -- with anybody representing Charys or actually employed by Charys regarding the retitling of the one million Charys warrants?

MR. VENTURINI: Objection. I think you're asking a new question now, not summing up what his prior testimony was but you can answer.

MR. DeAGAZIO: He can answer the question.

A. I had conversations with Charys in June -- late May, June is my recollection. This may be the only e-mail, I don't know.

Q. Okay. Who did you speak with when you had those conversations?

A. Who did I speak with? I spoke with Mike Brenner, I spoke with Ray Smith, I spoke with Karen Leach who is outside counsel, and I might have spoken

Page 41

to Darcy White.

Q. And what did you speak with -- strike that.

When you spoke to Mike Brenner what did the two of you discuss?

A. Must have been the retitling of the warrants.

Q. Do you remember what you told him and what he said to you?

A. I do not.

Q. Did you tell Mike Brenner that there had been assignments executed purportedly assigning the Charys warrants to other parties?

A. It is my understanding that I must have informed him of that.

Q. Well, do you recall informing him of that or are you guessing?

A. I don't recall. I would think I would have to.

Q. But you don't specifically recall?

A. I don't recall.

Q. Did he ask you why you were seeking to retitle the warrants?

A. I don't think he asked me that.

Q. He didn't find it unusual that one

11 (Pages 38 to 41)

Page 42

million warrants were issued in the name of Highgate House and now you're coming to tell him that those warrants are now going to be issued in other people's names?

A. I could speculate about the conversation but I don't recall specifically what we said.

Q. No need to speculate. Can you describe your conversation with Ray Smith about this topic of retitling of the warrants?

A. Again, I don't remember any specific conversations I had with him and I don't want to speculate.

Q. You don't recall what you said in that conversation or conversations with Mr. Smith?

A. I don't recall what form -- I mean, I am not sure if it was by e-mail or whether it was over the phone. I know I had communications with them.

Q. Do you recall if you had e-mail communications with Mike Brenner about this topic?

MR. VENTURINI: Other than what is before him?

MR. DeAGAZIO: Yes.

A. It is possible.

Q. So there may be other e-mails other than the one we have in front of us that's marked as P-30?

Page 43

A. There might be.

MR. DeAGAZIO: Well, obviously we will call for production of any documents relating to communications between any of the defendants and Charys or anybody representing Charys. Would you mind marking the deposition transcript? Thank you.

Q. Now, you said that you don't recall whether you had conversations or e-mails with Ray Smith. Do you recall the substance of what the two of you communicated about with regard to the retitling of the Charys warrants?

A. To me it was -- I can't recall but it wouldn't have been a long conversation.

Q. Why do you think it would not have been a long conversation?

A. Because I think I viewed this all along as more of an administrative retitling, and I don't remember any substantive conversations with Mike Brenner or Ray Smith about it.

Q. Do you recall the substance of your conversation or conversations or communications, whatever form they took, with Karen Leach on this topic?

A. Karen Leach, what we talked about was probably the securities laws implications, but I

Page 44

don't remember specifically what we talked about which might be in this e-mail.

Q. Well, what securities law implications would you think might have been brought up in such a conversation?

A. I don't remember.

Q. Well, sitting here today, do you know what securities law implications would exist for this type of retitling of warrants?

A. Well, you have Rule 144 issues.

Q. Issues relating to restricted stock. Is that what you --

A. That's correct.

Q. Was there any issue about the fact that Highgate House was listed as the named owner of the one million warrants and that Charys was going to be preparing and issuing a registration statement?

A. No.

Q. No?

MR. DeAGAZIO: I think it was intended to be verbal. It just didn't come out.

MR. VENTURINI: You need some water?

THE WITNESS: I am fine.

Q. And you said maybe you spoke with Darcy White. Do you recall the substance of any

Page 45

conversation you might have had with her?

A. The conversations with Darcy and Karen would have been about the Rule 144 issues.

Q. Okay. We're going to break now because I have been handed a note that the first tape is about to run so we will take a break.

THE VIDEOGRAPHER: Going off the record. The time is 11:27 A.M., this is the end of tape one.

(A recess takes place.)

THE VIDEOGRAPHER: We're back on the record. The time is 11:38 A.M. This is the beginning of tape two.

Q. Okay. Mr. Rimland, just looking again at P-30 for identification. Now, in your e-mail to Darcy White you say: "Attached are the original warrants issued in the November 16, 2005 transaction with Highgate House Funds." Correct?

A. That's correct.

Q. And do you recall that being the case, that you attached the -- what I'll call the original warrants totalling one million warrants?

A. I can only go by what is on the e-mail.

Q. You don't have an independent recollection of it?

A. I don't.

12 (Pages 42 to 45)

Page 46

Q.    But generally when you send an e-mail and you say you're attaching something, you normally attach it?

A.    If I say -- I mean not always.

MR. VENTURINI:  That's not the question.

A.    I mean I don't know --

Q.    Do you have any reason to doubt that you attached the original Charys warrants to this e-mail when you sent it to Darcy White?

A.    Do I have any reason to doubt?  I have no reason -- I don't know.

Q.    Now, it goes on to say, "As Michael discussed with Billy Ray G&P as escrow agent of the warrants requests that you subdivide the warrants pursuant to the attached chart."

Who is the Michael being referred to in that --

A.    Who is the Michael?

Q.    Yes.

A.    Michael Chorske I got to assume.

Q.    I mean was there any other Michael having any connection to the Charys transaction?

A.    Michael Brenner.

Q.    Would Michael Brenner have had the conversation that you're referring to there with --

Page 47

A.    I don't know.

Q.    You think that was Michael Chorske?

A.    Do -- you know, I know from the reading of the e-mails in front of me, I would assume it's Michael.

Q.    Did you ever speak with Michael Chorske about this conversation with Billy Ray that's described in that sentence?

MR. VENTURINI:  Let me note you can answer that question but any conversations that you had with Chorske to the extent he's affiliated with HHA and HHA is G&P's attorney would -- or client would be privileged.  But you can answer that question.

A.    Okay.

Q.    Let me digest that one. I'll ask the question again.  This sentence purports to describe a conversation that Michael somebody had with Billy Ray.

A.    Right.

Q.    Did that Michael tell you what was stated to Billy Ray in that conversation that led you to write this in your e-mail?

MR. VENTURINI:  Same objection.  You can answer the question yes or no but the subject, the

Page 48

actual contents of the conversation might be privileged.

A.    So what is the question?

Q.    Did Michael tell you what he discussed with Billy Ray?

A.    Yes.

Q.    What did he tell you that he discussed with Billy Ray?

MR. VENTURINI:  Let me just think about this.

MR. DeAGAZIO:  Understanding that the sentence describes some portion of it and that portion is certainly not privileged and therefore the entire conversation can't be privileged.

MR. VENTURINI:  I think that to the extent again that Michael Chorske is affiliated with HHA and HHA is a client of Gottbetter & Partners that conversations between Michael Chorske and Jason Rimland would be privileged.  Now, if it's with respect to third-party communications he could testify to that as long as you agree that that wouldn't be a deemed to be a waiver or argued to be a waiver of the attorney/client privilege from your part.

MR. DeAGAZIO:  I don't know that I need

Page 49

to agree to that.  If this sentence is telling a third party about a conversation between Michael and Billy Ray that was told to Mr. Rimland, no part of that conversation between Michael and Mr. Rimland could possibly be privileged.  He's revealing the conversation to a third party, it can't be privileged.

MR. VENTURINI:  Well, to the extent there's a revealing in this e-mail, and there's very little in this e-mail that says what was said between, if anything, Michael and Billy Ray, so I don't agree with that characterization, but I still think that again if it's a conversation between the client and his lawyer, then I've got to object and instruct him not to answer.  If it's a borderline call, I'm offering to you to let him testify as long as you agree not to claim that I've waived or he's waived the attorney/client privilege.

MR. DeAGAZIO:  I'll address that in a moment.  You're saying that HHA is or was a client of Gottbetter & Partners but not for the purpose that this conversation occurred?

MR. VENTURINI:  Well, I didn't say that. It could be for the purpose that this conversation occurred.

DOERNER & GOLDBERG, INC.
5 Becker Farm Road * Roseland, NJ  07068

973-740-1100
1161 Broad St. * Ste. 110 * Shrewsbury, NJ  07702

Page 50

MR. DeAGAZIO: This conversation obviously occurred with regard to Charys warrants and HHA was not a client of G&P with regard to the Charys warrants.

MR. VENTURINI: Well, G&P as I understand it represents HHA on a variety of issues.

MR. DeAGAZIO: Did they at the time though?

MR. VENTURINI: We can ask the witness, but I think that it's difference between what Michael and Billy Ray discussed, which I think is what you're trying to get at, versus what Michael and Jason discussed, which is where the privilege comes in. So --

MR. DeAGAZIO: The alleged privilege. I will agree it's not a waiver if he answers the question.

MR. VENTURINI: Okay. Then if you want to read it back.

MR. DeAGAZIO: I will just ask it again.

Q. Did Michael tell you what he discussed with Billy Ray on the topic covered by that sentence?

A. I mean I don't recall the specific conversation, but I'm reading the e-mail and I think it speaks for itself.

Page 51

Q. Okay. Now, regardless of who may have said what to Billy Ray, you're stating in this e-mail, G&P as escrow agent of the warrants requests that you subdivide the warrants pursuant to the attached chart. Correct?

MR. VENTURINI: That's what it says.

A. Assuming -- is that what it says?

Q. I just read you a quote.

A. If you're asking me whether the quote you just read is accurate, yes.

Q. You wrote that sentence. Correct?

A. I mean I don't know if I did or not.

Q. Well, this is from Jason M. Rimland, is it not, this e-mail?

A. It is but --

Q. Are you Jason M. Rimland?

A. I am.

Q. You purport to be, right?

A. I purport to be on some days. I am Jason M. Rimland.

Q. So Jason M. Rimland told Darcy White, an outside counsel for Charys, that G&P as escrow agent of the warrants requests that you subdivide the warrants pursuant to the attached chart. Correct?

A. That's what the e-mail --

Page 52

MR. VENTURINI: Objection. That's what the e-mail says.

A. That's what it says.

Q. The answer is yes?

A. Yes.

Q. Now, was G&P an escrow agent of the warrants?

A. No.

Q. So that statement, and I'll read it again, in quotes, "G&P as escrow agent of the warrants" is inaccurate. Is that correct?

A. In my -- it is my understanding that it is inaccurate.

Q. Inaccurate. Okay. And you were requesting that Charys subdivide warrants on the basis of an inaccurate statement that G&P was the escrow agent of the warrants. Is that correct?

MR. VENTURINI: Objection. There's no foundation for that.

MR. DeAGAZIO: I am asking him.

MR. VENTURINI: He can answer the question.

A. What was the question?

MR. DeAGAZIO: Can you read that back. It was a perfect question.

Page 53

A. You won't be able to do it again.

(The pending question is read by the court reporter.)

A. My understanding is that we asked Charys to subdivide the warrants based on the assignments.

Q. At any point did you forward the assignments to Charys?

A. I mean are you asking me to speculate or to tell you -- I --

MR. VENTURINI: I think the instruction would always be do not speculate. Tell him what you know.

Q. I have said I am not asking you to speculate on anything.

A. Probably.

Q. You think that you probably sent the assignments to somebody over on the Charys side?

A. A logical person would think that you would be sending assignments to a company that's going to be issuing new warrants.

Q. I guess we will find out when Mr. Venturini takes my request for documents under advisement. But as you said earlier you don't have a specific recollection of forwarding the assignments to Charys or their counsel. Correct?

14 (Pages 50 to 53)

Page 54

A.   A specific recollection, no.

Q.   Did you mention the assignments anywhere in this e-mail dated June 14, 2006?

MR. VENTURINI: Let me note an objection. The document obviously speaks for itself so you can argue what you want to argue.

MR. DeAGAZIO: I am asking him to read it and I am asking him whether it refreshes his recollection whether he told Charys about the assignments.

MR. VENTURINI: Objection. You can answer.

A.   So you're asking me whether this refreshes my recollection of whether we asked for the assignments of Charys?

Q.   I will break it down into two questions.

A.   Okay.

Q.   First of all, does the e-mail communicate to Charys anything about the assignments?

MR. VENTURINI: Same objection.

A.   I mean as it -- as I'm reading it it does not mention assignments.

Q.   Second part of the question is: Does this e-mail refresh your recollection about whether you told anybody at Charys or anybody that represents

Page 55

Charys about the assignments through any means whether by e-mail or through oral communication?

A.   Again, logic would dictate -- do I have a specific recollection of it? No. But logic would dictate that they had a copy of the assignment.

Q.   We can't base anything on logic in litigation. We have to base it on the facts. The fact is you don't have a specific recollection that you went -- strike that. You don't have a current recollection that you told Charys about the warrants or Charys's counsel about the warrants?

A.   I think I did discuss -- I think I've testified to that. I have discussed the warrants with Charys's counsel.

Q.   Who did you discuss the assignments with? Let me finish my --

A.   That's not what I said.

Q.   I know what you said and I am going to get there.

A.   Okay.

Q.   You confirmed for me that the e-mail -- the 6/14/06 e-mail doesn't mention the assignments. Correct? Is that a yes? You have to verbalize your answer.

A.   Ask the question again.

Page 56

Q.   You have confirmed for me that the June 14, 2006 e-mail does not itself mention the assignments itself?

MR. VENTURINI: Objection. Asked and answered.

A.   As I read it I do not see the word "assignment" in here.

Q.   Okay. It also -- the e-mail does not refresh your recollection whether you sent the assignments to Charys or their counsel. Is that correct?

A.   That's correct.

Q.   Okay. Now, I understand you testified probably five minutes ago that you believe you had conversations with Charys folks about the assignments. So I am going to ask you about that now.

A.   Okay.

Q.   First of all, who did you speak with about the assignments either at Charys or Charys's counsel?

A.   It had to be the same people, Karen Leach, Darcy White, Mike Brenner, and Ray Smith.

Q.   You said it had to be. I'm asking you whether you have a specific recollection of

Page 57

discussing the assignments with any one of those people?

A.   I remember having conversations with those four individuals about the warrants.

Q.   About the warrants?

A.   About the warrants.

Q.   Okay. What about specifically that there had been assignments purportedly executed?

A.   I would think that we were talking about assignments also when we were having our conversation about warrants.

Q.   I don't want you to say I would think, I want you to tell me whether you specifically recall discussing the assignments with either Karen Leach or Darcy White or Mike Brenner or Ray Smith, specific recollection.

A.   Specifically, no.

Q.   You spoke to them about the Charys warrants in general, but you don't recall specifically discussing the assignments with them. Is that correct?

A.   I remember talking to Karen Leach, Darcy White, Mike Brenner and Ray Smith about effectuating the retitling of the warrants.

Q.   But you don't recall specifically

15 (Pages 54 to 57)

Page 58

talking about assignments with them. Correct?

A. Again, I remember talking to --

Q. No, no, no, you have told me that already. You have to answer my question. I've already heard --

A. That's my answer.

Q. Heard that you remember talking to them about retitling of the warrants. I'm confirming what I think you said about two moments ago which is that you don't specifically recall speaking to any one of those four people specifically about assignments of Charys warrants?

A. What I remember is talking to Karen Leach, Darcy White, Mike Brenner and Ray Smith about retitling the warrants. That's what I remember talking to them about.

Q. In general?

A. I mean, my memory is I talked to them about retitling the warrants.

Q. Retitling the warrants?

A. Yes.

Q. Do you recall specifically telling any one of those four people that assignments had been executed regarding the Charys warrants?

A. Do I recall specifically? What I recall

Page 59

is that I had conversations with them about retitling the warrants.

Q. Mr. Rimland, you have to answer the question.

A. Okay.

Q. It's a yes or no question. If the court reporter.

MR. DeAGAZIO: Could read back my last question.

(The last question is read by the court reporter.)

MR. VENTURINI: Let me note an objection. I think the witness is saying that it's probably --

MR. DeAGAZIO: Speaking objection is not appropriate.

MR. VENTURINI: I know.

MR. DeAGAZIO: That is a simple simple question.

MR. VENTURINI: You have been asking the same question.

MR. DeAGAZIO: He hasn't answered it yet I don't think. I think he might have. I am trying to confirm what I think he said. That question is completely unobjectionable. It's a simple yes or no.

Page 60

MR. VENTURINI: Your asking the same question over and over again is objectionable.

MR. DeAGAZIO: He hasn't answered it yet.

MR. VENTURINI: I think it might be in terms of -- I think he's answered it. It may not be using precise language and you may not understand what he's saying.

MR. DeAGAZIO: I understand exactly what he's saying. I want an answer to my question, which is different from what he's saying. Okay. Read it back again, please.

(The last question is read by the court reporter.)

A. Again, I recall talking to Karen Leach, Darcy White, Mike Brenner and Ray Smith about retitling the warrants.

Q. Can you give me a yes or no answer to the question that I posed?

A. To the extent that assignments encompass retitling the warrants, then you can make your own conclusion.

Q. I am not going to draw my own conclusion.

MR. DeAGAZIO: Can you please read back

Page 61

the question again and I would like a yes or no answer to this question.

(The requested question is read by the court reporter.)

A. Again, I will answer as I had in the past.

Q. I don't want to hear that answer again, Mr. Rimland; I want to hear an answer to my question.

A. Then let's move on.

Q. Do you recall telling Karen Leach, Darcy White, Mike Brenner or Ray Smith about the Charys assignments? That's all I want to know. Do you recall telling them that?

A. I remember --

MR. VENTURINI: Objection. Go ahead.

Q. It's yes or no.

MR. VENTURINI: Well, if you can answer yes or no, then answer yes or no. If you have another answer, then give your answer.

A. I remember having conversations with Karen Leach, Darcy White, Mike Brenner and Ray Smith about retitling the warrants which would include assignments.

Q. Did you use the word "assignment" in your conversations with any of them?

16 (Pages 58 to 61)

Page 62

A.   Did I use the word "assignment" in my conversation with any of them? Do I recall using the word "assignment"? No.

Q.   Now, in order to suggest to Charys that these warrants be retitled you said in part, I am going to read the whole thing: "Attached are the original warrants issued in the November 16, 2005 transaction with Highgate House Funds. As Michael discussed with Billy Ray G&P as escrow agent of the warrants requests that you subdivide the warrants pursuant to the attached chart. The number of warrants has not changed and the terms of the warrants have not changed. The only changes that were made were to the denominations and the names. If you would like a black line please let us know. If there is another way you would like to accomplish the transfer also let us know. Once we receive the new warrants we will send back the warrants that we are holding in escrow."

By the way, that last statement, "we will send back the warrants that we are holding in escrow," is that an accurate statement?

A.   No.

Q.   So in two places in this e-mail you inaccurately told Charys as part of an e-mail in

Page 63

which you're asking them to retitle the warrants, you told them two inaccurate statements. Is that correct?

MR. VENTURINI: Objection. It's asked and answered. You already got that from him.

Q.   Is that correct?

A.   I've already answered that question.

Q.   Is that correct? Did you make two inaccurate statements about the fact that G&P was the escrow agent and that we are holding the warrants in escrow?

MR. VENTURINI: Again, objection. He's already testified that both times that where it says holding in escrow are inaccurate. You have gotten your answer so please move on.

Q.   Do I have my answer? Is that correct? I would like you to testify rather than your lawyer.

MR. VENTURINI: Objection. Asked and answered. I instruct him not to answer. Please move on.

MR. DeAGAZIO: That's not an appropriate objection in a deposition.

MR. VENTURINI: You're becoming abusive to the extent you're asking the same question. You already got the question out of him. If you want to

Page 64

tie it up at cross examination at trial you can do that.

MR. DeAGAZIO: Asked and answered is not an appropriate objection to direct the witness not to answer the question. I am asking a different question than I asked before.

MR. VENTURINI: No, you're asking a mathematical question based upon the two answers you got.

MR. DeAGAZIO: I am entitled to do that if I want. Let me move on and ask my questions.

MR. VENTURINI: Okay.

MR. DeAGAZIO: You stated your objections.

MR. VENTURINI: All right.

Q.   On one occasion you inaccurately said in this e-mail that G&P was the escrow agent of the warrants. Is that correct?

MR. VENTURINI: You can answer that one.

A.   What was the question?

MR. DeAGAZIO: Read that back.

(The pending question is read by the court reporter.)

MR. VENTURINI: Same objection, asked and answered. You can answer.

Page 65

A.   I mean if you read the e-mail it says G&P is escrow agent and I've testified that that's not correct.

Q.   Okay. And on another occasion you said that we, meaning G&P, were holding the warrants in escrow.

MR. VENTURINI: Objection.

Q.   Am I correct that that is also an inaccurate statement?

MR. VENTURINI: Objection. It's not another occasion. It's in the same e-mail.

Q.   On another occasion in the e-mail.

MR. VENTURINI: That's the same objection -- same question you asked last time. I instructed him not to answer. Same objection, same instruction.

MR. DeAGAZIO: You instructed him not to answer when I tried to mathematically combine them. I am asking them separately now to address your objection.

MR. VENTURINI: It's been asked already.

Q.   You stated on a second occasion in this e-mail inaccurately that G&P was holding the warrants in escrow. Is that correct?

MR. VENTURINI: Objection. It's not a

DOERNER & GOLDBERG, INC.
5 Becker Farm Road * Roseland, NJ 07068

973-740-1100
1161 Broad St. * Ste. 110 * Shrewsbury, NJ 07702

Page 66

second occasion. It's a second occurrence perhaps but it's listed twice and you have already gotten that.

Q. Is it correct to say: We are holding the warrants in escrow?

MR. VENTURINI: Same objection.

A. It's not correct.

Q. In this e-mail the bases that you gave to Charys and their counsel for retitling of the warrants is, correct me if I am wrong, the fact that the number of warrants has not changed, the terms of the warrants have not changed and that the only changes that were made were to the denominations and the names. Is that correct?

MR. VENTURINI: Objection. That answer was -- question was asked before. But you can answer the question.

A. I'm not sure what that refers to.

MR. DeAGAZIO: Read back the question. The question was very clear. Listen to the question.

A. All right.

(The pending question is read by the court reporter.)

MR. VENTURINI: Same objection.

A. I think I have answered this but I think

Page 67

this is -- the bases for retitling the warrants were the assignments.

Q. You didn't listen to my question. My question was: In this e-mail what you're communicating to Charys and their counsel are the three bases that I just described in my question, is that correct, in this e-mail?

A. I think --

MR. VENTURINI: Objection. I don't think you have established a foundation that that's a basis but you can answer the question.

A. I think the e-mail speaks for itself.

Q. It does in some respects but it doesn't in other respects. What I'm trying to get at is: In this e-mail did you say anything other than the three things I just said?

A. Which were?

Q. In order to tell Charys to retitle the warrants --

MR. VENTURINI: Objection. The document speaks for itself.

MR. DeAGAZIO: That is not – I didn't say this yesterday, I wasn't miked. The document speaks for itself is an absolutely inappropriate direction to direct a witness not to answer a

Page 68

question and you know it. You know it's only privilege and court order are appropriate objections to direct not to answer.

MR. VENTURINI: That's not true because if there's an abusive tactic where you're asking the same questions over and over again --

MR. DeAGAZIO: I haven't asked this question.

MR. VENTURINI: Let me finish. Or if you're asking a witness what a document says when it says and it clearly states what it says, that's also an abusive tactic, and I have the right to instruct not to answer in that event.

MR. DeAGAZIO: No, you don't. It's not abusive. All I am doing is asking the witness about a document he wrote, and I'm asking him whether the document says that the bases to retitle the warrants were, one, the number of warrants has not changed; two, the terms of the warrants have not changed; three, the only changes that were made were to the denominations and the names, did you give any other bases in this e-mail for the retitling of the warrants?

MR. VENTURINI: Objection. Lack of foundation. You haven't established that these were

Page 69

bases for retitling the warrants.

Q. Can you answer my question?

A. I don't know what the three bases are but if you want I can reread you what the e-mail says.

Q. I don't want you to reread me the e-mail.

A. Okay.

Q. Are there any other e-mails to Charys whereby you were trying to induce them to reissue the Charys warrants other than the one we see in front of us?

MR. VENTURINI: Objection. You can answer.

A. To my knowledge there were communications between me and Karen Leach and Darcy White and Ray Smith and Mike Brenner, maybe Billy Ray, I don't know if there are more e-mails or not.

Q. You're not sure?

A. I'm not sure.

Q. I suppose we will find out, but did you keep notes of any of your conversations with these four or five people?

A. No.

Q. You did not?

18 (Pages 66 to 69)

Page 70

A. I did not.

Q. Would it be your habit or practice to keep notes of conversations on a particular deal?

A. I really don't know.

Q. You don't know whether it's your -- you have a habit?

A. I do not keep notes.

Q. You generally don't keep notes?

A. I generally do not keep notes, and whatever notes I have, most of my practice is transactional and when the transaction is done I throw everything out.

Q. Now, if it's inaccurate to say that G&P was the escrow agent of the warrants why did you say it twice?

A. Why did I say it?

Q. Yes.

A. I don't know why I said it. I could speculate.

Q. I don't want you to speculate. Only if you recall why you said it, that's what I want to know. You do not recall why you said escrow agent?

A. I do not recall why I said escrow agent.

Q. Now, you have been a corporate and securities attorney as of the date of this e-mail for

Page 71

almost ten years. Correct?

A. About seven.

Q. I thought you said you graduated in '07. You started in '08 and you were doing securities and corporate work for six, seven, almost eight years at that point?

A. That's correct.

Q. So you knew what an escrow agent was. Correct?

A. I do.

Q. And at the time you wrote this e-mail you knew what an escrow agent was. Correct?

A. I do, I did and I do.

Q. Okay. Now, as I understand the Charys deal there were two types of escrow agreements, one was that Gottbetter & Partners would escrow the money that was going to fund the transaction, and the other was an escrow shares escrow agreement whereby Gottbetter & Partners would be the escrow agent of the shares underlying the four million dollar debenture and the one million warrants. Is that correct?

MR. VENTURINI: Objection to form.

Q. Is that a fair understanding of the two types of escrow agents there were?

Page 72

A. It depends on the transaction.

MR. VENTURINI: Same objection.

Q. In the Charys deal itself.

A. I don't know what the escrow arrangements are besides for the escrow shares at this point.

Q. Fair enough. You're aware though that there was not an escrow agreement whereby Gottbetter & Partners was designated as escrow agent of the warrants, the Charys warrants. Is that correct?

A. That's correct.

Q. What happened subsequent to this e-mail?

A. What happened subsequent?

Q. With regard to the retitling of the warrants?

A. We received the warrants, actually HH Advisors received the warrants, I believe they were sent to Michael Chorske, and then we must have sent the warrants, the original warrants back.

Q. Sorry, I didn't hear that last part.

A. What happened is Michael Chorske received the warrants.

Q. The original retitled warrants?

A. The retitled warrants and then the original warrants.

Page 73

Q. From November of '05?

A. The previously retitled warrants were sent to Charys with -- my recollection is with the assignments.

Q. Was that done by overnight mail or in other words --

A. I don't know the method.

Q. The actual physical hard copy original Charys warrants that were originally executed in November of '05 were sent to Charys with the assignments?

A. Yes.

Q. Who would have been the person to have sent those?

A. Could have been anybody -- I don't know who it was.

Q. Was it you?

A. I don't think so. I don't recall. Maybe it was.

Q. I mean would there be a cover letter that would accompany those documents?

A. I think there should be. Logic would dictate that when you're sending a package there would be a cover letter.

Q. Now, I just want to clarify something

DOERNER & GOLDBERG, INC.
5 Becker Farm Road * Roseland, NJ 07068
973-740-1100
1161 Broad St. * Ste. 110 * Shrewsbury, NJ 07702

Page 74

because I'm a little confused. Chorske received the original retitled warrants from Charys. Is that correct?

A.    I don't know if received -- I don't know where he got them from.

Q.    All you know is at some point he had them?

A.    That's correct. I don't know if it came from their counsel or from them -- from Charys or from Charys's counsel. I am not saying he showed up one day and had the warrants. I am saying I remember that he came into my office, told me he had the warrants.

Q.    Okay. And somebody then sent the original original Charys warrants, and do you know what I mean by original original?

A.    Pre-retitled warrants.

Q.    Yes. The ones that were originally one million warrants in the name of Highgate House. Those were sent to Charys?

A.    Yes, that's my understanding.

Q.    And your belief is that the assignments were with those warrants?

A.    Yes.

MR. DeAGAZIO:  My prior request, Mr.

Page 75

Venturini, would obviously include that communication.

Q.    Handing you what's been marked P-42 for identification. Do you recognize this document?

A.    It's my affidavit. I recognize it.

Q.    Did you review this affidavit before you signed it?

A.    I did.

Q.    And that is in fact your signature sworn to on December 19, which is on page four?

A.    Yes.

Q.    Now, you say in paragraph 11 in part, "G&P has never held the Charys warrants in escrow, trust or other capacity. The Charys warrants have been held by HHA in its offices which are separate from G&P's offices." Where were the warrants held?

