**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

BUDD LARNER, P.C.
Michael M. Rosenbaum, Esq. (MR-6304)
150 John F. Kennedy Parkway, CN1000
Short Hills, New Jersey 07078-0999
(973) 379-4800
Attorneys for Plaintiffs

|  |  |
|---|---|
| YORKVILLE ADVISORS MANAGEMENT, LLC, a Delaware limited liability company; HIGHGATE HOUSE FUNDS, LTD., a Cayman Islands exempted company,<br><br>           Plaintiffs,<br><br>      vs.<br><br>ADAM S. GOTTBETTER; HH ADVISORS, LLC, a New York limited liability company GOTTBETTER AND PARTNERS LLP, a New York limited liability partnership; JASON RIMLAND, ESQ.; TIM L. DOCKERY, ESQ., and MICHAEL CHORSKE,<br><br>           Defendants. | Civil Action No. 06-5212 (JAG)<br><br><br>**REPLY AFFIDAVIT OF MARK ANGELO** |

STATE OF NEW JERSEY    )
                            ) ss.:
COUNTY OF HUDSON     )

MARK ANGELO, of full age, being duly sworn upon his oath, hereby deposes and says:

1.     I am managing member of Yorkville Advisors, LLC, successor to Yorkville Advisors Management, LLC ("Yorkville"). In this role, I supervise all Yorkville employees (including all bankers employed by Yorkville) who are responsible for producing transactions for Yorkville-managed funds, including Highgate House Funds, Ltd. ("Highgate House"). This affidavit is being

1

submitted in response to Defendants' opposition papers and in further support of Plaintiffs' application for a preliminary injunction.

### Summary

2.      I will address Defendants' allegations in detail below.  However, I summarize the contents of this affidavit as follows:

a.      The 1,000,000 Charys Warrants ("Charys Warrants") in issue, which were improperly converted by Defendants to their own names, were issued and registered *in the name of Highgate House Funds, Ltd.*  Discovery has confirmed that Defendants converted some of those Warrants to their names in June 2006.  But this conversion was not recognized by Charys as reflected by a Registration Statement it filed with the Securities and Exchange Commission on October 17, 2006.  That Registration Statement indicated that all of the 1,000,000 Charys Warrants were still owned by and registered in the name of Highgate House Funds, Ltd.

b.      Mr. Gottbetter's claim that I made a verbal agreement with him in June 2005 that future Warrants "could" be issued directly to HHA (see Gottbetter Aff., ¶15) is not true.  This is best reflected by Mr. Gottbetter's June 1, 2005 memo to me in which he memorialized our conversations.  That memo contains no mention whatsoever of a June 2005 agreement Mr. Gottbetter claims allowed him to transfer the Charys Warrants a year later in 2006.

c.      On January 9, 2006, Mr. Gottbetter resigned from his engagement with Yorkville and also as a director of Highgate House.  We learned through discovery that the very next day, January 10, 2006, Mr. Gottbetter executed "Assignments" of the Charys Warrants on behalf of Highgate House.  Mr. Gottbetter did not have any authority to execute such documents on

behalf of Highgate House absent my approval when he was employed by Yorkville; he certainly lacked any authority to execute such documents *after he resigned.* Significantly, we were neither apprised of nor given copies of those Assignments until discovery.

d.      We also learned during discovery that Defendants waited until June 14, 2006 to effectuate the Assignments. On that date, G&P emailed Charys advising it that the firm was holding the Charys Warrants in "escrow" and allegedly had authority to cause them to be reissued. However, in fact, G&P was *not* holding the Charys Warrants in escrow, and never received permission from Yorkville or Highgate House to have the Warrants reissued. Significantly, Defendants did not provide us with a copy of the June 14, 2006 Email either when it was sent or during discovery. Rather, my attorneys obtained it from Charys. See Reply Affidavit of Michael M. Rosenbaum, Esq., Exhibit E.

3.      In summary, the Defendants simply stole the Charys Warrants by secretly executing Assignments on behalf of Highgate House, which they had no authority to do, and thereafter secretly telling Charys in their June 14, 2006 Email that G&P served as escrowee with the authority to direct Charys to reissue the Warrants, a statement Defendants now admit was false.

### The Charys Warrants Were Issued to and Owned by Highgate House

4.      On November 16, 2005, Highgate House purchased a $4 million Convertible Debenture from Charys for which Charys issued to it the 1,000,000 Charys Warrants in question. Those Charys Warrants, which are attached to the Verified Complaint as Exhibit C, were issued to and registered in the name of Highgate House.

5.      Section 10(g) of the Securities Purchase Agreement (Verified Complaint, Exhibit B) expressly prohibits the assignment of any rights "without the prior written consent of the other party

hereto." At no time did we ever provide Defendants with any authority, written or otherwise, to assign the Charys Warrants. Nor, to the best of my knowledge, did Charys ever give its written consent to allow Defendants to assign the Charys Warrants to themselves.

6. The Charys Warrants were exercisable into shares of Charys common stock. Accordingly, at the time of Highgate House's investment in Charys, an Investor Registration Rights Agreement (Exhibit A hereto) was entered into which required Charys to file a Registration Statement with the SEC to enable the "Investor" – Highgate House – to resell the shares of stock underlying the Charys Warrants. Notwithstanding Defendants' transfer of the Charys Warrants in June of 2006, a Registration Statement was filed by Charys on or about October 17, 2006 (Verified Complaint, Exhibit E) which indicated that Highgate House was still the record owner of all of the 1,000,000 Charys Warrants.

7. Significantly, the shares of stock to which the Charys Warrants could be converted were also to be registered only in the name of Highgate House. This is made clear in Section 6 of the Stock Purchase Agreement, which states that the escrowed shares "shall be … registered in the name of the buyer," which is Highgate House.

8. In short, Highgate House was the sole owner of the Charys Warrants and was to be the sole owner of the shares to which the Warrants would be converted.

## Defendants Secretly Assigned the Charys Warrants

9. On January 9, 2006, Gottbetter submitted a letter of resignation (Exhibit B hereto). Although the resignation was effective 10 days thereafter, Gottbetter ceased performing work on behalf of Yorkville effective January 9, 2006.

4

10.     We learned during discovery that on January 10, 2006, the day after he resigned, Mr. Gottbetter prepared and executed Assignments of the Charys Warrants to HHA, Chorske and Yorkville. He executed those Assignments on behalf of Highgate House. But Gottbetter was never an employee of Highgate House and never had authority to execute any documents on its behalf absent my knowledge and agreement. Certainly he had no authority to execute those Assignments after his January 9, 2006 resignation letter. And most importantly, he never advised us of the Assignments, and did not give us copies.

11.     Gottbetter's secret execution of the Assignments is especially egregious in view of his January 11, 2006 email (Exhibit C hereto) in which he stated that he would advise us of any action he intended to take with respect to Yorkville or Highgate House between January 9, 2006 and January 19, 2006. The January 11, 2006 email specifically states: "We will of course advise you in advance of any action we propose to take during this time period, if any." Yet Defendants did *not* advise us that they had executed Assignments of the Charys Warrants the day before.

12.     On January 13, 2006, Mr. Gottbetter sent me a comprehensive 7-page letter purporting to summarize the status of all outstanding Highgate House portfolio issues, including Charys (Exhibit D hereto). Nowhere in that letter did Mr. Gottbetter indicate that three days earlier he had executed Assignments of the Charys Warrants.

13.     Moreover, in the fourth paragraph of his January 13, 2006 letter, Mr. Gottbetter specifically stated that absent our written permission, he would take no "material actions" which would have a "material effect" on Highgate House – except as set forth in that letter. Remarkably, Mr. Gottbetter's January 13, 2006 letter made no reference to the fact that he had executed

5

Assignments of the Charys Warrants on behalf of Highgate House, which is obviously a "material action" that would have a "material effect" on Highgate House.

14.     Mr. Gottbetter's deceit did not stop with his execution of the Assignments. In the second paragraph of his January 13, 2006 letter, Mr. Gottbetter stated that G&P would send back to us a "full set of originally executed documents" for all of the transactions on which G&P had worked for Highgate House (which would include Charys because G&P represented Highgate House in that transaction). G&P later sent back the Charys closing binder which, based on the January 13, 2006 letter, we presumed contained all original documents, including the original Charys Warrants. Notably, the closing binder did not include copies of the Assignments purportedly executed just days earlier, and Mr. Gottbetter did not otherwise advise us that the Charys Warrants had been assigned. In fact, the binder contained the full complement of our 1,000,000 Charys Warrants.

15.     It wasn't until mid-October 2006 that we discovered that Mr. Gottbetter did not return the original Charys Warrants in the closing binder, but rather returned only copies. Contrary to his January 13, 2006 letter, he retained the original Charys Warrants even though they were registered in the name of Highgate House.

### Defendants Secretly and Fraudulently Had the Charys Warrants Reissued

16.     Defendants' fraud culminated on June 14, 2006, when the G&P law firm, claiming to be an "escrow agent" of the Charys Warrants, sent an email to Charys requesting reissuance of the Charys Warrants to HHA, Chorske, Rimland and Highgate House. G&P did not send us a copy of this email when it was written. Moreover, during discovery, Defendants withheld production of this email despite requests for all communications relating to the reissuance of the Charys Warrants. My attorneys obtained a copy of this email from Charys. See Rosenbaum Reply Affidavit, Exhibit E.

6

17.     Plaintiffs had no knowledge of either the January 10, 2006 Assignments or the June 14, 2006 Email to Charys.  Had we been told of either, we would have advised Charys that Mr. Gottbetter had no authority to be in possession of, assign, or cause to be reissued the original Charys Warrants.  Since we were kept in the dark about these events, we had no ability to halt the reissuance of the Charys Warrants.

18.     G&P's June 14, 2006 Email is remarkable in at least two respects.  First, contrary to its representation to Charys that G&P was holding the Charys Warrants in "escrow," G&P was *never* designated as an escrow agent of the Warrants.  Defendants have now admitted that G&P was *not* serving as escrow agent of the Charys Warrants.  See Rimland Aff., ¶ 11; Gottbetter Dep. at 145-146, 149, 158 (Rosenbaum Reply Aff., Exhibit F); Rimland Dep. at 51-52, 62 (Rosenbaum Reply Aff., Exhibit G).  G&P's statement to Charys that it was holding the Charys Warrants in escrow was obviously made to make Charys believe that the reissuance of the Warrants would be legitimate.