A.    In Michael Chorske's office.

Q.    Why were they held there to your knowledge?

A.    I don't know.

Q.    And was it Mr. Chorske who sent those original pre-retitled warrants to Charys after they were retitled?

A.    It might have been.

Q.    Now, you recall that Mr. Gottbetter and

Page 76

HHA terminated their engagement with Yorkville in or about January of 2006?

MR. VENTURINI:  Objection to form.

A.    Was the question do I --

Q.    Do you recall that?

A.    I do.

Q.    And do you recall that through various correspondence the -- I'll call it the resignation. Is that okay if we call it the resignation?

MR. VENTURINI:  Sure.

Q.    Do you recall that the resignation was made effective January 19 of 2006?

A.    Am I aware of that?

Q.    Yes.

A.    Yes, I am aware of that.

Q.    Now, prior to that resignation had -- where had the Charys file been kept? I mean the transaction file.

A.    The transaction file?

Q.    Yes.

A.    Probably in -- probably next door. Probably in HH Advisors offices and there might have been a copy in G&P.

Q.    Yeah, I mean since G&P actually represented Highgate House as outside counsel on the

Page 77

Charys transaction, I'm assuming that G&P had its own file. Correct?

A.    That's correct.

Q.    Its own legal file?

A.    That's correct.

Q.    Was there also a separate file kept at HHA?

A.    That is my understanding.

Q.    All right. And at what point was the Charys file transmitted to Highgate House or Yorkville?

MR. VENTURINI:  Objection. He didn't testify that it was transmitted.

MR. DeAGAZIO:  I am asking.

MR. VENTURINI:  You can ask him if it was transmitted before you ask him when it was done. Objection, lacks foundation.

Q.    Was the Charys transaction file transmitted to Yorkville or Highgate House?

MR. VENTURINI:  Well, objection. Which file are you referring to? He referred to two different files, one kept by HHA and one kept by G&P. Which one are you referring to?

MR. DeAGAZIO:  We will deal with them separately.

20 (Pages 74 to 77)

Page 78

Q. Was the G&P file or a copy thereof sent to Highgate House or YAM, Yorkville?

A. Customarily what I would do on these transactions is I would make a copy of all the documents and send them to Troy, because he was my point person there so I dealt with him. So he requested documents be sent to him. So at two points I would send him, say, Charys's typical deal, I don't know if this happened, but typically he would get the documents before the transaction was completed and he would look at the documents and bless the documents, and then second I would send him a set of closing documents.

Q. Copies of closing documents?

A. Copies.

Q. Now, in this particular instance with Mr. Gottbetter and HHA resigning from its engagement was there an effort made to transmit original files back over to Highgate House and Yorkville?

A. My understanding was that documents were sent to Troy, maybe to Mark.

Q. Original deal files?

A. That's my understanding.

Q. I hand -- handing you what's been marked P-5 for identification.

Page 79

A. Okay. Do I leave all these here?

Q. Yes.

A. Okay.

Q. Do you recognize this letter?

A. Through the course of this litigation I've seen this letter.

Q. Now, you were in the room yesterday but I'll represent to you that Mr. Gottbetter testified that you drafted this letter I believe. Is that correct?

A. Is what correct, that he said so?

Q. That you drafted this letter?

A. I don't remember.

Q. You don't recall. Do you recall participating in the drafting of this letter?

A. I mean I must have, you know, it's my understanding that I, you know -- I helped.

Q. The second paragraph of this letter it says, next week we will send you -- second paragraph on the first page.

A. Okay.

Q. "Next week we will send you a full set of originally executed documents for all of these transactions. G&P will retain certain of the original documents on a deal-by-deal basis pursuant

Page 80

to its obligations under the escrow arrangements." Do you see that?

MR. VENTURINI: Are you going to ask him a question about what it means?

MR. DeAGAZIO: I am asking him if he sees that wording.

A. I see it.

Q. Does that refresh your recollection about what occurred here in terms of original documents being forwarded to Highgate House and/or Yorkville?

MR. VENTURINI: Well --

A. I don't understand the question.

MR. VENTURINI: Objection. I think he testified that original documents were sent over. He said it was his understanding, so I don't know what recollection you're refreshing.

MR. DeAGAZIO: Just trying to jog his memory; that's all.

Q. You remember that Mr. Gottbetter and his people forwarded all original transaction files over to Yorkville and/or Highgate House?

A. I mean, that's my understanding.

Q. Now, this letter says that G&P will retain certain of the original documents on a

Page 81

deal-by-deal basis pursuant to its obligations under the escrow arrangements.

A. Uh-huh.

Q. Now, we already established that G&P was not the escrow agent of the Charys warrants. Correct?

A. That's correct.

Q. Okay. So there would have been no reason for G&P to retain the original Charys warrants. Is that correct?

A. I think that's correct.

Q. Now, did G&P in fact retain the original Charys warrants in its possession after Mr. Gottbetter's resignation?

A. That's not my understanding, not to my understanding.

Q. Who did?

A. I think I've told you I think they were in Michael Chorske's office.

Q. Okay. You can read over this letter if you want, if you need to to answer this question, but did anybody -- anybody from Gottbetter & Partners or Highgate House Advisors, HH Advisors, tell anybody at Yorkville or Highgate House Funds that the original Charys warrants were being retained by HH Advisors?

21 (Pages 78 to 81)

Page 82

A. To my knowledge? At what point?

Q. At any point. Strike that. In this time period of January when the deal files were being transmitted.

A. Not to my knowledge.

Q. I'll hand you what's been marked P-16 for identification. Do you recognize this to be the -- a copy of the closing binder of the Charys transaction, and again feel free to look through it if you need to to answer the question.

A. It looks to be the Charys holding company deal documents.

Q. Now, when this closing binder was transmitted over to Yorkville and/or Highgate House Funds, were all of the documents in this binder originals?

A. I don't know what -- when this was delivered to Cornell.

Q. Well, again --

A. If it was -- because if it was delivered in November, then it would be copies from G&P. If it was delivered later on, then I don't know who did that.

Q. Well, again we're talking about this time frame in or about January of '06 when original

Page 83

deal files are being returned to Yorkville.

A. Okay.

Q. So my question then is: When the original deal file was transmitted back to Yorkville or Highgate House Funds, did anybody tell my clients that the warrants were just copies?

MR. VENTURINI: Objection. You're talking back in November?

MR. DeAGAZIO: No, in January.

MR. VENTURINI: But you're looking at P-16 and we haven't established when P-16 was sent over as the witness stated so your question is really misleading.

MR. DeAGAZIO: It's not. He's testifying and I will confirm it with the witness rather than bantering back and forth.

Q. You have testified that the original Charys warrants were, in fact, retained in Mr. Chorske's office at HH Advisors?

A. My understanding is that.

Q. You have also testified that the original deal files including the Charys deal file was transmitted over to Yorkville. Is that correct?

MR. VENTURINI: Objection. You can answer.

Page 84

A. Again, was it sent over to Yorkville? Yes.

Q. Now --

A. I would like to say it's my understanding it was sent to Yorkville.

Q. Okay. Now, since Mr. Chorske had retained the original Charys warrants, by definition doesn't that mean that when the original Charys binder was forwarded to Yorkville it did not contain the original Charys warrants?

A. I think I want to clarify so that there's no confusion.

Q. Sure.

A. I don't know when this binder was sent to Yorkville because, you know, it could have been sent either after their deal closed, right afterward, which would have only copies of everything in the closing set, or was it sent when this letter was sent or whenever -- you're saying that Yorkville received documents in January. So I don't know. So it's hard for me to tell you what should be in these documents, what shouldn't be in these documents and whether a copy should have been held back or not. If you want to do each situation, that's fine. I can't answer blanketly about this.

Page 85

Q. Fair enough. Forget about the exhibit even. We have confirmed some facts here that would lead us to this answer.

A. Okay.

Q. Isn't it true that Mr. Chorske retained the original Charys warrants in his office at HH Advisors?

A. That's my understanding, yes.

Q. Isn't it true that in and about January of 2006 what was purported to be the original Charys deal file was transmitted to my clients?

A. Yes.

Q. And isn't it then true -- by combining facts one and two is it true then that when the original Charys deal file was transmitted to my clients it could not possibly have contained the original Charys warrants because they were in Mr. Chorske's office?

MR. VENTURINI: Objection. You can answer.

A. I mean logic would dictate that -- I mean.

Q. Physics I think.

A. Maybe it's Associate property. I don't --

22 (Pages 82 to 85)

Page 86

MR. VENTURINI: I think you got what you need, Richard.

A.    I don't...

Q.    And you've testified that nobody told anybody at my clients that the original warrants were being held by Mr. Chorske?

MR. VENTURINI: Objection. That wasn't exactly --

A.    That's not what I said. What I said was my understanding is that nobody talked to them.

Q.    Fair enough. I'm going to hand you what's been marked P-24, 25, 26 and 27, which are documents produced by your attorney in this case. And I believe, but you confirm whether this is true, that these documents are the assignments for each of the four warrants that are the subject of this case. And we've attached -- there was some confusion yesterday because we had a document that just had the assignments, the single page assignments collected together and there may have been some duplicates. So we have gone into your production and only produced what you gave us in terms of the assignments which were attached to original warrants.

A.    Okay.

Q.    So that's what we've done.

Page 87

A.    Okay.

Q.    Hopefully there won't be any confusion.

MR. DeAGAZIO: And I owe you a copy. There it is.

MR. VENTURINI: Great.

Q.    Just to make everybody understand what we did here, we just took from your production, from defendant's production, sequentially it appeared that your production was broken out into the -- each of the four warrants, the twenty-five cent warrant, the 50 cent warrant, the 75 cent warrant and the dollar warrant. Those were the original values, and there were I believe three assignments per warrant, and what we've done is included all three assignments per warrant in each one of these exhibits. Okay? So that's what we did. Essentially it corresponds to the folder that appeared to have been copied as the first page of each exhibit. Okay?

A.    This is -- what is this exactly? This is what?

Q.    This is what your attorney produced.

A.    That August has produced. Okay.

Q.    It looks to have been in folders for the twenty-five cent warrant. We have the three assignments and they're attached to I guess copies of

Page 88

the twenty-five cent warrants and then we've done the same for the other warrants so that's what we have done here.

A.    Okay.

Q.    Feel free to look over them just to confirm that that's the case.

A.    You want me to look through them and confirm that that's the case?

Q.    If you would like to do that feel free to do so.

A.    I mean whatever you ask me to do.

Q.    Why don't you do that?

A.    Okay.

Q.    Because I am not testifying but I want it to be clear.

A.    I won't read unless you tell me to read.

MR. VENTURINI: Can we take it one at a time perhaps.

Q.    Let's go through P-24 first and just confirm for me that it contains three assignments of the twenty-five cent warrant.

A.    Okay.

Q.    Can you in fact confirm that this P-24 contains three assignments of the twenty-five cent warrant?

Page 89

A.    I can.

Q.    And the twenty-five cent warrant was a warrant for 200,000 shares of Charys common stock. Is that correct? The warrant itself?

A.    This is the twenty-five cent warrant?

Q.    Yes.

A.    Yes.

Q.    And looking at the three assignment documents that were in there, am I correct that Mr. Chorske was being assigned 20,000 warrants?

A.    According to the assignment, yes.

Q.    That's on Bates number page D00714?

A.    Say that again.

Q.    That was Bate numbered D00714. Correct?

A.    Yes.

Q.    We're going to go off the record.

THE VIDEOGRAPHER: Going off the record. The time is 12:37 P.M., this is the end of tape two.

(A recess takes place.)

THE VIDEOGRAPHER: We're back on the record. The time is 12:39 P.M. This is the beginning of tape three.

Q.    All right. Still in P-24, directing your attention to Bate numbered page D00724 now. Just to move things along, is it correct that HH

23 (Pages 86 to 89)

Page 90

Advisors was purportedly assigned 79,920 warrants?

A.   That's what it says.

Q.   And then directing your attention to Bate numbered page D00734 is it correct that Yorkville Advisors Management was purportedly assigned 180,000 wants?

A.   Yes.

Q.   Now, as you said this twenty-five cent warrant was a total of 200,000. Am I correct that Mr. Chorske's -- the assignment to Mr. Chorske of 20,000 warrants was ten percent of those warrants?

A.   If you're asking me whether 20,000 is ten percent of 200,000?

Q.   Yes.

A.   Yes.

Q.   And then of the remainder of 180,000 the HHA assignment of 79,920 is 44.4 percent of that?

A.   I have to get a calculator.

Q.   We will leave that. But Mr. Chorske's amount was ten percent?

A.   That math I can do.

Q.   I'm with you. Let's quickly go to 25 now, which is the 50 cent warrant, and if you look on the first page of the warrant, which is D-644, is it correct that the 50 cent warrant was for 400,000

Page 91

shares?

A.   According to this document, yes.

Q.   And if you look at -- turn back one page to D-643 is it correct that Mr. Chorske was being assigned 40,000 of those warrants?

A.   That's correct.

Q.   Am I also correct that that is also ten percent of the total amount of --

A.   Again, that math I can do. Yes.

Q.   Moving along to P-26, which is the 75 cent warrant, on D-776, am I correct that this was a warrant to purchase 200,000 shares?

A.   Yes.

Q.   And turning back a page am I correct that Mr. Chorske was purportedly being assigned 20,000 warrants. Correct?

A.   That's correct.

Q.   And that is also ten percent of the 200,000. Correct?

A.   Yes.

Q.   Okay. And in P-27, this is the dollar warrant, is it correct that this dollar warrant was for a total of 200,000 shares?

A.   Yes.

Q.   And turning back to page D-838 is it

Page 92

correct that Mr. Chorske was again being -- purportedly being assigned 20,000 of those 200,000 warrants?

A.   That's correct.

Q.   Which is also ten percent?

A.   Right.

Q.   So in January when the assignments were purportedly created it was understood that Mr. Chorske's I'll say alleged participation in the warrants was ten percent?

MR. VENTURINI: Objection to form. You can answer.

A.   According to these documents, yes.

Q.   When were these assignments created?

A.   It is my understanding they were created around January 10.

Q.   Who created them?

A.   That I don't know.

Q.   Was it you?

A.   Maybe.

Q.   It might have been?

A.   It might have been.

Q.   Is there any way we would be able to know that? How can we figure out who created these documents?

Page 93

A.   I don't know.

Q.   For instance, if you look on the bottom there does appear to be -- unfortunately these are bad copies, but there does appear to be some sort of document stamp at the bottom. Do you think that's the G&P document identification at the bottom of the assignment, of the assignment itself?

A.   Yes.

Q.   Not of the warrant but of the assignment?

A.   It appears to be.

Q.   Was anybody else working on the Charys matter in January of '06 other than you at G&P?

MR. VENTURINI: Objection to form.

A.   Could have been anybody working on Charys. Just to give you -- just to clarify that, I wasn't working on Charys after the deal closed on November 17.

Q.   There wasn't anything to do. Right?

A.   Yeah, I mean, the deal is done.

Q.   Were you present when Mr. Gottbetter allegedly signed these assignments?

A.   Was I present?

Q.   Yes.

A.   I don't know.

24 (Pages 90 to 93)

Page 94

Q. You don't know. Do you know when he signed them?

A. My understanding is that he signed them around January 10.

Q. Why do you have a -- what seems to be a fairly decent recollection that these assignments were created on or about January 10 and then signed some time around there as well?

A. Through the course of the litigation I've -- I did some inquiry and I saw that the document was created on January 10 so that's my recollection. I mean I would assume that they were signed shortly afterwards.

Q. What did that inquiry consist of? Did you go into the documents and look at like the properties or the meta data. Is that what you did?

A. Yes.

Q. So your investigation shows that these documents were quote, unquote created on your computer system at G&P on January 10. Is that correct?

A. That's correct.

Q. But your testimony that they -- you think they were signed either on that date or shortly thereafter sounded more like guess work but you tell

Page 95

me what your basis for saying that is.

A. I'm giving you my understanding that I think it was signed around that time.

Q. Can you tell me what your understanding is based on?

A. What it's based on?

Q. Yes.

A. Just general knowledge of that time.

Q. You actually have a recollection of it?

A. A recollection of what?

Q. Of the signing --

A. Not -- I might have seen the signing. I don't remember but I definitely knew that they were signed.

Q. All right. I understand you don't remember whether or not you observed them being signed, but you do have a recollection that in January near the 10th either you observed it or somebody told you that they had been signed? Is that a fair statement?

A. No, I think what I said was I saw the documents were created on January 10 through my inquiry, and my general understanding is that they were signed on January 10 or thereabouts.

Q. Let's break.

Page 96

THE VIDEOGRAPHER: Going off the record. The time is 12:48 P.M.

(A lunch recess takes place.)

THE VIDEOGRAPHER: We're back on the record. The time is 1:31 P.M.

Q. I want to -- before we go back to the assignments I want to focus your attention back on your June 14, 2006 e-mail which was P-30. You should have a copy in front of you. I don't remember if I asked you this, if I did I apologize but I don't think I did. When you were having these communications that you testified to earlier with Charys and its counsel in and around June of 2006 regarding the retitling of the warrants, did you advise anybody at Yorkville or Highgate House about those communications?

A. At what time?

Q. In June of 2006.

A. I did not.

Q. Did you advise anybody in June of 2006 -- strike that. In June 2006 did you advise anybody at Highgate House or Yorkville that you were now effectuating the retitling of the Charys warrants?

A. Which warrants are you talking about?

Page 97

Q. The four warrants that we have been discussing.

A. Did I tell anybody at Yorkville?

Q. Or Highgate House?

A. I don't remember but...

Q. Do you remember if you sent any e-mail communications to anybody at Yorkville or Highgate House Funds in or around June of 2006 to tell them that you were effectuating the retitling of the Charys warrants?

A. I don't specifically remember that.

Q. Same question but later time period, at any time after June of 2006 did you tell anybody at Yorkville or Highgate House Funds that you had effectuated the retitling of the Charys warrants?

A. The one conversation I recall is with Troy.

Q. When was that?

A. In October.

Q. Troy Rillo?

A. Troy Rillo.

Q. And what did you say to him and what did he say to you during that conversation?

A. I -- what did he say to me?

Q. What did you say to him?

25 (Pages 94 to 97)

Page 98

A. What did I say to him?

Q. Yes.

A. I informed him that the assignments were -- the assignments were effectuated.

Q. Who called whom?

A. Who called whom?

Q. Yes.

A. I don't remember.

Q. It was a phone call?

A. It was a phone call, yes.

Q. And you don't remember whether Troy called you --

A. I don't remember.

Q. Do you recall specifically using the word "assignments" in that conversation with Troy Rillo in October of 2006?

A. Do I remember using the words "assignments"?

Q. The word "assignments."

A. Do I remember using that word? I mean I probably used the word.

Q. Or do you just remember telling him that the warrants had been reissued in the various denominations?

A. I don't remember.

Page 99

MR. VENTURINI: Objection to form. Wait until he finishes asking the question before you answer and you have to give me a second to object. Objection to form.

Q. You have got to let the lawyers do their thing.

(The requested portion is read by the court reporter.)

Q. That they were eventually retitled in?

MR. VENTURINI: Same objection.

Q. I'll withdraw the question. The focus of the question is: Did you tell him about quote, unquote assignments or did you simply tell him that the Charys warrants had been reissued in the names of Michael Chorske, HH Advisors, Yorkville and possibly even yourself?

MR. VENTURINI: Objection to form.

A. Did I tell him -- did I use -- what verbiage did I use?

Q. Did you use the word "assignments"?

A. I don't remember what verbiage I used.

Q. Do you remember telling him that assignments existed in that conversation?

A. Do I remember telling him that assignments existed? I don't remember.

Page 100

Q. So your earlier testimony a few moments ago when I first started this line of questioning about your conversation with Mr. Rillo, your earlier testimony was that you informed Mr. Rillo that the assignments had been effectuated. Should we correct that testimony to say that you told him that the Charys warrants had been reissued but that you don't recall whether you told him about the assignments? Is that a fair characterization of what occurred in that conversation?

MR. VENTURINI: Objection.

A. No.

MR. VENTURINI: You can answer.

Q. It's not a fair characterization? What about it is unfair?

A. I think I just testified that when I talked to Troy I told him that the assignments were effectuated.

Q. And you used the term assignments?

A. I must have.

Q. But you just told me a lesser moment ago that you don't recall whether you used the term assignment in the conversation.

A. I called him to tell him that I -- that we effectuated the assignments.

Page 101

Q. That was the -- that sounds like a general summary of what you think you were telling him but now I'm getting into details. Did you tell him that assignments existed?

A. Did I tell him -- I don't remember.

Q. Did you tell him that assignments had been effectuated?

A. Did I tell him --

Q. Use those words.

A. The general, the gist of our conversation was that the assignments had been effectuated. If you're asking me to tell you the exact verbiage, I don't recall.

Q. And you don't recall whether you actually used the term assignment in this conversation?

A. I think I just answered that question.

Q. You're going back and forth and I can't get a straight answer.

A. Okay.

Q. You're telling me that you think -- that the substance -- the general substance of the conversation was that the assignments had been effectuated, but then you told me that you don't recall whether you told him -- whether you actually

26 (Pages 98 to 101)

Page 102

used the word assignment in the conversation.

MR. VENTURINI: Objection to the characterization but you can answer the question.

Q. That's why I'm a little confused.

A. My conversation with Troy was that I told him that the assignments were effectuated. That's the general conversation I had with Troy.

Q. That's the general conversation. Now, previously you had testified that when the assignments were allegedly created in January of '06 you do not believe that anybody at Yorkville or Highgate House was told about those assignments. Is that correct?

A. That is not correct.

Q. That's not correct. You don't remember telling anybody. Is that correct?

A. That's correct.

Q. All right. Fair enough. Did you have a sense when you spoke to Mr. Rillo in October of 2006 that he was aware that assignments existed?

A. When I talked to Mr. Rillo in October 2006 he was very abusive and started using invective against Adam and hung the phone up on me.

Q. Why was he taking that kind of attitude with you in that conversation?

Page 103

A. I do not know. You have to ask him.

Q. Was it because he was shocked that the Charys warrants had been assigned to other people?

A. What I think it is is that there's some bad blood between Mark Angelo and Adam Gottbetter, and I think that this is just part of that because often times I would have conversations with Troy and he would use invective against Adam.

Q. I don't believe you actually answered my question a couple of moments ago which was: Did you get a sense from speaking with Troy in October of 2006 whether he was aware that assignments existed?

A. I don't know if he specifically told me that he wasn't aware. He hung up the phone on me.

Q. And what did you say to him just before he started using invective and then hanging up the phone?

A. It was a very short conversation. I explained to him that the assignments were effectuated and he flipped out, started using invective against Adam because Troy and I never had -- we didn't keep it personal between the two of us, and used invective against Adam and said: This is war and he hung up.

Q. Did you conclude from that that he did

Page 104

not know that assignments existed?

A. I didn't conclude anything from that.

Q. Before we broke for lunch -- well, strike that. We're going to go off the record now.

THE VIDEOGRAPHER: Going off the record. The time is 1:42 P.M.

(A recess takes place.)

THE VIDEOGRAPHER: We're back on the record. The time is 1:50 P.M.

Q. After the June 2006 time frame other than the conversation you had with Troy Rillo in October of 2006, did you tell anybody else at Yorkville and Highgate House about the retitling of the warrants, of the Charys warrants?

A. Let me think about that.

Q. Sure, take your time.

A. I believe there might have been another conversation with Troy although I do not believe so but there might have been, and I might have had discussions with maybe like a David Fein who is an in-house counsel there, but I do not recall but it's like fishing around my memory in general. It's possible I talked to somebody else about it.

Q. Do you remember what the time frame would have been of the possible conversation with

Page 105

David Fein?

A. What the time frame was?

Q. When it occurred.

A. Between October and now.

Q. Okay. Let's go back to the assignments that we were looking at before the lunch break.

A. What number?

Q. Let's go back to 24, P-24. Actually no, we discussed P-24 already. And we confirmed that there was 20,000 assignments to Chorske, 79,920 to HH Advisors and 180 -- strike that 100,080 assignments to Yorkville. Do you recall that?

A. No. I don't want to be difficult. I don't remember. I want to be precise.

Q. The record will stand. So let's quickly go through it again then. What I'm going to do is I am going to direct you to the Bates page numbers so we can expedite this process a little bit.

Again, looking at P-24, D-714, Chorske getting assignment of 20,000 warrants. Correct?

A. Yep.

Q. All right. D-724, HH Advisors purportedly getting assignment of 79,920 warrants. Correct?

MR. VENTURINI: Why are we doing this

27 (Pages 102 to 105)

Page 106

again?

MR. DeAGAZIO: He didn't remember the amounts and I need him to remember the amounts.

MR. VENTURINI: All right.

MR. DeAGAZIO: Believe me I wouldn't be doing it but for the fact that he didn't remember.

Q. And D-734, Yorkville Management Advisors purportedly getting assigned 100,080 warrants. Correct? Is that a yes?

A. Yes.

Q. Looking at P-25, which is the warrant for 400,000 shares we talked earlier about Mr. Chorske purportedly getting assignment of 40,000 warrants. Correct?

A. Yes.

Q. On page D-643 and then on page D-653 -- strike that. D-663 Yorkville Management Advisors purportedly getting assignment of 200,160 warrants?

A. Yes.

Q. All right? And then on page D-673, HH Advisors purportedly getting assignment of 159,840 warrants. Correct?

A. Yes.

Q. Looking at P-26 on D-775, Mr. Chorske getting -- purportedly getting assignment of 20,000

Page 107

warrants. Correct?

A. Yes.

Q. D-786 -- 785, sorry, HH Advisors purportedly getting assignment of 79,920 warrants. Correct?

A. Correct.

Q. And Yorkville Management Advisors on D-795 getting -- purportedly getting assignment of 100,080 warrants. Correct?

A. Correct.

Q. P-27, Chorske purportedly getting assignment of 20,000 warrants on D-838. Correct?

A. Correct.

Q. D-848, HH Advisors purportedly getting assignment of 79,920 warrants. Correct?

A. Correct.

Q. And D-858, Yorkville Management Advisors purportedly getting assignment of 100,080 warrants. Correct?

A. Correct.

Q. Now, I've done the arithmetic and I represent that the total amount of assignments going to Chorske is 100,000, okay? That was 20,000, 40,000, 20,000 and 20,000. That was 100,000 to Chorske. I also represent that the arithmetic for HH

Page 108

Advisors is a total of 399,600 warrants, which is based on three amounts of 79,920, and one amount of 159,840 warrants. Okay? And then the balance to Yorkville was 500,400 warrants. Okay? That's the arithmetic.

Now, I want to turn now to your e-mail dated June 14, P-30, and I want to look at the chart that you attached to your e-mail. By the way, can you confirm that in fact that you prepared this Charys revised warrant calculation chart?

A. I did not.

Q. You did not prepare it?

A. No.

Q. Who did prepare it?

A. I don't know who did but it was either -- I don't want to guess, it was not me.

Q. But whoever prepared it forwarded it to you. Is that correct?

A. This is an Excel spreadsheet. I definitely didn't do this.

Q. Do you agree though that you forwarded it to the people at Charys or their counsel on this e-mail?

A. Do I agree? You showed me an e-mail, again the e-mail has my name on it. I am assuming

Page 109

what you're giving me is accurate so the document speaks for itself.

Q. Now, do you remember the fact that the -- when the warrants were retitled they were retitled in the amounts depicted on this chart?

A. What is the question?

Q. When the warrants were retitled, do you recall that they were actually retitled in the amounts and to the people listed on this chart?

A. I am not sure that I have seen the retitled warrants.

Q. Now, do you know why -- let me back up, strike that. MWC, does that stand for Michael W. Chorske?

A. Yes.

Q. JMS is Jason M. Rimland?

A. Yes.

Q. HHA is HH Advisors. Correct?

A. Yes.

Q. And HHF is Highgate House Fund. Is that correct?

A. Yes.

Q. Let's go to the warrants. Let's go off the record.

THE VIDEOGRAPHER: Going off the record.

28 (Pages 106 to 109)

Page 110

The time is 1:59 P.M. This is the end of tape three.

(A recess takes place).

THE VIDEOGRAPHER: We're back on the record. The time is 2:16 P. M. This is the beginning of tape four.

Q.   I'm going to hand you what's been marked P-50, 51, 52 and 53. These are the -- these were produced by your attorney a couple of days ago. And P-50 are what we have been calling the retitled warrants, but P-50 are the retitled warrants to HH Advisors so there's actually four warrants in that exhibit. P-51 are the retitled warrants to Highgate House Funds and there's also four warrants in there. P-52 is the retitled warrants to Michael Chorske and there's also four warrants there, and P-53 are the retitled warrants to Jason Rimland and there's also four there as well. Take a moment if you need to look over them but my first question is simply whether you have ever seen them before?