19.     Second, the June 14, 2006 Email also refutes the statements in Mr. Gottbetter's and Mr. Rimland's affidavits (Gottbetter Aff., ¶57; Rimland Aff., ¶11) that the Charys Warrants were being held by HHA rather than G&P.  Indeed, the email itself (which was written by Mr. Rimland of G&P) forwarded the original Charys Warrants from G&P to Charys; and the email specifically stated that G&P was holding the Charys Warrants in escrow.

20.     Section 3.1 of the Charys Warrants does not permit an assignment unless there is an investment representation letter and legal opinion issued which are reasonably satisfactory to Charys.  None of the documents produced by Defendants indicate that Defendants provided Charys with either an investment representation letter or a legal opinion satisfactory to Charys when they requested the Reissued Warrants on June 14, 2006.

7

## The Blatant Inconsistencies in Defendants' Conversion of the Charys Warrants

21. The Defendants have made no less than three different calculations of the reissuance of the Charys Warrants. It seems that every time Defendants calculate the transfer of the Charys Warrants, their calculations are different.

22. The Assignments secretly executed on January 10, 2006 purported to assign the Charys Warrants as follows:

> ➢ 100,000 Warrants to Chorske
> ➢ 399,600 Warrants to HHA
> ➢ 500,400 Warrants to Yorkville

23. But in a chart attached to G&P's June 14, 2006 Email to Charys requesting reissuance of the Warrants, a different allocation was given. That Chart requested reissuance of the Charys Warrants as follows:

> ➢ 135,200 Warrants to Chorske
> ➢ 40,000 Warrants to Rimland
> ➢ 380,000 Warrants to HHA
> ➢ 444,800 Warrants to Highgate House

24. However, on October 26, 2006, Mr. Gottbetter wrote to us with yet a third calculation of the Charys Warrants that he claimed had been reissued. Verified Complaint, Exhibit K. That letter indicated that the Warrants had been reissued as follows:

> ➢ 200,000 Warrants to Chorske
> ➢ 355,200 Warrants to HHA
> ➢ 444,800 Warrants to Highgate House

Notably, the October 26, 2006 letter concealed from us the apparent fact that 40,000 Charys Warrants had been given to Rimland (which itself is improper because, even if the Assignments were valid, no Assignment had been executed in his favor).

8

25.     Apparently in their haste to improperly convert the Charys Warrants, Mr. Gottbetter and the remaining Defendants could not even calculate the amount of Charys Warrants they wanted converted the same way twice.

## There Was No Oral Agreement to Have Warrants Issued Directly to HHA

26.     Mr. Gottbetter claims that in June 2005 – five months before the Charys Transaction even closed – I agreed that warrants "could" (his word) be issued directly to HHA in connection with future Highgate House investments.  Gottbetter Aff., ¶¶13-22.  Mr. Gottbetter claims that this agreement was made at the same time that I agreed to accelerate the increase of his Net Profit participation from 40% to 44.4% of Yorkville's profits.  This claim is completely false and is belied by Mr. Gottbetter's own written communications to me.

27.     I did have conversation(s) with Mr. Gottbetter relating to increasing his profit participation from 40% to 44.4%.  But I never agreed that future warrants could be issued directly to HHA.

28.     The best evidence of the issues discussed with Mr. Gottbetter is his June 1, 2005 memo to me (Gottbetter Aff., Exhibit A) in which he confirmed our discussions.  As noted in that memo, I agreed to increase Mr. Gottbetter's profit participation from 40% to 44.4%, and further agreed to make an offer to Mr. Chorske to be a banker for the purpose of sourcing transactions, among other things.  But Mr. Gottbetter's June 1, 2005 memo is conspicuously *silent* as to any alleged agreement concerning issuance of warrants to HHA – because there was no such agreement.

29.     Interestingly, Mr. Gottbetter says in his Affidavit that I agreed on "two key items" in or around June 2005, which included the increase in his profit percentage and the issuance of warrants to HHA.  Gottbetter Aff., ¶13.  Yet, as noted above, Mr. Gottbetter's *own memo* confirmed

9

only *one* of those items, namely the agreement to increase his profit participation. There are no writings whatsoever confirming any agreement that warrants could be issued directly to HHA. Again, there are no such writings because we agreed to no such thing.

30.    Notably, G&P represented Highgate House in the Charys Transaction and drafted all of the deal documents. Thus, if there was some standing agreement allowing warrants to be issued directly to HHA or Chorske, Defendants were in a unique position as the drafter to ensure that the deal documents reflected as much. Yet, here, they drafted the Charys deal documents reflecting *Highgate House* as the record owner of the Charys Warrants -- further evidence that there was no June 2005 oral agreement.

## Fees on "Equity" Are Paid Only After Warrants Have Been "Monetized"

31.    I would never have made an agreement allowing warrants to be issued in individual names, because Yorkville's longstanding policy and practice is that we do not allow warrants to be issued "in kind" to bankers or portfolio managers.

32.    Bankers who produce the transactions are normally entitled to fees, including payments of "cash" and "equity". However, the "equity" portion of the fee is *not* paid by the bankers receiving warrants in their individual names, because Yorkville is concerned that the bankers could harm the Fund by "front running" or "trading ahead" of the Fund. If warrants were issued directly to a banker, it would enable him to exercise the warrants and sell the underlying stock in advance of the Fund's ability to do so. Since generally we invest in very small public companies with thinly-traded stock, the banker's sale of these shares would cause the stock price to drop, thereby reducing the value of the *Fund's* warrants.

33.     Because of this potential conflict of interest, the "equity" portion of a banker's fee is paid by Yorkville only after the equity has been "monetized" by the Fund. A warrant is "monetized" when the Fund exercises the warrant and then sells the underlying stock. At that point, *Yorkville* will generally pay a bonus to the banker based on a percentage of the proceeds received by the Fund from the sale of stock. No part of the bonus is paid by *the Fund*. This same policy and practice applies to portfolio managers. See Affidavits of bankers, portfolio managers and partners contained in the accompanying Affidavit Binder.

34.     Defendants were well aware that warrants were never issued directly to individual bankers or managers. This is reflected by the fact that they participated in numerous deals in which warrants were issued, and in each instance the warrants were issued to the Fund (or in one instance to a Highgate House subsidiary, Staraim Enterprises Limited) and never to HHA or any individual. Annexed hereto as Exhibits E-J are copies of all warrants issued during HHA's engagement. Notably, some of these warrants were issued after June 2005, which is when Mr. Gottbetter claims we agreed that future warrants could be issued to HHA – yet *none* of them were issued to HHA.

35.     Referring to paragraph 3 of his June 1, 2005 memo, Mr. Gottbetter notes that Mr. Chorske's compensation was to include "banker fees of cash and equity on Highgate financings," and he argues that that the use of the word "equity" meant that Mr. Chorske was to receive warrants in his name. This is not so. As noted above, the reference to equity simply meant that Mr. Chorske would be entitled to a percentage of the *monetized value* of the warrants. In fact, Mr. Chorske served as a banker on three transactions – Advaxis, Xinhua and Charys – and all of the warrants issued in those transactions were issued in the name of the Fund. See Exhibits K, L hereto and Verified Complaint, Exhibit C.

11

## The November 1, 2004 Agreement Precludes Payment of Warrants to HHA

36.     Mr. Gottbetter argues that the November 1, 2004 Agreement among himself, HHA, and Yorkville ("the Sub-Manager Agreement") contemplates the issuance of warrants directly to HHA as compensation.   This is simply incorrect.

37.     Section 2 of the Sub-Manager Agreement states that HHA will receive 40% (later increased to 44.4%) of Yorkville's "Net Profits" in connection with Highgate House investments. However, the Sub-Manager Agreement expressly states that "[a]ll fees and compensation payable in connection with an Investment or related to the Funds *shall be paid exclusively to the Company [Yorkville]*." Verified Complaint, Exhibit A, § 2(a) (emphasis added).

38.     Thus, the Sub-Manager Agreement explicitly precludes fees or compensation from being paid directly to HHA; all such fees and compensation were to be paid in the first instance to Yorkville.   Once Yorkville earns its compensation, it would then pay HHA its 44.4% Net Profit participation as Co-Manager, as set forth in Section 2(a) of the Sub-Manager Agreement.

39.     The term "Net Profits" was defined to mean the difference between all revenue earned by Yorkville from investments made by the Highgate House Fund, including revenue earned from "cash, common stock, debentures, warrants, and/or any other security"; reduced by any and all expenses incurred by Yorkville with respect to the funds.   However, the reference to "common stock, debentures, warrants, and/or any other security" simply meant that revenues earned by Highgate House from all sources, including by investing in or selling securities, would be part of Yorkville's revenues for purposes of determining "Net Profits."

40.     There is no provision in Section 2 or anywhere else in the Sub-Manager Agreement that states that HHA would or could receive *title* to warrants as part of its compensation.   The

12

compensation provisions in Sections 2 were comprehensive and did not state that HHA could receive warrants directly as a fee.

## The Charys Warrants Were Always Carried on Highgate House's Books as Its Asset

41.     Through a tortured analysis of unaudited monthly reports, Defendants claim that the Charys Warrants were not considered assets of Highgate House. This is simply untrue. As detailed in the accompanying Reply Affidavit of Edward Schinik (Yorkville's CFO), the Charys Warrants were included as an asset on Highgate House's books and were included in the Fund's net asset value as of December 31, 2005.

42.     Mr. Gottbetter also contends that the Charys Warrants – which were already registered in Highgate House's name – were somehow taken by Yorkville and then recontributed to Highgate House to increase the fund's net asset value. See Gottbetter Aff., ¶¶ 65-66. This is also untrue. In early 2006, Yorkville did remit approximately $2 million of its *cash* fees to Highgate House, which was a portion of the Yorkville fees on account of Highgate House transactions. However, this cash contribution had nothing to do with the Charys Warrants since those Warrants were already a Highgate House asset included in its books and records.