A.   It's possible.

Q.   Did you prepare these?

A.   You know, that again is possible. I don't recall.

Q.   I'm going to represent that all of the reissued warrants to Chorske total 135,200. Okay?

Page 111

The retitled warrants to Highgate House -- HH Advisors total 380,000, that the retitled warrants to Jason Rimland total 40,000 and there are retitled warrants to Highgate House Funds in the amount of 444,800. I would also note that those amounts correspond to the amounts you listed or that were listed on the Charys revised warrant calculation chart that was attached to your June 14, 2006 e-mail that's marked as P-30. Okay? So it would appear as if the totals that were listed on the chart you forwarded to Charys and its lawyers correspond to the way the actual retitled warrants were written. Okay? Do you recall that being the case independently of what I just said to you and what the documents say?

A.   I mean, do I recall what?

Q.   The fact that the retitled warrants in number and to whom they're going correspond with the numbers and names on the chart?

A.   It makes sense. I don't know. Do I recall it, no.

Q.   You were basically telling Charys we're going to reissue the warrants or retitle the warrants in these names and these numbers and that's the way it was done. Is that your recollection?

A.   I'm not sure what your question is.

Page 112

Q.   Do you remember that the chart contains names and numbers of how many warrants each person was going to get and that in fact when the warrants were prepared and signed they corresponded to the numbers on the chart?

MR. VENTURINI: Let me note an objection. I don't think he said he created the chart or had knowledge of it.

MR. DeAGAZIO: My question didn't purport to say that he created the chart, it just stated he forwarded the chart with the e-mail.

MR. VENTURINI: Right. But you're asking him if the warrants were issued in accordance with a document that he doesn't recall so I don't know how he can answer that question.

A.   What is the question?

Q.   Do you know that the reissued warrants were issued in the denominations and numbers and names listed on your chart? That's all I am asking.

MR. VENTURINI: Objection.

Q.   On the chart that was attached to your June 14 e-mail.

A.   Okay. Can you ask me the question again? I want to make sure I am not confused.

Q.   It's actually a very simple question.

Page 113

A.   I'm sure it is.

Q.   The chart contains names and numbers of warrants that people are going to get pursuant to retitling. Okay? P-50 through P-53 are the actual retitled warrants, the names and numbers correspond between the warrants and the chart. Do you recall that when the retitled warrants were issued that they in fact contained the numbers that are on P-50 through P-53?

A.   I think I've testified that that I don't recall.

Q.   You don't recall. All right. Do you know why Michael Chorske received 135,200 warrants?

A.   I do not know.

Q.   Do you know where the -- again, looking at the chart that was attached to the e-mail, do you know why there's the percentage 13.52 percent next to Mr. Chorske's initials?

A.   I do not know.

Q.   You don't know where that percentage came from?

A.   I do not know.

Q.   Do you know why you're listed as receiving four percent of the total amount of the million warrants?

DOERNER & GOLDBERG, INC.
5 Becker Farm Road * Roseland, NJ  07068

973-740-1100
1161 Broad St. * Ste. 110 * Shrewsbury, NJ  07702

Page 114

A.    I do not know.

Q.    You don't know why you got warrants?

A.    Do I know why I got warrants?

Q.    Did you get warrants?

A.    You're saying I have them. You gave them to me so have I seen them? I don't think I've seen them.

Q.    I'll backup and it's a fresh question. Are you aware that you were issued 40,000 warrants to purchase -- strike that. Were you aware -- are you aware that you purportedly received warrants to purchase 40,000 shares of common stock of Charys?

A.    Okay. I don't understand the question.

Q.    Are you aware that you got 40,000 warrants from Charys?

A.    Am I aware that I got 40,000 warrants from Charys?

Q.    Yes.

A.    I was told that they were sitting in Michael Chorske's office.

Q.    Did you have a discussion with anybody about the fact that you might be getting warrants?

A.    Did I have a discussion? I must have had a discussion.

Q.    Do you remember anything about the

Page 115

discussion?

A.    No.

Q.    Do you know why you were given 40,000 warrants allegedly?

A.    I mean I would think that, you know -- I don't have the authority to issue warrants but I would think that either Michael or Adam gave me some of their warrants.

Q.    But you don't specifically recall the fact that Michael and/or Adam gave you some of their warrants?

A.    Do I recall what fact?

Q.    In other words --

A.    I am not understanding the question.

Q.    I am a little surprised that you don't seem to have much knowledge of the fact that you supposedly are now the named owner of 40,000 warrants. It seems like you don't even know what I'm talking about which is surprising to me.

A.    Is that a question?

Q.    It's a statement.

A.    Okay.

Q.    It leads to the question: Why don't you seem to know anything about your own 40,000 warrants?

MR. VENTURINI: Objection. He didn't

Page 116

say he didn't know anything. He testified --

Q.    I'll withdraw the question. When was it first suggested that you would get warrants from Charys?

A.    Probably in the spring of 2006.

Q.    And how did you first learn of that suggestion?

A.    Somebody must have told me that they were giving me warrants.

Q.    And do you remember who that somebody was?

A.    I mean it had to be either Michael or Adam.

Q.    And did they tell you why you would be getting warrants?

A.    Why I would be getting warrants?

Q.    Yes.

MR. VENTURINI: Let me just note an objection. I don't think that's attorney/client privilege but to the extent that you know -- I will allow him to answer as long as you agree it's not deemed to be a waiver.

MR. DeAGAZIO: I don't think it's privileged so I don't think it's a waiver either.

A.    I think I was given warrants as a pat on

Page 117

the back.

Q.    Are there -- all right. So I'll backup. Do you know where the 40,000 warrants came from? What I mean by that is, do you know whether Chorske gave you all 40,000 or was it HH Advisors that gave you all 40,000 or was it a combination of both? Do you know where they came from?

A.    I don't know.

Q.    Okay. Do you know if any assignments were executed by either Michael Chorske or HH Advisors assigning you warrants?

A.    I don't know.

Q.    When you wrote your June 14, 2006 e-mail you said in part: The number of warrants has not changed and the terms of the warrants have not changed, the only changes that were made were to the denominations and the names. Now, what authority did you have to tell Charys that you were entitled to four percent of the warrants if you're not even aware that there was any assignments executed by either Chorske or HH Advisors?

MR. VENTURINI: Objection to form. You can answer.

A.    What authority do I have?

Q.    Yes.

30 (Pages 114 to 117)

Page 118

A. To do what?

MR. DeAGAZIO: Would you read back the question?

(The pending question is read by the court reporter.)

A. I mean as an attorney I have no authority. So I requested the change and I'm not sure what the e-mail refers to, whether it refers to the warrants just to Michael and HHA or what it refers to.

Q. Well, you said as a lawyer I didn't have the authority so I was requesting the change. But would Charys have any authority to issue warrants to you without any authority being executed by somebody giving you the right to four percent of the warrants?

A. You have to ask Charys that.

Q. Well, you worked on the deal, you're a lawyer who worked on this deal. We know, and correct me if I am wrong, that when the assignments were originally issued they were issued in the name of Highgate House Funds, one million warrants. Correct?

A. That's -- yeah.

Q. You've testified and Mr. Gottbetter testified that there were these assignments executed in January in the amounts and denominations that we

Page 119

discussed before lunch and then after lunch and that those assignments went to Mr. Chorske, HHA and Yorkville. Correct?

A. Yes.

Q. Okay. There were no assignments executed that give you any right to any warrants. Is that correct?

A. I do not know the answer to that.

Q. Let me restate the question as well. In January when the assignments that are now marked as P-24, P-25, P-26 and P-27 were executed -- those are the ones we looked at earlier.

A. Which ones are those?

Q. Those are the assignments produced by your lawyer in each of --

A. 24.

Q. -- the files.

A. 25 and 26? Is there another one?

Q. There should be 27 also.

(The pending question is read by the court reporter.)

A. We did look at those earlier.

Q. That went to Chorske, HHA and Yorkville?

A. Are you asking me if we looked at these earlier? Yes, we looked at these earlier.

Page 120

Q. Where Chorske got 100,000 warrants or was assigned 100,000 warrants, HHA was assigned 399,600 warrants and Yorkville was assigned 500,400 warrants.

A. I will assume your numbers are correct.

Q. At the time frame those assignments were prepared and executed, are you aware that there was any assignment that assigned you any warrants?

A. No.

Q. Subsequent to January are you aware that either Mr. Chorske or a representative -- an authorized representative of HHA executed any assignment assigning some of their assigned warrants to you, sort of a sub assignment of warrants? Are you aware of any sort of sub assignment or assignment to you?

A. I am not aware.

Q. Okay.

MR. VENTURINI: Again, we're talking about a written document in the question?

MR. DeAGAZIO: Yes.

MR. VENTURINI: Okay.

Q. Now, as I said a few moments ago, looking at P-24, P-25, P-26 and P-27, the assignments that went to my side of the table, if you will, the

Page 121

plaintiffs' side of the table were in favor of Yorkville Management Advisors, and you can certainly confirm that just by looking at those exhibits. For instance, in P-26 --

A. Right, okay.

Q. Looking at Bate numbered page D-795, 100,080 warrants to Yorkville Advisors Management, LLC. Do you agree with that?

A. Yes.

Q. Okay. And all of those warrants -- strike that. All of the assignments that we looked at in P-24 through P-27 went to either Chorske, HHA or Yorkville. Correct?

A. That's correct.

Q. Now, when the actual -- well, when the chart was forwarded to Charys by way of your June 14 e-mail the chart notes that HHF would be getting 44.48 percent of the warrants. Is that correct?

A. What are you asking me?

Q. Is that what the chart says?

MR. VENTURINI: Objection. It speaks for itself.

A. Yeah.

Q. That's not an appropriate objection, but do you agree that it says 44.48 percent next to the

31 (Pages 118 to 121)

Page 122

initials HHF?

MR. VENTURINI: Same objection. You can answer.

A. Yes.

Q. All right. And again if you want to look through P-50 through P-53, which are the actual warrants -- actually I'll direct you directly to P-51.

A. Okay.

Q. Which are or purport to be warrants to Highgate House Funds -- for warrants in Highgate House Funds totalling 444,800. Do you know why the warrants were reissued in the name of Highgate House Funds instead of Yorkville?

A. I don't know.

Q. In the absence of an assignment -- strike that. Highgate House funds in January assigned 500,400 warrants to Yorkville Management Advisors.

A. So I understand, you're saying Highgate House Funds assigned warrants in January 2006.

Q. According to the written assignments that Mr. Gottbetter claims he executed. The actual retitled warrants don't go to YAM, don't go to Yorkville, they go to Highgate House Funds, and I am

Page 123

asking you whether you know why that's the case?

A. I don't know why.

Q. Again, looking at P-24 through P-27, we determined that Chorske was purportedly given assignments of 100,000 warrants or as we learned before ten percent of the million warrants. Do you recall that testimony?

A. Yes.

Q. Looking at the actual retitled warrants as well as the chart that they were based on it appears that Mr. Chorske received 135,200 warrants or 13.52 percent of the total amount of the million warrants. Do you know why that number differed from the number that was in the assignments?

A. So what you're saying is that these numbers don't correspond?

Q. Correct. Do you know why the -- do you know why Mr. Chorske was purportedly assigned 100,000 warrants but then was issued 135,200 warrants?

A. Let me look at the documents.

Q. Fair enough. And again you would be comparing P-24 through P-27 with --

A. P-24 through P-27.

Q. With P-52, which is all the Chorske warrants. Would you like a pen?

Page 124

A. I'm just matching it up with the chart.

Q. Fair enough.

A. Okay. What is the question?

(The pending question is read by the court reporter.)

A. I do not know.

Q. I'm going to hand you what's been marked P-23. Have you ever seen P-23 before?

A. Yes.

Q. Can I just see that for a second? I'm going to take off the last page because it was not intended to be on there.

A. Okay.

Q. Probably just a mistake in the copying. No, you know what, it is intended to be on there, it's the Fed Ex confirmation sheet of this particular letter. I stand corrected.

A. Okay.

Q. So, I'm sorry, do you recall seeing this letter at any point?

A. Yes.

Q. Did you prepare this letter?

A. I did not.

Q. You did not?

A. I did not.

Page 125

Q. Did you assist Mr. Gottbetter in preparing it?

A. I mean did I assist him with what portion of the letter?

Q. In any fashion. Broadly stated did you assist him in any fashion?

A. I'm sure I did.

Q. I'll ask you now: How did you assist him in preparing this letter?

A. How did I assist him with this letter?

Q. Yes. What did you do with this letter?

A. I don't remember the exact specifics of what I did.

Q. Now, did you understand this letter to be advising Troy Rillo of the retitling of the Charys warrants in general?

A. Was this informing him?

Q. Yes.

A. What this is is the return of the warrants upon Troy's request.

Q. When had he made such a request?

A. I believe that he made the request to Augie but -- I don't recall.

Q. Perhaps his counsel may have made such a request.

32 (Pages 122 to 125)

Page 126

A.    Maybe you did or Mr. Rosenbaum.

Q.    Did you ever review any letters from either Mr. Rillo or this law firm with regard to the return of the Charys warrants shortly before this October 26 letter was sent?

A.    I did review the letters from Budd Larner, but I don't know when they were, when I reviewed them, sorry.

Q.    Again, we don't necessarily have to mark them, we will if we need to, but do you remember one of those letters requesting a return of all of the original warrants, all one million?

A.    I do not recall that specifically.

Q.    In any event, the response to somebody, Troy or us or whoever, I guess Troy in this letter dated October 26, was the enclosure of warrants to purchase 444,800 shares of Charys.  Is that correct?

A.    What was the question?

Q.    This -- the response in this letter was not the return of one million warrants but the return of 444,800 warrants.

A.    That's what it says in the first sentence.

Q.    Okay.  And then there's an explanation given as to why that amount of warrants is being

Page 127

returned, is there not?

A.    That's correct.

Q.    Now, looking at the -- I'll call it the little chart that's in this first page of the letter, okay, where the warrant denominations are listed and the names and the amounts, you see that?

A.    Uh-huh.

Q.    The twenty-five cent warrant, which was for 200,000 shares, am I correct that it states that the banker's fee, I am assuming that's going to Mr. Chorske, was intended to be 40,000 warrants.  Do you see that?

A.    I see it.

Q.    Is that correct?

A.    I don't know.

Q.    Now, Mr. Gottbetter testified yesterday that there was an error made and that in fact Mr. Chorske is entitled to ten percent of the warrants. Do you have any independent knowledge of that fact?

A.    I've heard that.  I was here yesterday so I heard that.

Q.    Do you know what that's based on?

A.    I do not know.

Q.    Do you know why this letter advised Highgate House Funds that Mr. Mr. Chorske was

Page 128

entitled to 20 percent of the warrants?

A.    Do I know why?

Q.    Yes.

A.    I assume because the banking fee is 20 percent.

Q.    But is the banking fee 20 percent on this deal?

A.    I do not know.

Q.    So in the January 2006 assignments Mr. Chorske was assigned ten percent of the warrants and in the actual retitled warrants Mr. Chorske was assigned 13.52 percent of the warrants and was given 13.52 percent of the warrants or 132,500, and then in this October 26, 2006 letter to Highgate House Funds when they made an inquiry about this they were told that Mr. Chorske was getting 20 percent of the warrants.  Can you explain why there's this discrepancy from January to June through October with regard to how much warrants Mr. Chorske was supposedly entitled to?

A.    I don't understand the question.  Can you break it down?  It gave a long assumption list. I want to make sure I understand it so I can answer correctly.

Q.    The question is:  Why do all these

Page 129

discrepancies exist with regard to how much warrants Mr. Chorske was supposedly entitled to?

A.    I do not know.

Q.    Now, in the assignments from January -- strike that.  In the October 26 letter do you know why the warrants purportedly issued to you were not listed in this chart?

A.    I do not know why.

Q.    Are you aware of a conversation that Mr. Dockery, Tim Dockery, had with Sonia Sun?

A.    Am I aware of it?

Q.    Yes.

A.    A conversation, no.

Q.    In or about October of 2006?

A.    No.

Q.    Are you aware that Charys was preparing a registration statement?

A.    Yes, I am aware of that.

Q.    And are you aware that Sonia Sun contacted somebody at Gottbetter & Partners to discuss these Charys warrants?

A.    I don't know who Sonia Sun is.

Q.    Do you know if Tim Dockery spoke to anybody at Morris Manning & Martin about the Charys warrants?

33 (Pages 126 to 129)

Page 130

A. Who is Morris, Manning --

Q. A law firm that was involved in the preparation of the registration statement.

A. So they are the ones who were drafting the registration statement?

Q. I am asking you.

A. I don't know.

Q. You don't know?

A. You just told me.

Q. All right. Did you ever speak with Sonia Sun?

A. No.

Q. Did you receive any drafts of the Charys registration statement in October of 2006?

A. I did.

Q. Did you provide revisions or comments on that draft?

A. Not personally.

Q. Who did?

A. Tim Dockery.

Q. Who communicated those revisions to Charys or its lawyer?

A. Tim Dockery.

Q. Did Mr. -- did you review the changes that Mr. Dockery had --

Page 131

A. I did not.

Q. Do you know if he pointed out the fact that the registration statement stated that Highgate House Funds was the owner of the one million warrants?

MR. VENTURINI: Objection to form. You can answer.

A. It wouldn't surprise me if that was the case.

Q. You're not sure though?

A. Do I know if he provided comments? I don't know.

Q. Were you aware that Charys filed the registration statement on or about October 17 of 2006 stating that Highgate House Funds was the owner of one million warrants?

A. Am I aware of the fact -- I am aware it was filed.

Q. Okay. Were you then aware that it stated that Highgate House Funds was the owner of one million Charys warrants?

A. I did not.

Q. Did you ever speak to Mr. Gottbetter about the fact that Highgate House Funds was listed as the owner of the one million warrants in the Reg

Page 132

statement?

MR. VENTURINI: Let me note an objection. You can answer him the question but we will discuss if he wants details as to what was said as to whether that's attorney/client privilege but you can answer the question whether you had a conversation regarding that topic.

A. I don't remember if we did because the registration statement was withdrawn shortly thereafter.

Q. When was it withdrawn?

A. I don't know.

Q. Do you know why it was withdrawn?

A. I do not know.

Q. Now, we talked earlier about communications that you had with four people connected to Charys, outside counsel or CFO, about the retitling of the warrants. You recall that testimony?

A. I do.

Q. Who did you speak with at Highgate House -- strike that. Who did you speak with at HH Advisors or Gottbetter & Partners regarding the retitling of the warrants prior to you having these communications with Charys people?

Page 133

A. Who did I talk to?

Q. Yes.

A. It had to have been Adam and Michael.

Q. And did they direct you to have these warrants retitled?

A. I don't remember but I don't have the authority to do so.

Q. I didn't mean for you to actually retitle the warrants yourself.

A. Right.

Q. But did they direct you to effectuate the retitling of the warrants by communicating with Charys?

A. Did they ask me what?

Q. Did they direct you to effectuate the retitling of the Charys warrants by communicating with Charys?

A. I mean I don't remember the specific conversations, but logic would dictate that either Michael or Adam talked to me about that.

Q. And do you recall when that was?

A. Recall when what was?

Q. When the conversation or conversations with either Chorske and/or Gottbetter occurred wherein they directed you to effectuate the retitling

DOERNER & GOLDBERG, INC.
5 Becker Farm Road * Roseland, NJ 07068

973-740-1100
1161 Broad St. * Ste. 110 * Shrewsbury, NJ 07702

Page 134

of the warrants by discussing it with Charys.

A. Do I remember when? It had to be between January and late June.

Q. Your e-mail to Charys's counsel was June 14. Right?

A. Right.

Q. Do you remember how close in time to that e-mail their communication to you was about the topic?

A. Probably the spring, early spring.

Q. And do you know why at that particular point in time they were asking you or either/or of them was asking you to effectuate that retitling?

A. I don't know.

Q. Did it have anything to do with the price of the Charys stock?

A. I don't know.

Q. Did it have anything to do with the fact that Mr. Gottbetter's fund was doing a new deal with Charys?

A. I mean I know there was a deal done with Gottbetter Capital in May, but I don't know the answer to that question.

Q. Did you work on that deal in May?

A. I did.

Page 135

Q. Very basically what was the nature of that deal?

A. It was either preferred stock or a note with warrants attached.

Q. Was it anticipated that investment by Gottbetter Capital and whoever the other co-investors may or may not have been, was it anticipated that that investment would be used to essentially take out the Highgate House Fund investment?

A. You got to ask Charys.

Q. Did -- I realize you said you weren't sure if it was Mr. Gottbetter or Mr. Chorske that directed you to effectuate the retitling of the Charys warrants. Whoever it was, do you remember what authority that person was giving you to actually have that done?

MR. VENTURINI: Objection to form.

Q. Did he or they tell you on what basis that these warrants could be retitled?

MR. VENTURINI: Objection. I don't think it's privileged, but to the extent it is I want to make sure that we're not being deemed to waive any attorney/client privilege.

MR. DeAGAZIO: It's factual. It's not really privileged. We're talking about retitling of

Page 136

the warrants which is the subject of this lawsuit.

MR. VENTURINI: I will allow him to answer.

A. What was the question?

MR. DeAGAZIO: Would you mind reading it back, please.

(The pending question is read by the court reporter.)

A. I would assume that it had to do with the assignments.

Q. Do you remember what they actually told you, forgetting about the assumption that you have?

A. I think I testified I don't remember whether it was Adam or Michael, I don't remember exactly what they said to me.

Q. With regard to P-50 to 53, which are the retitled warrants, earlier you testified that you went into the Gottbetter & Partners computer system and looked at the assignments and you determined that the assignments were created on your computer system on January 10 of 2006. Did you also look at your computer system to determine when these warrants may have been created if they were created by your firm?

A. No.

Q. Okay. Did -- at any time whether it was

Page 137

January or the spring of '06, did you ever speak with Mr. Gottbetter about what authority he had to execute assignments?

A. My understanding was that he had the ability to sign on behalf of Highgate House, and whatever closing set you gave me earlier, if you go to -- it says 12 -- I'm not a litigator, excuse me, the Bates stamp 1274, Adam Gottbetter has signed as the portfolio manager binding Highgate House and --

Q. That's the Securities Purchase Agreement?

A. It is. And every agreement is signed by Adam, and this was reviewed, all these documents prior to signing were always reviewed by Troy.

Q. Right. Okay. So if Mr. Gottbetter was signing deal documents he was always getting approval of you said Troy but would it also be approval -- or approval of Mark Angelo?

A. No.

MR. VENTURINI: Let me note an objection. Go ahead.

A. What I said was Troy would always look at the legal documents because I was outside counsel to Cornell.

Q. Are you aware --

35 (Pages 134 to 137)

Page 138

A. Slash Highgate. So he would look at it to make sure that he was happy with the structure.

Q. Are you aware whether Mr. Gottbetter needed Mark Angelo's approval to make portfolio decisions?

A. To my knowledge -- I mean I heard Adam testify yesterday at his deposition but my knowledge -- my understanding always was that he did not need authority from Mark Angelo.

Q. All right. Now, we have been speaking generally about signatory authority, if you will. You agree with that general statement, that's the nature of your answer right now, that you're stating that you -- your understanding was that Mr. Gottbetter had general authority to sign documents on behalf of Highgate House. Is that correct?

MR. VENTURINI: Objection.

Q. Is that your testimony?

MR. VENTURINI: Objection.

A. I think -- all I was saying was that Adam Gottbetter was an authorized signatory.

Q. Okay.

A. For Highgate House Funds.

Q. Okay. Setting that particular legal concept aside, do you know whether Mr. Gottbetter had

Page 139

factual authority to assign the one million warrants that were in the name of Highgate House to Michael Chorske, HH Advisors and Yorkville Management?

A. I'm not sure I understand what "factual authority" means.

Q. Did he have approval or authority from Mark Angelo to sign the assignments, to execute the assignments?

A. I think you would have to ask Mark Angelo or Adam Gottbetter -- or Adam Gottbetter.

Q. Did you ever discuss with Mr. Gottbetter what authority or approval he felt he had from Mark Angelo to execute assignments?

A. No.

Q. Now, Mr. -- you were in the room yesterday when Mr. Gottbetter testified about what I'll call a verbal agreement that was allegedly struck between him and Mr. Angelo in or about June of 2005 relating to certain things. Were you advised of the nature of that verbal agreement at the time it happened?

A. Can you refresh my recollection of what the June 2005 agreement was?

Q. I will show you the June 2005 memo. If I knew where it was. Handing you what was previously

Page 140

marked as both Angelo-13 and P-55.

A. What is the question?

Q. Well, first of all, did you ever see this document before this litigation?

A. No.

Q. Okay. I guess that answers my second question which was: Did you have any participation in preparing of this document?

A. No.

Q. Setting this document aside, do you have any recollection of being told at some point in or about June of 2005 or thereafter that Mr. Gottbetter had reached some sort of verbal agreement with Mr. Angelo about various things, some of which are reflected in this memo?

A. What's your question?

MR. DeAGAZIO: Could you read it back.

(The pending question is read by the court reporter.)

MR. VENTURINI: Let me just note an objection. To the extent it calls for attorney/client privileged communications don't give that out but you can still answer the question.

A. No.

MR. DeAGAZIO: What was my question

Page 141

again? Read that back again. I want to see what the "no" means.

(The last question is read by the court reporter.)

Q. Regarding P-23, the October 26 letter, I might have asked you this but did you prepare this letter?

A. No.

Q. You did not. I thought Mr. Gottbetter stated you did.

At any point subsequent to June of 2005 -- strike that. At any point subsequent to May of 2005, did Mr. Gottbetter ever tell you that he had made an agreement with Mr. Angelo to the effect that warrants on future deals would be issued in the name of HH Advisors?

MR. VENTURINI: Let me just note an objection. Again to the extent it calls for attorney/client communication don't answer. You can answer the question whether he informed you of that fact as long as it's not deemed to be a waiver.

A. He never informed me of any conversations he had with Mark Angelo.

Q. On that topic or about anything?

A. I mean on that topic.

36 (Pages 138 to 141)

Page 142

Q. Now, you heard Mr. Gottbetter testify yesterday that there were five or six transactions in which or after which assignments similar to the ones we have seen as to the Charys deal were also executed with respect to these other deals. Do you recall his testimony on that topic?

A. Do I recall his testimony about what?

Q. On the topic of there being five or six deals where assignments were executed with regard to warrants?

A. Yes.

Q. Do you know the names of those five or six deals, and I guess one of them is Charys but do you know the names of the other ones?

A. Didn't you ask me this earlier today?

Q. No. I asked you what deals you worked on and you said seven deals and you named four of them.

A. All right.

Q. This is a different question.

A. All right.

Q. Are you trying to trick me?

A. I'm really not.

Q. It was a joke.

A. I know but... it's my understanding that

Page 143

the deals -- so what is the question?

Q. The question is --

A. I'm sorry.

Q. -- what are the six deals where warrants -- where assignments were executed with regard to warrants?

A. You're asking -- what are you asking me? What six deals?

Q. Yes. What are the names of the transactions or the names of the issuers?

A. I should know this. I would think I would know this. One is Xinhua, XHUA is the stock symbol, and I don't remember the others.

Q. You don't remember the other ones?

A. No. Not now.

Q. Would there be any documents that might help refresh your recollection on that particular topic, not necessarily that we have here in the room but what documents would help you refresh your recollection for the names of those issuers? Perhaps the warrants themselves or the assignments themselves?

A. Yes.

MR. VENTURINI: We have been going I think for about an hour and 20 minutes. Is this a

Page 144

good time to take a break?

MR. DeAGAZIO: He's saying five more minutes on this particular tape so why don't we go to that five minutes and we can take a break.

MR. VENTURINI: That's fine.

MR. DeAGAZIO: I'll make another request for documents relating to these assignments in these other deals. Have you decided what you're doing about our request which we made yesterday on that topic?

MR. VENTURINI: I would be happy to discuss it with you after the deposition. I want to make sure you have enough time to complete your deposition.

MR. DeAGAZIO: Fair enough.

Q. I realize you don't remember all the names but at least we can pinpoint Charys and Xinhua I believe it is?

A. I think it's pronounced Xinhua.

Q. Xinhua.

A. I know what you mean.

Q. You don't remember the other three or four. Do you know if the assignments on those deals -- why don't we exclude Charys in this question because we have already been over that ad infinitum.

Page 145

A. Okay.

Q. Let's talk about the other four or five deals. Do you know if the assignments on those other four or five deals were forwarded to Yorkville or Highgate House Funds?

A. I don't know.

Q. You don't know?

A. I don't know.

Q. Do you know whether the fact of those assignments was ever communicated to Yorkville or Highgate House Funds?

A. I don't know.

Q. Do you know when those assignments were executed?

A. I would say probably around January 10.

Q. Same general time frame --

A. Yes.

Q. -- as the Charys assignment?

A. Yes.

Q. In fact, did you go on the computer and look at the assignments for the other four or five deals when you looked at the assignments for Charys?

A. I did not.

Q. You did not. If you can find it anywhere look for P-4 or 5, which is the -- I'm

37 (Pages 142 to 145)

Page 146

looking for the January 13, 2006 letter.