## The Prentice Capital Transactions

43.     Defendants argue that Yorkville "expressly approved the issuance of warrants to HHA in three analogous transactions," Gottbetter Aff., ¶ 45, namely, Oxford Ventures, Inc./Uluru, Inc., Cenuco, Inc., and FirstLook Studios, Inc., Id., ¶¶ 46-56. Defendants cite to these transactions as supposed evidence of a course of dealing. However, these transactions are *not* "analogous" to Charys at all, because they all involved a co-investor, Prentice Capital, which made each deal much

13

more complex than the Charys transaction and Highgate House's other transactions. Mr. Gottbetter acknowledges this fact (Gottbetter Aff., ¶ 50).

44.     Oxford/Uluru. This is an October 2005 deal in which Prentice invested $10 million in Oxford Ventures and Highgate House invested $3 million. In return, Prentice received 3,833,333 warrants and Highgate House received 1,166,667 warrants – a total of 5,000,000 warrants ("Oxford Warrants").

45.     When the deal closed in October 2005, Highgate House received 1,166,667 Oxford Warrants in its own name (Exhibit M hereto) and still owns them. However, Prentice had been introduced to the Oxford transaction by Gottbetter (HHA) and Chris Maloney, a banker employed by Yorkville, and so HHA and Mr. Maloney were expecting agency or banker's fees from Prentice. But it was not until *after* HHA resigned from Yorkville in January 2006 that Mr. Gottbetter started suggesting that HHA and Maloney receive title to some of the Oxford Warrants as fees.

46.     However, my understanding was that they were discussing receiving warrants *from Prentice*. I did not understand those discussions to mean that anybody would be receiving title to any of *Highgate House's* 1,166,667 Oxford Warrants. At one point, Mr. Maloney came to me and said that Highgate House would receive 1,518,933 Oxford Warrants, HHA would receive 414,400, and Prentice would receive a lowered amount of 3,066,667. How these calculations were arrived at was irrelevant to me. I told Mr. Maloney that I did not care what anybody else received so long as Highgate House received its 1,166,667 Oxford Warrants. I would add that *I* never agreed to the calculations set forth on the Oxford "spreadsheet" referenced in Mr. Gottbetter's affidavit.

47.     For his part, Mr. Maloney understood that he would not receive any Oxford Warrants directly in his name, in accordance with our normal policy. In fact, Mr. Maloney specifically told the

14

Defendants that he did not want any Oxford Warrants put in his name individually. See Gottbetter Aff., Exhibit L [March 30, 2006, 12:05 p.m. email from Timothy Dockery to Jason Rimland]; Venturini Aff., Exhibit R [Maloney Dep. at 40-41, 62, and 71-72].

48.    As I understand it, Oxford supposedly issued additional Warrants on or about March 31, 2006 as follows: 1,518,933 to Yorkville; 414,400 to HHA; and 3,066,667 to Prentice. I considered the issuance of Oxford Warrants *to Yorkville* to be an error; the warrants should have been issued to Highgate House as the investor. Accordingly, we subsequently assigned 1,166,667 warrants back to Highgate House. I would note, however, that I am not aware that the ***original*** 1,166,667 Oxford Warrant issued to Highgate House was ever assigned or canceled.

49.    One final note. While discovery has shown that there were numerous emails and other communications relating to the *Oxford* Warrants, there were ***no emails or communications at all*** between Plaintiffs and Defendants about any allocation or assignment of the ***Charys*** Warrants. This further illustrates that that the Oxford arrangement was a special deal that was openly discussed; while there was no discussion or agreement with respect to the assignment of the Charys Warrants.

50.    Cenuco and FirstLook. Warrants were issued to Highgate House on account of its investments in each of Cenuco and FirstLook. No part of the warrants issued to Highgate House was ever given to any of the Defendants. After the warrants were issued to Highgate House, Prentice purchased Highgate House's positions, including the warrants. If Mr. Gottbetter received warrants on account of either the Cenuco or FirstLook transactions, they were issued to him by Prentice after it purchased Highgate House's positions.

51.    In sum, the Oxford/Uluru, Cenuco and FirstLook transactions are completely irrelevant to the Charys Warrants which the Defendants converted.

## Irreparable Harm

52.     If we are denied the return of the Charys Warrants stolen from us, we will suffer injury not truly compensable in damages. There are no Charys warrants readily available on the open market. Thus, our Charys Warrants are unique and irreplaceable because we cannot purchase additional warrants on the open market to replace the nearly 500,000 Warrants stolen from us.

53.     Moreover, our investors will be deprived of the benefit of our experience and acumen in making investment decisions as to the right time to sell the warrant stock. Instead, *Defendants* will decide when to sell the 500,000 shares of stock whenever *they* see fit, and we will only be able to seek the proceeds of that sale as damages. These damages would be inadequate because Highgate House will have been deprived of the chance to hold onto the stock longer than Defendants did.

## Conclusion

54.     In summary, Defendants misappropriated the Charys Warrants, which were registered in Highgate House's name. Mr. Gottbetter did so by secretly executing Assignments after he resigned from Highgate House. Mr. Gottbetter had no authority to execute any such Assignments when he was employed, and certainly did not have any authority afterward.

55.     Defendants then secretly effectuated the reissuance of the Warrants on June 14, 2006 by misrepresenting to Charys that the G&P law firm was holding the original Charys Warrants in escrow, with the authority to have them reissued. G&P did not hold those Warrants as escrow agent as Defendants now admit. Moreover, Defendants failed to notify plaintiffs of their execution of Assignments and of their June 14, 2006 email to Charys, and certainly never had any permission from plaintiffs to have the Charys Warrants reissued to them. Highgate House is therefore immediately entitled to have its property returned.

MARK ANGELO

Sworn to and subscribed before me
this 8th day of January, 2007

NOTARY PUBLIC

**ARLENE M. KILANOWSKI**
A Notary Public of New Jersey
My Commission Expires 9/19/2011

17

# EXHIBIT A

<u>**INVESTOR REGISTRATION RIGHTS AGREEMENT**</u>

THIS REGISTRATION RIGHTS AGREEMENT (this "<u>Agreement</u>"), dated as of November *16*, 2005, by and among **CHARYS HOLDING COMPANY INC.**, a Delaware corporation (the "<u>Company</u>"), and **HIGHGATE HOUSE FUNDS, LTD.**, a Cayman Islands company (the "<u>Investor</u>").

**WHEREAS:**

A.    Company and Investor have entered into a Securities Purchase Agreement (the "<u>Securities Purchase Agreement</u>"), pursuant to which the Company proposes to sell a $3,000,000 secured convertible debenture (the "<u>First Convertible Debenture</u>") which shall be convertible into the Company's Common Stock, par value $0.001 per share (the "<u>Common Stock</u>") and in connection therewith the Company has agreed to issue certain of its warrants (the "<u>First Warrants</u>");

B.    The Company shall also have the option (the "<u>First Option</u>") to issue and sell to the Investor a second $1,000,000 secured convertible debenture (the "<u>Second Convertible Debenture</u>"), which shall be convertible into Common Stock and in connection therewith the Company has agreed to issue additional certain of its warrants (the "<u>Second Warrants</u>");

C.    To induce the Investor to execute and deliver the Securities Purchase Agreement, the Company has agreed to provide certain registration rights under the Securities Act of 1933, as amended, and the rules and regulations there under, or any similar successor statute (collectively, the "<u>Securities Act</u>"), and applicable state securities laws; and

D.    Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Securities Purchase Agreement.

**NOW, THEREFORE,** in consideration of the premises and the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Investor hereby agrees as follows:

1.        <u>DEFINITIONS</u>.

As used in this Agreement, the following terms shall have the following meanings:

(a)        "<u>Person</u>" means a corporation, a limited liability company, an association, a partnership, an organization, a business, an individual, a governmental or political subdivision thereof or a governmental agency.

(b)        "<u>Register</u>," "<u>registered</u>," and "<u>registration</u>" refer to a registration effected by preparing and filing one or more Registration Statements (as defined below) in compliance with the Securities Act and pursuant to Rule 415 under the Securities Act or any successor rule providing for offering securities on a continuous or delayed basis ("<u>Rule 415</u>"),

and the declaration or ordering of effectiveness of such Registration Statement(s) by the United States Securities and Exchange Commission (the "SEC").

(c)        "Registrable Securities" means (i) the Escrow Shares issued or issuable as "security stock" for conversion of the First Convertible Debenture and Second Convertible Debenture, as the case may be and (ii) the First Warrant Shares and Second Warrant Shares, as the case may be; *provided, however*, that if the Company has redeemed in full all amounts owing under the First Convertible Debenture and Second Convertible Debenture on or before the Exclusive Redemption Date, Registrable Securities shall mean only the First Warrant Shares and the Second Warrant Shares; *and provided further* that Registrable Securities shall not include any shares of Common Stock convertible from interest accrued under the First Convertible Debenture or Second Convertible Debenture subsequent to the date of the filing of the Initial Registration Statement (as defined below).

(d)        "Registration Statement" means a registration statement under the Securities Act which covers the Registrable Securities.

2.        REGISTRATION.

(a)        Subject to the terms and conditions of this Agreement, the Company shall prepare and file, no later than ninety (90) days from the date hereof (the "Scheduled Filing Deadline"), with the SEC a registration statement on Form SB-2 (or similar form) under the Securities Act (the "Initial Registration Statement") for the resale by the Investor of all Registrable Securities. The Company shall keep the Registration Statement "Evergreen" for the life of the Convertible Debentures or until Rule 144(k) of the Securities Act of 1933, as amended, is available to the Investor with respect to all of the Conversion Shares and Warrant Shares whichever is later.  The Company shall retain, and pay at its sole expense, a law firm to file the Registration Statement subject to the reasonable approval of the Investor.  Prior to the filing of the Registration Statement with the SEC, the Company shall furnish a copy of the Initial Registration Statement to the Investor for its review and comment.  The Investor shall furnish comments on the Initial Registration Statement to the Company within twenty-four (24) hours of the receipt thereof from the Company.