A.    P-4 or 5?

Q.    Yes.

A.    P-45?

Q.    Four or five, I'm sorry, it's actually P-5.

A.    I don't think I have it.

Q.    Here it is. Again, I don't remember whether I asked you this, but did you participate in putting this letter together in January of '06?

A.    I am sure I helped put this letter together.

Q.    Here's what I would like to do since the tape is ending, let's take a break and of course you can take a real break and go outside to take the break you need to take but then I would like you during the break to review this letter and I'm going to ask you some questions about it.

A.    Sure.

Q.    Since it's a fairly long letter I want you to read over the whole thing.

A.    I am going to go to the bathroom and then I will read the letter when I come back.

Q.    Fair enough. We're going off the record.

Page 147

THE VIDEOGRAPHER: Going off the record. The time is 3:15 P.M., this is the end of tape four.

(A recess takes place.)

THE VIDEOGRAPHER: We're back on the record. The time is 3:31 P.M. This is the beginning of tape five.

Q.    Mr. Rimland, while we were in the break did you have a chance to review the January 13, 2006 letter?

A.    I did.

Q.    Would you agree that the purpose of this letter was for Mr. Gottbetter to advise Mr. Angelo of issues regarding Highgate House Funds?

A.    I think it was meant to give a status of certain deals.

Q.    Because Mr. Gottbetter was in the process of resigning his engagement and he wanted to advise Mr. Angelo about the various issues ongoing. Correct?

A.    Yes.

Q.    Now, you've read the letter in the break, does this letter advise Mr. Angelo about the assignments that had been executed with respect to Charys?

A.    I didn't see it in there.

Page 148

Q.    Does the letter advise Mr. Angelo about the assignments that were apparently executed with regard to the four or five other issuers?

A.    With regard to the four or five other issuers, I don't recall seeing anything about assignments.

Q.    Now, the fourth paragraph down states, and I quote, "without your written permission we will not perform any material actions or omit to take any actions that would have a material effect on Highgate or Highgate, LLC outside the normal course of business except as set forth in this letter."

Did -- well, did you advise anybody at Yorkville or Highgate House at any point after this letter that the Charys warrants had been retitled in June?

MR. VENTURINI: Objection. I think that was asked and answered at least three or four times.

A.    I'll answer it again. No conversations with anybody at Yorkville or Cornell until I talked to Troy in October.

Q.    In October, okay. Are you aware that anybody else affiliated with Gottbetter & Partners or HH Advisors advised anybody affiliated with Yorkville or Highgate House Funds about the retitling of the

Page 149

Charys warrants in or about June of 2006?

MR. VENTURINI: Objection to form. You can answer if you know.

A.    Am I -- I am not aware.

Q.    Wouldn't you consider it a material action that warrants that were in the name of Highgate House in the amount of one million warrants were first assigned to three other parties and then later actually transferred to those three other parties?

MR. VENTURINI: Objection. Calls for a legal conclusion.

MR. DeAGAZIO: It's not calling for a legal conclusion. I am asking whether he thinks that's a material thing.

MR. VENTURINI: Material is a legal term.

MR. DeAGAZIO: It's a term that was used in this letter.

MR. VENTURINI: Not by him.

MR. DeAGAZIO: He helped prepare the letter.

MR. VENTURINI: You can ask him if it was his -- if he wrote that paragraph.

Q.    Did you write that paragraph?

38 (Pages 146 to 149)

Page 150

A. I don't remember.

Q. I'm asking for your lay opinion about whether you think if a party is the record owner of warrants and then is not the record owner of all of those warrants because assignments were made and the warrants were reissued in part to other parties, whether that would be considered a material event?

MR. VENTURINI: Objection to form but I'll let him answer.

A. It all depends on what your definition of "material" is.

Q. Okay. What's your definition?

MR. VENTURINI: Objection.

A. In what context?

Q. In this context.

A. Material to who?

Q. In this context.

A. Material to who?

Q. Would it have been material to tell Yorkville and Highgate House that their warrants were being assigned?

A. Was it material to Yorkville or material to Highgate?

Q. Highgate House, both, either one.

MR. VENTURINI: Same objection.

Page 151

Q. Let's say Highgate House Funds, it was their warrants initially.

A. So --

Q. Would you think it would be material to them to know, to be told that their warrants are being assigned to other parties?

MR. VENTURINI: Same objection.

A. I mean I think, you know, it's the kind of thing where you have to ask Highgate or Yorkville what is material to them.

Q. You're a securities law attorney, right, in part?

A. Yes.

Q. You deal with materiality things every day of the week I assume in drafting registration statements?

MR. VENTURINI: Objection.

Q. Do you draft registration statements?

A. I do not.

Q. You do not. Do you draft other documents where materiality of a particular fact might be an issue?

MR. VENTURINI: Objection.

A. Yes.

Q. All right. Do you think it would be

Page 152

material that the party that is the record owner of securities after a particular set of documents are executed in the form of these assignments --

A. Right.

Q. -- that that party is no longer the record owner of the full amount of the securities, isn't that a material event?

MR. VENTURINI: Same objection.

A. It may or may not be.

Q. But the bottom line is Yorkville and Highgate House Funds, to your knowledge, were never told until October of 2006 of either the assignment or the reissuance or retitling of these Charys warrants?

MR. VENTURINI: Objection. That's not what he said.

MR. DeAGAZIO: I said to his knowledge.

MR. VENTURINI: Asked and answered.

A. I did not have a conversation with anybody at Yorkville or Cornell until October when I talked to Troy.

Q. By the way, looking at P-50 to 53, which are the retitled warrants as we have been calling them --

A. Okay. I have some loose pages here.

Page 153

Q. I think that's because the staples --

A. There's like exhibits here, I just don't want to -- I think I'm pretty sure I have these.

Q. This looks to be -- I don't think this is part of those exhibits.

A. Right, I think I have them all.

Q. Would you agree with me -- in looking at those documents would you agree that they're all dated November 17, 2005?

A. I would.

Q. Okay.

A. You know what, it says the securities purchase agreement is dated November 16, 2005.

Q. Okay. Do warrants have dates themselves?

A. Do they?

Q. Yes.

A. Sometimes.

Q. Well, let's turn to page eight of P-53 for instance, which is D-1794.

A. Yes.

Q. It says dated November 17, 2005. Correct?

A. Yes.

Q. And I'll represent to you that if we

39 (Pages 150 to 153)

Page 154

were to look at page eight of all of the warrants contained in P-50 to P-53 they're all going to say November 17.

A. Okay.

Q. Okay? Do you know why warrants that were reissued in or about June of 2006 were dated November 17, 2005?

A. You want me to answer you why they were or why they could be?

Q. Well, my question is: Why are they?

A. Why are they? I don't know.

Q. Why could they be?

A. They could be because of something called tagging in Rule 144 so that you tag your ownership of the warrant back to the date it was issued. It's possible.

Q. Well, again, do you recall who prepared these documents?

A. I do not.

Q. So you don't know what that person was thinking when they dated them November 17?

A. I do not.

Q. And what is the legal basis again for the -- this tagging concept?

A. It's what is called tagging under Rule

Page 155

144.

Q. Is that terminology that's actually used in Rule 144?

A. Yes. You can talk to your client about that or securities law expert.

Q. Which I ain't. And to your knowledge does the concept of tagging permit a situation where if -- we will take the situation of a warrant, if a warrant was initially executed on a certain date, does this concept of tagging allow the parties to reissue that warrant at a later date to different parties and essentially back date it to the original date?

MR. VENTURINI: Objection.

A. Well, you said reissue and I guess if you're going to reissue warrants then you would not be able to do that but maybe -- again, I would have to pull out the Blue Book which is Securities Law Blue Book or Romeo & Dye or one of these sources and look but... which is what I would assume that Charys's attorneys did.

Q. You believe Charys's attorneys had some participation in the preparation of the retitled warrants?

A. I would think so.

Page 156

Q. I'm going to hand you what's been marked P-59. This was a document that your attorney produced, and I'll represent to you that this is the only document in a production of nearly 2000 pages that relates to any communications between the folks who are now the defendants in this case and anybody at Charys.

A. Okay.

Q. In fact, strike that, this is not a communication with Charys so that's not even the case, but it's the only communication we have that relates to the retitling of the warrants. Okay?

MR. VENTURINI: I'll note an objection to that colloquy and statement. If you're going to ask a question based on that assumption I will have to object to it.

MR. DeAGAZIO: The question is not based on that assumption.

MR. VENTURINI: Okay.

Q. But as you can see this is an e-mail from Michael Chorske to Kathleen Rush and Jason Rimland and it's dated Friday, June 9, 2006. Do you recall receiving this e-mail?

A. I do not.

Q. Does it at all refresh your recollection

Page 157

about why the chart that's attached to P-30, this chart notes that Mr. Chorske should be getting 13.52 percent of the warrants?

A. I don't. How does that -- can I see that?

Q. Yes.

A. It's the same percentage.

Q. Yes. But you don't recall receiving the e-mail dated June 9?

A. I do not recall receiving this particular e-mail, no.

Q. Now, the bottom e-mail in this string is from Kathleen Rush to Jason Rimland and Michael Chorske and it seems to say that she's attaching a document called the Charys Revised Warrant Calculation. You see that?

A. I do.

Q. Do you believe that that was the chart that is -- was later attached to your June 14 e-mail to Charys's lawyer?

A. Are you asking me whether it's the same chart?

Q. Yes.

A. Without this attachment I don't know.

Q. Who is Kathleen Rush, by the way?

40 (Pages 154 to 157)

Page 158

A.   She is -- she used to work for Highgate House -- actually she used to work for HH Advisors and now she works at Gottbetter & Partners.

Q.   Does this -- strike that. Did this document, P-59, refresh your recollection about who prepared the Charys revised warrant calculation that was later attached to your June 14, 2006 e-mail?

A.   Who created it?

Q.   Yes.

A.   I mean I don't -- it's hard for me to tell from this e-mail who created it.

Q.   Do you know whether Kathleen Rush created it?

A.   Do I know?

Q.   Yes.

A.   No.

Q.   And you don't know where either Kathleen Rush or Michael Chorske may have gotten a 13.52 percentage for Mr. Chorske?

A.   I do not know.

Q.   We talked earlier about the document production for this litigation and as I recall you testified that it was Todd -- I don't remember his last name, Moler?

A.   Lawlor.

Page 159

Q.   Todd Lawlor that is the person who actually reviewed the documents.

A.   That's correct.

Q.   But were you aware specifically that the plaintiffs in their document requests were asking for documents relating to communications with Charys regarding the reissuance or retitling of the warrants?

MR. VENTURINI:  I think that was asked and answered a long time ago.

A.   I looked through what you gave me earlier. I don't recall looking at that specific number request.

Q.   Did Mr. Lawlor present to you a stack of documents that he thought should be produced --

A.   Did he present to me?

Q.   -- before turning them over to Mr. Venturini?

A.   I saw a few e-mails but the vast majority of them went right to Mr. Venturini.

Q.   So you didn't review Mr. Lawlor's --

A.   I did not.

Q.   -- review of the documents?

A.   I didn't.

Q.   Do you remember which e-mails he showed

Page 160

you?

A.   I don't but I did turn over everything to Mr. Venturini.

Q.   What do you mean you turned over everything to Mr. Venturini?

A.   Whatever e-mails Todd had shown me I turned over to Mr. Venturini.

Q.   Do you remember how many e-mails Mr. Lawlor showed you?

A.   Maybe over the course of a month it was, I don't know, like 30.

Q.   Are you approximating?

A.   Or 40.

Q.   You're approximating?

A.   Uh-huh.  More or less.

Q.   And were any of those e-mails the June 14, 2006 e-mail that's marked as P-30?

A.   It's possible.  I don't know.

Q.   But you turned over those 30 to 40 e-mails to Mr. Venturini?

A.   I did.

Q.   Is it also possible that Mr. Lawlor simply didn't think it was important or decided not to produce them to Mr. Venturini or to you in his review?

Page 161

MR. VENTURINI:  Objection.  You can answer if you know.

A.   Is it possible?  I mean anything is possible.

Q.   Was there anything he showed you that the two of you decided would not be produced?

A.   No.

Q.   You don't recall specifically whether the June 14, 2006 e-mail was shown to you by Mr. Lawlor?

A.   I do not remember, but if it was shown to me I would have turned it over to Mr. Venturini.

Q.   Do you know what parameters were given to Mr. Lawlor in reviewing documents and e-mails?

MR. VENTURINI:  Objection, asked and answered.

A.   You asked me that question already.

Q.   If I did I don't remember the answer. Do you know what parameters were given, if any, to Mr. Lawlor?

MR. VENTURINI:  Same objection.

A.   I don't remember.

Q.   Was he just given the physical document request and told to go look for documents responsive, or was he given a set of parameters in order to

DOERNER & GOLDBERG, INC.
5 Becker Farm Road * Roseland, NJ 07068

973-740-1100
1161 Broad St. * Ste. 110 * Shrewsbury, NJ 07702

Page 162

produce documents responsive to the request?

A.   I think you would have to ask my counsel.

Q.   Did you tell Mr. Lawlor that you recalled some communications from the spring or June of 2006 relating to the reissuance of the warrants or the retitling of the warrants, did you tell him to look out for those communications?

A.   I had very limited communication --

MR. VENTURINI:   Just let me note an objection.

A.   Sorry.

MR. VENTURINI:   You can testify regarding the document production but I think again communications between you and Todd might be privileged because Todd was functioning as an attorney.  So, you know, I think you can answer in terms of what you know or what he did but specific conversations would be privileged.

MR. DeAGAZIO:   What was my question.

(The pending question is read by the court reporter.)

MR. DeAGAZIO:   Are you directing Mr. Rimland not to answer?

MR. VENTURINI:   It's a tough call.  I

Page 163

think that if you agree that that won't be a waiver of any attorney/client privilege I will allow him to answer the question.

MR. DeAGAZIO:   I agree.

A.   I did not have any direct discussions with Todd Lawlor about that; any discussions I would have had would have been with Mr. Venturini.

Q.   Handing you what's been marked P-18 for identification.  This is a two-page e-mail string with an attached spreadsheet Bates stamped P09237 through P09248.

A.   Okay.

Q.   Just take a quick look at it and my first question is whether you recognize the documents in P-18?

A.   Through the course of the litigation I've been familiarized with this document.

Q.   Were you aware that in December 2005 Mr. Chorske was preparing a warrant valuation spreadsheet with regard to Highgate House Funds?

A.   Was I aware?  It's possible.

Q.   Do you know why Mr. Chorske was preparing such a spreadsheet?

A.   Do I know why?  I mean I believe that was discussed yesterday, wasn't it?

Page 164

Q.   I would like your independent recollection.  Not your recollection --

A.   If you're asking me if I knew in December '05 that this was produced, I would say probably no.  Through the course of the litigation I've learned more about this document.  So if you want me to talk about what I know through the litigation or back then, this is -- I never really got involved in this stuff.

Q.   I only want to know what you knew in December of '05.  Separate question then is:  What have you learned about the reason for Mr. Chorske preparing this valuation?

MR. VENTURINI:   Say that again.

Q.   What have you learned about the reasons for Mr. Chorske preparing this valuation?

MR. VENTURINI:   You mean during the course of the litigation?

MR. DeAGAZIO:   Or subsequent to December of '05.  At any point which would include the litigation.

A.   Through the course of the litigation I have learned that Adam and Mark asked Michael to prepare valuations for the warrants to determine whether it would help boost the NAV of Highgate.

Page 165

Q.   Who told you that?

A.   Who told me that?

Q.   Yes.

A.   I mean it's only two people who could have told me that, it's either Adam or Michael or actually could be -- could be Augie.  I don't know.

Q.   I only want to know if Mr. Gottbetter or Chorske told you.  I don't know want to know your communications with Mr. Venturini.

A.   I'm trying to be honest.

MR. VENTURINI:   The other thing is his conversations with Adam and/or Michael might be privileged; however, what he's testified to is in our papers so I don't deem that to be an attorney/client privileged communication.

Q.   So the first time you saw -- and this is a question:

A.   Okay.

Q.   The first time you saw the actual valuation spreadsheet was in the litigation.  Is that correct?

MR. VENTURINI:   P-18?

MR. DeAGAZIO:   Yes.

A.   I think the first time I saw this was during the litigation.  That's my recollection?

42 (Pages 162 to 165)

Page 166

MR. VENTURINI: Let me note that the time is four o'clock so we're going to wrap this up by five.

MR. DeAGAZIO: We're going to be done by five.

Q. Handing you P-11. P-11 is a document entitled, Highgate House Funds, Ltd, Daily Portfolio Summary, with a date of December 14, 2005, and my first question is whether you've ever seen this document before.

A. I have.

Q. Do you recall that this was a document actually created by HH Advisors in December of 2005?

A. I believe that to be the case.

Q. And do you know the purpose of HH Advisors creating this document?

A. Do I know the purpose?

Q. Yes. Do you know why they created this document?

A. I would be -- it would be to track securities.

Q. Owned by Highgate House Funds?

A. Or HH Advisors.

Q. Are there any on here that are listed as being owned by HH Advisors? And take a moment to

Page 167

look through it if you need to.

MR. VENTURINI: Let me note an objection. There's I think a slight change of terminology in the question.

A. This is only part of the valuation that I've seen, not the valuation of the list that I've seen. There are other columns.

Q. Are you sure --

A. Which I believe that you guys produced to us.

Q. You're sure you're not thinking of a document created on the Yorkville side? This is a document created by HH Advisors, a similar one of which dated December 6, 2005 was attached to one of the defendant's affidavits in this case.

A. I know that one of the documents that your side has produced, because I've seen it, is our list of securities. When I say our, I mean HH Advisors, created by HH Advisors. I believe that was a different list.

Q. So you don't believe this list is complete -- strike that.

A. Some of the columns are cut off.

Q. Well, let's put it this way: It says page one of five in the lower right-hand corner and

Page 168

then two of five and then three of five, four of five and five of five.

A. Okay.

Q. According to the document it doesn't appear that anything is missing. So my question is --

A. Other columns.

Q. You mean vertically?

A. Yes. Whenever I have seen this list I've seen it eight and a half by 14 and I believe that your side produced that to our side.

Q. I'll hand you P-54.

A. This is not what I'm talking about.

Q. It's not what you're talking about?

A. It's not what I'm talking about.

Q. You can leave it there.

A. If you're asking me what it says in this document, on this document you showed me, I'll answer the question about this document, whatever you want me to do.

Q. Looking at P-11 do you feel that there's any transactions missing from the five-page document as opposed to some of the columns that might relate to the transactions?

A. I don't know.

Page 169

Q. But looking at the document as it is do you see anything that indicates any securities owned by HH Advisors?

A. It was my understanding that HH Advisors had a percentage interest in the warrants for these deals.

Q. On all of these deals, on all five pages?

A. On all five pages? On all the deals that were originated by HH Advisors.

Q. Do you know which ones that is?

A. Off the top of my head, no.

Q. On this document is it reflected that HH Advisors owns a percentage interest in any of the securities listed on this document?

A. I think I've answered the question.

Q. I don't think you have. You claim there's some interest in some of these securities but my question is whether this document reflects that interest?

A. It's hard for me to say.

Q. Why is it hard for you to say?

A. Let's go through -- I don't know if every warrant in every deal goes to HH Advisors. How do I know whether it does or not?

43 (Pages 166 to 169)

Page 170

Q.  Well, this is a daily portfolio summary for Highgate House Funds Limited listing various types of securities owned by Highgate House Funds.

A.  Right.

Q.  Is there any column on this document that indicates that HH Advisors owns a percentage interest in any of these securities?

A.  What this list is is a list of securities relating to Highgate House Funds.

Q.  And on page three of five of that document this list shows Highgate House Funds being the owner -- strike that. This list shows -- yeah, this list shows Highgate House Funds Limited being the owner of a total of one million warrants. Correct?

MR. VENTURINI:  Objection.

A.  No.

Q.  Why not?  Isn't that what it says at the top of the page?

A.  No.

Q.  Why am I wrong?  Tell me why I'm wrong.

A.  Tell you why you're wrong?  Because I don't know what this list -- it's a daily portfolio summary for securities related to Highgate House Funds.  It could be -- some of them could be YAM

Page 171

securities, some of them could be the banker securities, some of them could be --

MR. VENTURINI:  Let him finish.

A.  I don't know the answer to that.  So if you're asking me whether this says that those warrants belong to Highgate House Funds, I can't say yes.

Q.  What is a portfolio summary then?  Isn't it a summary of the Highgate House portfolio?

A.  I am a lawyer.

Q.  You're a lawyer that does securities transactions and works on the deals that are reflected on this document.  So what is a portfolio summary other than a summary of the portfolio of the fund?

A.  If you would like to ask me questions about the transaction documents I will gladly answer every question.

Q.  I am asking you about this document because the document like this has been produced by the other side and I'm entitled to ask questions about it.

A.  Okay.

Q.  And I just -- I can't understand that you're saying that this daily portfolio summary of

Page 172

Highgate House Funds doesn't reflect that Highgate House Funds is the owner of one million Charys warrants.

MR. VENTURINI:  Look, he's already testified what he thinks it is.  You can't argue with him.  If you don't believe him you have to move on but he's given his answer already.

MR. DeAGAZIO:  As incredible as it is. Okay.

MR. VENTURINI:  I object to the characterization.

Q.  Going back to P-54, which I handed you a moment ago, did you ever see documents like this during the course of your job?

A.  Never.

Q.  Never?

A.  I only saw this document through the course of the litigation.

Q.  Let me hand you P-48.  Have you ever seen a Highgate House Funds Limited balance sheet as of December 31, 2005 as this is titled?

MR. VENTURINI:  Wait.  Are you asking him if he's seen this document or are you asking him if he's seen any balance sheet dated as of that date?

Q.  Let's take the general question.  Did

Page 173

you ever see a balance sheet of Highgate House funds during the course of your job?

A.  Through the course of the litigation I have seen this balance sheet.

Q.  But not before that?

A.  Not before.

Q.  Did you ever discuss with Mr. Gottbetter whether he ever saw prior to the litigation P-48?

MR. VENTURINI:  Let me again note an objection based upon attorney/client privilege.  You can answer the question as to whether you had the conversation but not as to exactly what was said in the course of that conversation.

A.  I want to make sure I'm answering the question correctly so I am going to make a statement. I never had a conversation with Adam Gottbetter about the balance sheet prior to the litigation if that's what you're asking.

Q.  What about did you ever have a conversation with Mr. Gottbetter about P-54?

MR. VENTURINI:  Same objection.

A.  I have never seen P-54 before.  I am not even sure I have seen it during the course of the litigation.  I'm not sure I ever saw this before. Again I am a lawyer; I am not familiar with these

44 (Pages 170 to 173)

Page 174

types of documents. They all look very similar to me.

Q. Handing you what's been marked P-58, this is a January 17, 2006 e-mail from Kathleen Rush to Troy Rillo, but in the body of the e-mail it says, "Per Jason Rimland's request," and it appears as if Miss Rush is attaching warrant common stock calculations and warrant common stock calculations, two separate documents. Do you recall making a request that such documents be forwarded to Mr. Rillo?

A. I don't know what these are, no.

Q. Okay.

A. Do you have the attachments?

Q. Unfortunately not.

A. Okay.

Q. Do you recall from the Charys transaction documents how many, I'll call them, underlying shares were being held in escrow by G&P?

A. I do not remember.

Q. Do you recall it being 20 million shares which were supposed to be supporting I guess the convertible debentures as well as the one million warrants?

A. The documents are here. Do you want me

Page 175

to find it?

Q. Which documents would you need to see in order to answer that question? Something from the closing binder?

A. I would think so, yeah.

Q. I believe you have it.

A. Okay.

Q. It's P-16. Just tell me which document you're looking at.

A. The Whereas clause on page 1243, the sixth whereas clause states that there are 20 million shares of common stock that should have been held by Gottbetter & Partners.

Q. Okay. So you were reading from the Securities Purchase Agreement?

A. I am.

Q. The sixth whereas clause. So it was 20 million shares of common stock?

A. What was 20 million?

Q. That was being escrowed.

A. According to the documents should have been 20 million shares.

Q. Okay. Just describe for me in general what is the purpose again -- forgetting about Charys, when a deal like this is done what is the purpose of

Page 176

the escrow agent holding those shares when there's a deal like convertible debenture with warrants?

A. You have shares so that when the holder of the convertible warrants -- I mean the convertible notes, when they want to convert their note into common stock that it's available. So they give a notice to the escrow agent and the shares are delivered of the company -- excuse me, delivered to the holder.

Q. That also supports the warrants in addition to the convertible debenture?

A. Probably, yes.

Q. Let me show you what's been marked P-61. This was a document produced by your attorney. It's an e-mail from Catherine Gross to Troy Rillo, which itself is responding to an e-mail from Troy Rillo to Jason Rimland, which is why I am asking you about it. Do you recall Mr. Rillo asking you this question on February 14: "Jason, please confirm that your firm is holding 20 million pledged shares of Charys on behalf of Highgate"?

A. I don't recall the e-mail.

Q. Is that because you receive numerous e-mails a day?

A. Yes. I see the e-mail here, assuming

Page 177

that we produced it so I assume it's correct.

Q. Do you have any reason to doubt that you received it?

A. I have no reason to doubt that it's not the right e-mail.

Q. Do you recall authorizing somebody in your office to respond to Mr. Rillo's question?

A. Do I remember?

Q. Do you remember Catherine Gross responding: Yes, the firm is holding 20 million pledged shares of Charys on behalf of Highgate House?

A. It's possible I asked her. I mean the e-mail is from her. Whether I asked her or someone else did, I don't know.

Q. Let me show you P-62.

A. It's bizarre that there's no from me to Cathy Gross but...

Q. This was produced by your attorney.

A. I am not asking saying it's not accurate; I am saying it's bizarre to me so I can't tell you whether I asked her.

Q. If you look at P-62, the first e-mail from Troy Rillo is on the bottom of the first page there. Troy Rillo to Jason Rimland, February 14, 2006, same e-mail that we just looked at in P-61.

45 (Pages 174 to 177)

## Page 178

Please confirm that your film is holding 20 million pledged shares of Charys on behalf of Highgate. It looks like you then respond to somebody named Melissa?

A. She's my assistant.

Q. And you're asking her to confirm. She then asks you to give her until later or tomorrow morning to respond.

A. Uh-huh.

Q. And -- Troy says to Melissa because he was copied on the string, thanks, Melissa, that would be fine. She says, I appreciate it, but then it looks like two days later the response is actually coming from Catherine Gross. Now, again, do you recall this question being asked by Troy and you and two of your assistants discussing the answer?

A. Do I recall getting the e-mail from Troy? I think I've said I don't. Do I recall asking Melissa to do -- to find out whether we had 20 million pledged shares in escrow? I do not remember, and do I remember having a conversation with Cathy Gross about 20 million pledged shares? I do not remember.

Q. But it looks like Catherine Gross did respond to Troy: Yes, the firm is holding 20 million

## Page 179

pledged shares of Charys on behalf of Highgate House.

A. Catherine -- Cathy Gross is a receptionist so I'm not really sure why she's responding to this e-mail.

Q. Perhaps Melissa told her to respond, who knows.

A. I can't speculate.

Q. We may be done. I just want to go through my notes. If you want to take a five-minute break.

MR. VENTURINI: I think we will sit here if it's okay with you unless you feel pressured.

MR. DeAGAZIO: We can go off the record.

THE VIDEOGRAPHER: Going off the record. The time is 4:21 P.M.

(A recess takes place.)

THE VIDEOGRAPHER: We're back on the record. The time is 4:26 P.M.

Q. I have no further questions. Thank you.

MR. VENTURINI: Thank you, have a good evening.

THE VIDEOGRAPHER: Going off the record. The time is 4:26 P.M. This is the end of tape five and concludes this deposition.

(The deposition is concluded at 4:26 P.M.)

## Page 180

CERTIFICATE.