(b)        Effectiveness of the Initial Registration Statement.  The Company shall use its commercially reasonable best efforts (i) to have the Initial Registration Statement declared effective by the SEC no later than ninety (90) days after the date filed, provided that if the First Convertible Debenture is redeemed before the Exclusive Redemption Date, no later than one hundred twenty (120) days after the date filed (the "Scheduled Effective Deadline") and (ii) to insure that the Initial Registration Statement and any subsequent Registration Statement remains in effect until all of the Registrable Securities have been sold, subject to the terms and conditions of this Agreement.  It shall be an event of default hereunder if the Initial Registration Statement is not declared effective by the SEC within one hundred and twenty (120) days after filing thereof.

(c)        Failure to File or Obtain Effectiveness of the Registration Statement. In the event the Registration Statement is not filed by the Scheduled Filing Deadline or is not declared effective by the SEC on or before the Scheduled Effective Deadline, or if after the

Registration Statement has been declared effective by the SEC, sales cannot be made pursuant to the Registration Statement (whether because of a failure to keep the Registration Statement effective, failure to disclose such information as is necessary for sales to be made pursuant to the Registration Statement, failure to register sufficient shares of Common Stock or otherwise then as partial relief for the damages to any holder of Registrable Securities by reason of any such delay in or reduction of its ability to sell the underlying shares of Common Stock (which remedy shall not be exclusive of any other remedies at law or in equity), the Company will pay as liquidated damages (the "Liquidated Damages") and not as a penalty, to the holder, a cash amount equal to two percent (2%) per month of the outstanding principal amount of the Convertible Debenture outstanding. The initial payment of Liquidated Damages shall be made within three (3) business days from the end of the month in which the Scheduled Filing Deadline or Scheduled Effective Deadline occurred, as the case may be, and shall continue thereafter until the Registration Statement is filed or declared effective, as the case may be.

(d)     Liquidated Damages.     The Company and the Investor hereto acknowledge and agree that the sums payable under subsection 2(c) above shall constitute liquidated damages and not penalties and are in addition to all other rights of the Investor, including the right to call a default. The parties further acknowledge that (i) the amount of loss or damages likely to be incurred is incapable or is difficult to precisely estimate, (ii) the amounts specified in such subsection bear a reasonable relationship to, and are not plainly or grossly disproportionate to, the probable loss likely to be incurred in connection with any failure by the Company to file a Registration Statement or to obtain or maintain the effectiveness of a Registration Statement, (iii) one of the reasons for the Company and the Investor reaching an agreement as to such amounts was the uncertainty and cost of litigation regarding the question of actual damages, and (iv) the Company and the Investor are sophisticated business parties and have been represented by sophisticated and able legal counsel and negotiated this Agreement at arm's length.

3.     RELATED OBLIGATIONS.

(a)     The Company shall keep the Registration Statement effective pursuant to Rule 415 at all times until the date on which the Investor shall have sold all the Registrable Securities covered by such Registration Statement (the "Registration Period"), which Registration Statement (including any amendments or supplements thereto and prospectuses contained therein) shall not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein, or necessary to make the statements therein, in light of the circumstances in which they were made, not misleading.

(b)     The Company shall prepare and file with the SEC such amendments (including post-effective amendments) and supplements to a Registration Statement and the prospectus used in connection with such Registration Statement, which prospectus is to be filed pursuant to Rule 424 promulgated under the Securities Act, as may be necessary to keep such Registration Statement effective at all times during the Registration Period, and, during such period, comply with the provisions of the Securities Act with respect to the disposition of all Registrable Securities of the Company covered by such Registration Statement until such time as all of such Registrable Securities shall have been disposed of in accordance with the intended methods of disposition by the seller or sellers thereof as set forth in such Registration Statement.

In the case of amendments and supplements to a Registration Statement which are required to be filed pursuant to this Agreement (including pursuant to this Section 3(b)) by reason of the Company's filing a report on Form 10-KSB, Form 10-QSB or Form 8-K or any analogous report under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), the Company shall incorporate such report by reference into the Registration Statement, if applicable, or shall file such amendments or supplements with the SEC on the same day on which the Exchange Act report is filed which created the requirement for the Company to amend or supplement the Registration Statement.

(c)        The Company shall furnish to the Investor whose Registrable Securities are included in any Registration Statement, without charge, (i) at least one (1) copy of such Registration Statement as declared effective by the SEC and any amendment(s) thereto, including financial statements and schedules, all documents incorporated therein by reference, all exhibits and each preliminary prospectus, (ii) ten (10) copies of the final prospectus included in such Registration Statement and all amendments and supplements thereto (or such other number of copies as such Investor may reasonably request) and (iii) such other documents as such Investor may reasonably request from time to time in order to facilitate the disposition of the Registrable Securities owned by such Investor.

(d)        The Company shall use its commercially reasonable best efforts to (i) register and qualify the Registrable Securities covered by a Registration Statement under such other securities or "blue sky" laws of such jurisdictions in the United States as the Investor reasonably requests, (ii) prepare and file in those jurisdictions, such amendments (including post-effective amendments) and supplements to such registrations and qualifications as may be necessary to maintain the effectiveness thereof during the Registration Period, (iii) take such other actions as may be necessary to maintain such registrations and qualifications in effect at all times during the Registration Period, and (iv) take all other actions reasonably necessary or advisable to qualify the Registrable Securities for sale in such jurisdictions; provided, however, that the Company shall not be required in connection therewith or as a condition thereto to (w) make any change to its articles of incorporation or by-laws, (x) qualify to do business in any jurisdiction where it would not otherwise be required to qualify but for this Section 3(d), (y) subject itself to general taxation in any such jurisdiction, or (z) file a general consent to service of process in any such jurisdiction. The Company shall promptly notify the Investor who holds Registrable Securities of the receipt by the Company of any notification with respect to the suspension of the registration or qualification of any of the Registrable Securities for sale under the securities or "blue sky" laws of any jurisdiction in the United States or its receipt of actual notice of the initiation or threat of any proceeding for such purpose.

(e)        As promptly as practicable after becoming aware of such event or development, the Company shall notify the Investor in writing of the happening of any event as a result of which the prospectus included in a Registration Statement, as then in effect, includes an untrue statement of a material fact or omission to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading (provided that in no event shall such notice contain any material, nonpublic information), and promptly prepare a supplement or amendment to such Registration Statement to correct such untrue statement or omission, and deliver ten (10) copies of such supplement or amendment to the Investor. Notwithstanding any provision of this Agreement to

the contrary, if the Company makes such a notification, the Company may suspend the use of any prospectus contained in any Registration Statement for periods not to exceed forty five (45) business days in any three month period or two periods not to exceed an aggregate of ninety (90) business days in any 12 month period in the event that the Company determines, in the exercise of its reasonable discretion, confirmed by a legal opinion from outside counsel, that sales of Registrable Securities thereunder could constitute violations of the Securities Act due to the Registration Statement containing an untrue statement of a material fact or omission to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. In each case the Company shall use commercially reasonable best efforts to remedy the deficiency in the Registration Statement within thirty (30) business days. The Company shall also promptly notify the Investor in writing (i) when a prospectus or any prospectus supplement or post-effective amendment has been filed, and when a Registration Statement or any post-effective amendment has become effective (notification of such effectiveness shall be delivered to each Investor by facsimile on the same day of such effectiveness), (ii) of any request by the SEC for amendments or supplements to a Registration Statement or related prospectus or related information, and (iii) of the Company's reasonable determination that a post-effective amendment to a Registration Statement would be appropriate.

(f)     The Company shall use its commercially reasonable best efforts to prevent the issuance of any stop order or other suspension of effectiveness of a Registration Statement, or the suspension of the qualification of any of the Registrable Securities for sale in any jurisdiction within the United States of America and, if such an order or suspension is issued, to obtain the withdrawal of such order or suspension at the earliest possible moment and to notify the Investor who holds Registrable Securities being sold of the issuance of such order and the resolution thereof or its receipt of actual notice of the initiation or threat of any proceeding for such purpose.

(g)     At the reasonable request of the Investor, the Company shall furnish to such Investor, on the date of the effectiveness of the Registration Statement and thereafter from time to time on such dates as an Investor may reasonably request (i) a letter, dated such date, from the Company's independent certified public accountants in form and substance as is customarily given by independent certified public accountants to underwriters in an underwritten public offering, and (ii) an opinion, dated as of such date, of counsel representing the Company for purposes of such Registration Statement, in form, scope and substance as is customarily given in an underwritten public offering, addressed to the Investor.

(h)     The Company shall make available for inspection by (i) the Investor and (ii) one (1) firm of accountants or other agents retained by the Investor (collectively, the "Inspectors") all pertinent financial and other records, and pertinent corporate documents and properties of the Company (collectively, the "Records"), as shall be reasonably deemed necessary by each Inspector, and cause the Company's officers, directors and employees to supply all information which the Inspector may reasonably request; provided, however, that each Inspector shall agree, and the Investor hereby agrees, to hold in strict confidence and shall not make any disclosure (except to an Investor) or use any Record or other information which the Company determines in good faith to be confidential, and of which determination the Inspectors are so notified, unless (a) the disclosure of such Records is necessary to avoid or correct a

misstatement or omission in any Registration Statement or is otherwise required under the Securities Act, (b) the release of such Records is ordered pursuant to a final, non-appealable subpoena or order from a court or government body of competent jurisdiction, or (c) the information in such Records has been made generally available to the public other than by disclosure in violation of this or any other agreement of which the Inspector and the Investor has knowledge. The Investor agrees that it shall, upon learning that disclosure of such Records is sought in or by a court or governmental body of competent jurisdiction or through other means, give prompt notice to the Company and allow the Company, at its expense, to undertake appropriate action to prevent disclosure of, or to obtain a protective order for, the Records deemed confidential.