I, JANET BAILYN, a Notary Public and Certified Court Reporter of the State of New Jersey, do hereby certify that prior to the commencement of the examination JASON RIMLAND was duly sworn by me to testify the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

_____
Notary Public of the State of New Jersey
My commission expires February 3, 2008
    License No. XI00970

Dated: December 26, 2006

DOERNER & GOLDBERG, INC.    973-740-1100
5 Becker Farm Road * Roseland, NJ  07068    1161 Broad St. * Ste. 110 * Shrewsbury, NJ  07702

**A**

ability 6:13 137:5
able 53:1 92:23
  155:17
above-entitled
  1:17
absence 122:16
absolutely 14:10
  67:24
abusive 63:23
  68:5,12,15
  102:22
acces 32:12
access 25:4 31:1
  31:18,20 32:1
accompany 73:21
accomplish 62:16
accurate 21:7
  51:10 62:22
  109:1 177:20
  180:10
accurately 14:5
acquisitions 10:13
action 1:2 4:15
  149:6 180:15,18
actions 148:9,10
actual 20:14
  22:13 38:7,10
  48:1 73:8
  111:12 113:4
  121:15 122:6,23
  123:9 128:11
  165:19
ad 144:25
Adam 1:8 4:13
  9:8 29:1 102:23
  103:5,8,21,23
  115:7,10 116:13
  133:3,20 136:14
  137:8,13 138:6
  138:21 139:10
  139:10 164:23
  165:5,12 173:16
Adam's 12:9,13
  12:14,16 14:1
  33:5
addition 25:2
  176:11
address 33:11,16
  33:18,19,21
  49:19 65:19
addresses 32:19
  33:2
administrative
  43:17
admissible 35:7
advise 96:15,20

96:21 147:12,18
  147:22 148:1,13
advised 127:24
  139:19 148:24
advisement 53:23
advising 125:15
Advisors 1:3,9
  4:13 11:3,10,20
  11:23 12:3,7
  13:6,11,25
  15:11,13,16
  16:6,14 17:2
  18:3,7,8 34:20
  72:17 76:22
  81:23,23,25
  83:19 85:7 90:1
  90:5 99:15
  105:11,22 106:7
  106:17,21 107:3
  107:7,14,17
  108:1 109:18
  110:11 111:2
  117:5,11,21
  121:2,7 122:19
  132:23 139:3
  141:16 148:24
  158:2 166:13,16
  166:23,25
  167:13,19,19
  169:3,4,10,14
  169:24 170:6
affect 6:13
affidavit 75:5,6
affidavits 167:15
affiliated 10:19
  22:2 47:11
  48:16 148:23,24
affiliation 11:2,5
afterward 84:16
age 29:25
agent 46:13 51:3
  51:22 52:6,10
  52:17 62:9
  63:10 64:17
  65:2 70:14,22
  70:23 71:8,12
  71:19 72:9 81:5
  176:1,7
agents 71:25
ago 6:16 27:16
  38:2,21 56:14
  58:9 100:2,21
  103:10 110:8
  120:23 159:10
  172:13
agree 48:21 49:1
  49:12,17 50:16

108:21,24
  116:21 121:8,25
  138:12 147:11
  153:7,8 163:1,4
agreement 17:18
  17:23,24 18:1
  71:18 72:8
  137:11,12
  139:17,20,23
  140:13 141:14
  153:13 175:15
agreements 71:15
ahead 61:15
  137:21
ain't 155:6
al 4:13,14
alerting 37:2
alleged 50:15 92:9
allegedly 93:22
  102:10 115:4
  139:17
allow 5:16 14:7
  116:21 136:2
  155:10 163:2
ambiguous 35:6
amended 22:18
  35:18,23
amount 90:20
  91:8 107:22
  108:2 111:4
  113:24 123:12
  126:25 149:7
  152:6
amounts 106:3,3
  108:2 109:5,9
  111:5,6 118:25
  127:6
Andrew 7:14 9:6
and/or 34:20,20
  80:10,22 82:14
  115:10 133:24
  165:12
Angelo 17:9 103:5
  137:18 138:9
  139:7,10,13,18
  140:14 141:14
  141:23 147:12
  147:18,22 148:1
Angelo's 138:4
Angelo-13 140:1
answer 5:11,18,20
  8:22 16:11
  18:11 24:15,20
  26:17,18 27:6
  33:1 34:23
  35:11,13 36:7,9
  39:1 40:15,16

47:10,13,25
  49:15 52:4,21
  54:12 55:24
  58:4,6 59:3
  60:10,18 61:2,5
  61:7,8,17,18,19
  61:19 63:15,16
  63:19 64:5,19
  64:25 65:15,18
  66:15,16 67:11
  67:25 68:3,13
  69:2,14 81:21
  82:10 83:25
  84:24 85:3,20
  92:12 99:3
  100:13 101:19
  102:3 112:15
  116:21 117:23
  119:8 122:3
  128:23 131:7
  132:3,6 134:23
  136:3 138:13
  140:23 141:19
  141:20 148:19
  149:3 150:9
  154:8 161:2,18
  162:17,24 163:3
  168:18 171:4,17
  172:7 173:11
  175:3 178:16
answered 21:2
  56:5 59:22 60:3
  60:6 63:5,7,19
  64:3,25 66:25
  101:17 103:9
  148:18 152:18
  159:10 161:16
  169:16
answering 173:14
answers 5:12,12
  23:15,17 34:24
  35:20,21 36:13
  50:16 64:8
  140:6
anticipated 135:5
  135:7
anybody 26:15
  34:16 40:9,10
  43:5 54:25,25
  73:15 81:22,22
  81:23 83:5 86:5
  93:12,15 96:15
  96:20,22 97:3,7
  97:13 102:11,16
  104:12 114:21
  129:24 148:13
  148:20,23,24

152:20 156:6
anyway 9:4
apologize 96:10
apparently 148:2
appear 93:3,4
  111:9 168:5
appeared 87:8,17
appears 93:11
  123:11 174:6
appreciate 178:12
appropriate
  59:16 63:21
  64:4 68:2
  121:24
approval 137:16
  137:17,18 138:4
  139:6,12
approximately
  4:9 8:1,2
approximating
  160:12,14
April 7:18,20 9:13
argue 54:6,6
  172:5
argued 48:22
arithmetic 107:21
  107:25 108:5
arrangements
  72:5 80:1 81:2
artificial 9:3
aside 138:25
  140:10
asked 21:2 23:11
  23:21 24:2,14
  24:23 25:1,2
  26:10,18,21
  27:7 28:4,16
  34:18 36:20
  41:24 53:4
  54:14 56:4 63:4
  63:18 64:3,6,24
  65:14,21 66:16
  68:7 96:10
  141:6 142:16
  146:9 148:18
  152:18 159:9
  161:15,17
  164:23 177:12
  177:13,21
  178:15
asking 12:20
  18:13 40:14
  51:9 52:20 53:8
  53:13 54:7,8,13
  56:24 59:20
  60:1 63:1,24
  64:5,7 65:19

68:5,10,15,16
77:14 80:5
90:12 99:2
101:12 112:13
112:19 119:24
121:19 123:1
130:6 134:12,13
143:7,7 149:14
150:2 157:21
159:5 164:3
168:17 171:5,19
172:22,23
173:18 176:17
176:18 177:19
178:6,18
asks 178:7
assign 139:1
assigned 89:10
90:1,6 91:5,15
92:2 103:3
106:8 120:2,2,3
120:8,13 122:18
122:21 123:18
128:10,12 149:8
150:21 151:6
assigning 41:12
117:11 120:13
assignment 55:5
56:7 61:24 62:1
62:3 89:8,11
90:10,17 93:7,7
93:10 100:23
101:15 102:1
105:20,23
106:13,18,21,25
107:4,8,12,15
107:18 120:8,13
120:14,15,15
122:16 145:18
152:12
assignments
41:12 53:5,7,17
53:19,24 54:2
54:10,15,19,22
55:1,15,22 56:3
56:10,16,20
57:1,8,10,14,20
58:1,11,23
60:20 61:12,23
67:2 73:4,11
74:22 86:15,19
86:19,22 87:13
87:14,25 88:20
88:24 92:7,14
93:22 94:6 96:7
98:3,4,15,18,19
99:13,20,23,25

100:5,8,17,19
100:25 101:4,6
101:11,23 102:6
102:10,12,20
103:12,19 104:1
105:5,10,11
107:22 117:9,20
118:19,24 119:2
119:5,10,14
120:6,24 121:11
122:22 123:5,14
128:9 129:4
136:10,19,20
137:3 139:7,8
139:13 142:3,9
143:5,21 144:7
144:23 145:3,10
145:13,21,22
147:23 148:2,6
150:5 152:3
assist 125:1,3,6,8
125:10
assistant 178:5
assistants 178:16
associate 9:22
39:8 85:24
Associates 2:6
29:21
assume 23:16
29:17 32:25
46:20 47:4
94:12 120:5
128:4 136:9
151:15 155:20
177:1
assuming 51:7
77:1 108:25
127:10 176:25
assumption 32:24
128:22 136:12
156:15,18
attach 46:3
attached 38:7,9
38:11 45:15,20
46:8,15 51:5,24
62:6,11 86:17
86:23 87:25
108:8 111:8
112:21 113:16
135:4 157:1,19
158:7 163:10
167:14
attaching 46:2
157:14 174:7
attachment 38:6
157:24
attachments

37:24 38:1,4,16
40:8 174:14
attention 17:6
23:20 28:7
89:24 90:3 96:7
attitude 102:24
attorney 5:15,19
19:21,25 20:1
21:12,20,24
23:13 47:12
70:25 86:13
87:21 110:8
118:6 151:11
156:2 162:17
176:14 177:18
180:14,16
attorneys 2:5,8
4:17 5:16
155:21,22
attorney/client
48:23 49:18
116:19 132:5
135:23 140:22
141:19 163:2
165:14 173:10
audible 5:13
Augie 24:7 26:5
27:23 28:14
36:5 125:23
165:6
August 2:6 4:24
21:20 25:5,11
28:3,25 87:22
Austin 7:12,16,22
8:13 10:9
authority 115:6
117:17,24 118:7
118:12,13,14
133:7 135:15
137:2 138:9,11
138:15 139:1,5
139:6,12
authorized
120:12 138:21
authorizing 177:6
available 26:5
28:3 31:8,9
176:6
Avenue 2:7 4:2
aware 17:12,15
17:16 18:2,6
32:18,20,21,22
32:23 72:7
76:13,15 102:20
103:12,14 114:9
114:10,11,14,16
117:19 120:7,10

120:15,17 129:9
129:11,16,18,19
131:13,17,17,19
137:25 138:3
148:22 149:4
159:4 163:18,21
A.M 4:9 45:8,11

_____
B
_____
B 3:7
back 18:12 23:1
23:18 34:23
45:10 50:19
52:24 59:8
60:12,25 62:18
62:21 64:21
66:19 72:19
78:19 83:4,8,16
84:23 89:20
91:3,14,25 96:4
96:6,7 101:18
104:8 105:5,8
109:12 110:3
117:1 118:2
136:6 140:17
141:1 146:23
147:4 154:15
155:12 164:8
172:12 179:17
background 7:5
backup 114:8
117:2
bad 93:4 103:5
Bailyn 1:18 4:19
180:3
balance 108:3
172:20,24 173:1
173:4,17
banker 171:1
banker's 127:10
banking 128:4,6
bantering 83:16
base 55:6,7
based 23:14 53:5
64:8 95:5,6
108:2 123:10
127:22 156:15
156:17 173:10
bases 66:8 67:1,6
68:17,22 69:1,3
basically 35:1
111:21 135:1
basis 35:15 52:16
67:11 79:25
81:1 95:1
135:18 154:23
Bate 89:14,24

90:4 121:6
Bates 89:12
105:17 137:8
163:10
bathroom 146:22
becoming 63:23
beginning 45:12
89:22 110:5
147:5
behalf 4:23 137:5
138:16 176:21
177:11 178:2
179:1
belief 74:22
believe 7:17 9:13
22:1 27:17
56:14 72:17
79:9 86:14
87:13 102:11
103:9 104:17,18
106:5 125:22
144:18 155:22
157:18 163:24
166:14 167:9,19
167:21 168:10
172:6 175:6
belong 171:6
best 6:2,7 8:24
13:22
Billy 46:13 47:7
47:18,22 48:5,8
49:3,11 50:11
50:22 51:2 62:9
69:17
binder 82:8,13,15
84:9,14 175:4
binding 137:9
bit 9:3 105:18
bizarre 177:16,20
black 62:15
blanketly 84:25
bless 78:11
blood 103:5
Blue 155:18,19
body 174:5
Book 155:18,19
boost 164:25
borderline 49:15
bottom 93:2,5,6
152:10 157:12
177:23
Bowry 2:9 4:6
break 6:8,11 31:1
45:4,6 54:16
95:25 105:6
128:22 144:1,4
146:14,15,16,17

147:7,22 179:10
**breaks** 12:9
**Brenner** 39:17,18
  40:24 41:4,11
  42:19 43:19
  46:23,24 56:23
  57:15,23 58:14
  60:16 61:11,21
  69:17
**bring** 28:7
**broad** 35:5
**broadening** 24:16
**Broadly** 125:5
**broke** 104:3
**broken** 87:9
**brought** 44:4
**Budd** 1:20 2:3
  4:10,23 5:4
  126:6
**building** 11:14
**burdensome** 35:6
**business** 148:12
**businesses** 12:15
**B.S** 7:7,8

**C**

**C** 2:1,6
**calculated** 35:7
**calculation** 38:6
  108:10 111:7
  157:16 158:6
**calculations** 174:8
  174:8
**calculator** 90:18
**call** 38:17 43:3
  45:20 49:16
  76:8,9 98:9,10
  127:3 139:17
  162:25 174:18
**called** 98:5,6,12
  100:24 154:14
  154:25 157:15
**calling** 110:9
  149:13 152:23
**calls** 35:9,16
  140:21 141:18
  149:11
**campaign** 7:14
  8:6,16
**capacity** 75:14
**Capital** 16:21
  17:4 134:22
  135:6
**caption** 4:12
**case** 4:12 24:11
  45:19 86:13,16
  88:6,8 111:13

123:1 131:9
  156:6,11 166:14
  167:15
**Catherine** 176:15
  177:9 178:14,24
  179:2
**Cathy** 177:17
  178:21 179:2
**cause** 14:6
**Cayman** 1:5
**cc's** 39:12
**CD** 31:24
**cent** 87:10,11,11
  87:24 88:1,21
  88:24 89:2,5
  90:8,23,25
  91:11 127:8
**certain** 79:24
  80:25 139:19
  147:15 155:9
**certainly** 5:25
  6:24 48:13
  121:2
**certificate** 20:12
  20:12 180:1
**Certified** 1:18
  180:4
**certify** 180:5,9,13
**CFO** 40:5 132:17
**chairs** 13:2
**chance** 147:8
**change** 118:7,12
  167:3
**changed** 62:12,13
  66:11,12 68:18
  68:19 117:15,16
**changes** 62:13
  66:13 68:20
  117:16 130:24
**characterization**
  49:12 100:9,14
  102:3 172:11
**chart** 46:15 51:5
  51:24 62:11
  108:7,10 109:5
  109:9 111:8,10
  111:18 112:1,5
  112:8,10,11,19
  112:21 113:2,6
  113:16 121:16
  121:17,20
  123:10 124:1
  127:4 129:7
  157:1,2,18,22
**Charys** 19:15,23
  19:24 20:17
  24:3 31:4 34:20

36:10,15,16,16
  36:18,23 37:6
  37:12,23 38:23
  39:10,20 40:2,5
  40:10,11,12,18
  41:13 43:5,5,11
  44:16 46:8,22
  50:2,3 51:22
  52:15 53:4,7,17
  53:25 54:9,15
  54:19,25 55:1
  55:10 56:10,15
  56:20 57:18
  58:12,24 61:11
  62:4,25 66:9
  67:5,18 69:9,11
  71:14 72:3,10
  73:3,9,10 74:2,9
  74:15,20 75:13
  75:14,22 76:17
  77:1,10,18 81:5
  81:9,13,25 82:8
  82:11 83:18,22
  84:7,8,10 85:6
  85:10,15,17
  89:3 93:12,16
  93:17 96:13,23
  97:10,15 99:14
  100:7 103:3
  104:14 108:10
  108:22 111:7,11
  111:21 114:12
  114:15,17 116:4
  117:18 118:13
  118:16 121:16
  125:15 126:4,17
  129:16,21,24
  130:13,22
  131:13,21
  132:17,25
  133:13,16,17
  134:1,16,20
  135:10,14 142:4
  142:13 144:17
  144:24 145:18
  145:22 147:24
  148:15 149:1
  152:13 156:7,10
  157:15 158:6
  159:6 172:2
  174:17 175:24
  176:20 177:11
  178:2 179:1
**Charys's** 55:11,14
  56:20 74:10
  78:8 134:4
  155:21,22

157:20
**Chorske** 1:12
  33:11 40:6
  46:20 47:2,6,11
  48:16,18 72:18
  72:21 74:1
  75:21 84:6 85:5
  86:6 89:10
  90:10 91:4,15
  92:1 99:15
  105:10,19
  106:13,24
  107:11,23,25
  109:14 110:14
  110:25 113:13
  117:4,10,21
  119:2,23 120:1
  120:11 121:12
  123:4,11,18,24
  127:11,18,25
  128:10,11,16,19
  129:2 133:24
  135:12 139:3
  156:21 157:2,14
  158:18,19
  163:19,22
  164:12,16 165:8
**Chorske's** 33:17
  33:21 75:17
  81:19 83:19
  85:18 90:10,19
  92:9 113:18
  114:20
**Civil** 1:2 4:15
**claim** 49:17
  169:17
**claims** 122:23
**clarify** 32:8 73:25
  84:11 93:16
**clause** 175:10,11
  175:17
**clear** 66:20 88:15
**clearly** 68:11
**client** 47:12 48:17
  49:14,20 50:3
  155:4
**clients** 83:5 85:11
  85:16 86:5
**close** 134:7
**closed** 84:16
  93:17
**closing** 78:12,14
  82:8,13 84:18
  137:6 175:4
**closings** 30:6
**collect** 21:14
**collected** 86:19

**collection** 27:25
**colloquy** 156:14
**column** 170:5
**columns** 167:7,23
  168:7,23
**com** 39:18
**combination**
  117:6
**combine** 65:18
**combining** 85:13
**come** 14:20 15:23
  44:21 146:23
**comes** 50:13
**coming** 42:2
  178:14
**commence** 8:21
**commencement**
  180:5
**commencing** 1:22
**comments** 130:16
  131:11
**commercial** 30:17
**commission**
  180:21
**committed** 21:11
**common** 89:3
  114:12 174:7,8
  175:12,18 176:6
**communicate**
  54:19
**communicated**
  43:10 130:21
  145:10
**communicating**
  67:5 133:12,16
**communication**
  36:23 37:11
  38:1,20 55:2
  75:2 134:8
  141:19 156:10
  156:11 162:9
  165:15
**communications**
  24:2,7,10 25:2
  27:8 34:19 36:9
  36:14,18 42:17
  42:19 43:4,21
  48:20 69:16
  96:12,16 97:7
  132:16,25
  140:22 156:5
  159:6 162:5,8
  162:15 165:9
**company** 1:4,5,9
  38:11 53:19
  82:12 176:8
**comparing** 123:22

complete 144:13
  167:22
completed 78:10
completely 59:25
complex 12:8
comprise 37:11
computer 31:23
  32:4,6 34:6
  94:20 136:18,20
  136:22 145:20
computers 32:16
concept 138:25
  154:24 155:7,10
conclude 103:25
  104:2
concluded 179:25
concludes 179:24
conclusion 35:10
  35:16 60:22,24
  149:12,14
confirm 59:24
  83:15 86:14
  88:6,8,20,23
  108:9 121:3
  176:19 178:1,6
confirmation
  124:16
confirmed 55:21
  56:1 85:2 105:9
confirming 58:8
confused 13:14
  74:1 102:4
  112:24
confusion 84:12
  86:17 87:2
Congratulations
  10:7
connected 132:17
connection 46:22
consider 149:5
considered 150:7
consist 94:14
contact 28:24
contacted 129:20
contain 37:17
  84:9
contained 22:7
  85:16 113:8
  154:2
contains 88:20,24
  112:1 113:2
contents 48:1
context 150:14,15
  150:17
conversation
  36:25 42:5,8,14
  43:13,15,21

44:5 45:1 46:25
47:7,18,22 48:1
48:14 49:2,4,6
49:13,22,24
50:1,24 57:10
62:2 97:16,23
98:15 99:23
100:3,10,23
101:11,16,23
102:1,5,7,8,25
103:18 104:11
104:18,25 129:9
129:13 132:7
133:23 152:19
173:12,13,16,20
178:21
conversations
  23:13,14 25:4
  36:5 37:1,3 40:9
  40:18,22 42:11
  42:14 43:8,18
  43:21 45:2
  47:10 48:18
  56:15 57:3 59:1
  61:20,25 69:22
  70:3 103:7
  133:19,23
  141:23 148:19
  162:19 165:12
convert 176:5
convertible
  174:23 176:2,4
  176:4,11
copied 87:17
  178:11
copies 37:17
  78:14,15 82:21
  83:6 84:17
  87:25 93:4
copy 22:5 23:3
  25:14,20 31:9
  55:5 73:8 76:23
  78:1,4 82:8
  84:23 87:3 96:9
copying 124:14
Cornell 7:6,8
  82:18 137:24
  148:20 152:20
Cornell's 21:5
corner 167:25
corporate 10:9,10
  20:5,7 30:17
  70:24 71:5
correct 6:21 9:11
  9:20,24 10:6
  16:15,16 20:15
  20:18,22,23

21:1,3,17 31:5
31:10,14 37:9
44:13 45:17,18
51:5,11,24
52:11,17 53:25
55:23 56:11,12
57:21 58:1 63:3
63:6,8,16 64:18
65:3,8,24 66:4,7
66:10,14 67:7
71:1,7,9,12,22
72:10,11 74:3,8
77:2,3,5 79:10
79:11 81:6,7,10
81:11 83:23
89:4,9,14,25
90:4,9,25 91:4,6
91:7,11,14,16
91:17,19,22
92:1,4 94:21,22
100:5 102:13,14
102:15,16,17
105:20,24 106:9
106:14,22 107:1
107:5,6,9,10,12
107:13,15,16,19
107:20 108:18
109:18,21
118:18,21 119:3
119:7 120:5
121:13,14,18
123:17 126:17
127:2,9,14
138:16 147:19
153:23 159:3
165:21 170:15
177:1
corrected 124:17
correctly 128:24
  173:15
correspond 111:6
  111:11,17 113:5
  123:16
corresponded
  112:4
correspondence
  28:6,7,9 76:8
corresponds
  87:16
counsel 21:5,6,20
  26:14,16,24
  39:19 40:25
  51:22 53:25
  55:11,14 56:10
  56:21 66:9 67:5
  74:9,10 76:25
  96:13 104:21

108:22 125:24
132:17 134:4
137:23 162:3
180:14,16
counsels 39:11
  40:1
couple 22:25
  103:10 110:8
course 5:16 17:25
  79:5 94:9
  146:14 148:11
  160:10 163:16
  164:5,18,22
  172:14,18 173:2
  173:3,13,23
court 1:1 4:14,19
  5:13,18,21 6:4
  8:19 18:15 53:3
  59:6,10 60:13
  61:4 64:23
  66:23 68:2 99:8
  118:5 119:21
  124:5 136:8
  140:19 141:3
  162:22 180:4
courtesy 8:22
cover 73:20,24
covered 50:22
co-investors
  135:6
co-portfolio 17:10
  18:4,9
created 92:8,14
  92:15,17,24
  94:7,11,19
  95:22 102:10
  112:7,10 136:20
  136:23,23 158:8
  158:11,13
  166:13,18
  167:12,13,19
creating 166:16
cross 3:2 64:1
Cuomo 7:14 8:6
  9:6
current 55:9
Customarily 78:3
cut 167:23

_____
**D**
_____
D 4:1 20:13
daily 166:7 170:1
  170:23 171:25
Darcy 39:7,7 41:1
  44:24 45:2,15
  46:9 51:21
  56:23 57:15,22

58:14 60:16
61:10,21 69:16
data 94:16
date 4:8 70:25
  94:24 154:15
  155:9,11,12,13
  166:8 172:24
  180:12
dated 39:6 54:3
  108:7 126:16
  153:9,13,22
  154:6,21 156:22
  157:9 167:14
  172:24 180:22
dates 153:14
David 104:20
  105:1
day 74:11 151:15
  176:24
days 51:19 110:8
  178:13
DeAGAZIO 2:3
  3:4 4:5,22,22
  5:3 13:20 14:6
  14:15,18 22:19
  26:15 35:12,15
  35:19 37:16
  38:5,12 40:16
  42:22 43:2
  44:20 48:11,25
  49:19 50:1,7,15
  50:20 52:20,24
  54:7 59:8,15,18
  59:22 60:3,9,25
  63:21 64:3,10
  64:13,21 65:17
  66:19 67:22
  68:7,14 74:25
  77:14,24 80:5
  80:18 83:9,14
  87:3 106:2,5
  112:9 116:23
  118:2 120:21
  135:24 136:5
  140:17,25 144:2
  144:6,15 149:13
  149:18,21
  152:17 156:17
  162:20,23 163:4
  164:19 165:23
  166:4 172:8
  179:13
deal 19:3 20:10
  28:2 31:3 39:10
  70:3 71:15 72:3
  77:24 78:8,22
  82:3,12 83:1,4

83:22,22 84:16 85:11,15 93:17 93:20 118:17,18 128:7 134:19,21 134:24 135:2 137:16 142:4 151:14 169:24 175:25 176:2
**deals** 19:19 31:5 141:15 142:5,9 142:13,16,17 143:1,4,8 144:8 144:24 145:3,4 145:22 147:15 169:6,7,9 171:12
**dealt** 78:6
**deal-by-deal** 79:25 81:1
**debenture** 71:21 176:2,11
**debentures** 174:23
**December** 1:22 4:8 75:10 163:18 164:4,11 164:19 166:8,13 167:14 172:21 180:22
**decent** 94:6
**decided** 144:8 160:23 161:6
**decisions** 138:5
**deem** 165:14
**deemed** 48:22 116:22 135:22 141:21
**Defendant** 22:6
**defendants** 1:13 2:8 4:25 21:10 35:23 43:4 156:6
**defendant's** 87:8 167:15
**definitely** 95:13 108:20
**definition** 84:7 150:10,12
**Delaware** 1:3
**delivered** 82:18 82:20,22 176:8 176:8
**denominations** 62:14 66:13 68:21 98:24 112:18 117:17 118:25 127:5

**depended** 19:20
**depends** 72:1 150:10
**depicted** 109:5
**deposed** 6:19
**deposition** 1:7 4:9 5:5,10,16,21 6:9 6:15 9:4 43:6 63:22 138:7 144:12,14 179:24,25
**depositions** 14:8
**describe** 42:7 47:17 175:23
**described** 47:8 67:6
**describes** 48:12
**description** 3:8 36:9
**designated** 72:9
**designation** 20:12
**desk** 13:6
**despite** 8:24
**details** 101:3 132:4
**determine** 136:22 164:24
**determined** 123:4 136:19
**dictate** 55:3,5 73:23 85:21 133:19
**diem** 21:12,20
**differed** 123:13
**difference** 50:10
**different** 25:5 60:11 64:5 77:22 142:20 155:11 167:20
**difficult** 105:13
**digest** 47:16
**direct** 3:2 4:5 5:19 14:10,15 64:4 67:25 68:3 105:17 122:7 133:4,11,15 163:5
**directed** 133:25 135:13
**directing** 17:6 23:20 27:20,22 35:12 89:23 90:3 162:23
**direction** 14:19 67:25
**directly** 29:20 122:7

**discovery** 21:10 24:9 29:13 35:7
**discrepancies** 129:1
**discrepancy** 128:18
**discuss** 41:5 55:12 55:15 129:21 132:4 139:11 144:12 173:7
**discussed** 46:13 48:4,7 50:11,13 50:21 55:13 62:9 105:9 119:1 163:25
**discussing** 57:1,14 57:20 97:2 134:1 178:16
**discussion** 114:21 114:23,24 115:1
**discussions** 104:20 163:5,6
**District** 1:1,1 4:14 4:14
**Dockery** 1:12 129:10,10,23 130:20,23,25
**Dockery's** 33:9
**document** 21:18 22:7,18 23:7,10 25:14 26:4,11 26:14 27:10,13 27:17 28:1,17 28:20,22,23 30:21 37:10,23 54:5 67:20,23 68:10,16,17 75:4 86:18 91:2 93:5,6 94:11 109:1 112:14 120:20 140:4,8 140:10 156:2,4 157:15 158:5,21 159:5 161:23 162:14 163:17 164:6 166:6,10 166:12,16,19 167:12,13 168:4 168:18,18,19,22 169:1,13,15,19 170:5,11 171:13 171:19,20 172:17,23 175:8 176:14
**documents** 20:3,4 20:21,21 21:14 25:3,21,25 26:5

26:11,21 27:9 27:12,21,25 28:2,4 29:4 30:20 31:1,3,9 37:11 43:3 53:22 73:21 78:5,7,10,11,11 78:13,14,20 79:23,25 80:10 80:15,25 82:12 82:15 84:20,21 84:22 86:13,15 89:9 92:13,25 94:15,19 95:22 111:14 123:20 137:13,16,23 138:15 143:16 143:19 144:7 151:21 152:2 153:8 154:18 159:2,6,15,23 161:14,24 162:1 163:14 167:16 171:17 172:13 174:1,9,10,18 174:25 175:2,21
**Doerner** 4:19
**doing** 10:9,19 68:15 71:4 105:25 106:6 134:19 144:8
**dollar** 71:20 87:11 91:21,22
**door** 12:9,12 13:6 13:11,12 15:8 15:10,11,12,13 16:13 76:21
**doors** 12:18
**dot** 39:18
**doubt** 46:7,10 177:2,4
**draft** 130:17 151:18,20
**drafted** 79:9,12
**drafting** 20:3 79:15 130:4 151:15
**drafts** 38:17 130:13
**draw** 13:15,23,24 14:16 60:23
**drawings** 14:8
**duly** 4:3 180:6
**duplicates** 86:20
**Dye** 155:19
**D-1794** 153:20
**D-643** 91:4