(i)    The Company shall hold in confidence and not make any disclosure of information concerning the Investor provided to the Company unless (i) disclosure of such information is necessary to comply with federal or state securities laws, (ii) the disclosure of such information is necessary to avoid or correct a misstatement or omission in any Registration Statement, (iii) the release of such information is ordered pursuant to a subpoena or other final, non-appealable order from a court or governmental body of competent jurisdiction, or (iv) such information has been made generally available to the public other than by disclosure in violation of this Agreement or any other agreement. The Company agrees that it shall, upon learning that disclosure of such information concerning the Investor is sought in or by a court or governmental body of competent jurisdiction or through other means, give prompt written notice to such Investor and allow the Investor, at the Investor's expense, to undertake appropriate action to prevent disclosure of, or to obtain a protective order for, such information.

(j)    The Company shall use its commercially reasonable best efforts either to cause all the Registrable Securities covered by a Registration Statement (i) to be listed on each securities exchange on which securities of the same class or series issued by the Company are then listed, if any, if the listing of such Registrable Securities is then permitted under the rules of such exchange or (ii) the inclusion for quotation on the National Association of Securities Dealers, Inc. OTC Bulletin Board for such Registrable Securities. The Company shall pay all fees and expenses in connection with satisfying its obligation under this Section 3(j).

(k)    The Company shall cooperate with the Investor who hold Registrable Securities being offered and, to the extent applicable, to facilitate the timely preparation and delivery of certificates to a transferee of the Investor (not bearing any restrictive legend) representing the Registrable Securities to be offered pursuant to a Registration Statement and enable such certificates to be in such denominations or amounts, as the case may be, as the Investor may reasonably request and registered in such names as the Investor may request.

(l)    The Company shall use its commercially reasonable best efforts to cause the Registrable Securities covered by the applicable Registration Statement to be registered with or approved by such other governmental agencies or authorities as may be necessary to consummate the disposition of such Registrable Securities.

(m)    The Company shall make generally available to its security holders as soon as practical, but not later than ninety (90) days after the close of the period covered thereby, an earnings statement (in form complying with the provisions of Rule 158 under the Securities

Act) covering a twelve (12) month period beginning not later than the first day of the Company's fiscal quarter next following the effective date of the Registration Statement.

(n)    The Company shall otherwise use its commercially reasonable best efforts to comply with all applicable rules and regulations of the SEC in connection with any registration hereunder.

(o)    Within two (2) business days after a Registration Statement which covers Registrable Securities is declared effective by the SEC, the Company shall deliver, and shall cause legal counsel for the Company to deliver, to the transfer agent for such Registrable Securities (with copies to the Investor whose Registrable Securities are included in such Registration Statement) confirmation that such Registration Statement has been declared effective by the SEC in the form attached hereto as Exhibit A.

(p)    The Company shall take all other reasonable actions necessary to expedite and facilitate disposition by the Investor of Registrable Securities pursuant to a Registration Statement.

4.    OBLIGATIONS OF THE INVESTOR.

The Investor agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in Section 3(f) or the first sentence of Section 3(e), such Investor will immediately discontinue disposition of Registrable Securities pursuant to any Registration Statement(s) covering such Registrable Securities until such Investor's receipt of the copies of the supplemented or amended prospectus contemplated by Section 3(e) or receipt of notice from the Company that no supplement or amendment is required. Notwithstanding anything to the contrary, the Company shall cause its transfer agent to deliver unlegended certificates for shares of Common Stock to a transferee of an Investor in accordance with the terms of the Securities Purchase Agreement in connection with any sale of Registrable Securities with respect to which an Investor has entered into a contract for sale prior to the Investor's receipt of a notice from the Company of the happening of any event of the kind described in Section 3(f) or the first sentence of 3(e) and for which the Investor has not yet settled.

5.    EXPENSES OF REGISTRATION.

All expenses incurred in connection with registrations, filings or qualifications pursuant to the Agreement including, without limitation, all registration, listing and qualifications fees, printers, legal and accounting fees shall be paid by the Company.

6.    INDEMNIFICATION.

With respect to Registrable Securities which are included in a Registration Statement under this Agreement:

(a)    To the fullest extent permitted by law, the Company will, and hereby does, indemnify, hold harmless and defend the Investor, the directors, officers, partners, employees, agents, representatives of, and each Person, if any, who controls the Investor within the meaning of the Securities Act or the Exchange Act (each, an "Indemnified Person"), against

any losses, claims, damages, liabilities, judgments, fines, penalties, charges, costs, reasonable attorneys' fees, amounts paid in settlement or expenses, joint or several (collectively, "Claims") incurred in investigating, preparing or defending any action, claim, suit, inquiry, proceeding, investigation or appeal taken from the foregoing by or before any court or governmental, administrative or other regulatory agency, body or the SEC, whether pending or threatened, whether or not an indemnified party is or may be a party thereto ("Indemnified Damages"), to which any of them may become subject insofar as such Claims (or actions or proceedings, whether commenced or threatened, in respect thereof) arise out of or are based upon: (i) any untrue statement or alleged untrue statement of a material fact in a Registration Statement or any post-effective amendment thereto or in any filing made in connection with the qualification of the offering under the securities or other "blue sky" laws of any jurisdiction in which Registrable Securities are offered ("Blue Sky Filing"), or the omission or alleged omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading; (ii) any untrue statement or alleged untrue statement of a material fact contained in any final prospectus (as amended or supplemented, if the Company files any amendment thereof or supplement thereto with the SEC) or the omission or alleged omission to state therein any material fact necessary to make the statements made therein, in light of the circumstances under which the statements therein were made, not misleading; or (iii) any violation or alleged violation by the Company of the Securities Act, the Exchange Act, any other law, including, without limitation, any state securities law, or any rule or regulation there under relating to the offer or sale of the Registrable Securities pursuant to a Registration Statement (the matters in the foregoing clauses (i) through (iii) being, collectively, "Violations").   The Company shall reimburse the Investor and each such controlling person promptly as such expenses are incurred and are due and payable, for any legal fees or disbursements or other reasonable expenses incurred by them in connection with investigating or defending any such Claim. Notwithstanding anything to the contrary contained herein, the indemnification agreement contained in this Section 6(a): (x) shall not apply to a Claim by an Indemnified Person arising out of or based upon a Violation which occurs in reliance upon and in conformity with information furnished in writing to the Company by such Indemnified Person expressly for use in connection with the preparation of the Registration Statement or any such amendment thereof or supplement thereto; (y) shall not be available to the extent such Claim is based on a failure of the Investor to deliver or to cause to be delivered the prospectus made available by the Company, if such prospectus was timely made available by the Company pursuant to Section 3(c); and (z) shall not apply to amounts paid in settlement of any Claim if such settlement is effected without the prior written consent of the Company, which consent shall not be unreasonably withheld. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of the Indemnified Person and shall survive the transfer of the Registrable Securities by the Investor pursuant to Section 9 hereof.

(b)        In connection with a Registration Statement, the Investor agrees to indemnify, hold harmless and defend, to the same extent and in the same manner as is set forth in Section 6(a), the Company, each of its directors, each of its officers, employees, representatives, or agents and each Person, if any, who controls the Company within the meaning of the Securities Act or the Exchange Act (each an "Indemnified Party"), against any Claim or Indemnified Damages to which any of them may become subject, under the Securities Act, the Exchange Act or otherwise, insofar as such Claim or Indemnified Damages arise out of or is based upon any Violation, in each case to the extent, and only to the extent, that such Violation

occurs in reliance upon and in conformity with written information furnished to the Company by such Investor expressly for use in connection with such Registration Statement; and, subject to Section 6(d), such Investor will reimburse any legal or other expenses reasonably incurred by them in connection with investigating or defending any such Claim; provided, however, that the indemnity agreement contained in this Section 6(b) and the agreement with respect to contribution contained in Section 7 shall not apply to amounts paid in settlement of any Claim if such settlement is effected without the prior written consent of such Investor, which consent shall not be unreasonably withheld; provided, further, however, that the Investor shall be liable under this Section 6(b) for only that amount of a Claim or Indemnified Damages as does not exceed the net proceeds to such Investor as a result of the sale of Registrable Securities pursuant to such Registration Statement. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of such Indemnified Party and shall survive the transfer of the Registrable Securities by the Investor pursuant to Section 9. Notwithstanding anything to the contrary contained herein, the indemnification agreement contained in this Section 6(b) with respect to any prospectus shall not inure to the benefit of any Indemnified Party if the untrue statement or omission of material fact contained in the prospectus was corrected and such new prospectus was delivered to each Investor prior to such Investor's use of the prospectus to which the Claim relates.

(c). Promptly after receipt by an Indemnified Person or Indemnified Party under this Section 6 of notice of the commencement of any action or proceeding (including any governmental action or proceeding) involving a Claim, such Indemnified Person or Indemnified Party shall, if a Claim in respect thereof is to be made against any indemnifying party under this Section 6, deliver to the indemnifying party a written notice of the commencement thereof, and the indemnifying party shall have the right to participate in, and, to the extent the indemnifying party so desires, jointly with any other indemnifying party similarly noticed, to assume control of the defense thereof with counsel mutually satisfactory to the indemnifying party and the Indemnified Person or the Indemnified Party, as the case may be; provided, however, that an Indemnified Person or Indemnified Party shall have the right to retain its own counsel with the fees and expenses of not more than one (1) counsel for such Indemnified Person or Indemnified Party to be paid by the indemnifying party, if, in the reasonable opinion of counsel retained by the indemnifying party, the representation by such counsel of the Indemnified Person or Indemnified Party and the indemnifying party would be inappropriate due to actual or potential differing interests between such Indemnified Person or Indemnified Party and any other party represented by such counsel in such proceeding. The Indemnified Party or Indemnified Person shall cooperate fully with the indemnifying party in connection with any negotiation or defense of any such action or claim by the indemnifying party and shall furnish to the indemnifying party all information reasonably available to the Indemnified Party or Indemnified Person which relates to such action or claim. The indemnifying party shall keep the Indemnified Party or Indemnified Person fully apprised at all times as to the status of the defense or any settlement negotiations with respect thereto. No indemnifying party shall be liable for any settlement of any action, claim or proceeding effected without its prior written consent; provided, however, that the indemnifying party shall not unreasonably withhold, delay or condition its consent. No indemnifying party shall, without the prior written consent of the Indemnified Party or Indemnified Person, consent to entry of any judgment or enter into any settlement or other compromise which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Party or Indemnified Person of a release from all liability in

respect to such claim or litigation. Following indemnification as provided for hereunder, the indemnifying party shall be subrogated to all rights of the Indemnified Party or Indemnified Person with respect to all third parties, firms or corporations relating to the matter for which indemnification has been made. The failure to deliver written notice to the indemnifying party within a reasonable time of the commencement of any such action shall not relieve such indemnifying party of any liability to the Indemnified Person or Indemnified Party under this Section 6, except to the extent that the indemnifying party is prejudiced in its ability to defend such action.