106:16
**D-644** 90:24
**D-653** 106:16
**D-663** 106:17
**D-673** 106:20
**D-714** 105:19
**D-724** 105:22
**D-734** 106:7
**D-775** 106:24
**D-776** 91:11
**D-786** 107:3
**D-795** 107:8 121:6
**D-838** 91:25 107:12
**D-848** 107:14
**D-858** 107:17
**D00714** 89:12,14
**D00724** 89:24
**D00734** 90:4

**E**

**E** 2:1,1 3:7
**earlier** 53:23 96:12 100:1,3 106:12 119:12 119:22,25,25 132:15 136:17 137:6 142:15 158:21 159:12
**early** 37:7 134:10
**ease** 22:11
**easier** 22:20
**educational** 7:5
**effect** 141:14 148:10
**effective** 76:12
**effectuate** 133:11 133:15,25 134:13 135:13
**effectuated** 97:15 98:4 100:5,18 100:25 101:7,12 101:24 102:6 103:20
**effectuating** 57:23 96:23 97:9
**effort** 78:18
**eight** 71:5 153:19 154:1 168:10
**either** 10:24 12:17 12:18 15:21 56:20 57:14 84:16 94:24 95:18 108:16 115:7 116:12,24 117:10,20

120:11 121:12 126:3 133:19,24 135:3 150:24 152:12 158:17 165:5
either/or 134:12
electronic 31:18 31:24
elevator 14:21 15:5,17,23,24
elevators 15:22 16:7
employed 9:19 40:11
employee 180:14 180:16
enclosure 126:16
encompass 60:20
engaged 18:8 29:19,20
engagement 76:1 78:17 147:17
entail 20:2
entire 26:9 27:17 48:14
entities 10:23 12:10 16:22
entitled 64:10 117:18 127:18 128:1,20 129:2 166:7 171:21
entity 11:1,6 16:24,25
entrances 11:25
Equity 10:24,25
error 127:17
escrow 46:13 51:3 51:22 52:6,10 52:17 62:9,19 62:22 63:10,11 63:14 64:17 65:2,6,24 66:5 70:14,22,23 71:8,12,15,16 71:18,18,19,25 72:4,5,8,9 75:13 80:1 81:2,5 174:19 176:1,7 178:20
escrowed 175:20
ESQ 1:11,12 2:3,6
essentially 87:16 135:8 155:12
established 67:10 68:25 81:4 83:11
estate 6:19

estimate 19:5 29:25
et 4:13,13
etcetera 20:22
evening 179:21
event 68:13 126:14 150:7 152:7
events 6:13
eventually 99:9
everybody 87:6
evidence 35:8
Ex 124:16
exact 101:13 125:12
exactly 31:7 35:17 60:9 86:8 87:19 136:15 173:12
examination 4:5 64:1 180:6
example 19:23
Excel 108:19
exclude 144:24
excuse 137:7 176:8
execute 137:2 139:7,13
executed 36:21 41:12 57:8 58:24 73:9 79:23 117:10,20 118:14,24 119:6 119:11 120:7,12 122:23 142:4,9 143:5 145:14 147:23 148:2 152:3 155:9
exempted 1:5
exhibit 85:1 87:18 110:12
exhibits 87:15 121:3 153:2,5
exist 44:8 129:1
existed 99:23,25 101:4 102:20 103:12 104:1
expedite 105:18
experience 29:8 30:3,17
expert 155:5
expires 180:21
explain 16:17 128:17
explained 103:19
explanation 126:24
extent 47:11

48:16 49:8 60:20 63:24 116:20 135:21 140:21 141:18
e-mail 24:9 32:3,5 32:5,15,18 33:1 33:11,16,18,21 34:6 37:12,16 37:25 38:9,11 38:16 40:8,9,20 42:16,18 44:2 45:14,22 46:1,8 47:23 49:9,10 50:24 51:3,14 51:25 52:2 54:3 54:18,24 55:2 55:21,22 56:2,8 62:24,25 64:17 65:1,11,12,23 66:8 67:4,7,12 67:15 68:22 69:4,7 70:25 71:11 72:12 96:8 97:6 108:6 108:8,23,24,25 111:8 112:11,22 113:16 117:13 118:8 121:17 134:4,8 156:20 156:23 157:9,11 157:12,19 158:7 158:11 160:17 161:9 163:9 174:4,5 176:15 176:16,22,25 177:5,13,22,25 178:17 179:4
e-mails 24:6 28:8 28:10 31:24 42:24 43:8 47:4 69:9,18 159:19 159:25 160:6,8 160:16,20 161:14 176:24

_____
**F**
_____

F 1:21 2:4
fact 44:14 55:8 63:9 66:10 75:9 81:12 83:18 88:23 106:6 108:9 109:3 111:16 112:3 113:8 114:22 115:10,12,16 127:17,19 131:2 131:17,24

134:18 141:21 145:9,20 151:21 156:9
facts 55:7 85:2,14
factual 135:24 139:1,4
fair 26:2 71:24 72:7 85:1 86:11 95:20 100:9,14 102:18 123:21 124:2 144:15 146:24
fairly 94:6 146:20
familiar 6:20,22 173:25
familiarized 163:17
fashion 125:5,6
favor 13:15,22 121:1
February 176:19 177:24 180:21
Fed 124:16
fee 127:10 128:4,6
feel 35:4 82:9 88:5 88:9 168:21 179:12
Fein 104:20 105:1
felt 139:12
figure 92:24
file 20:11 31:4 76:17,18,19 77:2,4,6,10,18 77:21 78:1 83:4 83:22 85:11,15
filed 131:13,18
files 31:18,25 32:7 32:12,12 77:22 78:18,22 80:21 82:3 83:1,22 119:17
filing 20:13
filings 20:5,7
film 178:1
final 20:4
finance 10:11
financially 180:17
find 41:25 53:21 69:21 145:24 175:1 178:19
fine 44:23 84:24 144:5 178:12
finish 8:21 39:5 55:16 68:9 171:3
finishes 99:2
firm 9:10,14 11:6

18:3,7 20:25 22:2 39:21 126:3 130:2 136:23 176:19 177:10 178:25
firms 8:11 9:21,23 10:1,3,8
first 17:18,24 18:2 18:6,16,21,22 19:15 22:6 23:4 25:20 26:19 35:24 36:23,25 45:5 54:18 56:19 79:20 87:18 88:19 90:24 100:2 110:18 116:3,6 126:22 127:4 140:3 149:8 163:14 165:16 165:19,24 166:9 177:22,23
fishing 104:22
five 26:12,20,22 27:10 56:14 69:23 142:2,8 142:12 144:2,4 145:2,4,21 146:5 147:6 148:3,4 166:3,5 167:25 168:1,1 168:1,2,2 169:7 169:9 170:10 179:23
five-minute 179:9
five-page 168:22
flipped 103:20
floor 11:17,18,20 14:21 15:3,4
floors 11:18
focus 96:7 99:11
folder 87:17
folders 87:23
folks 56:15 156:5
follows 4:4
Force 19:16
Fordham 7:7
foregoing 180:9
forenoon 1:23
Forget 85:1
forgetting 136:12 175:24
form 18:10 20:4 23:5 24:19 37:14 38:9 42:15 43:22 71:23 76:3

92:11 93:14
99:1,4,17
117:22 131:6
135:17 149:2
150:8 152:3
forth 83:16
101:18 148:12
180:12
forward 53:6
forwarded 37:6
80:10,21 84:9
108:17,21
111:11 112:11
121:16 145:4
174:10
forwarding 53:24
foundation 52:19
67:10 68:25
77:17
four 9:21 10:3
57:4 58:11,23
69:23 71:20
75:10 86:16
87:10 97:1
110:5,11,13,15
110:17 113:24
117:19 118:15
132:16 142:17
144:23 145:2,4
145:21 146:5
147:2 148:3,4
148:18 166:2
168:1
fourth 148:7
frame 17:7 82:25
104:10,24 105:2
120:6 145:16
free 82:9 88:5,9
fresh 114:8
Friday 156:22
front 25:19 34:25
42:25 47:4
69:11 96:9
full 79:22 152:6
functioning
162:16
functions 20:1
fund 17:10 71:17
109:20 134:19
135:9 171:15
funds 1:4 17:11
18:4,9 19:7
45:17 62:8
81:24 82:15
83:5 97:8,14
110:13 111:4
118:21 122:11

122:12,14,17,21
122:25 127:25
128:14 131:4,15
131:20,24
138:23 145:5,11
147:13 148:25
151:1 152:11
163:20 166:7,22
170:2,3,9,11,13
170:25 171:6
172:1,2,20
173:1
further 179:19
180:9,13
future 141:15

_____ G _____

general 10:10
14:12 17:7
22:17 36:5
57:19 58:17
95:8,23 101:2
101:10,22 102:7
102:8 104:22
125:16 138:12
138:15 145:16
172:25 175:23
generally 5:18
6:20,22 19:18
46:1 70:8,9
138:11
gestures 5:14
getting 101:3
105:20,23 106:8
106:13,18,21,25
106:25 107:4,8
107:8,11,14,18
114:22 116:15
116:16 121:17
128:16 137:16
157:2 178:17
gist 101:10
give 5:8,11 6:4 7:4
8:19,22 14:8
19:14 25:25
27:5 34:13 39:1
60:18 61:19
68:21 93:16
99:3 119:6
140:22 147:14
176:6 178:7
given 6:15 31:17
31:18,24 32:1
32:12 34:15
36:7 115:3
116:25 123:4
126:25 128:12

161:13,19,23,25
172:7
giving 23:1 95:2
109:1 116:9
118:15 135:15
gladly 171:17
go 12:11,17,17
16:15 22:24
24:6,22 25:1
28:6 45:22
61:15 88:19
89:16 90:22
94:15 96:6
104:4 105:5,8
105:16 109:23
109:23 122:24
122:24,25 137:6
137:21 144:3
145:20 146:15
146:22 161:24
169:23 179:8,13
goes 5:20 16:13
46:12 169:24
going 6:1 14:2,15
34:23 35:20
39:4 42:3 44:16
45:4,7 53:20
55:18 56:16
60:23 62:6
71:17 80:3
86:11 89:16,17
96:1 101:18
104:4,5 105:16
105:17 107:22
109:25 110:6,24
111:17,22 112:3
113:3 124:7,11
127:10 143:24
146:17,22,24
147:1 154:2
155:16 156:1,14
166:2,4 172:12
173:15 179:14
179:22
Goldberg 4:20
good 5:1,2 7:4
144:1 179:20
Gottbetter 1:8,10
4:1,13 5:6 7:15
9:8,9,19 10:2,5
10:15,19 11:6
11:15,17,22
12:1,2,7,14
13:25 14:23,25
15:8,11,13,25
16:3,14,18,21
16:23 17:4,8

18:3,7 20:16,24
21:9 29:20
30:24 33:12
34:19 48:17
49:21 71:16,19
72:8 75:25
78:17 79:8
80:20 81:22
93:21 103:5
118:23 122:23
125:1 127:16
129:20 131:23
132:23 133:24
134:22 135:6,12
136:18 137:2,8
137:15 138:3,15
138:21,25
139:10,10,11,16
140:12 141:9,13
142:1 147:12,16
148:23 158:3
165:7 173:7,16
173:20 175:13
Gottbetter's
81:14 134:19
gotten 63:14 66:2
158:18
governor 7:14
8:15 9:7
graduated 7:6,7
7:11 71:3
Great 87:5
Gross 176:15
177:9,17 178:14
178:22,24 179:2
guess 6:6 21:11
53:21 87:25
94:25 108:16
126:15 140:6
142:13 155:15
174:22
guessing 22:10
41:17
guest 13:2
guys 167:9
G&P 12:17 32:9
32:12,16 46:13
50:3,5 51:3,22
52:6,10,16 62:9
63:9 64:17 65:2
65:5,23 70:13
75:13 76:23,24
77:1,22 78:1
79:24 80:24
81:4,9,12 82:21
93:6,13 94:20
174:19

G&P's 47:12
75:16

_____ H _____

H 3:7
habit 70:2,6
half 168:10
hallway 12:4,6
15:7 16:6,15,19
hand 6:11 22:23
37:21 78:24
82:6 86:11
110:6 124:7
156:1 168:12
172:19
handed 45:5
172:12
handing 22:4
25:13 35:22
75:3 78:24
139:25 163:8
166:6 174:3
hanging 103:16
happened 25:12
72:12,13,21
78:9 139:21
happy 138:2
144:11
hard 31:9 73:8
84:20 158:10
169:21,22
Hastings 39:8,9
39:15
head 5:14 169:12
hear 61:7,8 72:20
heard 58:5,7
127:20,21 138:6
142:1
held 1:20 4:10
75:13,15,16,18
84:23 86:6
174:19 175:12
help 143:17,19
164:25
helped 79:17
146:11 149:21
helping 29:12
hereinbefore
180:12
HH 1:8 11:2,9,20
11:23 12:3,7
13:6,11,25
15:11,12,16
16:5,14 17:2
18:3,7 34:20
72:16 76:22
81:23,25 83:19

85:6 89:25
99:15 105:10,22
106:20 107:3,14
107:25 109:18
110:10 111:1
117:5,10,21
132:22 139:3
141:16 148:24
158:2 166:13,15
166:23,25
167:13,18,19
169:3,4,10,13
169:24 170:6
**HHA** 12:18 16:18
32:12 47:12,12
48:17,17 49:20
50:3,6 75:15
76:1 77:7,22
78:17 90:17
109:18 118:9
119:2,23 120:2
120:12 121:12
**HHF** 109:20
121:17 122:1
**Highgate** 1:4
17:11 18:4,9,17
18:21 19:6
20:17,25 42:1
44:15 45:17
62:8 74:19
76:25 77:10,19
78:2,19 80:10
80:22 81:23,24
82:14 83:5
96:15,22 97:4,7
97:14 102:12
104:13 109:20
110:12 111:1,4
118:21 122:11
122:11,13,17,20
122:25 127:25
128:14 131:3,15
131:20,24
132:21 135:9
137:5,9 138:1
138:16,23 139:2
145:5,11 147:13
148:10,11,14,25
149:7 150:20,23
150:24 151:1,9
152:11 158:1
163:20 164:25
166:7,22 170:2
170:3,9,11,13
170:24 171:6,9
172:1,1,20
173:1 176:21

177:11 178:2
179:1
**Hills** 1:21 2:4 4:11
**hired** 28:6
**history** 7:10
**hold** 25:18,22
**holder** 176:3,9
**holding** 23:2
62:19,21 63:10
63:14 65:5,23
66:4 82:11
176:1,20 177:10
178:1,25
**honest** 165:10
**Hopefully** 87:2
**hour** 143:25
**house** 1:4 17:11
18:4,9,17 19:7
20:17 30:6 42:2
44:15 45:17
62:8 74:19
76:25 77:10,19
78:2,19 80:10
80:22 81:23,24
82:14 83:5
96:15,22 97:4,8
97:14 102:12
104:13 109:20
110:13 111:1,4
118:21 122:11
122:12,13,17,21
122:25 127:25
128:14 131:4,15
131:20,24
132:21 135:9
137:5,9 138:16
138:23 139:2
145:5,11 147:13
148:14,25 149:7
150:20,24 151:1
152:11 158:2
163:20 166:7,22
170:2,3,9,11,13
170:24 171:6,9
172:1,2,20
173:1 177:11
179:1
**House's** 20:25
**hung** 102:23
103:14,24

_____ I _____

**idea** 14:12 37:2
**identification**
25:14 36:13
37:22 45:14
75:4 78:25 82:7

93:6 163:9
**identify** 4:17 24:2
**identifying** 36:9
**illustrator** 14:4
**implications**
43:25 44:3,8
**important** 160:23
**inaccurate** 52:11
52:13,14,16
63:2,9,14 65:9
70:13
**inaccurately**
62:25 64:16
65:23
**inappropriate**
14:19 67:24
**include** 10:18
20:7 61:22 75:1
164:20
**included** 22:10
87:14
**including** 10:2
28:10 83:22
**incredible** 172:8
**independent**
45:23 127:19
164:1
**independently**
111:13
**INDEX** 3:1
**indicates** 169:2
170:6
**individuals** 57:4
**induce** 69:10
**Industrial** 7:9
**infinitum** 144:25
**information** 23:22
24:17,23 36:3
**informed** 41:15
98:3 100:4
141:20,22
**informing** 41:16
125:17
**initially** 151:2
155:9
**initials** 35:20
113:18 122:1
**injury** 30:13
**inquiry** 94:10,14
95:23 128:15
**inside** 16:2
**instance** 78:16
93:2 121:4
153:20
**instruct** 14:3
26:17 49:15
63:19 68:12

**instructed** 65:15
65:17
**instruction** 6:25
8:18 14:13
53:10 65:16
**instructions** 5:9
5:17
**intended** 44:20
124:12,15
127:11
**intentions** 8:24
**interest** 169:5,14
169:18,20 170:7
**interested** 180:17
**interrogatories**
22:7,12 23:3,4
23:12 24:15
34:25 35:18,24
**interrogatory**
24:18,24 34:24
36:4
**introduced** 37:14
**invective** 102:22
103:8,16,21,23
**investigation**
94:18
**investment** 10:23
10:25,25 135:5
135:8,9
**involved** 130:2
164:9
**in-house** 21:5
104:21
**IP** 33:19
**Islands** 1:5
**issue** 44:14 115:6
118:13 151:22
**issued** 42:1,3
45:16 62:7
112:13,18 113:7
114:9 118:20,20
123:19 129:6
141:15 154:16
**issuers** 143:10,20
148:3,5
**issues** 25:5,7
44:10,11 45:3
50:6 147:13,18
**issuing** 44:17
53:20

_____ J _____

**J** 4:1
**JAG** 1:2 4:15
**Janet** 1:18 4:19
180:3
**January** 10:5 76:2

76:12 82:3,25
83:9 84:20 85:9
92:7,16 93:13
94:4,7,11,20
95:18,22,24
102:10 118:25
119:10 120:10
122:17,21 128:9
128:18 129:4
134:3 136:21
137:1 145:15
146:1,10 147:8
174:4
**Jason** 1:8,11 3:3
4:16 39:6 48:18
50:12 51:13,16
51:20,21 109:16
110:16 111:3
156:21 157:13
174:6 176:17,19
177:24 180:6
**Jersey** 1:1,20,21
2:4 4:8,11,15
180:4,20
**JFK** 4:11
**JMS** 109:16
**job** 7:10 172:14
173:2
**jog** 80:18
**John** 1:21 2:4
**join** 8:5
**joined** 10:14
**joke** 142:24
**June** 37:7 39:6
40:7,19,19 54:3
56:1 96:8,13,18
96:20,21 97:8
97:13 104:10
108:7 111:8
112:22 117:13
121:16 128:18
134:3,4 139:18
139:23,24
140:12 141:11
148:16 149:1
154:6 156:22
157:9,19 158:7
160:16 161:9
162:5

_____ K _____

**Kaplan** 9:9 10:2
10:14
**Karen** 39:12,13
40:24 43:22,24
45:2 56:22
57:14,22 58:13

60:15 61:10,21
69:16
**Kathleen** 156:21
157:13,25
158:12,17 174:4
**keep** 5:22 6:5
69:22 70:3,7,8,9
103:22
**Kennedy** 1:21 2:4
**kept** 76:17 77:6
77:22,22
**key** 16:5,8,9,11
**kind** 6:17 10:7
20:5 102:24
151:8
**Kipling** 19:15
**knew** 71:8,12
95:13 139:25
164:3,10
**know** 11:9 14:19
17:5,23 18:1
20:9,11 22:3
23:19 27:8 29:8
29:11,18,19,22
29:23,24 30:5
30:16,18,25
31:15,20 32:4
32:14,15,17
33:1,3,5,5,6,7,8
33:20,22,23,25
34:4,5,8,9,11,12
34:15,17,18,22
36:6 39:3,21
40:6,20 42:17
44:7 46:6,11
47:1,3,3 48:25
51:12 53:12
55:18 59:17
61:12 62:15,17
68:1,1 69:3,18
70:4,5,18,22
72:4 73:7,15
74:4,4,6,8,15
75:20 78:9
79:16,17 80:16
82:17,22 84:14
84:15,20 92:18
92:24 93:1,25
94:1,1 103:1,13
104:1 108:15
109:12 110:22
111:19 112:15
112:17 113:13
113:14,15,17,19
113:20,22,23
114:1,2,3 115:3
115:5,18,24

116:1,20 117:3
117:4,7,8,9,12
118:18 119:8
122:12,15 123:1
123:2,13,17,18
124:6,15 126:7
127:15,22,23,24
128:2,8 129:3,5
129:8,22,23
130:7,8 131:2
131:11,12
132:12,13,14
134:11,14,17,21
134:22 138:25
142:12,14,25
143:11,12
144:21,23 145:3
145:6,7,8,9,12
145:13 149:3
151:5,8 153:12
154:5,11,20
157:24 158:12
158:14,17,20
160:11,18 161:2
161:13,19
162:17,18
163:22,24 164:7
164:10 165:6,7
165:8,8 166:15
166:17,18
167:16 168:25
169:11,23,25
170:23 171:4
174:12 177:14
**knowledge** 69:15
75:19 82:1,5
95:8 112:8
115:16 127:19
138:6,8 152:11
152:17 155:6
**knows** 179:6

_____
**L**
_____

**L** 1:12 4:1
**labor** 7:9
**Lack** 68:24
**lacks** 77:17
**language** 60:7
**Larner** 1:20 2:3
4:10,23 5:4
126:7
**late** 37:7 40:19
134:3
**law** 6:5 7:7,11,16
8:11 9:10,14,21
9:23 10:1,3,8
20:24 44:3,8

126:3 130:2
151:11 155:5,18
**Lawlor** 21:19,22
21:24 24:6
27:21,22 28:6
28:20 29:4,9
30:16,19 31:13
31:17 33:17,20
34:13,18 158:25
159:1,14 160:9
160:22 161:10
161:14,20 162:4
163:6
**Lawlor's** 29:16
159:21
**laws** 43:25
**lawsuit** 136:1
**lawyer** 20:25 29:9
30:3 49:14
63:17 118:11,18
119:15 130:22
157:20 171:10
171:11 173:25
**lawyers** 99:5
111:11
**lay** 14:8 150:2
**layout** 13:24
**layouts** 14:9
**Leach** 39:13,13
40:25 43:22,24
56:23 57:14,22
58:14 60:15
61:10,21 69:16
**lead** 35:7 85:3
**leads** 12:6 115:23
**learn** 116:6
**learned** 18:20
123:5 164:6,12
164:15,23
**leave** 25:19 79:1
90:19 168:16
**led** 24:2 47:22
**Lee** 2:9 4:6
**left** 8:12 14:24
15:5,6,19,20,24
**legal** 35:10,16
77:4 137:23
138:24 149:12
149:14,16
154:23
**lesser** 100:21
**letter** 73:20,24
79:4,6,9,12,15
79:18 80:24
81:20 84:18
124:17,20,22
125:4,9,10,11

125:14 126:5,15
126:19 127:4,24
128:14 129:5
141:5,7 146:1
146:10,11,17,20
146:23 147:9,12
147:21,22 148:1
148:12,15
149:19,22
**letters** 24:10
126:2,6,11
**let's** 13:2,15 19:23
61:9 88:19
90:22 95:25
105:5,8,15
109:23,23 145:2
146:14 151:1
153:19 167:24
169:23 172:25
**Levinson** 9:9
10:15
**liability** 1:4,9,11
**License** 180:21
**limited** 1:4,9,10
162:9 170:2,13
172:20
**limiting** 5:21
**line** 62:15 100:2
152:10
**list** 128:22 167:6
167:18,20,21
168:9 170:8,8
170:11,12,13,23
**listed** 44:15 66:2
109:9 111:6,7
111:10 112:19
113:23 127:5
129:7 131:24
166:24 169:15
**listen** 66:20 67:3
**listing** 170:2
**litigation** 17:25
30:17 36:17
55:7 79:5 94:9
140:4 158:22
163:16 164:5,8
164:18,21,22
165:20,25
172:18 173:3,8
173:17,24
**litigator** 25:24
137:7
**little** 8:4 26:1
49:10 74:1
102:4 105:18
115:15 127:4
**LLC** 1:3,9 4:13

121:8 148:11
**LLP** 1:10 4:2
**located** 4:7,11
11:10
**locked** 12:10
**logic** 55:3,4,6
73:22 85:21
133:19
**logical** 53:18
**long** 6:10 7:24 8:3
43:13,15 48:21
49:16 116:21
128:22 141:21
146:20 159:10
**longer** 152:5
**look** 19:15 23:8
25:16,23 28:5
78:11 82:9 88:5
88:7 90:23 91:3
93:2 94:15
108:7 110:18
119:22 122:6
123:20 136:21
137:22 138:1
145:21,25 154:1
155:20 161:24
162:8 163:13
167:1 172:4
174:1 177:22
**looked** 119:12,24
119:25 121:11
136:19 145:22
159:11 177:25
**looking** 32:11
45:13 83:10
89:8 105:6,19
106:11,24
113:15 120:24
121:3,6 123:3,9
127:3 146:1
152:22 153:7
159:12 168:21
169:1 175:9
**looks** 82:11 87:23
153:4 178:3,13
178:24
**loose** 22:25
152:25
**lower** 167:25
**lunch** 96:3 104:3
105:6 119:1,1
**L-a-w-l-or** 21:23

_____
**M**
_____

**M** 4:1,16 51:13,16
51:20,21 109:16
110:4

Madison 4:2 11:13 15:3
mail 73:5
main 12:4 16:6,15
majority 159:20
making 174:9
Management 1:3 4:12 16:21 18:8 90:5 106:7,17 107:7,17 121:2 121:7 122:18 139:3
manager 17:10 18:4,9 137:9
Manning 129:24 130:1
marathons 6:10
mark 13:21 17:9 78:21 103:5 126:9 137:18 138:4,9 139:7,9 139:12 141:23 164:23
marked 3:13 22:5 22:23 25:13 35:22 37:16,21 42:25 75:3 78:24 82:6 86:12 110:6 111:9 119:10 124:7 140:1 156:1 160:17 163:8 174:3 176:13
marking 43:6
Martin 129:24
matching 124:1
material 148:9,10 149:5,15,16 150:7,11,16,18 150:19,22,22 151:4,10 152:1 152:7
materiality 151:14,21
math 90:21 91:9
mathematical 64:8
mathematically 65:18
matter 1:17 5:5 93:13
mean 10:22 16:11 21:4,4 24:13 25:10 29:17 31:22 32:6,24 33:3 34:2 42:15

46:4,6,21 50:23 51:12 53:8 54:21 58:18 65:1 73:20 74:16 76:17,24 79:16 80:23 84:8 85:21,22 88:11 93:20 94:12 98:20 111:15 115:5 116:12 117:4 118:6 125:3 133:8,18 134:21 138:6 141:25 144:21 151:8 158:10 160:4 161:3 163:24 164:17 165:4 167:18 168:8 176:4 177:12
meaning 65:5
means 55:1 80:4 139:5 141:2
meant 147:14
mechanics 34:6
medication 6:12
Melissa 178:4,10 178:11,19 179:5
memo 139:24 140:15
memory 58:18 80:19 104:22
mention 30:10,13 54:2,22 55:22 56:2
Mergers 10:13
meta 94:16
method 73:7
Michael 1:12 40:6 46:12,16,18,20 46:21,23,24 47:2,5,6,18,21 48:4,16,18 49:2 49:4,11 50:10 50:12,21 62:8 72:18,21 75:17 81:19 99:15 109:13 110:14 113:13 114:20 115:7,10 116:12 117:10 118:9 133:3,20 136:14 139:2 156:21 157:13 158:18 164:23 165:5,12
Mike 39:17,18 40:23 41:4,11

42:19 43:18 56:23 57:15,23 58:14 60:16 61:11,21 69:17
miked 67:23
million 36:16 40:12 42:1 44:16 45:21 71:20,21 74:19 113:25 118:21 123:6,12 126:12 126:20 131:4,16 131:21,25 139:1 149:7 170:14 172:2 174:21,23 175:11,18,19,22 176:20 177:10 178:1,20,22,25
mind 5:23 6:5 43:6 136:5
mine 33:3
minutes 56:14 143:25 144:3,4
misleading 83:13
missed 12:13
missing 168:5,22
mistake 124:14
Moler 158:24
moment 38:21 49:20 100:21 110:17 166:25 172:13
moments 27:16 38:2 58:9 100:1 103:10 120:23
money 71:16
month 160:10
morning 5:1,2 178:8
Morris 129:24 130:1
mother's 6:18
move 61:9 63:15 63:19 64:11 89:25 172:6
moved 7:13
Moving 91:10
MTGSI 39:18,23
MWC 109:13