(d)    The indemnification required by this Section 6 shall be made by periodic payments of the amount thereof during the course of the investigation or defense, as and when bills are received or Indemnified Damages are incurred.

(e)    The indemnity agreements contained herein shall be in addition to (i) any cause of action or similar right of the Indemnified Party or Indemnified Person against the indemnifying party or others, and (ii) any liabilities the indemnifying party may be subject to pursuant to the law.

7.    CONTRIBUTION.

To the extent any indemnification by an indemnifying party is prohibited or limited by law, the indemnifying party agrees to make the maximum contribution with respect to any amounts for which it would otherwise be liable under Section 6 to the fullest extent permitted by law; provided, however, that: (i) no seller of Registrable Securities guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any seller of Registrable Securities who was not guilty of fraudulent misrepresentation; and (ii) contribution by any seller of Registrable Securities shall be limited in amount to the net amount of proceeds received by such seller from the sale of such Registrable Securities.

8.    REPORTS UNDER THE EXHANGE ACT.

With a view to making available to the Investor the benefits of Rule 144 promulgated under the Securities Act or any similar rule or regulation of the SEC that may at any time permit the Investor to sell securities of the Company to the public without registration ("Rule 144") the Company agrees to:

(a)    make and keep public information available, as those terms are understood and defined in Rule 144;

(b)    file with the SEC in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act so long as the Company remains subject to such requirements (it being understood that nothing herein shall limit the Company's obligations under Section 4(c) of the Securities Purchase Agreement) and the filing of such reports and other documents as are required by the applicable provisions of Rule 144; and

(c)        furnish to each Investor so long as such Investor owns Registrable Securities, promptly upon request, (i) a written statement by the Company that it has complied with the reporting requirements of Rule 144, the Securities Act and the Exchange Act, (ii) a copy of the most recent annual or quarterly report of the Company and such other reports and documents so filed by the Company, and (iii) such other information as may be reasonably requested to permit the Investor to sell such securities pursuant to Rule 144 without registration.

9.        AMENDMENT OF REGISTRATION RIGHTS.

Provisions of this Agreement may be amended and the observance thereof may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of the Company and Investor. Any amendment or waiver effected in accordance with this Section 9 shall be binding upon each Investor and the Company. No such amendment shall be effective to the extent that it applies to fewer than all of the holders of the Registrable Securities. No consideration shall be offered or paid to any Person to amend or consent to a waiver or modification of any provision of any of this Agreement unless the same consideration also is offered to all of the parties to this Agreement.

10.        MISCELLANEOUS.

(a)        A Person is deemed to be a holder of Registrable Securities whenever such Person owns or is deemed to own of record such Registrable Securities. If the Company receives conflicting instructions, notices or elections from two (2) or more Persons with respect to the same Registrable Securities, the Company shall act upon the basis of instructions, notice or election received from the registered owner of such Registrable Securities.

(b)        Any notices, consents, waivers or other communications required or permitted to be given under the terms of this Agreement must be in writing and will be deemed to have been delivered: (i) upon receipt, when delivered personally; (ii) upon receipt, when sent by facsimile (provided confirmation of transmission is mechanically or electronically generated and kept on file by the sending party); or (iii) one (1) business day after deposit with a nationally recognized overnight delivery service, in each case properly addressed to the party to receive the same. The addresses and facsimile numbers for such communications shall be:

If to the Company, to:

Charys Holding Company Inc.
1117 Perimeter Center West, Suite N415
Atlanta, GA 30338
Attention:      Billy Ray, Jr.
Telephone:     (678) 443-2300
Facsimile:     (678) 443-2320

With a copy to:

Paul, Hastings, Janofsky & Walker LLP
600 Peachtree Street, N.E., Suite 2400
Atlanta, GA  30308
Attention:      Karen K. Leach
Telephone:     (404) 815-2528
Facsimile:     (404) 685-5028

If to an Investor, to its address and facsimile number on the Schedule of Investor attached hereto, with copies to the Investor's representatives as set forth on the Schedule of Investors or to such other address and/or facsimile number and/or to the attention of such other person as the recipient party has specified by written notice given to each other party five (5) days prior to the effectiveness of such change.  Written confirmation of receipt (A) given by the recipient of such notice, consent, waiver or other communication, (B) mechanically or electronically generated by the sender's facsimile machine containing the time, date, recipient facsimile number and an image of the first page of such transmission or (C) provided by a courier or overnight courier service shall be rebuttable evidence of personal service, receipt by facsimile or receipt from a nationally recognized overnight delivery service in accordance with clause (i), (ii) or (iii) above, respectively.

(c)      Failure of any party to exercise any right or remedy under this Agreement or otherwise, or delay by a party in exercising such right or remedy, shall not operate as a waiver thereof.

(d)      The parties hereto acknowledge that the transactions contemplated by this Agreement and the exhibits hereto bear a reasonable relation to the State of New York.  The parties hereto agree that the internal laws of the State of New York shall govern this Agreement and the exhibits hereto, including, but not limited to, all issues related to usury.  Any action to enforce the terms of this Agreement or any of its exhibits shall be brought exclusively in the state and/or federal courts situated in the County and State of New York.  Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address for such notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof.  Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law.  If any provision of this Agreement shall be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect the validity or enforceability of the remainder of this Agreement in that jurisdiction or the validity or enforceability of any provision of this Agreement in any other jurisdiction.  EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT

MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION HEREWITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.

(e)    This Agreement, the Irrevocable Transfer Agent Instructions, the Securities Purchase Agreement and related documents including the Convertible Debenture, the Warrants and the Escrow Agreement dated the date hereof by and among the Company, the Investor and Gottbetter & Partners, LLP. (the "Escrow Agreement"), the Escrow Shares Escrow Agreement, and the Security Agreement dated the date hereof (the "Security Agreement") constitute the entire agreement among the parties hereto with respect to the subject matter hereof and thereof. There are no restrictions, promises, warranties or undertakings, other than those set forth or referred to herein and therein. This Agreement, the Irrevocable Transfer Agent Instructions, the Securities Purchase Agreement and related documents including the Convertible Debenture, the Warrants, the Escrow Shares Escrow Agreement, the Escrow Agreement and the Security Agreement supersede all prior agreements and understandings among the parties hereto with respect to the subject matter hereof and thereof.

(f)    This Agreement shall inure to the benefit of and be binding upon the permitted successors and assigns of each of the parties hereto.

(g)    The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning hereof.

(h)    This Agreement may be executed in identical counterparts, each of which shall be deemed an original but all of which shall constitute one and the same agreement. This Agreement, once executed by a party, may be delivered to the other party hereto by facsimile transmission of a copy of this Agreement bearing the signature of the party so delivering this Agreement.

(i)    Each party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as the other party may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent and no rules of strict construction will be applied against any party.

(j)    This Agreement is intended for the benefit of the parties hereto and their respective permitted successors and assigns, and is not for the benefit of, nor may any provision hereof be enforced by, any other Person.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties have caused this Investor Registration Rights Agreement to be duly executed as of day and year first above written.

COMPANY:
Charys Holding Company Inc.

By:_____
Name: Billy Ray, Jr.
Title:   Chief Executive Officer


INVESTOR:
Highgate House Funds, Ltd.

By:_____
Name: Adam S. Gottbetter
Title:   Portfolio Manager

IN WITNESS WHEREOF, the parties have caused this Investor Registration Rights Agreement to be duly executed as of day and year first above written.

COMPANY:
**Charys Holding Company Inc.**

By:_____
Name: Billy Ray, Jr.
Title:   Chief Executive Officer


INVESTOR:
**Highgate House Funds, Ltd.**

By:_____
Name:  Adam S. Gottbetter
Title:   Portfolio Manager

## SCHEDULE I

## SCHEDULE OF INVESTORS



| Name | Address/Facsimile Number or it delivery |
|------|------------------------------------------|
| Highgate House Funds, Ltd. | 488 Madison Avenue<br>New York, NY 10022<br>Facsimile: (212) 400-6901 |
| With a copy to: | Jason M. Rimland, Esq.<br>Gottbetter & Partners, LLP<br>488 Madison Avenue<br>New York, NY 10022<br>Facsimile: (212) 400-6901 |

{00077238.7 / 0860-001}

LEGAL_US_E # ~~70173544.4~~70173544.6

## EXHIBIT A

## FORM OF NOTICE OF EFFECTIVENESS
## OF REGISTRATION STATEMENT

Attention:

Re:    **CHARYS HOLDING COMPANY INC.**

Ladies and Gentlemen:

We are counsel to Charys Holding Company Inc., a Delaware corporation (the "Company"), and have represented the Company in connection with that certain Securities Purchase Agreement (the "Securities Purchase Agreement") entered into by and among the Company and the investor named therein (collectively, the "Investor") pursuant to which the Company issued to the Investors shares of its Common Stock, par value $0.001 per share (the "Common Stock"). Pursuant to the Purchase Agreement, the Company also has entered into a Registration Rights Agreement with the Investor (the "Investor Registration Rights Agreement") pursuant to which the Company agreed, among other things, to register the Registrable Securities (as defined in the Registration Rights Agreement) under the Securities Act of 1933, as amended (the "Securities Act"). In connection with the Company's obligations under the Registration Rights Agreement, on _____ ____, the Company filed a Registration Statement on Form _____ (File No. 333-_____) (the "Registration Statement") with the Securities and Exchange SEC (the "SEC") relating to the Registrable Securities which names each of the Investor as a selling stockholder there under.