**N**

N 2:1 4:1,1
name 4:6,16 5:3 42:1 74:19 108:25 118:20 122:13 139:2 141:15 149:6

158:24
named 21:12 44:15 115:17 142:17 178:3
names 19:14 42:4 62:14 66:14 68:21 99:14 111:18,23 112:2 112:19 113:2,5 117:17 127:6 142:12,14 143:9 143:10,20 144:17
Nationwide 2:10 4:7
nature 135:1 138:13 139:20
NAV 164:25
near 95:18
nearly 156:4
necessarily 126:9 143:18
need 5:12 6:8,11 32:25 42:7 44:22 48:25 81:21 82:10 86:2 106:3 110:17 126:10 138:9 146:16 167:1 175:2
needed 138:4
neglected 8:18
negotiated 20:21
negotiating 17:8 20:4
negotiation 17:18
neither 180:13,15
never 75:13 103:21 141:22 152:11 164:8 172:15,16 173:16,22
new 1:1,9,10,20 1:21 2:4,7,7 4:2 4:2,8,11,15 7:14 7:23,24 21:25 40:14 53:20 62:18 134:19 180:4,20
nods 5:14
normal 148:11
normally 46:2
Notary 1:19 4:3 180:3,20
note 14:18 22:16 36:8 38:3 40:8 45:5 47:9 54:4

59:12 111:5 112:6 116:18 132:2 135:3 137:20 140:20 141:17 156:13 162:10 166:1 167:2 173:9 176:5
notes 1:16 69:22 70:3,7,8,9,10 121:17 157:2 176:5 179:9
notice 176:7
November 17:7 17:12,18,24 45:16 62:7 73:1 73:10 82:21 83:8 93:18 153:9,13,22 154:3,7,21
number 3:8 4:15 23:22,23 24:14 24:24 26:11,20 26:22 27:10,13 34:24 35:5 36:4 36:8 62:11 66:11 68:18 89:12 105:7 111:17 117:14 123:13,14 159:13
numbered 89:14 89:24 90:4 121:6
numbers 105:17 111:18,23 112:2 112:5,18 113:2 113:5,8 120:5 123:16
numerous 176:23

**O**

O 4:1
oath 6:3,4
object 14:2 18:10 37:13 49:14 99:3 156:16 172:10
objection 5:17 22:17 24:19 35:1,9 38:4 40:13 47:24 52:1,18 54:5,11 54:20 56:4 59:13,15 61:15 63:4,12,18,22 64:4,24 65:7,10

65:14,15,20,25
66:6,15,24 67:9
67:20 68:24
69:13 71:23
72:2 76:3 77:12
77:17,20 80:14
83:7,24 85:19
86:7 92:11
93:14 99:1,4,10
99:17 100:11
102:2 112:7,20
115:25 116:19
117:22 121:21
121:24 122:2
131:6 132:3
135:17,20
137:21 138:17
138:19 140:21
141:18 148:17
149:2,11 150:8
150:13,25 151:7
151:17,23 152:8
152:15 155:14
156:13 161:1,15
161:21 162:11
167:3 170:16
173:10,21
**objectionable**
60:2
**objections** 22:5,17
35:23 64:14
68:2
**objects** 5:15
**obligations** 80:1
81:1
**observed** 95:16,18
**obtain** 30:19
**obtained** 37:23
**obviously** 43:2
50:2 54:5 75:1
**occasion** 64:16
65:4,11,12,22
66:1
**occurred** 49:22,25
50:2 80:9 100:9
105:3 133:24
**occurrence** 66:1
**October** 17:7
97:19 98:16
102:19,21
103:11 104:12
105:4 126:5,16
128:14,18 129:5
129:14 130:14
131:14 141:5
148:21,22
152:12,20

**offering** 49:16
**office** 1:20 4:10
7:22 11:14,23
11:24 12:2,8,9
12:13,14,16,19
13:2,5,8,12 14:1
15:1 16:20
74:12 75:17
81:19 83:19
85:6,18 114:20
177:7
**offices** 4:1 11:9
15:21 16:1,22
75:15,16 76:22
**okay** 5:8 7:2,4
8:23 13:17
14:25 15:7
17:23 22:22
24:22 31:17
33:4 35:3 36:2
36:11 38:12,18
40:21 45:4,13
47:15 50:18
51:1 52:14
54:17 55:20
56:8,13,18 57:7
59:5 60:11
64:12 65:4 69:8
71:14 74:14
76:9 79:1,3,21
81:8,20 83:2
84:6 85:4 86:24
87:1,15,18,22
88:4,13,22
91:21 101:20
105:5 107:23
108:3,4 110:25
111:9,12 112:23
113:4 114:13
115:22 117:9
119:5 120:18,22
121:5,10 122:9
124:3,13,18
126:24 127:5
131:19 136:25
137:15 138:22
138:24 140:6
145:1 148:22
150:12 152:25
153:11,14 154:4
154:5 156:8,12
156:19 163:12
165:18 168:3
171:23 172:9
174:13,16 175:7
175:14,23
179:12

**omit** 148:9
**once** 8:20 62:17
**ones** 74:18 119:12
119:13 130:4
142:3,14 143:14
169:11
**ongoing** 147:18
**opinion** 150:2
**opposed** 168:23
**oral** 55:2
**order** 5:21 12:10
30:25 62:4
67:18 68:2
161:25 175:3
**original** 34:24
45:15,20 46:8
62:7 72:19,23
72:25 73:8 74:2
74:15,15,16,16
75:22 78:18,22
79:25 80:9,15
80:21,25 81:9
81:12,24 82:25
83:4,17,22 84:7
84:8,10 85:6,10
85:15,17 86:5
86:23 87:12
126:12 155:12
**originally** 73:9
74:18 79:23
118:20
**originals** 82:16
**originated** 169:10
**outside** 21:6 39:11
39:19 40:1,25
51:22 76:25
132:17 137:23
146:15 148:11
**overly** 35:5
**overnight** 73:5
**oversee** 20:6
**owe** 87:3
**owned** 166:22,25
169:2 170:3
**owner** 44:15
115:17 131:4,15
131:20,25 150:3
150:4 152:1,6
170:12,14 172:2
**ownership** 154:15
**owns** 169:14
170:6
**o'clock** 166:2

_____
         **P**
_____
**P** 2:1,1 110:4
**package** 73:23

**page** 3:8,13 5:10
23:20,24 75:10
79:20 86:19
87:18 89:12,24
90:4,24 91:3,14
91:25 105:17
106:16,16,20
121:6 124:11
127:4 153:19
154:1 167:25
170:10,19
175:10 177:23
**pages** 22:25
152:25 156:4
169:8,9
**paid** 29:23
**papers** 165:14
**paragraph** 75:12
79:18,19 148:7
149:24,25
**parameters**
161:13,19,25
**Park** 2:7
**Parkway** 1:21 2:4
4:11
**part** 12:13 13:7,8
48:24 49:3
54:23 62:5,25
72:20 75:12
103:6 117:14
150:6 151:12
153:5 167:5
**participate** 39:9
146:9
**participated** 19:7
**participating**
79:15
**participation**
17:17 19:19
27:24 92:9
140:7 155:23
**particular** 12:19
25:9 28:17,23
31:1 70:3 78:16
124:16 134:11
138:24 143:17
144:3 151:21
152:2 157:11
**parties** 4:18 41:13
149:8,10 150:6
151:6 155:10,12
180:15
**partner** 5:4 10:4
39:14,15
**Partners** 1:10 4:2
7:15 9:19 10:5
11:15,17,22

12:2,2,7,15
13:25 14:23
15:1,8,11,13,25
16:3,14,18,23
20:16,24 29:20
30:24 33:12
34:20 48:17
49:21 71:16,19
72:9 81:22
129:20 132:23
136:18 148:23
158:3 175:13
**partnership** 1:11
**party** 49:2,6
150:3 152:1,5
**passed** 6:19
**pat** 116:25
**Paul** 39:8,9,15
**PC** 4:10,23
**pen** 123:25
**pending** 18:14
53:2 64:22
66:22 118:4
119:20 124:4
136:7 140:18
162:21
**people** 8:20 14:8
17:9 19:22 25:3
56:22 57:2
58:11,23 69:23
80:21 103:3
108:22 109:9
113:3 132:16,25
165:4
**people's** 42:3
**percent** 90:11,13
90:17,20 91:8
91:18 92:5,10
113:17,24
117:19 118:15
121:18,25 123:6
123:12 127:18
128:1,5,6,10,12
128:13,16 157:3
**percentage**
113:17,20 157:7
158:19 169:5,14
170:6
**perfect** 52:25
**perform** 148:9
**performed** 32:15
33:23
**performing** 32:3
32:5
**period** 8:7 82:3
97:12
**permission** 148:8

| | | | | |
|---|---|---|---|---|
| permit 155:7 | 171:9,13,14,25 | privilege 5:21 | 31:3,21 35:25 | 119:11 120:24 |
| permitted 5:19 | portion 3:13 | 48:23 49:18 | 37:25 131:11 | 121:12 123:3,22 |
| person 27:20,22 | 48:12,13 99:7 | 50:13,15 68:2 | **Public** 1:19 10:23 | 123:23 |
| 53:18 73:13 | 125:4 | 116:20 132:5 | 10:24,25 11:1 | **P-30** 37:21 39:6 |
| 78:6 112:2 | portions 27:18 | 135:23 163:2 | 180:3,20 | 42:25 45:14 |
| 135:15 154:20 | posed 60:19 | 173:10 | pull 155:18 | 96:8 108:7 |
| 159:1 | position 17:2 | privileged 47:13 | purchase 91:12 | 111:9 157:1 |
| personal 30:13 | possession 81:13 | 48:2,13,14,19 | 114:10,12 | 160:17 |
| 103:22 | possible 12:3,5 | 49:5,7 116:24 | 126:17 137:10 | **P-4** 145:25 146:2 |
| personally 19:6 | 23:9 34:13 | 135:21,25 | 153:13 175:15 | **P-42** 75:3 |
| 26:6 27:8,12,25 | 42:23 104:23,25 | 140:22 162:16 | purport 51:18,19 | **P-44** 22:23 23:3 |
| 31:11 34:14 | 110:20,22 | 162:19 165:13 | 112:10 122:10 | 23:21 |
| 130:18 | 154:16 160:18 | 165:15 | purported 85:10 | **P-45** 22:5,18 |
| phone 42:17 98:9 | 160:22 161:3,4 | probably 8:8,17 | purportedly | 34:23 146:4 |
| 98:10 102:23 | 163:21 177:12 | 18:16,20 19:10 | 37:24 41:12 | **P-46** 35:22,23 |
| 103:14,17 | possibly 49:5 | 19:16 30:1 | 57:8 90:1,5 | **P-48** 172:19 173:8 |
| physical 73:8 | 85:16 99:15 | 43:25 53:15,16 | 91:15 92:2,8 | **P-5** 78:25 146:6 |
| 161:23 | practice 70:2,10 | 56:14 59:14 | 105:23 106:8,13 | **P-50** 110:7,9,10 |
| **Physics** 85:23 | precise 60:7 | 76:21,21,22 | 106:18,21,25 | 113:4,8 122:6 |
| picture 13:16,20 | 105:14 | 98:21 116:5 | 107:4,8,11,14 | 136:16 152:22 |
| 14:16 | preferred 20:10 | 124:14 134:10 | 107:18 114:11 | 154:2 |
| pinpoint 144:17 | 20:11 135:3 | 145:15 164:5 | 123:4,18 129:6 | **P-51** 110:12 122:8 |
| **PIPES** 10:18,22 | preparation | 176:12 | purports 47:17 | **P-52** 110:14 |
| place 8:15 45:9 | 130:3 155:23 | proceed 4:21 | purpose 29:12 | 123:24 |
| 89:19 96:3 | prepare 25:3 | proceeding 5:9 | 49:21,24 147:11 | **P-53** 110:15 113:4 |
| 104:7 110:2 | 108:12,14 | 6:17 | 166:15,17 | 113:9 122:6 |
| 147:3 179:16 | 110:21 124:22 | proceedings 1:17 | 175:24,25 | 153:19 154:2 |
| 180:12 | 141:6 149:21 | 6:10 | purposes 30:20 | **P-54** 168:12 |
| placements 10:17 | 164:24 | process 6:21,23 | pursuant 46:15 | 172:12 173:20 |
| places 62:24 | prepared 20:21 | 105:18 147:17 | 51:4,24 62:11 | 173:22 |
| plaintiff 4:23 | 23:15 108:9,17 | produce 21:14 | 79:25 81:1 | **P-55** 140:1 |
| plaintiffs 1:6 2:5 | 112:4 120:7 | 160:24 162:1 | 113:3 | **P-58** 174:3 |
| 5:4 21:10 22:6 | 154:17 158:6 | produced 22:12 | put 31:25 146:11 | **P-59** 156:2 158:5 |
| 23:4 25:20 28:1 | preparing 44:17 | 86:13,21 87:21 | 167:24 | **P-61** 176:13 |
| 35:24 121:1 | 125:2,9 129:16 | 87:22 110:8 | putting 20:4 | 177:25 |
| 159:5 | 140:8 163:19,23 | 119:14 156:3 | 146:10 | **P-62** 177:15,22 |
| please 5:25 6:5,9 | 164:13,16 | 159:15 161:6 | **P-1** 25:13 | **P.C** 2:3 |
| 7:4 8:20 33:1 | present 93:21,23 | 164:4 167:9,17 | **P-11** 166:6,6 | **P.M** 89:18,21 |
| 60:12,25 62:15 | 159:14,16 | 168:11 171:20 | 168:21 | 96:2,5 104:6,9 |
| 63:15,19 136:6 | presented 24:8 | 176:14 177:1,18 | **P-16** 82:6 83:11 | 110:1 147:2,5 |
| 176:19 178:1 | pressured 179:12 | production 21:19 | 83:11 175:8 | 179:15,18,23,25 |
| pledged 176:20 | presumably 38:16 | 25:21 28:21,23 | **P-18** 163:8,15 | **P09237** 163:10 |
| 177:11 178:2,20 | pretty 153:3 | 43:3 86:21 87:7 | 165:22 | **P09248** 163:11 |
| 178:22 179:1 | previous 37:1 | 87:8,9 156:4 | **P-23** 124:8,8 | |
| point 30:2 32:21 | previously 22:4 | 158:22 162:14 | 141:5 | |
| 38:15 53:6 71:6 | 73:2 102:9 | **Productions** 2:10 | **P-24** 86:12 88:19 | **Q** |
| 72:6 74:6 77:9 | 139:25 | 4:7 | 88:23 89:23 | question 5:10,20 |
| 78:6 82:1,2 | pre-retitled 74:17 | pronounced | 105:8,9,19 | 8:21 12:21 16:2 |
| 124:20 134:12 | 75:22 | 144:19 | 119:11 120:24 | 18:12,14 22:21 |
| 140:11 141:11 | price 134:16 | properties 94:16 | 121:12 123:3,22 | 23:6,22,23 |
| 141:12 148:14 | principal 11:7 | property 85:24 | 123:23 | 24:16,21 25:9 |
| 164:20 | prior 37:4 40:7,15 | propounded 23:6 | **P-25** 106:11 | 26:20 27:1,4 |
| pointed 131:2 | 74:25 76:16 | provide 23:11,22 | 119:11 120:24 | 28:22 31:2 32:8 |
| points 78:7 | 132:24 137:14 | 24:7,16,23 | **P-26** 91:10 106:24 | 33:1 35:5 37:14 |
| portfolio 137:9 | 173:8,17 180:5 | 26:10,21 36:3 | 119:11 120:24 | 38:14 39:1 |
| 138:4 166:7 | private 10:17,22 | 130:16 | 121:4 | 40:14,17 46:5 |
| 170:1,23 171:8 | 10:24,25 | provided 23:18 | **P-27** 91:21 107:11 | 47:10,14,17,25 |
| | | | | 48:3 50:17 |

DOERNER & GOLDBERG, INC.                                                                973-740-1100
5 Becker Farm Road * Roseland, NJ  07068          1161 Broad St. * Ste. 110 * Shrewsbury, NJ  07702

52:22,23,25
53:2 54:23
55:25 58:4 59:4
59:6,9,10,19,21
59:24 60:2,10
60:13,19 61:1,2
61:3,8 63:7,24
63:25 64:5,6,8
64:20,22 65:14
66:16,17,19,20
66:20,22 67:3,4
67:6,11 68:1,8
69:2 76:4 80:4
80:13 81:21
82:10 83:3,12
97:12 99:2,11
99:12 101:17
102:3 103:10
109:6 110:18
111:25 112:9,15
112:16,23,25
114:8,13 115:14
115:20,23 116:2
118:3,4 119:9
119:20 120:20
124:3,4 126:18
128:21,25 132:3
132:6 134:23
136:4,7 140:2,7
140:16,18,23,25
141:3,20 142:20
143:1,2 144:24
154:10 156:15
156:17 161:17
162:20,21 163:3
163:14 164:11
165:17 166:9
167:4 168:5,19
169:16,19
171:18 172:25
173:11,15 175:3
176:18 177:7
178:15
**questioning** 100:2
**questions** 5:11,25
7:1 14:5,14 22:8
22:11,13,14
24:12,18 54:16
64:11 68:6
146:18 171:16
171:21 179:19
**quick** 163:13
**quickly** 90:22
105:15
**quote** 51:8,9
94:19 99:12
148:8

**quotes** 52:10

_____

_____ **R** _____

**R** 2:1 4:1
**raise** 6:11
**Ray** 40:4,24 42:8
43:8,19 46:13
47:7,19,22 48:5
48:8 49:3,11
50:11,22 51:2
56:23 57:15,23
58:14 60:16
61:11,21 62:9
69:17,18
**reached** 140:13
**read** 18:12,14
26:3,8,19 27:17
27:18 50:19
51:8,10 52:9,24
53:2 54:7 56:6
59:8,10 60:11
60:13,25 61:3
62:6 64:21,22
65:1 66:19,22
81:20 88:16,16
99:7 118:2,4
119:20 124:4
136:7 140:17,18
141:1,3 146:21
146:23 147:21
162:21
**reading** 47:3
50:24 54:21
136:5 175:14
**real** 146:15
**realize** 9:3 13:23
135:11 144:16
**really** 18:5 25:24
28:24 70:4
83:12 135:25
142:23 164:8
179:3
**reason** 14:10 46:7
46:10,11 81:9
164:12 177:2,4
**reasonably** 35:6
**reasons** 164:15
**recall** 6:13 17:8
18:18,22 21:8
21:15,16 23:21
24:1 25:8 29:6
41:16,18,20,21
42:6,13,15,18
43:7,9,12,20
44:25 45:19
50:23 57:13,19
57:25 58:10,22

58:25,25 60:15
61:10,13 62:2
70:21,22,23
73:18 75:25
76:5,7,11 79:14
79:14 97:16
98:14 100:8,22
101:13,14,25
104:21 105:12
109:8 110:23
111:13,15,20
112:14 113:6,11
113:12 115:9,12
123:7 124:19
125:23 126:13
132:18 133:21
133:22 142:5,7
148:5 154:17
156:23 157:8,10
158:22 159:12
161:8 166:12
174:9,17,21
176:18,22 177:6
178:15,17,18
**recalled** 162:5
**receive** 62:17
130:13 176:23
**received** 21:10
72:16,17,22
74:1,4 84:19
113:13 114:11
123:11 177:3
**receiving** 113:24
156:23 157:8,10
**receptionist** 179:3
**recess** 45:9 89:19
96:3 104:7
110:2 147:3
179:16
**recognize** 75:4,5
79:4 82:7
163:14
**recollection** 6:2,7
11:8 13:23
19:11 39:24
40:19 45:24
53:24 54:1,9,14
54:24 55:4,8,10
56:9,25 57:16
73:3 80:8,17
94:6,12 95:9,10
95:17 111:24
139:22 140:11
143:17,20
156:25 158:5
164:2,2 165:25
**record** 14:18 45:7

45:11 89:16,17
89:21 96:1,5
104:4,5,9
105:15 109:24
109:25 110:4
146:25 147:1,5
150:3,4 152:1,6
179:13,14,18,22
**RECROSS** 3:2
**REDIRECT** 3:2
**referred** 46:16
77:21
**referring** 38:2,21
46:25 77:21,23
**refers** 66:18 118:8
118:8,10
**reflect** 172:1
**reflected** 140:15
169:13 171:13
**reflects** 169:19
**refresh** 39:23
54:24 56:9 80:8
139:22 143:17
143:19 156:25
158:5
**refreshes** 54:8,14
**refreshing** 80:17
**Reg** 20:13 131:25
**regard** 34:20
36:15 43:10
50:2,3 72:14
126:3 128:19
129:1 136:16
142:9 143:6
148:3,4 163:20
**regarding** 40:11
58:24 96:14
132:7,23 141:5
147:13 159:7
162:14
**regardless** 27:7
51:1
**registration** 20:8
44:17 129:17
130:3,5,14
131:3,14 132:9
151:15,18
**reissuance** 24:3
34:21 36:15
152:13 159:7
162:6
**reissue** 69:10
111:22 155:11
155:15,16
**reissued** 98:23
99:14 100:7
110:25 112:17

122:13 150:6
154:6
**relate** 168:23
**related** 20:13
170:24
**relates** 156:5,12
**relating** 31:4 43:3
44:11 139:19
144:7 159:6
162:6 170:9
**relation** 13:25
15:10
**relations** 7:9
**relative** 180:14,16
**relevant** 31:6
**remainder** 90:16
**remember** 8:9
18:25 19:13,17
23:10 25:6 29:7
41:8 42:10
43:18 44:1,6
57:3,22 58:2,7
58:13,15 61:14
61:20 74:11
79:13 80:20
95:13,16 96:9
97:5,6,11 98:8
98:11,13,17,20
98:22,25 99:21
99:22,24,25
101:5 102:15
104:24 105:14
106:2,3,6 109:3
112:1 114:25
116:10 125:12
126:10 132:8
133:6,18 134:2
134:7 135:14
136:11,13,14
143:13,14
144:16,22 146:8
150:1 158:23
159:25 160:8
161:11,18,22
174:20 177:8,9
178:20,21,23
**rephrase** 7:1 27:4
**reported** 28:14
**reporter** 1:19
4:19 5:13 8:19
18:15 53:3 59:7
59:11 60:14
61:4 64:23
66:23 99:8
118:5 119:21
124:5 136:8
140:19 141:4

162:22 180:4
reporting 28:20
represent 4:18 5:4
37:22 79:8
107:22,25
110:24 153:25
156:3
representative
120:11,12
represented 20:17
76:25
representing
40:10 43:5
represents 50:6
54:25
request 25:15,20
26:9,11 27:10
27:13,17 28:1
30:21 53:22
74:25 125:20,21
125:22,25 144:6
144:9 159:13
161:24 162:1
174:6,10
requested 61:3
78:7 99:7 118:7
requesting 52:15
118:12 126:11
requests 21:10
26:7 46:14 51:3
51:23 62:10
159:5
required 6:6
reread 69:4,6
resignation 76:8,9
76:11,16 81:14
resigning 78:17
147:17
respect 48:20
142:5 147:23
respects 67:13,14
respond 177:7
178:3,8,25
179:5
responding 30:20
176:16 177:10
179:4
response 24:17,24
26:11,22 27:13
28:1 35:2 36:4
126:14,19
178:13
responses 22:6
23:11 35:23
responsible 29:11
29:14
responsive 27:9

161:24 162:1
restate 119:9
restricted 44:11
resulted 24:3
retain 79:24 80:25
81:9,12
retained 18:7
81:25 83:18
84:7 85:5
retaining 29:12
29:15,16
retitle 41:23 63:1
67:18 68:17
111:22 133:9
retitled 36:21,22
37:5 38:17 62:5
72:23,24 73:2
74:2 75:23 99:9
109:4,5,7,8,11
110:9,10,12,14
110:16 111:1,2
111:3,12,16
113:5,7 122:24
123:9 128:11
133:5 135:19
136:17 148:15
152:23 155:23
retitling 24:3
34:21 36:16,24
40:11 41:6 42:9
43:11,17 44:9
57:24 58:8,15
58:19,20 59:1
60:17,21 61:22
66:9 67:1 68:22
69:1 72:14
96:14,23 97:9
97:15 104:13
113:4 125:15
132:18,24
133:12,16,25
134:13 135:13
135:25 148:25
152:13 156:12
159:7 162:7
return 125:19
126:4,11,20,20
returned 83:1
127:1
revealing 49:5,9
review 17:20
22:12,14 23:17
26:6 30:20
31:11,24 75:6
126:2,6 130:24
146:17 147:8
159:21,23

160:25
reviewed 31:13,15
126:8 137:13,14
159:2
reviewing 22:11
161:14
revise 17:20
revised 38:6
108:10 111:7
157:15 158:6
revisions 130:16
130:21
Richard 2:3 4:22
5:3 86:2
right 7:16 8:17
13:1,6 14:20
15:6,18,25 16:4
17:1 25:10
28:13 31:4,13
39:12 40:3
47:20 51:18
64:15 66:21
68:12 77:9
84:16 89:23
92:6 93:19
95:15 102:18
105:22 106:4,20
112:12 113:12
117:2 118:15
119:6 121:5
122:5 130:10
133:10 134:5,6
137:15 138:10
138:13 142:19
142:21 151:11
151:25 152:4
153:6 159:20
170:4 177:5
right-hand
167:25
Rillo 97:20,21
98:16 100:3,4
102:19,21
104:11 125:15
126:3 174:5,11
176:15,16,18
177:23,24
Rillo's 177:7
Rimland 1:8,11
3:3 4:16 5:1
39:7 45:13
48:19 49:3,4
51:13,16,20,21
59:3 61:8
109:16 110:16
111:3 147:7
156:22 157:13

162:24 176:17
177:24 180:6
Rimland's 174:6
role 19:24 39:9
Romeo 155:19
room 13:7 79:7
139:15 143:18
Roseland 4:7
Rosenbaum 126:1
Rule 44:10 45:3
154:14,25 155:3
rules 5:18,22
run 45:6
Rush 156:21
157:13,25
158:12,18 174:4
174:7

_____
S
_____

S 1:8 2:1 3:7 4:1
4:13
sat 5:5 32:9
saw 23:9 94:10
95:21 159:19
165:16,19,24
172:17 173:8,24
saying 25:11
33:17 49:20
59:13 60:8,10
60:11 74:10,11
84:19 95:1
114:5 122:20
123:15 138:20
144:2 171:25
177:19,20
says 49:10 51:6,7
52:2,3 63:13
65:1 68:10,11
68:11,17 69:5
79:19 80:24
90:2 121:20,25
126:22 137:7
153:12,22
167:24 168:17
170:18 171:5
174:5 178:10,12
scale 13:23 14:11
school 7:11,16
search 24:9,10
27:9,12,21 32:5
33:17 34:2,5,7,9
34:10,13,15,19
searched 33:3,5,6
33:7,8,12,20
searches 32:3,5
32:16 33:24
searching 32:7,19