In connection with the foregoing, we advise you that a member of the SEC's staff has advised us by telephone that the SEC has entered an order declaring the Registration Statement effective under the Securities Act at **[ENTER TIME OF EFFECTIVENESS]** on **[ENTER DATE OF EFFECTIVENESS]** and we have no knowledge, after telephonic inquiry of a member of the SEC's staff, that any stop order suspending its effectiveness has been issued or that any proceedings for that purpose are pending before, or threatened by, the SEC and the Registrable Securities are available for resale under the Securities Act pursuant to the Registration Statement.

Very truly yours,

**[Law Firm]**

By:_____

cc:    **[LIST NAMES OF INVESTOR]**

# EXHIBIT B



# HIGHGATE HOUSE
### FUNDS, LTD.

<u>**VIA CERTIFIED MAIL R.R.R AND FACIMISLE 1.201.985.8266**</u>

January 9, 2006

Mr. Mark Angelo, President
Yorkville Advisors Management, LLC
101 Hudson St., Suite 3700
Jersey City, NJ 07302

RE:    Investment Management Letter Agreement dated November 1, 2004 (the "Letter Agreement")

Dear Mark:

We have decided to terminate the Letter Agreement effective as of January 9, 2006 (the "Effective Date"). All defined terms used, but not defined, in this letter have the meanings set forth in the Letter Agreement, and all section references are to the Letter Agreement. We wish to confirm that we are entitled to all compensation provided for under the Letter Agreement, including but not limited to (i) 44.4% of the 20% Incentive Fee earned by the Funds in the calendar year 2005 based on its profits of approximately $7,456,000, and (ii) 44.4% of the Tail Profits for a period of eighteen (18) months from and after the Effective Date.

We intend to resume the business of structured investments with companies using investment strategies substantially similar to those used for the Funds, which we may do in accordance with Section 5(a). We will require the use of all performance results relating to the time period that we served as Co-Manager. Although "Highgate House" is our trademark, we will grant you permission to continue to use it in connection with the Funds as long as necessary.

Kindly acknowledge your receipt of this letter and agreement with the foregoing by signing below and returning this letter to us by facsimile at 1.212.400.6901.

Best Regards,

Adam S. Gottbetter

Individually and as Managing Member of HH Advisors, LLC

EXHIBIT P-3
ALL-STATE LEGAL®

A CORNELL CAPITAL FUND
488 Madison Ave, 12th Fl., New York, NY 10022-5718
T 212.400.6990    F 212.400.6901
www.cornellcapital.com

84095021_2

01/10/2006 18:03 FAX  1212 400 6900        BOTTBETTER & PARTNER                    ☑003/003

ACCEPTED and AGREED to as of this ___ day of January, 2006:

YORKVILLE ADVISORS MANAGEMENT, LLC

_____

84096021_2

P005586

# EXHIBIT C

**Message Headers**

| | |
|---|---|
| From | Adam S. Gottbetter <ASG@gottbetter.com> |
| To | mangelo@cornellcapital.com <mangelo@cornellcapital.com> |
| Sent | Thursday, January 12, 2006 7:33:27 AM |
| Archived | Thursday, January 12, 2006 7:33:57 AM |
| Size | 7.18 KB |
| Subject | Re: Update |

I already replied yesterday in the affirmative.

-----Original Message-----
From: Mark Angelo
To: Adam S. Gottbetter
Sent: Thu Jan 12 06:57:11 2006
Subject: Re: Update

We need to do a call today at 12:30 with Lewis. Please advise if you can be on the call.
-----Original Message-----
From: "Adam S. Gottbetter" <ASG@gottbetter.com>
Date: Wed, 11 Jan 2006 22:00:55
To:<mangelo@cornellcapital.com>
Cc:"Troy Rillo" <trillo@cornellcapital.com>,    "Jason M. Rimland" <JMR@gottbetter.com>
Subject: Update

Mark,
After reviewing our agreement more carefully yesterday, I sent you a revised termination letter to reflect the terms of our agreement which requires that I give a 10 day notice of termination. We will need this time anyway in order for us to prepare and copy files, deal with transition issues, etc. Jason and I are working on the termination memo regarding those portfolio issues. Also, I will also prepare a more thorough summary of compensation issues as they relate to me as I had mentioned two items that I thought of in my termination letter. We will of course advise you in advance of any action we propose to take during this time period, if any. So as we continue to operate pursuant to the letter agreement, we will bill the fund for reimbursement of expenses through January 19 as well as a pro-rated portion of the management fee for the time period. FYI, Kathy Rush will become a G&P employee on January 23, 2006 when one of our legal secretaries leaves so the time perio!
 d dove tails nicely.
Tim and I had a good meeting with Prentice today about the hotel deal which I am sure he filled you in on tonight.
Let's talk tomorrow about how we will disseminate the termination to others.


Adam S. Gottbetter
Gottbetter & Partners, LLP
488 Madison Ave.
12th Fl.
New York, NY 10022
T-212.400.6900
F-212.400.6901
asg@gottbetter.com
www.gottbetter.com

Sent via BlackBerry - a service from AT&T Wireless.



EXHIBIT
P-4

D 01417

# EXHIBIT D



## HIGHGATE HOUSE
### FUNDS, LTD.



EXHIBIT

**P-5**

ALL-STATE LEGAL®

January 13, 2006

***VIA FACSIMILE & CERTIFIED MAIL – RETURN RECEIPT REQUESTED***
Mr. Mark Angelo, President
Yorkville Advisors Management, LLC
101 Hudson St., Suite 3700
Jersey City, NJ  07302

Dear Mark:

As a follow up to our letter dated as of January 9, 2006, we are writing to notify you of a number of noteworthy issues pertaining to Highgate House Funds, Ltd. ("Highgate") and its portfolio.  Some of these matters require your immediate attention and some are ongoing issues that we have previously discussed with you or others at Cornell Capital Partners, LP ("Cornell") or Yorkville Advisors, LLC ("YAM").

Gottbetter & Partners, LLP ("G&P") worked on several transactions that involve Highgate and Highgate House, LLC ("Highgate LLC").  Next week, we will send you a full set of originally executed documents for all of these transactions.   G&P will retain certain of the original documents on a deal-by-deal basis pursuant to its obligations under the escrow arrangements.

As stated in my email of January 10, 2006, Michael Chorske, Kathleen Rush and I will remain on the payroll of HH Advisors, LLC and YAM will continue to reimburse the expenses of Highgate and Highgate LLC pursuant to our letter agreement until January 19, 2006.

Without your written permission, we will not perform any material actions or omit to take any actions that would have a material effect on Highgate or Highgate LLC outside the normal course of business except as set forth in this letter.

### Highgate and Highgate LLC

The following issues pertain to global matters affecting Highgate and Highgate LLC:

1. <u>Follow on Fundings</u>.  There are two transactions that will require additional capital pursuant to agreements.  Highgate is obligated to fund Xinhua China, Ltd. ("XHUA") $2,000,000 upon filing of the registration statement and $750,000 upon its effectiveness.  XHUA expects to file the week of January 16, 2006.

A CORNELL CAPITAL FUND
488 Madison Ave, 12th Fl., New York, NY 10022-5718
{00081788.2 / 0860-001}       T  212.400.6990       F  212.400.6901
www.cornellcapital.com

P005590

Highgate is further obligated to fund Oxford Ventures, Inc. $500,000 upon effectiveness of its registration statement. We estimate that this should not occur until April 2006.

2. CallKey Group Limited. Please let us know by January 19, 2006 whether you want to fund this transaction. It is a reverse triangular merger into a Pinksheet shell company. The initial investment is $800,000 at closing upon merger with the shell and an additional $1,000,000 in June 2006.

3. Assignments to Montgomery. The assignments of Full Circle Image, Inc., Global IT Holdings, Inc., Global Marine, Ltd., Maisonette International Enterprises, Irwin Energy, Inc. and Surge Technologies, Inc. from Highgate to Montgomery Equity Partners, LP ("Montgomery") of the companies in the Highgate LLC portfolio that were originated by Montgomery should be completed including the payment to Highgate LLC of those positions at "par" by Montgomery.

4. Highgate LLC Audit. No audit firm has been retained for Highgate LLC. The options are to employ Goldstein Golub Kessler or some other auditor to conduct the audit or to render the Highgate LLC investment immaterial to Highgate thus requiring no audit. Also, Denise DePaola has offered to handle this matter.

5. Cenuco, Inc. Commitment Shares. Section 12.4(b)(ii) of the Standby Equity Distribution Agreement ("SEDA") between Cenuco, Inc. ("ICU") and Cornell states that the commitment shares are to be issued when the issuance is approved by the shareholders of ICU. Since the transaction was never approved by the shareholders, the shares are not due. This is consistent with our conversation with Troy Rillo, Jae Lee, Michael Zimmerman and Herb Henryson, ICU's attorney, that took place on or about November 15, 2005. On that conference call, Troy agreed with ICU's attorney that the shares would not have to be issued upon termination of the SEDA. We assume that Troy agreed because the SEDA documents already provided that shareholder approval is required in order to issue the commitment shares and it was consistent with Cornell's policy at the time to withdraw SEDAs from deals so as not to affect the registration process. Also, this was discussed with you and me and Prentice Capital Management, LP ("Prentice") to eliminate the SEDA and negotiate a floating convertible instead.

6. Requests for Consents. American Petroleum Group Inc., Charys Holding Company, Inc. and Donobi, Inc. have requested consents to certain transactions which are detailed below.

7. CEO America, Inc. This is the one transaction pending for Highgate LLC. The documents have been sent out, we were awaiting comments from the company and the diligence is progressing. It was originated by David Andresen and the funding obligation is for $465,000.

{00081788.2 / 0860-001}

P005591

8. <u>Escrow Agent</u>.    G&P is willing to either remain or relinquish its role as escrow agent for deals in which Highgate or Highgate LLC are the sole investors.

### Highgate and Highgate LLC Portfolio

A number of the portfolio companies are in default of their obligations under the relevant deal documents. Although we prepared default notices, none of them have been sent. Most of the defaults are due to lack of payments of principal and interest, the failure to file a registration statement and/or failure to have the registration statement declared effective. Upon the advice of you, Jerry Eicke and Troy, we did not send notices of default to these companies because of the issues with the Securities and Exchange Commission ("<u>SEC</u>") regarding the SEDA and the existing relationships between the portfolio companies and the principals and/or bankers of Cornell and YAM.