33:2
second 54:23
65:22 66:1,1
78:12 79:18,19
99:3 124:10
140:6
securities 10:10
10:16 43:25
44:3,8 70:25
71:4 137:10
151:11 152:2,6
153:12 155:5,18
166:21 167:18
169:2,15,18
170:3,7,9,24
171:1,2,11
175:15
securitization
10:11
see 13:18 17:1
24:8 25:20
37:23 56:6
69:11 80:2,7
124:10 127:6,12
127:13 140:3
141:1 147:25
156:20 157:4,16
169:2 172:13
173:1 175:2
176:25
seeing 39:23
124:19 148:5
seeking 41:22
seen 23:5,7 25:22
79:6 95:12
109:10 110:19
114:6,7 124:8
142:4 166:9
167:6,7,17
168:9,10 172:20
172:23,24 173:4
173:22,23
sees 80:6
send 46:1 62:18
62:21 78:5,8,12
79:19,22
sending 36:22
40:7 53:19
73:23
sense 102:19
103:11 111:19
sent 36:20 38:23
46:9 53:16 56:9
72:18,18 73:3
73:10,14 74:14
74:20 75:21
78:1,7,21 80:15

| | | | | |
|---|---|---|---|---|
| 83:11 84:1,5,14 84:16,18,18 97:6 126:5 | 161:9,11 shows 94:18 170:11,12,13 | 129:22 130:11 sorry 8:5 13:5 24:21 27:5 39:2 | 165:20 spring 116:5 134:10,10 137:1 | 105:11 106:17 109:13 114:10 121:11 122:17 |
| sentence 47:8,17 48:12 49:1 50:22 51:11 126:23 | side 12:11,17,18 12:19 15:21 53:17 120:25 121:1 167:12,17 168:11,11 | 72:20 107:3 124:19 126:8 143:3 146:5 162:12 | 162:5 stack 159:14 stamp 93:5 137:8 stamped 163:10 | 129:5 132:22 141:12 156:9 158:4 167:22 170:12 string 157:12 |
| separate 11:23,25 29:2 75:15 77:6 164:11 174:9 | 171:21 Sidley 7:12,16,22 8:13 10:9 | sort 10:18 22:2 30:4 93:4 120:14,15 140:13 | stand 105:15 109:13 124:17 stands 10:22 14:14 | 163:9 178:11 struck 139:18 structure 138:2 structured 10:11 |
| separately 65:19 77:25 sequentially 87:8 served 20:25 | sign 137:5 138:15 139:7 signatory 138:11 138:21 | sounded 94:25 sounds 101:1 sources 155:19 speak 30:2 40:21 | staple 22:24 staples 153:1 started 7:17 9:12 71:4 100:2 | stuff 164:9 sub 120:14,15 subdivide 46:14 51:4,23 52:15 |
| services 29:12,15 29:16 session 5:11 set 5:8 22:6 23:4 28:4 34:13 | signature 75:9 signed 20:5 38:11 75:7 93:22 94:2 94:3,7,13,24 95:3,14,17,19 | 40:23 41:2 47:6 56:19 130:10 131:23 132:21 132:22 137:1 speaking 8:20 | 102:22 103:16 103:20 state 1:19 5:18 21:25 180:4,20 stated 47:22 64:13 | 53:5 62:10 subject 36:17 47:25 86:16 136:1 subsequent 72:12 |
| 35:24 78:12 79:22 84:18 137:6 148:12 152:2 161:25 180:12 | 95:24 112:4 137:8,12 signing 95:11,12 137:14,16 | 13:19 17:24 58:10 59:15 103:11 138:10 speaks 50:25 54:5 | 65:22 83:12 112:11 125:5 131:3,20 141:10 statement 44:17 | 72:13 120:10 141:11,12 164:19 substance 43:9,20 |
| Setting 138:24 140:10 seven 19:10 71:2 71:5 142:17 | similar 142:3 167:13 174:1 simple 59:18,18 59:25 112:25 | 67:12,21,24 109:2 121:21 specific 24:17,17 42:10 50:23 | 52:9,16 62:20 62:22 65:9 95:20 115:21 129:17 130:3,5 | 44:25 101:22,22 substantive 35:2 43:18 suggest 62:4 |
| shares 71:18,20 72:5 89:3 91:1 91:12,23 106:12 114:12 126:17 | simply 99:13 110:18 160:23 single 86:19 sit 28:25 31:23 | 53:24 54:1 55:4 55:8 56:25 57:15 133:18 159:12 162:18 | 130:14 131:3,14 132:1,9 138:12 156:14 173:15 statements 20:8 | suggested 116:3 suggestion 116:7 suing 6:18 suite 11:23,24 |
| 127:9 174:19,21 175:12,18,22 176:1,3,7,20 177:11 178:2,20 178:22 179:1 | 179:11 sitting 13:2 30:24 44:7 114:19 situation 84:24 155:7,8 | specifically 23:10 23:21,25 25:6 26:10 41:20 42:6 44:1 57:7 57:13,17,20,25 | 63:2,9 151:16 151:18 states 1:1 4:14 68:11 127:9 148:7 175:11 | 12:2,8 15:1 summarizing 35:1 summary 101:2 166:8 170:1,24 171:8,9,14,14 |
| sheet 124:16 172:20,24 173:1 173:4,17 Sherman 7:13 8:3 | six 71:5 142:2,8 142:13 143:4,8 sixth 175:11,17 Slash 138:1 | 58:10,11,22,25 97:11 98:14 103:13 115:9 126:13 159:4 | stating 51:2 131:15 138:13 status 147:14 stenographic 1:16 | 171:25 summer 9:17,18 summing 40:14 Sun 129:10,19,22 |
| 8:12,14 10:12 shocked 103:2 short 1:21 2:4 4:11 103:18 | slight 167:3 Smith 40:4,24 42:8,14 43:9,19 56:23 57:15,23 | 161:8 specifics 125:12 speculate 6:6 42:5 42:7,12 53:8,11 | stenographically 180:11 stepfather 6:18 Sterling 7:13 8:3 | 130:11 supplemented 35:18,21 supporting |
| Shorthand 1:19 shortly 9:14,16 94:13,24 126:4 132:9 | 58:14 60:16 61:11,21 69:17 sole 19:21,25 20:1 somebody 16:9 | 53:14 70:19,20 179:7 spell 21:22 split 9:10,15 | 8:12,14 stock 20:10,11 44:11 89:3 114:12 134:16 | 174:22 supports 176:10 suppose 69:21 supposed 174:22 |
| show 37:18 139:24 176:13 177:15 showed 74:10 | 31:25 39:17 47:18 53:17 74:14 95:19 104:23 116:8,10 | spoke 40:23,24,24 41:4 44:24 57:18 102:19 129:23 | 135:3 143:12 174:7,8 175:12 175:18 176:6 straight 101:19 | supposedly 115:17 128:20 129:2 sure 5:12 18:13 |
| 108:24 159:25 160:9 161:5 168:18 shown 160:6 | 118:14 126:14 129:20 177:6 178:3 Sonia 129:10,19 | spoken 40:25 spreadsheet 108:19 163:10 163:19,23 | strike 13:5 18:5 19:16 34:12 41:2 55:9 82:2 96:21 104:4 | 27:19 33:10 42:16 66:18 69:19,20 76:10 |

DOERNER & GOLDBERG, INC.                                                973-740-1100
5 Becker Farm Road * Roseland, NJ 07068       1161 Broad St. * Ste. 110 * Shrewsbury, NJ 07702

84:13 104:16
109:10 111:25
112:24 113:1
118:8 125:7
128:23 131:10
135:12,22 138:2
139:4 144:13
146:11,19 153:3
167:8,11 173:14
173:23,24 179:3
surprise 131:8
surprised 115:15
surprising 115:19
swear 4:20 6:3
sworn 4:3 75:9
180:6
symbol 143:13
system 94:20
136:18,20,22

**T**

T 3:7
table 120:25
121:1
tactic 68:5,12
tag 154:14
tagging 154:14,24
154:25 155:7,10
take 5:13 6:8 8:20
19:23 23:7
25:23 45:6
88:17 104:16
110:17 124:11
135:8 144:1,4
146:14,15,15,16
148:9 155:8
163:13 166:25
172:25 179:9
taken 1:18 180:11
takes 45:9 53:22
89:19 96:3
104:7 110:2
147:3 179:16
talk 9:2 30:5
133:1 145:2
155:4 164:7
talked 30:7 43:24
44:1 58:18
86:10 100:17
102:21 104:23
106:12 132:15
133:20 148:20
152:21 158:21
talking 18:1 25:6
25:8 37:19 57:9
57:22 58:1,2,7
58:13,16 60:15

82:24 83:8
96:25 115:19
120:19 135:25
168:13,14,15
tape 45:5,8,12
89:18,22 110:1
110:5 144:3
146:14 147:2,6
179:23
tell 5:25 6:3 7:1
7:10 27:24
36:12,13 37:18
41:11 42:2
47:21 48:4,7
50:21 53:9,11
57:13 67:18
81:23 83:5
84:21 88:16
94:25 95:4 97:3
97:8,13 99:12
99:13,18 100:24
101:3,5,6,8,12
104:12 116:14
117:18 135:18
141:13 150:19
158:11 162:4,7
170:21,22 175:8
177:21
telling 49:1 58:22
61:10,13 98:22
99:22,24 101:2
101:21 102:16
111:21
ten 23:20,24 71:1
90:11,13,20
91:7,18 92:5,10
123:6 127:18
128:10
term 28:10 100:19
100:22 101:15
149:17,18
terminated 76:1
terminology
155:2 167:4
terms 24:10 28:2
28:5 34:2,9,13
34:15 60:6
62:12 66:11
68:19 80:9
86:22 117:15
162:18
testified 4:3 21:9
24:25 32:9
38:21 55:13
56:13 63:13
65:2 79:8 80:15
83:17,21 86:4

96:12 100:16
102:9 113:10
116:1 118:23,24
127:16 136:13
136:17 139:16
158:23 165:13
172:5
testify 38:13
48:21 49:16
63:17 77:13
138:7 142:1
162:13 180:7
testifying 83:15
88:14
testimony 5:22
38:17 40:7,15
94:23 100:1,4,6
123:7 132:19
138:18 142:6,7
180:10
Thank 43:6
179:19,20
thanks 178:11
thereabouts 95:24
thereof 78:1
thing 30:4,6 62:6
99:6 146:21
149:15 151:9
165:11
things 5:14 14:9
22:11 25:1 30:8
30:9 31:3 67:16
89:25 139:19
140:14 151:14
think 9:16 14:4
24:5,25 25:10
26:3,4,8,25 30:6
38:4 40:13
41:18,24 43:14
43:16 44:4,20
47:2 48:9,15
49:13 50:10,11
50:24 53:10,16
53:18 55:12,12
57:9,12 58:9
59:13,23,23,24
60:5,6 66:25,25
67:8,10,12
73:18,22 80:14
81:11,18,18
84:11 85:23
86:1 93:5 94:24
95:3,21 96:11
100:16 101:2,17
101:21 103:4,6
104:15 112:7
113:10 114:6

115:5,7 116:19
116:23,24,25
135:21 136:13
138:20 139:9
143:11,25
144:19 146:7
147:14 148:17
150:3 151:4,8
151:25 153:1,3
153:4,6 155:25
159:9 160:23
162:2,14,17
163:1 165:24
167:3 169:16,17
175:5 178:18
179:11
thinking 154:21
167:11
thinks 149:14
172:5
third 49:2,6
third-party 48:20
thought 37:14
71:3 141:9
159:15
thousand 13:21
three 7:25 10:1
24:24 25:11
67:6,15 68:20
69:3 87:13,14
87:24 88:20,24
89:8,22 108:2
110:1 144:22
148:18 149:8,9
168:1 170:10
throw 70:12
tie 64:1
Tim 1:11 129:10
129:23 130:20
130:23
time 4:9,17 6:8
8:7,10 17:7 23:8
25:23 26:1 45:8
45:11 50:7
65:14 71:11
82:3,25 88:18
89:18,21 94:8
95:3,8 96:2,5,17
97:12,13 104:6
104:9,10,16,24
105:2 110:1,4
120:6 134:7,12
136:25 139:20
144:1,13 145:16
147:2,5 159:10
165:16,19,24
166:2 179:15,18

179:23 180:11
times 28:15,21
29:2,2 63:13
103:7 148:18
titled 172:21
today 4:8 6:12
25:21 44:7
142:15
today's 5:9
Todd 21:12,19
24:6 25:1 27:21
27:22 28:6,24
158:23 159:1
160:6 162:15,16
163:6
told 26:24 31:23
41:8 49:3 51:21
54:9,25 55:10
58:3 62:25 63:2
74:12 81:18
86:4 95:19
100:6,8,17,21
101:24,25 102:6
102:12 103:13
114:19 116:8
128:15 130:9
136:11 140:11
151:5 152:12
161:24 165:1,2
165:5,8 179:5
tomorrow 178:7
top 169:12 170:19
topic 36:24 42:8
42:19 43:23
50:22 132:7
134:9 141:24,25
142:6,8 143:18
144:10
total 90:9 91:8,23
107:22 108:1
110:25 111:2,3
113:24 123:12
170:14
totalling 45:21
122:12
totals 111:10
tough 162:25
track 166:20
transaction 18:17
18:21,23,25
19:20,24 20:10
20:14,17 21:1
45:16 46:22
62:8 70:11
71:17 72:1
76:18,19 77:1
77:18 78:10

DOERNER & GOLDBERG, INC.
5 Becker Farm Road * Roseland, NJ 07068
973-740-1100
1161 Broad St. * Ste. 110 * Shrewsbury, NJ 07702

80:21 82:9
171:17 174:18
transactional
70:11
transactions 19:6
19:8,12 21:6
78:4 79:24
142:2 143:10
168:22,24
171:12
transcript 1:16
43:6 180:10
transfer 62:17
transferred 149:9
transmit 78:18
transmitted 77:10
77:13,16,19
82:4,14 83:4,23
85:11,15
traveled 7:21
trial 64:1
trick 6:1 142:22
tried 65:18
Troy 78:5,21
97:17,20,21
98:11,15 100:17
102:5,7 103:7
103:11,21
104:11,18
125:15 126:15
126:15 137:14
137:17,22
148:21 152:21
174:5 176:15,16
177:23,24
178:10,15,18,25
Troy's 125:20
true 68:4 85:5,9
85:13,14 86:14
180:10
trust 75:14
truth 6:3,3,7
180:7,7,8
truthful 27:5
try 6:1 9:2,4,4
trying 14:11
50:12 59:23
67:14 69:10
80:18 142:22
165:10
turn 91:3 108:6
153:19 160:2
turned 160:4,7,19
161:12
turning 91:14,25
159:17
twenty-five 87:10

87:24 88:1,21
88:24 89:2,5
90:8 127:8
twice 66:2 70:15
two 5:16 8:20
12:10 23:22,23
24:14 27:14
34:24 35:5 36:4
36:8 41:5 43:9
45:12 54:16
58:9 62:24 63:2
63:8 64:8 68:19
71:15,24 77:21
78:7 85:14
89:18 103:22
161:6 165:4
168:1 174:9
178:13,16
two-page 163:9
type 30:3,10 44:9
types 71:15,25
170:3 174:1
typical 78:8
typically 78:9

_____U_____
UCCs 20:9
Uh-huh 21:13
37:20 38:19
81:3 127:7
160:15 178:9
ultimately 17:10
underlying 71:20
174:19
understand 5:24
6:24,25 7:2,3
9:1,5,25 10:4
12:21 14:11
15:2 22:8,9
24:21 25:25
26:4,25 27:3
28:18 50:6
56:13 60:7,9
71:14 80:13
87:6 95:15
114:13 122:20
125:14 128:21
128:23 139:4
171:24
understanding
13:24 14:9
18:19,20 20:15
20:19 32:2
41:14 48:11
52:12 53:4
71:24 74:21
77:8 78:20,23

79:17 80:16,23
81:15,16 83:20
84:5 85:8 86:10
92:15 94:3 95:2
95:4,23 115:14
137:4 138:8,14
142:25 169:4
understood 21:8
22:19 92:8
unduly 35:5
unfair 100:15
unfortunately
93:3 174:15
United 1:1 4:14
University 7:6
unlock 12:11
unobjectionable
59:25
unquote 94:19
99:13
unusual 41:25
use 61:24 62:1
99:18,19,20
101:9 103:8

_____V_____
vague 35:6
valuation 163:19
164:13,16
165:20 167:5,6
valuations 164:24
values 87:12
variety 50:6
various 76:7
98:23 140:14
147:18 170:2
vast 159:19
Venturini 2:6,6
4:24,24 13:18
14:2,13,17
18:10 21:2,11
21:21 22:10,16
23:6 24:19 25:3
26:13,16,23
27:23 28:4,20
28:25 29:3,21
35:9,14,17
37:13 38:3,8,14
38:25 39:3
40:13 42:20
44:22 46:5 47:9
47:24 48:9,15
49:8,23 50:5,9
50:18 51:6 52:1
52:18,21 53:10
53:22 54:4,11
54:20 56:4

59:12,17,20
60:1,5 61:15,17
63:4,12,18,23
64:7,12,15,19
64:24 65:7,10
65:13,21,25
66:6,15,24 67:9
67:20 68:4,9,24
69:13 71:23
72:2 75:1 76:3
76:10 77:12,15
77:20 80:3,12
80:14 83:7,10
83:24 85:19
86:1,7 87:5
88:17 92:11
93:14 99:1,10
99:17 100:11,13
102:2 105:25
106:4 112:6,12
112:20 115:25
116:18 117:22
120:19,22
121:21 122:2
131:6 132:2
135:17,20 136:2
137:20 138:17
138:19 140:20
141:17 143:24
144:5,11 148:17
149:2,11,16,20
149:23 150:8,13
150:25 151:7,17
151:23 152:8,15
152:18 155:14
156:13,19 159:9
159:18,20 160:3
160:5,7,20,24
161:1,12,15,21
162:10,13,25
163:7 164:14,17
165:9,11,22
166:1 167:2
170:16 171:3
172:4,10,22
173:9,21 179:11
179:20
verbal 44:21
139:17,20
140:13
verbalize 55:23
verbiage 99:19,21
101:13
versus 4:13 50:12
vertically 168:8
Video 2:10 4:7
VIDEOGRAP...

2:9 4:6 45:7,10
89:17,20 96:1,4
104:5,8 109:25
110:3 147:1,4
179:14,17,22
VIDEOTAPED
1:7
viewed 43:16
vs 1:7

_____W_____
W 109:13
Wait 99:1 172:22
waive 135:22
waived 49:17,18
waiver 48:22,23
50:16 116:22,24
141:21 163:1
walk 15:17 16:20
16:21
walking 12:3 16:6
16:18
want 6:2,2,6,7
25:16 27:5,8
29:17 42:11
50:18 54:6
57:12,13 60:10
61:7,8,12 63:25
64:11 69:4,6
70:20,21 73:25
81:21 84:11,23
88:7,14 96:6,7
105:13,14 108:6
108:7,16 112:24
122:5 128:23
135:21 141:1
144:12 146:20
153:3 154:8
164:7,10 165:7
165:8 168:19
173:14 174:25
176:5 179:8,9
wanted 147:17
wants 90:6 132:4
war 103:24
warrant 38:6
87:10,11,11,12
87:13,15,24
88:21,25 89:2,3
89:4,5 90:9,23
90:24,25 91:11
91:12,22,22
93:9 106:11
108:10 111:7
127:5,8 154:15
155:8,9,11
157:15 158:6

| | | | | |
|---|---|---|---|---|
| 163:19 169:24 174:7,8 | 111:4,12,16,22 111:22 112:2,3 | 36:1 week 36:1 79:19 | 19:15,16 21:4,5 118:17,18 | 83:1,4,23 84:1,5 84:9,15,19 90:5 |
| warrants 24:4 | 112:13,17 113:3 | 79:22 151:15 | 142:16 | 96:15,22 97:3,7 |
| 34:21 36:17,20 | 113:5,6,7,13,25 | went 7:15 9:8 | working 19:19,22 | 97:14 99:15 |
| 36:21,23,24 | 114:2,3,4,9,11 | 34:6 55:9 119:2 | 93:12,15,17 | 102:11 104:13 |
| 37:5,17 38:7,9 | 114:15,16,22 | 119:23 120:25 | works 15:22 | 105:12 106:7,17 |
| 38:10,18,23 | 115:4,6,8,11,18 | 121:12 136:18 | 158:3 171:12 | 107:7,17 108:4 |
| 40:12 41:7,13 | 115:24 116:3,9 | 159:20 | worth 13:20 | 119:3,23 120:3 |
| 41:23 42:1,3,9 | 116:15,16,25 | weren't 135:11 | wouldn't 43:13 | 121:2,7,13 |
| 43:11 44:9,16 | 117:3,11,14,15 | west 15:24 | 48:22 106:5 | 122:14,18,25 |
| 45:16,21,21 | 117:19 118:9,13 | We'll 13:21 | 131:8 149:5 | 139:3 145:4,10 |
| 46:8,14,14 50:2 | 118:15,21 119:6 | we're 5:9 15:4 | wrap 166:2 | 148:14,20,24 |
| 50:4 51:3,4,23 | 120:1,2,3,4,8,13 | 45:4,10 82:24 | write 47:23 | 150:20,22 151:9 |
| 51:24 52:7,11 | 120:14 121:7,10 | 89:16,20 96:4 | 149:25 | 152:10,20 |
| 52:15,17 53:5 | 121:18 122:7,10 | 104:4,8 110:3 | written 111:12 | 167:12 |
| 53:20 55:10,11 | 122:11,13,18,21 | 111:21 120:19 | 120:20 122:22 | |
| 55:13 57:4,5,6 | 122:24 123:5,6 | 135:22,25 | 148:8 | **Z** |
| 57:11,19,24 | 123:9,11,13,19 | 146:24 147:4 | wrong 20:16 | zero 17:3 |
| 58:8,12,15,19 | 123:19,25 | 166:2,4 179:17 | 66:10 118:19 | |
| 58:20,24 59:2 | 125:16,20 126:4 | we've 86:17,25 | 170:21,21,22 | **0** |
| 60:17,21 61:22 | 126:12,16,20,21 | 87:14 88:1 | wrote 51:11 68:16 | 05 73:1,10 164:4 |
| 62:5,7,10,10,12 | 126:25 127:11 | White 39:7,7 41:1 | 71:11 117:13 | 164:11,20 |
| 62:13,18,18,21 | 127:18 128:1,10 | 44:25 45:15 | 149:24 | 06 82:25 93:13 |
| 63:1,10 64:18 | 128:11,12,13,17 | 46:9 51:21 | | 102:10 137:1 |
| 65:5,23 66:5,10 | 128:19 129:1,6 | 56:23 57:15,23 | **X** | 146:10 |
| 66:11,12 67:1 | 129:21,25 131:5 | 58:14 60:16 | X 3:7 | 06-5212 1:2 4:15 |
| 67:19 68:17,18 | 131:16,21,25 | 61:11,21 69:17 | XHUA 143:12 | 07 71:3 |
| 68:19,23 69:1 | 132:18,24 133:5 | withdraw 22:21 | Xinhua 143:12 | 07078-0999 2:4 |
| 69:11 70:14 | 133:9,12,16 | 31:2 99:11 | 144:17,19,20 | 08 71:4 |
| 71:21 72:10,10 | 134:1 135:4,14 | 116:2 | XI00970 180:21 | |
| 72:15,16,17,19 | 135:19 136:1,17 | withdrawn 132:9 | | **1** |
| 72:19,22,23,24 | 136:22 139:1 | 132:11,13 | **Y** | 1:31 96:5 |
| 72:25 73:2,9 | 141:15 142:10 | witness 3:2 4:16 | YAM 78:2 122:24 | 1:42 104:6 |
| 74:2,11,13,15 | 143:5,6,21 | 4:20 5:19 39:5 | 170:25 | 1:50 104:9 |
| 74:17,19,23 | 148:15 149:1,6 | 44:23 50:9 | yeah 13:9 76:24 | 1:59 110:1 |
| 75:13,14,16,22 | 149:7 150:4,5,6 | 59:13 64:4 | 93:20 118:22 | 10 92:16 94:4,7,11 |
| 81:5,10,13,25 | 150:20 151:2,5 | 67:25 68:10,15 | 121:23 170:12 | 94:20 95:22,24 |
| 83:6,18 84:7,10 | 152:14,23 | 83:12,15 | 175:5 | 136:21 145:15 |
| 85:6,17 86:5,16 | 153:14 154:1,5 | wondering 32:11 | year 8:4,9,15 | 10th 95:18 |
| 86:23 87:10 | 155:16,24 | word 34:5 56:6 | years 6:16 7:25 | 10:29 1:22 4:9 |
| 88:1,2 89:10 | 156:12 157:3 | 61:24 62:1,3 | 71:1,5 | 100,000 107:23,24 |
| 90:1,11,11 91:5 | 159:8 162:6,7 | 98:15,19,20,21 | Yep 105:21 | 120:1,2 123:5 |
| 91:16 92:3,10 | 164:24 169:5 | 99:20 102:1 | yesterday 5:5 | 123:18 |
| 96:14,24,25 | 170:14 171:6 | wording 80:6 | 21:9 37:15,17 | 100,080 105:11 |
| 97:1,10,15 | 172:3 174:24 | words 12:18 | 67:23 79:7 | 106:8 107:9,18 |
| 98:23 99:14 | 176:2,4,10 | 13:21 34:5,10 | 86:18 127:16,20 | 121:7 |
| 100:7 103:3 | wasn't 67:23 86:7 | 36:14 73:6 | 138:7 139:16 | 10169 2:7 |
| 104:14,14 | 93:17,19 103:14 | 98:17 101:9 | 142:2 144:9 | 11 75:12 |
| 105:20,23 106:8 | 163:25 | 115:13 | 163:25 | 11:27 45:8 |
| 106:14,18,22 | water 44:22 | work 5:17 7:15 | York 1:9,10 2:7,7 | 11:38 45:11 |
| 107:1,4,9,12,15 | way 9:3 16:19 | 10:7,10 30:3,10 | 4:2,3 7:14,23,24 | 12 137:7 |
| 107:18 108:1,3 | 22:24 62:16,20 | 30:14 32:9 71:5 | 21:25 | 12th 11:19,21 |
| 108:4 109:4,7 | 92:23 108:8 | 94:25 134:24 | Yorkville 1:3 4:12 | 14:21 15:3,4 |
| 109:11,23 | 111:12,23 | 158:1,2 | 10:20 18:8 76:1 | 12:37 89:18 |
| 110:10,10,11,12 | 121:16 152:22 | worked 7:12,13 | 77:11,19 78:2 | 12:39 89:21 |
| 110:13,14,15,16 | 157:25 167:24 | 8:6,13,14 9:8,22 | 78:19 80:11,22 | 12:48 96:2 |
| 110:25 111:1,2 | Wednesday 35:25 | 18:17,21 19:6 | 81:24 82:14 | 1243 175:10 |

DOERNER & GOLDBERG, INC.                                    973-740-1100
5 Becker Farm Road * Roseland, NJ 07068      1161 Broad St. * Ste. 110 * Shrewsbury, NJ 07702

**1274** 137:8
**13** 146:1 147:8
**13.52** 113:17
  123:12 128:12
  128:13 157:2
  158:18
**132,500** 128:13
**135,200** 110:25
  113:13 123:11
  123:19
**14** 39:6 40:8 54:3
  56:2 96:8 108:7
  111:8 112:22
  117:13 121:16
  134:5 157:19
  158:7 160:17
  161:9 166:8
  168:10 176:19
  177:24
**144** 44:10 45:3
  154:14 155:1,3
**15** 6:16
**150** 1:20 2:4 4:11
**159,840** 106:21
  108:3
**16** 45:16 62:7
  153:13
**17** 93:18 131:14
  153:9,22 154:3
  154:7,21 174:4
**180** 105:11
**180,000** 90:6,16
**19** 75:10 76:12
**1991** 7:7
**1997** 7:7
**1998** 7:17

— **2** —

**2:16** 110:4
**20** 128:1,4,6,16
  143:25 174:21
  175:11,17,19,22
  176:20 177:10
  178:1,19,22,25
**20,000** 89:10
  90:11,12 91:16
  92:2 105:10,20
  106:25 107:12
  107:23,24,24
**200,000** 89:3 90:9
  90:13 91:12,19
  91:23 92:2
  127:9
**200,160** 106:18
**2000** 156:4
**2001** 8:1,14
**2002** 8:16,17 9:12

**2003** 9:13,13,17
  9:18
**2004** 17:7,12,18
  17:24
**2005** 45:16 62:7
  139:19,23,24
  140:12 141:12
  141:13 153:9,13
  153:22 154:7
  163:18 166:8,13
  167:14 172:21
**2006** 1:22 4:8 37:8
  39:6 54:3 56:2
  76:2,12 85:10
  96:8,13,18,21
  96:21 97:8,13
  98:16 102:19,22
  103:12 104:10
  104:12 111:8
  116:5 117:13
  122:21 128:9,14
  129:14 130:14
  131:14 136:21
  146:1 147:8
  149:1 152:12
  154:6 156:22
  158:7 160:17
  161:9 162:6
  174:4 177:25
  180:22
**2007** 10:5
**2008** 180:21
**22** 1:22 4:8
**230** 2:7
**24** 105:8 119:16
**25** 86:12 90:22
  119:18
**26** 86:12 119:18
  126:5,16 128:14
  129:5 141:5
  180:22
**27** 86:12 119:19

— **3** —

**3** 180:21
**3:15** 147:2
**3:31** 147:5
**30** 160:11,19
**31** 172:21
**380,000** 111:2
**399,600** 108:1
  120:3

— **4** —

**4** 3:4
**4:21** 179:15
**4:26** 179:18,23,25

**40** 30:1 160:13,19
**40,000** 91:5
  106:13 107:24
  111:3 114:9,12
  114:14,16 115:3
  115:17,24 117:3
  117:5,6 127:11
**400,000** 90:25
  106:12
**43** 3:13
**44.4** 90:17
**44.48** 121:18,25
**444,800** 111:5
  122:12 126:17
  126:21
**488** 4:2 11:13 15:3

— **5** —

**5** 145:25 146:2
**50** 87:11 90:23,25
**500,400** 108:4
  120:3 122:18
**51** 110:7
**52** 110:7
**53** 110:7 136:16
  152:22

— **6** —

**6** 167:14
**6/14/06** 55:22

— **7** —

**75** 87:11 91:10
**785** 107:3
**79,920** 90:1,17
  105:10,23 107:4
  107:15 108:2

— **9** —

**9** 156:22 157:9
**97** 7:19
**98** 7:20 8:8,14

DOERNER & GOLDBERG, INC.    973-740-1100
5 Becker Farm Road * Roseland, NJ 07068    1161 Broad St. * Ste. 110 * Shrewsbury, NJ 07702