Below is a catalog of the portfolio companies that have special issues and circumstances of which you should be aware. Also included are any future actions that may be required and our assessment of our role going forward for these companies. Unless you notify us otherwise, we intend to follow through on these enumerated actions. Please note that many of the investments in the portfolio companies were not documented by G&P and/or HH Advisors was not consulted before the investment was made. As a result, we are not familiar with the terms and conditions concerning those deals and our ability to assess the transaction is limited.

1. <u>AeroTelesis Incorporated (AOTL.OB)</u>.    The company is in default of its obligation to file a registration statement by August 24, 2005. The Securities Purchase Agreement, Registration Rights Agreement, Irrevocable Instruction Letter were not signed by Highgate. The Irrevocable Instruction Letter and Pledge Agreement were not signed by David Gonzalez. The transaction was not handled by G&P or HH Advisors.

2. <u>American Petroleum Group, Inc. (AMPE.OB)</u>.    The company is in default of its obligation to pay principal and interest of $620,416.67 due October 4, 2005 and to file a registration statement by September 4, 2005. We have discussed consenting to a standstill agreement for six months coupled with an investment of new capital from another fund. These discussions ceased about two weeks ago with no final resolution. The original transaction was not handled by G&P.

3. <u>Blue Moon Group, Inc. (BMOO.OB)</u>.    There is an investigation by the SEC's Philadelphia office regarding the structure of this type of transaction and the character of the shares convertible from such a debenture. We advised the SEC that we would not sell any more shares until the investigation was concluded.

4. <u>Cenuco, Inc. (ICU.A)</u>.    Highgate co-invested with Prentice in an $80 million bridge loan. This bridge loan will convert to a convertible debenture after ICU's shareholder meeting scheduled for February 24, 2006. These documents have been negotiated with ICU's counsel and G&P will complete the transaction. As

escrow agent, we are receiving interest payments and distributing them to Highgate and Prentice accordingly.

5. Charys Holding Company, Inc. (CHYS.OB). The company is seeking to allow an investment without diminishing Highgate's security interest. We intend to continue to review the relevant documentation and consent to the new transaction as long as Highgate's security interest is not affected.

6. China World Trade Corporation (CWTD.OB). The assignment from Cornell to Highgate was not signed by the company. The transaction was not handled by G&P or HH Advisors.

7. CirTran Corp. (CIRT.OB). The company is in default of its obligation to file a registration statement by September 24, 2005. The transaction was not handled by G&P or HH Advisors.

8. City Networks, Inc. (CSN.A). The company is in default of its obligation to file a registration statement by September 14, 2005. The transaction was not handled by G&P or HH Advisors.

9. Directview, Inc. (DRVW.OB). The company is in default of its obligation to file a registration statement by August 29, 2005. The Company is seeking additional funding. The transaction was not handled by G&P.

10. Donobi, Inc. (DNOB.OB). There is an investigation by the SEC's Philadelphia office regarding the structure of this type of transaction and the character of the shares convertible from such a debenture. We advised the SEC that we would not sell any more shares until the investigation was concluded. Bill Wright, CEO of the company, has proposed several types of restructurings. We instructed him to continue his discussions with Troy and John Feniak.

11. EarthShell Corp. (ERTH.OB). The assignment from Cornell to Highgate was not executed by the company or Cornell. The transaction and assignment were not handled by G&P or HH Advisors.

12. Ei3 Corporation. We are in the process of collecting original signatures from the company's counsel for the just completed financing. The company is awaiting a decision on a binding arbitration against Siemens Corp. The company expects a favorable money damages decision on or about January 18, 2006. In the event the company actually receives money damages, then the company has agreed to negotiate a partial redemption of Highgate's investment.

13. Electronic Sensor Technology Inc. (ESNR.OB). The shares purchased by Highgate LLC were to be included in the registration statement recently filed by the company. The subscription agreement required written acceptance by Highgate to be included in the registration statement after written notice was

{00081788.2 / 0860-001}

P005593

delivered to Highgate by the company. The notice was sent to Walkers which then forwarded it to Cornell. The notice and questionnaire were not returned to the company. Despite Highgate's failure to request registration, we are in the process of requesting that Highgate's shares be included in the next amendment to the registration statement. A questionnaire has been filled out and sent to you for execution. Once completed and delivered to the company, we will work to get the shares included. We have spoken to company's counsel who appears to be amenable to the inclusion of the shares.

14. Enclaves Group, Inc. (ECGR.OB). The company is in default of its obligation to file a registration statement by July 25, 2005. The assignment from Montgomery to Highgate is not executed by Montgomery or the Company. The assignment may include an intra-fund transfer of interest. The transaction was not handled by G&P or HH Advisors.

15. Falcon Natural Gas Corp. (FNGC.OB). The company has not executed the October 17, 2005 promissory note. The transaction was not handled by G&P or HH Advisors.

16. FEC Resources* (FECOF.OB). There is an investigation by the SEC's Philadelphia office regarding the structure of this type of transaction and the character of the shares convertible from such a debenture. We advised the SEC that we would not sell any more shares until the investigation was concluded. Highgate LLC is selling its investment at "par" to D.R.R.R. Capital Corporation and Postcriptum Ventures Ltd. The transaction should be completed by January 20, 2006.

17. First Look Studios, Inc. (FRST.PK). We are collecting interest payments and distributing them to Highgate and Prentice accordingly.

18. Inseq Corporation (INSQ.OB). The company is in default of its obligation to file a registration statement by October 1, 2005. The company is also in default of its obligation to file a registration statement for the original Cornell transaction by February 6, 2004. The assignment from Cornell to Highgate is unclear as to what has been assigned, has the wrong company information and has not been signed by the company or Cornell. There is a possible intra-fund transfer of interest. Also, the Irrevocable Instruction Letter is not signed by David Gonzalez. The transactions were not handled by G&P or HH Advisors.

19. Kipling Holdings, Inc. Highgate invested $6,225,000 in December 2005 and Cornell was obligated to invest $5,000,000 on January 6, 2006. We negotiated a 60 day extension of that obligation. After our meeting with Tim Connolly and Prentice on January 11, 2006, Prentice has indicated that they are interested in replacing Cornell's obligation to fund, purchase Highgate's investment at "par" in exchange for the cancellation of your option on Kipling's shares. G&P will handle this transaction in consultation with you.

{00031788.2 / 0360-001}

P005594

20. KnockOut Holdings (KNOH.OB). The company is in default of its obligation to have its registration statement declared effective by September 8, 2005. The assignment from Cornell to Highgate was not signed by the company. The transaction was not handled by G&P or HH Advisors.

21. Magnetch Integrated Services. At the time of the company's offering, G&P was counsel to Strasbourger Pearson Tulcin Wolff Inc. ("Strasbourger"), the placement agent. Strasbourger has waived any penalties on behalf of the investors for the filing of the late registration statement which was done without our knowledge. Furthermore, Strasbourger consented to allow the company to incur senior debt in excess of the amounts allowed in the deal documents without our knowledge. The company has secured financing with Laurus Funds and is going public now. Highgate's investment is $500,000.

22. Maisonette International Enterprises (MAEN.PK). We are in the process of getting more escrow shares from the company.

23. Maximum Dynamics, Inc. The company is in default of its obligation to have its registration statement declared effective by September 1, 2005. The assignment from Cornell to Highgate was not signed by the company. There is a possible intra-fund transfer of interest. The transaction was not handled by G&P and HH Advisors.

24. MB Tech Inc. (MBTT.OB). There is an investigation by the SEC's Philadelphia office regarding the structure of this type of transaction and the character of the shares convertible from such a debenture. We advised the SEC that we would not sell any more shares until the investigation was concluded.

25. Michelex Corp. (MLXO.OB). There is an investigation by the SEC's Philadelphia office regarding the structure of this type of transaction and the character of the shares convertible from such a debenture. We advised the SEC that we would not sell any more shares until the investigation was concluded.

26. Nanoscience Technologies, Inc. (NANS.OB). The assignment from Cornell to Highgate was not signed by the company. After the recent financing, the registration statement that had been filed was withdrawn. G&P is drafting and filing the new registration statement. The audit will be completed in the next two to three weeks and then G&P will re-file the Form SB-2.

27. Oxford Ventures, Inc. (OXFV.OB). The information statement should be filed during the week of January 16, 2006 with the merger to close 45 days later. Highgate is obligated to fund an additional $500,000 upon effectiveness of the registration statement. The SEDA has not been terminated but the company and Prentice will want assurances from Cornell that the registration statement will not be blocked from going effective because of the inclusion of the shares underlying

{00081788.2 / 0860-001}

P005595

both the debenture and the SEDA. We are receiving interest payments and distributing to Highgate and Prentice accordingly. G&P is counsel to OXFV.

28. Power Technology (PWTC.OB). The assignment from Cornell to Highgate was not signed by the company. The transaction was not handled by G&P or HH Advisors.

29. Roanake Technology, Inc. (RNKE.OB). The company is in default of its obligation to have its registration statement declared effective by July 15, 2005. The assignment from Cornell to Highgate was not signed by the company. The transaction was not handled by G&P or HH Advisors.

30. SmarTire Systems, Inc. (SMTR.OB). The company is in default of its obligation to file a registration statement by October 24, 2005. The assignment from Cornell to Highgate was not signed by the company and has the wrong company identified. We do not have the signed documents from the January 3, 2006 transaction. The transaction was not handled by G&P or HH Advisors.

31. Xinhua China Ltd. (XHUA.OB). The second tranche of $2,000,000 is due upon filing of the registration statement and $750,000 is due upon its effectiveness.

## Conclusion

Although YAM originated, documented and controls many of the deals completed with the portfolio companies, we will answer any questions you may have on any subject described in this letter or that you deem relevant to Highgate and Highgate LLC. You already have most of the documents in your possession and the remainder will be sent to you. We will provide the necessary help and support to insure an orderly transition and exchange of documents and to maximize the profits of the portfolio.

Sincerely,

Adam S. Gottbetter

{00081788.2 / 0860-001}